# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

SHANNAN WHEELER,
A Texas resident; and
KELLY AND DAVID PHELPS,
Texas residents;
TROOPER COREY PRANTIL,
A Texas resident;
RONALD AND BETTY WHATLEY,
Texas residents;
KEITH LYONS,
A Texas resident;
BEVERLY AND ROLAND FLANNELS;
A Texas Resident;
EZEQUIEL VILLAREAL,
A Texas Resident;
BRET AND PHYLLIS SIMMONS,
Texas residents;
DEPUTY GREG NASON,
A Texas resident; and
LARRY AND TANYA ANDERSON,
Texas residents;
on behalf of themselves individually and
all others similarly situated,

        Plaintiffs,

        v.

ARKEMA FRANCE S.A.,
a French Société Anonyme corporation, and
ARKEMA INC.,
a Pennsylvania corporation;

        Defendants.

CIVIL ACTION

Case No.: 4:17-cv-2690

**CLASS ACTION COMPLAINT**

**Jury Demand**

## I.      INTRODUCTION

Plaintiffs, SHANNAN WHEELER, KELLY AND DAVID PHELPS, TROOPER COREY PRANTIL, RONALD AND BETTY WHATLEY, KEITH LYONS, BEVERLY AND ROLAND FLANNELS, EZEQUIEL VILLAREAL, BRET AND PHYLLIS SIMMONS, DEPUTY GREG NASON, and LARRY AND TANYA ANDERSON, on behalf of themselves individually and all others similarly situated, (collectively "Plaintiffs") through undersigned counsel, based on their personal knowledge, information and belief, as and for their Class Action Complaint for damages, equitable, statutory, and injunctive relief against ARKEMA, S.A., a French corporation; and ARKEMA INC., a Pennsylvania corporation, (collectively "Defendants") respectfully allege as follows:

## II.      NATURE OF THE ACTION

1.      As Hurricane Harvey swept up in from the Gulf, residents of Crosby, Texas were left unprotected from the toxic chemicals stored, used, processed and produced in Arkema's plant at the intersection of Eastgate Crosby Road and Highway 90.

2.      In the early morning hours of August 29, 2017, Arkema called Harris County Emergency Services requesting that Highway 90 be shut down because of a release into the flood waters that at that time were across the highway and being driven all around the area by the storm.

3.      By mid-day on August 29, 2017, National Guard troops were evacuating residents from a 1.5 mile exclusion zone around Arkema's facility warning them not of a chemical release into the surface waters but only of the risk of explosion.

2

4.      Between August 31, 2017 and September 3, 2017, a series of explosions occurred culminating with the allegedly controlled ignition of six refrigerated trucks reportedly containing plastic containers filled with organic peroxide. These explosions resulted in thick, rolling plumes of toxic smoke that mixed in the wind of the storm to rain ash, dust and particulate matter throughout the area.

5.      Scientific testing reveals the presence of four families of toxins, PAHs, SVOCs, Dioxins/Furans and heavy metals in ash, soil and dust samples taken from class members' property which correlates to toxins present in Arkema's Luperox product line manufactured at their Crosby facility or expected to be created as breakdown chemicals from the ignition of the product.

6.      Residents and First Responders breathed a toxic mixture of Arkema's chemicals released into the air, sustained additional exposure through dermal contact with contaminated flood waters and face a potential continuing risk of inhalation, dermal and ingestion exposure to particulate matter that deposited or precipitated in soil and or on exposed surfaces. Many exposed experienced negative health effects symptoms some of which have persisted long after exposure has ended. Residents depend on water wells that have been impacted by flood waters contaminated by Arkema's chemicals.

7.      Relying on Defendants' characterization of the toxic releases emanating from the Arkema site government officials established an exclusion zone of 1.5 miles from the Akrema plant. Given the toxicity of the substances released, the 1.5 mile perimeter was not far enough to adequately protect either First Responders or those living beyond the perimeter who were not evacuated. Residents living within the exclusion zone suffered enhanced damage to their

property because mold was allowed to grow unabated in their homes for eight days until the 1.5 mile exclusion zone order was lifted.

8.    Defendants could have prevented or avoided this accident with better precautionary measures, compliance with applicable regulations, and the use of reasonable care. The foreseeable risks of harm posed could have been reduced or avoided by reasonable instructions or warnings when it became clear that toxins had been released into the environment.  Those omissions render Arkema's products not reasonably safe.  Exposure to this toxic mixture in the environment through human pathways caused bodily injury and has created a need for a medical monitoring program to protect the public from risk.

9.     Certain other Plaintiffs and Class Members were exposed to the contaminated water and the polluted air and thus require medical monitoring.

10.    Plaintiffs and Class Members have incurred costs for displacement, travel, and other expenses directly related to the contamination of their water supply.

11.    In addition to damages, the Plaintiffs petition this Court for additional injunctive relief to protect Plaintiffs and Class Members from further danger.

### III.    PLAINTIFFS

12.    Plaintiffs and Class Members are individuals who have suffered economic losses, property losses, and non-economic losses or injuries as the result of Arkema's toxic release. Plaintiffs and Class Members have all suffered in common an array of damages from the spill, specifically and as explained in more detail herein, within five basic categories: Physical Personal Injury Tort Claims; Nonphysical Tort Claims; Property Related Claims; Financial Claims and Statutory Claims.

4

13.     Putative Class Representative and Plaintiff Shannan Wheeler is above the age of majority and lives on property he owns in Crosby, Texas within 3.1 miles of the Arkema Luperox(™) factory. After the toxic flood waters subsided and smoke from the explosions had passed overhead, he discovered mysterious looking pieces of black ash and black residue in his yard. His doctor diagnosed him with contact dermatitis after observing a thick, scaly rash he developed when he mowed his lawn two weeks after the explosions. His property has been contaminated by toxins emanating from the Arkema Luperox(™) facility. Scientific testing has revealed the presence of polycyclic aromatic hydrocarbons, dioxins and furans in soil samples taken from his yard. He seeks damages for personal injury, loss of use and enjoyment of property, diminution of property value, annoyance,  inconvenience, emotional distress, medical monitoring, punitives and property damage including top-soil replacement along with such injunctive and declaratory relief as necessary to protect human health and the environment.

