*A Rebuttal to Reports*

*Submitted by*

*Sheng Li, Ph.D., Gary Papke, MAI, and Thomas Hamilton, Ph.D.*

*In the Matter of the*

*Arkema Explosion Event in August, 2017*

In the United States District Court,

Southern District of Texas

Houston Division

October 4, 2021

Prepared at the request of:

Stag Liuzza, LLC

One Canal Place

365 Canal Street, Suite 2850

New Orleans, Louisiana 70130

Prepared by:

John A. Kilpatrick, PhD, MAI

Greenfield Advisors, Inc.

#677, 400 NW Gilman Blvd

Issaquah, Washington 98027

## Table of Contents

Introduction................................................................................................................................1

Summary of Findings – Li Report...........................................................................................2

Summary of Findings – Papke/Hamilton Report ................................................................4

Specific Issues Raised in the Two Reports............................................................................7

Summary and Conclusions .....................................................................................................18

## Figures

Figure 1 -- Simplified View of Impact Variable ...................................................................8
Figure 2 -- Table 10 from Original Report ............................................................................8
Figure 3 -- Figure 4 from Original Report .............................................................................9
Figure 4 -- Equation 5 from Original Report ........................................................................9
Figure 5 -- Inside Area Price Trends, 2-years .....................................................................10
Figure 6 -- Prices in Control Area ........................................................................................11
Figure 7 -- Table 11, Correlations, from Original Report..................................................15
Figure 8 -- Mundy (1992) Figure 1 .......................................................................................17

# INTRODUCTION

1.     I am Dr. John A. Kilpatrick, Ph.D., MAI.  On July 16, 2021, I submitted a report summarizing my study of the impacts of the Arkema Plant explosion event[1] on nearby property values.  My study accomplished the following:

- It presented a specific mass appraisal model to value properties in the affected area both before and after the explosion event.

- Using local tax assessor data, I was able to identify 10,478 improved residential parcels in Harris County within 7 miles of the Arkema plant, and 1,257 improved residential parcels in Liberty County within 7 miles of the Arkema plant.

- It used actual data from the marketplace to value each residence in the affected area immediately prior to the explosion event.  Specifically, I used 10,247 local transaction prices from the 5 Multiple Listing Service (MLS) areas which span the affected area from the period immediately prior to the Arkema explosion event to determine the coefficients for a mass appraisal model, consistent with modeling I have performed which has been accepted by Federal and State Courts throughout the United States.  Using this model, I was able to determine the "unimpaired" values, immediately prior to the explosion event[2].

- The accuracy, or "bias", of my mass appraisal model is measured by its Median Deviation, which was -0.72%.  This means that the model determined the value of a property within the class area with an average error of less than one percent[3].

- The consistency of my model, which may be thought of as the reliability, is measured by its Median Absolute Deviation, which was found to be 9.28%[4].  This is analogous to the Coefficient of Dispersion ("COD") Standards promulgated for Mass Appraisals by the International Association of Assessing Officers ("IAAO"), the leading professional organization for tax assessment and the source authority for standards used in mass appraisals.  The COD standards for heterogeneous residential neighborhoods is 5% to 15%.  Thus, my model falls well within the standards promulgated for such models[5].

---

[1] I understand that 3 distinct fire events and other emissions events occurred at the Arkema Crosby, TX plant site during the period August 29, 2017 through September 3, 2017. Here, I describe the impact of all of those events, taken together.

[2] Of these, I was able to ascertain the Tax Assessed Value ("TAV") for 10,029 of these properties, or 97.6%.  I was then able to determine values coefficients using 100% of these.

[3] See table 6 in my original report.

[4] Ibid.

[5] The IAAO is a member organization of the Appraisal Foundation, which promulgates the Uniform Standards of Professional Appraisal practice, or USPAP.  These COD standards are published in the IAAO's Standard on Ratio Studies, April, 2013, Table 1-3, page 17.

- It used actual data from the marketplace to show the pricing impacts on properties immediately after and as a result of the explosion event.

- It used other data, commonly used by appraisers, to extend this model to develop an appraisal opinion of the diminution in value for these properties within a reasonable degree of appraisal certainty.

2. I continue to find the results of this study to be credible and compelling, and fully incorporate my prior report and its findings into this reply report. *Note that all assumptions, limiting conditions, and certifications contained in my prior report are incorporated by reference into this report, and will not be repeated herein in the interest of brevity.*

3. On September 17, 2021, two reports were submitted in the matter of *Wheeler v. Arkema*, one by Dr. Sheng Li ("Li Report") and another jointly authored by Gary Papke and Dr. Thomas Hamilton ("Papke/Hamilton Report"). Together, these reports use the same data upon which I relied to replicate my work and thus demonstrate the practicality and applicability of a mass appraisal model in this matter. However, the authors of those two reports make several errors and erroneous assumptions in their analyses which cause them to arrive at different, flawed findings.

4. It is important to stress that both of these reports substantiate the efficacy of a mass appraisal model for property valuation, consistent with the certification of a property damage class. The only matter of contention is the ultimate findings of the degree of diminution in value ascribed to each of the properties.

5. The remainder of this report will reply to the Li and Papke/Hamilton reports and demonstrate how their flawed assumptions lead to their erroneous calculations.

## SUMMARY OF FINDINGS – LI REPORT

6. Dr. Li is apparently neither a real estate appraiser nor a licensed or certified real estate professional of any sort. Indeed, a review of his curriculum vita reveals absolutely no training, experience, or expertise in real estate valuation maters. This litigation is apparently the very first time Dr. Li has ever been professionally involved in a real estate related matter. As will be shown, his lack of expertise in this area leads to numerous mistakes in assumptions, analytical methods, and applications of appraisal standards.

