UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

SHANNAN WHEELER, ET AL.,            )

       Plaintiffs,                  )CIVIL ACTION NO.:

VERSUS                              )4:17-cv-2960

ARKEMA, INC.,                       )

       Defendants.                  )

DEPOSITION OF SHENG LI, Ph.D.

TAKEN VIA VIDEOCONFERENCE

ON THURSDAY, OCTOBER 14, 2021, AT 9:00 A.M.



AmersonWhite®

COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

A.   I understand that's the context that he's giving his opinions.

Q.   Okay.  So in that context, your opinion in this case is related to real estate appraisal, right?

A.   My opinions are related to how he has applied the econometric methods and the statistical test that he's using to arrive at his opinions.

Q.   Okay.  So are you saying your opinion in this case is not related to real estate appraisal?

A.   I am not giving any real estate appraisal opinion.  My opinion ultimately in this case relates to whether Dr. Kilpatrick has reliably employed econometrics and statistical methods in his analysis.  And, ultimately, he didn't.

Q.   So am I correct that you are providing opinions about the validity of methods employed by a real estate appraiser to determine property damage?

A.   I am providing an opinion about the validity -- or how the methods were employed in this case.  I'm not giving an opinion about, in general, methods for evaluating real estate

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

prices.  My opinion is how Dr. Kilpatrick applied econometrics in this case to try to assess class-wide economic damages.

MR. STAG:  Object to the responsiveness of the answer.

EXAMINATION BY MR. STAG:

Q.  Dr. Li, I'm asking a yes-or-no question. You're free to explain it after you answer yes or no.

My question is:  Am I correct that you are providing opinions about the validity of methods employed by a real estate appraiser to determine property damage?

MR. PRICHARD:  I'm going to object that it's asked and answered.

THE WITNESS:  My opinion is about the validity of methods used by Dr. Kilpatrick for appraising damages in this case.

MR. STAG:  Okay.  Object to the responsiveness of the answer.

EXAMINATION BY MR. STAG:

Q.  Dr. Li, I'm asking you a yes-or-no question.  I'm asking whether I am correct that you are providing opinions about the validity of methods employed by a real estate appraiser to



AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

Sheng Li, Ph.D. 10/14/2021

Page 8

determine property damage; yes or no?

A.    Yes --

MR. PRICHARD:  Asked and answered.

THE WITNESS:  -- yes, to the extent that it's about Dr. Kilpatrick's methods used in this case.

EXAMINATION BY MR. STAG:

Q.    Thank you.  Is it also correct that you are providing opinions about the validity of methods employed by a real estate appraiser to determine diminution of value of real estate?

A.    Again, I'm opining on the validity and reliability of the methods employed by Dr. Kilpatrick in this case.

MR. STAG:  Object to the responsiveness of the answer.

EXAMINATION BY MR. STAG:

Q.    Again, I'm asking a yes-or-no question. I'm asking whether I'm correct.  I'll just repeat it.

Is it also correct that you are providing opinions about the validity of methods employed by a real estate appraiser to determine diminution and value of real estate?

MR. PRICHARD:  Objection; asked and

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

answered.

THE WITNESS:  Yes, to the extent that Dr. Kilpatrick is a real estate appraiser, and I'm evaluating the validity and reliability of his methods, specifically the econometrics methods that he tries -- or he purports to employ in this case.

EXAMINATION BY MR. STAG:

Q.    And is it also correct that you are calculating property damage?

A.    I'm not calculating property damage.

Q.    All right.  Do you come to a conclusion that there is no property damage or zero property damages?

A.    My finding is that Dr. Kilpatrick fails to show that there is diminution.

Q.    Okay.  Do you independently conclude that there is no property damage?

A.    I do not have an independent assessment of property damage in this case.

Q.    Thank you.  Is it further correct that you are calculating diminution and value of real estate?

A.    I think I just answered that.

Q.    Okay.  So no, you're not; you're not

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

Q.    Okay.  Is there anything that you relied on or was important to your report that has not been produced?

A.    Not to my knowledge.  I think we produced our reliance materials.

Q.    Okay.  Now, you've been asked to review the report of Dr. Kilpatrick, a certified real estate appraiser, and his opinions about the appropriate methodology to determine damages in real estate, correct?

