**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| SHANNAN WHEELER, *et al*.,<br><br>   Plaintiffs,<br><br>v.<br><br>ARKEMA INC.,<br><br>   Defendant. | Civil Action No. 4:17-cv-2960 |

# SUPPLEMENTAL EXPERT REPORT OF SHENG LI, PH.D.

**September 17, 2021**

# I.  Introduction

## A.  Assignment

1.  My name is Sheng Li.  I am an economist and Associate Director at NERA Economic Consulting ("NERA").  I previously prepared a report in this matter submitted on October 8, 2018 ("Li 2018 Report")[1], responding to certain opinions presented in the Declaration of Randall Bell ("Bell Declaration").[2]  My qualifications are included in that report and are incorporated by reference.[3]

2.  I have been asked by counsel for Defendant Arkema Inc. ("Arkema") to review and respond to certain opinions presented in Dr. John A. Kilpatrick's report, "A Study Regarding the Diminution in Value of Properties Impacted by the Arkema Explosion in August, 2017," ("Kilpatrick Report") in connection with *Shannan Wheeler*, *et al.*, *v. Arkema Inc.*[4]  Specifically, I have been asked to opine on whether Dr. Kilpatrick's opinions regarding the assessment of class-wide damages related to property value diminution are the product of reliable economic principles and methods, and have been reliably applied to the facts of this case.  I offer no opinion relating to the question of Arkema's liability in this matter and whether the alleged misconduct caused injury to the purported class members.  NERA is being compensated for my time at a rate of $625 per hour.  Neither NERA's nor my compensation depends on the outcome of this litigation.

## B.  Materials Relied Upon

3.  In addition to the materials considered in my 2018 report, I, and research staff working under my direction, have reviewed the Kilpatrick Report, supplemental reports from Dr. William M. Auberle,[5] Mr. Marc Glass,[6] and Dr. Marco Kaltofen,[7] and other

---

[1]  Expert Report of Sheng Li, Ph.D., on behalf of Defendant in connection with *Shannan Wheeler*, *et al., Plaintiffs, v. Arkema Inc., Defendant*, No. 4:17-cv-2960, United States District Court for the Southern District of Texas Houston Division, October 8, 2018.

[2]  Declaration of Randall Bell, Ph.D., MAI, on behalf of Plaintiff in connection with *Shannan Wheeler*, *et al., Plaintiffs, v. Arkema Inc., Defendant*, No. 4:17-cv-2960, United States District Court for the Southern District of Texas Houston Division, August 6, 2018.

[3]  An updated version of my curriculum vitae, which includes a list of my prior testimony, is appended to this report as **Supplemental Exhibit 1**.

[4]  Expert Report of John A. Kilpatrick, Ph.D., MAI, on behalf of Plaintiff in connection with *Shannan Wheeler*, *et al., Plaintiffs, v. Arkema Inc., Defendant*, No. 4:17-cv-2960, United States District Court for the Southern District of Texas Houston Division, July 16, 2021.

[5]  Expert Report of William M. Auberle, L.H.D, P.E., BCEE, on behalf of Plaintiff in connection with *Shannan Wheeler*, *et al., Plaintiffs, v. Arkema Inc., Defendant*, No. 4:17-cv-2960, United States District Court for the Southern District of Texas Houston Division, July 14, 2021 ("Auberle Report").

[6]  Supplemental Expert Report of Marc Glass, on behalf of Plaintiff in connection with *Shannan Wheeler*, *et al., Plaintiffs, v. Arkema Inc., Defendant*, No. 4:17-cv-2960, United States District Court for the Southern District of Texas Houston Division, July 15, 2021 ("Supplemental Glass Report").

[7]  Supplemental Expert Report of Marco Kaltofen, Ph.D., P.E., on behalf of Plaintiff in connection with *Shannan Wheeler*, *et al., Plaintiffs, v. Arkema Inc., Defendant*, No. 4:17-cv-2960, United States District Court for the Southern District of Texas Houston Division, July 15, 2021 ("Supplemental Kaltofen Report").

documents and data produced in the course of this litigation, as well as additional publicly available data and information.  The opinions that I express in this report are based on my review of these materials, in addition to my training and experience as an economist.  A list of materials that I relied upon to form my opinions is presented in **Updated Exhibit 2**.

4. In preparing this report, I was requested by Arkema to accept as accurate and, to the extent necessary, rely on the information set out in Exhibit 3 to my 2018 report ("Timeline of Arkema Crosby Events").  The events described in Timeline of Arkema Crosby Events are hereafter referred to as the "2017 Crosby Incident."

## II.   Summary of Opinions

5. Based on my analysis to date, I have reached the following opinions to a reasonable degree of economic certainty:

   a. In my 2018 report, I identified a number of shortcomings in Dr. Bell's proposed method for assessing class-wide damages in this case, making it inappropriate and unreliable for proving class-wide economic damages in this case.  Dr. Kilpatrick's proposed method for assessing class-wide damages does not address the shortcomings of Dr. Bell's proposed method and suffers from additional deficiencies.  Specifically, Dr. Kilpatrick's ultimate opinion regarding economic damages is not supported by any regression or any other empirical analysis.  Rather, Dr. Kilpatrick's quantitative analyses relating to alleged diminution are limited to a regression to determine an "unimpaired value" and a false trendline analysis that are both economically and statistically unreliable and unsupportable.

   b. Dr. Kilpatrick presents two estimates of the alleged property value diminution in the purported class area due to the 2017 Crosby Incident: an estimate of 20 percent diminution based on case studies and an estimate of 12.12 percent diminution based on his purported trendline analysis of one year of data following the 2017 Crosby Incident.  Neither of these estimates are based on regression analysis, and only the 12.12 percent estimate is linked to empirical assessment of a limited set of transaction prices.

   c. Dr. Kilpatrick limited his empirical analysis to one year after the 2017 Crosby Incident.  This presents an incomplete and misleading view of property prices in the purported class area.  Sales data are available as recent as 2021, but Dr. Kilpatrick does not analyze or perform any regression or empirical assessment of any transaction that occurred after August 2018.  In other words, market data is readily available for September through December 2018, all of 2019 and 2020, and 2021 through present, but Dr. Kilpatrick does not analyze any transaction that is more recent than August 2018, and he offers no justification for ignoring the readily available data for later years.

