

## Appraisal Review Report and Real Property Appraisal Consulting Report

*Expert Report of Gary R. Papke, MAI; Thomas W. Hamilton, PhD, MAI*

*Wheeler, et al. v. Arkema Inc.*



JLL Valuation & Advisory Services LLC

**September 17, 2021**

## APPRAISAL REVIEW REPORT; REAL PROPERTY APPRAISAL CONSULTING REPORT

**REPORT OF JOHN A. KILPATRICK, PHD, MAI**

**WHEELER ET AL. V. ARKEMA INC.**
PROPOSED CLASS AREA IN HARRIS, LIBERTY
AND CHAMBERS COUNTIES, TEXAS

### PREPARED FOR:

MR. THOMAS E. BIRSIC
K&L GATES LLP
K&L GATES CENTER
210 SIXTH AVENUE
PITTSBURGH, PA 15222
ON BEHALF OF: ARKEMA INC.

### DATE OF THE KILPATRICK REPORT:

JULY 16, 2021

### DATE OF THE REVIEW AND CONSULTING REPORT:

SEPTEMBER 17, 2021

### SUBMITTED BY:

JLL VALUATION & ADVISORY SERVICES LLC
200 EAST RANDOLPH STREET
CHICAGO, IL 60601

COPYRIGHT © JONES LANG LASALLE IP, INC. 2021.
All Rights Reserved

# Table of Contents

1. **EXECUTIVE SUMMARY** ................................................................................................. 1

    1.1 REPORT REVIEWED .................................................................................................. 2
    1.2 INTRODUCTION ...................................................................................................... 2
    1.3 SUMMARY OF OPINIONS ........................................................................................ 3
    1.4 PLAINTIFFS' EXPERTS' FINDINGS RELATED TO REAL ESTATE .............................................. 6
    1.5 DEFENDANT'S EXPERTS' FINDINGS RELATED TO REAL ESTATE .......................................... 9
    1.6 LIMITATIONS ......................................................................................................... 9

2. **REVIEW OF THE REPORT OF JOHN KILPATRICK, PHD, MAI** ...........................................11

    2.1 REPORT REVIEWED ................................................................................................ 12
    2.2 STANDARD TO EVALUATE DR. KILPATRICK'S REPORT UNDER THE UNIFORM STANDARDS OF PROFESSIONAL APPRAISAL PRACTICE ................................................................................................................ 12
    2.3 DR. KILPATRICK FAILED TO IDENTIFY THE NATURE, EXTENT, AND LOCATION OF THE PURPORTED ENVIRONMENTAL CONTAMINATION, OR TO CONSIDER THE POTENTIAL FOR GEOGRAPHICAL VARIATIONS IN IMPACT ...................................... 13
    2.4 DR. KILPATRICK'S REPORT FAILS TO CONSIDER AND IS IRRELEVANT TO 83.3% OF THE PROPOSED CLASS AREA ..................... 16
    2.5 DR. KILPATRICK FAILED TO CONSIDER THE THREE MOST RECENT YEARS OF MARKET DATA .................................. 17
    2.6 DR. KILPATRICK DID NOT USE AN ACCEPTED, QUANTITATIVE MASS APPRAISAL METHODOLOGY; AND EVEN ACCEPTED MASS APPRAISAL METHODOLOGIES ARE INAPPROPRIATE IN THIS CASE BECAUSE THE MARKET IS HETEROGENEOUS ......................... 18
        *2.6.1 Mass Appraisal Methodologies are Inappropriate in a Non-Homogenous Market Like the Proposed Class Area ...................................................................................................................... 18*
        *2.6.2 Dr. Kilpatrick's Quantitative Analysis to Calculate Purported Diminution in Value in the Proposed Class Area did not Employ an Accepted Methodology ....................................................................... 19*
        *2.6.3 The Appraisal Profession Recognizes that Even Accepted Methodologies for Calculating Diminution in Value Associated with Environmental Conditions are Inappropriate to Employ on a Mass Basis ...................... 20*
        *2.6.4 Description of the Analysis Employed by Dr. Kilpatrick .......................................................... 21*
    2.7 DR. KILPATRICK'S CASE STUDIES ARE INAPPROPRIATE AND DO NOT SUPPORT HIS SUBJECTIVE 20% DIMINUTION CONCLUSION ................................................................................................................ 24
    2.8 DR. KILPATRICK'S PRICE TREND ANALYSES ARE FALSE AND DO NOT SUPPORT HIS 12.12% DIMINUTION CONCLUSION .......... 30
        *2.8.1 The "Control Area" Selected by Dr. Kilpatrick is Not Appropriate ............................................ 36*
        *2.8.2 Failure to Analyze the Differential Impacts of Hurricane Harvey Flooding and Other Damages ......... 39*
        *2.8.3 Failure to Consider Alternative Contamination Sources and Other Factors Affecting Market Value ..40*
    2.9 ANALYSIS OF THE DATA DR. KILPATRICK IGNORED USING DR. KILPATRICK'S METHODOLOGY CONTRADICTS HIS 12.12% DIMINUTION CONCLUSION ................................................................................................................ 44
    2.10 DR. KILPATRICK'S REGRESSION MODEL (THE GAVM) WAS NOT USED TO CALCULATE DIMINUTION IN VALUE, AND IS HIGHLY UNRELIABLE TO CALCULATE "UNIMPAIRED VALUES" ....................................................................................... 48
        *2.10.1 Dr. Kilpatrick's "GAVM" is Reliant on Tax-Assessed Values, which is Disconnected from Market Value 48*
        *2.10.2 Dr. Kilpatrick's "GAVM" is Highly Unreliable ................................................................ 50*
    2.11 CONCLUSIONS OF REVIEW ...................................................................................... 54

3. **ADDENDA – UPDATES AND REVISIONS TO THE 2018 JLL REPORT** ...........................................58

    3.1 NAMED PLAINTIFFS ................................................................................................ 59
        *3.1.1 Assessed Values 2017 to 2020 ................................................................................ 60*
        *3.1.2 Changes in Ownership ........................................................................................ 61*
    3.2 FLOODING, WATER INFILTRATION AND MOLD IN THE EXCLUSION ZONE AND ELSEWHERE ................................. 62
    3.3 REAL ESTATE MARKET IMPACTS DUE TO HURRICANE HARVEY ....................................................... 62
    3.4 COMPARABILITY OF THE PROPOSED CLASS AREA TO SURROUNDING AREAS – THE KILPATRICK CONTROL AREA .......... 63
    3.5 REAL ESTATE DEVELOPMENT ACTIVITY IN THE PROPOSED CONTROL AREA SINCE 2017 ................................. 67



     3.5.1    *New Single-Family Home Sales* .................................................................................... 67

3.6   VARIATIONS IN THE ENVIRONMENTAL SITUATION BASED ON DIFFERENCE IN PROXIMITY AND DIRECTIONS FROM THE INCIDENT 71

3.7   DISTINGUISHING ACTUAL IMPACTS ON POST-INCIDENT PRICES ALREADY PAID FROM IMPACT ON CURRENT AND FUTURE MARKET VALUES .................................................................................................................... 72

3.8   THE PLAINTIFFS' CLAIMS FOR REAL PROPERTY DAMAGES; THE PROPOSED CLASS AND THE EXCLUSION ZONE ...................... 73

3.9   VARIATIONS IN LAND USE WITHIN THE PROPOSED CLASS AREA ................................................................ 74

3.10  PARCELS BY LAND USE TYPE BY AREA ................................................................................................ 76

3.11  VARIATION IN FLOODING AND REAL PROPERTY DAMAGE DUE TO HURRICANE HARVEY WITHIN THE PROPOSED CLASS AREA ..76

3.12  DIFFERENCES IN FLOODING EXPOSURE IN THE EXCLUSION ZONE ............................................................. 79

3.13  DEMOGRAPHIC VARIATIONS WITHIN THE PROPOSED CLASS AREA ........................................................... 79

3.14  VARIATION IN THE QUALITY OF ELEMENTARY SCHOOLS IN THE PROPOSED CLASS AREA MAY AFFECT PRICES AND VALUES AND DEMONSTRATES THE NEED FOR NEIGHBORHOOD-BY-NEIGHBORHOOD ANALYSIS ........................................................ 82

3.15  MANY OTHER ENVIRONMENTAL ISSUES AND POTENTIAL DISAMENITIES AFFECT PRICES AND VALUES IN THE PROPOSED CLASS AREA ................................................................................................................................ 84

3.16  REAL ESTATE MARKET TRENDS 2017 TO 2021 ................................................................................. 89

     3.16.1   *Price Trends in the Proposed Class Area Demonstrate No Significant Class-Wide Effects on Real Estate Prices Before and After the Combined Hurricane Harvey/Arkema Events* ......................................................... 89

     3.16.2   *Residential Real Estate Market Trends in the Proposed Class Area – Monthly Analysis* .................... 92

     3.16.3   *Comparison of Price Trends in One Neighborhood inside the Proposed Class Area to a Neighborhood Outside the Proposed Class Area Demonstrates Why Neighborhood-by-Neighborhood and Property-by-Property Analysis Will Be Necessary* ......................................................................................... 94

     3.16.4   *Residential Real Estate Sales Volume and Prices by Alternative Areas*................................. 95

     3.16.5   *Examining Sales Trends in One Neighborhood Straddling the Proposed Class Area Demonstrates the Need for Neighborhood-by-Neighborhood and Property-by-Property Appraisals*.............................. 96

     3.16.6   *Proximity of Retail and Commercial Land Uses to Single Family Home Prices in Some Neighborhoods but Not Others*.............................................................................................................. 98

     3.16.7   *Residential Property Transaction Disclosure Information*................................................. 99

     3.16.8   *Days on Market Trends*.................................................................................... 101

3.17  SUMMARY OF OPINIONS AND CONCLUSIONS CONCERNING DETERMINATION OF REAL PROPERTY DAMAGE ON A CLASS-WIDE BASIS .................................................................................................................... 102

**4.   ADDENDA ........................................................................................................... 106**

4.1   PREMISES OF THE APPRAISAL REVIEW AND APPRAISAL CONSULTING REPORT .......................................... 107

     4.1.1   *Definitions Important to the Assignment*.............................................................. 108

     4.1.2   *Subject and Purpose of the Report*.................................................................... 108

     4.1.3   *Qualifications of the Experts*.......................................................................... 109

     4.1.4   *Client and Intended Use and Users of This Report*.................................................. 111

     4.1.5   *Purposes of the Assignment*........................................................................... 111

     4.1.6   *Scope of the Assignment*.............................................................................. 112

     4.1.7   *Date of Value in the Report Reviewed* .............................................................. 114

     4.1.8   *Date of Report Submission*............................................................................ 114

     4.1.9   *Definitions Important to the Assignment*............................................................ 115

     4.1.9.1  *Market Value* ....................................................................................... 115

     4.1.9.2  *Appraisal Review*................................................................................... 117

     4.1.9.3  *Type of Appraisal Review Conducted and Report Format*...................................... 117

     4.1.9.4  *Environmental Contamination and Impaired Value* ............................................. 118

     4.1.10  *Extraordinary Assumptions and Hypothetical Conditions Used in the Report*.................. 118

4.2   CERTIFICATION.................................................................................................... 119

4.3   ASSUMPTIONS AND LIMITING CONDITIONS.................................................................. 122

4.4   USPAP ADVISORY OPINION (AO-9) ......................................................................... 126

4.5   FACTS OR DATA CONSIDERED ................................................................................. 131

4.6   QUALIFICATIONS ................................................................................................. 140

4.7   JLL VALUATION & ADVISORY SERVICES LLC HOURLY RATES FOR THIS ASSIGNMENT ................................ 151



4.8    TEXAS APPRAISAL LICENSE ....................................................................................................................153



# 1.   EXECUTIVE SUMMARY



## 1.1   REPORT REVIEWED

Our objective was to address whether a common methodology for class-wide real property damages that might be attributable to post-hurricane events at the Arkema Inc. plant in Crosby, Texas (Arkema Plant) (the Incident) had been reliably applied in this case. Our review refers to the following report, which is presented in the form of an affidavit:

> *A Study Regarding the Diminution in Value of Properties Impacted by the Arkema Explosion in August, 2017*, John A. Kilpatrick, PhD, MAI, July 16, 2021 (the Kilpatrick Report).

We were asked to, and did perform the following tasks:

1. Assess the completeness, accuracy, adequacy, relevance and reasonableness of the analysis performed by Plaintiffs' expert, Dr. John A. Kilpatrick to evaluate the effect, if any, of the Incident on real property in the Proposed Class Area.

2. Assess whether Dr. Kilpatrick's report provides a credible basis for his opinion that all single-family residential improved properties within the Proposed Class Area currently are diminished in value by 20% across the board due to the Incident.

3. Update and revise our original report dated October 8, 2018 (the "2018 JLL Report") to provide up to date information  on demographics, real estate market trends, the characteristics of the real estate parcels within the Proposed Class Area, and factors that may affect those properties' market value.

From reviewing the Kilpatrick Report, it is our understanding that Plaintiffs attempt to prove through Dr. Kilpatrick's analysis that all improved single-family residential parcels within the Proposed Class Area were commonly impacted by the Incident and, as a result, are all diminished in value by 20% as of the date of Dr. Kilpatrick's report.

## 1.2   INTRODUCTION

We understand that the parties have been permitted by the court to supplement the record as it pertains to class-certification, including new expert reports. The Plaintiffs have retained Dr. John Kilpatrick as their expert on real estate issues for this round.

In our opinion, much of the 2018 JLL Report remains valid and can serve as the starting point and reference for our updated and revised opinions. Our opinions will be based in large part on the facts and analyses contained in the 2018 JLL Report, which is incorporated by reference, except as explicitly updated and revised in the addendum attached to this report. Updates and revisions have been made primarily for one or more of the following reasons:



- Revisions necessitated by additional or revised analyses of the factual issues related to the Arkema Incident and in the new reports presented by plaintiffs or defendants' experts.

- Real estate-related updates since 2018 in the circumstances of the parties designated as representatives of the proposed class.

- Updates since 2018 in some of the numerous factors differentially affecting the market value of real property in the area, as described in the 2018 JLL Report.

- Updates to account for changes in the real estate market in the area over the past three additional years which might provide evidence of the extent and duration of the impact of Hurricane Harvey and of the Arkema Incident, if any.

We understand that the Court excluded the opinions of Randall Bell, and that Plaintiffs have replaced Dr. Bell with Dr. Kilpatrick. Therefore, this report also includes a newly developed review of the methodology, accuracy and conclusions reached in the July 16, 2021 report of John A. Kilpatrick, PhD, MAI -- replacing sections of the 2018 JLL Report that addressed the report of Randall Bell -- and addressing the conclusions of Dr. Kilpatrick regarding the market value and impact on market value of the Arkema Incident on single-family residential properties in the Proposed Class Area.

### 1.3 SUMMARY OF OPINIONS

A summary of our opinions regarding the Kilpatrick Report are as follows:

1. Setting aside the other significant deficiencies in his report, Dr. Kilpatrick provides no analysis or possible methods of determining damages for those Named Plaintiffs and others with agricultural properties or for others in the area with interests in multi-family residential, commercial, industrial, institutional, vacant land or other uses. As of 2021, these excluded property types comprise 44.1% of all parcels and 83.3% of the land area in the Proposed Class Area. In other words, ***the Kilpatrick Report does not address and is completely irrelevant to 83.3% of the Proposed Class Area's acreage***.

2. Dr. Kilpatrick's ultimate conclusion of a blanket 20% diminution in value applicable to all improved residential parcels within the Proposed Class Area is not based on any quantitative analysis or market data. Instead, it is based on Dr. Kilpatrick's subjective and flawed application of case studies that are not comparable to this case. The case studies are not based on primary research by Dr. Kilpatrick; in many cases do not represent actual market data; involve contaminants and circumstances unlike those claimed in the Arkema Incident; are not recent events; and the percentage diminutions presented are either inaccurate or misleading. These case studies therefore present no credible support for even a subjective opinion regarding diminution in the market value of single-family residences in the Proposed Class Area.



3. Dr. Kilpatrick justifies a 20% diminution conclusion based on his subjective use of case studies and not on market data because of his unsupported opinion that the market "is not yet at equilibrium." His own flawed quantitative analyses of market data led him to a 12.12% diminution estimate; but these analyses are limited to data only through August 2018. That is an artificial, improper, and self-imposed limitation, since actual market transaction data is readily available for the remainder of 2018, all of 2019 and 2020, and through the present in 2021.  Dr. Kilpatrick is not justified in substituting his subjective 20% diminution figure based on case studies for his 12.12% diminution based on data solely because he opines that the market has not reached an "equilibrium," when actual market data that could have answered that question is available. This failure to analyze the full range of actual real estate sales data that is readily available renders Dr. Kilpatrick's analyses and opinions unreliable and irrelevant to the issue of diminution, if any, that may exist in the present day.

4. Had Dr. Kilpatrick looked at the readily available market data for September 2018 through present, it would have shown that housing prices (on a per square foot basis) were rising in both the Proposed Class Area and in his control area. In fact, prices in the Proposed Class Area rose at a faster rate than in the control area, indicating no overall diminution in single-family residential prices in the Proposed Class Area.

5. Dr. Kilpatrick fails to comply with the requirements of the applicable *Uniform Standards of Professional Appraisal Practice (USPAP)* in significant respects—by not employing the proper methodologies and analyses, and by applying the methodologies and analyses that he did implement in a flawed and improper manner. For example, industry consensus is that mass appraisal methodologies are inappropriate for large, heterogeneous real estate markets such as in the Proposed Class Area. Given the varied, heterogeneous nature of the Proposed Class Area, no mass appraisal methodologies are appropriate to apply in this particular case. When applied to such non-homogeneous markets both the real estate economics profession and the appraisal profession have long recognized the limited reliability of mass appraisal tools. The lack of fit between Dr. Kilpatrick's chosen methodologies and his application of them is demonstrated in the large margin of error in his analysis. For example, ***Dr. Kilpatrick's model for unimpaired property values at best projects values +/- approximately 60% either way***. In our opinion, this renders Dr. Kilpatrick's model useless for appraising properties or assessing damages supposedly attributable to market value diminution.

6. Further, Dr. Kilpatrick purports to determine diminution in market value associated with an environmental condition, but he simply assumes that an environmental condition exists for all properties within the Proposed Class Area. Dr. Kilpatrick does not cite any support for that assumption—not even Plaintiffs' other experts—which is a serious violation of USPAP. This is most apparent in the fact that Dr. Kilpatrick's opinions regarding diminution in value do not match Plaintiffs' other experts' opinions regarding alleged contamination. The reports of Drs. Auberle and Kaltofen, taken at face value,



indicate that large portions of the Proposed Class Area were not directly affected by the Incident; and suggest that chemicals were detected in samples closest to the Arkema Plant.[1] Dr. Kilpatrick's opinions that there is a uniform impact of the Incident on all homes across the Proposed Class Area and that there is no correlation between diminution in value and proximity to the Arkema Plant[2] therefore does not even fit Plaintiffs' experts' theories of alleged contamination.  His failure to take into consideration available information on the environmental conditions he claims to be impairing properties in the area makes his analyses and conclusions unreliable.

7. The trend line analyses that Dr. Kilpatrick performs to quantitatively calculate purported diminution manipulates actual pricing trends and is not recognized as an acceptable appraisal tool in the industry for this application, and the trend lines that he reports are not the actual or true trend lines for the dataset. When the trend lines for the actual dataset are used, diminution according to Dr. Kilpatrick's methodology is only 0.24% -- not the 12.12% he reports. Even that corrected projection, however, does not fit the actual market data, which indicates that properties inside the Proposed Class Area did 5.24% *better than* properties in Dr. Kilpatrick's control area when correctly using his trend line comparison method.

8. The flawed quantitative analyses presented in the Kilpatrick Report to support a conclusion of 12.12% market value diminution for all single-family residential properties as of August 2018 is further unreliable because:

    a. The explanatory value of Dr. Kilpatrick's regression analysis used to calculate unimpaired values at paras. 57–63 of the Kilpatrick Report is low. There is such a wide margin for error in Dr. Kilpatrick's model that a property appraised at $200,000 by his model in reality could be valued anywhere between $78,629 and $321,371 at the standard 95th percentile confidence interval.

    b. Dr. Kilpatrick does nothing to establish that his selected control area—properties outside of the Proposed Class Area—is sufficiently similar to properties within the Proposed Class Area. Our comparison of demographic, economic, and real estate-related variables in the control area to the area inside the Proposed Class Area indicates that Dr. Kilpatrick's control area is inappropriate. Without an appropriate control area, Dr. Kilpatrick's analyses cannot isolate the effect, if any, that the Incident may have had on properties within the Proposed Class Area from effects of other factors.

    c. Dr. Kilpatrick's quantitative analysis does nothing to isolate the effects that Hurricane Harvey may have had on single-family residential property values within the Proposed Class Area from any effects of the Incident. Dr. Kilpatrick simply

---

[1] Auberle Report, paragraph 5.5; Kaltofen Supplemental Report, page 6.
[2] Kilpatrick Report, p. 38.

assumes that Hurricane Harvey caused identical property damage throughout both the Proposed Class Area and his control area. But that assumption is completely contradicted by the evidence -- including testimony from the class representatives -- that flood damage from Hurricane Harvey varied significantly from property to property within the Proposed Class Area.

    d. Dr. Kilpatrick failed to consider the effects that other environmental conditions may have had within the Proposed Class Area. The 2018 JLL Report at Section 5.12 detailed the numerous other environmental issues and potential disamenities present in the Proposed Class Area. Since the 2018 JLL Report, there have been others. For example, on April 2, 2019, there was a fatal fire and explosion at a chemical facility in the middle of the Proposed Class Area owned by KMCO LLC.[3]

Further, the 2018 JLL Report -- and the attached addenda updating that Report -- lead to the conclusion that there is no real estate appraisal method to measure impairment that can be applied on a class-wide basis in this case through the use of common evidence. Even if all of the properties in the Proposed Class Area were actually impacted -- which Dr. Auberle and other Plaintiffs' experts, taken at face value, indicate is not the case -- there is no consistent and common methodology to measure impacts on property values as well as "loss of use and enjoyment" in the Proposed Class Area given: the large number of properties; the variety of land use types; the diversity in flooding and other disparate impacts of Hurricane Harvey; variations in air dispersal; and the varying levels of contaminants allegedly found on properties. From a real estate appraisal perspective, it is inappropriate to delineate a Proposed Class Area by including all 21,841 properties within the Proposed Class Area because it will not result in a fair, accurate, and reliable determination of damages if measured on a class-wide basis. Simply stated, the Proposed Class Area is too large, varied, and heterogeneous for mass appraisal methodology to be reliably applied in this case.

Therefore, neighborhood-by-neighborhood and property-by-property analysis will be necessary for the reasons set forth in Sections 7.1 and 7.2 of the 2018 JLL Report, and Section 3.17 of the attached addendum, which are incorporated by reference.

## 1.4   PLAINTIFFS' EXPERTS' FINDINGS RELATED TO REAL ESTATE

We have also reviewed the Plaintiffs' expert reports which have some direct relationship to questions of alleged real estate damages. These are briefly summarized below. For the purposes of our analyses, we took Plaintiffs' expert reports at face value; we understand that others will comment on the propriety and credibility of Plaintiffs' technical experts' opinions and reports.

Other Plaintiffs' experts, whose work is not summarized below, address matters of toxicology, public health and chemical industry standards that have only indirect, if any, connections to real estate analysis and appraisal.

---

[3] *See* https://www.csb.gov/kmco-llc-fatal-fire-and-explosion-/

JLL

**Report of William M. Auberle**

*Dispersion and Deposition of Particulate Matter from Explosions and Fires in August and September, 2017 at Arkema Plant, 18000 Crosby Eastgate Road, Crosby, Texas*, July 12, 2021.

Dr. Auberle's report "…focuses on the atmospheric transport and deposition of the particles emitted from the explosions and fires…at the Arkema facility."[4]

After modeling the atmospheric transport of the plumes from the Arkema Incident, Dr. Auberle estimated the deposition of the particulates on the land within the Proposed Class Area:

> Figure 8 shows the cumulative deposits of particulate matter caused by the Arkema explosions and fires on August 31, September 1 and September 3, 2017. Greatest impacts were nearest the Arkema facility. Local meteorological conditions during each of the explosions and fires moved the plumes of air pollutants downwind with generally lower deposits of particulate matter. Isopleths are shown for cumulative deposition ranging from 0.001 g/m2 to 100 g/m2.[5]

Figure 8 from the Auberle Report shows his estimation of the cumulative distribution of particulate matter from the Arkema Incident.

---

[4] Auberle Report, paragraph 3.0
[5] Auberle Report, paragraph 4.5





Figure 8. Particulate Matter Deposition from Three Arkema Explosion and Fire Events in grams per square meter. g/m^2
Receptor rings are spaced every: 50 m out to 200 m, 100 m to 2,000 m, 500 m to 7,000 m, 1,000 m to 15,000 m.

It is apparent from this illustration that the Plaintiffs' own expert concluded that large portions of the Proposed Class Area were not directly affected by the Arkema Incident.

Dr. Auberle also reported that "The greatest particulate matter deposition occurred near the Arkema facility."[6]

**Report of Marco Kaltofen**

*Supplemental Expert Report: Arkema, Inc. plant and area, chemical quality data, Crosby, TX*, July 15, 2021.

As stated in the Kaltofen Supplemental Report:

> This supplement focuses on (1) background concentration data and literature, (2) potentially confounding contaminant sources, (3) environmental persistence of contaminants, (4) resuspension of contaminants and tracking of outdoor material into homes by human movement and activity.[7]

---

[6] Auberle Report, paragraph 5.5.
[7] Kaltofen Report, p. 2.



**Report of Marc Glass**

Supplemental Expert Report of Marc Glass**,** July 15, 2021; Expert Report of Marc Glass, *Arkema Plant Site and Surrounding Areas,1800 Crosby Eastgate Road, Crosby, Texas; Wheeler v. Arkema, Civil Action No. 4:17-cv-2960*, August 7, 2018.

Mr. Glass' reports address a variety of sampling activities undertaken in the area. The report includes information on soil, well and interior sampling. It also includes an estimate of costs to remediate purported contamination in the interiors of homes in the area.

No commercial or other non-residential sampling is addressed, despite such properties making up 83.3% of the Proposed Class Area's acreage.

### 1.5   DEFENDANT'S EXPERTS' FINDINGS RELATED TO REAL ESTATE

We understand that no additional environmental samples have been taken since we issued the 2018 JLL Report. In the 2018 JLL Report at Section 2.14, we presented our high-level review of Defendant's technical experts, which is incorporated herein by reference. Overall, those findings confirmed our conclusion that the assessment of potential damages to real property must be made on a property-by-property basis that takes variations in environmental effects, if any, into consideration.

We understand that Defendant's technical experts will issue additional reports in response to Plaintiffs' supplemental reports. We reserve the right to make appropriate adjustments, if necessary, based on our review of those additional reports.

### 1.6   LIMITATIONS

This executive summary and report have been researched and written in conformity with the requirements of the *Uniform Standards of Professional Appraisal Practice* (USPAP) published by the Appraisal Standards Board of the Appraisal Foundation, and the *Supplemental Standards of Professional Practice and Code of Professional Ethics* published by the Appraisal Institute. This report is subject to the statement of assumptions and limiting conditions included in it. Neither the JLL Valuation & Advisory Services name nor the material submitted in the report may be included in any prospectus or used in offerings or representations in connection with the sale of real estate, securities, or participation interests to the public, without our written consent.

This report was prepared for counsel for Arkema Inc. in the above-referenced litigation. It is intended to be used by the parties in the litigation to assist the court in determining the admissibility and reliability of expert testimony and the appropriate techniques to be used to determine damages, if any, in litigation.

The report describes in detail the scope of work involved in the assignment and the analyses, opinions and conclusions reached. This executive summary is not to be separated from the body



of the attached report, of which it is a part. It is also subject to the Statement of Assumptions and Limiting Conditions included later in this report.


JLL Valuation & Advisory Services, LLC


_____                _____

Gary R. Papke, MAI, CRE, FRICS                           Thomas W. Hamilton, PhD, MAI, CRE, FRICS

 Executive Vice President                                 Senior Vice President



### 2. REVIEW OF THE REPORT OF JOHN KILPATRICK, PHD, MAI



### 2.1   REPORT REVIEWED

Our review refers to the following report, which is presented in the form of an affidavit:

> *A Study Regarding the Diminution in Value of Properties Impacted by the Arkema Explosion in August, 2017*, John A. Kilpatrick, PhD, MAI, July 16, 2021 (the Kilpatrick Report).

### 2.2   STANDARD TO EVALUATE DR. KILPATRICK'S REPORT UNDER THE UNIFORM STANDARDS OF PROFESSIONAL APPRAISAL PRACTICE

Dr. Kilpatrick is a licensed real estate appraiser in Texas. As such, he is required to comply with the *Uniform Standards of Professional Appraisal Practice* (USPAP).[8] Our review of his report is being conducted under Standards Rule 3 (*Appraisal Review Development*) and Standards Rule 4 (*Appraisal Review Reporting*) of USPAP.

Under USPAP, our determination of whether Dr. Kilpatrick's report is appropriate and credible looks at "what an appraiser's peers' actions would be in performing the same or a similar assignment."[9] In the sections below, we explain why Dr. Kilpatrick's report is neither appropriate nor credible under USPAP as follows:

1.  Dr. Kilpatrick failed to identify the nature, extent, and location of the purported environmental contamination, or to consider the potential for geographical variations in impact.

2.  Dr. Kilpatrick's report fails to consider and is irrelevant to 83.3% of the Proposed Class Area as identified by his client.

3.  Dr. Kilpatrick failed to consider all available and relevant data, including the three most recent years of market data.

4.  Dr. Kilpatrick did not use an accepted quantitative mass appraisal methodology, and even accepted mass appraisal methodologies are inappropriate in this case because the market is heterogeneous.

5.  Dr. Kilpatrick's case studies are inappropriate, inaccurate and not comparable to the Arkema Incident and the Proposed Class Area and do not support his subjective 20% diminution conclusion.

---

[8] See, for example, 22 Tex. Admin. Code § 8 (2013) (Texas Appraiser Licensing and Certification Board, Rules Relating to Standards of Practice)
[9] The Appraisal Foundation, *USPAP*, 2020-21 ed., p. 14, Line 387.



6. Dr. Kilpatrick's price trend methodology manipulates his stated conclusions by engineering false indications of actual market behavior and do not support his 12.12% diminution conclusion.

7. Analysis of market data Dr. Kilpatrick ignored, using Dr. Kilpatrick's methodology, contradicts his 12.12% diminution conclusion.

8. Dr. Kilpatrick's regression model (the GAVM) was not used to calculate diminution in value, and is highly unreliable to calculate "unimpaired values."

The first four critiques, above, relate to the fundamental flaws associated with the methodologies and analyses that Dr. Kilpatrick selected for this matter, without consideration for whether those methodologies were correctly implemented or the analyses were sound. In other words, Dr. Kilpatrick selected the wrong tools, and ignored some of the necessary tools, for this case.

The second four critiques, above, relate to the flawed ways that Dr. Kilpatrick implemented his selected methodologies. In other words, even if Dr. Kilpatrick had selected the right tools for the job, he used them incorrectly or inaccurately.

## 2.3 DR. KILPATRICK FAILED TO IDENTIFY THE NATURE, EXTENT, AND LOCATION OF THE PURPORTED ENVIRONMENTAL CONTAMINATION, OR TO CONSIDER THE POTENTIAL FOR GEOGRAPHICAL VARIATIONS IN IMPACT

Nowhere in his report does Dr. Kilpatrick address the specific environmental contamination he has determined to have uniformly and permanently diminished the market value of all of the single-family properties throughout the area. He appears to have no awareness of the air and particulate deposition modeling of Plaintiffs' expert Dr. Auberle, showing large swaths of the area unaffected by any particulates from Arkema; no awareness of the nature of the claimed contaminants on area properties or of the sampling conducted by experts for the Plaintiffs; no awareness of the likely duration of any such contamination; and no acknowledgement of any reports prepared by such experts or by other experts for state and federal agencies or by Arkema.

The sole reference to the nature of the contamination is a single, vague statement justifying his selection of case studies:

> All of these cases included air and soil-related contamination including industrial products.[10]

The only references to the Incident are found in paragraphs 15, 16, 17 and 18 on pages 5-6 of the Kilpatrick Report. The only apparent sources for even this minimal knowledge are found in two footnotes, one referencing an Arkema Safety Data Sheet for Luperox; and another a link to a local television source related to the landfall of Hurricane Harvey.

---

[10] Kilpatrick Report, p. 40.



This is a violation of USPAP standards, particularly Standards Rule 1-2(e), and as elaborated in USPAP Advisory Opinion AO-9 on the appraisal of real property that may be impacted by environmental contamination:

> **Relevant Property Characteristics**
> The appraisal of a property that includes the effects of environmental contamination on its value usually requires data not typically used in an appraisal of an otherwise similar but uncontaminated property or an appraisal of a potentially impacted property using either a hypothetical condition or an extraordinary assumption that it is uncontaminated or not impacted. The inclusion of these additional relevant property characteristics is consistent with Standards Rule 1-2(e).
>
> …
>
> Since the appraiser is usually not an expert on the scientific aspects of contamination, experts from other fields will typically provide this information. Appropriate regulatory authorities should also be consulted to confirm the presence or absence of contamination. The appraiser should consider the use of extraordinary assumptions when this information serves as a basis for an opinion of value. The appraiser should also collect similar data for any comparable sales used in the analysis.[11]

Dr. Kilpatrick has a long resume citing his experience in the appraisal of property with environmental contamination. He acknowledges in his report that "USPAP AO-9 presents a framework for analyzing a variety of detrimental conditions, including environmental contamination."[12] He therefore has no excuse for not having consulted and used information readily available from public reports, the reports of experts for his own clients, or experts for Arkema.

Dr. Kilpatrick not referencing this information in the analyses presented in his report is a serious violation of USPAP standards and AO-9. With no apparent knowledge of the purported contamination and its relationship to properties throughout the large class area:

- Dr. Kilpatrick has selected five case studies which he somehow considers comparable to the contamination and the Proposed Class Area. He then uses those cases to support his subjective 20% diminution in impaired value estimate;

---

[11] USPAP 2020-2021 edition, Advisory Opinion AO-9, p. 78
[12] Kilpatrick Report, p. 24.



- Dr. Kilpatrick has concluded that impairment is uniformly distributed throughout the Proposed Class Area and nowhere outside of that area, justifying an identical percentage diminution for all single-family residential properties; and

- Dr. Kilpatrick has assumed that contamination and its effects, if any, as he found from an analysis of one year's worth of data, are continuing without any dissipation over time.

This failure to make use of readily available information, including from fellow experts retained by his own client, is a fundament flaw and violation of appraisal standards.