14.     Putative Class Representative and Plaintiff Keith Lyons is above the age of majority, lives on property he owns in Crosby, Texas within 1.51 miles of south of the Arkema Luperox(™) factory and serves as a sergeant for the Harris County Sheriff's Department. He was not told to evacuate his residence and as such he was was exposed to toxic substances released from the Arkema Luperox(™) factory on August 29, 2017 and during the explosions on September 3, 2017. Sgt. Lyons was never warned of potential hazards associated with the toxic smoke plume and toxic flood waters coming from the Arkema facility. Upon information and belief, the 1.5 mile evacuation zone was arbitrary and constituted a failure by Defendant Arkema, Inc. to properly warn of a known hazard. His property has been contaminated by toxins emanating from the Arkema Luperox(™) facility. Sgt. Lyons seeks damages for personal injury,

loss of use and enjoyment of property, diminution of property value, annoyance, inconvenience, emotional distress, medical monitoring, punitives and property damage including top-soil replacement along with such injunctive and declaratory relief as necessary to protect human health and the environment.

15.     Putative Class Representative and Plaintiff Corey Prantil is above the age of majority and lives in Crosby, Texas on only 1.01 miles south of the Arkema plant. Plaintiff Corey Prantil is a Texas State Trooper who rents a property next to his grandparents, Putative Class Representatives and Plaintiffs Ronald and Betty Whatley. On August 29, 2017, Trooper Prantil was on his way home after being on duty in Liberty County when he encountered a roadblock on Highway 90 where he was told there had been a release from the Arkema Plant. He overheard on his radio that a chemical release from the Arkema plant triggered the road block. He asked Harris County officials When Trooper Prantil finally returned to his home where he fell fast asleep after over 14 hours on duty.    He was awakened the next morning by National Guardsmen banging on his door to tell him he had to evacuate because of an explosion risk at the Arkema plant. He was never told of any chemical release by the National Guard or anyone else. For the next eight days, Harris County emergency officials established a 1.5 mile exclusion zone around the Arkema plant. Upon returning to his home after the exclusion zone was lifted he discovered that the small amount of water that remained in his home had inflicted serious property damage causing mold to grow, warping the floors of his house and damaging his personal property. He sought medical treatment after suffering negative health effects. Had he not been excluded from his home he would have been able to effectively prevent the spread of mold and thus mitigate damage to his leasehold and personal property. Upon returning to his

home and inspecting his yard, Trooper Prantil found the strange black ash that spread throughout the area surrounding the Arkema plant. Scientific testing reveals the presence of PAHs, dioxins, furans and heavy metals linked to Arkema's release in the soil of Trooper Prantil's yard. He seeks damages from toxic exposure, personal injury, property damage, nuisance, trespass, medical monitoring, punitive damages and seeks injunctive relief to bring Defendant Arkema, Inc. into continuing compliance with relevant environmental statutes.

16.     Putative Class Representative and Plaintiff Ronald and Betty Whatley, are above the age of majority and live less than one mile south of the Arkema plant. Their residence is within the 1.5 exclusion zone. They were excluded from their home for eight days because their property was within the evacuation zone. Flood waters intruded into their home. Upon returning home after the exclusion zone was lifted, the water that reached their house had inflicted serious property damage, caused mold to grow and has created a health hazard. Had they not been excluded from their home they would have been able to effectively prevent the spread of mold and thus mitigate damage.  They were also exposed to toxins from the chemical releases from the Arkema Luperox(™) factory. They were not warned of the dangers associated with such exposures. Ms. Whatley has suffered from headaches and respiratory difficulty as a result of the Defendants' negligence and has sought medical treatment. Further, the Whatley's raise cattle and have possessory rights to several leaseholds they use to grow hay for their herd. This land has been contaminated by toxins negligently released from the Defendants' operations. They seek damages for personal injury, loss of use and enjoyment of property, diminution of property value, annoyance,   inconvenience, emotional distress, medical monitoring, punitives and property

damage including top-soil replacement along with such injunctive and declaratory relief as necessary to protect human health and the environment.

17.     Putative Class Representatives and Plaintiffs David and Kelly Phelps are above the age of majority and live in Crosby, Texas only 1.43 miles south of the Arkema Luperox(™) factory. They were excluded from their home for eight days because their property was within the evacuation zone. Flood waters reached crawlspace causing mold to grow. Upon returning to his home after the exclusion zone was lifted the water that reached their house remained in his home had inflicted serious property damage and has created a health hazard. Had they not been excluded from their home they would have been able to effectively prevent the spread of mold and thus mitigate damage.  They were exposed to toxins from the chemical releases from the Arkema Luperox(™) factory. They were not warned of the dangers associated with such exposures and they suffered from headaches and respiratory difficulty. They seek damages for personal injury, loss of use and enjoyment of property, diminution of property value, annoyance, inconvenience, emotional distress, medical monitoring, punitives and property damage including top-soil replacement along with such injunctive and declaratory relief as necessary to protect human health and the environment.

18.     Putative Class Representative and Plaintiffs Larry and Tanya Anderson are above the age of majority, live over 4 miles southwest of the Arkema Luperox(™) factory and also own commercial and agricultural properties in close proximity to the Defendants' facility. They were exposed to toxic substances released from Defendants' plant even though their home was outside the evacuation zone and Mr. Anderson experienced negative health effects. The Andersons own a 56-acre hay field west of the plant contaminated by toxins released from the Arkema facility and

upon which several jars full of mysterious black ash were recovered. He owns a rental unit and another commercial property used for the storage of hay that were also contaminated. They seek damages for personal injury, loss of use and enjoyment of property, diminution of property value, annoyance,  inconvenience, emotional distress, medical monitoring, punitives and property damage including top-soil replacement along with such injunctive and declaratory relief as necessary to protect human health and the environment.