7. Dr. Li's opinion #5a is demonstrably false. He expresses the blanket claim that my "…ultimate opinion regarding economic damages is not supported by any regression or any other empirical analysis." In fact, later on in his own report, and in the accompanying Papke/Hamilton report, he and his colleagues examine in detail the regression analyses and other empirical analyses used in my analysis and report.

8. This point is critically important. One of the core aims of my analysis was to demonstrate that sufficient data existed to successfully use a mass appraisal model. In their analyzes, Li and Papke/Hamilton implicitly acknowledge this fact by re-creating my models using the very same data which I used. Thus, they end up acknowledging this point, and their only real disagreement is with the magnitude of the empirical findings.

9.    Dr. Li's opinion #5b is a mischaracterization of the model, and stems from his lack of understanding of appraisal methodology.  In any "takings" matter, which from an appraisal perspective includes environmental or other forms of damages, the generic formula is:

*value unimpaired minus value impaired equals damages*

If Dr. Li was a real estate appraiser, he would know this.  The "value unimpaired" is determined via the regression model, and the response reports both demonstrate this fact. The "value impaired" is calculated by inserting an <u>instrumental variable</u> into the regression findings.  This instrumental variable accounts for the loss in value attributed to the Arkema explosion event and is determined in a separate calculation.  This is consistent with appraisal methodology as well as econometrics as applied in the real estate profession.  Dr. Li's lack of familiarity with appraisal methods is evident here.

10.   Dr. Li's opinion #5c focuses on the use of sales data one-year after the 2017 Arkema event. The appraisal question is to determine the impact on values immediately surrounding the event.  Values of affected residences may or may not have risen in the years after the event, but that is not relevant to the appraisal issue.  Further, there is no evidence presented, either by Dr. Li or by Papke/Hamilton, that the property value of any individual property, or residences in general, were fully restored at any point after the event.  Conversely, my analysis and report empirically demonstrate that residential property sales prices were impacted immediately after the event relative to nearby unimpaired properties.

11.   Dr. Li's opinion #5d concerns what he calls a "false trend line".  Dr. Li attempts to re-set the price trend in the affected area after the Arkema explosion event to ignore the drop in prices which occurred immediately following the explosion event.

12.   Dr. Li's opinion #5e is simply a re-statement of prior arguments.  His statement of "…individualized effects…" underscores his lack of understanding of how real estate appraisal works.  The appraisal of an individual property is based on sales of other nearby properties. Hence, a generic decline in prices in a market, as happened to residences in the 7-mile ring after the Arkema explosion event, will impact the appraised values of all of the other properties in that ring, consistent with good appraisal practice.

13.   Dr. Li's opinion #5f is woefully misleading.  He claims that the supposed margin of error for the regression overwhelms the finding that there is a difference in prices before-and-after the Arkema explosion event.  Here, Dr. Li again reveals his lack of familiarity with appraisal standards and methods.  The instrumental variable for impaired value is determined using residential pricing trends in the market.  This sort of pricing trend analysis is common in real estate appraisal, and in fact taught in the salient appraisal texts.  USPAP Standards Rules 1.3(a)(v) and 5.3(a) obligate appraisers to analyze these pricing trends[6] and is discussed in detail in the Appraisal Institute's text <u>The Appraisal of Real Estate</u>[7].  However, the fact remains that

---

[6] Rule 1.3(a)(v) governs appraisals of individual properties.  Rule 5.3(a) governs mass appraisals.  See USPAP 2020-2021 (Washington, DC:  The Appraisal Standards Board, 2020).  Texas State code Section 23.01 adopts USPAP as the standard for mass appraisal.

[7] See Chapter 21, Comparative Analysis, in <u>The Appraisal of Real Estate</u> 15th (Chicago:  The Appraisal Institute, 2020)

there is an obvious and discernable difference in prices before and after the Arkema explosion event, and this empirical fact undermines Dr. Li's contention.

14. Dr. Li's opinion #5g deals with "windfall awards". Here, he appears to be attempting to make a legal argument, not a valuation assessment. Certainly, his opinion here has nothing to do with my original report, and does not address my original analyses or findings.

15. I will examine Li's specific findings in more detail in a subsequent section of this rebuttal report.

## SUMMARY OF FINDINGS – PAPKE/HAMILTON REPORT

16. While the Li report and the Papke/Hamilton report carry the same date, it appears that the former informed the latter. Thus, many of the mistakes in the Papke/Hamilton report appear to stem from their blanket acceptance of Dr. Li's work.

17. The Papke/Hamilton report's first opinion is the irrelevant and unsupported claim that my analysis and report do not address 83.3% of the "Proposed Class Area acreage." In part this is irrelevant and in part it is almost certainly wrong. In this opinion, Papke/Hamilton appear to attempt to measure the total acreage of land/lots which appear to be agricultural or otherwise not improved. First, my assignment was to value residences. Upon examination of property records in the three counties, I found that many residences spanned multiple lots. One lot will have the residence and other contiguous or adjacent lots will carry either no value for tax purposes or de minimis value. In appraisals, the unity rule directs that parcels with a nexus of location, ownership, and highest-and-best use be treated as a unified property[8]. Hence, without re-examining their data, it is impossible to determine how many of the parcels in question are not relevant to my analysis (that is, stand-alone agricultural parcels) and how may of them are actually subsumed into residential parcels, which are indeed valued in my model.