A.    Yes.

Q.    Okay.  Now, did you set your own scope of work, or was that assigned to you by the attorneys?

A.    That was my assignment to review his methods, broadly, his econometrics and his statistical methods.

Q.    Okay.  And who gave you that assignment?

A.    I don't know specifically.  It was through conversations with counsel.

MR. STAG:  I'm going to mark, as Exhibit Number 2, the 2018 report by Dr. Li.

(EXHIBIT 2 IDENTIFIED)

EXAMINATION BY MR. STAG:

Q.    This 2018 report related to opinions

THE WITNESS:  I just gave you the answer.  Same answer I gave you before.  We can read it back.

EXAMINATION BY MR. STAG:

Q.  I don't think you did.  What I'm asking is a yes-or-no question, and you give me a lot of words that are not yes or no.  So I'm going ask it again, and I'll just start with the question I started at the beginning.  And it's a yes-or-no question, sir, if you listen carefully.  You're free to explain yourself after you say yes or no, but I'm going to ask it again.

It is true that your education, experience does not directly relate to real estate appraisal?

MR. PRICHARD:  Objection; asked and answered.

THE WITNESS:  For one, you changed the question.  But it's untrue that my education and experience does not relate to real estate appraisal.  It does relate to real estate appraisal to the extent that they're using econometric tools --

EXAMINATION BY MR. STAG:

Q.  Okay.

A.  -- to arrive at their conclusions.

Q.   So I'm clear, your answer is:  No, you believe that your education and experience relates to real estate appraisal?

MR. PRICHARD:  Objection; misstates testimony.

THE WITNESS:  I would agree, you are misstating what I say.  It relates to real estate appraisal when they're using econometrics and statistics.

EXAMINATION BY MR. STAG:

Q.   All right.  Now, none of your presentations you list in your résumé pertain to real estate appraisal, true?

A.   Let me look.  Yes, none of these are real estate.

Q.   Right.  I'm looking at the presentations.  The most recent one had to do with a virtual talk, SEP to Arbitration:  "Can we be FRANDS?"  What is that?

A.   Standard essential patents is SEP.  And FRANDS is fair, reasonable, and non-discriminatory license and practices for patents.

Q.   So that had to do with patents?

A.   Patents.

Q.   And the second one in March of 2021 is

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

Sheng Li, Ph.D. 10/14/2021

GCR Interactive Pharmaceuticals. What is that about?

A.    We were talking about licensing and antitrust issues in pharmaceutical industry.

Q.    Okay. The third one in September 2020, is ACI 11th Summit on Biosimilars and Innovator Biologics. What is that?

A.    Those are -- biosimilars is a type of drugs that are made using larger biological molecules. So it's, again, pharmaceuticals.

Q.    Did it also have to do with antitrust issues?

A.    Potentially, there was some antitrust issues, as well.

Q.    Okay. We also have this Berkeley-Tsinghua Conference on Transnational IP Litigation. What is that concerning?

A.    IP is intellectual properties. So that was patents.

Q.    Okay. Did they concern antitrust issues, as well?

A.    Some, yes.

Q.    So would you agree that most of your presentations relate in some way to antitrust and economics, right?



AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

A.    Yes.

Q.    Are you published in any antitrust magazines?

A.    Yes.  I think I list some articles in antitrust source or antitrust magazine, yes.

Q.    Have you published in any real estate appraisal peer-review publications?

A.    I have not.

Q.    Have you taken any university course work concerning the appropriate methods of real estate appraisal?

A.    I have not.

Q.    Do you know if Dr. Hamilton is trained in the realm of statistics as it relates to real estate appraisal?

A.    I am not familiar with Dr. Hamilton's training.

Q.    Are you trained in the realm of statistics as it relates to real estate appraisal?

A.    I am trained in statistics and econometrics.  And the very concepts that Dr. Kilpatrick lists in his report as econometrics methods that he uses, I am trained in those.