   d. When Dr. Kilpatrick's false trendline is corrected, comparison of property value trends in the purported class area and Dr. Kilpatrick's control area, both during

Dr. Kilpatrick's assessed timeframe and extending through 2021 year to date, shows no indication that purported class members suffered any property value diminution.

e. Dr. Kilpatrick's opinion that property values in the purported class area suffered diminution of 12.12 percent to 20 percent due to the 2017 Crosby Incident is not based on any regression analyses, or any empirical analyses that account for the individualized effects of Hurricane Harvey on properties and variation in contamination, if any, in the purported class area.

    i. Dr. Kilpatrick's opinion that property values in the purported class area declined by 20 percent due to the 2017 Crosby Incident is not grounded in any empirical analysis of market transactions in the purported class area. This opinion is also contradicted by market outcomes.

    ii. Dr. Kilpatrick's opinion that property values within the purported class area decreased by 12.12 percent due to the 2017 Crosby Incident is based on erroneous analysis using a false trendline that does not correspond to the underlying data. In presenting his trendline analysis, Dr. Kilpatrick displayed a false trendline *and* misleadingly displayed the wrong R-squared value for the depicted false trendline. In doing so, Dr. Kilpatrick reports statistical values that suggest his false trendline fits the underlying data when reality is the opposite. Based on true trendlines that are fitted to the underlying data, during the 12 months following the 2017 Crosby Incident, property prices grew 49 percent faster in the purported class area compared to Dr. Kilpatrick's control area, which directly contradicts Dr. Kilpatrick's claim that "prices inside the 7-mile zone are observed to actually decline from levels prior to" the 2017 Crosby Incident.

    iii. Dr. Kilpatrick provides no empirical analysis to establish that the effect of the 2017 Crosby Incident on property values, if any, is uniform across class members' properties, and instead assumes his conclusion that diminution is uniform. This assumption is inconsistent with analyses presented by Plaintiffs' other experts.

f. Dr. Kilpatrick only uses regression analysis to compute purported "unimpaired" property values as inputs to his damages calculation. The results of Dr. Kilpatrick's regression estimates from this application are not suitable measures of unimpaired property values because this "GAVM" regression analysis, based on a built-in Microsoft Excel function, does not distinguish between the effects of Hurricane Harvey and the 2017 Crosby Incident.

    i. Dr. Kilpatrick's regression estimates of purported "unimpaired" values for class member properties is also economically unreliable and inappropriate for assessing damages, if any, in this case because the margin of error for his "unimpaired" value estimates are comparable to the magnitude of his claimed diminution effects.

3

g. Using Dr. Kilpatrick's method to calculate class-wide damages would result in windfall awards to class members who suffered no property value diminution due to the 2017 Crosby Incident (which, as demonstrated in **Figure 2.B**, below, could be all purported class members according to Dr. Kilpatrick's methodology).

h. Dr. Kilpatrick's proposed damages calculations is inappropriate and unreliable for proving class-wide economic damages, if any, in this case.

6. These opinions are based on my analyses and review of information made available to me to date. I reserve the right to update my opinions if additional information becomes available.

## III. Economics of Class Certification and Damages

7. I understand that, to obtain class certification, Plaintiffs must demonstrate that they can establish the central elements of their claim (including liability, injury, and damages) using evidence and methods common to the proposed class.

8. I understand that, to establish class-wide damages, Plaintiffs must demonstrate that impact to individual class members can be established using evidence common to the class and that the amount of damages awarded to each purported class member can be reliably calculated using a formulaic approach that can be applied to the entire proposed class.

9. Isolating the economic impact, if any, of the alleged harmful act is essential to any economic damages analysis. Economic damages reflect how Plaintiffs' economic positions absent the conduct at issue would differ, if at all, from their present positions. To establish economic damages, the expert must be able to demonstrate that the damages calculated are accurate to a reasonable degree of economic certainty and are causally linked, in an economic sense, to the conduct at issue. That is, the damages expert must be able to reliably distinguish the alleged harm caused by the conduct at issue from the influence of other market factors unrelated to the conduct at issue.[8]

10. In the case at hand, class-wide economic damages relating to property values, if any, must be measured by assessing how each individual Plaintiff's property value would have differed but for the alleged contamination arising from the 2017 Crosby Incident. The damages expert must be able to reliably distinguish the alleged injury caused by the 2017 Crosby Incident from other market factors that influenced property values in the purported class area. And, the expert must be able to do so using information and methodologies that are common to all properties in the purported class area.

11. As previewed above and further described in the following sections, Dr. Kilpatrick's proposed damages calculations cannot be used to accurately and reliably measure class-

---

[8] *See e.g.*, Mark A. Allen, Robert E. Hall, and Victoria A. Lazear, "Reference Guide on Estimation of Economic Damages," in *Reference Manual on Scientific Evidence* (3rd Edition) (Washington, DC: National Academies Press, 2011), p. 432.

wide damages, if any, arising from the 2017 Crosby Incident for the following reasons and others:

   a. Market data is readily available for September through December 2018, all of 2019 and 2020, and 2021 through present, but Dr. Kilpatrick does not analyze any transaction that occurred after August 2018. He offers no justification for ignoring the readily available data for later years despite purporting to estimate diminution that continues after August 2018.

   b. Dr. Kilpatrick's opinion that property values within the purported class area decreased by 12.12 percent due to the 2017 Crosby Incident is based on erroneous analysis using a false trendline that does not correspond to the underlying data. Based on true trendlines that are fitted to the underlying data, after the 2017 Crosby Incident, property prices grew 49 percent faster in the purported class area compared to Dr. Kilpatrick's control area, which directly contradicts Dr. Kilpatrick's claim that "prices inside the 7-mile zone are observed to actually decline from levels prior to" 2017 Crosby Incident.[9]

   c. Dr. Kilpatrick's opinion that property values in the purported class area declined by 20 percent due to the 2017 Crosby Incident is not grounded in any empirical analysis of market transactions in the purported class area. This opinion is also contradicted by market outcomes.

   d. In short, Dr. Kilpatrick's ultimate opinion regarding economic damages is not supported by any regression or any other empirical analysis. Rather, Dr. Kilpatrick's quantitative analyses relating to alleged diminution are limited to a regression to determine an "unimpaired value" and a false trendline analysis that are both economically and statistically unreliable and unsupportable.