Dr. Kilpatrick's ignorance of the characteristics of the contamination as asserted by the Plaintiffs' other experts, is particularly apparent in his attempt to explore the question of whether impacts of contamination change with distance from the Arkema property. Dr. Kilpatrick states at page 38 of his report:

> As an additional analysis, we examined the sales prices within the 7-mile affected area as a function of distance to/from the Arkema facility. We first began by examining the correlation between sales price and distance <u>before</u> the Arkema explosion and found that there was nearly zero correlation between the two. This suggest that mere proximity to the facility is not a factor in sales prices. Second, we examined prices <u>after</u> the explosion, and found that while distance is a slight correlative factor, it does not pass the threshold of statistical significance, as shown in Table 11, following.[13]

Having found no statistically significant correlation between sales price and distance, he merely lets the issue drop. But Dr. Kilpatrick's analysis is directly contrary to Plaintiffs' technical experts' theory of alleged contamination. For example, Dr. Kaltofen opined that "the environmental concentration of compounds of interest increase as one gets closer to Arkema." [14] Dr. Auberle's air modeling of the alleged "impact zone" demonstrates that large portions of the Proposed Class Area were not directly affected by the Arkema Incident. Dr. Auberle also reported that "The greatest particulate matter deposition occurred near the Arkema facility."[15] Dr. Kilpatrick's opinion that there is no correlation between diminution in value and proximity to the Arkema Plant[16] therefore does not fit Plaintiffs' experts' theory of alleged contamination.

In sum, by failing to identify the nature, extent, and location of the purported environmental contamination and square that information with his analysis, Dr. Kilpatrick violated USPAP standards and has presented an unreliable and not credible analysis. Further, by failing to consider the potential for geographical variations in impact, Dr. Kilpatrick's analysis does not even fit Plaintiffs' technical experts' theory of alleged contamination.

---

[13] Kilpatrick Report, p. 38.
[14] Kaltofen Supplemental Report, page 3.
[15] Auberle Report, paragraph 5.5.
[16] Kilpatrick Report, p. 38.



## 2.4   DR. KILPATRICK'S REPORT FAILS TO CONSIDER AND IS IRRELEVANT TO 83.3% OF THE PROPOSED CLASS AREA

The Kilpatrick Report recognizes that the proposed class members include all property owners in the area.[17] However, Dr. Kilpatrick expressly limits his analyses to addressing single-family residential properties, including vacant land, multi-family property with 4+ units, and mobile homes:

> This section explains the factors that I used to establish the values of single-family residential properties in the affected area in a hypothetical unimpaired case. These properties include, but are not limited to, residential vacant land, multi-family property with 4+ units, and mobile homes. In past assignments, I have found that properties best appraised with such hybrid methods have accounted for an immaterial percentage of all properties and aggregate property value.[18]

Ultimately Dr. Kilpatrick's report – even after acknowledging that he had been told by his client that the proposed class included "…all properties within a seven-mile radius of the Arkema facility…."— only offers a methodology and conclusions that address improved single-family residential properties, excluding even residential vacant land, multi-family properties and mobil homes.

**As a result, the Kilpatrick Report provides no analysis or possible methods of determining damages for those Named Plaintiffs and others with agricultural properties and mobile homes or for others in the area with interests in multi-family residential, commercial, industrial, institutional, or other uses. As of 2021 as shown in the attached addendum, these excluded property types that Dr. Kilpatrick's report ignores comprise 44.1% of all parcels and 83.3% of the land area in the Proposed Class Area.**

The Kilpatrick Report does not even offer any hypothetical methodologies for addressing these left-out properties on a comprehensive class-wide basis.

Further, Dr. Kilpatrick did not apply or even propose any method of accurately determining damages to lessors such as Named Plaintiffs Larry and Tanya Anderson or lessees such as Named Plaintiff Prantil. He did not present any method of sorting out issues of damages for parties such as Prantil who was a lessee at the time of the Incident and become an owner of a fee interest less than a year after the Incident. Or the question of equitably determining damages for others like Named Plaintiff Nason, who sold his home after the Incident; or for the buyer of the Nason home who now might claim eligibility for compensation under the Kilpatrick model of permanent impairment of the fee simple interest. Simply put, Dr. Kilpatrick's report does not address many obvious property interest issues in the Proposed Class Area and therefore is insufficient to serve as a basis for determining class-wide property damages.

---

[17] Kilpatrick Report, p. 5.
[18] Kilpatrick Report, p. 10. It is unclear what is meant by the phrase "…properties best appraised with such hybrid methods…."



Finally, Dr. Kilpatrick's report does not address all types of property damages that Plaintiffs allege to have incurred. For example, Plaintiffs allege that actions of Arkema during the Hurricane Harvey weather event in late August and early September 2017, as described in Paragraphs 1 to 6 of the Complaint, have resulted in property damage, loss of use and enjoyment of property and stigma.[19] But the Kilpatrick report solely addresses impacts on the market value of properties. It offers no mechanism for addressing other types of real estate-related claims asserted by Plaintiffs' counsel or the Named Plaintiffs, including in particular, temporary loss or impairment of use. [20]

Plaintiffs also allege that some members of the larger Proposed Class, namely "residents" living in the Exclusion Zone, "suffered enhanced property damage from the floodwaters that invaded their homes and properties because mold grew unabated in their homes for eight days until the Exclusion Zone order was lifted."[21] But these alleged damages would not extend throughout the entire Proposed Class Area. Dr. Kilpatrick's report does not consider these alleged damages—or the effect of Hurricane Harvey as opposed to the Incident—and instead treats all residential improved properties the same, assigning a uniform 20% diminution based on a subjective analysis of case studies.

In short, Dr. Kilpatrick's report does not fit Plaintiffs' allegations and, most significant in this regard, it is completely irrelevant to a supermajority of the Proposed Class Area.

## 2.5   DR. KILPATRICK FAILED TO CONSIDER THE THREE MOST RECENT YEARS OF MARKET DATA

Dr. Kilpatrick's Report is vague regarding dates of value,[22] but purports to offer an opinion on diminution in value valid *in the present day*. But his quantitative analysis for supposed diminution is limited to end in August 2018, without any explanation for why the limit was imposed. Market data is readily available for September through December 2018, all of 2019 and 2020, and in 2021 through the present, but Dr. Kilpatrick did not consider any of that market data in his quantitative analyses. This is particularly concerning from an appraisal perspective because the limited market data that Dr. Kilpatrick did look at is insufficient to support his analysis and conclusions, which he essentially concedes: "Statistically modeling property value impacts requires a large set of observations; there are quite simply relatively few sales observations in situations comparable to the affected properties."[23]

---

[19] Complaint, Paragraph 6.
[20] Complaint, Paragraphs 8, 78 (c).
[21] Complaint, Paragraph 8.
[22] Under the heading of "Various USPAP-Related Items" at the end of the Report, is the statement: "My inspection of the affected area and surrounding MLS zones was in June, 2021, but the effective date of value is August, 2017. I assume that there were no material changes in the properties which would affect the value, but for the Hurricane and the Arkema Explosion, during the intervening period. If found to be false, this could have a material impact on the valuation conclusions." (page 44).
[23] Kilpatrick Report, p. 33.



In sum, Dr. Kilpatrick concedes that the data he looked at was insufficient, but he simultaneously fails to look at the three most recent years of market data. Further, since environmental conditions are widely recognized to evolve over time, it is a serious flaw for Dr. Kilpatrick to have limited his analysis in this way. Dr. Kilpatrick provides no explanation for having cut his research and analysis off at this arbitrary point. It is a violation of USPAP Standards, which require full consideration of available and relevant information pertinent to a clearly stated date of value, both unimpaired and as if impaired. Therefore, Dr. Kilpatrick ignoring the readily available market data is inappropriate, and his opinions regarding present-day diminution—which did not consider more recent, available market data—are unreliable and fall short of the appraisal industry's standards.[24]

## 2.6 DR. KILPATRICK DID NOT USE AN ACCEPTED, QUANTITATIVE MASS APPRAISAL METHODOLOGY; AND EVEN ACCEPTED MASS APPRAISAL METHODOLOGIES ARE INAPPROPRIATE IN THIS CASE BECAUSE THE MARKET IS HETEROGENEOUS

### 2.6.1 MASS APPRAISAL METHODOLOGIES ARE INAPPROPRIATE IN A NON-HOMOGENOUS MARKET LIKE THE PROPOSED CLASS AREA

Both the real estate economics profession and the appraisal profession have long recognized the limited reliability of mass-appraisal methodologies, such as regression analyses, when applied to non-homogeneous markets such as the Proposed Class Area. An article in the *AREUA Journal* in 1985 put the problem as follows:

> "The assumption of the unified housing market has been challenged by a number of authors . . . The alternative hypothesis is the absence of short-run equilibrium and market segmentation along structural and neighborhood lines. In this case, one would find significant differences in attribute prices across different market segments. This implies that hedonic price regressions should be fitted separately for each submarket."[25]

Even some of the strongest advocates in the academic community of the use of statistical models to measure various types of real estate "attributes" and "detriments" acknowledge the fundamental proposition that hedonic modeling must be applied to a homogeneous market for the results to have any validity. A 1998 article in the *Journal of Real Estate Research* authored by Professors George H. Lentz and Ko Wang stated that "problems encountered in estimating hedonic pricing equations include the delineation of homogeneous submarkets and the selection of an estimation period."[26]

---

[24] In addition, Dr. Kilpatrick – like Dr. Bell before him in his 2018 report on the proposed class -- misrepresents the meaning of the term "market value" and the level of information necessary for sale prices in a marketplace to be considered reliable evidence of the impact of an environmental event. Therefore, our critique of Dr. Bell presented in Section 8.2 is equally applicable to Dr. Kilpatrick and is incorporated by reference.

[25] V. Bajic, "Housing-Market Segmentation and Demand for Housing Attributes: Some Empirical Findings," *AREUA Journal*, Vol. 13, No. 1, 1985, 58, at 59:

[26] George H. Lentz and Ko Wang, "Residential Appraisal and the Lending Process: A Survey of Issues," *Journal of Real Estate Research*, Vol. 15, Numbers 1/2, 1998, at p. 16.



The Proposed Class Area is not homogeneous in terms of land uses, neighborhoods, property characteristics, and many other factors described in detail in the earlier 2018 JLL Report and the attached addendum to this report- in particular including the variable impacts of Hurricane Harvey - that affect prices and values. For example, there are more than 8,882properties in non-residential (or undetermined) types of use. Among those 9,343 properties in non-residential use, are 3,227 vacant land parcels, over 1403 exempt or publicly owned properties, 460 commercial/industrial/retail parcels, and 1,982 agricultural parcels.

The problem with applying mass appraisal methodologies like regression modeling to non-homogeneous neighborhoods and sub-markets like those in the Proposed Class Area was more recently explored in an article dealing with the appropriateness of utilizing class action treatment to determine the impact of Hurricane Katrina on prices and values in New Orleans.[27] The class proposed in New Orleans included a similar wide variety of land use and property types including homes, apartments, commercial, industrial, and retail properties similar to the diversity in the Proposed Class Area.[28]

With respect to mass appraisal methodologies like automated valuation multiple regression models in a diverse marketplace such as the Proposed Class Area, the authors of the article related to the class in New Orleans in the aftermath of Hurricane Katrina concluded that "techniques such as AVMs are prone to high rates of error and typically cannot fairly, efficiently and accurately measure real property damages," and "other statistical techniques, such as hedonic regression analysis, also present fundamental difficulties in identifying and handling all of the independent variables affecting prices" in a situation requiring analysis "before and after" an event alleged to have damaged prices and values on a submarket or market wide basis.

In sum, while it is clear that Dr. Kilpatrick's ultimate opinion of a 20% diminution in value is not based on an accepted quantitative mass appraisal methodology, it is also the case that the Proposed Class Area is precisely the type of market that the appraisal profession recognizes is not suitable for mass appraisal because it is heterogeneous. The use of any mass appraisal methodology—even if generally accepted *in the abstract*—is thus inappropriate *in this case* to determine diminution in value for the Proposed Class Area.

### 2.6.2 Dr. Kilpatrick's Quantitative Analysis to Calculate Purported Diminution in Value in the Proposed Class Area did not Employ an Accepted Methodology

The methods generally accepted by the appraisal profession to determine any actual or potential diminution in market value associated with an environmental condition are as follows:

---

[27] Richard J. Roddewig, CRE, MAI, FRICS, Charles T. Brigden, CRE, ASA, FRICS, and Gary R. Papke, CRE, MAI, AICP, "Real Estate Counseling in Class Action Litigation: Determining Real Estate Damages from Natural Disasters, *Real Estate Issues*, Volume 37, Numbers 2 and 3, 2012, at 77.

[28] The Hurricane *Katrina* class action litigation settled before the federal district court could rule on the appropriateness of class action certification.

JLL

"1. Paired sales analysis of potentially impacted properties;

2. Analysis of environmental case studies;

3. Multiple regression analysis of potentially impacted neighborhood areas or properties in proximity to a contamination source; and

4. Adjustment of income and yield capitalization rates to reflect environmental risk premiums in an income capitalization analysis."[29]

In this case and as further described below, Dr. Kilpatrick's quantitative analysis to calculate purported diminution in value in the Proposed Class Area consisted of a price trend analysis using false trend lines that did not fit the underlying, limited market data that he considered. This is not a generally accepted methodology by the appraisal profession to determine alleged diminution in market value associated with an environmental condition. In short, Dr. Kilpatrick's selected quantitative analysis methodology for determining purported diminution in value, as of either August 2018 or today, is inappropriate and not generally accepted in the industry for his application in this case.

### 2.6.3 THE APPRAISAL PROFESSION RECOGNIZES THAT EVEN ACCEPTED METHODOLOGIES FOR CALCULATING DIMINUTION IN VALUE ASSOCIATED WITH ENVIRONMENTAL CONDITIONS ARE INAPPROPRIATE TO EMPLOY ON A MASS BASIS

Even when using one of the generally accepted methods, determination of any actual or potential diminution in market value associated with an environmental condition is inherently difficult to reliably perform on a mass basis. As a peer-reviewed article in *The Appraisal Journal* entitled "Real Property Valuation Issues in Environmental Class Actions" specifically states, multiple regression analysis on a mass appraisal basis is likely to produce inaccurate estimates of claimed damages in environmental class action litigation:

> "Since a regression analysis of environmental impacts produces only estimates of average effects for a group of properties, it is likely to overestimate impacts for some properties and underestimate impacts for others. This could potentially result in an inequitable allocation of damages in class actions involving the impacts of environmental contamination on property values."[30]

This is because of two fundamental components of the recognized and generally accepted appraisal profession standards regarding diminution in value associated with an environmental condition: (1) that adverse environmental conditions including the effects of flooding as well as soil contamination concerns do not automatically decrease market prices and values; and (2) that

---

[29] Appraisal Institute, *Analyzing the Effects of Environmental Contamination on Real Property*, Instructor Handbook (2010), Part 4, Page 4-33.

[30] Thomas O. Jackson, PhD, MAI, "Real Property Valuation Issues in Environmental Class Actions," *The Appraisal Journal*, Spring 2010, at 148.



the effect of changes in environmental conditions, including the effects of flooding as well as groundwater and soil contamination issues, on real estate prices and values can change over time.

In other words, adverse environmental conditions generally have varied effects on property values across a particular market, and any effects that may exist at one time commonly disappear altogether over time. That sequence of events has been recognized for more than 25 years; a 1992 *Appraisal Journal* article included the diagram below to demonstrate the typical pattern of an initial impact on prices and values in the immediate aftermath of initial public awareness of the situation followed by recovery to full market value:



By concluding that the market value of every single-family residential property in the Proposed Class Area has been permanently diminished to a uniform degree, the Kilpatrick report gives no recognition to the changing nature of any purported effects of the Arkema Incident over time. Nor does it account for the variability of any impacts from property to property. Therefore, contrary to the claim of Dr. Kilpatrick, mass appraisal methodologies cannot be used to fairly and accurately estimate claimed damages on a class-wide basis in this case.

### 2.6.4   DESCRIPTION OF THE ANALYSIS EMPLOYED BY DR. KILPATRICK

Our review of Dr. Kilpatrick's report thus far has related to the fundamental flaws associated with the methodologies and analyses that Dr. Kilpatrick selected for this case. For the reasons described above, Dr. Kilpatrick selected the wrong methodologies and analyses and, therefore, the opinions presented in his report are neither reliable or credible.

Before shifting to our analysis of the flawed ways that Dr. Kilpatrick implemented his selected methodologies, it is useful to first describe what those methodologies and analyses were for orientation. The summary of steps in Dr. Kilpatrick's analysis which follows, demonstrate the



limited quantitative analysis, limited selection of market data and ultimate reliance on the subjective application of incomparable case studies used in his determination of impaired value.

**Unimpaired Value**

First, Dr. Kilpatrick determined the "unimpaired market value" of all single-family residential properties within the Proposed Class Area. The unimpaired market value is supposed to represent the value of the single-family residential properties within the Proposed Class Area. This is an initial step in the analysis that does not yet attempt to calculate diminution in value, if any.

Dr. Kilpatrick purported to determine the unimpaired market value as of August 25, 2017, by use of a mass appraisal model. In other words, Dr. Kilpatrick's use of a mass appraisal regression model does not attempt to quantify diminution in value, if any.

Dr. Kilpatrick throughout his report refers to his model as "the Greenfield Automated Valuation Model ('GAVM')", which his reliance materials indicate is the built-in regression function in Microsoft Excel. This analysis made use of single-family residential transaction data from the local Multiple Listing Service (MLS) between September 1, 2016 and August 31, 2018; and tax assessed values and other data from county assessors for various assessment years between 2018 and 2020. By this method, the Aggregate Unimpaired Value for all single-family residential properties in the Proposed Class Area was determined to be $1,833,824,421.39.

This Aggregate Unimpaired Value is supposed to serve as the "baseline" reference for the remainder of Dr. Kilpatrick's analysis against which any diminution in value is applied.

**Quantitative Analysis for Diminution in Value**

Dr. Kilpatrick then purported to calculate a percentage diminution in single-family residential market value within the Proposed Class Area. To do so, Dr. Kilpatrick employed a price trend analysis which, as indicated above, is not recognized as a generally accepted appraisal methodology for determining diminution in value associated with an environmental condition. Dr. Kilpatrick represents that he analyzed trend lines for data related to single-family residential sales from the MLS in five MLS areas that include the Proposed Class Area, as well as additional areas outside of the seven-mile radius. Only sales during the first year following Hurricane Harvey and the Arkema Incident were used. In other words, as indicated above, Dr. Kilpatrick ignored the three most recent years of available market data.

Using these purported trend lines, Dr. Kilpatrick calculated monthly average sales prices per square foot of building area, for sales occurring before and after the Incident and in and outside of the Proposed Class Area, with the area outside of the Proposed Class Area considered to be a "control area" for the analysis of impairment.



Sale price "trend lines" were determined and compared. Projections were made of average prices per square foot inside and outside the Proposed Class Area to the end of the one-year post-Incident study period, leading to Dr. Kilpatrick's conclusion that sales prices inside the Proposed Class Area lagged behind prices outside the area by 12.12% as of August 2018. From this, Dr. Kilpatrick concluded this 12.12% differential represented diminution damages solely attributable to the Arkema Incident.

**Subjective Analysis for Diminution in Value**

Dr. Kilpatrick then termed this calculated 12.12% diminution "a floor for damages, since research shows us that homes in an affected area are less likely to transact, are less likely to fully and immediately inculcate new knowledge and thus are not likely to be 'at equilibrium'." He offers no objective quantitative analysis of market data to show that the market is not in equilibrium. As presented in the Kilpatrick report, this is a subjective, speculative hunch.

Rather than analyze the three more recent years of the same readily available MLS transaction data to determine whether that more recent market data indicated that the market had reached an equilibrium, Dr. Kilpatrick turned to a subjective review and application of case studies. Dr. Kilpatrick presented five "case studies" as comparable to this matter. These case studies were drawn from appraisal literature, opinion surveys, and appraisals done by other appraisers and tax assessors. From these case studies, Dr. Kilpatrick reports that diminution in value for this case is at least 14% and as high as 42%.

Dr. Kilpatrick then abandoned his own flawed and limited trend line results and subjectively concluded, based on these case studies, that an appropriate diminution in value for this case would be "in the range of 20%." Dr. Kilpatrick then took the unimpaired market values that he calculated earlier and applied a uniform 20% discount across the board to calculate supposed damages related to diminution in market value of each of the single-family residential properties within the Proposed Class Area purportedly attributable to the Incident. The result is a total alleged diminution in value of the single-family residential properties in the area of $366,764,884.28.

In sum, Dr. Kilpatrick's ultimate conclusion that all single-family residential homes within the Proposed Class Area suffer a 20% diminution in value, is ultimately based on his subjective application of a handful of inappropriate case studies and not on any quantitative analysis of market data.

Even if Dr. Kilpatrick's methodologies were proper in theory -- and they were not as explained above -- they were inappropriately applied. The following sections of our report describe in detail the flawed ways that Dr. Kilpatrick implemented his selected methodologies. In other words, even if Dr. Kilpatrick had selected the right tools for the job, he used them the wrong way.

As previously noted in Section 2.2 above, our review of Dr. Kilpatrick's application of methods falls into four categories, as presented in the sections that follow:



1. Dr. Kilpatrick's case studies are inappropriate and do not support his subjective 20% diminution conclusion.

2. Dr. Kilpatrick's price trend analyses are false and do not support his 12.12% diminution conclusion as of August 2018.

3. Analysis of the data Dr. Kilpatrick ignored using Dr. Kilpatrick's methodology contradicts his 12.12% diminution conclusion as of August 2018.

4. Dr. Kilpatrick's regression model (the GAVM) was not used to calculate diminution in value, and is highly unreliable even for his limited purpose of attempting to determine unimpaired market values of individual homes.

## 2.7 DR. KILPATRICK'S CASE STUDIES ARE INAPPROPRIATE AND DO NOT SUPPORT HIS SUBJECTIVE 20% DIMINUTION CONCLUSION

Dr. Kilpatrick presents information on five environmental situations which he considers to be useful case studies for comparison to the Incident. He describes the case study selection process as follows:

> Case studies rely on empirical information drawn from a variety of sources, and they provide a range of conclusions. Because there is seldom a perfectly comparable case study, the analyst must consider the characteristics of each study and its relevance to the subject. When each case study is considered individually, its merits and conclusions must be judged relative to other studies and its similarity to the subject. Valuation guidelines recommend that the analyst consider cost, use, and risk effects of contamination on value. While case studies are considered a derivative of the sales comparison approach to value, they more broadly address these three issues.[31]

> I thus utilize case studies, including legal cases, as additional evidence to support conclusions I derived from other methods.[32]

Dr. Kilpatrick presents a lengthy rationale for using the awards in legal proceedings as being somehow a form of market-based data of use in appraising real estate. They are not. Appraisers do not use the conclusions of litigation or settlements of litigation as reliable indicators of value, and in fact are generally advised or directed to exclude from consideration in their work even actual transactions of properties that occur under threat of eminent domain or other legal proceedings.

---

[31] Kilpatrick Report, p. 39.
[32] Kilpatrick Report, p. 39.



Much of Dr. Kilpatrick's discussion of using litigation results as value indicators revolves around the notion that there is often little actual market data available:

> Where other market information is in short supply, legal cases can be especially helpful.[33]

As we have previously pointed out in the sections above, Dr. Kilpatrick has created an artificial data limitation by choosing to use only a single year of actual transactions in his quantitative diminution analysis and ignoring the three additional years of actual sales he could – and should – have studied. Therefore, Dr. Kilpatrick has no credible justification to rely on legal case studies and other inappropriate case studies in lieu of the available market data.

Dr. Kilpatrick reports that he has preliminarily examined "…five recent case studies comparable to the Arkema situation.  All of these cases included air and soil-related contamination including industrial products.  Diminution in value for residential properties ranged for (sic) a low of 5% to as high as 42%..."[34]

We have reviewed the information presented in his report, as well as the brief narratives on each case we were able to locate in Dr. Kilpatrick's produced reliance materials.[35] We also reviewed academic and appraisal articles that are the primary sources for much of his information, but which were not produced with Dr. Kilpatrick's reliance materials. As described below, these case studies are an apples-to-oranges comparison to the Incident and Dr. Kilpatrick's use of them is unreliable for five reasons: (1) Dr. Kilpatrick did not collect the primary sources of research and analysis on market data for any of the case studies; (2) all of Dr. Kilpatrick's case studies are dated; (3) Dr. Kilpatrick made no effort to compare the contaminants at issue in his case studies and those alleged to be present in this case; (4) Dr. Kilpatrick's case studies all concern long-term, permitted emissions whereas the Incident is alleged to be a series of five one-time, accidental, brief duration events; and (5) Dr. Kilpatrick did not accurately represent the diminution in value reported in the case studies.

### A.  *Sources of Primary Research and Analysis on Market Data*

None of the information reported in these case studies was collected or analyzed by Dr. Kilpatrick. All of it is derived from academic or appraisal industry journals, regulatory agency reports, news media, or similar sources. The brief descriptions of each case in his files, and the even more brief descriptions in his report provide insufficient information on real estate market conditions, the environmental conditions and their impacts on individual properties, and the source data for the reader of his report to rely on their conclusions.

---

[33] Kilpatrick Report, p. 39

[34] Kilpatrick Report, p. 40.

[35] We could not locate any additional information in the Kilpatrick file production related to the ASARCO El Paso Smelter.  Our comments on that proposed case are therefore limited in scope.



The appropriate and typical method of developing case studies for use in appraising the impact of environmental issues on real estate is to collect market data to develop one's own indications of value and impacts, or to use such data to test conclusions developed by another party.

### B. *"Recent" Cases*

None of the studies cited by Dr. Kilpatrick are recent.

- The RSR Corporation Lead Smelter was shut down in 1984. The four academic articles on which the case study is based were published between 1999 and 2003 and rely on residential sales that occurred between 1979 and 1995.

- The El Paso Cement Plant and Quarry case was derived entirely from a 2003 journal article reporting on a contingent valuation opinion survey conducted in 2001.

- The Rocky Flats case was derived from a 2001 article reporting on market data and sales from 1989 to 1995.

- The date of the court award of damages in the Industrial Excess Landfill case was not reported in the background document in the Kilpatrick files; but it was the resolution of a case filed in April 1989.

- The date reported in the ASARCO El Paso Smelter case is 2007; it is unclear whether the diminution percentages reported are from that time.

There is no discussion of how changes in technology, regulations, or real estate market conditions and perceptions over the past several decades could be adjusted to conditions relevant to the Incident between 2017 and 2021.

### C. *Comparability of Contaminants*

The Incident involved a series of short duration fires, the dispersion of combustion products and particulates in the air, and purported deposition on the ground in some portions of the Proposed Class Area. The contaminants associated with the sources in Dr. Kilpatrick's case studies differed significantly from the Incident:

- The RSR Corporation Lead Smelter reportedly produced airborne emissions of lead as well as soil contamination that resulted from the distribution of slag and battery chips from the operation as fill in the yards and driveways of West Dallas.

- Participants in the contingent valuation opinion survey for the El Paso Cement Plant and Quarry were told that the operation produced dust and fumes, involved day and night blasting operations, and generated heavy truck traffic affecting the surrounding area.



- Contaminants at Rocky Flats included radioactive plutonium and uranium, as well as other manufacturing contaminants associated with sludge ponds and two landfills on the site.

- The Industrial Excess Landfill was accepting hazardous materials containing arsenic, benzene, metals and other VOCs, and generated as methane gas from decomposition of materials in the landfill.

- According to the Kilpatrick Report, the ASARCO Smelter generated contaminants including arsenic, metals (lead) and carcinogens.

No analysis is offered by Dr. Kilpatrick comparing the Incident with the varied contaminants and operational impacts associated with these other situations. No consideration is given to variations in terms of their toxicity, location in the environment, geographic distribution, persistence, perception by the public, or direct or indirect impacts on residential properties. These considerations are a standard part of an appraiser's analysis when considering case studies. None of the case study contaminants appear to be comparable to those which the Plaintiffs' experts contend resulted from the Incident.

### D. *Accidental vs. Permitted or Long-Standing Discharge*

Some environmental situations result from long-standing activities generating contaminants over an extended period. Others, such as the Incident, are one-time events occurring over a specific, short period of time. All of the Kilpatrick cases resulted from decades of industrial operations.

- The RSR Corporation Lead Smelter operated continuously from 1934 to 1984.

- The El Paso Cement Plant and Quarry had been operating for some time and was continuing at the time of the opinion survey regarding home values.

- Rocky Flats manufactured nuclear weaponry and stored nuclear material on the site from 1952 to 1992.

- Industrial Excess Landfill was accepting hazardous waste from 1965 to 1980.

- The ASARCO El Paso Smelter operated continuously from the 1880s until 2005.

The Kilpatrick Report provides no analysis of the potential differences in effects on residential real estate between these long-standing operating sources of contamination and an accidental short-term event such as the Incident. This analysis is a standard, expected part of an appraiser's analysis when considering case studies regarding environmental conditions. In Dr. Kilpatrick's case studies, the emissions were ongoing for decades (in one case more than a century), whereas the Arkema Incident involved a few hours of total emissions in discrete events over a few days.



### E. *Misleading or Erroneous Reporting of Percentage Diminution of Value*

The final 20% diminution in market value offered by Dr. Kilpatrick is derived from the percentages for individual case studies reported in Table 12 in his report.

> In summary, the case studies selected would support a diminution in value of at least 14%, the baseline finding in the Rocky Flats matter, and perhaps as high as 42%, the assessor finding in the Asarco (sic) matter.[36]
>
> ---------------------------------------------------------------------
>
> Comparable case studies would indicate a somewhat higher equilibrium loss in value, and as such a conservative estimate of the actual decline in value would be in the range of 20%.[37]

Dr. Kilpatrick's Table 12 is reproduced below:[38]

| Case Title | Location/Site | Case Type | Contaminant(s) | Media | Damages/Costs | Affected Area | Diminution |
|---|---|---|---|---|---|---|---|
| RSR Corp Lead Smelter | Dallas, TX | Appraisal Literature | Arsenic, Lead | Air, Soil | - | 1.2-Mile Radius | 20% |
| El Paso Cement Plant & Quarry | El Paso, TX | Contingent Valuation | Mercury, Metals | Air, Soil | - | - | 20% - 32% |
| Rocky Flats | Rocky Flats, CO | Appraisal Literature | Plutonium, Uranium | Air, Groundwater, Soil, Surface Water | $190M | 13,000 Properties | 5% - 30% |
| Industrial Excess Landfill | Uniontown, OH | Stigma | Arsenic, Benzene, Metals, Methane, Vocs | Air, Groundwater, Soil | $6.7M | 1,713 Property Owners | 5%–15% |
| ASARCO El Paso Smelter | El Paso, TX | Cost to Cure and Diminution | Arsenic, Carcinogens, Metals (Lead) | Air, Soil | - | 3-Mile Radius | 16% Cost to Cure & up to 42% Diminution |

The percentages reported in this table to support his conclusion are not accurate or do not present the correct understanding of the information.

- <u>RSR Corp Lead Smelter</u> – while the diminution percentage is presented as a flat 20% in Dr. Kilpatrick's report, the summary of the matter in Dr. Kilpatrick's produced reliance materials states that "…the diminution in value was **up to** 20% of property value within that radius."  [emphasis added] The 2003 journal article on which this case study was

---

[36] Kilpatrick Report, p. 42.

[37] Kilpatrick Report, p. 42.

[38] Located at p. 41 in the Kilpatrick Report.  This copy is from the original spreadsheet in Dr. Kilpatrick's reliance materials production.



largely based actually found significantly lower levels of diminution with increasing distances beyond the 1.2-mile radius noted in the Kilpatrick table.

- <u>El Paso Cement Plant & Quarry</u> – the presented range of -20% - 32% was based on the results of two different surveys of random people in El Paso County. The 20% result was from a survey conducted in English; the 32% was from a survey conducted in Spanish. Both were contingent value surveys, not surveys of actual market buyers, let alone of actual market transactions. Contrary to Dr. Kilpatrick's description, the study had nothing to do with being "at equilibrium," since it did not involve an analysis of actual transactions, nor was it a survey of actual home buyers.[39]

- <u>Rocky Flats</u> – Dr. Kilpatrick's Table 12 reports a range of 5-30%, but the text clarifies that the 30% was for vacant residential land, while residences were actually reduced 5-10%.

- <u>Industrial Excess Landfill</u> – Dr. Kilpatrick's Table 12 states that this case study indicated a diminution in value of 5-15%. The text says that five economists and an appraiser testified that nearby properties decreased in value by 14%. The summary of the matter in the file production states that while the plaintiffs claimed the value of their homes was reduced by $26 million, the court awarded $6.7 million in stigma damages to be awarded among 1,713 members. The information presented only indicates opinions in testimony and a court award. In any event, there is no support provided for the stated range of 5-15% diminution.

- <u>ASARCO El Paso Smelter</u> – there is no support in the Kilpatrick Report or in the file for the information presented in Dr. Kilpatrick's Table 12 which seems to suggest a diminution range of 16% for the "cost to cure" up to 42% for diminution of value. A footnote in the Kilpatrick Report cites a 2006 story on the Sierra Club website; that still existing website link only reports on an interview with one individual who had obtained a lab report on arsenic in the dust in his attic:

  > He went to the county tax appraiser's office, gave it the lab results, and asked for a new valuation of his property. His historic home, which used to be worth just over $43,000, had lost nearly $25,000 in value. A cleanup company gave him a $7,000 estimate for the attic.[40]

In sum, none of the diminution percentages presented in Dr. Kilpatrick's Table 12 are accurately presented or supported by information in the Kilpatrick Report or in Dr. Kilpatrick's reliance materials production.

---

[39] Kilpatrick Report, p. 41
[40] https://vault.sierraclub.org/sierra/200605/goingforbroke/sidebar1.asp



### F.   *Conclusions Regarding the Kilpatrick Case Studies*

The case studies presented in the Kilpatrick Report are not based on primary research by Dr. Kilpatrick, in many cases do not represent actual market data, involve contaminants unlike those claimed in the Incident, are not recent events, and the percentage diminutions presented are either inaccurate or misleading. They present no credible or reliable support for diminution in the market value of single-family residences in the Proposed Class Area.

### 2.8   DR. KILPATRICK'S PRICE TREND ANALYSES ARE FALSE AND DO NOT SUPPORT HIS 12.12% DIMINUTION CONCLUSION

Dr. Kilpatrick's report includes a number of graphs that report false trend lines that are not representative of the underlying data or have scale bias (*i.e.*, the scale of the graph's axes present the data in a biased manner). Specifically, Figures 6 and 7 in Dr. Kilpatrick's report display false and distorted trend lines that Dr. Kilpatrick manually imposed and that are not representative of the underlying data. This is critical because Dr. Kilpatrick's only opinion regarding diminution in value that is based on market data relies on these false trend lines. As further explained below, Dr. Kilpatrick's opinion at page 38 of his report that market data demonstrates a 12.12% diminution in property values inside the Proposed Class Area is simply incorrect.

Below, we present the figures found in the Kilpatrick report -- modified to correct for scale bias and proper display -- which were generated by us using the data produced by Dr. Kilpatrick in his reliance materials. From Dr. Kilpatrick's report, "Figure 4 – Price Trend 'Inside' Before the Arkema Event" at page 34 was corrected for scale bias; "Figure 6 – Price Trend 'Inside After the Arkema Event" at page 37 was corrected to display the trend line that matches the data and was not manually imposed; and "Figure 7 – Price Trend 'Outside' After the Arkema Events" at page 37 was corrected to display the trend line that matches the data and was not manually imposed.