19.     Putative Class Representative and Plaintiff Ezequiel Villareal is above the age of majority and owns a large piece of property upon which he operates a horse stable west of the Arkema Luperox(™) factory. He was never warned of the toxic nature of the releases but experienced respiratory difficulty and eye irritation while at his stables in the days and weeks after the releases.  He had to return to the stables each day because the valuable horses under his care would not have survived  had he not fed and watered them. Not only was Mr. Villareal exposed to the toxins which emanated from the Defendants' facility during the Defendants' various releases but scientific tests reveal that PAHs, dioxins, furans and other toxic compounds have contaminated his property. He seeks damages for personal injury, loss of use and enjoyment of property, diminution of property value, annoyance, inconvenience, emotional distress, medical monitoring, punitives and property damage including top-soil replacement along with such injunctive and declaratory relief as necessary to protect human health and the environment.

20.     Putative Class Representative and Plaintiffs Beverly and Roland Flannel are married, above the age of majority and live in Crosby, Texas just over six miles south of the Arkema Luperox(™) factory. They were exposed to the toxins released from the Arkema facility, experienced negative health impacts, sought medical treatment, and are concerned about

long-term effects on their health. Scientific testing reveals their property was contaminated with toxins released from the site. They seek damages for personal injury, loss of use and enjoyment of property, diminution of property value, annoyance,  inconvenience, emotional distress, medical monitoring, punitives and property damage including top-soil replacement along with such injunctive and declaratory relief as necessary to protect human health and the environment.

21.     Putative Class Representative and Plaintiff Deputy Greg Nason is above the age of majority and lives on property he owns with his wife and children on a large piece of property 3 miles miles west of the the Arkema Luperox(™) facility. He and family were not evacuated despite the fact that they were so close to the facility that they were exposed to toxins as a result of the various releases from Arkema.  Scientific testing revealed the presence of various contaminants which emanated from Defendant Arkema's facility. He experienced negative health effects. He seeks damages for personal injury, loss of use and enjoyment of property, diminution of property value, annoyance,  inconvenience, emotional distress, medical monitoring, punitives and property damage including top-soil replacement along with such injunctive and declaratory relief as necessary to protect human health and the environment.

22.     Putative Class Representative and Plaintiffs Bret and Phyllis Simmons is above the age of majority and lives Crosby, Texas outside of the evacuation zone. As the floodwaters threatened to enter his home on August 25, 2017, he and his wife hopped on his motorcycle to evacuate to his place of employment on higher ground at the intersection of Adlong Johnson Road and Highway 90 just across from the Arkema facility. They stayed there until the morning of August 29, 2017 when he saw the National Guard evacuating people who lived along Adlong Johnson Road. Mr. Simmons spoke to the National Guardsmen who informed him that the

evacuation was prompted by a risk of explosion at the Arkema facility. At no time did the National Guard ever inform Mr. Simmons that thousands of pounds of toxic chemicals spilled the night before from two tanks filled with toxic waste. Although the National Guardsman told Mr.Simmons they would be returning to evacuate he and his wife, they never returned. Eventually, Mr. Simmons and his wife got back on the motorcycle and tried to make it Highway 90. Mrs. Simmons, being deathly afraid of snakes in the water, rode on the back of the motorcycle in such a manner that her legs were not in the water. The motorcycle stalled shortly after they began their escape attempt. Mr. Simmons stepped off the motorcycle to push the motorcycle and his wife out of the flood waters to safety. As he waded through the water closer to the Arkema Luperox(™) factory, his legs began to burn, he cried out in pain but kept pushing the motorcycle, imploring his wife to continue to keep her legs out of the water. Both Mr. Simmons and his wife experienced respiratory difficulty as they breathed in toxic fumes coming off of the floodwaters as they moved closer and closer to the Arkema facility. His legs burned more intensely as he continued to wade through the toxic water until he finally reached higher ground along Highway 90.  He and his wife examined his legs to find blisters, lesions and burns where his skin had come in contact with water polluted by Arkema's toxic waste. For a few days, his wife tried to no avail to treat the lesions and burns on his legs. Finally, on September 15, 2017, he sought treatment for his skin conditions. As of filing, his symptoms persist. They seek damage for toxic exposure, personal injury, medical monitoring, punitive damages and injunctive relief to bring Defendant Arkema, Inc. into continuing compliance with relevant environmental statutes.

## IV.   DEFENDANTS

23.    Defendant Arkema Inc., a Pennsylvania corporation with its principal place of business in King of Prussia, Pennsylvania is the owner, operator and permittee of the Arkema facility that the subject of this lawsuit. Defendant Arkema, Inc. is an operating subsidiary of Defendant Arkema S.A. [1]

24.    Defendant Arkema, S.A., is a publicly traded foreign corporation having its principal place of business in Colombes, France. Defendant Arkema, S.A. is the parent corporation of Defendant Arkema, Inc. Upon information and belief, Arkema, S.A. exercises complete dominion and control over its wholly-owned subsidiary, Defendant Arkema, Inc. and as such is responsible for the damages caused to the Plaintiffs by its subsidiary. Further, Defendant Arkema, S.A. is directly responsible for its own conduct, failure to act and negligence including but not limited to failing to exercise due diligence when it purchased the facility that is the subject of this lawsuit and in its failure to properly manage environmental risks, in its failure to insist that corporate environmental policies be followed and in its failure to properly capitalize Defendant Arkema, Inc. Defendant Arkema, S.A. managed, oversaw, planned, conducted, participated in, allowed, capitalized and profited from negligent, dangerous, hazardous and/or ultra-hazardous handling, storage, production and disposal of the toxic chemicals found at the facility which is the subject of this lawsuit.