18. Papke/Hamilton's next opinion is that my appraisal findings of a 20% diminution in value "…is not based on any quantitative analysis or market data." Not only is this blatantly false, but their own analysis and Dr. Li's accompanying analysis prove the falsity of their statement. They in fact re-examine my quantitative analysis using the same market data which I used in my work. While Papke/Hamilton may have disagreements about the ultimate appraisal conclusions, it is disingenuous for them to claim that those appraisal conclusions are not based on quantitative analysis and market data and then use that same analysis and market data in their own work.

19. Papke/Hamilton express the opinion that case studies cannot be used to inform an appraisal of market value. There is a long history and tradition of using case studies of comparable situations in appraisal analyses. Indeed, a search of the Appraisal Institute's library on the

---

[8] See, for example, Section 4.3.4 (Criteria for Analysis) contained in the Uniform Appraisal Standards for Federal Land Acquisition (Interagency Land Acquisition Conference and the U.S. Department of Justice, 2016) beginning at page 111.

term "case studies" produces 350 citations on the subject (the maximum number that search engine will provide). That said, in in my analysis and report, the use of case studies is only to supplement the pricing model, which as noted used local pricing data. See, for example, Tachovsky, Michael, "Environmental Dead Zones: The Evaluation of Contaminated Properties" in the current edition of The Appraisal Journal, in which he says, "… real estate valuation professionals may consider techniques such as case studies, surveys, and literature reviews to measure environmental risk effects, if any, on property value."

20.    Papke/Hamilton allege that prices in both the control and in the affected areas were rising during the years after the Kilpatrick study. While this may be true, it is also irrelevant. The key element in this matter is that prices and values fell immediately after and as a result of the Arkema explosion event and fell more than could be explained by the effects of Hurricane Harvey. The fact that prices/values may have generically risen in years afterwards is not relevant to the matter at hand, and in fact Papke/Hamilton are egregiously misleading in this respect.

21.    Papke/Hamilton express a blatant falsehood in saying, "…industry consensus is that mass appraisal methodologies are inappropriate for large, heterogeneous real estate markets such as in the Proposed Class Area." First, they strain credulity by presenting this without support. Indeed, the afore-cited text, The Appraisal of Real Estate contains no less than twenty citations to "mass appraisal". Second, they ignore the very obvious fact that the county tax appraisers, in all three of the relevant counties, use mass appraisal methodologies in Texas state approved tax assessment[9]. As noted, The International Association of Assessing Officers (IAAO) proffers specific standards for use when conducting a mass appraisal of heterogeneous residences[10].

22.    Papke/Hamilton proffer an opinion that my mass appraisal model has an error rate of plus or minus 60%. This statement is wildly misleading. Any appraisal gathering market sales transactions may see a broad array of prices. Appraisers are then expected to reconcile this data to a conclusion of the most probable price. In an individualized appraisal, this reconciliation is qualitative, and is provide for under UAPAP Rule 1.6[11]. In a mass appraisal, this is governed by Rule 5.7[12]. More to the point, the accuracy of the mass appraisal employed here is measured by the median deviation, which as noted previously is -0.72%. In other words, the mass appraisal performed in this case has been shown, empirically, using local data from this marketplace, to value residences on average to within 99% of actual market prices. Thus, Papke/Hamilton's plus-or-minus 60% ignores the testing, calibration, and reconciliation performed in this mass appraisal.

23.    Papke/Hamilton attempt to tie the appraisal work directly to the physical science. While indeed the physical science helps inform the appraiser as to why a particular empirical phenomenon is observed (in this case, a diminution in prices), it is not a *sine qua non* for the conduct of the appraisal. In this case, I was asked to determine if a holistic, statistical model

---

[9] See Title I, Property Tax Code, Subtitle D, Chapter 23, "Appraisal Methods and Procedures"

[10] See, for example, Standard on Mass Appraisal of Real Property, (IAAO, April, 2013), at 13.

[11] See USPAP, 2020-21, op. cit, at 19.

[12] Id, at 36.

could be applied which would analyze property values within a 7-mile radius allegedly affected area, and to use that model to estimate property value diminution. The mass appraisal I have applied, and the results reported, show that this can and has been done. The resulting determination of values for each individual property speaks for itself.

24.    Papke/Hamilton call into question the use of pricing trends. I would refer them again to The Appraisal of Real Estate, published by the Appraisal Institute, which in its coverage of the topic of Highest and Best Use Analysis, clearly calls out the need to review "…MLS records of sales trends", which is exactly what I have done here[13].

25.    Papke/Hamilton reference the 95% confidence interval. Notably, real estate appraisal doesn't operate at the fringes of potential value, but asks the question, "what is the most probable price". Indeed, "the most probable price is the determination required under the Federal law and regulations[14]. In a mass appraisal such as this one, the most probable price is represented by the measure of central tendency, which is the median (preferred) or the mean. Hypothetically, for any given parcel, a transaction price anywhere between zero and infinity is possible, but it is neither probable nor plausible, and to suggest such would be to fly in the face of the common definitions of market value.