Q.    Are you trained in the standards for the real estate appraisal profession?

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

A.    I am not a part of the real estate appraisal profession.

Q.    Okay.  And it's true you've never worked as a real estate appraiser?

A.    I have not worked as a real estate appraiser.

Q.    You've never appraised real estate property before, right?

A.    I have not appraised real estate property.

Q.    Before this assignment, have you ever worked with real estate appraisers?

A.    Perhaps when I was shopping for my apartments.

Q.    Is it true that you have no training or education in real estate appraisal methods and techniques?

A.    Again, I think we covered this earlier. Dr. Kilpatrick says he's using a lot of econometrics as statistical methods.  I have training and expertise in those methods and how they should be applied.

Q.    But no training and expertise in real estate appraisal methods, correct?

A.    Well, he calls those econometrics

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

Sheng Li, Ph.D. 10/14/2021

Page 27

A. I don't know.

Q. Okay. Am I correct that you hold no memberships in any professional organizations that publish standards for the methodology to appraise real estate?

A. As far as I'm aware, no.

Q. You're not a member of the Appraisal Foundation that publishes the Uniform Standards of Professional Appraisal Practice, right?

A. I am not a member of that organization.

Q. And it's true that you have no certifications in real estate appraisal?

A. I don't have certifications in real estate appraisal, yes.

Q. And it's true you hold no licenses to appraise real estate?

A. Yes.

Q. And in summary, it's true that your formal education and training and experience is more closely related to economics and not real estate appraisal specifically?

A. Again, we've been talking about the same thing, just in multiple questions. Dr. Kilpatrick says he's using econometrics methods. I have expertise in econometrics methods. He calls those

AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

those more or less some type of report or declaration?

A. Teradata and SAP, that was a written declaration. Nick's Garage, the case settled before any written testimony was given.

Q. All right. So you did not do a report in Nick's Garage?

A. I did not do a report.

Q. Okay. And you were not deposed?

A. I was not deposed.

Q. Okay. In Teradata, you didn't really do a report; you did a declaration; is that right?

A. I did a declaration, yes.

Q. And you were not deposed?

A. I was not deposed.

Q. And this case is the first time you've been asked to evaluate a real estate appraisal report as a professional, right?

A. Yes. The 2018, that was the first time I was asked to respond to a real estate report.

Q. Right. 2018 in this Arkema matter, right?

A. Yes.

Q. Okay. What is your hourly rate in this case?



Q.    Okay.  Did you consult with any local residential real estate appraisers?

A.    No.

Q.    What data did you review, if anything?

A.    For this case, I looked at the MLS transaction data.  So I looked at the data that Dr. Kilpatrick eventually produced in his reliance materials.  It took him about a month, I think, after his report was filed to actually get that to us.  And then I reviewed additional MLS transaction data that came from, I think, Mr. Papke.

Q.    Okay.  Did you provide any drafts of your reports to the attorneys for Arkema before you completed it?

A.    Yes, I sent drafts.

Q.    Okay.  Without getting into the details of it, did you -- did they make comments or suggestions related to your drafts?

A.    There were comments on the drafts.

Q.    Okay.  Now, before forming your opinions, did you perform any research on real estate appraisal standards for guidance or consult with authorities for real estate appraisal?

A.    I evaluated the econometrics and

Sheng Li, Ph.D. 10/14/2021

statistical studies that Dr. Kilpatrick performed as he presented them in the report.  I'm not offering an opinion about real estate industry standards.

Q.   Okay.  So you didn't perform research on real estate appraisal standards for your opinions, right?

A.   I did not do specific research on real estate industry standards.

Q.   Okay.  And that would include you did not review something like the Appraisal Foundation's Uniform Standards of Professional Appraisal Practice, which is called USPAP, correct?

A.   I looked at materials that Dr. Kilpatrick cited in his report.

Q.   Okay.  Which may have included USPAP, right?

A.   I think that was one of the materials that he cited.

Q.   Right.  Did you rely on USPAP in forming your opinions?

A.   No.

Q.   Did you visit the Arkema plant?

A.   No.



AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233     P.O. Box 1554  Hammond LA  70404     Fax 985.419.0799

reports.  I skimmed a couple of the other reports.

Q.   Do you know what chemical substances were released from the Arkema plant in connection with the incident?

A.   I saw it in some of the documents.  I can't name them off the top of my head.

Q.   Do you know if any of the chemical substances released have the potential to cause health effects?

A.   I believe that's a matter of dispute among the other experts.

Q.   But since you don't know the specific chemical substances, you can't say whether or not they have a potential to cause health effects, right?