## IV. Dr. Kilpatrick's Opinion That Property Values Within the Purported Class Area Decreased Due to the 2017 Crosby Incident is Based on Erroneous Analysis and False Trendlines

12. Dr. Kilpatrick presents two estimates of the alleged property value diminution in the purported class area due to the 2017 Crosby Incident: an estimate of 20 percent diminution based on case studies and an estimate of 12.12 percent diminution based on his purported trendline analysis of one year of data following the 2017 Crosby Incident.[10] Neither of these estimates is based on regression analysis, and only the 12.12 percent estimate is linked to an empirical assessment of transaction prices. Dr. Kilpatrick appears to concede that there are insufficient sales observations to properly use regressions to assess class-wide property value diminution in this case. He states that the "bulk of [the literature on contamination and diminution of value] consists of hedonic studies" but "a shortcoming of using hedonic studies to analyze property value diminution from

---

[9] Kilpatrick Report, ¶ 126.

[10] Kilpatrick Report, ¶¶ 127, 141.

contamination is that they rely on sales as observations."[11]  Dr. Kilpatrick does not present a hedonic regression analysis to assess property value diminution in this case and he concedes that "there are quite simply relatively few sales observations in situations comparable to the affected properties."[12]

13.    Dr. Kilpatrick ultimately opines that "the actual decline in value [due to the 2017 Crosby Incident] would be in the range of 20%," but he provides no empirical analysis of transaction prices to support this claim.[13]  Based on what he purports to be trendline analysis, Dr. Kilpatrick also opines that "actual home prices in the 7-mile zone had decreased 12.12% more than they would have decreased without" the 2017 Crosby Incident.[14]  As I explain below, Dr. Kilpatrick's 12.12 percent diminution estimate is based on erroneous statistical analysis which hinges on only a few hundred observations in the purported class area during the first year following the 2017 Crosby Incident.[15]  Correcting Dr. Kilpatrick's errors and extending the analysis to incorporate data from the remainder of 2018, 2019, 2020, and 2021 illustrates that property values within the purported class area grew at similar or faster rates compared to property values in Dr. Kilpatrick's control area, indicating that purported class members likely did not suffer any property value diminution due to the 2017 Crosby Incident.

## A.    Dr. Kilpatrick's Erroneous Trendline Analysis Obscures and Misrepresents Actual Trends in the Data

14.    Dr. Kilpatrick relies on his purported trendline analysis of per-square-foot sales prices to arrive at his 12.12 percent diminution estimate.  To conduct this analysis, Dr. Kilpatrick collects residential property transaction data from five MLS zones that cover the purported class area as well as what he claims to be "unaffected control areas."[16]  Dr. Kilpatrick restricts his analysis to property transactions that occurred within one year before or after the 2017 Crosby Incident (*i.e.*, September 2016 to August 2018).[17]  Dr. Kilpatrick provides no explanation for why he limited his analysis to those data, even though more recent market data were readily available[18] when he purported to estimate diminution that continues after August 2018.[19]  Dr. Kilpatrick then calculates per-square-

---

[11]    Kilpatrick Report, ¶ 112.

[12]    Kilpatrick Report, ¶ 112.

[13]    Kilpatrick Report, ¶ 141.  Dr. Kilpatrick refers to case studies as support for this opinion.  I understand that Arkema's other experts will establish that those case studies are not appropriate for assessing property value diminution in this case.

[14]    Kilpatrick Report, ¶¶ 126-127, Table 10.

[15]    Kilpatrick Report, Table 7.

[16]    Kilpatrick Report, ¶¶ 113-115.  For the purposes of this report, I replicated Dr. Kilpatrick's own methods using his own control areas.  This is not to be understood as endorsing his methods or his control areas.  I understand that the appropriateness of Dr. Kilpatrick's control areas will be addressed by others.

[17]    Kilpatrick Report, Tables 8-9, Figures 4-7.

[18]    Mr. Papke has provided real estate transaction data that extends to August 2021 for the same MLS zones identified in the Kilpatrick report.  *See*, Extended MLS data provided by Mr. Papke, "Sales to 2021.xlsx."

[19]    Kilpatrick Report, ¶¶ 127, 141.

foot prices on a monthly-median[20] basis for transactions of properties inside the purported class area as well as for transactions outside of the purported class area.[21]

15. Dr. Kilpatrick presents comparisons of predictions from his purported trendline of per-square-foot prices from the "inside" and "outside" areas to support his opinion that property prices had decreased 12.12 percent more than they would have decreased without the 2017 Crosby Incident.[22] However, Dr. Kilpatrick's findings are based on erroneous analyses and false trendlines. Dr. Kilpatrick claims that "prices inside the 7-mile zone are observed to actually decline from levels prior to" the 2017 Crosby Incident and he reports a negatively sloped trendline for the inside purported class area and after Hurricane Harvey sample,[23] but this is a false trendline that does not correspond to the underlying data.[24] When this error is corrected, the true trendline does not support Dr. Kilpatrick's claim.

16. It is clear from visual inspection that in Figure 6 of Dr. Kilpatrick's report, the underlying data trend upwards, but Dr. Kilpatrick reports a "trendline" that slopes downwards. Simply put, Dr. Kilpatrick's purported trendline does not fit the data. This lack of fit is quantitatively reflected in the poor R-squared value of his purported trendline. R-squared is a statistical measure of how well a trendline fits the underlying data, and R-squared typically takes on values between one and zero. A trendline that perfectly fits the data would have an R-squared value of one and a trendline that provides predictions with no correlation with the underlying data would have an R-squared value of zero.[25] Dr. Kilpatrick's purported trendline in Figure 6 of his report has a R-squared value of $-0.369$.[26] In layman's terms, the fit of Dr. Kilpatrick's purported trendline to the underlying data is so poor that the direction of the trendline's predictions is opposite to the direction of the underlying data, which generated a negative R-squared value.[27]

---

[20] Dr. Kilpatrick states in his report that his tables and figures present monthly averages of per-square-foot prices, but his reliance materials show that the numbers that he presents are monthly medians rather than averages. *See*, Kilpatrick Report, ¶ 116, Tables 8-9; Kilpatrick Reliance Materials, "Sales for In-Out Analysis.xlsx," tab "working copy."