Using the corrected graphs and combining both the "Inside" and "Outside" property groups for both the "Before" and "After" one-year time periods results in the following graph of all sales analyzed in the Kilpatrick report's Figures 4 through 7:

"Inside and Outside / All" Monthly Price per Square Foot Trends

31

JLL

As can be seen in the "Inside and Outside / All" graph above, actual residential prices per square foot "Inside" the Proposed Class Area have outperformed actual residential prices per square foot "Outside" the Proposed Class Area.

We further modified this graph using a 3-month moving average to smooth out idiosyncratic monthly price differences due to differing quantities and types of residential property sales in any given month, shown below. Both combined graphs inarguably indicate that prices of properties within the Proposed Class Area (Inside) are both "higher" and "increasing at a faster rate" than the Kilpatrick control area (Outside).

"Inside and Outside / All" 3-Month Moving Average of Monthly Price per Square Foot Trends



The Kilpatrick Report presents an opinion of "damages" supposedly due to the Incident. But Dr. Kilpatrick's calculations are based on the false trend line graphs that he manually imposed and are not representative of the underlying data, which are Figures 4, 5, 6, and 7 (pages 34 and 37) in the Kilpatrick report. Based on these false trend lines, the reported damages in the Kilpatrick report are found in Table 10 (page 38), which is replicated below:[41]

---

[41] What is noted as "Aug 2018 Actual Prices" in the Kilpatrick Table 10 row of information are not actual prices. They are the forecasted prices from the "After" trendline equations that are based on manipulating the intercept for both equations to be equal to the ending point of the "Before" trendline equations for both the Inside (area of concern) and Outside (control area) residential sales. Furthermore, what is noted as "Aug 2018 Actual Prices" are really computations based on the manipulated trendlines in Figures 6 and 7.



|  | Inside | Outside |
|---|---|---|
| Aug 2017 Prices | 100.365 | 88.9364 |
| Aug 2018 Forecasted | 116.781 | 95.5448 |
| Aug 2018 Actual Prices | 97.8548 | 91.6432 |
| % Change 2017/2018 | -16.21% | -4.08% |
| *Damages* | *-12.12%* |  |

*Table 10 excerpted from Kilpatrick Report*

Using the corrected Figures 6 and 7 above and replicating Dr. Kilpatrick's methodology using the real trend lines of the underlying data, it is apparent that Dr. Kilpatrick's "damages" calculation is grossly overstated and unsupported. While we disagree that Dr. Kilpatrick's methodology of comparing trend lines is appropriate for determining class-wide diminution in value for this case as explained throughout this report, below we replicate his methodology to show how the false trend lines manually imposed by Dr. Kilpatrick affected his analysis.

The August 2018 **Forecasted** "Inside" Price PSF and "Outside" Price PSF (based on the 24-month trendlines from Graph 1 and Graph 2 above) are determined by:

Inside PSF Price = $88.261 + $0.5394 X 24 months = $101.21 / SF (rounded)

Outside PSF Price = $83.113 + $0.3809 X 24 months = $92.26 / SF (rounded)

The August 2018 **After** "Inside" Price PSF and "Outside" Price PSF (based on the 12-month trendlines from Corrected Figure 6 and Corrected Figure 7 above) are determined by:

Inside PSF Price = $92.008 + $0.7932 X 12 months = $101.52 / SF (rounded)

Outside PSF Price = $86.386 + $0.5317 X 12 months = $92.77 / SF (rounded)

In our replication of Dr. Kilpatrick's methodology, we use the same August 2017 "Before" prices as Dr. Kilpatrick since he did not mathematically manipulate those trend lines. Applying Dr. Kilpatrick's methodology using the trend lines that have not been manually imposed results in a "damages" calculation that is nearly zero (-0.24%), as shown in the Kilpatrick Table 10 "Corrected" below:

Kilpatrick Table 10 "Corrected"

|  | Inside | Outside |
|---|---|---|
| Aug 2017 Before Prices | 100.365 | 88.936 |
| Aug 2018 Forecasted | 101.207 | 92.255 |
| Aug 2018 After Prices | 101.526 | 92.7664 |
| % Change 2017/2018 | 0.32% | 0.55% |
| Damages | *-0.24%* |  |



However, even when correcting Dr. Kilpatrick's false trend lines, the calculation presented in Table 1, above, does not match how prices actually performed over this time period. This is further indicative of the Dr. Kilpatrick's chosen methodologies being unreliable as discussed throughout this report. ***As can be seen in the "Inside and Outside / All" Trendline Predictions table and the monthly and 3-month moving average graphs for "Inside and Outside / All" price per square foot data below, actual residential prices per square foot "Inside" the area of concern have outperformed actual residential prices per square foot "Outside" the area of concern.*** The Actual prices paid on a per square foot basis were 6.51% higher on average than their Forecasted value of prices per square foot for residential properties "Inside" the area of concern in August 2018. Properties "Outside" the area of concern were only 1.27% higher on average. In effect, according to Dr. Kilpatrick's methodology, properties "Inside" the Proposed Class Area outperformed properties "Outside" the Proposed Class Area, on average, by 5.24%. ***According to Dr. Kilpatrick's methodology, this means that no damages exist in the aggregate for the Proposed Class Area.***

"Inside and Outside / All" Trendline Predictions

|  | Inside | Outside |
| --- | --- | --- |
| Aug 2018 Forecasted | 101.207 | 92.255 |
| Aug 2018 Actual Prices | 107.796 | 93.428 |
| % Difference | 6.51% | 1.27% |
| Damages | *5.24%* | |

"Inside and Outside / All" Monthly Price per Square Foot Trends





As can be seen in the monthly sale price graph above, the trendline of prices per square foot for properties "Inside" the Proposed Class Area are growing at a rate faster than properties "Outside" the Proposed Class Area from September 2016 through August 2018, the timeframe considered by Dr. Kilpatrick. This is reflected in the steeper slope ($0.5394 per square foot per month) of the green trend line for "Inside" properties compared to the slope ($0.3809 per square foot per month) of the black trend line for the "Outside" properties. To eliminate some of the "noise" caused by the limited number of property transactions and the variation in properties selling in any given month due to drastically different size, quality and condition, this data can be "smoothed" using a 3-month moving agerage to obtain more directly observable price change patterns in the two groups of residential property transactions. This is shown in the following graph, below.



"Inside and Outside / All" 3-Month Moving Average of Monthly Price per Square Foot Trends



The 3-month moving average of sale price per square foot graph, above, depicts the typical price paid for properties on a rolling three-month basis both inside and outside the Proposed Class Area. Both of the preceding two graphs (monthly and 3-month moving average of sale price per square foot indicate that the prices "Inside" the Proposed Class Area are growing faster (having steeper slopes) than prices outside the Proposed Class Area.

**In short, while we disagree that Dr. Kilpatrick's price trend analysis is appropriate for calculating class-wide diminution in value in this case, that methodology, if not manipulated, would have indicated that there was no diminution in value for single-family homes inside the Proposed Class Area. If anything, Dr. Kilpatrick's methodology indicates that properties inside the Proposed Class Area are doing better, on average, than properties outside the Proposed Class area.**



### 2.8.1   THE "CONTROL AREA" SELECTED BY DR. KILPATRICK IS NOT APPROPRIATE

To perform an appraisal that attempts to isolate the effect, if any, that the Incident had on property values, Dr. Kilpatrick must select a "control area" that is similar to the Proposed Class Area but has not been affected by the Incident. Dr. Kilpatrick's "control area" includes areas outside of the Proposed Class Area in five MLS zones, covering the northeastern quadrant of the Houston metropolitan area. It is a large area that extends from largely agricultural Liberty County on the northeast to the edge of downtown Houston on the southwest. Dr. Kilpatrick provides no rationale in his report for selecting this as a control area, even though it is critical to being able to assess whether there has been diminution in the value of all single-family residential properties within the Proposed Class Area.

No map of the control area is provided in the Kilpatrick Report. The figure below displays the MLS zones which Dr. Kilpatrick reports he included in his analysis. Areas outside of the Proposed Class Area (indicated in the blue dotted line) served as Dr. Kilpatrick's "control area."



Dr. Kilpatrick introduced his analysis of trends inside the Proposed Class Area and an outside control area as follows:

> If the explosion had no impact on values, then pricing trends inside the affected
> area before/after the explosion should show no changes beyond those which
> might be discerned in unaffected control areas. Since the entire area was

36



impacted by the Harvey landfall, one might expect some systematic impact on real estate prices across the region. However, any pricing impacts within the 7-mile affected area over and above those experienced outside the region would logically be ascribed to the effects of the explosion. This sort of location adjustment is common in appraisal analyses.[42]

For purposes of this analysis, I utilized the entirety of sales from the 5 MLS zones, categorized as follows:

Table 7 – Sales Analyzed Before/After

| Category | Transactions |
|---|---|
| In/Before | 333 |
| In/After | 389 |
| Out/Before | 4,778 |
| Out/After | 4,774 |
| Total Analyzed | 10,274[43] |

From the map above and Dr. Kilpatrick's Table 7, it is immediately apparent how much larger the control area is than the Proposed Class Area. Dr. Kilpatrick's control area covers much more area than the Proposed Class area; and there are more than 12 times as many sales in the control area as there are in the Proposed Class Area.

For Dr. Kilpatrick's control area to be valid, it must be comparable to the area being studied (here, the Proposed Class Area) in every meaningful variable other than the factor being studied (here, an alleged impact from the Incident). But Dr. Kilpatrick's control area is unlike the Proposed Class Area in key factors related to single-family residential market value; and there are also variations between different portions of the control area itself.

The Kilpatrick Report provides no information on the characteristics of the control area and no comparison of characteristics between areas inside and outside of the Proposed Class Area.

We have compiled the table below from Census data on selected demographic, economic, housing and real estate factors, broken down between the five MLS areas and for the total area, separating "inside" (the Proposed Class Area) from "outside" (the control area used by Dr. Kilpatrick).

---

[42] Kilpatrick Report, p. 33.
[43] Kilpatrick Report, p. 33

JLL

MLS Areas Inside and Outside of the Proposed Class Area - Census Data Comparison

| | MLS Area 1 | | MLA Area 2 | | MLS Area 52 | | MLS Area 32 | | MLS Area 53 | | Totals & Avg. | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Inside | Outside | Inside | Outside | Inside | Outside | Inside | Outside | Inside | Outside | Inside | Outside |
| Total Population | 30,541 | 173,309 | 4,713 | 427,267 | 6,689 | 87,281 | - | 66,472 | 3 | 49,307 | 41,946 | 803,636 |
| Median Age | 37.7 | 33.5 | 38.7 | 32.5 | 33.4 | 38.5 | - | 42.3 | - | 38.1 | 27.5 | 37.0 |
| Total Households | 10,547 | 55,699 | 1,575 | 134,479 | 1,935 | 29,729 | - | 24,094 | 1 | 16,626 | 14,058 | 260,627 |
| Median Household Income | $69,881 | $83,543 | $53,269 | $48,275 | $59,501 | $49,776 | - | $99,303 | - | $87,433 | $45,663 | $73,666 |
| Unemployment Rate | 5.9% | 5.4% | 14.6% | 11.0% | 12.9% | 10.3% | - | 5.5% | - | 8.0% | 8.4% | 8.0% |
| Total Housing Units | 10,987 | 58,657 | 1,691 | 150,850 | 2,120 | 33,256 | - | 25,389 | 1 | 18,188 | 14,799 | 286,340 |
| Vacant Housing Units | 440 | 2,958 | 116 | 16,371 | 185 | 3,527 | - | 1,295 | - | 1,562 | 741 | 25,713 |
| Occupied Housing Units | 10,547 | 55,699 | 1,575 | 134,479 | 1,935 | 29,729 | - | 24,094 | 1 | 16,626 | 14,058 | 260,627 |
| % Owner-Occupied | 80.9% | 75.0% | 70.5% | 58.6% | 85.1% | 77.7% | - | 82.5% | 100.0% | 84.5% | 80.3% | 68.1% |
| % Renter-Occupied | 19.1% | 25.0% | 29.5% | 41.4% | 14.9% | 22.3% | - | 17.5% | 0.0% | 15.5% | 19.7% | 31.9% |
| Median Year Structure Built | 1990 | 2001 | 1989 | 1976 | 2001 | 1989 | - | 1989 | - | 1998 | 1993 | 1991 |
| Median Home Value | $245,643 | $263,343 | $145,524 | $142,756 | $127,836 | $166,947 | - | $280,988 | - | $237,740 | $129,751 | $218,355 |

*Source: Source: Esri BAO 2021, US Census Bureau, and American Community Survey, 2019*

It is immediately apparent that MLS Area 32 and MLS Area 53 are anomalies that are clearly not comparable to the Proposed Class Area in key market value-related characteristics.

Area 32 is entirely outside of the Proposed Class Area. Its contribution to any control area is questionable. For example, the median age of the population in Area 32 is 42.3 years, compared to the median age inside the Proposed Class Area of 27.5, a difference of nearly 15 years. The median household income in Area 32 is $99,303, more than double the median household income inside the Proposed Class Area of $45,663. Given such differences in important demographic and economic variables related to the residential real estate market, it is not surprising that the median home value in Area 32 is $280,998, again well over double the $129,751 median for homes inside the Proposed Class Area. Such differences should have been analyzed by Dr. Kilpatrick and the area excluded from the control area.

Area 53 does include a very small area within the Proposed Class Area, so there is slightly more rationale for having considered including it in a control area. However, the portion of Area 53 inside the area is reported to have a population of 3, compared to a total population of 49,707 outside the area. Once again, the differences in characteristics between demographic, economic, and home values are very large, skewing the control area away from comparability with the Proposed Class Area.

Comparing Dr. Kilpatrick's total control area to the Proposed Class Area, the overall lack of comparability is readily apparent. The control area has a population that is more than 19 times that in the Proposed Class Area; a median age that is 9.5 years greater; a median household income 61.3% higher; and median home values that are 68.3% higher than the inside area.

Comparison of these demographic, economic and housing-related characteristics shows that it is inappropriate and unsupportable to have compared trends in this large and diverse "control area" to trends in the Proposed Class Area in order to calculate a purported diminution of value. Therefore, Dr. Kilpatrick's opinions regarding diminution in value (which rely on the appropriateness of his control area) are unreliable from an appraisal perspective.



### 2.8.2  FAILURE TO ANALYZE THE DIFFERENTIAL IMPACTS OF HURRICANE HARVEY FLOODING AND OTHER DAMAGES

In the 2018 JLL Report and the attached addendum updating it, we include information on the impacts of Hurricane Harvey on real estate. The information shows that flooding in particular was highly variable, across the region as well as in the Proposed Class Area and among the Named Plaintiffs. As we have noted in our analysis, the tangible short- and long-term impacts on properties and people were devastating, but they were not homogenous. In examining the market value of properties in the area in the years since 2017, it is essential to consider first how individual properties were affected differently by the storm and its aftermath.

Dr. Kilpatrick makes no effort to examine the differential effects of the Hurricane. There is no indication in his report or reliance materials that Dr. Kilpatrick made any effort to collect such information, let alone analyze that information as it applies within the Proposed Class Area or in his selected outside control area. Yet he makes an assumption that this historic storm had a uniform impact across both areas.

> To examine this, I conducted an analysis of residential transactions within the 7-mile radius during the one-year period following the Arkema explosion and compared those to transactions both after the explosion as well as transactions before/after the explosion but outside of the 7-mile radius.
>
> If the explosion had no impact on values, then pricing trends inside the affected area before/after the explosion should show no changes beyond those which might be discerned in unaffected control areas. *Since the entire area was impacted by the Harvey landfall, one might expect some systematic impact on real estate prices across the region.* However, any pricing impacts within the 7-mile affected area over and above those experienced outside the region would logically be ascribed to the effects of the explosion. This sort of location adjustment is common in appraisal analyses.[44] [*Emphasis* added]

Dr. Kilpatrick's unsupported assumption that Hurricane Harvey impacted the Proposed Class Area and his control area in a uniform manner is fundamental to his false trend line comparisons, on which he bases his opinion regarding 12.12% diminution in value for the Proposed Class Area. Assuming uniformity both between the inside and outside control areas, as well as between individual properties within the Proposed Class Area is unsupported by reality. As discussed in Section 5.7 of the 2018 JLL Report and in Section 3.11 of the attached addendum, there was significant disparity in how Hurricane Harvey affected even the named plaintiffs and the larger Proposed Class Area—let alone Dr. Kilpatrick's control area, which is even larger. Therefore, Dr. Kilpatrick's assumption that Hurricane Harvey uniformly impacted the Proposed Class Area and his control area is not true, which is an additional fundamental flaw that renders both his unimpaired and impaired determinations of market value unreliable.

---

[44] Kilpatrick Report, p. 33.



### 2.8.3    FAILURE TO CONSIDER ALTERNATIVE CONTAMINATION SOURCES AND OTHER FACTORS AFFECTING MARKET VALUE

Dr. Kilpatrick's Report makes no reference to – and makes no analysis of -- other important factors potentially affecting or impairing the market value of properties in the area. Our 2018 Report included detailed information on many such factors. The Addenda in this report includes updated information on some of them, including alternative contamination sources in the vicinity.

The Proposed Class Area contains many sites with identified environmental contamination issues. The map below is from the EnviroMapper service of the US Environmental Protection Agency and Texas Commission on Environmental Quality. It indicates the various environmental hazards in the Proposed Class Area.



There are 63 different sites within the Proposed Class Area that have been flagged by various EPA programs for different sources of hazardous or toxic substances both past and present, of which 34 sites are listed on the RCRA Info database as remediation sites. Among these 34 sites, 15 are considered active Resource Conservation and Recovery Act (RCRA) sites and 19 inactive RCRA sites, with one, the KMCO Crosby Plant, considered noncompliant as of July 2018. The 14 other active RCRA sites include the following: Enron Gas/Crosby Dist. Office, San Jacinto Services, Bryant's Transport, O'Reilly Auto Parts 572, Walmart Supercenter 522, CVS Pharmacy 7296, Russ



Oil Filter Disposal, Hunting Energy Services – Crosby, Family Dollar #3868, Cedar Bayou Products Terminal, Huntsman Petrochemical LLC, Jesse Sinclair Plant, Caltex, and Family Dollar #5498.[45]

The KMCO Crosby plant is a custom chemical processing and specialty chemical manufacturing facility. The plant has over 600 tanks, 28 reactors and 250 rail storage spots.[46] According to the EPA, the site is categorized as a "large quantity hazardous waste generator" and is an active RCRA site.[47] On Tuesday April 2nd, 2019, a vapor cloud of isobutylene (a highly flammable gas) formed after a piping component failed, allowing the chemical to leak out of its storage tank. Shortly thereafter, the gas contacted an ignition source, causing an explosion. The explosion killed one KMCO worker and seriously burned two others. In total the incident injured at least 30 workers –seven KMCO employees and 23 contract workers. A shelter-in-place was issued to all community members within a 1-mile radius of the facility. [48]

KMCO had been criminally convicted of two counts of knowingly violating the Clean Air Act in 2016 and ordered to pay $3.5 million in fines.[49] After the explosion in 2019, the company was sued for violating the Texas Clean Air Act, as well as the state's Solid Waste Disposal Act and Water Code by Harris County as well as the State of Texas.[50]

Below is a map showing the location of the KMCO plant with the 1-mile shelter-in-place buffer displayed. It is apparent that the Incident evacuation zone and the 2019 KMCO shelter-in-place zone overlap each other slightly.

Also shown on this map is the location of a property within the KMCO evacuation zone owned by Villareal, a Named Plaintiff in the Arkema litigation. The map also shows the location of the other Named Plaintiffs; a number of them are closer to the KMCO site than they are to Arkema.

---

[45] https://www3.epa.gov/enviro/facts/rcrainfo/search.html

[46]        https://www.khou.com/article/news/local/what-we-know-about-the-kmco-chemical-plant-in-crosby/285-1b046b7a-bec3-437c-86f6-ed2e4400d1bd

[47] https://enviro.epa.gov/enviro/rcrainfoquery_3.facility_information?pgm_sys_id=TXD074198961

[48] U.S. Chemical Safety and Hazard Investigation Board. (2019) "Explosion and Fire at KMCO Chemical Facility: Factual Update" 17 September 2019.
Retrieved from:<https://www.csb.gov/assets/1/17/csb_kmco_factual_update.pdf?16508>.

[49]        https://www.khou.com/article/news/local/what-we-know-about-the-kmco-chemical-plant-in-crosby/285-1b046b7a-bec3-437c-86f6-ed2e4400d1bd

[50]   https://www.houstonpublicmedia.org/articles/news/2019/04/09/328525/harris-county-sues-kmco-over-fire-at-crosby-facility-argues-violations-of-state-and-county-laws/





In addition to the 15 active RCRA sites in the Proposed Class Area, the Texas Commission on Environmental Quality (TCEQ) has identified eight sites that contribute to groundwater contamination, and 30 leaking petroleum storage tanks within the Proposed Class Area. Two of the eight sites contributing to groundwater contamination are federal Superfund sites. These two sites, the Sikes Disposal Pits and French LTD, are shown in the map below.





During Hurricane Harvey, both sites experienced flooding as shown in the map below.





Both sites are near the San Jacinto River and were heavily flooded during Hurricane Harvey. An Associated Press article published on September 3, 2018 stated that "the acrid smell of creosote filled the air."[51] This negative publicity surrounding this section of the Proposed Class Area adds to the level of variation within the Proposed Class Area and makes a "one size fits all" methodology unreliable and inaccurate.

No reference is made in the Kilpatrick Report to any of these other environmental issues in the vicinity. Neither his quantitative analysis nor his case studies have the capacity to account for the impact of such issues on the market value of properties in the Proposed Class Area.

### 2.9    ANALYSIS OF THE DATA DR. KILPATRICK IGNORED USING DR. KILPATRICK'S METHODOLOGY CONTRADICTS HIS 12.12% DIMINUTION CONCLUSION

Dr. Kilpatrick arbitrarily cuts off his analysis of sales in September 2018. However there have been many sales in the Proposed Class Area and Dr. Kilpatrick's "control area" in the three years since that date. The geographical distribution of those excluded sales is shown on the map below.

---

[51] https://apnews.com/27796dd13b9549b0ac76aded58a15122



While we do not agree with Dr. Kilpatrick's methodology, we have extended out his analysis to include sales of properties through February 29, 2020 in order to verify if the price trend differences between "Inside" and "Outside" the Proposed Class Area continue beyond the arbitrary August 2018 cutoff date, but do not extend into the COVID-19 Global Pandemic. The results of our extending the analysis for an additional 18 months is depicted in the two graphs below:



"Inside and Outside / All" Monthly Price per Square Foot Trends: Extended to Pandemic



Extending the data through February 2020, the same trending differential exists between properties within ("Inside") the Proposed Class Area and the control ("Outside") area. This is true for both the monthly sales data (above) and the 3-month moving average of the monthly sales data (below).

"Inside and Outside / All" 3-Month Moving Average of Monthly Price per Square Foot Trends: Extended to Pandemic





According to Dr. Kilpatrick's methodology, trend lines from these analyses can be used to predict price trends in both areas. The trend line equations from these extended time-period graphs is shown in the Extended Trend line Table, below.

|  | Trend line Equation |
|---|---|
| **Inside (within 7 Miles of Arkema)** | y = 0.014x - 502.15 |
| **Outside (greater than 7 Miles away)** | y = 0.0121x - 432.01 |
| **Inside 3-Month Moving Average** | y = 0.0139x - 499.63 |
| **Outside 3-Month Moving Average** | y = 0.012x - 428.03 |

We analyzed the price per square foot changes in the "Inside" and "Outside" the Proposed Class Area for the entire time period (September 1, 2016 through February 29, 2020) and for the time period following the Arkema Incident (September 4, 2017 through February 29, 2020). The results are depicted in the next two tables and Growth Rate Differences are summarized in the third table.

| Price Per Square Foot Changes: From September 1, 2016 to February 29, 2020 | | | |
|---|---|---|---|
|  | **February 29, 2020 Predicted SP/SF** | **September 1, 2016 Predicted SP/SF** | **Percent Value Change** |
| **Inside All** | 111.16 | 93.33 | 19.11% |
| **Outside all** | 101.03 | 85.53 | 18.12% |
| **(Date)  X=** | 2/29/2020 | 9/1/2016 |  |

| Price Per Square Foot Changes: September 4, 2017 to February 29, 2020 | | | |
|---|---|---|---|
|  | **February 29, 2020 Predicted SP/SF** | **September 4, 2017 Predicted SP/SF** | **Percent Value Change** |
| **Inside All** | 111.16 | 98.47 | 12.89% |
| **Outside all** | 101.03 | 90.00 | 12.25% |
| **(Date)  X=** | 2/29/2020 | 9/4/2017 |  |

| **September 1, 2016 To 2/29/2020** | |
|---|---|
| Growth Rate Difference: |  |
| 0.99% | (Inside Area > Outside Area) |
| **September 4, 2017 to 2/29/2020** | |
| Growth Rate Difference: |  |
| 0.63% | (Inside Area > Outside Area) |



By extending the "Corrected" Kilpatrick methodology to February 29, 2020 (the month preceding the COVID-19 Global Pandemic), properties "Inside" the Proposed Class have sale prices that are growing at a faster pace than properties "Outside" the Proposed Class Area. This is true whether we look at starting a year before the Arkema Incident or whether we look at prices only after the Incident. **Based on this extended market data—which Dr. Kilpatrick ignored—and Dr. Kilpatrick's methodology, there is no market evidence of property price diminution.**

### 2.10   DR. KILPATRICK'S REGRESSION MODEL (THE GAVM) WAS NOT USED TO CALCULATE DIMINUTION IN VALUE, AND IS HIGHLY UNRELIABLE TO CALCULATE "UNIMPAIRED VALUES"

#### 2.10.1   DR. KILPATRICK'S "GAVM" IS RELIANT ON TAX-ASSESSED VALUES, WHICH IS DISCONNECTED FROM MARKET VALUE

Dr. Kilpatrick's regression model (the GAVM) is described in the Kilpatrick report and used in the determination of unimpaired value, but the results are not used in developing any diminution of value opinions. The Kilpatrick Report explains on page 20 that the "Results from GAVM Training" (Table 5) are based on a bootstrapping process that results in "an exceptionally high explanatory power" due to the use of only four independent variables. One of those variables is "TAV" which appears to be the tax assessed value of each property that sold. In other words, this variable is an appraised value of the sold property as conducted by the local property taxing districts (such as the Harris County Appraisal District).

The other three variables are common variables used in hedonic regression modeling (days since sale, "Area 2", and "In/Out"). Days since sale is a market conditions adjustment. "Area 2" indicates that properties in Area 2 are priced differently in the competitive market than properties in the other four areas (Areas 1, 32, 52 and 53). The "In/Out" variable is used to differentiate properties within the area of concern (the 7-mile radius) from properties that are outside the area of concern.

The "exceptionally high explanatory power" reported by Dr. Kilpatrick refers to the regression model's R-Square, also known as a regression model's coefficient of determination. That is shown in Table 5 of the Kilpatrick report as 0.709448, or 70.94% (rounded). The coefficient of determination can be read to mean that the Kilpatrick regression model variables are explaining 70.94% of the variation in sale prices, and 29.06% of the variation in sale prices is "unaccounted for" in the regression residuals.

To understand how much of this model's "explanatory power" is from the inclusion of the TAV variable, one only needs to determine the correlation between TAV and the dependent variable, sale price. Since the model is in a semi-log form, the correlation between the natural log of TAV and the natural log of sale price must be analyzed. Our analysis indicates that the correlation is 0.82799603. The "R-Square" of a regression of these two variables is simply the correlation squared, or 0.82799603 times 0.82799603 which equals 0.68557743.



**This means that Dr. Kilpatrick's GAVM regression model only improves the hedonic model's explanatory power to 70.95% from 68.56% of the variation in sale price when only using TAV; the three additional variables that were included in the GAVM only improve the explanatory power of the regression model by 2.39%. Even after adding these three variables, nearly 30% of sale price variation is still "unexplained" by the GAVM.**

That Dr. Kilpatrick's GAVM relies so heavily on TAV is separately notable for three reasons. First, in a recent deposition, named Plaintiffs Larry Anderson testified to appealing his tax-assessed values on all his properties as a matter of course, and generally achieving some sort of reduction in tax-assessed value as a result. As recognized by Mr. Anderson, "each property has its own individualized story with respect to its assessed valuation."[52] For example, the Andersons learned in 2018 that their property on Highway 90, one of five parcels the Andersons own within the Proposed Class Area, was contaminated to levels "way over the limit for EPA" because the previous owner buried car batteries under the property.[53] The Andersons used this contamination to successfully reduce their tax-assessed value; but the Andersons have never attempted to reduce the tax-assessed value of any of their properties by claiming that the Incident contaminated one of their properties.[54]

Second, Dr. Kilpatrick's reliance on TAV to conclude that property values have decreased is inconsistent with the experiences of the Named Plaintiffs. Dr. Kilpatrick claims that TAV is "highly correlated with market value and provides an extremely high 'hit' rate to value properties without sales prices."[55] As an initial matter, that is simply not true. For example, Plaintiff Nason sold his property located at 19726 Miller Wilson Road on September 21, 2020 for $570,000, which is more than double the $265,212 assessed value in 2020, demonstrating the common disconnect between assessed values for tax purposes and market value as indicated by transaction data. The Andersons and Flannels have similar experiences. The TAV for the Flannels' residence has steadily increased from $55,467 in 2016 to $87,709 in 2021, increasing by 8–10% each year.[56]

Similarly, the total tax assessed value of the Anderson named plaintiffs' residential properties on Krenek Road increased from $202,257 in 2016 to $287,121 in 2021, an average annual increase of around 7% per year.[57] The annual property value growth rates for the Flannels and Andersons

---

[52] Deposition of Larry Anderson, Named Plaintiff, August 4th, 2021, 108:13-18 ("Q …would you agree that each property has its own individualized story with respect to its assessed valuation? Is that correct?  A. Correct").

[53] Deposition of Larry Anderson, Named Plaintiff, August 4th, 2021, 76:2-79:7.  *See also,* Deposition of Tanya Anderson, Named Plaintiff, August 4th, 2021, Exhibit 7 (2012-2021 HCAD Appraised Value for Highway 90 parcel)

[54] Deposition of Larry Anderson, Named Plaintiff, August 4th, 2021, 109:14–18.

[55] Kilpatrick Report, ¶ 58.

[56] Their property was appraised for tax-assessment purposes at $55,467 in 2016, $59,909 in 2017, $65,899 in 2018, $72,488 in 2019, $79,736 in 2020, and $87,709 in 2021. Appraised value is dated January 1st of each year. *See*, Deposition of Bevely Flannel, Named Plaintiff, August 3rd, 2021, Exhibit 3 (2012-2016 HCAD Appraised Value History), Exhibit 4 (2017-2021 HCAD Appraised Value History).

[57] Tanya and Larry Anderson own five parcels: 3 parcels correspond to their residence on Krenek Road and 2 parcels correspond to commercial properties. *See*, Deposition of Tanya Anderson, Named Plaintiff, August 4th, 2021, Exhibit 2 (2012-2021 HCAD Appraised Value for Krenek Road parcels), Exhibit 6 (2012-2021 HCAD Appraised Value for



are in line with the three to eight percent annual per-square foot property price growth rates that Dr. Kilpatrick reported for his "Outside" control area during September 2016 to August 2018 (the time period to which Dr. Kilpatrick limited his transaction analysis),[58] indicating under Dr. Kilpatrick's own, flawed methodology that these named plaintiffs likely did not suffer property value diminution compared to property owners in Dr. Kilpatrick's control area. Nevertheless, Kilpatrick assigns $21,455 in damages to the Flannels' property and $34,497 in damages to the Andersons' Krenek Road property.[59]

Third, according to Dr. Errol Williams of the Harris County Appraisal District[60], 2018 assessed values in Harris County were based on sales price information through January 2018. This includes transactions both pre- and post-Hurricane Harvey. The HCAD appraisers made neighborhood valuation adjustments to their CAMA model for hurricane-related pricing effects, but the HCAD appraisers made no systematic valuation adjustments at any level to account for the Arkema incident in any tax assessment years since the incident. The HCAD decision not to include any type of property value adjustment for the Arkema Incident in their property tax assessment procedure is consistent with our analysis of housing price trends in the Proposed Class Area and in the Kilpatrick control area from 2017 to the present.

In sum, Dr. Kilpatrick's reliance on TAV for use in his GAVM is misplaced. TAV is not indicative of market value, the Named Plaintiffs' experiences relative to their TAV contradict Dr. Kilpatrick's diminution conclusion, and Harris County tax assessors did not themselves consider the Proposed Class Area contaminated from the Incident when setting TAVs.

### 2.10.2  DR. KILPATRICK'S "GAVM" IS HIGHLY UNRELIABLE

Dr. Kilpatrick's GAVM regression modeling tool and data is not fully described in Dr. Kilpatrick's Report. It is apparent that this regression was run in Microsoft Excel using built-in regression

---

Ramsey Road parcel), Exhibit 7 (2012-2021 HCAD Appraised Value for Highway 90 parcel), 58:12-60:1 (explaining that Exhibit 2 consolidates tax assessed value data for the three parcels comprising their Krenek Road property; data for each property can be found in Exhibits 3, 4, and 5), 67:17-68:21 (explaining that Exhibit 6 contains tax assessed value data for their commercial property on Ramsey Road), 70:7-20 (explaining that Exhibit 7 contains tax assessed value data for their commercial property on Highway 90).

[58] Kilpatrick Report, ¶¶ 119 and 125, Equation 4, and Equation 8.  Equation 8 of Dr. Kilpatrick predicts that per-square foot property prices in his "Outside" control area increased from $88.936 to $91.64 during the 12-month period following August 2017, which corresponds to a three percent annual increase.  Similarly, Equation 4 of Dr. Kilpatrick predicts that per-square foot property prices in his "Outside" control area increased from $82.328 to $88.94 during the 12-month period following August 2016, which corresponds to an eight percent annual increase.

[59] Only one of the Andersons' three Krenek Road property parcels appears in Kilpatrick's damages reliance materials. *See,* Kilpatrick Reliance Materials, "Harris County Parcels Within Ring With TAV", tab "Residential", row 8931 (showing an Account Number of "0720030000074" in column A, Mail To of "FLANNEL ROLAND & BEVERLY" in column C, mail_addr of "242 CYPRESS AVE" in column D, and Diminution of "21,455.22" in column CM), row 1451 (showing an Account Number of "1011200000047" in column A, Mail To of "ANDERSON LARRY DEAN" in column C, mail_addr of "3623 KRENEK RD" in column D, and Diminution of "34,496.91" in column CM); Deposition of Tanya Anderson, Named Plaintiff, August 4th, 2021, Exhibit 2 (Showing the Account Numbers of their Krenek Road parcels);  Deposition of Bevely Flannel, Named Plaintiff, August 3rd, 2021, Exhibits 2 (showing account number of Cypress Ave residence).
[60] Telephone conversation between Dr. Williams of HCAD and Dr. Hamilton of JLL that took place on 9/1/2021.



functions. We have reconstructed the model in Excel using data from Dr. Kilpatrick's recent production. Below is a replication of Dr. Kilpatrick's GAVM regression model report, which shows the R-Square and other important regression model statistics. This standard Excel output format was also not included in the Kilpatrick Report, although it is consistent with selected information included in that report.