## V.   JURISDICTION

25.    Original jurisdiction of this Court is invoked pursuant to 28 U.S.C.A. §§ 1331 and 1332(d)(2).   This Court is vested with jurisdiction by virtue of 28 U.S.C. §1332(d). Minimal

---

[1] Together, Defendants Arkema, Inc. and Defendant Arkema, S.A. are referenced as the Arkema Defendants.

diversity exists between named Plaintiffs of this putative class action, each of whom are citizens of the State of Texas, and Defendant Arkema France S.A. is a citizen of France, and Defendant Arkema Inc. is a citizen of Delaware, its state of incorporation, and Pennsylvania, its headquarters and principal place of business location. The proposed class exceeds 100 persons. Further, the amount in controversy exceeds $5,000,000.00.

26.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(2), in that a substantial portion of the events and omissions giving rise to Plaintiffs' claims occurred in this district.

## VI.     FACTUAL ALLEGATIONS

### A.     Arkema Defendants

27.     At their chemical plant in Crosby, Texas, the Arkema Defendants used, controlled, stored, manufactured, distributed, transported, and disposed of hundreds of known toxic chemicals used in the production of the Luperox(™) family of chemicals used in the production of plastic bottles.

28.     The Arkema Defendants knew that the organic peroxide products produced and stored at the plant would burst into flames if not refrigerated.

29.     During Hurricane Harvey, the Arkema Luperox(™) factory predictably lost power and flooded.

30.     The Arkema Defendants were unprepared and unable to maintain refrigeration for their highly flammable inventory of Luperox(™).

31.     According to Texas Department of Environmental Quality (TDEQ) documents, personnel of Defendants, Arkema, Inc. removed the containers of organic peroxides from storage and placed them in refrigerated trailers.

32.     According to TDEQ documents, ultimately the refrigeration of the organic peroxide products was also compromised by flood waters.

33.     According to TDEQ documents, that loss of refrigeration led to product decomposition.

34.     As the chemicals reached room temperatures, chemical reactions associated with decomposition of the organic peroxide products ignited the mixture sending  up a cloud of combusting organic peroxide along with fumes from burning plastic containers, tires and insulation.

35.     In media reports since the explosions, officials speaking on behalf of the Arkema Defendants stated that the cause of the explosions was a lack of power  which hindered efforts to maintain refrigeration of thousands of individual plastic containers filled with organic peroxide.

36.     Between August 31, 2017 and September 3, 2017,, nine refrigerated tractor trailers containing up to 10,000 plastic containers filled with Luperox(™) exploded at the Arkema chemical plant sending massive plumes of thick black and gray smoke into the air.

37.     According to TDEQ records, the ignitions released 62,394 pounds of toxic chemicals into the air. TDEQ's reports on the air emissions list the following chemicals as being emitted into the air by the explosions: ethylhexanol, ethyl hexaldehyde, acetone, acetophenone, ethane, nonane, nonene, isobutane, isobutene, N-propanol, carbon monoxide, NO2 and other

14

VOCs partially from burning diesel. Additionally, other novel exposures can be expected because of the reactions and combination that likely occurred during the explosions.

38.     Although spokesmen for the Arkema Defendants have publicly claimed that a power outage and flooding associated with Hurricane Harvey caused a loss of refrigeration which led to the explosions, the Arkema Defendants knew or should have known that site of the Arkema's Luperox plant lies in a floodplain and is prone to flooding.

39.     The Arkema Defendants knew or should have known that given the likelihood of flooding and the likelihood of a hurricane striking its local electric utility that it was entirely forseeable that the facility would face a situation where a loss of electrical service from its utility during a hurricane would coincide with flooding.

40.     The Arkema Defendants failed to design, maintain or operate their Luperox(™) factory in a manner that could safely store the highly unstable organic peroxide in the very likely event of a power outage during a hurricane. Defendant Arkema, Inc.  reports in its SDS that its product Luperox(™) contained less than 10% of organic peroxides. The product is largely made up of petroleum distillates.

41.     Defendant Arkema, Inc. reports in its SDS that Luperox(™) releases toxic chemicals if burned.

42.     Defendant Arkema, being in the chemical industry, knew or should have known that the plastic containers in which the Luperox (™) was stored would release toxic materials in the atmosphere if burned.

43.     Despite the fact that virtually everything stored, used, manufactured, processed or disposed of at Defendant Arkema's plant was toxic, Defendant Arkema's CEO insisted that the

smoke from the fire was not toxic. The Arkema Defendants owed a duty to honestly disclose the toxic nature of the smoke that blew over the Plaintiffs and their property.

44.     In addition to the Luperox(™) explosions, there was also a toxic release of liquid contaminants from a storage tank at the facility into the floodwaters which then migrated off-site before the explosions began.

45.     According to TDEQ documents, on August 29, 2017, two waste water tanks accumulated large amounts of rain water which exceeded the tanks' capacity which caused the tank contents to overflow into the tanks' containment dike. The containment dike exceeded its capacity which resulted in the release of stormwater containing what the TDEQ characterized as mineral spirits and residual organics into the flood waters within the plant.

46.     According to TDEQ documents, an estimated 23,608 pounds of contaminants were released from two tanks including: ethylbenzene,mineral spirits, naptha, naphthalene, organic peroxides, trimethylbenzene, tert-butyl alcohol, 2,5 dimethyl-2,5 di(t-butylperoxy)hexane and t-amyl alcohol.