26.    Papke/Hamilton call into question the efficacy of the control areas used. While the affected properties span three counties, they are all contained in 5 Houston Area Multiple Listing Service ("MLS") zones. In my analysis, sales prices inside the affected area are compared with their neighbors in the same MLS zones outside the affected area. Indeed, the bulk of the properties studied (both affected and control areas) come from MLS zones 1 and 2[15]. The use of MLS information to help inform neighborhood delineation is a common practice in the appraisal profession[16]. Papke/Hamilton present a table of data on page 38 of their report, without any fulsome explanation, in an attempt to suggest that there is a broad array of differences between the residences in the affected area and their neighbors in the remainders of the respective MLS zones. However, in their own table, they show that the difference in average price inside/outside the affected area for MLS zone 1 is 7.2%, and for zone 2 is 4.7%. For comparison, until 2014, Fannie Mae and Freddie Mac had a longstanding guideline about adjustments to comparable greater than 15% net. While this standard is no longer in force, Fannie Mae still tracks these issues, and it is clear that the pricing differential between residences in the affected area and comparables used in the control area is well within agency guidelines[17].

27.    Papke/Hamilton falsely opine that my report fails to account for the impacts of Hurricane Harvey. This argument is flawed on its face. My use of prices before/after in a control area is designed specifically to account for the exogenous impacts of Harvey on affected area prices. To quote from paragraph 114 of my original report:

---

[13] The Appraisal of Real Estate 15th, op cit, at 318

[14] See, for example, FDIC Law, Regulations, and Related Acts, section 323.2(h)

[15] The raw sales data used to populate the mass appraisal model totaled 10,274 sales. Of these, 9,588, or 93.3%, were in MLS zones 1 and 2.

[16] See, for example, The Appraisal of Real Estate, op. cit, at Chapter 11

[17] See FannieMae Lender Letter LL-2015-02, February 4, 2015.

*If the explosion event had no impact on values, then pricing trends inside the affected area before/after the explosion event should show no changes beyond those which might be discerned in unaffected control areas. Since the entire area was impacted by the Harvey landfall, one might expect some systematic impact on real estate prices across the region. However, any pricing impacts within the 7-mile affected area over and above those experienced outside the region would logically be ascribed to the effects of the explosion event. This sort of location adjustment is common in appraisal analyses.*

28.    In utilizing the preceding analysis to account for the impacts of Harvey, I cited the methodology outlined in The Appraisal of Real Estate 15th, at 390-392.

29.    Papke/Hamilton opine that certain exogenous conditions and events should have been accounted for in my analysis. This is a common problem in real estate appraisal, and Jackson (2010) summarized some of the issues to be considered. In the case of properties impacted by the Arkema explosion event, by focusing on prices/values during the year prior to the explosion event, any environmental conditions in the affected area would already be capitalized into those prices and values[18].

30.    In that same vein, Papke/Hamilton opine that the 2019 fire and explosion event at the KMCO Facility should have been considered[19]. However, Papke/Hamilton fail to explain how a 2019 event could have impacted property values in 2017.

31.    The remainder of this reply will deal with specifics of some of the issues raised in both the Li report and the Papke/Hamilton report. Since it appears that Li's report informed Papke/Hamilton, I will deal with issues raised in these two reports together, rather than separately.

## SPECIFIC ISSUES RAISED IN THE TWO REPORTS

32.    Paragraph 10 of the Li report begins a discussion of individual damages versus class-wide damages. I would note that the appraisal question I have been asked to address is to utilize a mass appraisal model to calculate individual damages on a class-wide basis. My model has done exactly that. The mass appraisal model holds constant what Dr. Li would call "other market factors that influenced property values in the purported class area." By using a two-step process, first an unimpaired model with an accuracy of -0.72%, and then adding to it an instrumental variable which measures the degree of diminution resulting from the Arkema explosion event, I have successfully applied a class-wide model to individual residential properties. Note that this model is able to value nearly every residence in the 7-mile affected area.

33.    The instrumental variable is calculated by examining trends in monthly average residential property prices both inside and outside of the class area, and before and after the Arkema explosion event, approximately contemporaneous with the Harvey landfall. In this way, the collateral impacts of Harvey, which would have impacted prices both within and without the affected area, are controlled. This allows my model to focus narrowly on the impacts of the

---

[18] Jackson, Thomas, "Real Property Valuation Issues in Environmental Class Actions", The Appraisal Journal, Spring, 2010, 141-149.

[19] April 2, 2019. See https://www.csb.gov/kmco-llc-fatal-fire-and-explosion-/, viewed but not downloaded 10/1/21.

explosion event itself.  Figure 1, following, provides a simplified view of how this works in practice:

*Figure 1 -- Simplified View of Impact Variable*

| A:  Prices 'inside and before' | B:  Prices 'outside and before' |
|---|---|
| C:  Prices 'inside and after" | D:  Prices 'outside and after' |

34.    In this model, the difference between B and D (outside/before versus outside/after) gives a direct measurement of the pricing impact of Hurricane Harvey, holding everything else equal. The difference between A and C (inside/before versus inside/after) gives a direct measurement of the pricing before/after the Arkema Explosion event, but it also includes any impact from Harvey.  Thus, deducting the Harvey impact from the Arkema/Harvey impact allows me to isolate the pricing loss from Arkema.

35.    These findings are summarized in my report in table 10, which is reproduced here as Figure 2:

*Figure 2 -- Table 10 from Original Report*

|  | Inside | Outside |
|---|---|---|
| Aug 2017 Prices | 100.365 | 88.9364 |
| Aug 2018 Forecasted | 116.781 | 95.5448 |
| Aug 2018 Actual Prices | 97.8548 | 91.6432 |
| % Change 2017/2018 | -16.21% | -4.08% |
| *Damages* | *-12.12%* |  |

36.    Thus, the total pricing drop inside the affected area from before the Arkema explosion event to after is 16.21%, but the model ascribes 4.08% of this to the Harvey effects.  Hence, the residential price "damages" immediately after the Arkema explosion event are determined to be 12.12%.