A.   That's not in the scope of my assignment.

Q.   All right.  Well, let's talk about your report and some of the opinions in here.  I want to go to page 4, section 3, economics of class certification and damages.

A.   Which report?

Q.   This is the 2021 report, your current report, Exhibit 4.

A.   2021?  Okay.  Section 3?



AmersonWhite

COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

Q.   Yes, sir.  We're on Exhibit 4, section 3, page 4 of your 2021 report.

A.   Yes.

Q.   Okay.  Now, in paragraph 7, you state that you understand that to obtain class certification, Plaintiffs must demonstrate that they can establish central elements of their claim, including liability, injury and damages using evidence and methods common to the proposed class, correct?

A.   Yes.

Q.   Where did your understanding come from?

A.   From my prior work on class certification matters.  So I've worked on other matters involving economic damages for classification.  I think at some point I also talked to counsel in this matter to confirm if that's a correct understanding.

Q.   Are you providing any legal opinions in this matter?

A.   I am not providing legal opinions.

Q.   Now, you go on to state that you understand that to establish class-wide damages, Plaintiffs must demonstrate that impact to individual class members can be established using

evidence common to the class, and that the amount of damages awarded to each purported class member can be reliably calculated using a formulaic approach, right?

A.    Yes.  And it continues, "using a formulaic approach that can be applied to the entire proposed class."

Q.    Okay.  And where does that understanding come from?

A.    Same as the previous paragraph, on my work in other classification matters.  And I also, I think, discussed with counsel in this case to confirm whether that's a correct understanding.

Q.    When you say "reliably calculated," what do you understand that to mean?

A.    Depending on the method you used, there are reliability standards.  And if you're using a measure that's going to be off by 50, 60, 70 percent, most of the time, that's not reliable measure.

Q.    Okay.  And formulaic approach, what do you mean when you say "formulaic approach?"

A.    That you use a formula that you can apply to the entire class, that you don't have to go one by one and do individual inquiry and

individual assessment for each of the class members.

Q. Anything else?

A. That's my general overview. We can get into specifics about this case and how we're looking at it, but that's the general idea.

Q. Okay. Is your understanding of class certification issues essential to your report and opinions?

A. My understanding of these issues is the starting point. So it's my understanding of what the goal is for the analysis, what the damages expert needs to establish.

Q. Okay. Now, are all of your opinions included in your reports, both the 2018 and 2021 reports?

A. My reports contain my opinions, yes.

Q. Okay. Do your reports contain a complete statement of all basis and reasons for your opinions?

A. I provide the basis for my opinions in my reports, and I also provide reliance materials for my reports.

Q. Were all of the opinions in your reports generated by you?

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

Q.    Who is Nathan Evans and Greg Levin?

A.    They are researchers on my team.

Q.    What's their background?

A.    They have degrees in economics, and they've taken course work in econometrics.  They are -- and they have both worked for several years at NERA.

Q.    Are either of them trained in real estate?

A.    Not to my knowledge.  I don't think either of them are real estate appraisers.

Q.    Okay.  Did you assist other experts in this case with their reports in any way?

A.    No.

Q.    Are you familiar with the Appraisal Foundation's Uniform Standards for Professional Appraisal Practice Standards?

I know you mentioned that you read it in connection with Dr. Kilpatrick's report or looked at it, but are you familiar with it?

A.    As I said, I think I might have seen it in part of the reliance materials.  I did not do an in-depth review.

Q.    Are you aware that The Appraisal Foundation is the nation's foremost authority on

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

valuation of real estate?

A. That's not something I looked at.

Q. Do you know that the appraisal foundation -- let me ask this again.

Are you aware that The Appraisal Foundation is the organization that sets the congression and authorized standards and qualifications for real estate appraisers and provides voluntary guidance on recognized valuation methods and techniques for all valuation professionals?