[21] Kilpatrick Report, Tables 8-9.

[22] Kilpatrick Report, ¶¶ 126-127, Table 10. What Dr. Kilpatrick misleadingly labels as "Aug 2018 Actual Prices" in his Table 10 are not averages or medians of actual transaction prices in August 2018. The values that Dr. Kilpatrick presents under that label are forecasts from his erroneous trendline analysis from Equation 7 and Equation 8 of his report. Similarly, the values that Dr. Kilpatrick labels as "Aug 2017 Prices" are also not actual prices, but instead correspond to projections from Dr. Kilpatrick's Equation 3 and Equation 4.

[23] Kilpatrick Report, ¶ 126, Figure 6, Equation 7. Note that there is a typo in Dr. Kilpatrick's Equation 7, as it reports a slope of -0.0296 instead of the -0.2096 that he shows in Figure 6, which also matches the slope that is reported in his reliance materials. *See,* Kilpatrick Reliance Materials, "Sales for In-Out Analysis.xlsx," tab "working copy."

[24] Dr. Kilpatrick states that in constructing the purported trendlines in Figure 6 and Figure 7, he "anchor[ed] the beginning of the trend line to the per-square-foot prices determined prior to Harvey and the Arkema Explosion" using forecasts from Equation 3 and Equation 4 of his report. He provides no explanation for why it is appropriate to make such adjustments and no citations to any literature to support this methodology. *See,* Kilpatrick Report, ¶ 123. As discussed below, manually changing the starting point results in "trendlines" that do not represent the underlying data.

[25] *See*, William H. Greene, *Econometric Analysis*, 6th Edition, 2008, p. 34.

[26] Kilpatrick Reliance Materials, "Sales for In-Out Analysis.xlsx," tab "working copy."

[27] In technical terms, a negative R-squared value means the sum of squared prediction errors from the trendline (also known as the sum of squared residuals) is larger than the variance in the underlying data.

**Figure 1: Reproduction of Figure 6 of Kilpatrick Report[28]**
**Median Sale Price per Square-Foot Inside 7-Mile Radius After 2017 Crosby Incident**
**September 2017 – August 2018**



17.    **Figure 1** above illustrates that the actual trendline fitted to the sample of transactions that occurred inside the class area and after the 2017 Crosby Incident (the red dotted line above) has a positive slope, which indicates a positive $0.7932 per month growth rate for per-square-foot prices, rather than the negative $0.2096 per month per-square-foot price decline claimed by Dr. Kilpatrick (the blue dotted line above).[29]

18.    As discussed above and as displayed in **Figure 1**, the R-squared value of Dr. Kilpatrick's false trendline in his Figure 6 is −0.369.  However, in his report at Figure 6, Dr. Kilpatrick shows the R-squared value of his false trendline as 0.3515.  In simple terms, Dr. Kilpatrick's Figure 6 shows the blue dotted line above but displays the R-squared value of the red dotted line above.  The work file that Dr. Kilpatrick provided for his Figure 6 *does show* the −0.369 R-squared of his false trendline (corresponding to the

---

[28]    Based on the underlying data used by Dr. Kilpatrick in his reliance materials to create Figure 6 of his report. *See,* Kilpatrick Reliance Materials, "Sales for In-Out Analysis.xlsx," tab "working copy."

[29]    Kilpatrick Report, Equation 7.  Figure 7 of Dr. Kilpatrick's report also misleadingly presents a false trendline that does not match the underlying data as well as an R-squared value that does not correspond to his false trendline. See **Exhibit 3** for a correction of Dr. Kilpatrick's Figure 7 with the true trendline for the underlying data in that graph as well as the R-squared values for the true trendline and Dr. Kilpatrick's false trendline.

blue dotted line),[30] but the R-squared value shown in Figure 6 of Dr. Kilpatrick's report was manually changed to the 0.3515 R-squared value from the true trendline for that data series (which corresponds to the red dotted line).[31] This suggests that Dr. Kilpatrick generated the true trendline, yet he opted instead to display his false trendline *with the R-squared value of the true trendline*. In other words, Dr. Kilpatrick displayed a false trendline *and* misleadingly displayed the wrong R-squared value for the depicted false trendline. In doing so, Dr. Kilpatrick reports statistical values that suggest his false trendline fits the underlying data when reality is the opposite.

19.     As shown in **Table 1**, the $0.7932 per month growth rate for per-square-foot prices in Dr. Kilpatrick's "Inside/After" category is higher than the $0.2256 per month per-square-foot growth rate for prices that Dr. Kilpatrick reports for his "Outside/After" category.[32] Based on true trendlines that are fitted to the underlying data, after the 2017 Crosby Incident, property prices grew 49 percent faster in the purported class area compared to Dr. Kilpatrick's control area, which directly contradicts Dr. Kilpatrick's claim that "prices inside the 7-mile zone are observed to actually decline from levels prior to" the 2017 Crosby Incident.[33]

---

[30]    **Exhibit 4** shows the worksheet from Dr. Kilpatrick's reliance materials that reports the −0.369 R-squared value of his false trendline.

[31]    *See,* Kilpatrick Reliance Materials, "Sales for In-Out Analysis.xlsx", tab "working copy."

[32]    Kilpatrick Report, Equation 8.

[33]    Kilpatrick Report, ¶ 126.