### Kilpatrick GAVM (Reproduced in Microsoft Excel)

| SUMMARY OUTPUT | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | |
| *Regression Statistics* | | | | | | |
| Multiple R | 0.842356251 | | | | | |
| R Square | 0.709564053 | | | | | |
| Adjusted R Square | 0.709448157 | | | | | |
| Standard Error | 0.26971339 | | | | | |
| Observations | 10029 | | | | | |
| | | | | | | |
| ANOVA | | | | | | |
| | *df* | *SS* | *MS* | *F* | *Significance F* | |
| Regression | 4 | 1781.506085 | 445.3765214 | 6122.408518 | 0 | |
| Residual | 10024 | 729.1990133 | 0.072745313 | | | |
| Total | 10028 | 2510.705099 | | | | |
| | | | | | | |
| | *Coefficients* | *Standard Error* | *t Stat* | *P-value* | *Lower 95%* | *Upper 95%* |
| Intercept | 3.969581 | 0.062307337 | 63.70969 | 0 | 3.847446407 | 4.091716175 |
| LN(TAV) | 0.679234 | 0.005114791 | 132.798 | 0 | 0.669207782 | 0.689259816 |
| Days since Sale | -0.000298 | 1.27194E-05 | -23.4535 | 1.8168E-118 | -0.000323247 | -0.000273382 |
| Area 2 | -0.095353 | 0.006205619 | -15.3656 | 1.10773E-52 | -0.107517142 | -0.083188627 |
| In/Out | 0.027946 | 0.010113227 | 2.763343 | 0.005731698 | 0.008122362 | 0.047770271 |

One important item to note in this regression output is the regression model's standard error (in the Regression Statistics output above, a value of 0.26971339). Dr. Kilpatrick's model is a modified log-linear model, which means the dependent variable (the "Y" variable that is being explained, here, Sale Price) is modeled in its logarithmic form. As such, the regression coefficients are rates of change that need to be transformed using the natural log exponent ($e^x$) to convert their pricing influence back into dollars. When these values are small decimals, they are close to the decimal equivalent of percentage values.[61]

The regression standard error in the model, 0.26971339, when transformed, equates to 30.96%. This means that the very best prediction outcome in the Kilpatrick regression model will have a 95% prediction interval around the regression predicted value of 60.69%.[62] **In simple terms, at the standard 95% prediction interval, Dr. Kilpatrick's GAVM can at best predict property values +/- 60.69%. For example, a property whose regression prediction is $200,000 from Dr. Kilpatrick's GAVM has a 95% prediction interval of at least $121,371 (60.69% of $200,000), or**

---

[61] For example, the In/Out variable coefficient is 0.027946 which transforms into 2.83% [ exp(0.27946) -1 = 2.83%]. This indicates that properties *inside* the area of concern are selling for 2.83% higher than the same property if it were *outside* the area of concern.

[62] One standard error is 30.96%. The 95% confidence interval for a sample of over 10,000 observations is approximately 1.9602 standard errors. Multiplying 30.96% by 1.9602 is 60.69%--this is the 95% confidence interval range in each direction, both positive and negative.

JLL

**anywhere between $78,629 and $321,371. This is the best outcome possible, because the farther a property's predicted price is from the average sale price of the 10,029 observations, this deviation range becomes wider. For the Kilpatrick Report to claim that the model has "exceptionally high explanatory power" is simply not true. There is a very large error disturbance in this underspecified regression model, making the "GAVM" useless from an appraisal perspective.**

Taking the standard error problem in Dr. Kilpatrick's GAVM one step further, a regression's standardized residuals (the difference between predicted prices from the model and actual sale prices used to develop the model) should not show any trends. There should be no trends in the "random disturbance" known as regression residuals because a properly developed regression model must have "independent" residuals to be an unbiased regression model. But in Dr. Kilpatrick's GAVM, there is a 53.8% correlation between the residuals (*i.e.,* the prediction errors) and sale prices.[63] As can be seen in the Kilpatrick GAVM Standardized Residual Plot below, low priced properties are systematically overvalued, and higher priced properties are systematically undervalued. For a regression model that is adequately and accurately developed **and unbiased**, this residual plot of standardized residuals should look like a random "shotgun blast", with no predictable pattern. Any systematic residual patterns are indicative of a model that is neither valid nor credible as a property valuation model because these prediction errors are driving a significant portion of the predicted price. As can be seen in the Residual Plot graph below, there is a clear residual pattern causing a regressive prediction model from Dr. Kilpatrick's GAVM, which is indicative of the 53.8% correlation between prediction error and predicted sales price. In simple terms, Dr. Kilpatrick's GAVM is not a reliable indicator of actual sales prices.[64]

---

[63] 53.8% is the square root of the 0.2904 R-square from Dr. Kilpatrick's GAVM residual trend line reproduced by JLL.
[64] Wolverton, Marvin L, *An Introduction to Statistics for Appraisers*, Appraisal Institute, Chicago (2009), pp. 278-80.



Kilpatrick GAVM Standardized Residual Plot with Trendline (Reproduced by JLL)



Furthermore, any dots (residuals) displayed in the pink areas in the Residual Plot graph, above, are more than two standard deviations away from the regression's prediction. Since one standard error in Dr. Kilpatrick's GAVM is 30.96% of sales price, any dots displayed in the pink areas in the Residual Plot graph, above, are predicted prices from the Kilpatrick GAVM that are at least 60.69% different than the actual sales prices of properties. The "green" area is the 95% confidence range, which means the predicted value is within 60.69% of reality. As can be seen in the Residual Plot graph, below, not only is there a discernable trend in the residuals, there are hundreds of "dots" (sale prices of residential properties) in the pink areas which corresponds to the high coefficient of dispersion (*i.e.*, "COD", which is a measure used as a benchmark for mass appraisals in the appraisal industry) and the forecast standard deviation (*i.e.*, "FSD", which is a measure used as a benchmark in the mortgage lending industry), as explained next.

The Kilpatrick report discusses model validation on pages 20 and 21, including the International Association of Assessing Officers (IAAO) Standards on Mass Appraisal. One of the IAAO's Standards on Mass Appraisal is that a valid and reliable mass appraisal model will have a COD for "heterogeneous" properties of no more than 15. At paragraph 62 of his report, Dr. Kilpatrick claims the Proposed Class Area is relatively homogeneous, which requires a COD of less than 10 under IAAO Standards.

**We have analyzed the COD for Dr. Kilpatrick's GAVM, and it is 16.89, which *fails* the IAAO requirement for valuation uniformity because it is above the IAAO standard of 15 for**



**heterogeneous properties and even further above the IAAO standard of 10 for homogeneous properties (which is what Dr. Kilpatrick says should apply).**

Further, 22.40% of the Kilpatrick model's predictions are more than 20% different than their associated sale prices. This is not indicative of an appraisal model that predicts consistently. The Kilpatrick model produces a forecast standard deviation (FSD) score of 127.37 (*i.e.*, the forecast standard deviation of percentage error is 127.37%). Mortgage lending standards are much lower. In fact, Freddie Mac (the Federal Home Loan Mortgage Corporation) categorizes FSDs generated from its Home Value Explorer (HVE) Automated Valuation Model as high, medium, or low confidence. To be considered "High confidence" an FSD of 13 or less is required. "Medium confidence" is for an FSD between 13 and 20, whereas "low confidence" occurs for valuation models with an FSD greater than 20.[65] Given that the Kilpatrick model's FSD is more than six-times greater than the minimum threshold for the "low confidence" category, the Kilpatrick hedonic regression model fails to meet minimum mortgage lending standards for AVM performance.

A final indication that Dr. Kilpatrick's GAVM is not reliable is its absolute deviation. At Table 6 on page 21 of his report, Dr. Kilpatrick reports that the median absolute deviation of his GAVM is 9.28%. This means that half of Dr. Kilpatrick's predicted unimpaired sales values are off by at least 9.28%. Further, we calculated the mean absolute deviation of Dr. Kilpatrick's GAVM (which he did not report), and it is 17.03%. Since the mean absolute deviation is higher than the median absolute deviation, Dr. Kilpatrick's GAVM generates large prediction errors for a significant number of properties. Together, the mean and median absolute deviations indicate that Dr. Kilpatrick's GAVM does not reliably or accurately predict unimpaired values. Therefore, his opinions based on that GAVM are unreliable and unsound from an appraisal perspective.

For the above reasons, we conclude that the Kilpatrick GAVM regression model fails standards of mass appraisal practice and is not a reliable indicator of the unimpaired market values of single-family residential properties in the Proposed Class Area.

## 2.11  CONCLUSIONS OF REVIEW

Considering all of the above, we conclude that Dr. Kilpatrick's analyses and report are not based on accepted appraisal standards and the practices of peer appraisers; do not reflect any awareness of actual effects of the Arkema Incident and contamination conditions in the Proposed Class Area; do not make use of all available and reliable real estate market data pertinent to the purposes of the appraisal; contain errors in analysis and the reporting of modeling and trend line calculations; and reach conclusions of market value and diminution of value due to Arkema-related impairment that are not credible or worthy of reliance.

Specifically, a summary of our opinions regarding the Kilpatrick Report are as follows:

---

[65] Freddie Mac, "Confidence Levels" (2020), available at http://bit.ly/freddiemac_confidencescores.



1. Setting aside the other significant deficiencies in his report, Dr. Kilpatrick provides no analysis or possible methods of determining damages for those Named Plaintiffs and others with agricultural properties or for others in the area with interests in multi-family residential, commercial, industrial, institutional, vacant land or other uses. As of 2021, these excluded property types comprise 44.1% of all parcels and 83.3% of the land area in the Proposed Class Area. In other words, ***the Kilpatrick Report does not address and is completely irrelevant to 83.3% of the Proposed Class Area's acreage***.

2. Dr. Kilpatrick's ultimate conclusion of a blanket 20% diminution in value applicable to all improved residential parcels within the Proposed Class Area is not based on any quantitative analysis or market data. Instead, it is based on Dr. Kilpatrick's subjective and flawed application of case studies that are not comparable to this case.  The case studies are not based on primary research by Dr. Kilpatrick; in many cases do not represent actual market data; involve contaminants and circumstances unlike those claimed in the Arkema Incident; are not recent events; and the percentage diminutions presented are either inaccurate or misleading. These case studies therefore present no credible support for even a subjective opinion regarding diminution in the market value of single-family residences in the Proposed Class Area.

3. Dr. Kilpatrick justifies a 20% diminution conclusion based on his subjective use of case studies and not on market data because of his unsupported opinion that the market "is not yet at equilibrium." His own flawed quantitative analyses of market data leads him to a 12.12% diminution estimate; but these analyses are limited to data only through August 2018. That is an artificial, improper, and self-imposed limitation, since actual market transaction data is readily available for the remainder of 2018, all of 2019 and 2020, and through the present in 2021.  Dr. Kilpatrick is not justified in substituting his subjective 20% diminution figure based on case studies for his 12.12% diminution based on data solely because he opines that the market has not reached an "equilibrium," when actual market data that could have answered that question is available. This failure to analyze the full range of actual real estate sales data that is readily available renders Dr. Kilpatrick's analyses and opinions unreliable and irrelevant to the issue of diminution, if any, that may exist in the present day.

4. Had Dr. Kilpatrick looked at the readily available market data for September 2018 through present, it would have shown that housing prices (on a per square foot basis) were rising in both the Proposed Class Area and in his control area. In fact, prices in the Proposed Class Area rose at a faster rate than the control area, indicating no overall diminution in single-family residential prices in the Proposed Class Area.

5. Dr. Kilpatrick fails to comply with the requirements of the applicable *Uniform Standards of Professional Appraisal Practice (USPAP)* in significant respects—by not employing the proper methodologies and analyses, and by applying the methodologies and analyses that he did implement in a flawed and improper manner. For example, industry consensus is that mass appraisal methodologies are inappropriate for large, heterogeneous real estate



markets such as in the Proposed Class Area. Given the varied, heterogeneous nature of the Proposed Class Area, no mass appraisal methodologies are appropriate to apply in this particular case. When applied to such non-homogeneous markets both the real estate economics profession and the appraisal profession have long recognized the limited reliability of mass appraisal tools. The lack of fit between Dr. Kilpatrick's chosen methodologies and his application of them is demonstrated in the large margin of error in his analysis. For example, ***Dr. Kilpatrick's model for unimpaired property values at best projects values +/- approximately 60% either way***. In our opinion, this renders Dr. Kilpatrick's model useless for appraising properties or assessing damages supposedly attributable to market value diminution.

6. Further, Dr. Kilpatrick purports to determine diminution in market value associated with an environmental condition, but he simply assumes that an environmental condition exists for all properties within the Proposed Class Area. Dr. Kilpatrick does not cite any support for that assumption—not even Plaintiffs' other experts—which is a serious violation of USPAP. This is most apparent in the fact that Dr. Kilpatrick's opinions regarding diminution in value do not match Plaintiffs' other experts' opinions regarding alleged contamination. The reports of Drs. Auberle and Kaltofen, taken at face value, indicate that large portions of the Proposed Class Area were not directly affected by the Incident; and suggest that chemicals were detected in samples closest to the Arkema Plant.[66] Dr. Kilpatrick's opinions that there is a uniform impact of the Incident on all homes across the Proposed Class Area and that there is no correlation between diminution in value and proximity to the Arkema Plant[67] therefore does not even fit Plaintiffs' experts' theories of alleged contamination. His failure to take into consideration available information on the environmental conditions he claims to be impairing properties in the area makes his analyses and conclusions unreliable.

7. The trend line analyses that Dr. Kilpatrick performs to quantitatively calculate purported diminution is not recognized as an acceptable appraisal tool in the industry for this application. Moreover, the trend lines that he reports are not the actual or true trend lines for the dataset. When the trend lines for the actual dataset are used, diminution according to Dr. Kilpatrick's methodology is only 0.24% -- not the 12.12% he reports. Even that corrected projection, however, does not fit the actual market data, which indicates that properties inside the Proposed Class Area did 5.24% *better than* properties in Dr. Kilpatrick's control area when correctly using his trend line comparison method.

8. The flawed quantitative analyses presented in the Kilpatrick Report to support a conclusion of 12.12% market value diminution for all single-family residential properties as of August 2018 is further unreliable because:

---

[66] Auberle Report, paragraph 5.5; Kaltofen Supplemental Report, page 6.
[67] Kilpatrick Report, p. 38.

JLL

a. The explanatory value of Dr. Kilpatrick's regression analysis used to calculate unimpaired values at paras. 57–63 of the Kilpatrick Report is low. There is such a wide margin for error in Dr. Kilpatrick's model that a property appraised at $200,000 by his model in reality could be valued anywhere between $78,629 and $321,371 at the standard 95th percentile confidence interval.

b. Dr. Kilpatrick does nothing to establish that his selected control area—properties outside of the Proposed Class Area—is sufficiently similar to properties within the Proposed Class Area. Our comparison of demographic, economic, and real estate-related variables in the control area to the area inside the Proposed Class Area indicates that Dr. Kilpatrick's control area is inappropriate. Without an appropriate control area, Dr. Kilpatrick's analyses cannot isolate the effect, if any, that the Incident may have had on properties within the Proposed Class Area from effects of other factors.

c. Dr. Kilpatrick's quantitative analysis does nothing to isolate the effects that Hurricane Harvey may have had on single-family residential property values within the Proposed Class Area from any effects of the Incident. Dr. Kilpatrick simply assumes that Hurricane Harvey caused identical property damage throughout both the Proposed Class Area and his control area. But that assumption is completely contradicted by the evidence -- including testimony from the class representatives -- that flood damage from Hurricane Harvey varied significantly from property to property within the Proposed Class Area.

d. Dr. Kilpatrick failed to consider the effects that other environmental conditions may have had within the Proposed Class Area. The 2018 JLL Report at Section 5.12 detailed the numerous other environmental issues and potential disamenities present in the Proposed Class Area. Since the 2018 JLL Report, there have been others. For example, on April 2, 2019, there was a fatal fire and explosion at a chemical facility in the middle of the Proposed Class Area owned by KMCO LLC.[68]

---

[68] *See* https://www.csb.gov/kmco-llc-fatal-fire-and-explosion-/



**3.   ADDENDA – UPDATES AND REVISIONS TO THE 2018 JLL REPORT**



On October 8, 2018 we submitted our original expert report in this matter, titled *Real Property Appraisal Consulting Report, Expert Report of Gary R. Papke, MAI, Wheeler, et al. v. Arkema Inc.* This report remains relevant to our opinions in this matter, is incorporated by reference, and will be included in our reliance documents.

The following represents updates and revisions of portions of that report to reflect additional information available three years later.

### 3.1   NAMED PLAINTIFFS

The Complaint names only 15 individuals as representative of the owners of the more than 21,000 real estate parcels in the Proposed Class Area. For each Named Plaintiff, various damages have been stated. Some of these include personal injuries, personal property damage, or business losses. Our analysis only addresses issues related to claimed damages to real property.

The places of residence of the Named Plaintiffs within the Proposed Class Area are shown on the following map.



There are significant real estate-related variations among these Named Plaintiffs. Some of the Named Plaintiffs own the property at which they resided on the date of the Incident. Others were



tenants residing on property owned by others. One individual was leasing a house under a "rent-to-buy" or purchase contract arrangement. Some individuals owned or rented other properties in the Proposed Class Area, in addition to their places of residence.

Information on each of the Named Plaintiffs and their real estate interests is presented Section 3.2 of the 2018 JLL Report included in the addenda. In that report, we note that the Named Plaintiffs are not fully representative of real property and real property owners in the Proposed Class Area because:

- The land uses of their properties are limited to single-family residential uses, with some ancillary agricultural uses. There are no representatives of the significant number of other land uses in the Proposed Class Area, including industrial, commercial and public uses.

- The Named Plaintiffs' interests in real estate do not represent all interest types. In some cases, they do not represent the entire fee simple estate of the properties they occupy. Several of them either rent the properties or have rent-to-own contracts.

- The Named Plaintiffs are not geographically representative of the large Proposed Class Area. They are clustered near the center of the Proposed Class Area, while the majority of parcels in terms of number are at the far western end of the Proposed Class Area.

For this updated report, we reviewed information from public records, the local multiple listing service database, and recent depositions related to changes in the value and use of these individuals' properties since the Arkema incident and our earlier report.

### 3.1.1  ASSESSED VALUES 2017 TO 2020

We accessed the Harris County Appraisal District's real property database. Properties in Harris County are reassessed every year. The following table shows the changes in appraised values for the plaintiffs' properties from 2017 to 2020, the most recent year available.



**Plaintiff Properties**

| Address | Plaintiff | Property Use | 2017 Total Assessed Mkt Value | 2018 Total Assessed Mkt Value | 2019 Total Assessed Mkt Value | Assessed Mkt Value Total 2020 |
|---|---|---|---|---|---|---|
| 3623 Krenek Rd. | Anderson | Residence | $202,257 | $289,087 | $289,087 | $207,677 |
| 18665 Ramsey Rd. | Anderson | Hay field | $488,295 | $488,295 | $488,295 | $488,295 |
| Highway 90 | Anderson | Vacant | $231,715 | $117,588 | $115,127 | $115,127 |
| 242 Cypress Ave | Flannel | Residence | $59,909 | $70,822 | $97,798 | $110,913 |
| 3330 Euell Rd. | Lyons | Residence | $86,147 | $86,147 | $128,167 | $198,413 |
| 19726 Miller Wilson Rd. | Nason | Residence | $183,615 | $183,615 | $270,028 | $265,212 |
| 5030 Methvin Ln. | Phelps | Residence | $182,199 | $182,199 | $265,052 | $312,603 |
| 17117 Adlong School Rd. | Prantil | Residence | $383,192 | $359,864 | $334,399 | $340,000 |
| 205 Reidland Road, #1 | Simmons | Residence | $92,384 | $117,881 | $117,881 | $117,881 |
| 1728 Crosby Dayton Rd. | Villareal | Residence & horse stable | $1,180,957 | $1,291,477 | $1,730,988 | $1,682,111 |
| 18831 Sunset Trail St. | Wheeler | Residence | $214,636 | $250,000 | $250,000 | $415,000 |
| 17205 Adlong School Rd. | Whatley | Residence | $249,779 | $238,709 | $235,732 | $243,538 |
| 17006 Adlong School Rd. | Whatley | Leased Barn and Grazing Land (Joan Walters) | | | | |
| Bohemian Hall Rd. | Whatley | Leased Grazing Land | | | | |
| "Stralla" Property | Whatley | Leased Grazing Land | | | | |
| "Davis" Property | Whatley | Leased Grazing Land | | | | |
| Parker Field | Whatley | Leased Hay Field | | | | |
| Warwick Property | Whatley | Leased Hay Field | | | | |
| Partnership Property with Senkle | Whatley | Leased Hay Field (Split 50/50 Hay) | | | | |
| Miller Wilson Rd. Property (Terry M | Whatley | Leased Hay Field | | | | |
| North of "Davis" E. side of Stralla F | Whatley | Hay Field ("Handshake" Deal) | | | | |
| North of "Stralla" Property | Whatley | Leased Hay Field | | | | |

Generally, the assessed values of residential real property owned by the Plaintiffs has increased between 2017 and 2021, in some cases significantly. The two exceptions are the Prantil residence and the Whatley residence, both of which showed a small decline. This may have been attributable to the common practice of owners regularly appealing the assessed value determinations of the County, achieving reductions. Mr. Anderson, for example, reported in a recent deposition that he appeals assessed values and achieves reductions on virtually all of his properties on a routine basis.

### 3.1.2 CHANGES IN OWNERSHIP

Plaintiff Nason sold the property located at 19726 Miller Wilson Road on September 21, 2020 for $570,000. The home was listed for 188 days and sold for 5% below list price. It was reportedly completely rehabbed before sale. The sale price was more than double the $265,212 assessed value in 2020, demonstrating the common disconnect between assessed values for tax purposes and market value as indicated by transaction data.

Plaintiff Prantil purchased the home he was previously renting as well as the other home on the property located at 17111 & 17117 Adlong School Road, according to public record documents.

- o General Warranty Deed dated 10/17/18
- o Grantor: George Lawrence Theobald & Linda S. Theobald
- o Grantee: Corey Prantil
- o Recorded Amount: $135,000
- o Prantil took out "Purchase Money" from Community Resource Credit Union to purchase the property (Deed of Trust recorded 10/17/18 for $135,000).

The property was not listed in the MLS. We do not know whether it was otherwise offered in the open market or was privately negotiated between the parties.



### 3.2 FLOODING, WATER INFILTRATION AND MOLD IN THE EXCLUSION ZONE AND ELSEWHERE

The Complaint (Paragraph 8) states that "residents living within the Exclusion Zone suffered enhanced property damage from the flood waters that invaded their homes and property because mold grew unabated in their homes for eight days until the 1.5-mile radius Exclusion Zone order was lifted."

Our research in county records indicates there are 992 parcels in the 1.5-mile Exclusion Zone as of 2021.

### 3.3 REAL ESTATE MARKET IMPACTS DUE TO HURRICANE HARVEY

Hurricane Harvey hit the Houston metro area with an unprecedented natural disaster, making landfall as a category 4 hurricane near Port Aransas the evening of August 25, 2017. According to the National Hurricane Center, Hurricane Harvey was the second costliest tropical cyclone in U.S. history behind Hurricane Katrina in 2005, causing over $125 billion in damages, adjusted to $136.3 billion with the 2021 Consumer Price Index.[69] Consequently, any discussion of the real estate impacts of the Incident must first explore the real estate impacts of the hurricane itself.

In late-August and early-September 2017, Harris County endured "record rainfall" during the Hurricane Harvey weather event.[70] The Harris County government stated that "[d]uring Hurricane Harvey, all 4.7 million people in Harris County were impacted directly or indirectly during the flood," and that "[Hurricane] Harvey produced the largest and most devastating house flooding event ever recorded in Harris County."[71] Recovery and reconstruction efforts in the wake of Hurricane Harvey are still ongoing in Harris County, including the Crosby area.[72]

Due to the wide variation of Hurricane Harvey's impacts across various residential and commercial real estate markets, each of these markets must be examined separately, and even broken into smaller submarket groupings. Just as with any purported impacts related to the Incident, a "one size fits all" model for the impact of the hurricane and flooding is inappropriate and would be inherently inaccurate. An accurate analysis must consider property-by-property variations in degree and duration of impacts as they changed over time following the event.

---

[69] "Costliest U.S. tropical cyclones." National Hurricane Center. 9 July 2021. Retrieved from: < https://www.ncdc.noaa.gov/billions/dcmi.pdf >.

[70] Draft Harris County Supplemental Action Plan, Harris County, Texas, June 27, 2018, p. 3, 6. Retrieved from: <https://csd.harriscountytx.gov/Documents/DRAFT_Harris_County_Supplement_Action_Plan_07102018.pdf>.

[71]Ibid, p. 3, 6.3.

[72]Ibid, p. 6. The passage went on to state that "the resulting devastation of Hurricane Harvey has left the county with an unmet need of over $12.5 billion in housing and infrastructure damage or failure to function."



### 3.4   COMPARABILITY OF THE PROPOSED CLASS AREA TO SURROUNDING AREAS – THE KILPATRICK CONTROL AREA

To perform a mass appraisal that attempts to isolate the effect, if any, that the Incident had on property values, Dr. Kilpatrick must select a "control area" that is similar to the Proposed Class Area but has not been affected by the Incident. Dr. Kilpatrick's "control area" includes areas outside of the Proposed Class Area in five MLS zones, covering the northeastern quadrant of the Houston metropolitan area. It is a large area that extends from largely agricultural Liberty County on the northeast to the edge of downtown Houston on the southwest. Dr. Kilpatrick provides no rationale in his report for selecting this as a control area, even though it is critical to being able to assess whether there has been diminution in the value of all single-family residential properties within the Proposed Class Area.

No map of the control area is provided in the Kilpatrick Report. The figure below displays the MLS zones which Dr. Kilpatrick reports he included in his analysis. Areas outside of the Proposed Class Area (indicated in the blue dotted line) served as Dr. Kilpatrick's "control area."



We have compiled the table below from Census data on selected demographic, economic, housing and real estate factors, broken down between the five MLS areas and for the total area, separating "inside" (the Proposed Class Area) from "outside" (the control area used by Dr. Kilpatrick.



*Updated and Revised Expert Report*                                             *Wheeler, et al. v. Arkema Inc.*
*United States District Court*

**MLS Areas Inside and Outside of the Proposed Class Area - Census Data Comparison**

| | MLS Area 1 Inside | MLS Area 1 Outside | MLA Area 2 Inside | MLA Area 2 Outside | MLS Area 52 Inside | MLS Area 52 Outside | MLS Area 32 Inside | MLS Area 32 Outside | MLS Area 53 Inside | MLS Area 53 Outside | Totals & Avg. Inside | Totals & Avg. Outside |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Population | 30,541 | 173,309 | 4,713 | 427,267 | 6,689 | 87,281 | - | 66,472 | 3 | 49,307 | 41,946 | 803,636 |
| Median Age | 37.7 | 33.5 | 38.7 | 32.5 | 33.4 | 38.5 | - | 42.3 | - | 38.1 | 27.5 | 37.0 |
| Total Households | 10,547 | 55,699 | 1,575 | 134,479 | 1,935 | 29,729 | - | 24,094 | 1 | 16,626 | 14,058 | 260,627 |
| Median Household Income | $69,881 | $83,543 | $53,269 | $48,275 | $59,501 | $49,776 | - | $99,303 | - | $87,433 | $45,663 | $73,666 |
| Unemployment Rate | 5.9% | 5.4% | 14.6% | 11.0% | 12.9% | 10.3% | - | 5.5% | - | 8.0% | 8.4% | 8.0% |
| Total Housing Units | 10,987 | 58,657 | 1,691 | 150,850 | 2,120 | 33,256 | - | 25,389 | 1 | 18,188 | 14,799 | 286,340 |
| Vacant Housing Units | 440 | 2,958 | 116 | 16,371 | 185 | 3,527 | - | 1,295 | - | 1,562 | 741 | 25,713 |
| Occupied Housing Units | 10,547 | 55,699 | 1,575 | 134,479 | 1,935 | 29,729 | - | 24,094 | 1 | 16,626 | 14,058 | 260,627 |
| % Owner-Occupied | 80.9% | 75.0% | 70.5% | 58.6% | 85.1% | 77.7% | - | 82.5% | 100.0% | 84.5% | 80.3% | 68.1% |
| % Renter-Occupied | 19.1% | 25.0% | 29.5% | 41.4% | 14.9% | 22.3% | - | 17.5% | 0.0% | 15.5% | 19.7% | 31.9% |
| Median Year Structure Built | 1990 | 2001 | 1989 | 1976 | 2001 | 1989 | - | 1989 | - | 1998 | 1993 | 1991 |
| Median Home Value | $245,643 | $263,343 | $145,524 | $142,756 | $127,836 | $166,947 | - | $280,988 | - | $237,740 | $129,751 | $218,355 |

*Source: Source: Esri BAO 2021, US Census Bureau, and American Community Survey, 2019*

Tables comparing MLS listed sales of single-family residential properties in each of the five MLS zones – inside and outside the Proposed Class Area are shown below.

**MLS Areas Inside & Outside the Proposed Class Area - Quarterly Sales, Q1 2014 - Q2 2021**

| | MLS Area 1 - Inside | MLS Area 1 - Outside | MLS Area 2 - Inside | MLS Area 2 - Outside | MLS Area 52 - Inside | MLS Area 52 - Outside | MLS Area 32 - Inside | MLS Area 32 - Outside | MLS Area 53 - Inside | MLS Area 53 - Outside |
|---|---|---|---|---|---|---|---|---|---|---|
| Q1 2014 | 94 | 498 | 3 | 444 | 2 | 91 | 0 | 279 | 0 | 83 |
| Q2 2014 | 105 | 734 | 4 | 535 | 6 | 118 | 0 | 392 | 0 | 135 |
| Q3 2014 | 95 | 767 | 4 | 536 | 8 | 86 | 0 | 419 | 0 | 133 |
| Q4 2014 | 104 | 600 | 3 | 548 | 5 | 106 | 0 | 325 | 0 | 113 |
| Q1 2015 | 71 | 533 | 3 | 463 | 1 | 96 | 0 | 242 | 0 | 104 |
| Q2 2015 | 112 | 799 | 6 | 564 | 5 | 111 | 0 | 348 | 0 | 125 |
| Q3 2015 | 105 | 817 | 4 | 625 | 4 | 118 | 0 | 387 | 0 | 158 |
| Q4 2015 | 109 | 640 | 5 | 538 | 5 | 96 | 0 | 230 | 0 | 89 |
| Q1 2016 | 102 | 564 | 4 | 501 | 3 | 78 | 0 | 251 | 0 | 117 |
| Q2 2016 | 100 | 763 | 7 | 544 | 6 | 123 | 0 | 367 | 0 | 133 |
| Q3 2016 | 105 | 793 | 10 | 581 | 6 | 96 | 0 | 324 | 0 | 145 |
| Q4 2016 | 99 | 668 | 6 | 528 | 1 | 130 | 0 | 295 | 0 | 122 |
| Q1 2017 | 86 | 522 | 8 | 531 | 4 | 92 | 0 | 226 | 0 | 108 |
| Q2 2017 | 128 | 800 | 9 | 630 | 5 | 133 | 0 | 375 | 0 | 147 |
| Q3 2017 | 117 | 753 | 13 | 531 | 4 | 118 | 0 | 341 | 0 | 153 |
| Q4 2017 | 143 | 675 | 5 | 591 | 5 | 127 | 0 | 251 | 0 | 186 |
| Q1 2018 | 110 | 554 | 8 | 536 | 1 | 99 | 0 | 209 | 0 | 155 |
| Q2 2018 | 140 | 690 | 10 | 685 | 6 | 143 | 0 | 328 | 0 | 178 |
| Q3 2018 | 180 | 712 | 2 | 697 | 4 | 153 | 0 | 309 | 0 | 172 |
| Q4 2018 | 139 | 646 | 6 | 695 | 0 | 149 | 0 | 234 | 0 | 157 |
| Q1 2019 | 102 | 506 | 4 | 624 | 0 | 134 | 0 | 223 | 0 | 143 |
| Q2 2019 | 144 | 806 | 1 | 722 | 0 | 160 | 0 | 326 | 0 | 218 |
| Q3 2019 | 131 | 812 | 6 | 803 | 0 | 182 | 0 | 341 | 0 | 222 |
| Q4 2019 | 142 | 713 | 4 | 699 | 0 | 175 | 0 | 310 | 0 | 191 |
| Q1 2020 | 103 | 541 | 0 | 638 | 0 | 175 | 0 | 286 | 0 | 151 |
| Q2 2020 | 147 | 856 | 6 | 664 | 0 | 167 | 0 | 378 | 0 | 202 |
| Q3 2020 | 111 | 1,120 | 0 | 850 | 0 | 234 | 0 | 463 | 0 | 251 |
| Q4 2020 | 116 | 1,039 | 0 | 851 | 0 | 215 | 0 | 369 | 0 | 232 |
| Q1 2021 | 89 | 770 | 0 | 670 | 0 | 160 | 0 | 263 | 0 | 197 |
| Q2 2021 | 191 | 940 | 0 | 928 | 0 | 277 | 0 | 430 | 0 | 265 |
| **Total:** | **3,520** | **21,631** | **141** | **18,752** | **81** | **4,142** | **0** | **9,521** | **0** | **4,785** |

**Total Sales Inside:**      3,742
**Total Sales Outside:**     58,831



*Updated and Revised Expert Report*  ·  *Wheeler, et al. v. Arkema Inc.*
*United States District Court*