47.     Upon information and belief, personnel from  Defendant Arkema, Inc. contacted Harris County officials to request that Highway 90 be closed because of a release of chemicals from the facility into the flood waters. In an effort to absolve the Arkema Defendants, TDEQ later characterized the release as an air emission event rather than what it really was- a release of tens of thousands of pounds of toxic waste into flood water flowing off site driven by the storm.

48.     Defendant Arkema never issued any warnings to the public regarding this release and in fact refused to give details about the nature of the release to law enforcement officials from the State of Texas and Harris County. Not until the Defendant TCEQ finally released their

report over one week after the release did the public have any notice that over 20,000 pounds of deadly chemicals released into flood waters roiling through the residential and agricultural properties surrounding the plant.

49.     Plaintiffs' testing of surface water in ditches leading from the Arkema Luperox(™) factory to nearby Cedar Bayou revealed the presence of numerous toxic materials and heavy metals consistent with chemicals implicated in both the explosions and the waste water tank failure.

50.     On information and belief, plaintiffs allege that intermittent effluent discharges from the Arkema Cosby Plant (a Class 3 site) into Cedar Bayou create an imminent and substantial endangerment to public health.

51.     The Arkema Defendants  either knew or should have known of the obvious poor conditions and environmental practices at the site and knew or with the exercise of reasonable diligence should have known of the threat of chemical release. Given the known toxicity of the chemicals at the site, the Arkema Defendants either knew or should have known that its warnings were insufficient under the circumstances.

## B.     Environmental Evidence

52.     Environmental evidence gathered thus far by the Putative Class Representatives and Plaintiffs indicate that property and persons within seven miles of the Arkema Luperox(™) factory were exposed to toxic substances and negatively impacted by toxic releases from the site between August 29, 2017 and September 3, 2017.

53.     All of the Putative Class Representatives and Plaintiffs witnessed the dark plumes of smoke that arose from the Arkema Luperox(™) factory and smelled noxious odors that accompanied the plume.

54.     Putative Class Representative and Plaintiff Shannan Wheeler noticed strange black ash in his yard and an odd black, oily residue on sandy areas in yard after last explosions at took place on Sunday, September 3.

55.     Experts engaged by the Putative Class Representatives and Plaintiffs have gathered samples of the black ash as far as 3.8 miles west and 1.4 miles north of the Arkema Luperox(™) factory.

56.     Scientific analysis of that black ash and the black residue revealed the presence of metals and chemicals linked to the products either stored and manufactured at the Arkema Luperox(™) factory or chemicals and compounds suspected to have been created in the spills, fires and explosions.

57.     Samples of the black ash indicated the presence of napthalene. Napthalene is a polycyclic aromatic hydrocarbon (PAH) listed as an ingredient of the SDSs of Luperox(™) products.

58.     Sampling of ash material deposited in yards from Arkema Plant explosion, surface water, soils, drinking well water, surface dust, and other bulk materials has been performed to investigate impacts from the Arkema Plant explosion on residential properties surrounding the Arkema Plant.

59.     The collected samples have been analyzed for heavy metals and cyanide, volatile organic compounds (VOCs), semi-volatile organic compounds (SVOCs), polycyclic aromatic

compounds (PAHs), Dioxins, Furans, and Tentatively Identified Compounds (TICs). Results received to date have identified compounds from each of these analytical groups. The presence of such toxins, including many man-made substances, in concert with eye-witness accounts of smoke plumes, black ash, black residue and physical symptoms offers substantial support for the proposition that a completed exposure pathway existed between the Defendants' facility and the Plaintiffs' property.

60.    Analysis for metals and inorganics revealed detections for a number of metals: aluminum, antimony, barium, calcium, chromium, cobalt, copper, iron, lead, manganese, nickel, potassium, sodium, thallium, vanadium, zinc, and cyanide. While these metals are found in the Earth's crust, their appearance consistently throughout the samples indicates linkage to activities at the Arkema facility. The concentrations of aluminum, barium, calcium and zinc present a marker establishing an environmental pathway even if the detected concentrations fall below levels expected to cause negative health impacts.

61.    Testing also revealed a number of Volatile Organic Compounds (VOCs): acetone, bromodichloromethane, bromoform, chloroform, dibromochloromethane. The EPA classified bromoform as a probable human carcinogen and dibromochloromethane as a possible human carcinogen. There is evidence that eating or drinking bromodichloromethane causes liver, kidney, and intestinal cancer in rats and mice. The Department of Health and Human Services (DHHS) has determined that bromodichloromethane is reasonably anticipated to be a human carcinogen.

62.    Lab tests identified were semi-volatile organic compounds (SVOCs): benzoic acid, bis(2-ethylhexyl)phthalate, di-n-butyl phthalate. Additionally, GCMS analysis revealed the presence of several SVOC Tentatively Identified Compounds (TICs): Unknown hydrocarbons,

unknown compounds, azuleno [4,5-b]furan-2,9-dione; decahydro, n-hexadecanoic acid; gamma sitosterol, 1-hexanol; 2-ethyl-, hexanoic acid; 2-ethyl-, diethyltoluamide; hexanoic acid; butanoic acid, ethane, 1,1,2,2-tetrachloroethane.

63.     Tests of ash samples, surface water samples and soil samples revealed the presence of the following polycyclic aromatic hydrocarbons (PAHs): acenaphthylene, benzo(a)anthracene, benzo(a)pyrene, benzo(b)fluoranthene, benzo(g,h,i)perylene, benzo(k)fluoranthene, chrysene, dibenzo(a,h)anthracene, fluoranthene, fluorene, indeno(1,2,3-cd)pyrene, naphthalene, phenanthrene, pyrene,2-methylnaphthalene.