37.    I would note that this is probably not a full equilibrium price.  For that reason, and as I will describe later, I also rely on comparable case studies to inform my opinion of the full equilibrium value impact.

38.    Nonetheless, Dr. Li either misconstrues the data or manipulates it to establish a counterpoint. The "inside/before" prices show a significant upward trend line, as shown in Figure 4 of my original report, reproduced below as Figure 3:

*Figure 3 -- Figure 4 from Original Report*



39.    Note in the above figure that the trend line reaches about $100 per square foot right before Arkema explosion event – actually $100.37. Starting from 12 months prior to the Arkema event, prices were increasing, on average, by $1.368/month. But for Harvey and Arkema, we would have expected these prices to continue into 2018[20].

40.    Hence, I took the pre-Arkema equation and extended it for 24 months, to determine what per-square-foot prices would have been expected in the 7-mile affected area a year after the explosion event, if not for the explosion event and Harvey. That was shown in Equation 3 in my report, reproduced as Figure 4 below:

*Figure 4 -- Equation 5 from Original Report*

$$\text{Inside PSF Price} = \$83.949 + \$1.368 \times 24 \text{ months} = \$116.78/\text{SF}$$

41.    Thus, if prices simply continued on their pre-Arkema trend, residential prices in this market would have grown to $116.78.

42.    In my original report, I split this analysis into two different graphics, Figure 4 and Figure 6. This latter figure compares actual prices after the Arkema explosion event compared to the price trend starting from where prices were <u>before</u> the explosion event. The defendant's experts purposely confuse these trend lines and attempt to ignore the collapse in prices which occurred immediately after Arkema. To clarify this, I have now added Figure 5, below, which combines the "inside" trend lines from before and after the Arkema explosion event:

---

[20] According to Houstonproperties.com, prices in the broader Houston market rose 31% from the 2009 trough to 2016, and were continuing to rise until Harvey hit. See https://www.houstonproperties.com/houston-real-estate-market-2016-recap and https://www.houstonproperties.com/houston-real-estate-market-2017-recap, viewed but not downloaded 10.1.21

*Figure 5 -- Inside Area Price Trends, 2-years*



43. As can now be clearly shown, prices after the Arkema explosion event trended downward. While this actual downward trend is in itself materially important, it is even more economically significant when compared to where prices were trending before the explosion event.

44. This analysis from my original report is then compared to the pricing trends from the unaffected area, as reconstructed in Figure 6, following:

*Figure 6 -- Prices in Control Area*



45.    In the control area, prices were also impacted around the time of Harvey, but not to the same extent as in the affected area.  The isolated factor differentiating these two data sets is the Arkema explosion event.  Thus, any difference in these trend lines could only be ascribed to that event.  That difference is shown in Table 10 of my original report, and reproduced as Figure 2, preceding.

46.    Beginning at his paragraph 16, Li raises the issue of relatively low "R-squared" values in my price trend analysis.  R-squared, or $R^2$, is shorthand name given to the <u>coefficient of determination</u>.  In a simple ordinary least square regression, $R^2$ ranges from zero to 1 (or zero to 100%) and is a shorthand for the proportion of the variance in the dependent variable explained by the array of independent variables.  Real estate appraisers who use regression in their work are cautioned against an overly high $R^2$, since that would be an indicator of <u>overfitting</u> which results in an overly fragile model[21].

47.    Nonetheless, in this case, when I isolate just one variable – in this case, the price change over time[22], the $R^2$ no longer represents <u>all</u> of the array of variables, but only one.  In this case, the

---

[21] See, for example, Dell, George, "Common Statistical Errors and Mistakes:  Valuation and Reliablity", <u>The Appraisal Journal</u>, Fall, 2013, 332-347.

[22] In appraisal jargon, the "market conditions adjustment".  See <u>The Appraisal of Real Estate</u> 15th, op cit., at 388

$R^2$ is called the <u>coefficient of partial determination</u>. Wuensch (2013)[23] provides an excellent teaching tool for his undergraduate students and shows examples where a fully-functional regression equation may have $R^2$ values in the 75% range, but a partial $R^2$ from that same model may be as low as 18%. This is exactly the phenomenon that Li misleadingly critiques.

48.    Beginning at Section D, page 12, Dr. Li invokes Dr. Kaltofen's analysis, and critiques my analysis for supposedly not utilizing his model. Here, Li shows his ignorance of the appraiser's <u>scope of work</u> obligations[24]. At the beginning of every appraisal assignment, including mass appraisals, an appraiser is obligated under USPAP to determine an acceptable scope of work for the assignment. This scope of work determination includes the acceptability of <u>conditions of the assignment</u> imposed by the client. My clients in this case are the attorneys representing the plaintiffs in this matter, and a condition of my assignment was the 7-mile affected area. As an appraiser, I found this to be an acceptable condition, and evaluated the data accordingly. Dr. Li's criticisms here have no basis in econometric analysis, but only appear to be an unfounded attempt to sow confusion.