A. Again, that's not something that I looked at.

Q. Do you understand the Uniform Standards of Professional Appraisal Practice Standard 4?

A. Sorry, can you repeat that?

Q. Do you know the Uniform Standards of Professional Appraisal Practice Standard Number 4?

A. I don't know that specific Number 4 of that standard, no.

Q. Did you review Standard 4 prior to generating your report on Dr. Kilpatrick's appraisal?

A. Again, to the extent that Dr. Kilpatrick cited it, I might have looked at it. It's not something I reviewed in depth.

A.    Yes.

Q.    Okay.  And in paragraph 12, middle of the paragraph, you state that neither of Dr. Kilpatrick's estimates are based on regression analysis, and only the 12.12 estimate is linked to the end empirical estimate of transaction prices, correct?

A.    Yes.

Q.    Are you aware of the formula accepted within the real estate appraisal profession for calculating diminution and value?

A.    Sorry, repeat that.

Q.    Are you aware of the formula accepted within the real estate appraisal profession for calculating diminution and value?

A.    Dr. Kilpatrick wrote a formula in his response report, if that's what you're referring to.

Q.    Well, I'm asking you whether you're aware of any formula accepted within the real estate appraisal profession for calculating diminution and value?

A.    So Dr. Kilpatrick wrote a formula in his response report.  He represents that as something that's accepted.  I didn't independently verify

EXAMINATION BY MR. STAG:

Q.   Do you know whether it is an accepted methodology in real estate appraisal profession to calculate via a regression model the unimpaired property value and calculate the impaired value by inserting an instrumental variable into the regression findings?

A.   So that's what Dr. Kilpatrick says he did, but he actually didn't do that.  That's the method he describes.  Actually, only in his reply report did he use those words to describe his method.  But from an econometrics perspective, he didn't really calculate the unimpaired value, and he didn't use an instrumental variable.

Q.   Okay.  Well, I'm not asking about his opinions right now.  What I'm asking you is whether it is an accepted methodology in the real estate appraisal profession to calculate via regression model the unimpaired property value and calculate the impaired value by inserting an instrumental variable into the regression findings?

A.   I'm not offering any opinions about the standards that are accepted or not accepted for real estate appraisal within the industry.

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

Q.    Okay.  Well, in paragraph 13, I don't see you cite to any literature or journal articles or textbooks, right; am I correct?

A.    Yes.  I don't cite anything in paragraph 13, because it's mainly an intro paragraph to a section.  The more detailed opinions are later on --

Q.    Okay.

A.    -- in the rest of the report.

Q.    And because you didn't cite any authorities, you don't cite any real estate appraisal authorities for this opinion, right?

A.    I cite authorities in econometrics later on.  I don't cite real estate industry standards.

Q.    Okay.  Can you summarize your methodology for this opinion in paragraph 13?

A.    In paragraph 13?

Q.    Yes.

A.    So let me look at this.  So what I did was, I looked at how doctor -- well, let me see.  So the first sentence, that "Dr. Kilpatrick provides no empirical analysis of transaction prices to support his 20 percent diminution claim," I looked at his report.  I didn't see any empirical analysis that gives 20 percent

AmersonWhite

COURT REPORTING & LITIGATION SUPPORT

866.870.7233     P.O. Box 1554 Hammond LA 70404     Fax 985.419.0799

diminution.  So that's -- and I still don't see any analysis in this reply report that gives 20 percent diminution.  That's the first sentence.

The second sentence, "based on what he purports to be trendline analysis, Dr. Kilpatrick also opines that actual home prices in 7-mile zone had decreased 12.12 percent," that's reading Dr. Kilpatrick's report.  That's summarizing what he did.

"As I explain below, Dr. Kilpatrick's 12.12 percent diminution estimate is based on erroneous statistical analysis which hinges on only a few hundred observations in the purported class area."  So here, the erroneous statistical analysis, I explained later in my report that he's drawing a trendline that objectively doesn't fit the underlying data.  He claims that within the 7-mile radius area, that the prices decline.  I show later on in my report, I think figure 1, I show that what he drew was not actually a trendline for the data that he's presenting.  And he actually misrepresented what he showed in his report.  He claimed that his trendline has an R-squared of 0.35, when, in fact, it was negative.  So that analysis is erroneous.  It's objectively a

And then in figure 2.B, I extend that analysis to using the MLS data all the way to 2021. And you see a very similar result, that prices inside the 7-mile purported class area grow faster than Dr. Kilpatrick's control area.