**Table 1: Average Monthly Change in Median Price per Square-Foot After Crosby Incident from Trendlines[34]**
**September 2017 – August 2018**

| | True Trendline | Dr. Kilpatrick's Purported Trendline |
|---|---|---|
| | ---(Dollars / Month)--- | ---------------(Dollars / Month)--------------- |
| | (a) | (b) |
| Inside | $ 0.7932 | $ -0.2096 |
| Outside | 0.5317 | 0.2256 |

## B.     Dr. Kilpatrick's Price Index Shows No Diminution of Property Value Inside the Class Area After the 2017 Crosby Incident

20.     Comparison of per-square-foot prices between transactions in the purported class area and Dr. Kilpatrick's control area further illustrates that Dr. Kilpatrick's property diminution claims are at odds with market outcomes. **Figure 2.A** below compares the growth of per-square-foot prices, as calculated by Dr. Kilpatrick, between the purported class area and Dr. Kilpatrick's control area,[35] during the time period that was examined by Dr. Kilpatrick. To compare price growth across the purported class area and Dr. Kilpatrick's control area, I present the percent increase in price relative to the first month of the data period, so that a direct comparison of percentage price changes can be made across the two areas.[36] As shown in **Figure 2.A**, per-square-foot prices grew faster in the purported class area compared to those in Dr. Kilpatrick's control area. Over the time period examined by Dr. Kilpatrick, from one year prior to the 2017 Crosby Incident to one year after the incident, per-square-foot prices inside the purported class area achieved a compound annual growth rate ("CAGR") of 12 percent, while prices in Dr. Kilpatrick's control area only achieved a CAGR of five percent. There is no indication that purported class members suffered property value diminution due to the 2017 Crosby Incident. In fact, Dr. Kilpatrick's price index shows that property values inside the purported class area grew at equal of faster rates than those in Dr. Kilpatrick's control area.

---

[34]   **Exhibit 3**; **Figure 2.A**; Kilpatrick Report, Equations 7 and 8.

[35]   I offer no opinion on the appropriateness of Dr. Kilpatrick's control area for assessing property value diminution in the purported class area. I understand that Arkema's other experts will opine on this subject.

[36]   This method is often referred to as price normalization and is commonly employed in economic analysis to study price changes. *See, e.g.,* home price indices for New York, NY and Dallas, TX reported by the Federal Reserve Bank of St. Louis. These indices are normalized using January 2000 home prices. "S&P Dow Jones Indices LLC, S&P/Case-Shiller NY-New York Home Price Index [NYXRSA]," *St. Louis Federal Reserve*; "S&P Dow Jones Indices LLC, S&P/Case-Shiller TX-Dallas Home Price Index [DAXRNSA]," *St. Louis Federal Reserve*.

10

**Figure 2.A: Growth in Median Price per Square-Foot[37]**
**September 2016 – August 2018**



## C.   Dr. Kilpatrick Inappropriately Limits His Analysis to 2018 and an Analysis of Data Extending to 2021 Shows No Diminution of Property Value

21.    Dr. Kilpatrick's decision to limit this analysis to one year after the 2017 Crosby Incident presents an incomplete and misleading view of property prices in the purported class area.  Sales data are available as recent as 2021,[38] but Dr. Kilpatrick does not analyze any transaction that occurred after August 2018.[39]  In other words, market data are readily available for September through December 2018, all of 2019 and 2020, and 2021 through present, but Dr. Kilpatrick does not analyze any transaction that is more recent than August 2018, and he offers no justification for ignoring the readily available data for later years.

---

[37]   Median price per square-foot values are taken from the underlying data used by Dr. Kilpatrick in his reliance materials to create Figure 6 of his report.  Percentage change in prices are calculated relative to September 2016.  CAGR is from September 2016 to August 2018.  *See*, Kilpatrick Reliance Materials, "Sales for In-Out Analysis.xlsx," tab "working copy."

[38]   *See*, Extended MLS data provided by Mr. Papke, "Sales to 2021.xlsx."

[39]   Kilpatrick Report, Tables 8-9, Figures 4-7.

11



**Figure 2.B: Growth in Median Price per Square-Foot[40]**
**September 2016 – July 2021**

22.    As shown in **Figure 2.B** above, analysis of more recent data shows that the trends identified in **Section IV.B** continue through 2021 as property prices inside the purported class area outperform those in the control area.  From one year prior to the 2017 Crosby Incident to July 2021, per-square-foot property prices inside the purported class area achieved a CAGR of 11 percent, while prices in Dr. Kilpatrick's control area achieved a CAGR of eight percent.  This comparison of property value trends in the purported class area and Dr. Kilpatrick's control area, both during Dr. Kilpatrick's assessed timeframe and extending through 2021, shows no indication that purported class members suffered any property value diminution.

## D.    Dr. Kilpatrick's Correlation Analysis is Inconsistent With Plaintiffs' Theory of Harm

23.    Dr. Kilpatrick's findings relating to the correlation between sales prices and distance to the Arkema facility contradict Plaintiffs' and Dr. Kilpatrick's theory of harm relating to property value diminution due to contamination from the 2017 Crosby Incident.  Table 11 of Dr. Kilpatrick's report shows that the correlation between property sales prices and

---

[40]    Values are relative to September 2016.  CAGR is from September 2016 to July 2021 in the extended MLS data.  The monthly median price per square-foot values from the Extended MLS data and Dr. Kilpatrick's reliance materials do not match exactly, but the qualitative trends in those data are similar, as illustrated by how closely the solid and dashed lines track each other in the figure above.  *See*, Kilpatrick Reliance Materials, "Sales for In-Out Analysis.xlsx," tab "working copy"; Extended MLS data provided by Mr. Papke, "Sales to 2021.xlsx."

distances to the Arkema facility was negative, both before and after the 2017 Crosby Incident, although neither of these correlations were statistically significant.[41] At face value, negative correlations between sales prices and distances to the Arkema facility mean that properties closer to the Arkema facility had higher sales prices. Dr. Kilpatrick's negative correlation estimates suggest that this relationship between proximity to the Arkema facility and higher sales prices was stronger after the 2017 Crosby Incident.[42] This result directly contradicts Plaintiffs' and Dr. Kilpatrick's theory of harm.

24. Plaintiffs' experts opine that contamination was more severe in areas closer to the Arkema facility. Dr. Kaltofen opines that "the environmental concentration of compounds of interest increase as one gets closer to Arkema."[43] Expert reports of Dr. Auberle and Dr. Glass also present analysis with similar findings.[44] If, as Plaintiffs' experts claim, the contamination was more severe in areas closer to the Arkema facility and there was property value diminution due to contamination from the 2017 Crosby Incident, then there would likely exist a more positive correlation between sales prices and distance to the Arkema facility after the 2017 Crosby Incident. The fact that Dr. Kilpatrick found the opposite result (*i.e.*, a larger negative correlation between sales prices and distance to the Arkema facility during the period after the 2017 Crosby Incident) is inconsistent with his claim that that there was property value diminution based on contamination from the 2017 Crosby Incident.