MLS Areas Inside & Outside the Proposed Class Area - Average Sale Price, Q1 2014 - Q2 2021

| | MLS Area 1 - Inside | MLS Area 1 - Outside | MLS Area 2 - Inside | MLS Area 2 - Outside | MLS Area 52 - Inside | MLS Area 52 - Outside | MLS Area 32 - Inside | MLS Area 32 - Outside | MLS Area 53 - Inside | MLS Area 53 - Outside |
|---|---|---|---|---|---|---|---|---|---|---|
| Q1 2014 | $149,941 | $217,067 | $64,467 | $100,174 | $175,275 | $118,793 | - | $240,835 | - | $192,925 |
| Q2 2014 | $165,530 | $221,904 | $90,450 | $109,741 | $130,733 | $132,249 | - | $264,404 | - | $214,114 |
| Q3 2014 | $164,033 | $227,653 | $63,528 | $120,683 | $105,088 | $121,244 | - | $251,118 | - | $213,895 |
| Q4 2014 | $182,198 | $222,607 | $85,000 | $116,969 | $154,300 | $122,319 | - | $251,280 | - | $221,903 |
| Q1 2015 | $169,827 | $219,670 | $125,500 | $123,322 | $22,000 | $112,159 | - | $266,262 | - | $224,222 |
| Q2 2015 | $170,797 | $230,358 | $137,279 | $123,678 | $150,980 | $121,585 | - | $278,509 | - | $214,754 |
| Q3 2015 | $176,342 | $231,409 | $218,500 | $130,959 | $223,625 | $132,504 | - | $266,170 | - | $239,969 |
| Q4 2015 | $170,839 | $230,779 | $68,200 | $130,250 | $171,000 | $130,795 | - | $261,093 | - | $209,193 |
| Q1 2016 | $173,635 | $223,754 | $168,375 | $128,304 | $201,333 | $134,960 | - | $280,688 | - | $233,292 |
| Q2 2016 | $181,532 | $230,613 | $253,886 | $137,922 | $115,850 | $144,722 | - | $281,960 | - | $249,339 |
| Q3 2016 | $181,572 | $230,564 | $153,501 | $149,930 | $163,721 | $162,987 | - | $268,267 | - | $230,579 |
| Q4 2016 | $194,715 | $229,523 | $178,533 | $146,092 | $50,000 | $148,457 | - | $278,639 | - | $236,725 |
| Q1 2017 | $186,783 | $231,850 | $140,283 | $143,312 | $346,625 | $150,221 | - | $265,551 | - | $245,041 |
| Q2 2017 | $202,177 | $240,093 | $161,056 | $150,706 | $189,422 | $171,469 | - | $298,135 | - | $266,335 |
| Q3 2017 | $203,860 | $231,826 | $141,345 | $153,615 | $429,650 | $148,545 | - | $265,273 | - | $257,842 |
| Q4 2017 | $207,100 | $233,932 | $150,800 | $156,789 | $268,780 | $153,556 | - | $270,080 | - | $238,025 |
| Q1 2018 | $198,834 | $239,081 | $166,856 | $151,204 | $44,000 | $163,161 | - | $271,035 | - | $252,577 |
| Q2 2018 | $196,543 | $252,314 | $161,371 | $158,784 | $210,853 | $168,991 | - | $273,937 | - | $249,888 |
| Q3 2018 | $219,560 | $246,771 | $91,000 | $166,231 | $145,475 | $182,970 | - | $285,455 | - | $281,112 |
| Q4 2018 | $216,118 | $257,000 | $101,333 | $157,833 | - | $172,088 | - | $271,369 | - | $242,314 |
| Q1 2019 | $210,327 | $255,243 | $58,250 | $155,952 | - | $163,151 | - | $290,001 | - | $261,467 |
| Q2 2019 | $243,287 | $258,275 | $124,900 | $165,818 | - | $176,087 | - | $291,668 | - | $265,668 |
| Q3 2019 | $230,386 | $260,567 | $118,517 | $172,787 | - | $193,206 | - | $300,353 | - | $273,397 |
| Q4 2019 | $218,650 | $257,418 | $222,225 | $171,608 | - | $185,744 | - | $279,903 | - | $272,905 |
| Q1 2020 | $213,077 | $266,116 | - | $176,706 | - | $190,471 | - | $276,491 | - | $281,346 |
| Q2 2020 | $221,537 | $268,677 | $152,233 | $174,540 | - | $197,388 | - | $281,842 | - | $304,414 |
| Q3 2020 | $211,464 | $277,563 | - | $189,672 | - | $191,651 | - | $319,991 | - | $293,711 |
| Q4 2020 | $229,601 | $279,912 | - | $197,614 | - | $221,588 | - | $310,589 | - | $294,472 |
| Q1 2021 | $237,245 | $291,595 | - | $195,469 | - | $219,367 | - | $302,795 | - | $283,363 |
| Q2 2021 | $250,785 | $312,459 | - | $209,586 | - | $231,274 | - | $354,534 | - | $306,847 |



MLS Areas Inside & Outside the Proposed Class Area - Average Sale Price per SF, Q1 2014 - Q2 2021

| | MLS Area 1 - Inside | MLS Area 1 - Outside | MLS Area 2 - Inside | MLS Area 2 - Outside | MLS Area 52 - Inside | MLS Area 52 - Outside | MLS Area 32 - Inside | MLS Area 32 - Outside | MLS Area 53 - Inside | MLS Area 53 - Outside |
|---|---|---|---|---|---|---|---|---|---|---|
| Q1 2014 | $76 | $78 | $51 | $57 | $93 | $63 | - | $88 | - | $83 |
| Q2 2014 | $80 | $81 | $62 | $61 | $66 | $72 | - | $92 | - | $88 |
| Q3 2014 | $84 | $82 | $36 | $66 | $61 | $68 | - | $91 | - | $89 |
| Q4 2014 | $84 | $83 | $85 | $64 | $101 | $69 | - | $92 | - | $94 |
| Q1 2015 | $87 | $84 | $74 | $69 | $14 | $64 | - | $94 | - | $92 |
| Q2 2015 | $86 | $87 | $72 | $68 | $88 | $68 | - | $99 | - | $92 |
| Q3 2015 | $88 | $88 | $112 | $74 | $87 | $72 | - | $98 | - | $101 |
| Q4 2015 | $84 | $88 | $40 | $73 | $78 | $73 | - | $98 | - | $93 |
| Q1 2016 | $90 | $88 | $68 | $73 | $79 | $72 | - | $101 | - | $98 |
| Q2 2016 | $94 | $91 | $106 | $76 | $78 | $81 | - | $100 | - | $102 |
| Q3 2016 | $93 | $90 | $83 | $79 | $104 | $85 | - | $101 | - | $104 |
| Q4 2016 | $97 | $91 | $87 | $80 | $21 | $80 | - | $102 | - | $99 |
| Q1 2017 | $92 | $92 | $73 | $81 | $120 | $86 | - | $101 | - | $101 |
| Q2 2017 | $97 | $91 | $91 | $84 | $108 | $95 | - | $104 | - | $107 |
| Q3 2017 | $101 | $91 | $79 | $86 | $134 | $87 | - | $101 | - | $115 |
| Q4 2017 | $99 | $93 | $97 | $87 | $116 | $86 | - | $98 | - | $107 |
| Q1 2018 | $102 | $93 | $90 | $85 | $23 | $86 | - | $97 | - | $115 |
| Q2 2018 | $100 | $97 | $94 | $90 | $93 | $92 | - | $102 | - | $110 |
| Q3 2018 | $104 | $97 | $75 | $93 | $94 | $100 | - | $105 | - | $116 |
| Q4 2018 | $108 | $99 | $73 | $92 | - | $97 | - | $101 | - | $113 |
| Q1 2019 | $103 | $100 | $53 | $90 | - | $92 | - | $103 | - | $117 |
| Q2 2019 | $113 | $102 | $51 | $97 | - | $101 | - | $105 | - | $120 |
| Q3 2019 | $111 | $103 | $64 | $99 | - | $103 | - | $107 | - | $125 |
| Q4 2019 | $109 | $104 | $109 | $99 | - | $104 | - | $102 | - | $119 |
| Q1 2020 | $109 | $105 | - | $100 | - | $105 | - | $103 | - | $116 |
| Q2 2020 | $110 | $108 | $93 | $104 | - | $103 | - | $105 | - | $128 |
| Q3 2020 | $108 | $109 | - | $109 | - | $108 | - | $111 | - | $127 |
| Q4 2020 | $112 | $113 | - | $112 | - | $118 | - | $117 | - | $131 |
| Q1 2021 | $113 | $118 | - | $113 | - | $119 | - | $113 | - | $127 |
| Q2 2021 | $127 | $123 | - | $122 | - | $122 | - | $128 | - | $138 |

The following graphy depicts the average sale prices for these MLS Areas, aggregated to inside and outside the Proposed Class Area.





**MLS Areas Sales Combined - Inside and Outside Proposed Class Area**
**Average Sale Price per SF, Q1 2014 - Q2 2021**

Hurricane Harvey/ Arkema Incident Conclusion Date (Sep. 4, 2017)

Inside Proposed Class Area — Outside Proposed Class Area

## 3.5   REAL ESTATE DEVELOPMENT ACTIVITY IN THE PROPOSED CONTROL AREA SINCE 2017

### 3.5.1   NEW SINGLE-FAMILY HOME SALES

We collected information from the MLS on recent sales of newly constructed single-family homes in the Proposed Class Area between 2014 and 2021.  The volume of sales by quarter is shown on the attached chart.



It is apparent that the number of sales of newly constructed homes rose in the first year following the Arkema Incident.  Sales volumes then returned to roughly pre-2017 levels, before increasing again into 2021.  The temporary effect of the Covid pandemic in 2020 – initially negative, then positive -- is also evident.

The map below shows the location of those sales.  The predominant cluster has been on the west side of the City of Crosby, in and near the large residential development of Newport.





This has been a very active residential development area, before and after the Arkema Incident. The following photographs from Dr. Kilpatrick's production of reliance materials show typical construction activity in the area at the time of his inspection of the area in June 2021.









Residential development in areas closer to the Arkema facility have been more scattered in location. One obvious cluster of recent single-family home construction on larger lots is immediately north of the Arkema plant.  These new homes do not typically show up in the MLS system, likely because they are built-to-suit for homeowners and are not actively listed.



Nevertheless, new construction has been happening in the immediate vicinity since the Arkema Incident.

We examined time-sequenced aerial photos of the area taken between 2018 and today in the immediate vicinity of the plant. At least a half dozen houses were under construction in the area in red in the photo below. The yellow lines indicate distance from the Arkema operational boundary to houses under construction – the shorter yellow line is approximately 1,700 feet; the longer yellow line about 3,500 feet.



### 3.6   VARIATIONS IN THE ENVIRONMENTAL SITUATION BASED ON DIFFERENCE IN PROXIMITY AND DIRECTIONS FROM THE INCIDENT

Based on our understanding of the conclusions of other expert reports submitted in 2018 on behalf of Arkema in this case, any effects to properties from the Incident would vary based on a multitude of different factors specific and unique to each individual property, including:

- Each property's location relative to the Arkema Facility and the varying concentrations and directions of the air emissions events (Dr. Yocke);



- Each property's proximity and direction relative to other potential alternative sources of contamination (Drs. Yocke and Stout);

- The specific sampling and testing data collected and analyzed for each property (Drs. Stout and Millner); and

- The geographic setting of each property relative to floodplains and other natural geographic features that could have impacted the potential flooding of each property, which would also affect the nature and extent of any resultant mold growth (Dr. Thomann).

Each of these specific factors that are unique to each property would necessarily affect the market's valuation of any given property.

As a result of these variations, any variations in prices paid for properties in the Proposed Class Area at various points in time need to be analyzed on a location-by-location and individual property-by-property basis in order to determine the status of each property relative to the four stages of the typical detrimental condition life cycle (i.e., initial impact stage, assessment stage, repair stage, and post-remediation or ongoing stage).

For each property, and at each stage, cost, use and risk factors may vary depending upon the "case-by-case" circumstances at play. As a result, impacts on real estate prices and values will vary from property to property and likely have changed over time depending upon the stage in the interplay between cost, use and risk factors as reflected in prices paid in the real estate marketplace post-Harvey.

### 3.7 DISTINGUISHING ACTUAL IMPACTS ON POST-INCIDENT PRICES ALREADY PAID FROM IMPACT ON CURRENT AND FUTURE MARKET VALUES

Our 2018 research found more than 597 real estate transactions in the Proposed Class Area in the first year following the Incident. We concluded that the effect, if any, of the Arkema Incident on the value of those properties that had sold since September 2017 must be measured on a property-by-property basis by comparing the actual price received to the market value of those properties as if the Incident had not occurred but recognizing that Hurricane Harvey and its various impacts on people and property did occur. *That requires an individual appraisal analysis as of the date of sale for each of those properties using sales data that was not affected by the Incident*.

Now, in 2021, updated information from the MLS database indicates there have been 2,108 sales within the area between September 2017 and June 2021 significantly increasing the pool of transactions available for study.



### 3.8    THE PLAINTIFFS' CLAIMS FOR REAL PROPERTY DAMAGES; THE PROPOSED CLASS AND THE EXCLUSION ZONE

We looked up public information for each parcel in order to confirm current land use. The following map shows 7, 6, 5, 4, 3, 2, and 1-mile rings from the perimeter of the Arkema property, as well as the 1.5-mile Exclusion Zone. The table reports the number of parcels within each of these rings.



| Number of Parcels within Class Area Rings | |
|---|---|
| **Radius** | **Number of Parcels** |
| 1 mi. | 570 |
| 1.5 mi. | 992 |
| 2 mi. | 1,410 |
| 3 mi. | 2,966 |
| 4 mi. | 8,265 |
| 5 mi. | 13,086 |
| 6 mi. | 17,778 |
| **7 mi.** | **21,841** |

Our analysis found that as of 2021 the Proposed Class Area contains 21,841 real estate parcels.



**3.9   VARIATIONS IN LAND USE WITHIN THE PROPOSED CLASS AREA**

The following map shows the variations in land use of the Proposed Class Area.



Any potential effects of situations such as the Incident on prices and values typically vary from one type of land use or property category to another. For example, buyers of income producing industrial and commercial properties or apartment complexes may have quite different concerns about purported contamination than buyers of single-family homes. And apartment renters or renters of single-family homes may have different concerns than owner occupants. The potential effects on prices and values will likely be quite different for owner-occupied properties than for rental properties. According to the Census, about 78% of occupied housing units in the area were owner-occupied. The remaining 22% were occupied by tenants. If 22% of the 12,959 residential parcels are rented to tenants, approximately 2,851 parcels will require individual analysis to determine the effect, if any, of the Incident on actual rental income and operating expenses.

Concerns of buyers of vacant land may also be quite different from concerns of buyers of existing homes or improved commercial properties. In actively developing residential marketplaces – such as portions of the Proposed Class Area – if the land buyers for residential or commercial development believe conditions will be addressed before they actively begin marketing the development, they likely will have a different attitude towards the situation than buyers of single-family homes looking for immediate occupancy.



Also included in the Proposed Class Area are thousands of acres of agricultural properties. Agricultural properties likely have an entirely different set of facts and issues than homes or commercial properties.

The calculations to determine the effect, if any, for each of these non-residential property types will be quite different (and possibly more complex) than the impairment calculations for owner-occupied single-family residences. That calculation will also depend upon whether the non-residential properties are owner-occupied or renter-occupied. Among the additional issues/questions that must be answered on a property-by-property basis for rented, income-producing properties, including the 2,851 potentially tenant-occupied residential rental properties, are the following:

- What is the market rental rate for the properties "pre-Incident" compared to "post-Incident"? And how are any similar impacts due to Hurricane Harvey flooding separable from any Arkema-related effects?

- What is the actual contract rent for the properties "pre-Incident" compared to "post-Incident"?

- Is the actual contract rent rate higher or lower than the market rent rate "pre-Incident" and "post-Incident"?

- What was the remaining term of any "pre-Incident" lease or leases as of September 2017 and what is the remaining term of any "post-Incident" leases signed since September 2017?

- What was the vacancy rate and collection loss factor "pre-Incident" and what is it now "post-Incident"?

- What were the operating expenses "pre-Incident" and what are the "post-Incident" operating expenses?

- What was the net operating income "pre-Incident" and what is it now "post-Incident"?

- For rented properties that have not yet sold "post-Incident," what are the likely future rental rates, operating expenses, vacancy rates, and net annual incomes likely to be between current date and date of sale?

- What is the investment risk profile change, if any, comparing "pre-Incident" and "post-Incident" market and property circumstances?



All of this requires property-by-property analysis, including analysis of actual lease terms and rents both "pre-Incident" and "post-Incident" on a property-by-property basis.

## 3.10  PARCELS BY LAND USE TYPE BY AREA

We have updated information from county tax rolls for newer parcels and referred to previous research for other parcels to determine the number of parcels by land use type. The following table shows the number of parcels by land use within cumulative rings surrounding the Arkema property as of 2021. It also shows total acreage by type in the entire area.

**Number of Parcels by Land Use Type within Class Area Rings**

| Land Use | 1 mi. | 1.5 mi. | 2 mi. | 3 mi. | 4 mi. | 5 mi. | 6 mi. | 7 mi. (total parcels) | % | Total Acreage | % |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Agricultural | 127 | 230 | 302 | 548 | 868 | 1,269 | 1,633 | 1,982 | 9.1% | 58,755 | 52.1% |
| Timber | 1 | 2 | 7 | 10 | 13 | 23 | 27 | 28 | 0.1% | 6,787 | 6.0% |
| Residential - Improved* | 28 | 51 | 73 | 159 | 240 | 352 | 561 | 669 | 3.1% | 1,050 | 0.9% |
| Residential - Single Family | 256 | 442 | 640 | 1,455 | 4,885 | 7,477 | 9,971 | 12,208 | 55.9% | 18,830 | 16.7% |
| Residential - Multifamily | 0 | 0 | 0 | 6 | 16 | 57 | 67 | 82 | 0.4% | 531 | 0.5% |
| Commercial | 5 | 12 | 21 | 45 | 169 | 262 | 329 | 446 | 2.0% | 2,875 | 2.5% |
| Industrial | 0 | 0 | 2 | 7 | 7 | 9 | 10 | 14 | 0.1% | 690 | 0.6% |
| Exempt | 1 | 5 | 5 | 9 | 44 | 62 | 80 | 103 | 0.5% | 1,777 | 1.6% |
| Other | 34 | 71 | 88 | 145 | 314 | 454 | 612 | 874 | 4.0% | 12,415 | 11.0% |
| Vacant | 65 | 120 | 173 | 388 | 853 | 1,453 | 2,522 | 3,227 | 14.8% | 5,603 | 5.0% |
| Unclassified** | 53 | 59 | 99 | 194 | 856 | 1,668 | 1,966 | 2,208 | 10.1% | 3,461 | 3.1% |
| | 570 | 992 | 1,410 | 2,966 | 8,265 | 13,086 | 17,778 | 21,841 | | 112,774 | |

* Properties that are used for residential purposes such as a shed, garage, or mobile home but were not specifically categorized a single or multi-family

**Unclassified parcels are where the account number associated with a parcel did not match with the land use database provided from the counties

More than 50% of the total land area and about 9% of the parcels are in agricultural or timber use. Other uses include exempt/public uses, vacant land, and industrial and commercial uses. It is apparent that the Proposed Class Area has no uniform land use type.

## 3.11  VARIATION IN FLOODING AND REAL PROPERTY DAMAGE DUE TO HURRICANE HARVEY WITHIN THE PROPOSED CLASS AREA

There is significant variation in the Hurricane Harvey-related flooding extent and its effect on property damage within the Proposed Class Area, and among the Named Plaintiffs. As part of its Hurricane Harvey analysis, the Federal Emergency Management Agency (FEMA) has released data that evaluates damage based on ground measurements and river and coastal flood gauge levels. The following map shows the results of the damage assessment modelling done by FEMA around the Proposed Class Area.

It is important to note that the following damage assessment map and table are based on incomplete and often inaccurate data. Consequently, while this information is useful and provides the best-known available data, it does not show the complete picture of the flooding situation.





As indicated in this map, there is significant variation in the level of flooding damage across the Proposed Class Area.

The following chart summarizes the FEMA damage assessments in the Proposed Class Area.

| FEMA Damage Assessment of Proposed Class Area | | |
|---|---|---|
| **FEMA Assessment** | **#** | **%** |
| Affected | 897 | 39.5% |
| Minor | 752 | 33.1% |
| Major | 381 | 16.8% |
| Destroyed | 242 | 10.7% |
| | | |
| Total | 2,272 | 100.0% |

The FEMA assessments do not account for the whole Proposed Class Area, or even the maximum extent of where flooding occurred. As of 22018, the Proposed Class Area contained 21,124 parcels, but only 2,272 were given a FEMA assessment. Within the group of Named Plaintiffs there is also variation.



- Named Plaintiffs Simmons, Wheeler, Nason, Villareal, Flannel, and two of the Anderson's properties received no assessment.

- Named Plaintiffs Phelps, Whatley, Prantil, Lyons and the home of the Andersons were assessed.

Among the FEMA-assessed Named Plaintiffs, all were categorized as having minor damage to the property. The following map shows FEMA-assessed levels of flooding damage for the Named Plaintiffs.



Any effort to determine any impacts of the Incident on real property in the Proposed Class Area must simultaneously address the significant and nearly simultaneous impacts of Harvey-related flooding and other effects. It is clear from the records of property damage that these effects were both significant and highly variable across the Proposed Class Area. Any model which would purport to accurately distinguish Incident-related effects from Harvey flooding effects would be impossibly complex and highly inaccurate with respect to individual properties. To account for this factor alone, a property-by-property analysis is essential.



### 3.12   DIFFERENCES IN FLOODING EXPOSURE IN THE EXCLUSION ZONE

Named Plaintiffs within the Exclusion Zone claim to have "suffered enhanced property damage from the floodwaters that invaded their homes and properties because mold grew unabated in their homes for eight days until the Exclusion Zone order was lifted."[73]

According to Census data, 827 individuals resided at 337 residences in the Exclusion Zone in the period following the Arkema Incident. Not all of these individuals actually evacuated their homes. If a person did not evacuate, and instead remained at their home, they would have been in their homes and could have potentially taken the same steps to mitigate damage from flooding-generated mold as anyone outside of the Exclusion Zone.

There are differences in the Proposed Class, and even among Named Plaintiffs, regarding how many residents actually evacuated and how long it took people to evacuate.

According to a list prepared by the Crosby Volunteer Fire Department, approximately 205 people from 79 different addresses are believed to have evacuated from the Exclusion Zone evacuated. This would indicate that only 23% of the units, or 25% of residents within the Exclusion Zone evacuated.[74]

The variation in evacuation status and timing would need to be accounted for in an analysis of potential damages related to mold. At present property specific data does not exist. As a result, a property-by-property analysis of evacuation status is necessary.

### 3.13   DEMOGRAPHIC VARIATIONS WITHIN THE PROPOSED CLASS AREA

There are significant demographic differences within the Proposed Class Area. The differences affect the real estate market. Properties in the Proposed Class Area fall within all or portions of 12 census tracts.

---

[73] Complaint, Paragraph 8.
[74] Crosby Volunteer Fire Department List of Evacuees.





There were considerable differences between the 12 census tracts according to the 2016 American Community Survey 5-Year Estimates.

Among the significant differences:

- The median home value varied from a low of $75,300 to more than $205,000.

- The median age of homes varied between tracts from 22 years to 36 years.

- The median income varied between tracts from a low of $41,603 to a high of $83,051. This means there is wide variability in the financial ability to own a home or to keep up with mortgage payments during a downturn in the economy.

- The median age varied from 29.5 years to 45.8 years. That means there was wide variability between the tracts in terms of the numbers of families with young children. Neighborhoods with large numbers of children are typically more concerned about adverse environmental conditions.

- Owner-occupied housing units ranged from a low of 60% to a high of 89%. That indicates significant variation in the number of apartments and homes rented to tenants in various portions of the Proposed Class Area, and prices for owner-



occupied single-family homes can be affected by perceptions about tenants in nearby rental housing.

- The percentage of housing units that are vacant varied from a low of 2% to a high of 15%. High vacancy rates can adversely impact home prices paid for owner-occupied homes in a neighborhood.

Because socioeconomic and demographic characteristics affect the way in which real estate submarkets react to all kinds of events, the variability in socioeconomic characteristics between the 12 census tracts in the Proposed Class Area has significant implications for the potential impact, if any, of the Incident on the real estate market. For example:

- The percentage of married households and/or households with children in the various census tracts is extremely variable. In our experience, market areas with significant numbers of family households with children can react differently to environmental issues potentially affecting residential properties more than would market areas in which typical buyers are more likely to be empty-nesters or retired people without children.

- The percentage of owner-occupied households (versus renters) and the number of vacant homes vary among the census tracts in the Proposed Class Area. In our experience, variations in ownership (owner-occupied versus investor owned and rented) might well affect the response of market participants to particular environmental issues, as a homeowner population might have different concerns related to environmental issues and conditions than would a passive investor, more concerned about the ratio of net rental income to purchase price.

When examined collectively, these socioeconomic and demographic characteristics can result in significant variation to impacts on value within the Proposed Class Area that must be analyzed on a neighborhood-by-neighborhood and property-by-property basis.

Updated housing unit and population counts (2020) have been prepared based on distance from the Arkema property; key information is shown in the following table.



### 2020 Population and Housing Data

| Radius | Total Population | Total Housing Units | Owner Occupied | Renter Occupied | Vacant |
|---|---|---|---|---|---|
| 1 mi. | 268 | 103 | 75 | 19 | 9 |
| 1.5 mi. | 465 | 173 | 124 | 37 | 12 |
| 2 mi. | 627 | 231 | 167 | 47 | 17 |
| 3 mi. | 2,668 | 971 | 713 | 196 | 62 |
| 4 mi. | 4,762 | 1,750 | 1,254 | 360 | 136 |
| 5 mi. | 13,588 | 4,873 | 3,422 | 1,037 | 414 |
| 6 mi. | 23,168 | 8,247 | 5,898 | 1,752 | 597 |
| 7 mi. | 38,380 | 13,857 | 10,162 | 2,872 | 823 |

*Source: Esri BAO, US Census Bureau, and American Community Survey, 2020*

### 3.14 VARIATION IN THE QUALITY OF ELEMENTARY SCHOOLS IN THE PROPOSED CLASS AREA MAY AFFECT PRICES AND VALUES AND DEMONSTRATES THE NEED FOR NEIGHBORHOOD-BY-NEIGHBORHOOD ANALYSIS

Quality of public schools is an important factor in the value of single-family homes. The Proposed Class Area includes portions or all of five independent school districts (ISDs) across Harris, Liberty and Chambers Counties. The following chart provides a general ranking of the five ISDs in relation to Texas state-wide averages.



A map of the boundaries of the five ISDs is shown below with the locations of the schools that lie within the Proposed Class Area.





We reviewed test score data from the Texas Education Association for schools within each district.[75]

| ISD | School Name | Municipality | School Type | 2018 | | 2021 | | Difference, 2018-2021 |
|---|---|---|---|---|---|---|---|---|
| | | | | Rank | Percentile | Rank | Percentile | |
| Crosby | Crosby Kindergarten Center | Crosby | Kindergarten | n/a | n/a | n/a | n/a | n/a |
| Crosby | Newport Elementary | Crosby | Elementary | 1,226/4,357 | 72% | 860/4,554 | 81% | 9% |
| Crosby | Barrett Elementary | Crosby | Elementary | 2,518/4,357 | 42% | 1,412/4,554 | 69% | 27% |
| Crosby | Crosby Elementary | Crosby | Elementary | 3,013/4,357 | 31% | 1,565/4,554 | 66% | 35% |
| Crosby | Drew Elementary | Crosby | Elementary | 3,306/4,357 | 24% | 2,698/4,554 | 41% | 17% |
| Crosby | Crosby Middle School | Crosby | Middle | 687/2,050 | 66% | 1,095/2,211 | 50% | -16% |
| Huffman | Huffman Middle | Huffman | Middle | 1,393/2,050 | 33% | 1,233/2,211 | 44% | 11% |
| Huffman | Hargrave High School | Huffman | High | 487/1,797 | 73% | 767/1,861 | 59% | -14% |
| Crosby | Crosby High School | Crosby | High | 784/1,797 | 56% | 934/1,861 | 50% | -6% |
| Non-ISD | Premier HS of Dayton | Dayton | High | 1,478/1,797 | 18% | 1,348/1,861 | 28% | 10% |

The above table illustrates that within the Proposed Class Area:

- There are four elementary schools, all located within the Crosby ISD, that rank between 860 to 2,698 out of 4,554 elementary schools (41st to 81st percentiles, respectively). All four elementary schools have increased in ranking since 2018.

---

[75] https://www.schooldigger.com/aboutranking.aspx



- There are two middle schools, located in the Crosby and Huffman ISDs, that rank 1,095 and 1,233 out of 2,211 middle schools (50th to 44rd percentiles, respectively). Between 2018 and 2021, Crosby Middle School has decreased in ranking by 16% and Huffman Middle School has increased by 11%.

- There are three high schools, located in the Crosby and Huffman ISDs, as well as a Non-ISD, that rank between 767 and 934 out of 1,348 high schools (59th to 28th percentiles, respectively). Since 2018, two of the high schools have decreased in ranking, and one has increased.

Residential real estate markets are particularly impacted by the perceived quality of the schools serving an area. The wide variation in school district quality in the Proposed Class Area adds further complexity that could not be readily accounted for in a mass appraisal approach to value, requiring instead a neighborhood-by-neighborhood and property-by-property analysis of value.

### 3.15 MANY OTHER ENVIRONMENTAL ISSUES AND POTENTIAL DISAMENITIES AFFECT PRICES AND VALUES IN THE PROPOSED CLASS AREA

There are a variety of other environmental issues and potential disamenities that may also affect prices and values in the Proposed Class Area.

#### A. *Environmental Hazards in the Proposed Class Area*

The Proposed Class Area contains many sites with identified environmental contamination issues. The map below is from the EnviroMapper service of the US Environmental Protection Agency and Texas Commission on Environmental Quality. It indicates the various environmental hazards in the Proposed Class Area.





There are 63 different sites within the Proposed Class Area that have been flagged by various EPA programs for different sources of hazardous or toxic substances both past and present, of which 34 sites are listed on the RCRA Info database as remediation sites. Among these 34 sites, 15 are considered active Resource Conservation and Recovery Act (RCRA) sites and 19 inactive RCRA sites, with one, the KMCO Crosby Plant, considered noncompliant as of July 2018. The 14 other active RCRA sites include the following: Enron Gas/Crosby Dist. Office, San Jacinto Services, Bryant's Transport, O'Reilly Auto Parts 572, Walmart Supercenter 522, CVS Pharmacy 7296, Russ Oil Filter Disposal, Hunting Energy Services – Crosby, Family Dollar #3868, Cedar Bayou Products Terminal, Huntsman Petrochemical LLC, Jesse Sinclair Plant, Caltex, and Family Dollar #5498.[76]

The KMCO Crosby Plant was a custom chemical processing and specialty chemical manufacturing facility. On Tuesday April 2nd, 2019, a vapor cloud of isobutylene (a highly flammable gas) formed after a piping component failed, allowing the chemical to leak out of its storage tank. Shortly thereafter, the gas contacted an ignition source, causing an explosion. The explosion killed one KMCO worker and seriously burned two others. In total the incident injured at least 30 workers – seven KMCO employees and 23 contract workers. A shelter-in-place order was issued to all community members within a 1-mile radius of the facility.[77]

---

[76] https://www3.epa.gov/enviro/facts/rcrainfo/search.html

[77] U.S. Chemical Safety and Hazard Investigation Board. (2019) "Explosion and Fire at KMCO Chemical Facility: Factual Update" 17 September 2019. Retrieved from:
 <https://www.csb.gov/assets/1/17/csb_kmco_factual_update.pdf?16508>.



KMCO was criminally convicted of two counts of knowingly violating the Clean Air Act in 2016 and ordered to pay $3.5 million in fines.[78] After the explosion in 2019, the company was sued for violating the Texas Clean Air Act, as well as the state's Solid Waste Disposal Act and Water Code by Harris County as well as the State of Texas.[79]

Below is a map showing the location of the KMCO plant with the 1-mile evacuation buffer displayed. It is apparent that the 2017 Arkema Incident evacuation zone and the 2019 KMCO evacuation zone overlap each other slightly.

Also shown on this map is the location of a property within the KMCO evacuation zone owned by Villareal, a Named Plaintiff in the Arkema litigation. The map also shows the location of the other Named Plaintiffs. A number of them are closer to the KMCO site than they are to Arkema.



In addition to the 15 active RCRA sites in the Proposed Class Area, the Texas Commission on Environmental Quality (TCEQ) has identified eight sites that contribute to groundwater contamination, and 30 leaking petroleum storage tanks within the Proposed Class Area. Two of the eight sites contributing to groundwater contamination are federal Superfund sites. These two sites, the Sikes Disposal Pits and French LTD, are shown in the map below.

---

78 https://www.khou.com/article/news/local/what-we-know-about-the-kmco-chemical-plant-in-crosby/285-1b046b7a-bec3-437c-86f6-ed2e4400d1bd

79 https://www.houstonpublicmedia.org/articles/news/2019/04/09/328525/harris-county-sues-kmco-over-fire-at-crosby-facility-argues-violations-of-state-and-county-laws/





During Hurricane Harvey, both sites experienced flooding as shown in the map below.





Both sites are near the San Jacinto River and were heavily flooded during Hurricane Harvey. Questions related to the spread of toxins because of flooding and its potential effects on nearby commercial and residential properties remain to be answered. An Associated Press article published on September 3, 2018 stated that "the acrid smell of creosote filled the air."[80] This negative publicity surrounding this section of the Proposed Class Area adds to the level of variation within the Proposed Class Area and makes a "one size fits all" model unreliable and inaccurate.

---

[80] https://apnews.com/27796dd13b9549b0ac76aded58a15122



### B. *Location in Flood Hazard Zones*

Portions of the Proposed Class Area are located within the 100- and 500-year flood zones as shown on the map below. Location in a flood zone can affect insurance costs as well as property prices and values.



Much of the Proposed Class Area is exposed to flooding hazards as defined by FEMA. This has implications for the potential damage expected during the year, and the severity. A house or business in the base flood plain has a significantly higher likelihood of flooding on a yearly basis than one outside the floodplain and could potentially experience higher flood levels during a more severe flood event. Incorporating this into a regression model is difficult, especially when flood events like Hurricane Harvey occur that behave differently than expected have further complicated flood hazard assessment.

### 3.16   REAL ESTATE MARKET TRENDS 2017 TO 2021

### 3.16.1   PRICE TRENDS IN THE PROPOSED CLASS AREA DEMONSTRATE NO SIGNIFICANT CLASS-WIDE EFFECTS ON REAL ESTATE PRICES BEFORE AND AFTER THE COMBINED HURRICANE HARVEY/ARKEMA EVENTS

In the 2018 JLL Report we tracked the average price paid per square foot on a moving average basis for all single-family residential sales in the Proposed Class Area between January 2014 and the end of August 2018. The vertical red line in the graph represents September 4, 2017, when the Exclusion Zone was lifted.





That graph shows that the average sale price per square foot in the Proposed Class Area had been generally increasing before the Hurricane and the Incident in late August through early September 2017. After these events, prices level off and then dip slightly at the beginning of 2018 before rising again. While the limited amount of post-Incident data combined with Hurricane Harvey flooding makes any definitive basis for these trends uncertain, this leveling off and subsequent rise are consistent with the larger recovery trends seen in Houston's housing market in the months after the storm.

Single-family residential sales trends previously analyzed through August 2018 were extended through Q2 2021 by collecting and analyzing additional MLS sales data. The graph shows that, overall, prices in the proposed Class Area have risen steadily through 2021, with some seasonal variations.





That relationship between prices "before and after" the Incident is perhaps more clearly expressed in the graph below showing the average price per square foot on a quarterly basis using the same data.

When looking at the average sale price per square foot on a quarterly basis, the same result is concluded. The quarterly average chart includes some effects from seasonality as well as a dip likely from the early phase of the COVID-19 pandemic, but as is being reflected around the country, sales prices are increasing.