64.     Polycyclic aromatic hydrocarbons (PAHs) are a group of over 100 different chemicals that are formed during the incomplete combustion. The Department of Health and Human Services (DHHS) has determined that some PAHs may reasonably be expected to be carcinogens. Due to carcinogenic effects, USEPA establishes a maximum contaminant level for one found in some samples, benzo(a)pyrene, the most carcinogenic PAH, and benzo(b)fluoranthene, benzo(k)fluoranthene, chrysene at 0.2 parts per billion. Other carcinogenic PAHs include dibenzo(a,h)anthracene, indeno(1,2,3-c,d)pyrene, all of which are listed above.

65.     Disturbingly, testing also found detections of the following Dioxins and Furans: 2,3,7,8-tetrachlorodibenzodioxin (tcdd), pentachlorodibenzo-p-dioxin (12378-pecdd), hexachlorodibenzo-p-dioxin, heptachlorodibenzo-p-dioxin, octachlorodibenzo-p-dioxin, tetrachlorodibenzofuran, pentachlorodibenzofuran, hexachlorodibenzofuran, heptachlorodibenzofuran, octachlorodibenzofuran, pentachlorodibenzo-p-dioxin.

### VII.    CLASS ACTION ALLEGATIONS

66.     Plaintiffs seek to represent the following class of individuals: *All persons within seven miles of the Arkema Luperox(™) factory in Crosby, Texas who have either been exposed to toxic substances released from the Arkema facility between August 29, 2017 and September3, 2017 and/or all persons possessing an interest in property located within 7 miles from the Arkema facility.*

67.     Excluded from the Class are the Defendants and their officers, directors, and employees, as well as the Court and its personnel working directly on the case with the exception of court reporters.

68.     Plaintiffs and all others similarly situated are entitled to have this case maintained as a class action pursuant to Federal Rules of Civil Procedure  for the following reasons:

(1)    The prerequisites for a class action under Federal Rule of Civil Procedure 23(a) are met.  The class is so numerous that joinder of all persons is impracticable. As many as ten thousand (10,000) people are adversely affected by Defendants' release of toxic chemicals. The exact number of Class Members can be readily determined from the United States Census Bureau.

(2)    There are common issues of law and fact, including: (a) whether Defendants are liable for damages to the class for negligently allowing the release of toxic chemicals and/or failure to warn of its toxicity; (b) the scope of damages caused by the Defendants' conduct; (c) whether Defendants are strictly liable for conducting an ultra-hazardous activity injurious to members of the class; (d) whether Defendants are liable for nuisance and trespass; and,

(e) whether the Defendants may be compelled under statute or court order to take steps to protect human health and the environment including but not limited to medical monitoring, top-soil replacement, a compliance audit and improved environmental safety measure.  These and other common issues of law and fact relate to and affect the rights of Plaintiffs and Class Members.

69.     Plaintiffs' claims are typical of the class. Plaintiffs reside and/or were present within the affected area.

70.     Plaintiffs have suffered annoyance, aggravation, personal and bodily injuries, as well as economic loss and bodily injury to their real and personal property and/or have been subjected to health risks, that are typical of the experience of the Class Members. Plaintiffs' interests are identical to and aligned with those of other Class Members. Plaintiffs and the Class Members have suffered an array of damages all stemming from the common trunk of facts and issues related to the spill. Those damages are as follows:

(1)  Physical Personal Injury Tort Claims are pursued by Class Members for bodily injury, emotional distress, and medical monitoring;

(2)  Non-Physical Tort Claims are pursued by Class Members for annoyance, loss of enjoyment, nuisance, and inconvenience;

(3)  Property Related Claims are pursued by Class Members for trespass, property damage, and loss of use of property; and

(4)  Financial Claims are pursued by Class Members for lost income and loss of business claims.

71.     Plaintiffs will fairly and adequately represent and protect the interests of the class because:

> (1)   Plaintiffs have retained counsel experienced in the prosecution of class action litigation who will adequately represent the interests of the class;
>
> (2)   Plaintiffs and their counsel are aware of no conflicts of interest between Plaintiffs and absent Class Members or otherwise that cannot be managed through the implementation of available procedures;
>
> (3)   Plaintiffs, through their counsel have adequate financial resources to assure that the interests of the class will be protected; and
>
> (4)   Plaintiffs are knowledgeable concerning the subject matter of this action and will assist counsel in the prosecution of this litigation.

72.     A class action may be maintained under Federal Rule of Civil Procedure 23(b)(2) because the parties opposing the class, the Arkema defendants, have acted and/or refused to act on grounds that apply generally to the class, so that final injunctive relief is appropriate respecting the class as a whole. Plaintiffs and the Class seek an injunction requiring:

- Amendment of Arkema's Spill Prevention Control and Countermeasure plan to include provisions that would prevent future preventable incidents such as this, or in the alternative, the resiting of the plant to a location where it does not endanger the public;

- Measures to ensure that continuous power is provided to operate safely;

- Amendments to Arkema's community warning plans; and

- A third party compliance audit of Arkema's entire waste management operation and environmental health and safety program.

- Top-soil replacement to remediate continuing threats to human health and the environment.

- Medical Monitoring and Medical Surveillance to protect human health.

If this injunctive relief is not granted, great harm and irreparable injury to Plaintiffs and members of the Class will continue, and Plaintiffs and members of the Class have no adequate remedy at law for the injuries which are threatened to occur. Absent action from this Court, Arkema defendants will continue to damage Plaintiffs and members of the Class and threaten future injury. Defendants' actions and inactions are generally applicable to the Class as a whole, and Plaintiffs seek, inter alia, equitable remedies with respect to the Class as a whole.

73.     A class action may also be maintained under Federal Rule of Civil Procedure 23(b)(3) because common issues of law and fact predominate over those issues that might pertain to individual cases, and a class action is superior to other available procedures for the fair and efficient adjudication of this controversy.    The interests of all members of the class in establishing the liability of Defendants, and their relative fault, for the release of toxic chemicals are cohesive.    The certification of a Class seeking damages is an appropriate means by which injured Plaintiffs and Class Members may assert claims to recover economic losses and property damage, as well as assert claims for personal and bodily injury, annoyance, aggravation and inconvenience.