49.    Again, Dr. Li has no training, experience, or expertise as a real estate appraiser. However, in Section V, paragraph 25, Dr. Li makes the broad claim that, "…[r]egression property value estimates are fundamentally unsuited as benchmarks for assessing damages in this case." I would note that the appraisal profession has decades of experience using regressions analyses and other tools in the mass appraisal toolbox. Two of the ten USPAP rules (#5 and #6) are devoted to mass appraisal and regression analyses, as well as three USPAP advisory opinions (#18, #32, and #37). There are 36 references to the use of regression analysis in the text, <u>The Appraisal of Real Estate</u> 15th. For example, under the topic of Specialized Methods and Techniques for Determining the effect of Environmental Contamination on Prices and Values, the text lists the following four recommended methods[25]:

*Paired data analysis of sales of impacted or potentially impacted properties*

*Analysis of environmental case studies*

*Multiple regression analysis of property sales in a potentially impacted area or in proximity to a source site*

*Adjustment of income and yield capitalization rates on income-producing properties to reflect environmental risk premiums estimated through market research*

50.    Of the four methods listed, the fourth is exclusive to income producing properties. In this analysis, I have used all three of the other methods recommended by this widely regarded text.

51.    Somewhat ironically, Mr. Papke and Dr. Hamilton reproduce this very list in Section 2.6.2 of their report.

---

[23] Wuensch, Karl L, "Multiple $R^2$ and Partial Correlation/Regression Coefficients", East Carolina University, 2013

[24] See USPAP, 2020-2021, op cit., at 13

[25] <u>The Appraisal of Real Estate</u>, 15th, op cit., at 188.

52. In paragraph 27, Dr. Li opines, "It is not appropriate to use pre-Hurricane Harvey property prices as a basis for measuring economic damages in this case, as doing so would award damages based on the hurricane damage that is unrelated to Arkema's conduct at issue." First, this is of course an obvious attempt to weave a legal argument into an appraisal review. However, "prices" are generally accepted and used as the primary basis for real estate appraisal[26]. Hence, the use of pre-Harvey prices to determine individual real estate values is in fact the only acceptable way of performing appraisals, either mass or individual appraisals.

53. Further, I use as a baseline for unimpaired values the sales which occurred both in the affected area and in nearby unaffected areas during the period one-year prior to the effective date of value. This choice of one year was not arbitrary. Residential appraisals commonly use one-year prior to the effective date of value as a period from which to examine comparable sales, and in fact this one-year time frame is codified for Fannie-Mae and Freddie-Mac conforming appraisals in the Fannie Mae Selling Guide[27].

54. In addition, my use of a control area which was also affected by Hurricane Harvey allows me to deduct the Harvey-related impact on sales prices during the one-year period following Harvey's landfall. Hence, the net sales price impact measured during the year following the Arkema explosion event does not include Harvey impacts[28].

55. In paragraph 28, Dr. Li appears to misunderstand, misconstrue, or outright mislead regarding my model. He opines that it is inappropriate to use transactions in the affected area after the explosion event to calculate unimpaired values. This is patently not what was done here. I use transaction prices in the affected area after the Arkema explosion event to draw a contrast with transaction prices in the unaffected control area as well as a contrast with property price trends before the Arkema explosion event. Thus, any impact on pricing after the Arkema explosion event can be isolated from Harvey impacts.

56. Dr. Li's opinions beginning on paragraph 30 are based an a highly flawed characterization of my work. The MLS prices and tax assessment data used in a regression to determine baseline unimpaired prices are drawn from the period before Hurricane Harvey, and thus purposely exclude the impacts of Harvey. The pricing model after Harvey is purposely designed to account for the impacts of Harvey separate from the impacts of the Arkema explosion event.

57. Beginning in Paragraph 32, Dr. Li questions the dispersion measures I have used. I would note that these measures are similar in nature to those I have used for several years in numerous residential mortgage-backed securities cases. My Greenfield AVM has been consistently accepted in these court cases, including (but not limited to):

---

[26] See, for example, Chapter 20, "The Sales Comparison Approach", in The Appraisal of Real Estate 15th, op cit.; See also Sec. 23.013, "Market Data Comparison Method of Appraisal" in the Texas Tax Code, chapter 23, Appraisal Methods and Procedures

[27] Fannie Mae Selling Guide, September 2021, Section B4-1.3-08, at 609. Note that this 1-year requirement was in effect before the date of my report, and this specific section dates to October 2, 2018.

[28] This "separating equilibrium" type methodology was approved by the Court for my use in the class certification of Turner v. Murphy Oil. (US, 2006 WL 91364 (E.D.La. Jan. 12, 2006). In that case, I utilized a similar method for examining the impact of an oil spill which occurred three days after the Hurricane Katrina landfall.

*FHFA v. Nomura* (USDC, SD of NY)[29]

*Mass. Mut. Life Ins. Co. v. DB Structured Prod., Inc.* (USDC, District of Mass)[30]

*Mass. Mut. Life Ins. Co. v. DLJ Mortg. Capital, Inc.* (USDC, District of Mass)

*In Re: RFC and ResCap Liquidating Trust Litigation* (USDC, District of Minn)

*Home Equity Mortgage Trust et al. v. DLJ Mortg. Capital, Inc.* (State of NY)

*US Bank NA v. Citigroup Mortg. Loan Trust* (USDC, SD of NY)

*Deutsche Bank Nat Trust co v. Morgan Stanley Struct. Trust* (USDC, SD of NY)

*FHLB of Chicago v. Banc of America Funding* (Circuit Court of Cook County, Il)

*FHLB of Boston v. Ally Financial* (Superior Ct. of Suffock County, Mass)

*FHLB of Boston v. Nomura Asset Accpt.* (Superior Ct. of Suffock County, Mass)

58. Notably, in these cases, I also used post-event data to aid in informing my mass appraisal model, such as I have done here. In *ResCap*, the Court specifically addressed and accepted that, noting:

> *Dr. Kilpatrick uses post-settlement values as a method to assess information that was available to parties at the time of settlement – contemporaneous TAV values.*

59. As previously noted, the Papke/Hamilton report appears to be informed by Dr. Li's opinions, even though the two reports are dated the same. However, the Papke/Hamilton report also misleadingly misconstrues certain aspects of USPAP. For example, on page 14 they make reference to USPAP's advisory opinion #9 (AO-9) in a context that implies it establishes a requirement under USPAP. The Appraisal Standards Board itself cautions against such characterization, and in fact includes a very specific disclaimer in USPAP about the advisory opinions:

> *Advisory Opinions are not part of USPAP…Advisory Opinions are based on presumed conditions without investigation or verification of actual circumstances. Guidance provided in Advisory Opinions does not represent the only possible*

---

[29] The Court noted that "Kilpatrick's testimony both rested on a reliable foundation and was relevant to the task at hand…When subjected to close examination at trial, his tools were shown to be conservative, careful instruments that were well-designed…" In its decision, the Court further noted that "FHFA has shown that Kilpatrick's AVM has performed at least as reliably as those on which defendants and others in business typically rely in making important decisions."

[30] The Court stated that, "As for Dr. Kilpatrick's testimony regarding GAVM, the court finds his opinion relevant and rests upon sufficiently reliable grounds for admissibility purposes."

*solution to the issues discussed and the advice provided may not be applied equally to seemingly similar situations[31].*

60.    Mr. Papke and Dr. Hamilton critique my empirical determination of a uniform diminution in value throughout the 7-mile affected area I have examined and researched (see page 15). They fail to acknowledge the very specific discussion in my report, beginning at page 38, about examining any correlation between distance from the Arkema explosion event and diminution in value. I calculate correlation coefficients (often referred to as Pearson's Coefficients) for prices both before and after the explosion event. In both cases, the correlations are nearly zero, indicating near uniformity of effects within the affected area. Table 11 from my original report is reproduced following as Figure 7.

*Figure 7 -- Table 11, Correlations, from Original Report*

|  | Correlation |
| --- | --- |
| *Before Explosion* | -0.006230049 |
| *After Explosion* | -0.029686217 |

61.    Schacht and Aspelmeier (2005)[32] show that for large samples, these correlation coefficients would reject any statistically meaningful correlation at a confidence level greater than 99%. Hence, Mr. Papke and Dr. Hamilton's argument on this matter are flawed in two regards. First, I did examine this, and second, the empirical data rejects any statistical correlation between distance and diminution.

62.    In their section 2.6.1, Mr. Papke and Dr. Hamilton rely on a 36-year-old journal article to suggest that an AVM is not appropriate in this matter. First, as previously noted, both State and Federal Courts throughout the country, including in the 5th Circuit, have accepted my mass appraisal and AVM work. Second, as previously noted, USPAP now has two rules and three advisory opinions relative to the application of AVMs. Finally, in the ensuing three-and-a-half decades, there has been substantial advancement in AVM practice and its acceptance in the appraisal field. As Dell (2017) noted in The Appraisal Journal[33]:

>    *Thus, an understanding of regression provides a clear starting point for the reengineering of the valuation process.*

63.    In their section 2.6.3, Mr. Papke and Dr. Hamilton cherry-pick from Jackson (2010)[34] to suggest the "potential" for inequitable allocation of damages when using a regression analysis. However, the bigger picture of the Jackson article is that he actually supports the use of such models, noting:

---

[31] USPAP 2020-21, op cit., at 63

[32] Appendix 2 from Schacht, Stephen P., and Jeffrey E. Aspelmeier, Social and Behavioral Statistics, 2nd, (New York: Routledge, 2005)

[33] Dell, George, "Regression, Critical Thinking, and the Valuation Problem Today, The Appraisal Journal, Summer, 2017, 217-230. *Note: Mr. Dell and I serve together on the Review Board for The Appraisal Journal, the peer-reviewed, flagship publication of The Appraisal Institute.*

[34] Jackson, 2010, op cit.

> *One technique that has been increasingly employed to estimate risk effects is multiple regression analysis[35].*

In that, Jackson was in fact building on his prior, 2005, article, in which he noted:

> *Multiple regression analysis is an increasingly used technique in the real estate appraisal field. The Appraisal Institute has two books on this topic as it relates to automated valuation modeling. In addition, the Appraisal Institute offers a seminar entitled Regression Analysis in Appraisal Practice: Concepts and Applications[36].*

In short, it is clear that Mr. Papke and Dr. Hamilton are wrong in their characterization of regression analysis and AVMs, and these statistical techniques now have a firm place in the appraisal body-of-knowledge.

64.    Mr. Papke and Dr. Hamilton proffer a hypothesis, without any analysis or support, that given enough time, residential prices in the affected area may rebound to what they would have been had the Arkema explosion event never occurred. In support of this argument, they provide, without citation, a figure on page 21 taken from an un-cited 1992 Appraisal Journal article. In fact, that article was written by Dr. Bill Mundy, the founder of Greenfield Advisors, who is generally credited with introducing the term "stigma" into the appraisal lexicon[37]. That figure illustrates some actual observations made by practicing appraisers over the years, and as such deserves further review. I have reproduced it following, as Figure 8.