Q. All right. Do you cite any real estate appraisal literature to support that methodology that's describing this?

A. I'm basically extending Dr. Kilpatrick's methodology. He's comparing his inside area to what he calls as control area. He's comparing the prices. I'm just extending what he did.

Q. Do you cite to any real estate literature, real estate appraisal literature, in support of that methodology?

A. I am not citing real estate literature.

Q. Okay. Now, let's go on to section 4A, where you state that Dr. Kilpatrick's erroneous trendline analysis obscures and misrepresents actually trendlines in the data. You attack Dr. Kilpatrick's use of the trendline as erroneous and false, right?

A. What he drew was not a trendline.

Q. It states "erroneous and false," right; true?

AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

A.    Yes.

Q.    Is it correct that your criticism is that Dr. Kilpatrick provides no explanation for why he limited his analysis to property transactions that occurred within one year before and after the 2017 Crosby event?

A.    That's one of my critiques, but also the other part of that is if he extended it past the one-year period, you'll see actually the same pattern, that there was -- there is no evidence that there is diminution using the control area that Dr. Kilpatrick defined.

Q.    All right.  Well, let's stick with this -- let's take it piece by piece.  Let's talk about this criticism that you have that Dr. Kilpatrick provided no explanation for why he limited his analysis to property transaction that occurred within one year before and after the 2017 Crosby event.  Do you know if what Dr. Kilpatrick did is an accepted methodology in the real estate appraisal industry?

A.    I'm not giving opinions about the standards in the real estate appraisal industry. I'll say that what he did is inconsistent with what he says himself about how the prices should

MR. PRICHARD:  We can keep going.  I'll leave it up to Sheng.

MR. STAG:  I mean, Dr. Li, are you in California?

THE WITNESS:  I'm in New York.  I'm on East Coast Time.  I can take a short break. Either way, lunch or short break.  I would like --

MR. STAG:  Let's take 10 minutes, Wesley, and then I'll go about another -- start up at, I guess, it's 12 your time, I'll go about another half hour, and then we'll break.  Is that okay?

MR. PRICHARD:  Yes.  Okay, Mike.  Up to you.  Thanks.  See y'all in 10.

(RECESS 10:51-11:03 A.M.)

EXAMINATION BY MR. STAG:

Q.   Dr. Li, let's talk about part 4B on page 10.  It's entitled, "Dr. Kilpatrick's Price Index Shows No Diminution of Property Value Inside the Class Area After the 2017 Crosby Incident."

Are you with me?

A.   Yes.

Q.   Okay, great.  In this section, you compare price growth between the class area and



Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

the control area in order to conclude that, "there is no indication that purported class members suffered property value diminution due to the Crosby 2017 incident," correct?

A.    I'm comparing price growth in the 7-mile radius area with Dr. Kilpatrick's control area.  I understand whether that's actually a good control area is also a matter of dispute.

Q.    Okay.  And you conclude that there is no indication that the purported class members suffered property value diminution due to the 2017 Crosby incident, right?

A.    Yes.

Q.    Okay.  And you say you accomplish this by comparing the percent increase in price relative to the first month of the data period, right?

A.    Yes.

Q.    And you state that this method is known as the price normalization and is commonly employed in economic analysis, right?

A.    Yes.

Q.    Do you know if this is commonly employed in real estate appraisal?

A.    The example I cite is from the Federal

Reserve, looking at housing price indexes. It's home price index.

Q. Okay. But do you know if that's commonly employed in real estate appraisal outside of that citation that you have?

A. I am not giving opinions about specific real estate appraisal standards. I will just note that this is a commonly used index for home prices.

Q. Okay. But you don't know if it's commonly employed in real estate appraisal, right?

MR. PRICHARD: Objection --

THE WITNESS: Again, I'm not giving an opinion.

EXAMINATION BY MR. STAG:

Q. Right, you're not giving an opinion. You don't know, right?

A. I'm not giving an opinion on the specific standards in the real estate appraisal industry.

Q. Right. Because you don't know those specific standards, right?

A. I'm not an expert in the specific real estate appraisal standards.

Q. All right. Is there a reason -- well,

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

Q.   Okay.  Do you agree that residential appraisals commonly use a one year prior to the effective date of value as the period from which to examine comparable sales?

MR. PRICHARD:  Object to the form.