## V.   Dr. Kilpatrick's Regression Property Value Estimates Are Fundamentally Unsuited as Benchmarks for Assessing Damages in This Case

25. Dr. Kilpatrick's only use of regression analysis in his report is to compute purported "unimpaired" property values as inputs to his damages calculation. The results of Dr. Kilpatrick's regression estimates from this application are not suitable measures of unimpaired property values because Dr. Kilpatrick's regression model does not distinguish between the effects of Hurricane Harvey and the 2017 Crosby Incident.

---

[41]   Kilpatrick Report, Table 11, ¶ 128.

[42]   Dr. Kilpatrick finds that the correlation between sales prices and distance to the Arkema facility was -0.006230049 before the 2017 Crosby Incident and -0.029686217 after the 2017 Crosby Incident. *See,* Kilpatrick Report, Table 11. Dr. Kilpatrick's reliance materials do not include the worksheets for the correlation results shown in Table 11 of his Report. I was not able to replicate his correlation estimates.

[43]   Supplemental Kaltofen Report, p. 3, p. 12 ("The data show that highest Arkema release-related contaminant concentrations are at the Arkema site. For offsite samples, concentrations are highest closer to Arkema and are not related to distance from KMCO.")

[44]   Auberle Report, Figure 8; Supplemental Glass Report, Figure 9.

## A.    Dr. Kilpatrick's Regression Analysis is Not Appropriate for Establishing "Unimpaired" Property Values

26.    Dr. Kilpatrick's regression estimates of purported "unimpaired" values for class member properties are based on property transactions inside and outside of the purported class area from both before and after Hurricane Harvey.[45]  Neither transactions before nor transactions after Hurricane Harvey are appropriate benchmarks for measuring damages in this case.

27.    It is inappropriate for Dr. Kilpatrick to calculate "unimpaired" property values based on transactions in the purported class area that occurred before Hurricane Harvey because those transaction prices do not reflect the effects of Hurricane Harvey.  By calibrating his regression model using transaction prices that occurred before Hurricane Harvey, Dr. Kilpatrick calibrated his model, in part, to predict property prices based on transactions that were not affected by Hurricane Harvey.  It is not appropriate to use pre-Hurricane Harvey property prices as a basis for measuring economic damages in this case, as doing so would award damages based on the hurricane damage that is unrelated to Arkema's conduct at issue.

28.    It is also inappropriate for Dr. Kilpatrick to calculate "unimpaired" property values based on transactions in the purported class area that occurred after Hurricane Harvey because, under Plaintiffs' and Dr. Kilpatrick's theory of harm, those are the allegedly impaired transactions.  If a regression model is calibrated using allegedly impaired transactions, then any differences between the predictions of that regression model and the actual values of class members' properties would correspond to prediction errors from the regression model and statistical noise, rather than actual impairment.

29.    Given Dr. Kilpatrick's use of inappropriate inputs for calibrating his regression model, even if his regression is properly specified, the predictions from that model would still be inappropriate for estimating economic damages in this case.  However, as discussed below, Dr. Kilpatrick's regression specification also suffers from shortcomings that make it inappropriate for assessing damages in this case.

## B.    Dr. Kilpatrick's Regression Does Not Differentiate the Alleged Effects of the 2017 Crosby Incident from Unrelated Effects

30.    Another fundamental flaw in Dr. Kilpatrick's regression model is that it does not take into account any variables that measure the effect of Hurricane Harvey or factors that, as I understand, significantly affect property pricing.[46]  The only input variables used by Dr. Kilpatrick in his model are tax assessed value, days since sale, an indicator for whether

---

[45]    Dr. Kilpatrick's regression coefficients are derived from regression analysis using his full sample of 10,029 transactions, which includes transactions from both before and after the 2017 Crosby Incident.  *See,* Kilpatrick Report, Table 4 (showing a minimum sale date of 9/1/2016 and a maximum sale date of 8/31/2018), Table 5 (showing 10,029 observations used in the regression, which is the same number of observations shown to have tax assessed value in Table 4).

[46]    Kilpatrick Report, Table 5.  *See also*, Papke 2018 Report, pp. 13-14, 74-75; Yocke 2018 Report, p. 32; Stout, *et al.* 2018 Report, p. 13; Millner 2018 Report, p. 34; Thomann 2018 Report, pp. 6-8; Li 2018 Report, ¶¶ 28-30.

14

the property is in MLS area 2, and another indicator for whether the property is located within the purported class area.  None of these variables measure the extent of damage from Hurricane Harvey.

31.    More generally, Dr. Kilpatrick's regression does not account for property-specific factors such as each property's proximity to sources of chemical emissions that are unrelated to the 2017 Crosby Incident, location and topography, construction characteristics, locations of water breach, and preventative measures taken by owners.  I understand that such factors are significant for assessing property value diminution, if any, due to the 2017 Crosby Incident.[47]  The fact that Dr. Kilpatrick's regression model does not account for any such property factors means that it cannot separate the effects of the 2017 Crosby Incident from the effects of other unrelated sources of chemical emissions or the effects of Hurricane Harvey, making this model fundamentally unsuited for calculating class-wide economic damages in this case.

## C.    Dr. Kilpatrick's "Unimpaired" Value Estimates are Inappropriate for Assessing Damages in This Case Because the Margin of Error for His Estimates Are Comparable to the Magnitude of His Claimed Diminution

32.    In addition to the reliability issues discussed above, Dr. Kilpatrick's "unimpaired" property value estimates from his regression suffer from poor statistical precision, to the extent that the margins of error on those estimates are similar in magnitude to his claimed property value diminution effects.  Dr. Kilpatrick reports that the median absolute deviation between the predictions of his regression model and the actual property sales prices is 9.28 percent,[48] which means half of Dr. Kilpatrick's "appraisal values" have prediction errors that are equal to or larger than 9.28 percent of the property's actual sales price.  The average absolute deviation between the predictions of Dr. Kilpatrick's regression model and the actual property sales prices is even higher at 17.03 percent because for a large portion of properties, Dr. Kilpatrick's regression model generates large prediction errors.