### 3.16.2  RESIDENTIAL REAL ESTATE MARKET TRENDS IN THE PROPOSED CLASS AREA – MONTHLY ANALYSIS

Prices as of March 2021 continue to show that the market has returned to "normal". As stated in our 2018 Report, this would suggest that Proposed Class members who sold residential properties immediately after Hurricane Harvey and/or the Incident may have been in a different position than those who have not sold their properties or sold more recently.

| | Proposed Class Area | | | |
|---|---|---|---|---|
| | Number of Sales | Average Sale Price | Average Sale Price per SF | Average DOM |
| Sep-17 | 50 | $190,033 | $94 | 37 |
| Oct-17 | 51 | $201,918 | $102 | 57 |
| Nov-17 | 51 | $219,196 | $100 | 60 |
| Dec-17 | 52 | $200,605 | $97 | 46 |
| Jan-18 | 26 | $201,943 | $99 | 57 |
| Feb-18 | 44 | $198,115 | $102 | 65 |
| Mar-18 | 49 | $189,449 | $100 | 50 |
| Apr-18 | 50 | $193,397 | $99 | 48 |
| May-18 | 48 | $189,384 | $101 | 52 |



| Proposed Class Area | | | | |
|---|---|---|---|---|
| | **Number of Sales** | **Average Sale Price** | **Average Sale Price per SF** | **Average DOM** |
| Jun-18 | 58 | $200,597 | $98 | 45 |
| Jul-18 | 70 | $208,290 | $101 | 47 |
| Aug-18 | 60 | $230,476 | $112 | 48 |
| Sep-18 | 56 | $212,068 | $98 | 33 |
| Oct-18 | 48 | $221,153 | $112 | 49 |
| Nov-18 | 50 | $220,351 | $107 | 51 |
| Dec-18 | 47 | $191,819 | $101 | 69 |
| Jan-19 | 41 | $199,410 | $102 | 49 |
| Feb-19 | 30 | $217,307 | $107 | 59 |
| Mar-19 | 35 | $199,752 | $95 | 84 |
| Apr-19 | 52 | $236,538 | $118 | 60 |
| May-19 | 51 | $263,089 | $114 | 45 |
| Jun-19 | 42 | $224,780 | $103 | 45 |
| Jul-19 | 45 | $222,995 | $111 | 46 |
| Aug-19 | 62 | $216,753 | $110 | 42 |
| Sep-19 | 30 | $247,276 | $105 | 62 |
| Oct-19 | 55 | $219,281 | $108 | 50 |
| Nov-19 | 41 | $211,394 | $108 | 49 |
| Dec-19 | 50 | $224,192 | $112 | 51 |
| Jan-20 | 26 | $195,711 | $101 | 54 |
| Feb-20 | 33 | $216,969 | $114 | 52 |
| Mar-20 | 44 | $220,421 | $111 | 55 |
| Apr-20 | 48 | $225,833 | $111 | 67 |
| May-20 | 46 | $219,322 | $109 | 54 |
| Jun-20 | 59 | $212,721 | $109 | 55 |
| Jul-20 | 40 | $209,421 | $106 | 48 |
| Aug-20 | 26 | $211,714 | $107 | 41 |
| Sep-20 | 45 | $213,136 | $110 | 47 |
| Oct-20 | 36 | $230,184 | $112 | 43 |
| Nov-20 | 22 | $239,027 | $117 | 58 |
| Dec-20 | 58 | $225,663 | $110 | 46 |
| Jan-21 | 21 | $223,017 | $109 | 39 |
| Feb-21 | 29 | $233,097 | $118 | 32 |
| Mar-21 | 40 | $248,041 | $112 | 39 |
| Apr-21 | 74 | $239,616 | $128 | 30 |
| May-21 | 55 | $262,261 | $128 | 45 |
| Jun-21 | 63 | $253,443 | $125 | 23 |
| **Total** | **2,109** | **$218,436** | **$108** | **49** |



The data seems to suggest a possible short-term reduction in prices immediately following Hurricane Harvey. By August 2018 prices appear to have returned to normal. This would suggest that Proposed Class members who sold residential properties immediately after Hurricane Harvey may have been in a different position than those who have not sold their properties or sold more recently. Such variations can only be accounted for by property-by-property analyses that can address the timing and other circumstances of such transactions.

### 3.16.3 COMPARISON OF PRICE TRENDS IN ONE NEIGHBORHOOD INSIDE THE PROPOSED CLASS AREA TO A NEIGHBORHOOD OUTSIDE THE PROPOSED CLASS AREA DEMONSTRATES WHY NEIGHBORHOOD-BY-NEIGHBORHOOD AND PROPERTY-BY-PROPERTY ANALYSIS WILL BE NECESSARY

The Houston Association of Realtors' Multiple Listing Service (MLS) area comprising the largest area of the Proposed Class Area, including the entire Exclusion Zone, is Area 1, which represents the Northeast Houston metro market and includes Crosby. This area provided several geographies from which to compare sales data. MLS Area 1 was subsequently broken into three subareas for comparison: the large Newport group of subdivisions; the rest of MLS Area 1 within the Proposed Class Area; and all of MLS Area 1 outside of the Proposed Class Area. These subareas are represented in the following map with Newport in Blue, non-Newport areas inside the Proposed Class Area in orange, and all of Area 1 outside the Proposed Class Area in grey.





The updated graph below tracks the average price paid per square foot per quarter for all single-family residential sales from Q1 2014 through June of Q2 2021. The vertical red line in the graph marks September 4, 2017, the date when the Exclusion Zone was lifted.



### 3.16.4 RESIDENTIAL REAL ESTATE SALES VOLUME AND PRICES BY ALTERNATIVE AREAS

Disaggregating residential sales by alternative areas through the first quarter of 2021 shows generally consistent growth in sale volumes, average prices, and average prices per square foot of building area.



## Sales Data Summary in Various Radii, 2014 - 2021

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|---|
| **Total Number of Sales per Year** | | | | | | | | |
| 1 mi. | 11 | 5 | 8 | 2 | 9 | 15 | 10 | 2 |
| 1.5 mi. | 14 | 9 | 11 | 2 | 9 | 15 | 11 | 2 |
| 2 mi. | 19 | 4 | 2 | 3 | 13 | 18 | 14 | 3 |
| 3 mi. | 37 | 23 | 29 | 24 | 41 | 41 | 21 | 9 |
| 4 mi. | 208 | 220 | 206 | 244 | 249 | 239 | 134 | 78 |
| 5 mi. | 292 | 318 | 306 | 404 | 414 | 385 | 386 | 219 |
| 6 mi. | 385 | 396 | 389 | 483 | 537 | 469 | 438 | 258 |
| 7 mi. | 446 | 439 | 453 | 530 | 609 | 536 | 484 | 288 |
| **Average Sale Price** | | | | | | | | |
| 1 mi. | $206,090 | $251,900 | $189,257 | $110,000 | $265,278 | $233,093 | $250,530 | $310,034 |
| 1.5 mi. | $195,135 | $205,056 | $173,087 | $110,000 | $265,278 | $233,093 | $250,664 | $310,034 |
| 2 mi. | $198,994 | $267,750 | $177,200 | $292,333 | $283,500 | $251,300 | $239,474 | $356,689 |
| 3 mi. | $195,391 | $210,832 | $218,135 | $240,740 | $231,537 | $285,554 | $237,447 | $285,730 |
| 4 mi. | $152,484 | $162,386 | $171,958 | $187,081 | $203,981 | $225,101 | $208,467 | $243,975 |
| 5 mi. | $153,198 | $167,099 | $176,894 | $196,229 | $207,502 | $222,866 | $217,436 | $246,904 |
| 6 mi. | $161,039 | $170,286 | $178,611 | $200,169 | $205,709 | $224,121 | $218,860 | $247,644 |
| 7 mi. | $160,495 | $169,289 | $181,494 | $200,665 | $204,981 | $224,003 | $218,621 | $247,081 |
| **Average Sale Price/SF** | | | | | | | | |
| 1 mi. | $101 | $128 | $94 | $81 | $122 | $135 | $123 | $133 |
| 1.5 mi. | $96 | $106 | $87 | $81 | $122 | $135 | $126 | $133 |
| 2 mi. | $100 | $125 | $84 | $112 | $134 | $142 | $125 | $127 |
| 3 mi. | $97 | $103 | $102 | $109 | $123 | $138 | $130 | $124 |
| 4 mi. | $79 | $84 | $90 | $98 | $103 | $109 | $110 | $126 |
| 5 mi. | $77 | $84 | $90 | $97 | $103 | $107 | $108 | $120 |
| 6 mi. | $79 | $84 | $91 | $97 | $102 | $107 | $109 | $120 |
| 7 mi. | $80 | $85 | $93 | $98 | $103 | $109 | $110 | $123 |

### 3.16.5 EXAMINING SALES TRENDS IN ONE NEIGHBORHOOD STRADDLING THE PROPOSED CLASS AREA DEMONSTRATES THE NEED FOR NEIGHBORHOOD-BY-NEIGHBORHOOD AND PROPERTY-BY-PROPERTY APPRAISALS

We examined prices paid for homes in the Lake Shadows subdivision in Crosby, which spans the Proposed Class Area boundary, both before and after the Incident.





We compiled updated sales data for the 177 sales occurring from September 2016 through June 2021 for the entire Lake Shadows subdivision. This provided us sales data for approximately two years prior to the Incident and one year after. Below are updated comparison charts of the pre- and post-Incident sales for the areas of Lake Shadows inside and outside the Proposed Class Area.







### 3.16.6 PROXIMITY OF RETAIL AND COMMERCIAL LAND USES TO SINGLE FAMILY HOME PRICES IN SOME NEIGHBORHOODS BUT NOT OTHERS

The map below is one example of a location in the Proposed Class Area that contains a mixture of land uses within close proximity of each other. Nine different land uses are represented in this map. The map shows the multiple land uses in the community of Crosby centered on FM 2100 as it runs south to US Route 90.





The map below is of the same area, but it shows the number of sales that occurred in the 12 months prior to September 2017 and between September 2017 and June 2021.



The prices paid for sales located closest to the retail/commercial/non-residential properties will need to be analyzed to determine if they were affected by noise, traffic, aesthetic or safety concerns associated with living adjacent to such uses.

Any effect of proximity to commercial and other non-residential uses on single-family home prices will need to be analyzed on a neighborhood-by-neighborhood and property-by-property basis and such an effect will need to be distinguished from any effect from the Incident as well as from flooding during Hurricane Harvey.

### 3.16.7 RESIDENTIAL PROPERTY TRANSACTION DISCLOSURE INFORMATION

According to Section 5.008 of the Texas Property Code, sellers of single-unit residential real property must give purchasers a written notice containing their knowledge of the condition of the property, and sets forth language that should be on that form, focusing on material defects.[81] That language has been incorporated into a standard form created by the Texas Real Estate Commission (TREC), a state agency charged with overseeing the real estate market.[82]

---

[81] Section 5.008, Texas Property Code. Accessed at: https://statutes.capitol.texas.gov/Docs/PR/htm/PR.5.htm
[82] Bray, Ilona. "Selling a Texas Home: What are my Disclosure Obligations?" NOLO. Accessed at: https://www.nolo.com/legal-encyclopedia/selling-texas-home-disclosure-obligations.html

- Item number four on the disclosure form requires a seller to mark and explain if he/she knows about any hazard or toxic waste on the property.

- Item number nine requires the seller to disclose if there are any lawsuits directly or indirectly affecting the property as well as any condition on the property which materially affects the physical health or safety of an individual.

The MLS records for Named Plaintiff Nason's sale of his residence do not include a copy of such a disclosure document. However, a copy has recently been obtained for review.  That form is marked for no hazardous or toxic waste on the property and no disclosure of any lawsuits directly or indirectly affecting the property or any condition on the property which materially affects the physical health or safety of an individual.

MLS records for active listings occasionally do include disclosure information.  We have searched these listings.  As of September 1, 2021, there were 37 active listings of single-family homes within the Proposed Class Area that had disclosure statements attached to the listing in the HAR MLS. The following map shows the locations of each of the 37 properties.



Each of the 37 disclosure forms mark "No" to the following questions:



- **Section 3, Condition of the Property:** Are you (Seller) aware of any of the following conditions? Hazardous or Toxic Waste
- **Section 8, Are you (Seller) aware of any of the following:** Any lawsuits or other legal proceedings directly or indirectly affecting the Property?

None of the 37 disclosure forms mention the Arkema plant or proximity to the Arkema plant anywhere in the documents.

### 3.16.8  DAYS ON MARKET TRENDS

The graph below charts the average marketing times for the Proposed Class Area from the first quarter of 2014 through the third quarter of 2018.



The graph shows that there has been significant variability of marketing times (days on market) over the last four years, typically coinciding with seasonal market changes. However, there is also an emerging trend of decreasing volatility over the last four years, where seasonal peaks and troughs have become less pronounced. At the time of the events at the Arkema Facility and Hurricane Harvey in late August and early September 2017, average marketing time had been decreasing since the fourth quarter of 2016. After these events, there was a slight increase in average marketing time that was then followed by a slight decrease in the second and third



quarters of 2018, settling slightly below 50 days on market. While the limited amount of post-Incident data combined with Hurricane Harvey flooding makes any definitive basis for these trends uncertain, this trend is consistent with the larger recovery trends seen in Houston's housing market in the months after the storm.

That comparison again demonstrates the need for neighborhood-by-neighborhood and property-by-property analysis of possible increases in marketing times and the resulting contribution to a possible loss of use based on lost interest on reinvested funds.

The extended chart below continues to reflect the overall seasonality of the single-family home real estate market. However, with overall higher demand in real estate markets across the country, the proposed class area seems to reflect this, with a drop in marketing times in Q1 2021.



### 3.17  SUMMARY OF OPINIONS AND CONCLUSIONS CONCERNING DETERMINATION OF REAL PROPERTY DAMAGE ON A CLASS-WIDE BASIS

There is no real estate appraisal method to measure impairment that can be applied on a class-wide basis in this case through the use of common evidence. Even if all of the properties in the Proposed Class Area were actually impacted, there is no consistent, common methodology to measure impacts on property values as well as "loss of use and enjoyment" in the Proposed Class



Area given the large number of properties, the variety of land use types, the diversity in the flooding, variations in air dispersal, the varying levels of contaminants found on properties. From a real estate appraisal perspective, it is inappropriate to delineate a Proposed Class Area by including all 21,841 properties within the Proposed Class Area because it will not result in a fair, accurate, and reliable determination of damages if measured on a class-wide basis.

Neighborhood-by-neighborhood and property-by-property analysis will be necessary for the following reasons:

- There are 21,841 properties (parcels) in the Proposed Class Area, including over 12,959 residential properties, 3,227 vacant land parcels, over 103 exempt or publicly owned properties, 460 commercial/industrial/retail parcels, and 1,982 agricultural parcels. There is a wide variation in the way in which an environmental situation can potentially affect different types of real estate, and in particular, there is a wide variation in the possible effects on residential property as compared to commercial and industrial properties or vacant land.

- The appraisal profession has long recognized that the effects of an environmental situation, if any, on prices and values can change over time and are typically temporary rather than permanent. That means any alleged effect of the environmental situation on prices and values must be analyzed on various dates related to the circumstances of the investigation and resolution of the situation and the circumstances of individual sale prices.

- Because the levels of flooding and Incident-related property impacts, if any, vary across the Proposed Class Area, the impact, if any, of the Incident on prices and values will have varied over time and from one part of the Proposed Class Area to another.

- More than 597 single-family residential properties in the Proposed Class Area have been bought and sold since the Incident. Those sale prices must be individually analyzed – and likely appraised individually – to determine the effect, if any, from the Incident.

- Buyers and sellers of properties within the 1.5-mile Exclusion Zone affected by flooding are in a different situation than property owners in other portions of the Proposed Class Area. Sale prices paid for those properties must be separately analyzed on a property-by property-basis.

- The potential impact of the Incident on properties *that have not sold*, and the method for analyzing that impact, will be quite different than for properties that have sold since August of 2017.



- The method for analyzing the potential impact on properties that are rented is quite different from the method for analyzing owner-occupied properties and requires owners of rented properties to submit information on a property-by-property basis concerning actual rents and expenses before and after the Incident.

- Analysis of recent sale prices indicates that the potential effects of the Incident on prices and values in the Proposed Class Area must be analyzed on a neighborhood-by-neighborhood and property-by-property basis using a variety of different methods and techniques.

- Based on our preliminary analysis of the residential market in the Proposed Class Area any evidence regarding property prices or values in one area, one neighborhood, one house, or one property is not necessarily comparative proof that property prices and values in another area, neighborhood, house, or property in the Proposed Class Area, have similarly behaved.

- Loss of use, if any, and the effect, if any, of the Incident on marketability of property will also vary from neighborhood to neighborhood and from property to property.

- The real estate appraisal profession has long recognized that multiple regression modeling has only a limited role in assignments involving measuring the effects of environmental contamination. The most recent course of the Appraisal Institute states that regression modeling may sometimes be useful in measuring "the average differences between groups of properties (impacted and non-impacted neighborhoods)" but "it is **not** used for estimating individual property values."

- The limited number of commercial/retail, office, vacant land, and agricultural sales since August of 2017 means an accurate and reliable statistical model to determine market value for those categories of properties in the Proposed Class Area is not possible.

- As a result, the more than 5,772 commercial/retail, exempt/public, agricultural, vacant land, and industrial use properties (parcels) in the Proposed Class Area will need to be individually analyzed – and likely appraised individually – to determine the effect, if any, of the Incident on their market value.

All the above means that no "one size fits all" regression model or matched pairs analysis can be constructed that can fairly, accurately, and reliably estimate class-wide property values on all 21,841 parcels of real estate in the Proposed Class Area. The Proposed Class Area involves such a large number of properties encompassing such a wide geographic area, variety of land uses, physical characteristics, neighborhoods, other environmental or neighborhood concerns, and property ownership characteristics that neighborhood-by-neighborhood and property-by-property analysis is required.



*Updated and Revised Expert Report*                                        *Wheeler, et al. v. Arkema Inc.*
                                                                            *United States District Court*



**4. ADDENDA**



**4.1**    PREMISES OF THE APPRAISAL REVIEW AND APPRAISAL CONSULTING REPORT



### 4.1.1 DEFINITIONS IMPORTANT TO THE ASSIGNMENT

- **"Arkema Facility"** – The facility owned and operated by Arkema Inc. located on Crosby Eastgate Road in Crosby, Texas.

- **"Arkema Property"** – The contiguous real property parcels owned by Arkema Inc. on Crosby Eastgate Road in Crosby, Texas.[83]

- **"Complaint"** – The *Second Amended Class Action Complaint* filed on June 19, 2018 in *Wheeler, et al. v. Arkema Inc.,* Case No. 4:17-cv-2960, in the United States District Court for the Southern District of Texas.

- **"Exclusion Zone"** – All of the real property within 1.5 miles[84] of the Arkema Facility that was subject to an evacuation order from August 29, 2017 to September 4, 2018, as identified by local and regional officials.

- **"Incident"** – The series of events occurring from August 25, 2017 to September 4, 2017 at the Arkema Facility concurrent and associated with Hurricane Harvey, described in Addenda Item 9.3 to this report. We were requested by Arkema to accept as accurate and, to the extent necessary, to rely on the information set out in Section 1.4 of the 2018 JLL Report.

- **"Proposed Class"** – As defined in paragraph 74 of the Complaint, "All persons within seven miles of the Arkema facility in Crosby, Texas between August 29, 2017 and September 3, 2017 and/or who possessed a property interest in property located within 7 miles from the Arkema facility."

- **"Proposed Class Area"** – The area, as referenced in the Complaint, identified as all real property within 7 miles of the Arkema Facility in Crosby, Texas. For the purposes of this report and its maps, the Proposed Class Area includes all real property within seven miles of the boundaries of the Arkema Facility.

- **"Named Plaintiffs"** – The 15 individuals identified in the Complaint.

### 4.1.2 SUBJECT AND PURPOSE OF THE REPORT

The subject of this assignment includes all the real property owned or occupied by the purported members of the Proposed Class identified in the Complaint.

---

[83] Per Harris County Appraisal District records, the northernmost parcel that is part of the Arkema Property lists its owner as Atofina Chemicals, Inc., a precursor company to Arkema Inc.

[84] It is our understanding that, in actual practice, the Exclusion Zone boundaries may not have been uniformly set by government officials at 1.5 miles.



The Proposed Class is defined in the Complaint as follows: "All persons within seven miles of the Arkema facility in Crosby, Texas between August 29, 2017 and September 3, 2017 and/or who possessed a property interest in property located within 7 miles from the Arkema facility."[85] Crosby is a town in Harris County, Texas.

The purpose of this report is to examine whether there is a reliable methodology to determine the alleged damages, or impact, to real property attributable to the Incident on a class-wide basis through the use of a reliable method based on common evidence. The report also provides a review and analysis of the declaration on behalf of the Plaintiffs by John Kilpatrick PhD, MAI, dated July 16 2021 (the "Kilpatrick Report"), to assess whether the methods used by Dr. Kilpatrick are the product of reliable and applied principles and methods applicable to the field of real estate appraisal.

### 4.1.3   QUALIFICATIONS OF THE EXPERTS

The appraiser preparing this expert report is Gary R. Papke, MAI, CRE, FRICS. Mr. Papke is an Executive Vice President at JLL Valuation & Advisory Services, which is part of Jones Lang LaSalle, one of the largest full-service real estate firms in the world, with offices in more than 80 countries. Between 1988 and 2017, Mr. Papke was Senior Vice President of Clarion Associates, Inc., one of the most experienced firms in the United States in evaluating the relationship between sources of environmental contamination and environmental risks, and real estate prices, values, and marketability. Mr. Papke has more than 30 years of experience in the evaluation of the impact of various types of environmental situations and environmental risk on real estate prices, markets and values. Mr. Papke and Clarion Associates, Inc. merged into Jones Lang LaSalle in November of 2017.  Mr. Papke works nationally out of the Chicago office of JLL Valuation & Advisory Services, LLC.

In 1993, the Appraisal Institute selected Mr. Papke to co-develop with one of his colleagues the first educational seminar and course materials on valuation of contaminated properties, entitled *Environmental Risk and the Real Estate Appraisal Process*. Mr. Papke has taught the course across the country. In 2001, he updated that Appraisal Institute seminar, now renamed *Appraising Environmentally Contaminated Properties: Understanding and Evaluating Stigma*. The latest 2010 environmental seminar on that topic from the Appraisal Institute incorporates much of the earlier 2001 seminar developed by Mr. Papke and his former Clarion colleague, Richard J. Roddewig.

Mr. Papke has authored or co-authored articles in a variety of professional journals, including *The Appraisal Journal.* Among those articles is "Determining Real Estate Damages from Natural Disasters: Real Estate Counseling in Class Action Litigation – Lessons from Hurricane Katrina" published in *Real Estate Issues* in 2012.[86]

---

[85] Complaint, Paragraph 74.

[86] Richard J. Roddewig, CRE, MAI, FRICS, Charles T. Brigden, CRE, ASA, FRICS, and Gary R. Papke, CRE, MAI, FRICS, AICP, "Determining Real Estate Damages from Natural Disasters: Real Estate Counseling in Class Action Litigation – Lessons from Hurricane Katrina," *Real Estate Issues*, Vol. 37, No. 1 and 2, 2012, at 77.



Mr. Papke has determined the impact on market value and real estate markets of a wide variety of contamination types and environmental risks resulting from both on-site and off-site sources. Among the states in which he has worked on such assignments are the following: Alaska, Hawaii, California, Illinois, Indiana, Iowa, Maryland, Michigan, Wisconsin, Louisiana, Mississippi, Florida, Georgia, South Carolina, Washington, Massachusetts, Maine, and Missouri. He has investigated the real estate impacts of such environmentally sensitive activities as oil spills, industrial emissions and contamination, sanitary landfills, hazardous waste disposal sites, quarries, electrical transmission lines, and airports. He has analyzed the impact on property values resulting from groundwater contamination, soil contamination, vapor intrusions, and air emissions. Among the types of hazardous or toxic materials potentially affecting the market values of properties analyzed by Mr. Papke to determine their real estate market impacts have been the following: lead, heavy metals, chlorinated solvents, PCBs, furans and dioxins, crude oil, fuel oil, diesel fuel, TCE/PCE, and various polyaromatic hydrocarbons (PAHs) and volatile organic compounds (VOCs) including MTBE.

Mr. Papke holds the MAI designation from the Appraisal Institute (the largest organization of professional real estate appraisers in the United States) and the Counselor of Real Estate (CRE) designation from The Counselors of Real Estate. Mr. Papke has more than 30 years' experience as a real estate appraiser. He has also been designated as a Fellow of the Royal Institution of Chartered Surveyors (FRICS) headquartered in London.

The types of properties Mr. Papke has analyzed or appraised in relationship to environmental contamination or environmental risks potentially affecting their marketability or value include the following: single-family homes, apartment buildings, townhouses, hotels, nursing homes, office buildings, industrial plants, warehouses, gas stations, shopping centers, landfills, and undeveloped land (residential, commercial, retail, industrial and agricultural).

Mr. Papke also regularly conducts appraisal review assignments for a wide variety of clients and attorneys in litigation. Many of these involved properties potentially impacted by contamination and environmental risks.

Mr. Papke has the qualifications and experience to prepare an appraisal consulting report related to the impact on prices and values from the Incident during and following the weather-related events of August and September of 2017 and is, therefore, competent to undertake this assignment under the *Uniform Standards of Professional Appraisal Practice*.

A more complete description of the qualifications of the appraiser, as well as information regarding compensation for services is included in the Addenda.

Thomas W. Hamilton holds the Fogelson Distinguished Chair of Real Estate in the Chicago School of Real Estate at Roosevelt University in Chicago and previously was a Commercial Real Estate Professor in the Shenehon Center for Real Estate at the University of St. Thomas in Minneapolis. Dr. Hamilton has developed and taught numerous real estate economics and statistics courses at both Roosevelt University in Chicago, Illinois and at the University of St. Thomas in Minneapolis,



Minnesota. He was on the development team and has frequently taught the five-day Appraisal Institute course Quantitative Analysis for real estate appraisers.

In addition to his academic position at Roosevelt University, Dr. Hamilton is also a Senior Vice President with Jones Lang LaSalle (JLL) Valuation & Advisory Services, LLC. In that capacity, he is often engaged in assignments in which the application of statistical techniques is a significant part of the work being analyzed. Prior to joining JLL in 2019, he was engaged as an expert witness and consultant in a variety of real estate related statistical studies for various tax assessment jurisdictions across the United States.

Dr. Hamilton's academic credentials include a Doctor of Philosophy in Urban Land Economics and a Master of Science in Real Estate from the University of Wisconsin-Madison School of Business and a Master of Science in Finance from the University of Wyoming. He also holds numerous real estate professional credentials, including the MAI designation from the Appraisal Institute, the CRE designation from the Counselors of Real Estate, and the FRICS designation from the Royal Institution of Chartered Surveyors. Dr. Hamilton is also a professionally licensed real estate appraiser in the State of New Hampshire and other states.

Over the past 30+ years, Dr. Hamilton has published more than 20 refereed, academic and professional journal articles on valuation, authored textbook chapters on the cost of capital, and has provided expert witness testimony on valuation matters across the country. He has been a member of the peer review panel of The Appraisal Journal as well as being a reviewer of statistical concepts for the Journal for the past 8 years. In addition to these roles, during 2011 and 2012 Dr. Hamilton was a development team member of the Appraisal Institute's Quantitative Analysis course required of all candidates for the MAI designation and is currently a contributing author to the Mathematics and Statistics section of the forthcoming 7th Edition of The Dictionary of Real Estate Appraisal. A complete description of his qualifications is included in the Addenda.

### 4.1.4   CLIENT AND INTENDED USE AND USERS OF THIS REPORT

This appraisal review and consulting report has been prepared for Arkema in the case captioned *Wheeler, et al. v. Arkema Inc.,* Case No. 4:17-cv-2960, U.S. District Court for the Southern District of Texas, Houston Division (hereinafter, the "Wheeler case"). This report was prepared for the Defendant at the request of K&L Gates, attorneys for the Defendant. This report is intended to be used in the judicial proceedings.

The intended users of this consulting report are the United States District Court handling the litigation, the parties to the litigation, and their respective attorneys and other representatives.

### 4.1.5   PURPOSES OF THE ASSIGNMENT

The purposes of the appraisal consulting assignment may be summarized as follows:



- To determine the number of properties in the Proposed Class Area and to classify them by type of use;

- To describe any variability in the facts and circumstances of the environmental situation during and after the Hurricane Harvey-related weather event in late August and early September 2017 as it applies to the Proposed Class Area and solely as it relates to any impact on real property valuation;

- To explain the appraisal profession's generally accepted principles and findings as to whether the effects on prices and values, if any, from sudden events such as flooding or dispersal of contaminants by wind or flooding are typically temporary, rather than permanent, whether they vary from property to property, and whether they end when the buyers' marketplace considers the environmental situation to have been properly addressed;

- To summarize the response, to date, related to investigation and characterization of environmental conditions within the Proposed Class Area related to the Hurricane Harvey weather events and the Incident;

- To show by example how the effects, if any, of the environmental situation on prices and values will vary from neighborhood to neighborhood and from property to property within the Proposed Class Area;

- To summarize whether the diversity of land uses and factors affecting prices and values of the 21,841 properties in the Proposed Class Area means that neighborhood-by-neighborhood and for many, if not most properties, a property-by-property individualized analysis rather than a class-wide "one size fits all" multiple regression or paired sales model is necessary to a fair and equitable calculation of alleged property damages and loss of use and enjoyment; and

4. To prepare a review of the July 16, 2021 report of Dr. John Kilpatrick and assess whether the methods used by Dr. Kilpatrick are appropriate based on principles and methods applicable to the appraisal of real estate affected by environmental contamination; to assess the completeness, accuracy, relevance and reasonableness of the analysis performed; and to assess whether it provides a credible basis for his opinions regarding the diminution of the market value of single-family residential improved properties in the Proposed Class Area.

### 4.1.6   SCOPE OF THE ASSIGNMENT

USPAP defines scope of work as "the type and extent of research and analyses in an assignment." Additionally, *The Appraisal of Real Estate* includes the following discussion of the importance of the scope of work to an appraisal assignment:



"Scope of work for an assignment is acceptable if it leads to credible assignment results, is consistent with the expectations of parties who are regularly intended users for similar assignments, and is consistent with what the actions of the appraiser's peers would be in the same or similar assignment," (*The Appraisal of Real Estate*, 14th Edition, page 87).

The scope of this appraisal consulting assignment involved the following:

- Conversations and meetings with attorneys for the Defendant and review of the Complaint and other pleadings and documents filed in the litigation;

- Inspections of the Proposed Class Area and adjacent and nearby neighborhoods outside the Proposed Class Area;

- Inspection of the Arkema Facility;

- The use of Geographic Information Systems (GIS) mapping of the Proposed Class Area, adjacent and nearby market areas, sales and rental data, Hurricane Harvey flooding conditions, and various other factors relevant to the real estate market and real estate damages;

- Review of U.S. Census data including the *American Community Survey*, 2012-2016;

- Review of newspaper and other reports and information concerning the weather-related events accompanying Hurricane Harvey, the Incident, the Exclusion Zone and evacuation, and the environmental situation following Hurricane Harvey and the Incident, in the Proposed Class Area and at the Arkema Facility itself;

- Collection and analysis of real estate transaction data for the three counties in the Proposed Class Area (Harris, Liberty, and Chambers) from the Houston Association of Realtors' Multiple Listing Service database;

- Research related to the properties owned by the Named Plaintiffs specifically identified in the Complaint and review of Named Plaintiffs' responses to interrogatories and deposition transcripts;

- Review of the Kilpatrick Report regarding methods, accuracy, and compliance with accepted practices and standards for real estate appraisal and the analysis of impacts of environmental contamination on market value;

- Review of other expert reports prepared by: Dr. William Auberle, Dr. Marco Kaltofen, Marc Glass, Dr. Richard Troast, Dr. Charles L. Werntz, and Lawrence M. Stanton, for the Plaintiffs; and Dr. Glenn Millner, Dr. Scott Stout, Dr. Wayne Thomann, and Dr. Mark Yocke for the Defendant;

- Research and analysis concerning the Houston real estate market, before and since Hurricane Harvey, in consultation with Houston-based JLL staff;



- Review of the *Uniform Standards of Professional Appraisal Practice* (USPAP), including the 2020-21 Edition;

- Review of books, publications and seminars of the Appraisal Institute, including articles published in *The Appraisal Journal* and in other recognized publications that deal with the appraisal of properties potentially impacted by various types of environmental conditions, impairments and detrimental conditions; and

- Review of the 15th Edition of *The Appraisal of Real Estate* and the 6th Edition of *The Dictionary of Real Estate Appraisal*, both published by the Appraisal Institute.

### 4.1.7   DATE OF VALUE IN THE REPORT REVIEWED

The stated effective date of value of the report reviewed is August 2017.[87]

### 4.1.8   DATE OF REPORT SUBMISSION

This Appraisal Review Report and Real Property Appraisal Consulting Report is submitted on September 17, 2021.

Our original assignment in this matter began in August 2018 and our report was submitted in October 2018.  Our current work began in July 2021 and this report is submitted as of September 2021.

---

[87] Kilpatrick Report, p. 44.



### 4.1.9   DEFINITIONS IMPORTANT TO THE ASSIGNMENT

### 4.1.9.1   MARKET VALUE

The standards of professional practice require appraisers testifying in litigation to use the definition of market value in use by the jurisdiction and courts in which they will be testifying. The *Uniform Standards of Professional Appraisal Practice* (2020-2021) says the following: "Appraisers are cautioned to identify **the exact definition of market value, and its authority, applicable in each appraisal** completed for the purpose of market value."[88]

The 14th Edition of *The Appraisal of Real Estate* states: "It is important to note that USPAP does not provide a citable definition of market value."[89] *The Appraisal of Real Estate* continues: "Citable definitions of market value can be found in state and federal regulations, laws, or publications." It further states that: "Client wishes or instructions do not change the basic requirement that the appraiser must identify an appraisal's intended use and cite an appropriate definition of market value for that use. **Appraisers must understand why a particular definition of market value should be used**, apply that definition according to established standards, and communicate these requirements clearly to the clients they serve."