74.     A class action may be maintained under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class,

thereby making appropriate the entry of equitable or injunctive relief, including a medical monitoring protocol and injunctive relief to prevent recurrence of the conduct in the future.

75.     Further, any denial of liability and defenses raised by the Defendants would be applicable to all claims presented by all members of the class or can otherwise be managed through available procedures.

76.     Defendants' conduct presents predominant common factual questions. Fundamentally, all of the Plaintiffs' claims arise out of a single course of conduct by Defendants that caused the release of toxic chemicals from the Arkema plant..  Although this was an incident that affected a sizeable geographic area and many individuals and businesses, it can be traced back to actions made jointly and severally by the small group of Defendants named here. Whether Plaintiffs and the Class Members are presenting one or more of the four relevant categories of Physical Personal Injury Tort Claims, Non-Physical Tort Claims, Property Claims, and Financial Claims, they will present common liability proof that is the same for each member of the Class.  Across claim categories, Plaintiffs' common proof of Defendants' liability will involve the same cast of characters, events, discovery, documents, fact witnesses, and experts.

77.     The need for proof of Plaintiffs' and Class Members' damages will not cause individual issues to predominate over common questions.  The amounts of economic and non-economic losses, consistent with each of the four categories of claims, can be efficiently demonstrated either at trial or as part of routine claims administration through accepted and court-approved methodologies with the assistance of court-appointed personnel, including Special Masters.  Certain types or elements of damage are subject to proof using aggregate damage methodologies or simply rote calculation and summation.

78.     A class action is superior to maintenance of these claims on a claim-by-claim basis when all actions arise out of the same circumstances and course of conduct.  A class action allows the Court to process all rightful claims in one proceeding.  Class litigation is manageable considering the opportunity to afford reasonable notice of significant phases of the litigation to Class Members and permit distribution of any recovery.  The prosecution of separate actions by individual Class Members, or the individual joinder of all Class Members in this action, is impracticable and would create a massive and unnecessary burden on the resources of the courts and could result in inconsistent adjudications, while a single class action can determine, with judicial economy, the rights of each member of the class or subclasses, should that be determined to be appropriate.

79.     The conduct of this action as a class action conserves the resources of the parties and the court system, protects the rights of each member of the class, and meets all due process requirements.

80.     Certification of the Class with respect to particular common factual and legal issues concerning liability and comparative fault, as well as the necessary and appropriate quantum of punitive damages, or ratio of punitive damages to actual harm, is appropriate under Federal Rule of Civil Procedure 23(c)(4).

81.     The particular common issues of liability, comparative fault, and the quantum of punitive damages or ratio of punitive damages to actual harm, are common to all Class Members no matter what type of harm or injury was suffered by each Class Member.

## VIII.   CAUSES OF ACTION

### A.     Count One - Negligence Against the Arkema Defendants

82.     Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

83.     The conduct, acts and omissions of the Defendants violated duties owed to Plaintiffs and the Class.  Defendants' negligence proximately caused damage to Plaintiffs and the Class.

84.     Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

### B.      Count Two - Trespass

85.     Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

86.     The conduct of Defendants as set forth herein constitutes trespass which resulted in damages to plaintiffs.

### C.      Count Three - Nuisance

87.     Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

88.     The conduct of Defendants as set forth herein constitutes the tort of nuisance which resulted in damages to plaintiffs.

### D.      Count Four - Property Damage

89.     Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

90.     The conduct of Defendants as set forth herein constitutes the tort of property damage  which resulted in damages to plaintiffs.

### E.      Count Five - Personal Injury

91.      Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

92.      The conduct of Defendants as set forth herein constitutes the tort of personal injury which resulted in damages to plaintiffs

### F.      Count Six - Failure to Warn

93.      Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

94.      The conduct of Defendants as set forth herein constitutes the tort of failure to warn which resulted in damages to plaintiffs.

### G.      Count Seven - Product Liability

95.      Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

96.      The conduct of Defendants as set forth herein constitutes the tort of product liabilty which resulted in damages to plaintiffs.

### H.      Count Eight - Ultra-Hazardous Activity

97.      Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

98.      The conduct of Defendants as set forth herein constitutes the tort of ultra-hazardous liability which resulted in damages to plaintiffs.

### I.      Count Nine - Gross Negligence

99.     Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

100.    The conduct of Defendants as set forth herein was reckless and wanton, constituting the tort of gross negligence, which resulted in damages to plaintiffs.

### J.      Count Ten -  Negligent Infliction of Emotional Distress

101.    Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

102.    The conduct of Defendants as set forth herein was reckless and wanton, constituting the tort of negligent infliction of emotional distress, which resulted in damages to plaintiffs.

### K.      Count Eleven - Punitive Damages

103.    Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

104.    The conduct of Defendants as set forth herein was malicious, oppressive, willful, wanton, reckless, and/or criminally indifferent to civil obligations affecting the rights of others, including Plaintiffs.  Plaintiffs and the Class are thus entitled to recover punitive damages against Defendants.

105.    Defendants were malicious, oppressive, willful, wanton, reckless, and/or criminally indifferent to civil obligations affecting the rights of others, including Plaintiffs, in

their activities and in failing to warn Plaintiffs of dangers well known to Defendants, which acts exhibited a deliberate disregard for the rights and safety of Plaintiffs.

106.    Defendants realized the imminence of danger to Plaintiffs and other members of the public, but continued their ultra-hazardous activities with deliberate disregard and complete indifference and lack of concern for the probable consequences of their acts.

107.    As a direct result of Defendants' deliberate disregard for the rights and safety of others, gross negligence, malicious, oppressive, willful, wanton, reckless, and/or criminally indifferent to civil obligations affecting the rights of others, including Plaintiffs, Plaintiffs suffered the injuries and dangers stated above.