65.    First, this figure focuses on what Dr. Mundy calls the "marketability effect" of environmental impacts. Second, the figure clearly notes that after the occurrence of a "problem" there is damage, in the form of lost opportunity or opportunity costs. Finally, in the legend (which Mr. Papke and Dr. Hamilton leave out), point #6 represents residual stigma which remains after the problem is removed. Dr. Mundy puts no time boundaries on the hypothetical restoration of value in real dollars, nor does he attempt to deal with property value impacts in markets which were trending upward in value prior to the damage occurring.

66.    Dr. Mundy goes on to quantify the marketability loss in an example of a property which had both a loss in value for a period of time but also an increase in the capitalization or discount rate as a result of increased marketability risk. In his example, the present value loss ascribed only to marketability problems was 42.3%[38]. He notes that for income producing properties, this loss would actually be "…increased by the present value of the lost NOI."

---

[35] *Id,* at 148

[36] Jackson, Thomas O., "Evaluating Environmental Stigma with Multiple Regression Analysis", The Appraisal Journal, Fall, 2005, 363-369.

[37] Mundy, Bill, "The Impact of Hazardous Materials on Property Value", The Appraisal Journal, April, 1992, 155-162. Note that in the 75th Anniversary issue of The Appraisal Journal, this article was listed as #4 of the 9 most important articles published in the 75-year history of The Appraisal Institute's flagship publication.

[38] *Id*, at 162

*Figure 8 -- Mundy (1992) Figure 1*



**FIGURE 1    Marketability Effect**

1 = Loss in value as a result of diminished marketability. Public becomes aware of the problem. How buyers and intermediaries perceive risk (unknown & dread factors).
2 = Duration. Time to understand relationship between hazard and risk.
3 = Amount of improvement in value resulting from knowledge (scientific) of hazard and effect knowledge has on perceived risk.
4 = Duration as hazard remains. Value may change as perceived risk changes.
5 = Increased value caused by removal of hazard (i.e., cost to cure).
6 = Stigma remaining after hazard removed. A period of uncertainty related to uncontrollable, involuntary, unknown, unobservable character of the hazard.

Damage—Related to opportunity. Lost opportunity is an opportunity cost measured by the diminished value over the duration of the event at a market rate.

67.    Beginning on page 23, Mr. Papke and Dr. Hamilton critique the use of environmental case studies. The use of case studies to inform appraisal values in complex situations has long been accepted by the profession. Indeed, <u>The Appraisal Journal</u> publishes in each issue a compendium of recent court cases to inform appraisers of valuation determinations in complex litigation. Jackson (2004) notes that

> *…environmental case studies are one of several acceptable methods for analyzing the impacts of environmental contamination and for estimating the impaired value of a contaminated or previously contaminated property*[39].

It is important to note that even though this is an important and well accepted methodology in such appraisal situations, Mr. Papke and Dr. Hamilton do not proffer a single case study of their own to substantiate their valuation.

---

[39] Jackson, Thomas O. "Case Studies Analysis:  Environmental Stigma and Monitored Natural Attenuation", <u>The Appraisal Journal</u>, Spring, 2004, 111-118.

## SUMMARY AND CONCLUSIONS

68.    I have addressed the Li Report and the Papke/Hamilton Report together because it appears that Dr. Li's work informed Mr. Papke and Dr. Hamilton. It would appear that these three experts have successfully used the data and models I provided to reconstruct my model and findings, thus supporting my primary opinion that a model can be used with data from the affected area to value residential real estate both before and after the Arkema event. However, they have not proffered any alternative model, and their opinion that there is no diminution in value in the area affected by the Arkema explosion event is clearly a result of their incorrect re-set of the "after" price trend in the affected area. When the actual prices "before" and "after" the Arkema explosion event are examined together, the analytical mistakes made by Li, Papke, and Hamilton become clear.

69.    Dr. Li, who is not an appraiser, concentrates his efforts on my empirical analyses, which includes my AVM. Dr. Li has no training, experience, or expertise in real estate appraisal, and as such is woefully unfamiliar with how analytical methods are used in the appraisal process. As such, Dr. Li has no facility with market conditions trends, the manner in which prices inform values, appraisal reconciliation, the treatment of mass appraisals and AVMs in USPAP, or the USPAP Scope of Work requirements. Further, he seems to ignore, misunderstand, or misconstrue relatively straightforward econometric concepts, such as the use of instrumental variables, correlation coefficients, event studies, partial coefficients of determination, and trend analyses.

70.    Mr. Papke and Dr. Hamilton are appraisers, although I would note that according to the Appraisal Subcommittee, which oversees appraisal licensing nationally, neither Mr. Papke nor Dr. Hamilton are, nor have they ever been, certified or licensed in Texas. That said, they repeatedly misrepresent appraisal standards and methodologies. Their flawed interpretation of and failure to provide a citation to Dr. Mundy's marketability graphic is an example of their repeated misleading of the reader. They acknowledge that case studies are an acceptable tool in situations such as this one, and then critique the use of case studies in my analysis. They critique the use of regression analyses, even though the authors they cite actually support regression analysis, as does the appraisal profession's current body of knowledge.

71.    Thus, I continue to stand by my findings as reported in my previous study and incorporate all of those findings into this reply.

72.    Further, all of the assumptions, limiting conditions, hypothetical conditions, factual data, definitions, citations, and analyses contained in my previous study are incorporated herein by reference.

I hereby declare that the above statement is true to the best of my knowledge and belief, and that I understand it is made for use as evidence in court and is subject to penalty for perjury.

GREENFIELD ADVISORS INC.

John A. Kilpatrick, PhD, MAI

Texas State Certified General Appraiser No. 1329613

October 4, 2021