THE WITNESS:  I'm not giving any opinions about what is commonly used in real estate appraisal for tax purposes or for other purposes.  My opinions in this case is, did he perform the right econometrics analysis to calculate what he is saying is unimpaired for the purposes of assessing damages in this case.  And unimpaired -- it's my understanding for this case is, unimpaired with respect to the event that happened at the Arkema plant.

So when he uses before the Arkema event, that's before the Arkema plant incident. It's also before the hurricane.  So he's not measuring something that's just allegedly unimpaired by the Arkema event.  It's also unimpaired by the hurricane.  So on that basis, I don't think it's appropriate data to use the before data to measure unimpaired in this case.  Because properties, if they're

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

descriptions.

Q.    All right.

A.    Eventually we were able to recreate his regression of measurements, but we were actually never able to replicate other parts of his report, like the correlation.  I think he has the table on correlation coefficients.  We weren't able to replicate that.

Q.    Okay.  So it sounds like it took you a lot of work, but you were able to recreate his valuation models?

A.    It took a lot of work.  We were able to recreate some of the analysis, not all of his analysis.

Q.    Okay.  Just so I'm clear, which part of the analysis were you able to recreate, which part were you unable to recreate?

A.    His regression, I guess, of his unimpaired value, I was able to recreate the trendline stuff.  We saw his code.  We noticed that actually what he says it is in his report and what his underlying code for underlying Excel spreadsheet show were different things, but we were able to see at least where the lines were coming from.  Off the top of my head, I can't go

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

affect property values in the area, regardless of the level of physical impact?

MR. PRICHARD: Object to the form.

THE WITNESS: I studied and analyzed the transaction data for this event in this case.

EXAMINATION BY MR. STAG:

Q. Right. You didn't look at studies or literature concerning real estate appraisal and impacts similar to this, right?

A. I'm not sure what you mean by "similar to this." I'm looking at -- we have a specific question we're trying to solve for this case, did the Arkema event specifically have a classwide effect on this purported class in a very specific area. I looked at the transaction data in this area. So I looked at the most relevant data for this. I looked at the underlying data for transactions in the purported class area and what Dr. Kilpatrick calls the control area.

Q. Right. You didn't look at real estate studies, right; that's not something you considered?

A. I did not perform a review of real estate literature.

Q. Okay. Do you agree that internet search



Q.    Are you aware that three of the USPAP advisory opinions, Opinions 18, 32, and 37, are devoted to mass appraisal and regression analysis?

A.    That is entirely possible.

Q.    I understand you're saying it's possible, but do you know that specifically that that's --

A.    I haven't read those rules.

Q.    Okay.  And I take it so you wouldn't -- since you haven't read the rules, you wouldn't know whether there are 36 references to the use of regression analysis in the text of the Appraisal of Real Estate 15th edition?

A.    I don't know how many references there are in the 15th edition of those rules.

Q.    This opinion in section 5, did you originate this opinion, or was this Drs. Hamilton and Papke?

A.    The opinion in section 5 and every opinion I've presented in my report are my opinions.

Q.    And you originated that opinion?

A.    Yes.

Q.    Okay.  If they have an identical opinion, you have no idea how they came to an

identical opinion?

MR. PRICHARD:  Object to the form.

THE WITNESS:  I don't know how they came to their opinions.

EXAMINATION BY MR. STAG:

Q.   Okay.  In section 5A, it's entitled "Kilpatrick's Regression Analysis is Not Appropriate for Establishing Unimpaired Property Values."  In paragraph 26, you state that, "neither transactions before nor transactions after Hurricane Harvey are appropriate measures for measuring damages in this case," right?

A.   Yes.

Q.   Okay.  Is it your opinion it is inappropriate to rely on sales before Hurricane Harvey?

A.   For assessing unimpaired values in this case with respect to the Arkema event, yes, it is inappropriate to use sales before.

Q.   And is it your opinion it's inappropriate to rely on sales after Hurricane Harvey?

A.   It is inappropriate to rely on sales after the hurricane, especially inside the 7-mile radius, because, by definition, those are not

Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

unimpaired, even under Dr. Kilpatrick and the Plaintiffs' definition of impaired and unimpaired.