33.    Using Dr. Kilpatrick's property value diminution estimates as reference points, 39.81 percent of his regression property value predictions differ from the actual sales price by at least 12.12 percent, and 22.40 percent of his regression property value predictions differ from the actual sales price by at least 20 percent.  As shown in **Table 2** below, for one in ten properties, the prediction error from Dr. Kilpatrick's regression model for property prices is greater than 36 percent of the actual transaction price, and for one in twenty properties, the prediction error is greater than 50 percent.  Even if Dr. Kilpatrick's regression estimates did not suffer from the reliability issues discussed above, the poor statistical precision of these estimates would make them inappropriate benchmarks for assessing property value diminution in this case.

---

[47]    Papke 2018 Report, pp. 13-14, 74-75; Thomann Report, pp. 6-8.  *See also*, Li 2018 Report, ¶¶ 28-30.

[48]    Kilpatrick Report, Table 6.

15

**Table 2: Absolute Deviation of Dr. Kilpatrick's Regression Estimates[49]**

| Percentile | Absolute Deviation |
| --- | --- |
| 5th | 0.85 % |
| 10 | 1.64 |
| 25 | 4.19 |
| 50 | 9.28 |
| 75 | 18.38 |
| 90 | 36.03 |
| 95 | 53.75 |

34. The prediction error in Dr. Kilpatrick's regression model means that, even if he has accurate and appropriate measures of individual property value diminution due to the 2017 Crosby Incident, damages awards based on his regression estimates would be over- or under-compensating class members by at least 9.28 percent in half of the instances, and that a quarter of class members would be over- or under- compensated by at least 18.38 percent.

35. Furthermore, comparing actual transaction prices to Dr. Kilpatrick's regression's predicted values would likely result in large portions of false positives (*i.e.*, false estimates of impairment due to statistical noise, when no actual impairment exists). For example, if a property sold for 20 percent less than Dr. Kilpatrick's regression prediction, there is a 22.40 percent chance that this difference was due to the unreliability of his regression model, and not the result of the conduct at issue. Dr. Kilpatrick's proposed damages calculations rely fundamentally on these unreliable and noisy regression predictions. Because of this critical flaw and the other reliability issues discussed in previous sections, Dr. Kilpatrick's proposed damages calculations are inappropriate and unreliable for proving class-wide economic damages, if any, in this case.

\*\*\*

Signed this 17th day of September 2021:

Sheng Li

---

[49] Absolute deviation is calculated by taking the absolute value of the difference between the predicted sales price from Dr. Kilpatrick's regression and actual transaction price and then dividing that result by actual transaction price. Although Dr. Kilpatrick does not provide reliance materials for this calculation, this methodology exactly replicates the results shown in Table 6 of Dr. Kilpatrick's report. *See,* Kilpatrick Reliance Materials, "Copy 6 of Residential Sales.xlsx," tab "All Areas (NA removed) (3)."

**Exhibit 1**



**Sheng Li, PhD**
Associate Director

NERA Economic Consulting
360 Hamilton Avenue, 10th Floor
White Plains, New York 10601
Tel: 914-448-4104  Fax: 1 (914) 448-4040
sheng.li@nera.com
www.nera.com

# SHENG LI, Ph.D.
## Associate Director

Dr. Li is an Associate Director in NERA's Antitrust and Intellectual Property practices.  He applies his expertise in economics and data analytics to assist clients in high-stakes commercial damages, antitrust, intellectual properties, and class action litigations.  Dr. Li has provided expert report and deposition testimony in U.S. district court.

In the area of antitrust, Dr. Li has evaluated liability and damages theories in cases involving price-fixing, alleged monopolization, anticompetitive foreclosure, and exclusive dealing.  In the area of intellectual property, Dr. Li has assessed economic damages and liability claims arising from alleged patent and trademark infringement, as well as antitrust patent misuse.  He has analyzed economic damages and competitive issues in a variety of industries, including prescription eyewear, pharmaceuticals, medical devices, real estate, digital game platforms, financial services, dental supplies, communications hardware, auto parts, and insurance.

Dr. Li received his Ph.D. in economics from the University of California, Berkeley and his B.Sc. in financial economics from the University of Toronto.  He taught microeconomics, behavioral economics, game theory, and international trade at the University of California, Berkeley.  He has served as a peer-review referee for economic studies submitted to the *Antitrust Law Journal*, the *American Law and Economics Review,* the *Journal of European Economics Association,* and *The Review of Economic Studies.*

**Exhibit 1**

**Sheng Li, Ph.D.**

## Education

**University of California, Berkeley**
Ph.D., Economics, 2015

**University of Toronto**
B.Sc., *with High Distinction*, Financial Economics, 2009

## Professional Experience

**NERA Economic Consulting**
2020-Present   Associate Director
2017-2020       Senior Consultant
2015-2017       Consultant

**Microsoft Research New England**
2014            Research Analyst in Economics Group

**University of California, Berkeley**
2012-2013       Research Assistant, Department of Economics
2010-2011       Teaching Assistant for Microeconomics, Behavioral Economics, Game Theory, and International Trade

**University of Toronto**
2008-2009       Head Peer Mentor, Economics Study Center
2008            Research Assistant, Rotman School of Management

2014-2019       **Ad-hoc reviewer** for the *Antitrust Law Journal*, the *American Law and Economics Review,* the *Journal of European Economics Association,* and *The Review of Economic Studies*

## Expert Testimony and Report Experience

*Teradata Corp. et al., v. SAP SE et al.*

Submitted declaration in support of defendant SAP's motion to exclude certain portions of plaintiff's expert testimony in connection with *Teradata Corp. et al., v. SAP SE et al.*, August 2021.

*Nick's Garage, Inc. v. Allstate Insurance Co. et al.*

Retained as economic expert on behalf of defendant Allstate Insurance Co. in connection with *Nick's Garage, Inc. v. Allstate Insurance Co. et al.*, January 2019.