Appraisal Standards Board Advisory Opinion 22 (AO-22) has made clear that real estate appraisers testifying in litigation are expected to use the definition of market value in use by the jurisdiction and courts in which they will be testifying:

> "The source (of the definition of market value) **must be consistent with the jurisdiction** having authority over the transaction in which the appraisal is to be used… Likewise, if an appraisal is prepared for use in litigation, using a definition of value other than the definition specified by the court having jurisdiction over the matter being litigated may disqualify that appraisal for use in that court."[90]

This requirement of using the current jurisdictional definition of market value is also addressed in *Real Estate Valuation in Litigation* (Second Edition) published by the Appraisal Institute. Although the primary focus of that book is eminent domain trials, the following is a professional appraisal responsibility in all cases:

> "If an appraisal is to be valid for condemnation purposes, the appraiser must use a definition of market value that is acceptable to the courts where the condemnation trial on the property will be held. *Thus it is imperative that the real estate appraiser be aware of the applicable market value definition and include it*

---

[88] USPAP, 2018-2019 Edition, Definitions, p. 5, Lines 148-149.  
[89] *The Appraisal of Real Estate*, 14th Edition, The Appraisal Institute, 2013, at 59.  
[90] Advisory Opinion 22 (AO-22), SUBJECT: Scope of Work in Market Value Appraisal Assignments, Real Property, issued July 10, 2000, USPAP, 2018-2019 Edition, p. 128, lines 96-101.



in the appraisal report; otherwise the entire appraisal report and/or the appraiser's testimony may be rejected.*"[91] (Emphasis added)

The Texas definition of market value can be found in Texas Tax Code 1.04, Subdivision 7:

> "Market value" means the price at which a property would transfer for cash or its equivalent under prevailing market conditions if: (A) exposed for sale in the open market with a reasonable time for the seller to find a purchaser; (B) both the seller and the purchaser know of all the uses and purposes to which the property is adapted and for which it is capable of being used and of the enforceable restrictions on its use; and (C) both the seller and purchaser seek to maximize their gains and neither is in a position to take advantage of the exigencies of the other."[92]

This Texas definition of market value does not address some of the issues also addressed in the following definition of market value indicated as the "most widely accepted" by the 14th Edition of *The Appraisal of Real Estate* published by the Appraisal Institute:

> "The most probable price, as of a specified date, in cash, or in terms equivalent to cash, or in other precisely revealed terms, for which the specified property rights should sell after reasonable exposure in a competitive market under all conditions requisite to a fair sale, with the buyer and seller each acting prudently, knowledgeably, and for self-interest, and assuming that neither is under undue duress."

In addition, the Texas Pattern Jury Charge PCJ 203.1 defines "market value" as: "the amount that would be paid in cash by a willing buyer who desires to buy, but is not required to buy, to a willing seller who desires to sell but is under no necessity of selling."

*The Dictionary of Real Estate Appraisal* goes on to state that the definition applied must relate to the property rights considered in the appraisal report.[93]

> *For purposes of this Report, it has been assumed that the potentially-applicable Texas definitions of "market value" are consistent with the definition of market value in the 14th Edition of The Appraisal of Real Estate.*

However, this appraisal consulting assignment does not include the appraiser's opinion of the market value of any specific properties in the Proposed Class Area.

---

[91] J.D. Eaton, MAI, SRA, "Real Estate Valuation in Litigation," 2d Ed., The Appraisal Institute, Chicago, 1995, at 19.
[92] Texas Tax Code § 1.04
[93] *The Dictionary of Real Estate Appraisal*, 6th Edition, The Appraisal Institute, 2015, at 142.



### 4.1.9.2   APPRAISAL REVIEW

The "Definitions" Section of USPAP defines an "appraisal review" as "the act or process of developing and communicating an opinion about the quality of another appraiser's work."

### 4.1.9.3   TYPE OF APPRAISAL REVIEW CONDUCTED AND REPORT FORMAT

The Appraisal Institute differentiates between a "desk review" and a "field review."

A desk review is defined by *The Dictionary of Real Estate Appraisal* (5th Edition) as follows:

> "An appraisal review that is limited to the data presented in the report which may or may not be independently confirmed. Generally performed using a checklist of items. The reviewer checks the accuracy of calculations, the reasonableness of data, the appropriateness of methodology, and compliance with client guidelines, regulatory requirements, and professional standards."

A field review" is defined by The Dictionary of Real Estate Appraisal (5th Edition) as follows:

> "A valuation review that includes inspection of the exterior and sometimes the interior of the subject property and possibly inspection of the comparable properties to confirm the data provided in the report. Generally performed using a checklist that covers the items examined in a desk review and may also include confirmation of market data, research to gather additional data, and verification of the software used in preparing the report."

This appraisal review assignment, as undertaken by JLL Valuation & Advisory Services, therefore, involves a field review because JLL staff inspected the property that is the subject of the work under review and its neighborhood location and market area in connection with 2018 report.

This appraisal review assignment does not include the reviewer's own opinions of the market value of the subject property. Instead, it identifies the errors and inconsistencies in the Kilpatrick Report that cause it to be unreliable and without credibility and presents the effect on the indicated market values of the subject properties once those errors are corrected.

This report has been researched and written in conformity with the requirements of the Code of Ethics of the Appraisal Institute and the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation. The report is subject to the statement of assumptions and limiting conditions included in it, if any. Neither the JLL Valuation & Advisory Services LLC name, nor the material submitted in the report may be included in any prospectus or used in offerings or representations in connection with the sale of real estate, securities, or participation interests to the public, without our written consent.



This report describes the property and components of the appraisal review, and it contains the pertinent data considered in reaching our review opinions. Please be advised, however, that this appraisal review incorporates by reference some of the data and information about the subject property contained in the Kilpatrick Report. Therefore, this appraisal review report should be read only in conjunction with the Kilpatrick Report itself.

Additional information about the property and data related to our analysis and opinions is retained in our files.

### 4.1.9.4   ENVIRONMENTAL CONTAMINATION AND IMPAIRED VALUE

Advisory Opinion 9 (AO-9) published by the Appraisal Standards Board contains a number of important definitions, including the following that are specifically applicable to this assignment:

> **"Environmental Contamination**: Adverse environmental conditions resulting from the release of hazardous substances[94] into the air, surface water, groundwater or soil. Generally, the concentrations of these substances would exceed regulatory limits established by the appropriate federal, state, and/or local agencies.
>
> **Impaired Value**: The market value of the property being appraised with full consideration of the effects of its environmental condition and the presence of environmental contamination on, adjacent to, or proximate to the property. Conceptually, this could be considered the "as is" value of a contaminated property.
>
> **Remediation Lifecycle**: A cycle consisting of three stages of cleanup of a contaminated site: before remediation or cleanup; during remediation; and after remediation. A contaminated property's remediation lifecycle stage is an important determinant of the risk associated with environmental contamination. Environmental risk can be expected to vary with the remediation lifecycle stage of the property."[95]

### 4.1.10   EXTRAORDINARY ASSUMPTIONS AND HYPOTHETICAL CONDITIONS USED IN THE REPORT

This appraisal review and appraisal consulting report does not employ any extraordinary assumptions or hypothetical conditions.

---

[94] AO-9 does not contain a definition of the term "hazardous substance." However, the Appraisal Institute's book entitled *Real Estate Damages: An Analysis of Detrimental Conditions* contains the following definition of the term "hazardous substance": "A material that is determined by qualified engineers to be poisonous, reactive, flammable, corrosive, toxic, or that has been designed (sp.) as such by a governmental or regulatory agency."
[95] USPAP, 2020-2021 Edition, Advisory Opinion 9 (AO-9), p. 77-78.



**4.2**   CERTIFICATION



## CERTIFICATION

WE CERTIFY that, to the best of our knowledge and belief:

-the facts and data reported by the appraisers signing this appraisal review and appraisal consulting report ("this report")  and used in the review and consulting process are true and correct;

-the analyses, opinions, and conclusions in this report are limited only by the assumptions and limiting conditions stated in this report and are our personal, impartial, and unbiased professional analyses, opinions, and conclusions;

-we have no present or prospective interest in the properties that are the subject of this report and no personal interest or bias with respect to the parties involved;

-our engagement in this assignment was not contingent upon developing or reporting predetermined results;

-our compensation is not contingent on any action or event resulting from the analyses, opinions, or conclusions in this report or from its use;

-the reported analyses, opinions, and conclusions were developed and this report was prepared, in conformity with the requirements of the Code of Professional Ethics & Standards of Professional Appraisal Practice of the Appraisal Institute, which include the *Uniform Standards of Professional Appraisal Practice*;

-we have performed no other services, as appraisers or in any other capacity, related to the specific properties that are the subject of this assignment within the three years prior to beginning our work;

-the use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives;

-no one other than the undersigned prepared the analyses, conclusions and opinions concerning the real estate that are set forth in this report. Gary R. Papke inspected the Proposed Class Area that is subject of the report in August 2018;

-the Appraisal Institute conducts a continuing education program for its members. As of the date of this report, Gary R. Papke and Thomas W. Hamilton have completed requirements of the continuing education program of the Appraisal Institute;

-Gary R. Papke is permanently licensed and certified as a general real estate appraiser in the state of Illinois. He holds a temporary appraisal license in Texas for purposes of this assignment;



-Thomas W. Hamilton is permanently licensed and certified as a general real estate appraiser in the state of Minnesota and other states.

-professional assistance in the preparation of this report was provided by the following: Anne Baxendale, Margo La Clair, Parker Hayes, Hayley Scheid and Garrett Mickal of JLL Valuation & Advisory Services, LLC, all of whom assisted in mapping the Proposed Class Area, collection of data related to the properties in the Proposed Class Area, collecting and downloading multiple listing service sales data, gathering other market-related data, reviewing published literature, and preparing maps, charts and graphs.

Respectfully submitted,

**Electronic PDF Copy**

JLL VALUATION & ADVISORY SERVICES LLC

| | |
|---|---|
| Gary R. Papke, MAI, CRE, FRICS | Thomas W. Hamilton, PhD, MAI, CRE, FRICS |
| Executive Vice President | Senior Vice President |
| JLL Valuation & Advisory Services LLC | JLL Valuation & Advisory Services LLC |
| Illinois Certified General Real Estate Appraiser  No. 553.000812, expires 9/30/21 | Minnesota Certified General Real Estate Appraiser No. 40653406, expires 8/31/2023 |

Texas Non-Resident Temporary
Appraiser Registration No. TX 5075

Report Date:   September 17, 2021



**4.3**  ASSUMPTIONS AND LIMITING CONDITIONS



## ASSUMPTIONS AND LIMITING CONDITIONS

The opinions in this Appraisal Review and Appraisal Consulting Report ("this report") are expressly subject to the following assumptions and limiting conditions:

1. This report assumes no responsibility for matters of a legal nature. It is assumed that title to the properties is marketable and any legal description provided is correct. No separate review of legal descriptions has been undertaken in this review and consulting process. It is also assumed that title to the properties involved in any sales considered in this appraisal was also marketable and that any legal description furnished is correct.

2. This report assumes that the properties involved are under responsible ownership and competent and efficient management, and free and clear of all liens and encumbrances unless otherwise noted in this report.

3. This report assumes that there are no hidden or non-apparent physical conditions affecting value. No liability is assumed for the soundness of structural members or equipment or suitability of soil conditions for construction, since no engineering tests were made other than those conducted for purposes of revealing environmental conditions of properties in the Proposed Class Area.

4. Improvements, if any, are considered to be within lot lines and in accordance with local zoning and building ordinances, unless otherwise stated. We have also assumed that any plats, diagrams or drawings provided are not meant to be used as references in matters of survey, as no survey was made by the appraiser, and no responsibility was assumed by the appraiser regarding questions of survey. The same caveats apply to any additional maps, plans, sketches and GIS information in this review report.

5. This report also assumes that all applicable zoning and use regulations and restrictions have been complied with except any planning and zoning permits not yet obtained and discussed in this report.

6. This report assumes that utilization of the land and improvements of any properties involved in the appraisal assignment are within lot lines or boundaries of the property described.

7. Any information and data received from others in the course of this assignment (other than from the appraiser whose report is being reviewed) is believed to be reliable; however, no warranty is given for its accuracy.

8. Other than in the litigation for which this report is being submitted, the authors of this report shall not be required to give further consultation or testimony, or appear in court,



by reason of this report with reference to the properties that are the subject of the appraisal unless previous arrangements have been made to that effect.

9.  Disclosure of the contents of this report is governed by the By-Laws and Regulations of the Appraisal Institute. Possession of this report, or a copy thereof, or any part thereof, does not carry with it the right of publication, nor may it be used by anyone but the party for whom it has been prepared or in the legal proceedings for which it has been produced, without the previous written consent of the appraisers. Any use of the report outside of the legal proceedings for which the report has been produced must be undertaken with proper written qualification and the report must be used only in its entirety.

10. Neither all nor any part of the contents of this report (especially the identity of the appraiser) shall be disseminated to the public through advertising, public relations, news, sales, or other media without the prior written consent and approval of the appraiser, except by the client and its counsel for whom this appraisal has been prepared as part of the legal proceedings for which it has been produced.

11. This report is intended to be read and to be used as a whole and not in parts. Separation of any section or page from the main body of the report, in the absence of specific authorization from the signers, is expressly forbidden and will be considered as invalidating the report.

12. The professional fees paid for preparing this report were not based in whole or in part on the amount of the appraised value of the underlying properties or upon the outcome of the legal proceedings for which it has been produced. Rather, professional fees have been based upon an hourly reimbursement basis at our hourly rates in effect on the date the work was performed plus reimbursements for costs and expenses associated with research, travel and report production.

13. Effective January 26, 1992, the Americans with Disabilities Act (ADA) established requirements intended to make most privately operated, non-residential buildings accessible to and usable by disabled persons. We have not undertaken a specific compliance survey and analysis of any of the properties that are the subject of the assignment to determine whether or not or to what extent those properties conform to the provisions of the ADA. Such a survey and detailed analysis of ADA requirements could reveal that the properties do not comply with the act in one or more respects. We have assumed that the properties either are in compliance or that measures can be taken to remove architectural barriers or otherwise achieve compliance at minimal cost.

14. *Special Assumption: For purposes of this Report, it has been assumed that the potentially applicable Texas definitions of "market value" are consistent with the definition of market value in the 15th Edition of The Appraisal of Real Estate.*



15. *Limiting Condition: Unless otherwise noted in this report, no responsibility is assumed for detecting the existence of any structural, mechanical or utility defects or deficiencies, or the presence of hazardous substances such as but not limited to radon gas, asbestos, natural or artificial radiation, or toxic substances of any description, whether on or off the premises, other than those readily apparent from a visual inspection of the property. The appraiser is not qualified to test for the presence of such factors and does not assume responsibility for the engineering or scientific knowledge or expertise required to discover them. However, the appraiser has reviewed and considered publicly available information related to the environmental situation in the Proposed Class Area resulting from the weather events related to Hurricane Harvey that is the subject of the litigation in which this report is being submitted.*

16. *Limiting Condition: The Appraisal Review Report which is intended to comply with the reporting requirements set forth under Standards 3 and 4 of the Uniform Standards of Professional Appraisal Practice for an Appraisal Review. The depth of discussion contained in this report is specific to the needs of the client and for the intended use stated herein. The review appraiser is not responsible for unauthorized use of this report.*



Case 4:17-cv-02960 Document 256-9 Filed on 09/27/21 in TXSD Page 131 of 159

*Updated and Revised Expert Report*                                         *Wheeler, et al. v. Arkema Inc.*
*United States District Court*

**4.4    USPAP ADVISORY OPINION (AO-9)**

126



| | STANDARDS | OPINIONS | FAQs |

## ADVISORY OPINION 9 (AO-9)

This communication by the Appraisal Standards Board (ASB) does not establish new standards or interpret existing standards. Advisory Opinions are issued to illustrate the applicability of appraisal standards in specific situations and to offer advice from the ASB for the resolution of appraisal issues and problems.

**SUBJECT: The Appraisal of Real Property That May Be Impacted by Environmental Contamination**

**APPLICATION: Real Property**

**THE ISSUE:**

Appraisals of contaminated properties, or properties suspected of being contaminated, are sometimes developed using either a hypothetical condition or an extraordinary assumption that the property is free of the contamination. While this is acceptable practice under certain conditions and for certain intended uses, there are assignments that require an appraisal of the "as-is" condition of the property, with full consideration of the effects of environmental contamination. In these assignments, the appraiser is asked to analyze the effects of known environmental contamination on the value of the subject property.

How does an appraiser comply with USPAP when appraising properties that may be impacted by environmental contamination?

**ADVICE FROM THE ASB ON THE ISSUE:**

**Relevant USPAP & Advisory References**

- DEFINITIONS, specifically the definitions of

  - *EXTRAORDINARY ASSUMPTION: an assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions.*

    *Comment: Uncertain information might include  physical, legal, or economic characteristics of the subject property; or conditions external to the property, such as market conditions or trends; or the integrity of data used in an analysis.*

  - *HYPOTHETICAL CONDITION: a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis.*

    *Comment: Hypothetical conditions are contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis.*

- ETHICS RULE, particularly:

    *Conduct: An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests .... An appraiser must not communicate assignment results with the intent to mislead or to defraud.*

- COMPETENCY RULE:

    *An appraiser must: (1) be competent to perform the assignment; (2) acquire the necessary competency to perform the assignment; or (3) decline or withdraw from the assignment. In all cases, the appraiser must perform competently when completing the assignment.*

- Standards Rule 1-1(a):

    *In developing a real property appraisal, an appraiser must: (a) be aware of, understand, and correctly employ those recognized methods and techniques that are necessary to produce a credible appraisal;*

- Standards Rule 1-2(e):

    *In developing a real property appraisal, an appraiser must: (e) identify, from sources the appraiser reasonably believes to be reliable, the characteristics of the property that are relevant to the type and definition of value and intended use of the appraisal....*

76     **GO BACK**     Advisory Opinions 2020-2021 Edition
© The Appraisal Foundation



STANDARDS   OPINIONS   FAQs

**ADVISORY OPINION 9**

- Standards Rule 1-2(f) and (g):

  *In developing a real property appraisal, an appraiser must: (f) identify any extraordinary assumptions necessary in the assignment; and (g) identify any hypothetical conditions necessary in the assignment.*
- Standards Rule 1-3(b):

  *When necessary for credible assignment results in developing a market value opinion, an appraiser must: (b) develop an opinion of the highest and best use of the real estate.*
- Standards Rule 1-4:

  *In developing a real property appraisal, an appraiser must collect, verify, and analyze all information necessary for credible assignment results.*

**Competency and Related Issues**

Consistent with Standards Rule 1-1(a): in the appraisal of a property as impacted by environmental contamination, an appraiser must *be aware of, understand, and correctly employ those recognized methods and techniques necessary to produce a credible appraisal*. Accordingly, an appraiser must have the requisite knowledge about appropriate methods, and be able to assemble the required information. An appraiser who lacks knowledge and experience in analyzing the impact of environmental contamination on the value of real property must take the steps necessary to complete the assignment competently, as required by the COMPETENCY RULE. However, an appraiser need not be an expert on the scientific aspects of environmental contamination, and in most situations the appraiser will utilize scientific and other technical data prepared by others, such as environmental engineers. In these situations, the appraiser should utilize an extraordinary assumption regarding the information obtained from other experts that is used in the appraisal.[1] Examples of such information include items (1) to (10) under the header titled "Relevant Property Characteristics" later in this Advisory Opinion. This is especially important in situations where there is conflicting information about such information.

**Specialized Terms and Definitions**

The appraisal of properties that may be impacted by environmental contamination involves specialized terms and definitions that might not be used in an appraisal assignment in which the effect of the property's environmental condition is not analyzed, or when the property is not contaminated. Though it is recognized that there are other valid definitions of these and similar terms, for purposes of this Advisory Opinion, the following definitions apply:

**Diminution in Value (Property Value Diminution):** The difference between the unimpaired and impaired values of the property being appraised. This difference can be due to the increased risk and/or costs attributable to the property's environmental condition.

**Environmental Contamination:** Adverse environmental conditions resulting from the release of hazardous substances into the air, surface water, groundwater or soil. Generally, the concentrations of these substances would exceed regulatory limits established by the appropriate federal, state, and/or local agencies.

**Environmental Risk:** The additional or incremental risk of investing in, financing, buying and/or owning property attributable to its environmental condition. This risk is derived from perceived uncertainties concerning:

1)   the nature and extent of the contamination;
2)   estimates of future remediation costs and their timing;
3)   potential for changes in regulatory requirements;
4)   liabilities for cleanup (buyer, seller, third party);
5)   potential for off-site impacts; and
6)   other environmental risk factors, as may be relevant.

**Environmental Stigma:** An adverse effect on property value produced by the market's perception of increased environmental risk due to contamination. (See Environmental Risk.)

**Impaired Value:** The market value of the property being appraised with full consideration of the effects of its environmental condition and the presence of environmental contamination on, adjacent to, or proximate to the property. Conceptually, this could be considered the "as-is" value of a contaminated property.

---

1    See Standards Rule 1-2(f).

Advisory Opinions 2020-2021 Edition
© The Appraisal Foundation

GO BACK

77



*Updated and Revised Expert Report*

*Wheeler, et al. v. Arkema Inc.*
*United States District Court*

STANDARDS   OPINIONS   FAQs

**ADVISORY OPINION 9**

**Remediation Cost:** The cost to cleanup (or remediate) a contaminated property to the appropriate regulatory standards. These costs can be for the cleanup of on-site contamination as well as mitigation of off-site impacts due to migrating contamination.

**Remediation Lifecycle:** A cycle consisting of three stages of cleanup of a contaminated site: before remediation or cleanup; during remediation; and after remediation. A contaminated property's remediation lifecycle stage is an important determinant of the risk associated with environmental contamination. Environmental risk can be expected to vary with the remediation lifecycle stage of the property.

**Source, Non-source, Adjacent and Proximate Sites:** Source sites are the sites on which contamination is, or has been, generated. Non-source sites are sites onto which contamination, generated from a source site, has migrated. An adjacent site is not contaminated, but shares a common property line with a source site. Proximate sites are not contaminated and not adjacent to a source site, but are in close proximity to the source site.

**Unimpaired Value:** The market value of a contaminated property developed under the hypothetical condition that the property is not contaminated.

**Relevant Property Characteristics**
The appraisal of a property that includes the effects of environmental contamination on its value usually requires data not typically used in an appraisal of an otherwise similar but uncontaminated property or an appraisal of a potentially impacted property using either a hypothetical condition or an extraordinary assumption that it is uncontaminated or not impacted. The inclusion of these additional relevant property characteristics is consistent with Standards Rule 1-2(e). The relevant property characteristics may include, but are not limited to:

1) whether the contamination discharge was accidental or permitted;
2) the status of the property with respect to regulatory compliance requirements;
3) the remediation lifecycle stage (before, during or after cleanup) of the property as of the appraisal date;
4) the contamination constituents (petroleum hydrocarbons, chlorinated solvents, etc.);
5) the contamination conveyance (air, groundwater, soil, etc.);
6) whether the property is a source, non-source, adjacent or proximate site;
7) the cost and timing of any site remediation plans;
8) liabilities and potential liabilities for site cleanup;
9) potential limitations on the use of the property due to the contamination and its remediation; and
10) potential or actual off-site impacts due to contaminant migration (for source sites).

Since the appraiser is usually not an expert on the scientific aspects of contamination, experts from other fields will typically provide this information. Appropriate regulatory authorities should also be consulted to confirm the presence or absence of contamination. The appraiser should consider the use of extraordinary assumptions when this information serves as a basis for an opinion of value. The appraiser should also collect similar data for any comparable sales used in the analysis.

**Valuation Issues – As If Unimpaired**
In some assignments, the appraiser may be asked to appraise a property known to be contaminated under the *hypothetical condition* that the real estate is free of contamination. In these assignments, an appraiser may appraise interests in real estate that is known to be contaminated under the hypothetical condition that the real estate is free of contamination when:

1) the resulting appraisal report is not misleading,
2) the client has been advised of the limitation, and
3) all the requirements of the ETHICS RULE have been satisfied.

To avoid confusion in the marketplace, the appraiser should disclose available information about the contamination problem, explain the purpose of the hypothetical condition that the real estate is not contaminated, and state that the use of the hypothetical condition might have affected the assignment results in accordance with Standards Rule 2-2(a)(xiii) and (b)(xv).

In other situations, the appraiser may be asked to appraise a property believed to be free of contamination or for which the environmental status is uncertain due to the lack of information or conflicting information. For these

78

GO BACK

Advisory Opinions 2020-2021 Edition
© The Appraisal Foundation





**ADVISORY OPINION 9**

assignments, the property may be appraised under the *extraordinary assumption* concerning assumed factual information about its environmental condition and status. Indeed, since an appraiser is usually not an expert in detecting contamination, or confirming its absence, extraordinary assumptions regarding environmental condition may be necessary in many assignments.

**Valuation Issues - As Impaired**

Highest and Best Use Issues: The appraisal of properties that may be impacted by environmental contamination usually involves extensive highest and best use analysis. In accordance with Standards Rules 1-2(e) and 1-3(b), the appraiser must consider relevant factors in developing an opinion of the highest and best use of the property in its impaired condition. The valuation of properties impacted by environmental contamination usually involves the estimate of two values: the unimpaired value and the impaired. As such, two highest and best use analyses are typically required. The first does not consider any limitations on the property due to the environmental contamination. The second does consider any limitations due to the contamination, its remediation, and any legal use restrictions associated with the cleanup of the contamination source. Environmental contamination and its remediation to appropriate regulatory standards may affect the feasibility of site development or redevelopment, use of the site during remediation, use of the site after remediation, marketability of the site, and other economic and physical characteristics of a contaminated property. The appraiser should consider the possibility that site remediation and any remaining limitations on the use of the site following remediation may alter or limit its highest and best use in the impaired condition. In addition, excessive environmental risk and stigma may deter site development or redevelopment and thereby limit the highest and best use until the property's environmental risk is reduced to levels acceptable to the relevant market participants.

Satisfying Standards Rule 1-4 Requirements: When the appraiser addresses the diminution in value of a contaminated property and/or its impaired value, the appraiser must recognize that the value of an interest in impacted or contaminated real estate may not be measurable simply by deducting the remediation or compliance cost estimate from the opinion of the value as if unaffected (unimpaired value). Rather, *cost, use* and *risk* effects can potentially impact the value of contaminated property. *Cost effects* primarily represent deductions for costs to remediate a contaminated property. These costs are usually estimated by someone other than the appraiser, and should include consideration of any increased operating costs due to property remediation. The appraiser should also be aware that the market might not recognize all estimated costs as having an effect on value. *Use effects* reflect impacts on the utility of the site as a result of the contamination. If the contamination and/or its cleanup rendered a portion of the site unusable, or limited the future highest and best use of the property, then there could be a use effect on value. *Risk effects* are typically estimated by the appraiser and often represent the most challenging part of the appraisal assignment. These effects are derived from the market's perception of increased environmental risk and uncertainty. The analysis of the effects of increased environmental risk and uncertainty on property value (environmental stigma) must be based on market data, rather than unsupported opinion or judgment.

In general, an opinion of the subject property's unimpaired value can be developed using the sales comparison approach [Standards Rule 1-4(a)], cost approach [Standards Rule 1-4(b)], and income approach [Standards Rule 1-4(c)]. Estimating the effects of environmental contamination on real property value usually involves the application of one or more specialized valuation methods. These methods should be consistent with the requirements related to the valuation approaches in USPAP.

Advisory Opinions 2020-2021 Edition
© The Appraisal Foundation



79



**4.5    FACTS OR DATA CONSIDERED**



### LIST OF DOCUMENTS CONTAINING FACTS OR DATA CONSIDERED IN JLL 2018 & 2021 REPORTS

**Books**

1. "Appraising Environmentally Contaminated Properties: Understanding and Evaluating Stigma," Seminar Handbook (The Appraisal Institute, 2001, Part 4). Seminar developed by Richard J. Roddewig, MAI, CRE, FRICS, and Gary R. Papke, MAI, CRE, FRICS of Clarion Associates.
2. A Guide to Appraisal Valuation Modeling, Appraisal Institute (2000).
3. American Institute of Real Estate Appraisers and Society of Real Estate Appraisers, Appraisal Terminology (Chicago: American Institute of Real Estate Appraisers and Society of Real Estate Appraisers, 1975).
4. American Institute of Real Estate Appraisers, Appraisal Terminology (Chicago: American Institute of Real Estate Appraisers, 1935).
5. American Institute of Real Estate Appraisers, The Appraisal of Real Estate, 8th ed. (Chicago: American Institute of Real Estate Appraisers and Society of Real Estate Appraisers, 1983).
6. Appraisal Institute, Analyzing the Effects of Environmental Contamination on Real Property, Instructor Handbook, 2010.
7. Appraisal Institute, The Appraisal of Real Estate, 13th ed. Chicago: Appraisal Institute, 2013.
8. Appraisal Institute, The Appraisal of Real Estate, 14th ed. Chicago: Appraisal Institute, 2013.
9. Appraisal Institute, The Appraisal of Real Estate, 15th ed. Chicago: Appraisal Institute, 2020.
10. Interagency Land Acquisition Conference, Uniform Appraisal Standards for Federal Land Acquisitions, Washington, D.C., 2016, Paragraph 4.2.1.3., pages 95-96, citing Florida Rock Industries, Inc. v. United States, 18 F.3d 1560, 1567 (Fed. Cir. 1994).
11. J.D. Eaton, MAI, SRA, "Real Estate Valuation in Litigation," 2d Ed., The Appraisal Institute, Chicago, 1995.
12. The Appraisal Foundation, USPAP, 2018-2019 ed.
13. The Dictionary of Real Estate Appraisal, 6th Edition, The Appraisal Institute, 2015
14. International Association of Assessing Officers (IAAO) Standards on Mass Appraisal
15. Supplemental Standards of Professional Practice and Code of Professional Ethics published by the Appraisal Institute
16. The Appraisal Foundation, USPAP, 2014-2015 ed.
17. The Appraisal Foundation, USPAP, 2020-2021 ed.
18. Marvin L. Wolverton, PhD, MAI, "An Introduction to Statistics for Appraisers," Appraisal Institute, 2009

**Course Materials**

1. Appraisal Institute, Analyzing the Effects of Environmental Contamination on Real Property, 2010, Part 4, Instructor Notes, pp. IN-15 and IN-16.
2. "Residential Applications: Using Technology to Measure and Support Assignment Results," Appraisal Institute Course Number PS110SH-C.

**Datasets**



3. Chambers County Parcel Viewer and Harris and Liberty County Appraisal Districts. GIS County Parcel Data and Shapefiles.
4. EPA Enviromapper Website and Envirofacts. Retrieved from: <https://www3.epa.gov/enviro/facts/rcrainfo/search.html>.
5. FEMA Flood Hazard Zones Map Data.
6. Houston Association of Realtors' Multiple Listing Service Single Family Sales Data. Retrieved from JLL Houston Office.
7. Railroad Commission of Texas. Digital Map Data. Retrieved from: <http://www.rrc.state.tx.us/about-us/resource-center/research/data-sets-available-for-purchase/digital-map-data/>.
8. Texas Department of Public Safety Sex Offender Database. Retrieved from: <https://records.txdps.state.tx.us/SexOffenderRegistry>.
9. Texas Department of Transportation Open Data Portal Mapping Data. Retrieved from <http://gis-txdot.opendata.arcgis.com/datasets/4480ddc1608a4ca1a6ca4da25f9fbf1b_0>.
10. Texas Education Association School and District Ranking Data. Retrieved from: <https://www.schooldigger.com/aboutranking.aspx>.
11. U.S. Census Bureau. 2016 American Community Survey 5-Year Estimates. Selected Demographic Data.
12. U.S. EPA Facility Info. Retrieved from: <https://cumulis.epa.gov/supercpad/cursites/csitinfo.cfm?id=0602498>.
13. ESRI Business Analyst Online Data
14. Disclosure Data: HAR MLS

**Defendant's Expert Reports**

1. Glenn Millner. Expert Report of Glenn Millner, PhD Wheeler v. Arkema Inc, No. 17-cv-2960 (S.D. Tex.). 8 Oct. 2018.
2. Mark A. Yocke, Ph.D. Expert Report-Review of Plaintiffs' Air Quality Modeling and Analysis *Re: Wheeler et al. v. Arkema Inc.* 5 Oct. 2018.
3. Scott A. Stout, Ph.D., P.G. et al. Expert Report. 5 Oct. 2018.
4. Wayne R. Thomann. Expert Report. 5 Oct. 2018.
5. Gary Papke, Real Property Appraisal Consulting Report. 8 Oct. 2018.

**General Documents**

1. Arkema Inc. Timeline of Arkema Crosby Events.
2. Crosby Volunteer Fire Department List of Evacuees.
3. Conversation with Errol Williams, HCAD

**Legal Codes**

1. 22 Tex. Admin. Code § 8 (2013) (Texas Appraiser Licensing and Certification Board, Rules Relating to Standards of Practice)



2. Texas Tax Code § 1.04.
3. Section 5.008, Texas Property Code. Accessed at: https://statutes.capitol.texas.gov/Docs/PR/htm/PR.5.htm
4. 55 Fed Reg 33888, Aug 20, 1990
5. FDIC, Rules and Regulations 323.2(h).

**Legal Documents**

1. Deposition of Betty Whatley, dated August 14, 2018.
2. Deposition of Bevely Flannel, dated August 16, 2018.
3. Deposition of Brett Simmons, dated August 17, 2018.
4. Deposition of Corey Prantil, dated August 14, 2018.
5. Deposition of Greg Nason, dated August 17, 2018.
6. Deposition of Kelly Phelps, dated August 15, 2018.
7. Deposition of Larry Anderson, dated August 13, 2018.
8. Deposition of Phyllis Simmons, dated August 17, 2018.
9. Deposition of Ronald Flannel, dated August 16, 2018.
10. Deposition of Ronald Whatley, dated August 14, 2018.
11. Deposition of Shannan Wheeler, dated August 15, 2018.
12. Deposition of Tanya Andersson, dated August 13, 2018.
13. Plaintiffs' Response to Defendant's First Set of Interrogatories, dated July 30, 2018.
14. Second Amended Class Action Complaint filed on June 19, 2018 in Wheeler, et al. v. Arkema Inc., Case No. 4;17-cv-2960, in the United States District Court for the Southern District of Texas.
15. Named Plaintiff HCAD Data
16. Uniform Discovery Responses - State Court
17. Deposition of Larry Anderson, Named Plaintiff, August 4th, 2021
18. Deposition of Tanya Anderson, Named Plaintiff, August 4th, 2021
19. Deposition of Bevely Flannel, Named Plaintiff, August 3rd, 2021
20. Deposition of Roland Flannel, Named Plaintiff, August 3rd, 2021

**News Articles**

1. David Hunn and Matt Dempsey. "In Houston's flooded neighborhoods, real estate investors see an opportunity." Houston Chronicle. Retrieved from: <https://www.houstonchronicle.com/news/houston-texas/houston/article/houston-harvey-flood-homes-real-estate-investor-12901718.php>.
2. Ester Fung. "Harvey Likely to Weigh on Houston's Commercial Property Market for Months." The Wall Street Journal. 30 Aug. 2017. Retrieved from: <https://www.wsj.com/articles/harvey-likely-to-weigh-on-houstons-commercial-property-market-for-months-1504032205>.
3. Hansi Lo Wang. "Real Estate Investors Rush to Buy Houston Homes Damaged by Flooding." NPR. 8 Nov. 2017. Retrieved from: <https://www.npr.org/2017/11/08/562903267/some-real-estate-investors-eager-to-buy-houston-homes-damaged-by-flooding>.



4. HAR. "Hurricane Harvey Can't Stop Houston's Housing Market from Reaching Record Territory in 2017." 10 Jan. 2018. Retrieved from <https://www.har.com/content/mls/?m=1&y=18>.