108.    Defendants' acts as described herein exhibited deliberate disregard for the rights and safety of others and were malicious, oppressive, willful, wanton, reckless, and/or criminally indifferent to civil obligations affecting the rights of others, including Plaintiffs. An award of punitive and exemplary damages is therefore necessary to punish Defendants, and each of them, and to deter any reoccurrence of this intolerable conduct. Consequently, Plaintiffs are entitled to an award of punitive damages.

109.    The conduct of Defendants as set forth herein was malicious, oppressive, willful, wanton, reckless, and/or criminally indifferent to civil obligations affecting the rights of others, including Plaintiffs. Plaintiffs and the Class are thus entitled to recover punitive damages against Defendants in an amount sufficient to punish Defendants for their wrongful conduct and to deter Defendants and others from similar wrongful conduct in the future.

    **L.    Count Twelve - Piercing Corporate Veil Against Arkema Defendants**

110.    Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

111.    Plaintiffs are informed, believe and thereupon allege that the corporate veils of Defendant Arkema France S.A. and Arkema, Inc. be pierced and their corporate forms disregarded on the following grounds:  First, Arkema France S.A. has organized and operated Arkema, Inc. as an alter ego, mere tool or business conduit with sufficient financial interests and unity that holding only Arkema, Inc. liable would result in injustice.  Second, Arkema France S.A has used Arkema, Inc. to evade the legal duty of care.  Third, Arkema France, S.A. has used Arkema, Inc. to circumvent the applicable environmental statutes and duties.  Fourth, Arkema France S.A. has inadequately capitalized Arkema, Inc. for the type of business it has been conducting.

## IX.    PRAYER FOR RELIEF

112.    **WHEREFORE**, the Plaintiffs respectfully pray for a Jury Trial and for the following relief:

(1)    An Order certifying this action to proceed as a Class Action, authorizing Plaintiffs to represent the interests of the Class or subclasses as appropriate and appointing undersigned counsel to represent the Class;

(2)    An award of damages for Class Members who suffered business or economic losses as a result of Defendants' conduct, acts, or omissions;

(3)    An award of damages or mechanism for recovery for Class Members who incurred costs for water replacement, travel, home  repair and any other

out-of-pocket expenses as a result of the Defendants' conduct, acts, or omissions;

(4) An award of damages or mechanism for recovery to compensate those who sought medical attention or advice after exposure to the contaminated water.

(5) An award of damages or mechanism for recovery to compensate for personal injury;

(6) An award of damages or mechanism for recovery to compensate for loss of use and enjoyment of property, annoyance, nuisance, aggravation, and inconvenience;

(7) An award of punitive damages for all Class Members who were exposed to Arkema's toxic chemicals;

(8) Prejudgment and post-judgment interest;

(9) Damages for lost wages;

(10) An Order establishing a Medical Monitoring Program designed to survey as appropriate and to protect the Class Members from latent, dread disease, funded by the Defendants;

(11) An Order establishing such administrative procedures as are reasonable to effectuate the relief granted Plaintiffs and the Class Members;

(12) That the Court order the Defendants to pay for the costs of this proceeding, including reasonable attorneys' fees and costs, including, but not limited to, costs of class notice and administration; and

(13) Such other relief as the Court or Jury may deem appropriate.

Respectfully Submitted,

**DENNIS SPURLING P.L.L.C.**
ATTORNEY AT LAW AND FRIENDS

s/ Dennis D. Spurling
Dennis D. Spurling, Esq.
Attorney-in-Charge
Texas State Bar No.: 24053909
Southern District of Texas Federal Bar No. 718307
ddspurling@dennisspurling.com
s/ Jeremy V. Axel
Jeremy V. Axel, Esq.
Texas State Bar No. 24073020
Southern District of Texas Federal Bar No. 1850082
s/ Brian L. Ponder
Brian L. Ponder, Esq.
New York Attorney Registration No. 5102751
Southern District of Texas Federal Bar No. 2489894
brian@brianponder.com
J.P. Morgan Chase Building
3003 S. Loop West, Suite 400
Houston, Texas 77054
Telephone (713) 229-0770
Facsimile (713) 229-8444

/s/ Mark F. Underwood
Mark F. Underwood, Esquire
Texas State Bar No.: 24059341
Southern District of Texas Federal Bar No. 2601475
Underwood Law Office, Inc.
2530 West White Avenue, Suite 200
McKinney, Texas 75071
Telephone (972) 535-6377
Facsimile (972) 292-7828
munderwood@underwoodlawoffices.com

/s/ Kevin W. Thompson
Kevin W. Thompson, Esquire (W.Va. Bar No. 5062)
*Attorney seeking pro hac vice admission*
David R. Barney, Jr., Esquire (W.Va. Bar No. 7958)
*Attorney seeking pro hac vice admission*
Thompson Barney Law Firm
2030 Kanawha Boulevard, East
Charleston, West Virginia  25311

33

Telephone: (304) 343-4401
Facsimile: (304) 343-4405
kwthompsonwv@gmail.com
drbarneywv@gmail.com

/s/ Michael G. Stag
Michael G. Stag, Esquire
Louisiana State Bar No. 23314
*Attorney seeking pro hac vice admission*
Ashley Liuzza, Esquire
Louisiana State Bar No. 34645
*Attorney seeking pro hac vice admission*
Stephen H. Wussow, Esquire
Louisiana State Bar No. 35391
*Attorney seeking pro hac vice admission*
Smith Stag, LLC
One Canal Place
365 Canal Street, Suite 2850
New Orleans, Louisiana 70130
Telephone: (504) 593-9600
Facsimile: (504) 593-9601
mstag@smithstag.com
aliuzza@smithstag.com
swussow@smithstag.com

ATTORNEYS FOR PLAINTIFFS