Q. So are you suggesting the only sales -- you can only use sales during Hurricane Harvey?

A. No.

Q. No, okay. So you couldn't use them before, after or during Hurricane Harvey, right?

A. It's --

MR. PRICHARD: Object to form; misstates testimony.

THE WITNESS: It's Dr. Kilpatrick's job to find a good benchmark for something that's unimpaired with respect to the Arkema event, but accounts for the effects of the Hurricane Harvey and would be comparable to the properties in the class area. As I outlined in my 2018 report, I'm not sure that, like, you could find a very good control area. That's not what Dr. Kilpatrick has done.

EXAMINATION BY MR. STAG:

Q. All right. Well, if you cannot use transactions before or after Hurricane Harvey, what data can you use in your opinion to measure damages in this case?

A. That's Dr. Kilpatrick's job to find the



AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

data.

Q.    So you don't know?

A.    I think it is truly difficult.  My opinion in the first report is that regression analysis is likely not going to work in this case.

Q.    So you don't think there's any data that could be used; you can't think of any, do you?

A.    I haven't seen anything that Dr. Kilpatrick has done or the previous expert has done --

Q.    Okay.

A.    -- that would satisfy --

Q.    You can't independently think of anything at this point, right?

A.    My assignment is not to affirmatively assess harm.  My assignment is to respond to the analysis presented in the last report, it was Dr. Bell, and the analysis presented by Dr. Kilpatrick.

Q.    Right.  And because it wasn't your assignment, you haven't thought about that issue, right?

A.    That's beyond the scope of my opinions.

Q.    Right.  So therefore, you haven't thought about it, right?

THE WITNESS:  We talked about that earlier, my -- it's actually part of my assignment.  I'm not offering an opinion on specific -- like, an affirmative opinion on property value diminution.

EXAMINATION BY MR. STAG:

Q.  Right.  Because it's not your expertise, right?

A.  It wasn't part of my assignment for specifically.  I responded to the application of econometrics and statistical methods by Dr. Kilpatrick.

Q.  Well, my question wasn't whether it was one of your assignments.  What I was asking is: What you would do if you were attempting to assess whether there has been a diminution of property values caused to an individual residence by the Arkema explosion and fires during Harvey; what would be your methodology?

A.  That's beyond the scope of my opinions.

Q.  Right.  Because you have no methodology for that, right?

A.  It's beyond the scope of my opinions.

Q.  Right.  Because it's beyond the scope of your expertise, right?

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

Dr. Kilpatrick's reported trendline is to make the trendline go down rather than go up; is that the effect?

A.   Yes.

Q.   And are you aware of any basis for this anchoring in statistics or in econometrics?

A.   I am not.  And I've looked for support that maybe Dr. Kilpatrick might provide in his first report or his second report.  I didn't see any support that he cites for this practice.

Q.   And you mentioned the R-squared.  So I'd like to talk about that for a second.  What is R-squared?

A.   So R-squared is a measure of how the predictions fit the underlying data.  And as we talked about just a bit earlier, by construction, if you're trying to fit the data, the R-squared would range from zero to 100 percent.  Zero is if you're not even trying to fit the data, if you just draw a flat line through what is the average of the data, you'll still get a zero.  You can't do worse than zero.  100 is if you perfectly fit the data.

Q.   And if we look at the R-squared value for what's labeled in your figure 1 as

Dr. Kilpatrick's purported trendline, the R-squared value is negative .369. What does that mean?

A. That means he's -- in layman's terms, it means he's not even trying to fit the data. It's actually running against the data. If you were trying to fit the data at all, the worst you could do is zero. To have a negative R-squared, on one level, it means the prediction errors are -- there's even more variation in his prediction errors than the actual underlying data variation itself. You're not explaining away any of the actual variation data. In fact, your predictions are even worse than doing nothing. And so what you see is, if the data actually is going up, and you draw a line that goes in the opposite direction. Another way to think of it is, it's a worse than useless prediction.

MR. PRICHARD: I'd like to look now at Dr. Kilpatrick's rebuttal report, which we'll mark as Exhibit 6.

(EXHIBIT 6 IDENTIFIED)

EXAMINATION BY MR. PRICHARD:

Q. Specifically, I'd like to go to paragraphs 46 and 47 of his rebuttal.



Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799