*Shannon Wheeler et al. v. Arkema Inc.*

**Exhibit 1**

**Sheng Li, Ph.D.**

Provided economic expert report and deposition testimony regarding assessment of classwide damages, contributing to the exclusion of the opposing class damages expert.

Deposition testimony, on behalf of defendant Arkema Inc. in connection with *Shannon Wheeler et al. v. Arkema Inc.*, January 17, 2019.

Expert Report, on behalf of defendant Arkema Inc. in connection with *Shannon Wheeler et al. v. Arkema Inc.*, October 8, 2018.

## Presentations

NYIAC Virtual Talks – SEPs to Arbitration: "Can we be FRANDS?", July 2021.

GCR Interactive: Pharmaceuticals, March 2021.

ACI 11th Summit on Biosimilars & Innovator Biologics, September 2020.

Berkeley-Tsinghua Conference on Transnational IP Litigation, October 2019.

The Legal Talk Network, ABA Section of Antitrust Law Big Data Task Force Podcast, April 2019.

The Knowledge Group, Antitrust Damages: Economic and Legal Considerations in 2018, January 2018.

The 7th Annual Chicago Forum on International Antitrust Issues at Northwestern University, June 2016.

Household and Behavioral Finance Symposium at Cornell University, April 2015.

Rady School of Management at University of California, San Diego, February 2015.

Financial Markets Group at London School of Economics and Political Science, January 2015.

School of Economics and Finance at University of Hong Kong, January 2015.

US Federal Reserve Board, January 2015.

Whitman School of Management at Syracuse University, January 2015.

Department of Economics at University of California, Berkeley, December 2014.

## Fellowships and Awards

Dean's Normative Time Fellowship, University of California, Berkeley, 2014

**Exhibit 1**

**Sheng Li, Ph.D.**

Yale Summer School in Behavioral Finance, 2013

Russell Sage Foundation Summer Institute for Behavioral Economics, 2012

University of Toronto Excellence Awards Research Grant, University of Toronto, 2008

Peter F. Bronfman Leadership Award, University of Toronto, 2007

Dean's List, University of Toronto, 2005-2009

## Articles/White Papers

Contributor, "Artificial Intelligence & Machine Learning: Emerging Legal and Self-Regulatory Considerations – Part 2," American Bar Association Section of Antitrust Law, 2021.

Contributor, "Artificial Intelligence & Machine Learning: Emerging Legal and Self-Regulatory Considerations – Part 1," American Bar Association Section of Antitrust Law, 2019.

Contributor, Chapter 6: "Relevant Market" in *2018 Annual Review of Antitrust Law Developments*, American Bar Association Section of Antitrust Law, 2019.

"Automated Pricing Algorithms and Collusion: A Brave New World or Old Wine in New Bottles?", with Claire (Chunying) Xie, *Antitrust Source*, 2018

"Unpacking the Economic Toolbox: How to Make Sense of Your Economic Expert's Analysis," with Christine Meyer and Gabriella Monahova, *Antitrust Magazine*, 2018

"Rise of the Machines: Emerging Antitrust Issues Relating to Algorithm Bias and Automation," with Claire (Chunying) Xie, *ABA Perspectives in Antitrust,* 2017

"The Influence of Financial Advisers on Return Chasing," University of California, Berkeley, 2015

"Video Games and Youth Crime," University of California, Berkeley, 2015

## Languages

Native in English and Chinese (Mandarin)

**Updated Exhibit 2**

## Materials Relied Upon by Sheng Li, Ph.D.

**Expert Reports**

Declaration of Randall Bell, Ph.D., MAI, August 6, 2018

Expert Report of Dr. Wayne R. Thomann, October 5, 2018

Expert Report of Gary R. Papke, MAI, October 8, 2018

Expert Report of Glenn Millner, Ph.D., October 8, 2018

Expert Report of John A. Kilpatrick, Ph.D., MAI, July 16, 2021

Expert Report of Mark Yocke, Ph.D., October 5, 2018

Expert Report of Scott Stout, Ph.D., P.G., Allen D. Uhler, Ph.D., and Katherine L. Flanders, Ph.D., October 5, 2018

Expert Report of Sheng Li, Ph.D., October 8, 2018

Expert Report of William Auberle, L.H.D, P.E., BCEE, July 14, 2021

Supplemental Expert Report of Marc Glass, July 15, 2021

Supplemental Expert Report of Marco Kaltofen, Ph.D., P.E., July 15, 2021

**Data**

Extended MLS data provided by Mr. Papke

**Publicly Available Information**

"S&P Dow Jones Indices LLC, S&P/Case-Shiller NY-New York Home Price Index [NYXRSA]," *St. Louis Federal Reserve,* available at https://fred.stlouisfed.org/series/NYXRSA, accessed September 5, 2021

"S&P Dow Jones Indices LLC, S&P/Case-Shiller TX-Dallas Home Price Index [DAXRNSA]," *St. Louis Federal Reserve,* available at https://fred.stlouisfed.org/series/DAXRNSA, accessed September 5, 2021

Mark A. Allen, Robert E. Hall, and Victoria A. Lazear, "Reference Guide on Estimation of Economic Damages," in *Reference Manual on Scientific Evidence* (3rd Edition) (Washington, DC: National Academies Press, 2011)

William H. Greene, *Econometric Analysis*, 6th Edition, 2008

**Exhibit 3**

## Reproduction of Figure 7 of Kilpatrick Report
## Median Sales Price per Square Foot Outside 7-Mile Radius After 2017 Crosby Event
## September 2017 - August 2018



Notes:  Based on the underlying data used by Dr. Kilpatrick in his reliance materials to create Figure 7 of his report.
         Dr. Kilpatrick misleadingly displays the R-squared of the actual trendline in his Figure 7 rather than the actual R-squared of his purported "trendline."

Source:  Kilpatrick Reliance Materials, "Sales for In-Out Analysis.xlsx," tab "working copy."

NERA Economic Consulting

**Exhibit 4**

## Reproduction of Figure 6 of the Kilpatrick Report as Shown in Reliance Materials



Note:  Red circular callout added.

Source:  Kilpatrick Reliance Materials, "Sales for In-Out Analysis.xlsx," tab "working copy."

NERA Economic Consulting