5. http://www.nola.com/newslogs/rpanswerspot/index.ssf?/mtlogs/nola_tpqa/archives/2006_12.html.

6. Jasen Dearen and Michael Biesecker. "AP Exclusive: Toxic waste sites flooded in Houston area." Associated Press. 3 Sep. 2017. Retrieved from: <https://apnews.com/27796dd13b9549b0ac76aded58a15122>.

7. Melissa Spencer. "Hurricane Harvey Distorts Houston Housing Analysis." Houston Association of Realtors. 14 Sep. 2018. Retrieved from: <https://www.har.com/blog_64961_hurricane-harvey-distorts-houston-housing-analysis>.

8. National Hurricane Center. "Costliest U.S. tropical cyclones tables updated." National Hurricane Center. 26 Jan. 2018. Retrieved from: <https://www.nhc.noaa.gov/news/UpdatedCostliest.pdf>.

9. National Hurricane Center. "Costliest U.S. tropical cyclones tables updated." National Hurricane Center. 26 Jan. 2018. Retrieved from: <https://www.nhc.noaa.gov/news/UpdatedCostliest.pdf>.

10. Paige Martin. "How Hurricane Harvey Affects the Houston Real Estate Market." Houston Properties.com. Retrieved from <https://www.houstonproperties.com/hurricane-harvey-impact-houston-real-estate>.

11. The Times-Picayune, August 28, 2007.

12. The Times-Picayune, May 1, 2007.

13. Bray, Ilona. "Selling a Texas Home: What are my Disclosure Obligations?" NOLO. Accessed at: https://www.nolo.com/legal-encyclopedia/selling-texas-home-disclosure-obligations.html

14. https://apnews.com/27796dd13b9549b0ac76aded58a15122

15. https://vault.sierraclub.org/sierra/200605/goingforbroke/sidebar1.asp

16. https://www.csb.gov/kmco-llc-fatal-fire-and-explosion-/

17. https://www.houstonpublicmedia.org/articles/news/2019/04/09/328525/harris-county-sues-kmco-over-fire-at-crosby-facility-argues-violations-of-state-and-county-laws/

18. https://www.khou.com/article/news/local/what-we-know-about-the-kmco-chemical-plant-in-crosby/285-1b046b7a-bec3-437c-86f6-ed2e4400d1bd

19. U.S. Chemical Safety andHazard Investigation Board. (2019) "Explosion and Fire at KMCO Chemical Facility: Factual Update" 17 September 2019. Retrieved from:<https://www.csb.gov/assets/1/17/csb_kmco_factual_update.pdf?16508>.

**Plaintiffs' Expert Reports**

1. Declaration of Randall Bell, dated August 6, 2018.

2. Expert Report of Marc Glass – Arkema Plant Site and Surrounding Areas. 7 Aug. 2018.

3. William J. Rogers. Dispersion Modeling and Risk Evaluation: Organic Peroxide Decomposition, Release, and Fire at Arkema Following Hurricane Harvey Flooding. Expert Report. 31 Aug. 2017.



4. A Study Regarding the Diminution in Value of Properties Impacted by the Arkema Explosion in August, 2017 John A. Kilpatrick, PhD, MAI, July 16, 2021

5. Dispersion and Deposition of Particulate Matter from Explosions and Fires in August and September, 2017 at Arkema Plant, 18000 Crosby Eastgate Road, Crosby, Texas, Dr William M. Auberle, July 12, 2021.

6. Supplemental Expert Report of Marc Glass, July 15, 2021

7. Supplemental Expert Report: Arkema, Inc. plant and area, chemical quality data, Crosby, TX, Marco Kaltofen, July 15, 2021.

**Property Records**

1. Harris County Appraisal District Property Record Info for Arkema Property. Retrieved from: <https://public.hcad.org/records/>.

2. Harris County Appraisal District. Selected Plaintiff Property and Ownership Records. Retrieved from: <<https://public.hcad.org/records/>.

3. Harris County Appraisal District. Assessed Value history.
Retrieved from: <https://hcad.org/property-search/real-property/real-property-search-by-address/>.

**Reports**

1. Draft Harris County Supplemental Action Plan, Harris County, Texas, June 27, 2018, p. 3, 6. Retrieved from: <https://csd.harriscountytx.gov/Documents/DRAFT_Harris_County_Supplement_Action_Plan_07102018.pdf>.

2. Fannie Mae and Freddie Mac Uniform Appraisal Dataset Specification Appendix D: Field-Specific Standardization Requirements, 22 Nov. 2013. Retrieved from: <https://www.fanniemae.com/content/technology_requirements/uad-specification-appendix-d.pdf>.

3. Harris County Flood Control District. "Immediate Report – Final Hurricane Harvey – Storm and Flood Information." 4 Jun. 2018. Retrieved from: <https://www.hcfcd.org/media/2678/immediate-flood-report-final-hurricane-harvey-2017.pdf>.

4. HNTB Corporation (2007). Houston Region Freight Study. Retrieved from: <https://ftp.dot.state.tx.us/pub/txdot-info/rail/freight/houston_study.pdf>.

5. JLL Research. Hurricane Harvey's impact on the Houston commercial real estate market. October 2017.

6. Louisiana Legislative Auditor, "Residential Tax Assessment Practice," April 2003

7. Texas Department of Transportation (2011). Building Barriers to Traffic Noise. June 2011. Retrieved from: <https://ftp.dot.state.tx.us/pub/txdot-info/env/toolkit/730-01-bro.pdf>.

8. https://enviro.epa.gov/enviro/rcrainfoquery_3.facility_information?pgm_sys_id=TXD074198961

9. "Costliest U.S. tropical cyclones." National Hurricane Center. 9 July 2021. Retrieved from: < https://www.ncdc.noaa.gov/billions/dcmi.pdf >.

10. Freddie Mac, "Confidence Levels" (2020), available at http://bit.ly/freddiemac_confidencescores.



**Research Articles**

1. Abbigail J. Chiodo, et al. (2010). Nonlinear Effects of School Quality on House Prices. Federal Reserve Bank of St. Louis Review, May/June 2010, 92(3), pp. 185-204.

2. Allen, Williford & Seale, Inc., "Natural Gas Pipeline Impact Study," Interstate Natural Gas Association of America Foundation (INGAA Foundation), Houston, 2001.

3. Barry A. Diskin, PhD, MAI, CRE, Jack R. Friedman, PhD, MAI, CRE, FRICS, Spero C. Peppas, PhD, and Stephanie R. Peppas, MAT, "The Effect of Natural Gas Pipelines on Residential Value," Right of Way, January/February 2011

4. Bill Mundy, MAI, PhD, "The Impact of Hazardous Materials on Property Value," The Appraisal Journal, April 1992.

5. Brenda B. White, "Evaluating AVMs," in Mortgage Banking, September 2006, p. 17, referencing the March 2006 issue of Mortgage Technology.

6. David R. Bolton, MAI, "Properties Near Power Lines and Valuation Issues: Condemnation or Inverse Condemnation," Proceedings of the Institute on Planning, Zoning and Eminent Domain, Southwestern Legal Foundation, 1993.

7. Eric Fruits, PhD, "The Impact of the Presence of a Natural Gas Pipeline on Residential Property Values," Portland State University and Economics International Corp., November 4, 2008, available online at <http://ssrn.com/abstract=1518065>.

8. George Dell, MAI, "AVMs: The Myth and the Reality; the Problem and the Solution," Valuation Insights & Perspectives, The Appraisal Institute, Third Quarter, 2004.

9. George H. Lentz and Ko Wang, "Residential Appraisal and the Lending Process: A Survey of Issues," Journal of Real Estate Research, Vol. 15, Numbers 1/2, 1998.

10. Halbert C. Smith, "Value Concepts as a Source of Disparity Among Appraisals," The Appraisal Journal (April 1977): 204-05.

11. Harold D. Albritton, MAI, SREA, "A Critique of the Prevailing Definition of Market Value," The Appraisal Journal, April 1980.

12. J. Lamond, D. Proverbs, and A. Antwi, "Measuring the Impact of Flooding on UK House Prices", Property Management, Vol. 25, No. 4 (2007), pp. 344-359.

13. James A. Chalmers and F. A. Voorvart, "High Voltage Transmission Lines: Proximity, Visibility and Encumbrance Effects," The Appraisal Journal, Summer 2009.

14. James L. Larson et al., "The Effect of Proximity to Registered Sex Offender's Residence on Single-Family House Selling Price", The Appraisal Journal, July 2003, 253-265.

15. Jared Shlaes, MAI, "The Market in Market Value," The Appraisal Journal, October 1984.

16. Jennifer M. Pitts and Thomas O. Jackson, "Power Lines and Property Values Revisited," The Appraisal Journal, Fall 2007.

17. Jon Strand and Mette Vagnes, "The Relationship Between Property Values and Railroad Proximity: A Study Based on Hedonic Prices and Real Estate Brokers' Appraisals," Transportation, Volume 28: 137-156 (2001).

18. Julia L. Hansen, Earl D. Benson, and Daniel A. Hagen, "Environmental Hazards and Residential Property Values: Evidence from a Major Pipeline Event," Land Economics, November 2006, Vol. 82, No. 4.



19. Kenneth M. Lusht, "Most Probable Selling Price," The Appraisal Journal, July 1983.

20. Kerry D. Vandell, "Optimal Comparable Selection and Weighting in Real Property Valuation," AREUEA Journal, Vol. 19, No. 2., 1991.

21. Louis Wilde, Jack Williamson, and Christopher Loos, "A Long-Term Study of the Effect of a Natural Gas Pipeline on Residential Property Values," Journal of Real Estate Literature, Vol. 22, No. 1, 2014.

22. Mark R. Linne, MAI, CRE, ASA, FRICS, "A Vision for Valuation: Automated Valuation Models and Appraisal Practice," paper presented at the 23rd Pan Pacific Congress of Appraisers, Valuers and Counselors, San Francisco, CA, September 16-19, 2006.

23. Orell C. Anderson, MAI, Jack Williamson, PhD, and Alexander Wohl, "The Effect of High-Voltage Overhead Transmission Lines on Property Values: A Review of the Literature Since 2010," The Appraisal Journal, Summer 2017.

24. Peter F. Colwell, Roger E. Cannaday, and Chunchi Wu, "The Analytical Foundations of Adjustment Grid Methods," AREUEA Journal, Vol. 11, No. 1., 1983.

25. Richard J. Roddewig and Charles T. Brigden, "Power Lines and Property Prices," Real Estate Issues, Volume 39, Number 2, 2014.

26. Richard J. Roddewig, CRE, MAI, FRICS, Charles T. Brigden, CRE, ASA, FRICS, and Gary R. Papke, CRE, MAI, FRICS, AICP, "Determining Real Estate Damages from Natural Disasters: Real Estate Counseling in Class Action Litigation – Lessons from Hurricane Katrina," Real Estate Issues, Vol. 37, No. 1 and 2, 2012.

27. Richard J. Roddewig, MAI, CRE, FRICS and Rebel A. Cole, PhD, "Real Estate Value Impacts from Fracking: Industry Response and Property Analytical Techniques," Real Estate Issues, Vol. 39, No. 3, 2014.

28. Richard Marchitelli, MAI, and Peter F. Korpacz, MAI, "Market Value: The Elusive Standard," The Appraisal Journal, July 1992.

29. Robert A. Simons, "Settlement of an Oil Pipeline Leak with Contaminated Residential Property: A Case Study," Real Estate Issues, Summer 1999.

30. Robert A. Simons, "The Effect of Pipeline Ruptures on Noncontaminated Residential Easement-Holding Property in Fairfax County," The Appraisal Journal, July 1999.

31. Robert A. Simons, Kimberly Winson-Geideman, and Brian Milkelbank, "The Effects of an Oil Pipeline Rupture on Single-Family Home Prices," The Appraisal Journal, October 2001.

32. Robert A. Simons, PhD and Abdellazia El Jaouhari, PhD, "The Effect of Freight Railroad Tracks and Train Activity on Residential Property Values," The Appraisal Journal, Summer 2004

33. Robin A. Dubin, "Estimating of Regression Coefficients in the Presence of Spatially Autocorrelated Error Terms," The Review of Economics and Statistics, 1988.

34. S. Yeo, K. Roche, and J. McAneney, "Effects of Disclosure of Flood-Liability on Residential Property Values: An Update," Floodplain Management Association, 2015 Floodplain Management Association National Conference.

35. V. Bajic, "Housing-Market Segmentation and Demand for Housing Attributes: Some Empirical Findings," AREUA Journal, Vol. 13, No. 1, 1985.

36. Victoria Cassens Zillioux, "Automated Valuation Models: Automation vs. Hybrid," paper presented at the 23rd Pan Pacific Congress of Appraisers, Valuers and Counselors, San Francisco, CA, September 16-19, 2006.



37. William N. Kinnard, Jr., Sue Ann Dickey, and Mary Beth Geckler, "Natural Gas Pipeline Impact on Residential Property Values: An Empirical Study of Two Market Areas," Right of Way, June/July 1994.

38. William R. Lang, MAI, and Brett A. Smith, "Setting Value on a Gas Pipeline Easement: Case Studies of Potential Damages," Journal of the American Society of Farm Managers and Rural Appraisers, January/February 1999.

39. William T. Hughes and C. F. Sirmans, "Adjusting House Prices for Intra-Neighborhood Traffic Differences," The Appraisal Journal, October 1993.

40. William T. Hughes and C.F. Sirmans, "Traffic Externalities and Single-Family House Prices," Journal of Regional Sciences, Volume 32, 1992, pp. 487-500.

41. McCluskey, Jill & Gordon Rausser, "Estimation of Perceived Risk and Its Effect on Property Values," Land Economics. Feb 2001.

42. McCluskey, Jill & Gordon Rausser, "Hazardous Waste Sites and Housing Appreciation Rates," California Agricultural Experiment Station. Jan 2000.

43. McCluskey, Jill & Gordon Rausser, "Stigmatized Asset Value: Is It Temporary or Long-Term?," Review of Economics and Statistics, 2003.

44. Hunsperger, Wayne L. "The Effects of the Rocky Flats Nuclear Weapons Plant on Neighboring Property Values," 2001.

45. Berrens, Robert P., et al., "The Effect of Environmental Disclosure Requirements on Willingness to Pay for Residential Properties in Borderlands Community," Social Science Quarterly. June 2003.

46. Dale, Larry, et al., "Do Property Values Rebound from Environmental Stigmas? Evidence from Dallas," Land Economics, May 1999.

47. Thomas O. Jackson, PhD, MAI, "Real Property Valuation Issues in Environmental Class Actions," The Appraisal Journal, Spring 2010.



**4.6** **QUALIFICATIONS**



QUALIFICATIONS OF
**GARY R. PAPKE, MAI, CRE, FRICS**
**Jones Lang LaSalle – JLL Valuation & Advisory Services, LLC**

**PROFESSIONAL HISTORY**

Present

Executive Vice President
JLL Valuation & Advisory Services
Chicago, Illinois
2017 to present

Prior

Senior Vice President - Clarion Associates, Inc.
Chicago, Illinois
1988 to 2017

Manager – Pannell Kerr Forster
Chicago, Illinois
1987 to 1988

Consultant – Shlaes & Co.
Chicago, Illinois
1984 to 1987

Senior Planner – Northeastern Illinois Planning Commission
Chicago, Illinois
1975 to 1984

**AREAS OF SPECIAL COMPETENCE**

Real estate consulting, appraisal, environmental impact analysis, market analysis, feasibility analysis, and highest and best use studies for office, retail, industrial, residential, hotel, theater and special purpose properties. Community development and redevelopment planning, fiscal impact analysis, and zoning studies for public sector and private clients.

**REPRESENTATIVE ASSIGNMENTS**

Case studies on *environmental impacts on real estate* throughout North America and analysis of impacts in Alaska real estate market related to *Exxon Valdez* oil spill. Analysis and appraisal of various types of environmental impacts on real estate in numerous assignments in Illinois, Wisconsin, Michigan, Missouri, Indiana,



Alabama, Oklahoma, Mississippi, South Carolina, Iowa, Maryland, Hawaii, Louisiana and other states involving industrial, commercial, residential, agricultural, vacant land and improved subdivisions, and special purpose properties.

Analysis of *national park concession improvements*, including more than 320 concessionaire structures at the South Rim in Grand Canyon National Park; appraisal of 27 commercial structures in Yellowstone National Park; appraisal and consulting related to numerous other park concessions throughout the National Park system.

Market analysis and appraisal of former *military installations*, including Fort Sheridan, Illinois, involving conversion of more than 750,000 square foot historic US Army installation to residential, commercial, and public uses.

Appraisal of *office buildings* up to 1.3 million square feet in Chicago, Los Angeles, Memphis, Minneapolis, and other cities.

Appraisal, feasibility and investment analysis of existing and proposed *retail facilities*, including shopping centers and other commercial structures in Chicago area, Memphis, Madison, Phoenix, Baltimore, Oahu, Maui, among others.

Appraisal of *industrial properties* in Illinois, Indiana, Minnesota, Wisconsin, Missouri, Hawaii, Colorado and other states.

Appraisal and market analysis for existing and proposed *multi-family residential buildings* in downtown and suburban Chicago, Minneapolis, Augusta, Omaha, Fairbanks, and other locations.

Appraisal, feasibility and investment analysis of existing and proposed *hotels, resorts, marinas, and meeting facilities* in Chicago area, Miami, Augusta, Los Angeles, suburban Denver, Albuquerque, Boston, Las Vegas.

Analysis of *theaters* in Los Angeles, Tucson, and downtown Chicago.

Appraisal of various *vacant land parcels, ground leases and air rights interests* in Chicago, Los Angeles, Phoenix, Omaha and other locations; analysis of easement and fee interests in *timber*



*properties* in Alaska, California, Maine, Georgia, New Brunswick and Nova Scotia.

Fiscal and economic impact analysis for a mixed-use, multi-billion dollar project under development in downtown Chicago. Other *fiscal and environmental impact analysis* work on retail, residential and industrial properties.

Appraisal and analysis of various *special use properties*, including commercial and general aviation airports, theme parks, Chicago's central library, railroad and utility corridors, mineral processing facilities and other specialized industrial uses.

*Location and facility analysis* for various clients, including a medical school, a bank, and a not-for-profit service organization.

*Highest and best use analysis* for a 250-acre suburban Chicago mixed-use development, a former quarry, and other properties.

Analysis of *historic preservation and conservation easement* donations on residential and commercial structures throughout the United States.

Consultant to municipalities, townships, and counties on *development, redevelopment, development incentives, planning and zoning*.

Consultant to the National Trust for Historic Preservation on the *preservation of historic estates*.

## EDUCATION

Gustavus Adolphus College
St. Peter, Minnesota
Bachelor of Arts, History and Sociology

University of Illinois at Urbana-Champaign
Master of Urban Planning

## PROFESSIONAL AFFILIATIONS

Designated Member (MAI), Appraisal Institute



Designated Member (CRE), American Society of Real Estate Counselors

Member, American Planning Association

Designated Member (FRICS), Fellow of the Royal Institution of Chartered Surveyors

Certified General Real Estate Appraiser in Illinois.

## PROFESSIONAL AND CIVIC ACTIVITIES

Adjunct Lecturer on real estate analysis, School of Planning and Policy, University of Illinois at Chicago.

Past Secretary, Illinois Chapter of the American Planning Association.

Adjunct Lecturer on real estate valuation, Department of Finance, DePaul University.

Member, Historic Preservation Commission, Oak Park, Illinois.

Past President, Unity Temple Restoration Foundation (Frank Lloyd Wright's National Historic Landmark Unity Temple), Oak Park, Illinois.

## PUBLICATIONS

"Institutional Considerations," Chapter One in Studies in Areawide Waste Treatment Management, prepared for the United States Environmental Protection Agency, by the Department of Urban and Regional Planning, University of Illinois, 1974.

The Costs of Regional Land Use Planning: A Research Survey, prepared for the Water Planning Division, United States Environmental Protection Agency, January 1975.

Goals, Policies, Objectives and Standards for "208" Planning in Northeastern Illinois, Northeastern Illinois Planning Commission, February 1976.



Implementing the "208" Clean Water Program: Background Information for the Selection of a Management System, Northeastern Illinois Planning Commission, October 1976.

Lake Michigan Water Quality Trends and Monitoring Programs in Illinois Waters, Northeastern Illinois Planning Commission, December 1976 (with Gary D. Harmon).

Wastewater Treatment Processes and Cost Estimating Data, Northeastern Illinois Planning Commission, April 1977 (with Joseph A. Smedile and Greeley and Hansen Engineers).

Background Report on Alternative Institutional Frameworks for Water Quality Management, Northeastern Illinois Planning Commission, May 1977.

208 Management Options: Alternative Institutional Frameworks for Water Quality Management, Northeastern Illinois Planning Commission, May 1977.

An Institutional Framework for Water Quality Management in Northeastern Illinois, Northeastern Illinois Planning Commission, October 1977.
Finding Solutions for Problem Septic Areas, Northeastern Illinois Planning Commission, 1978.

"Appraising Theme Parks," with P. Schiltz and Richard Roddewig, in The Appraisal Journal, Volume LIV, Number 1, (Chicago: American Society of Real Estate Appraisers, January 1986 p. 85).

"Detecting the Flaws in Market Analysis", with Cheryl A. Inghram, in, Planning, Volume 56, Number 6, (Chicago, American Planning Association, June 1990, p. 18).

"Market Value and Public Value: An Exploratory Essay, " with Richard Roddewig, in The Appraisal Journal, Volume LXI, Number 1, (Chicago: Appraisal Institute, January 1993).

Co-author Appraisal Institute seminar textbook on "Environmental Risk and the Real Estate Appraisal Process," 1994.

Co-author Appraisal Institute seminar textbook on "Appraisal of Special Purpose Properties," 1995.



"Environmental Risk and the Real Estate Appraisal Process," presented to the <u>18th Pan Pacific Congress of Real Estate Appraisers, Valuers, and Counsellors</u>, Sydney, Australia, April 23, 1996.

"Value in Use vs. Market Value: Special Problems in the Valuation of Special Use Properties," presented to the <u>18th Pan Pacific Congress of Real Estate Appraisers, Valuers, and Counsellors</u>, Sydney, Australia, April 26, 1996.

Co-author, Appraisal Institute seminar textbook on "Appraising Environmentally Contaminated Properties: Understanding and Evaluating Stigma," 2001.

"Determining Real Estate Damages from Natural Disasters: Real Estate Counseling in Class Action Litigation – Lessons from Hurricane Katrina," with Richard J. Roddewig and Charles T. Brigden, in *Real Estate Issues*, Volume 37, Issues 2 and 3 (Chicago: The Counselors of Real Estate, December 2012, p. 77).

Co-recipient (2013) of the William S. Ballard Award as the "author whose work best exemplifies the high standards of content maintained by *Real Estate Issues*, the professional journal published by The Counselors of Real Estate."



**Gary R. Papke**
**Recent Depositions and Trial Testimony**

Snowstorm Acquisition Corp. v Tecumseh Products Company, AlixPartners, LLP, AP Services, LLC, and James Bonsall, United States District Court for the District of Delaware, Civ. No. 09- 866-SLR.

Sontov Partners LLC v. Transworld Sedgwick LLC, Circuit Court of Cook County, IL, Chancery Division, Case No. 12 CH 27438.

Seven Resorts, Inc. v. United States, United States Court of Federal Claims, Case No. 09-184C.

Arbitration to Determine the Value of the Possessory Interest in Real Estate Improvements at Echo Bay Resort and Marina, under National Park Service Concession Contract No. 9900C20001.

Harbor Point Venture, LLC v. Environmental Solutions, Inc., et al, Circuit Court of Cook County, IL, Case No. 2017 L 012169.

Wheeler, et al v. Arkema, Inc., United States District Court, Southern District of Texas, Houston Division, Civil Action No. 4:17 – cv – 2960.

RPAI Schaumburg American Lane LLC f/k/a Inland Western Schaumburg American Lane LLC v. Zurich American Insurance Company, Circuit Court of Cook County, Illinois, Case No. 16 L 012623.



## JLL Biography



# Thomas W. Hamilton, PhD, MAI, CRE, FRICS

**Senior Vice President**



### Overview

Thomas W. Hamilton, PhD, MAI, CRE, FRICS is Senior Vice President of JLL Valuation & Advisory Services, LLC (VAS), which is part of Jones Lang LaSalle, one of the largest full service real estate firms in the world with offices in more than 80 countries. Previously, Dr. Hamilton was president of Karvel-Hamilton Valuation Advisory Services where, for 30 years, he conducted valuation and appraisal services for the telecommunication, railroad, and public utility industries as well as for numerous local and state agencies in the valuation of real property.

### Experience

Dr. Hamilton works nationally out of the Chicago office of JLL VAS on large-scale valuation and litigation assignments. He is currently a certified general real estate appraiser in Wisconsin and several other states. Dr. Hamilton specializes in the economic market analysis of large-scale, complex real estate assignments typically involving litigation or the threat of litigation. His extensive valuation consulting record includes valuation of owned versus possessed real property rights, separating real property and personal property rights in transactions, the economics of real estate market analysis and property marketability, highest and best use analysis, and quantitative valuation methodologies for complex real estate.

Dr. Hamilton has developed the required real estate appraisal coursework required to obtain a certified general appraisal license, and he has co-developed continuing education and professional designation education coursework for the Appraisal Institute. He is also an approved instructor for all of the MAI designation courses offered by the Appraisal Instute as well as for numerous other Appraisal Institute seminars. Dr. Hamilton has published more than 20 refereed, academic and professional journal articles on valuation, authored textbook chapters on the cost of capital, produced residential and commercial real estate market index reports, and has provided expert witness testimony on valuation matters across the country.

*Leads JLL Valuation Advisory's real estate econometric and forensic valuation efforts for litigation assignments across the United States.*

*Certified General Real Estate Appraiser with over 30 years' experience.*

*Nationally recognized expert in complex valuation methods and techniques.*

*Widely published author of real estate valuation issues and concepts.*

COPYRIGHT © JONES LANG LASALLE IP, INC. 2021. All Rights Reserved.



**Education and Affiliations**
- Designated Member (MAI), Appraisal Institute
- Designated Member (CRE), Counselors of Real Estate
- Designated Member (FRICS), Royal Institute of Chartered Surveyors
- Designated Member (CCIM), CCIM Institute
- Midwest Chapter of the Counselors of Real Estate, member. Chairperson of the Minnesota Chapter, 2007-2009
- Certified General Real Estate Appraiser in Wisconsin, Minnesota, Michigan, Iowa, New York, and New Hampshire
- Doctor of Philosophy in Urban Land Economics – University of Wisconsin-Madison
- Master of Science in Real Estate – University of Wisconsin-Madison
- Master of Science in Finance – University of Wyoming
- Bachelor of Science in Natural Resources – University of Wisconsin-Madison

**Prior Experience**

President and Founding Partner – Karvel-Hamilton, 1992 to 2021, Chicago, Illinois and Minneapolis, Minnesota

Fogelson Distinguished Chair of Real Estate, Chicago School of Real Estate, Roosevelt University, 2014 to 2021, Chicago, Illinois

Commercial Real Estate Professor, Shenehon Center for Real Estate, University of St. Thomas, 2000 to 2014, Minneapolis, Minnesota

**Publications**

"Setting the Record Straight on Fee Simple", Hamilton, T.W., et. al., IAAO Position Paper, August 2019.

"Commercial Big-Box Retail: A Guide to Market-Based Valuation", Hamilton, T.W., et. al., IAAO Position Paper, September 2017.

"Valuing the Leased Fee Simple Estate: The Answer for Ad Valorem Taxation Issues", Hamilton, T.W., Real Estate Issues, 40(1), 19-25, 2015.

Hamilton, T.W. (2014). *Cost of Capital of Real Property—Individual Assets.* (Chapter 41) and *Cost of Capital of Real Estate Entities.* (Chapter 42) in Cost of Capital, 5th edition, Shannon Pratt and Roger Grabowski, eds. John Wiley and Sons.

"Economic Rationale, Highest and Best Use, and Market Valuation Issues for Appraising Inextricably Intertwined Assets", Hamilton, T.W., Real Estate Issues, 38(2), 18-25, 2013.

Hamilton, T.W. and Sell, J.A. (2011). *Use of the Income Approach in Valuing a Sand and Gravel Property in a Condemnation Proceeding.* In David. C. Lennhoff, MAI, SRA (Ed), A Business Enterprise Value Anthology, 2nd edition. Chicago: Appraisal Institute.

"Real Estate Market Dynamics during Capital Market Imbalances", Hamilton T.W., Journal of Property Investment and Finance, 29(4/5), 359-371, 2011.

"Ensuring Equity in Property Taxation and Administration", Hamilton, T.W., Journal of Property Tax Assessment and Administration, 8(1), 5-29, 2011.

"Appraising Leased Assets: A Needed Correction to WSATA Procedures", Hamilton, T.W. and Vang, D.O. Real Estate Journal, 25(9), 212-220, 2009.

"Use of the Income Approach in Valuing a Sand and Gravel Property in a Condemnation Proceeding", Hamilton, T.W. and Sell, Jan A. Real Estate Issues, 34(2), 35-40, 2009.

"Accounting for Operating Leases in the Unit Valuation Approach", Hamilton, T.W. and Vang, D. O. Journal of Property Tax Assessment and Administration, 4(3), 25-35, 2008.

"Partitioning Capitalization Rates: The Case of Operating Leases in the Unitary Valuation Method", Hamilton, T.W. and Karvel, G.R. The Appraisal Journal, 75(2), 146-55, 2007.

"Appraising Leased Assets in the Unitary Valuation/Assessment Process", Hamilton, T.W. and Karvel, G.R. Real Estate Journal, 23(12), 304-10, 2007.

"Real Estate Market Segmentation: Empirical Results," Hamilton, T.W., Assessment Journal 5(3), 52-72, 1998.

"Real Estate Market Segmentation: A Review," Hamilton, T.W., Assessment Journal 3(2), 47-57, 1996.

COPYRIGHT © JONES LANG LASALLE IP, INC. 2021. All Rights Reserved

2



"Adjusting for Vertical and Horizontal Inequity: Supplementing Mass Appraisal Systems", Birch, J.W., Sunderman, M.A., Hamilton, T.W. Property Tax Journal, 11, (Sept): 257-276, 1992.

"Estimating the Importance of Outliers in Appraisal and Sales Data", Birch, J.W., Sunderman, M.A., Hamilton, T.W. Property Tax Journal, 10 (Dec): 361-376, 1991.

"Determining the Minimum Sample Size for Assessment and Reappraisal Work", Birch, J.W., Sunderman, M.A, Hamilton, T.W. Property Tax Journal, 10 (Sept): 299-311, 1991.

"Testing for Vertical Inequity in Property Tax Systems", (co-authored), Sunderman, M.A., Birch, J.W., Cannaday, R.W., Hamilton, T.W. The Journal of Real Estate Research, 5(3), 319-334, 1990.

"Adjusting for Vertical Inequity in Property Tax Systems", Sunderman, M.A., Birch, J.W., Hamilton, T.W, Property Tax Journal, 9 (Sept): 197-211, 1990.

"Components of COD", Sunderman, M.A., Birch, J.W., Hamilton, T.W, Property Tax Journal, 9 (June): 127-139, 1990.

### Industry Reports
NAIOP National Commercial Real Estate Sentiment Index and Report: Spring and Fall Editions, 2014-2019.

Twin Cities Housing Report: 2011- 2014 (Monthly: July 2011 to August 2014).

Minnesota Commercial Real Estate Report: 2010 to 2014 (May and December).

### Prior Testimony (January 2016 to present)
*Kevin Brown, et al, v. Saint-Gobain, et al* (United States District Court of New Hampshire), 2021, Case No. 1:16-CV-00242-JL

*MGP XII Buena Park GL, LLC v. Parkvan Associates and Irwin Kallman* (JAMS Ref. No. 1210037117), 2021

*Michele Baker, amongst others. al, v. Saint-Gobain Performance Plastics Corp., et. al.,* (United States District Court of New York), 2020, Case 1:16CV-917

*Mayfair Mall (GGP) v. City of Wauwatosa* (District Court, Milwaukee County, Wisconsin), 2017-2018, Case # 14-CV-3776

*Lowes v. City of Wauwatosa* (District Court, Milwaukee County, Wisconsin), 2017, Case # 15-CV-6376

*Firestone v. City of Wauwatosa* (District Court, Milwaukee County, Wisconsin), 2017, Case # 15-CV-006122

*Southlake Mall v. Lake County* (Indiana Board of Tax Review, Indianapolis, Indiana), 2017, (Forty individual Petition numbers covering tax years 2011 2012, 2013, and 2014)

*Best Buy v. City of Wauwatosa* (District Court, Milwaukee County, Wisconsin), 2018, Case # 15-CV-6472

*Nordstrom v. City of Wauwatosa* (District Court, Milwaukee County, Wisconsin), 2018, Case # 2016-CV-5175 & 2016-CV-5377

*Sherwood Manner v. City of Brookfield* (District Court, Wisconsin), 2018, Case # 15-CV-1411 & 16-CV-1585

*Kohl's v. City of Delafield* (District Court, Waukesha County, Wisconsin), 2018, Case # 16-CV-1317 & 17-CV-1683

*Lowes v. City of Plover* (District Court, Waukesha County, Wisconsin), 2019, Case # 2016-CV-0208 & 2017-CV-0187

*Target v. City of Oconomowoc* (District Court, Wisconsin), 2019, Case # 15-CV-1885

*Wal-Mart Stores v. Johnson County* (Kansas Board of Tax Appeals), 2019, Docket Nos. 2016-2691-EQ et al.

### Awards and Honors
Recipient (2018, 1992, 1991) of the IAAO Distinguished Research and Development Award.

### Contact
T: +1 312 228 3573
M: +1 651 335 3560
E: thomas.hamilton@am.jll.com

COPYRIGHT @ JONES LANG LASALLE IP, INC. 2021. All Rights Reserved

3



**4.7 JLL VALUATION & ADVISORY SERVICES LLC HOURLY RATES FOR THIS ASSIGNMENT**

JLL

**JLL VALUATION ADVISORY SERVICES, LLC –
REAL ESTATE LITIGATION SUPPORT GROUP**

**Hourly Rates - 2021 – This Assignment**

| Name | Position/Title | Rate |
|---|---|---|
| Richard J. Roddewig | Managing Director | $795 |
| Gary R. Papke | Executive Vice President | $550 |
| Charles T. Brigden | Executive Vice President | $485 |
| Thomas W. Hamilton | Senior Vice President | $475 |
| Joseph M. Miller | Senior Vice President | $375 |
| Robert S. Wells | Vice President | $335 |
| Anne S. Baxendale | Vice President | $295 |
| Adam J. Wood | Vice President | $285 |
| Scott E. Belsky | Vice President | $285 |
| J. Andrew Stables | Senior Analyst | $250 |
| Margo E. La Clair | Analyst II | $225 |
| Parker F. Hayes | Analyst I | $195 |
| Hayley A. Scheid | Analyst I | $185 |
| Tania Gorgius | Project Coordinator | $140 |

Rates effective as of January 1, 2021.



**4.8    TEXAS APPRAISAL LICENSE**





