**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| SHANNAN WHEELER, *et al.*, | CIVIL ACTION |
| *Plaintiffs*, | |
| v. | Case No. 4:17-cv-2960 |
| ARKEMA INC., | Hon. Keith P. Ellison |
| *Defendant*. | |

**APPENDIX TO
DEFENDANT ARKEMA INC.'S REPLY IN SUPPORT OF MOTION TO EXCLUDE
EXPERT TESTIMONY AND REPORTS OF DR. JOHN A. KILPATRICK**

**TABLE OF CONTENTS**

**Tab**

**Exhibits**

Ex. 1, Deposition of Dr. John Kilpatrick, October 29, 2021 ........................................................1

Ex. 2, Expert Report of Dr. John A. Kilpatrick, July 16, 2021 ....................................................2

Ex. 3, Expert Report of Dr. Sheng Li, September 17, 2021 .........................................................3

**Unreported Cases**

*Cannon v. BP Prods. N. Am., Inc.*,
     No. 10-622, 2013 WL 5514284 (S.D. Tex. Sept. 30, 2013) (Costa, J.) .............................4

*Cotromano v. United Techs. Corp.*,
     No. 13-80928, 2018 WL 2047468 (S.D. Fla. May 2, 2018)...............................................5

*Hixson v. Houston Indep. Sch. Dist.*,
     No. 09-3949, 2011 WL 3648104 (S.D. Tex. Aug. 17, 2011) (Ellison, J.) .........................6

*In re Katrina Canal Breaches Consol. Litig.*,
     No. 05-4182, 2007 WL 3245438 (E.D. La. Nov. 1, 2007)................................................7

# Exhibit 1

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

Civil Action No.: 4:17-cv-2968

SHANNAN WHEELER, et al.,

    Plaintiffs,

vs.

ARKEMA INC.,

    Defendant.


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

VIDEOTAPE / REALTIMED DEPOSITION OF

JOHN KILPATRICK

OCTOBER 29, 2021

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*



MAGNA
LEGAL SERVICES

Greenfield may have helped.  The absence of --
if that was the case, then that person would
have been identified in the report.  I can't
recall offhand as I sit here.

Q.   In your invoices in this case, there's
someone identified as -- with the initials JS.
Who is that?

A.   That may be Jonathan, my son.  I would
have to take a look.

Q.   Does his middle initial start with an
S?

A.   It does.

Q.   Okay.  And you also mentioned in the
report a Jerry Gilbert.  What did Mr. Gilbert
contribute to these reports?

A.   Well, Mr. Gilbert was engaged
separately from me by plaintiffs' counsel, and
he did some preliminary mapping and preliminary
parcel counts within the 7-mile affected area.

So his report was provided to me.  I
can't recall if any of his underlying data was
provided.  But it became a -- kind of a launch
point for my work, so to speak.

Q.   With reference to your report,
Exhibit 1, are the calculations model and



damages presented in your report the final versions that you believe the court should rely on at trial if a class is certified in this case?

A.    Well, as I say, the report is subject to any information which may be provided to me subsequent to that report, certainly.  And let me clarify that a bit.  At the time I authored that report, that was -- that was certainly my belief, and that would be my testimony.

Now, to the extent that any additional information comes up in the course of preparing for trial or the litigation process, then I'd certainly amend or reserve the right to amend my opinions.

Q.    So prior to today's deposition, has any additional information come to your attention that you believe merits any revisions or adjustments or supplements to your report?

A.    No.

Q.    Can we turn to page 20 of your report, specifically footnote 38.  I'm going to put it up on the screen.  And before I do that, I'm going to ask you, do you have any documents with you today?


MAGNA
LEGAL SERVICES

believe that it's the date of the Arkema explosion, that's your date of valuation?

A.　Yes.　That's correct.

Q.　Can we also take a look on that same page at paragraph 59, where you say:　"As this case moves forward, I will supplement this data as appropriate."

Do you see that?

A.　Yes.

Q.　Okay.　Under what circumstances might it be appropriate for you to supplement the data?

A.　I don't have any in mind right now.

Q.　Okay.　Can we go to page 5 of your report, please.　And in the first bullet -- I'm sorry.　Let's just let you see that.

And in the first bullet you say: "USPAP, the governing paradigm of the appraisal profession."

Do you see that?

A.　Yes.

Q.　And you're referring there to USPAP, right?

A.　Yes.

Q.　And you recognize that you as an



explosion.

Q.    So you calculate the -- so you're saying that, as of the date of the explosion, the diminution in value as of that date is in the range of 20 percent?

A.    That's correct.

Q.    Do you have any opinion as to what the diminution in value is as of today?

A.    No.

Q.    Do you have any opinion as to what the diminution in value is as of August 2018?

A.    No.

Q.    I want to, if I can, just generally confirm your basic methodology as reflected in your first report so that I have a general understanding of that methodology.

In general, in terms of your methodology, is it correct that you had two basic analyses or calculations:  One, a determination of unimpaired value of all single family properties within the class area using AVM; and, two, calculation of a diminution in value due to the events at the Arkema plant in August 2017; is that correct, in general terms?

A.    Not really.  I mean, the two are



the two trend lines, and you subtracted out what you considered to be the impact of Harvey to get the 12.12 percent, correct?

MR. STAG:  Object to form.

A.    Well, I wouldn't want to minimize the efficacy of doing that.  In other words, at the end of the day, that's how one measures the differential value trend between the affected area and unaffected area.  So, yeah.  That's what I did.  The caveat, of course, is that -- that's consistent with good appraisal practice.

Q.    You didn't run any of those numbers through an AVM at that point, did you?

A.    I ran them through a part of the AVM. In other words, those are instrumental variables which then inform the regression equation which is all part of the automated valuation model.

So in short, that's why it's called a two-stage least-squares.  We run the base functional equation with the regression, and then we examine the partial derivative of the instrumental variable and bring that into the regression equation, which all falls under the rubric of an AVM.

Q.    You took the 12.12 percent, then you


MAGNA
LEGAL SERVICES

looked at case studies, correct?

A.    Yes.

Q.    And you made the judgment that it should be approximately in the range of 20 percent diminution, right?

A.    Well, remember, any appraisal, any appraisal determination is called an opinion of value.  And, in fact, some states -- Oregon comes to mind -- they are adamant that I use that language.  It's an opinion of value.  It's not an estimate; it's an opinion of value.

And so based on appraisal information, based on good appraisal practice, based on my years of experience, it would be my determination that the true diminution in value as of the day after the Arkema event, as of the date of the Arkema event, would be 20 percent, yes.

Q.    And you took that 20 percent, and you applied it to the unimpaired values derived from your GAVM, correct?

A.    Well, to make life simple, that's what we did to be able to provide to the court an unimpaired value and impaired value and the difference between those two.



From a purely appraisal econometrics perspective, the impaired value or the impairment coefficient becomes part of the valuation equation.

So we, in essence, have one equation, one big equation.  For the court's perspective we are breaking it down into impaired value without that instrumental variable and the impaired value with that instrumental variable.

Q.    Are you -- is it your testimony that you did regression analysis as part of your trend line calculation?

A.    The trend line informs the regression equation.  So I know you and I are -- we're talking about the same thing, but I'm having to use a little bit more correct appraisal lingo here because I want to say what we did very precisely.

There is a valuation equation.  As -- part of that valuation equation is calculated in one manner.  And one part of that valuation equation is calculated in a different manner. And then those two are combined to become the full impaired valuation equation.

Q.    How did you use the trend line



analysis to determine unimpaired value?

A.    It does not factor into unimpaired value.  The unimpaired value assumes that the trend -- that the instrumental variable which is informed by the trend line is null.

Q.    How did you use the regression analysis in the trend line?

A.    The regression analysis becomes the functional equation to which the instrumental variable is appended.

Q.    What does that mean in laymen's terms?  How does that get calculated into the Excel spreadsheet?

MR. STAG:  Object to form.

A.    We've done our best to try to lay this out in layperson's terms for the court.  And we do that by showing that we can truncate this valuation equation.  We can assume -- assume away for a moment the instrumental variable, and just look at the output as if we let the instrumental variable go to zero.

And then we let the instrumental variable take its full value, and that gives us, of course, the impaired value.

In practice, we do it in two stages,



which is why it's called two-stage least-squares. But the value of the instruments is informed by a different statistical process, as I've described already.

Q.   So the -- would you agree that the percentage diminution is the result of the trend line and your case study analysis?

A.   Yes.

Q.   Those are the two components?

A.   Yes.

Q.   Run the trend line, and then apply case studies, correct?

A.   In this case, yes, sir.

MR. STAG:  Counselor, we've been at it for about an hour.  Do you mind if I stretch my legs for a moment?

MR. BIRSIC:  That would be fine. Let's take a 15-minute break if that's good for everybody.  Let me check the clock.  It is 9:30 -- 9:30 my time.  What time is it? It's 11:30 your time.  Let's come back in 15 minutes.  How's that?

THE WITNESS:  Great.  Thank you.

THE VIDEOGRAPHER:  Going off the record, 11:30 a.m.



Q.    Do you agree that your report provides an opinion of market value for the single family properties within the proposed class zone?

A.    Yes.

Q.    As of what date?

A.    As of the date of the Arkema event.

Q.    As of August 2017, correct?

A.    That's correct.  Yes.

Q.    So that is a market value determination, correct?

A.    Yes.

Q.    And in rendering your opinion of market value, you gathered transactional data from September 1, 2016, to August 31, 2018. Correct?

A.    Yes.

Q.    And we look at that if we look at paragraph 56 of your report.  I think that you make that clear in paragraph 56, but let's take a look at it.

Paragraph 56, you indicate that "Transaction data was gathered from the period September 1, 2016, one year prior to Hurricane Harvey, to August 31, 2018, approximately one year after Hurricane Harvey.  In total, I began



with a data set of 10,274 transactions, broken down as shown in table 3."

And that is the market transaction data that you used in your analysis to determine market value as of August 2017, correct?

A.    Yes.

Q.    Okay.  And so it's correct that your analysis did not use or consider any data earlier than September 1, 2016, correct?

A.    Not explicitly, no.

Q.    When you say, "Not explicitly," did you consider transactional data before September 1, 2016, in your analysis?

A.    Not explicitly, no.

Q.    And is it correct that your analysis did not use or consider any transactional data later than August 31, 2018?

A.    That's correct.

Q.    Okay.  Did you make any attempts to determine if data earlier than September 1, 2016, or later than August 31, 2018, was available?

A.    I can't recall if I looked or didn't look.  I know that good appraisal practice -- and here I would refer you to the methodological



edicts from Fanny Mae and Freddie Mac -- consider one-year windows, in this case one year before and one year after, for real estate value events.

(Reporter clarification.)

A.    Right.  Maybe if I rephrase.  Fannie Mae and Freddie Mac methodological edicts point to one-year windows for value trends.  And so, in the determination of which data to utilize, I followed the methodological edicts of Fannie and Freddie, which are generally accepted in residential real estate, to give me -- to inform me that I wanted to utilize MLS data for the year before and the year after.

Now, whether or not I happen to notice if I had other data in the data files, I can't recall because I was focused, appropriately consistent with appraisal edicts, on those one-year windows.

Q.    So you intentionally limited your window of MLS data to the two-year window, correct?

A.    Yes.  And, again, consistent with methodological edicts coming from authoritative sources.


MAGNA
LEGAL SERVICES

impacts as a result of and immediately surrounding the Arkema event.

Q.     Okay.  And that's -- and I think that's what you testified before.  Your opinions and your analysis are focused on the time period of August 2017, correct?

A.     Yes.

Q.     Okay.  And so you just have not analyzed and you have no opinions today regarding whether the detrimental impact from 2017 is permanent or not, correct?

A.     I have not done any study, so I'm not expressing an opinion on that.

Q.     Can we please pull up an article by Jackson, Case Studies Analysis:  Environmental Stigma and Monitored Natural Attenuation.  I'm pulling it up, and I'm going to show you --

          MR. BIRSIC:  Do we need somebody to mute there?

          MR. PRICHARD:  That's Van.

          MR. BIRSIC:  Van, will you stop messing up my deposition?

BY MR. BIRSIC:

Q.     Okay.  I'm going to show you, Dr. Kilpatrick, an article from Thomas O.


MAGNA
LEGAL SERVICES

# **Exhibit 2**

*A Study Regarding the Diminution in Value of*

*Properties Impacted by the*

*Arkema Explosion in August, 2017*

In the United States District Court,

Southern District of Texas

Houston Division

July 16, 2021

Prepared at the request of:

Stag Liuzza, LLC

One Canal Place

365 Canal Street, Suite 2850

New Orleans, Louisiana 70130

Prepared by:

John A. Kilpatrick, PhD, MAI

Greenfield Advisors, Inc.

#677, 400 NW Gilman Blvd

Issaquah, Washington 98027

# Table of Contents

Qualifications...........................................................................................................................................1

    Prior Testimony and Consultations............................................................................................2

Summary of Findings .............................................................................................................................4

Summary of Events Leading to This Case ..........................................................................................5

Description of the Proposed Class........................................................................................................6

Valuation of Residential Properties....................................................................................................10

    Unimpaired Values .........................................................................................................................11

        Mass Treatment in Determination of Damages to Real Estate .......................................11

        Relevant Literature – Mass Appraisal and Automated Valuation....................................14

        USPAP Requirements for Mass Appraisal Methods ..........................................................15

        Data Sources..............................................................................................................................18

    Impaired Values ...............................................................................................................................21

        Relevant Literature...................................................................................................................21

        Property Rights and Homeowner's Perceptions of Impairment .....................................22

Summary and Conclusions ...................................................................................................................42

Various USPAP-Related Items ...........................................................................................................44

    Extraordinary Assumptions and Hypothetical Conditions:...............................................44

    Interests Valued...............................................................................................................................44

    Type and Definition of Value.......................................................................................................44

    Highest and Best Use......................................................................................................................45

    General Assumptions .....................................................................................................................45

    General Limiting Conditions.........................................................................................................45

Certification ...........................................................................................................................................46

## Tables

Table 1 -- Parcels in Harris County ................................................................................................8
Table 2 -- Parcels in Liberty County ............................................................................................10
Table 3 -- Total Transaction Data Set ..........................................................................................19
Table 4 -- Independent Variables and Summary Data ................................................................19
Table 5 – Results from GAVM Training ......................................................................................20
Table 6 -- Goodness of Fit Statistics ............................................................................................21
Table 7 -- Sales Analyzed Before/After .......................................................................................33
Table 8 -- Monthly Per Square Foot Average Prices ..................................................................35
Table 9 -- Post Event Monthly Prices PSF ..................................................................................36
Table 10 -- Summary of Pricing Impacts After Arkema Explosion ..........................................38
Table 11 -- Correlations Between Distance and House Price .....................................................38
Table 12 -- Comparable Case Studies ..........................................................................................41
Table 13 -- Aggregate Values for Liberty County .......................................................................42
Table 14 -- Aggregate Values for Harris County .........................................................................43
Table 15 -- Aggregate Values for Affected 7-mile Area .............................................................43
Table 16 -- Aggregate Values by Ring Segment ..........................................................................43

## Figures

Figure 1 -- Seven Mile Radius of Arkema Facility ......................................................................7
Figure 2 -- Geolocated Parcels in 7-Mile Affected Area .............................................................8
Figure 3 -- Chambers County Parcels ............................................................................................9
Figure 4 -- Price Trend "Inside" Before the Arkema Event .......................................................34
Figure 5 -- Price Trend "Outside" Before the Arkema Event ....................................................34
Figure 6 -- Price Trend "Inside" After the Arkema Event .........................................................37
Figure 7 -- Price Trend "Outside" After the Arkema Event .......................................................37

## QUALIFICATIONS

1.      I am Dr. John A. Kilpatrick, Ph.D., MAI.  My Ph.D. degree is in Finance, with a concentration in real estate investments.  I am a state-certified (general) real estate appraiser in Texas and in all of the other 49 states plus D.C.  I am a Nationally Certified USPAP[1] instructor, one of a small percentage of appraisers so certified by the Appraisal Standards Board in Washington and authorized to teach appraisal standards[2].  I am the sole author of five textbooks on real estate, most recently Real Estate Valuation and Strategy (McGraw Hill, 2020), and contributing author to five others, most recently Corridor Valuation (Appraisal Institute, 2019) and Brownfields Law and Practice: The Cleanup and Redevelopment of Contaminated Land (LexisNexis Matthew Bender Publications, 2020). My publications on real estate have won numerous awards, including the Appraisal *Institute's Best Paper in Real Estate Valuation* (American Real Estate Society annual meetings, 2010) and the *Bernard L. Barnard Outstanding Technical Essay* Award (International Association of Assessing Officers, 2014).  I have been accepted as an expert witness in various state and federal courts throughout the United States on matters relating to real estate valuation, contaminated or otherwise impaired property values, construction defects, and statistical analysis.

2.      I am an MAI-designated[3] member of the Appraisal Institute and currently serve on the review board for its flagship publication, The Appraisal Journal[4].  I am a past member of the editorial board of the Journal of Sustainable Real Estate, a Fellow of the American Real Estate Society, and a Principal Member of the Real Estate Counseling Group of America.  I am co-holder of a patent on Automated Valuation Modeling[5].

3.      In 2004, I became one of a handful of appraisers in the United States to be designated as a nationally certified appraisal standards instructor by the Appraisal Standards Board in Washington, D.C. Also in 2004, my peers in the industry honored me by nominating me for a seat on the Appraisal Qualifications Board and by naming me a Member of the Faculty of Valuation of the British Royal Institution of Chartered Surveyors; I was later named a *Fellow* of that organization in 2011. In March of 2017, Washington's Governor Jay Inslee appointed me to a two-year term representing the citizens of Western Washington as a *Director* of the Washington State Economic Development Finance Authority.

4.      I have served as a consultant on environmentally impaired property to the U.S. General Services Administration, the U.S. Army, and many other organizations. At the invitation of the Japan Real Estate Institute, I co-authored the authoritative guide on the appraisal of

---

[1] Uniform Standards of Professional Appraisal Practice, published by the Appraisal Standards Board, which governs real estate appraisal practice in Texas.  See Texas Appraiser Licensing and Certification Act, Section 1103.154

[2] As of this writing there were 418 certified Appraisal Standards Instructors in the U.S.

[3] The MAI designation is one that is held by appraisers who are experienced in the valuation and evaluation of commercial, industrial, residential and other types of properties.

[4] I am also a former member of the Editorial Board of that publication.

[5] "Automated-valuation-model training-data optimization systems and methods, U.S. Patent No. 9,582,819, February 28, 2017.

environmentally impaired properties for appraisers in that nation, published in the October 2003 issue of the Journal of the Japan Real Estate Institute (JJREI).

5.   I am the lead author of "The Aftermath of Katrina: Recommendations for Real Estate Research," a peer-reviewed article written at the invitation of The Journal of Real Estate Literature (Kilpatrick and Dermisi, 2007) to provide authoritative guidance to academics and real estate practitioners conducting scholarly research into the real estate impacts in New Orleans following the 2005 hurricane. The article recognizes that holistic, market-wide analytical methods are necessary to understand the economic and property value issues in the affected areas.

6.   I serve on the National Board of Advisors for the Carson College of Business, Washington State University, and was appointed a *Visiting Professor* in Finance for the Spring, 2020, semester.  I am former *Visiting Scholar in Finance* at the Zicklin School of Business, Baruch College, New York City.  I am a member, a *Paul Harris Fellow,* and a *Pinkham and Steel Honoree* in the Seattle Rotary Club and serve on the *Advisory Board* for the U.S. Global Leadership Coalition.  A complete copy of my current professional qualifications, including a listing of recent testimony, are appended to this report.

7.   For more than 40 years, our firm has been a leading authority on difficult real estate appraisal problems, specializing in the valuation of impaired sites. Greenfield has distinguished itself over the years in the high level of educational and professional qualifications of our staff; the rigor of our quantitative techniques; and our articles on appraisal techniques, which have been published in both academic and professional journals. Greenfield Advisors is widely regarded as one of the leading firms in the world in the valuation of environmentally impaired property. This is evident by our 2003 JJREI invitation, requests for me to lecture on this topic to the Asian Real Estate Society (2007 and 2008) and the Technical University of Eindhoven in the Netherlands (2007), and our ongoing legacy of peer-reviewed articles that appear in refereed journals and presentations at scholarly conferences.

8.   Greenfield Advisors first introduced many of the advanced tools and techniques that appraisers use to evaluate environmentally impaired property, such as *stigma analysis*, *underground rent*, and *survey research*. We have written and lectured extensively on the application of mass appraisal and statistical methods in class actions, and Greenfield Advisors' 2007 white paper, *Certifying the Real Estate Damages Class – An Appraiser's Perspective*, is widely considered the authoritative outline on the subject.

9.   I am being compensated at the rate of $800 per hour for this work but my compensation is not dependent on the outcome of this case.

10.   A full and complete copy of my Professional Qualifications, as well as a listing of my deposition and trial testimony for the last four years, is attached to this report.

## Prior Testimony and Consultations

11.   I have testified or consulted on numerous toxic release situations utilizing mass appraisal methods and I have testified or consulted on property valuation using automated valuation models (AVMs) specifically in federal court cases. Examples include but are not limited to the following:

- 2019, California: I consulted on a loss of use and enjoyment case for the County of Santa Barbara regarding a large number of County-owned properties impacted by the Refugio Oil Spill. The matter recently settled in mediation.

- 2018, Michigan: I offered expert opinions in *Tenniswood, et al., v. Ford Motor Company*, a Michigan state court matter involving contaminated properties. In this matter, I utilized a mass appraisal model to determine unimpaired and impaired property values.

- 2018, Minnesota: I have offered expert testimony in the Rescap Liquidating Trust matter in the U.S. District Court, District of Minnesota. While the case is presently ongoing, my testimony, and specifically my Greenfield Automated Valuation Model ("GAVM") withstood a 2018 *motion in limine*.

- 2017, District of Massachusetts: In *Massachusetts Mutual Life Insurance Co. v. DLJ Mortgage Capital, Inc.* my mass appraisal model withstood a *motion in limine*, and the case recently settled for an undisclosed sum.

- 2017, W. D. of Washington: In *Jordan v. Nationstar*, I offered opinions on rental rates for foreclosed homes throughout the State of Washington using a variant of the GAVM.

- 2017, District of Massachusetts, in *Massachusetts Mutual v. Credit Suisse*, my mass appraisal model, utilizing my GAVM, withstood a *motion in limine*, and the case settled.

- 2017, District of Connecticut: I was offered as an expert witness in *FHFA v. RBS*, United States District Court, District of Connecticut, in which my mass appraisal model, utilizing the GAVM, would be used to retrospectively value properties throughout the United States. The case subsequently settled for $6.5 Billion.

- 2012-2017, Missouri: A federal class action where I consulted with attorneys representing a class of claimants in *Barfield, et al., v. Sho-Me Power Electric, et al.* (USDC, Western Dist of Mo) regarding the value of a state-wide fiber optic cable easement. My mass appraisal model, utilizing a corridor valuation, which was accepted by the Court, showed that there was a systematic and measurable impact on all properties burdened by this easement.

- 2016-2019, Oregon: I consulted on *Meeker et al. v. Bullseye Glass Co.*, an Oregon state court matter, similar to the matter at hand, involving contaminated properties. I utilized a mass appraisal model, which withstood a *motion in limine* and was accepted by the Court. This case recently settled.

- 2015, District of Massachusetts: I was offered as an expert witness in *Massachusetts Mutual v. Deutsche Bank*, United States District Court, District of Massachusetts, in which my mass appraisal model, using the GAVM, would be used to retrospectively value properties throughout the United States. My model and testimony withstood a *motion in limine* and were admitted, and the case settled for an undisclosed sum.

- 2015, Southern District of New York: I testified in *Federal Housing Finance Agency (FHFA) v. Nomura*, utilizing the GAVM to determine retrospective property values.

My testimony and the mass appraisal model withstood a *motion in limine* and the case went to trial. The court awarded $806 million. Recently, on appeal, the 2nd Circuit Court of Appeals affirmed the trial court's decision.

- 2014, United States: I consulted on *American International Group Inc. et al. v. Bank of America Corp. et al.,* utilizing the GAVM to determine retrospective property values of homes underlying residential mortgage-backed securities. This case settled in July 2014 for $650 million.

- 2014, United States: I was a testifying expert in *FHFA v. Goldman Sachs & Co., et al.*, a federal court case focused on the valuation of properties underlying residential mortgage-backed securities. This case recently settled for $1.2 billion.

- 2014, United States: I also testified in the matter of *FHFA v. Ally Financial Inc., et al., F/K/A GMAC, Inc.*, regarding the use of AVM, mass appraisal, and appraisal reviews for evaluating appraisals underlying residential mortgage-backed securities. This case settled.

- 2014, United States: Also in the federal court system, I was the testifying expert in *FHFA v. Merrill Lynch & Co., Inc.* This matter also involved my expertise on AVMs, the GAVM itself, other mass appraisal techniques, and appraisal reviews as means for evaluating appraisals underlying residential mortgage-backed securities. This case settled in 2014 as part of a $9.3 Billion settlement with Bank of America.

- 2005, Louisiana: I consulted on and testify in a variety of cases stemming from Hurricane Katrina. Most notable among these was *Turner v. Murphy Oil*, a class action involving 6,700 properties (residences, mixed-use, and commercial) that suffered an oil spill from a nearby refinery occurring 3 days after Katrina. After demonstrating that Greenfield Advisors could utilize a mass appraisal model to separate the oil damage from the flood damage, our clients were able to negotiate a settlement with the responsible parties. *Turner v. Murphy Oil has implications for Wheeler v. Arkema, in that in both instances I used a mass appraisal model to separate any market impacts of the hurricane from market impacts of the contamination.*

- 2003, Louisiana: I testified in the successful class certification of *Guillory et al. v. Union Pacific*, a case involving PCE contamination from a leaking tanker car, and specifically as to the applicability of mass appraisal techniques. Affected properties totaled in the hundreds and included a variety of residences and some nonresidential properties.

12. I have been asked to opine on whether and how the real damages alleged by the class can be efficiently and commonly assessed on a class-wide basis. I conclude that damages reflecting diminished values can be analyzed systematically with an as explained below. The facts and data I have relied upon to formulate my opinions are referenced herein.

## SUMMARY OF FINDINGS

13. The following is a summary of my opinions:

- My expertise and experience in valuation has shown that mass treatment for determining the real property values of the residential properties within the area

impacted by the Arkema explosion, using mass appraisal methods that apply an AVM, will be more accurate, less expensive, and faster than approaching the valuation of proposed class properties through individual appraisals by a large set of human appraisers.

- USPAP, the governing paradigm of the appraisal profession, recognizes mass appraisal by means of automated valuation as an accepted method for valuing a large collection of properties. USPAP Standards Rule 5-7 requires an appraiser to evaluate the performance of their mass appraisal methods, to ensure that his or her model meets attainable standards of accuracy. The peer-reviewed appraisal literature overwhelmingly supports the use of multiple regression analysis (in this case taking the form of an AVM) as a method for valuing large collections of properties.

- In sum, given the facts of the case, the availability of data, and the professional standards and wealth of academic studies that support the mass appraisal of the properties in this situation, it is my opinion, to a reasonable degree of scientific certainty based on the above factors as well as my expertise and experience, that the approaches discussed in this affidavit can and should be used for valuation and damage assessment purposes in this case.

- I have utilized data from the affected area and surrounding "control" areas to populate my GAVM and demonstrate the following:
  - o The data exists to successfully utilize a mass appraisal model;
  - o A mass appraisal utilizing this data is both efficient and efficacious;
  - o A mass appraisal utilizing this data is statistically robust and unbiased; and
  - o A mass appraisal utilizing this data can accurately discern both unimpaired values before the Arkema explosion as well as impaired values after the explosion.

- I reserve the right to update and alter my opinions in this matter based on the availability of any new or unknown information.

## SUMMARY OF EVENTS LEADING TO THIS CASE

14. It is my understanding that the proposed class members in this matter are property owners and residents who are located within seven miles of the Arkema manufacturing facility at 18000 Crosby Eastgate Road in Crosby, Texas.

15. As I understand it, Arkema, Inc., owns and operates a manufacturing facility in Crosby, Texas, that produces organic peroxide-based products including various products sold under the brand name "Luperox." For ease of reference, I will refer to all of the organic peroxide products in this report collectively as "Luperox." Many Luperox brand and other organic peroxide products are volatile and will combust unless refrigerated[6].

---

[6] See, for example, Arkema Safety Data Sheet for Luperox, dated 8/4/17

16. The facility sits in a flood plain near the Gulf Coast, leaving it vulnerable to the approach of Hurricane Harvey, which made landfall on August 25, 2017[7]. Heavy rain and rising flood waters forced Arkema to move nearly 350,000 pounds of combustible materials first to the low temperature warehouse on higher ground, then to refrigerated trailers which were moved to even higher ground.

17. The floodwaters' continued rise eventually threatened the trailers' cooling systems as well, and on August 29, Arkema alerted local authorities that a combustion event was imminent. The authorities established a 1.5-mile evacuation zone around the facility. Between August 31 and September 4, nine refrigerated trailers burned in three separate ignitions.

18. In addition, two of the facility's wastewater tanks overflowed, dispersing contaminated water. Shortly, local residents saw vapor clouds of white smoke, flames and plumes of black smoke, and accumulating ash on their properties, and persons inside and outside of the established 1.5-mile evacuation zone reported physical symptoms including bodily rashes, headaches, eye irritation, blisters, and respiratory difficulty.

## DESCRIPTION OF THE PROPOSED CLASS

19. According to plaintiffs' counsel, the proposed class includes all properties within a seven-mile radius of the Arkema facility.

20. Our examination of the proposed class indicates that this area spans portions of three different, counties, Harris County, Chambers County, and Liberty County, as shown in Figure 1, following[8].

---

[7] https://www.fox6now.com/weather/powerful-hurricane-harvey-makes-landfall-in-texas

[8] Figure 1 and preliminary property information are provided by Jerry Gilbert, a consulting engineer, in his report dated March 16, 2021.

*Figure 1 -- Seven Mile Radius of Arkema Facility*



*Map Provided by Jerry Gilbert*

21.  Using publicly available data from the three counties, the individual parcels can then be mapped and geolocated, as shown in Figure 2, following.

22.  A preliminary map count for Harris County was provided by Jerry Gilbert, a consultant engaged by plaintiff attorneys. I have further updated this with my own research.

*Figure 2 -- Geolocated Parcels in 7-Mile Affected Area*



*Map from Greenfield Advisors and Google Earth*

*Table 1 -- Parcels in Harris County*

| Ring Geometry – Distance from Arkema Site | Ring Identifier | Total Number of Parcels | Total Residential Parcels |
|---|---|---|---|
| Within 1.5 miles | 1.5 | 724 | 397 |
| From 1.5 to 2 miles | 2 | 373 | 201 |
| From 2 to 2.5 miles | 2.5 | 449 | 274 |
| From 2.5 to 3 miles | 3 | 520 | 305 |
| From 3 to 3.5 miles | 3.5 | 846 | 503 |
| From 3.5 to 4 miles | 4 | 2,384 | 1,828 |
| From 4 to 4.5 miles | 4.5 | 2,077 | 1,434 |
| From 4.5 to 5 miles | 5 | 1,976 | 1,140 |
| From 5 to 5.5 miles | 5.5 | 1,805 | 1,092 |
| From 5.5 to 6 miles | 6 | 1,951 | 1,223 |
| From 6 to 6.5 miles | 6.5 | 2,020 | 1,277 |
| From 6.5 to 7 miles | 7 | 1,583 | 804 |
| Total Parcels | | 16,708 | 10,478 |

23.  The largest number of properties within the 7-mile ring are in Harris County. Specifically, there are 700 parcels within the 1.5 mile ring and 16,708 parcels total within a 7-mile radius. Of these, within the 1.5 mile ring, 404 are classified as residences by Harris County and within the 7-mile radius, 10,478 are residences. This is detailed in Table 1, above. Note that categorization among the ring segments is based on the centroid of each parcel.

24.  Similarly, there are 22 parcels in Chambers County. It appears that all 22 of these parcels have agricultural use. (See Figure 3, following).

*Figure 3 -- Chambers County Parcels*



*Map provided by Jerry Gilbert*

25.  There are apparently 2,923 affected properties in Liberty County, as detailed in the following Table 2. Of these, 1,257 are improved residential properties, and the remainder are unimproved.

*Table 2 -- Parcels in Liberty County*

| Ring Geometry – Distance from Arkema Site | Ring Identifier | Total Number of Parcels | Total Residential Parcels |
|---|---|---|---|
| From 2 to 2.5 miles | 2.5 | 6 | 2 |
| From 2.5 to 3 miles | 3 | 120 | 44 |
| From 3 to 3.5 miles | 3.5 | 236 | 96 |
| From 3.5 to 4 miles | 4 | 401 | 197 |
| From 4 to 4.5 miles | 4.5 | 394 | 172 |
| From 4.5 to 5 miles | 5 | 285 | 113 |
| From 5 to 5.5 miles | 5.5 | 189 | 76 |
| From 5.5 to 6 miles | 6 | 431 | 165 |
| From 6 to 6.5 miles | 6.5 | 362 | 165 |
| From 6.5 to 7 miles | 7 | 499 | 227 |
| Total Parcels | | 2,923 | 1,257 |

## VALUATION OF RESIDENTIAL PROPERTIES

26. To estimate damages, residential properties will be valued in the before and after (or unimpaired and impaired) state, thus allowing me to assess damages according to the methods outlined by The Appraisal Foundation's *Uniform Standards of Professional Appraisal Practice* (USPAP) and the Appraisal Standards Board (ASB). USPAP and the ASB recommend that damages to property values be determined by calculating the difference between the unimpaired and impaired values. The unimpaired value is a property's value before the environmental contamination event(s); the impaired value is the value after the environmental contamination event(s). This follows the guidance set forth in Advisory Opinion 9 ("AO-9").

27. This section explains the factors that I used to establish the values of single-family residential properties in the affected area in a hypothetical unimpaired case. These properties include, but are not limited to, residential vacant land, multi-family property with 4+ units, and mobile homes. In past assignments, I have found that properties best appraised with such hybrid methods have accounted for an immaterial percentage of all properties and aggregate property value.

28. The unimpaired values are as of August 25, 2017, the day that Hurricane Harvey made landfall. To determine the unimpaired value of the residential properties, I utilize the Greenfield Automated Valuation Model ("GAVM"), in accordance with USPAP standards for mass appraisals, allowing me to value the single-family residential affected properties in a consistent and reliable manner. AVMs are computer programs that employ statistical models to ascertain objective and accurate estimates of the market value of real property.[9] The Appraisal Standards Board describes an AVM as "a computer software program that analyzes data using an

---

[9] USPAP 2020-21 (Advisory Opinion 18).

automated process."[10] AVMs have been used in the industry since the early 1990s to value residential property and, when properly designed, validated, and applied, AVMs provide a statistically accurate measure of property value when sufficient reference data are available.[11] The Appraisal Standards Board recognizes AVMs, when used competently by a trained and knowledgeable appraiser, as an appropriate tool for performing appraisals.[12] Federal regulators have authorized the use of AVMs to estimate collateral value for mortgage lending purposes[13].

29.  As a next step, I then discuss the methodology for determining value impairment and discuss the evidence that has been collected to this point, demonstrating evidence of value impairment. I approach the impaired (or "as-is") valuation from multiple perspectives. As USPAP's AO-9 states, "Estimate[s of] the effects of environmental contamination on real property value usually involves the application of one or more specialized valuation methods [besides the sales comparison approach, cost approach, and income approach]."[14] The following sections present an abstract of the appraisal methods proposed. These appraisal methods are acceptable for determining the impaired values of the properties in this case. After applying these methodologies, and consistent with the requirements of USPAP, I will reconcile the various findings to an overall diminution in value, which is used to determine the impaired (or as-is) values of the residential affected properties. Beginning with an unimpaired value, I will apply the diminution results as a component of the mass appraisal to determine the impaired values.

## Unimpaired Values

### Mass Treatment in Determination of Damages to Real Estate

30.  It is my opinion, as an appraiser, (based on my education, training, and experience, as well as evidence throughout this report) that considering the diminution to individual residential properties with reference to the pattern of diminution across the proposed class members results in an objective and credible estimate of damages of the residential properties. I will utilize a mass appraisal approach to reach a consistent valuation across a large number of properties. Specifically, I will use an AVM, a type of regression analysis, to determine the unimpaired property values of single-family residential properties in this proposed class members group.

31.  Greenfield Advisors has successfully employed mass appraisal methodology in a host of cases throughout the United States.[15] Two of the seminal cases accepting our methodology are one

---

[10] *Id.*

[11] Kirchmeyer, James, and Peter Staas. 2008. *AVMs 201: A Practical Guide to the Implementation of Automated Valuation Models* at 24–25.

[12] USPAP 2018-2019, at 102 (Advisory Opinion 18).

[13] See 12 U.S. Code § 3354

[14] USPAP 2018-2019, p. 83.

[15] Specifically, the Greenfield AVM ("GAVM") was accepted very recently in *FHFA v. Nomura*, No. 11-06201 (S.D.N.Y.), Final Opinion & Order (Dkt. No. 1686), *Massachusetts Mutual v. Deutsche Bank*, No. 11-30039 (D. Mass.), Jt

that arose out of the Hurricane Katrina litigation, specifically *Turner v. Murphy Oil USA, Inc.,* 2006 WL 91364, *5 (E.D. La. 2006), involving an oil spill, and *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc., 104 F. Supp. 3d 441, 501 (S.D.N.Y. 2015), aff'd 873 F.3d 85 (2d Cir. 2017),* which involved failed mortgage-backed securities. Citing from the Court's decision in this latter case regarding the acceptability of this methodology:[16]

> Kilpatrick's testimony "both rest[ed] on a reliable foundation and [wa]s relevant to the task at hand." *Daubert, 509 U.S. at 597.* When subjected to close examination at trial, his tools were shown to be conservative, careful instruments that were well-designed to ferret out appraisal bias and to be of assistance to the finder of fact in making assessments about appraisals…While defendants have mounted a vigorous attack against the Greenfield AVM, there is no evidence that any AVM currently used in the field would have performed better when assessed with the rigor applied by the impressive array of experts assembled by defendants. It is telling that defendants themselves have historically relied upon AVMs to identify a set of appraisals deserving further scrutiny. FHFA has shown that Kilpatrick's AVM has performed at least as reliably as those on which defendants and others in business typically rely in making important decisions.

Recently, in *Meeker et al. v. Bullseye Glass Co.,* a case involving heavy metal contamination in a neighborhood in Portland, the court relied on my report anticipating the same AVM methodology as proposed in this case when it certified the class. The Greenfield AVM has been specifically designed to achieve statistically reliable results, even when there is a high degree of property level heterogeneity. It does so by valuing the dwellings one home at a time, using a uniquely selected data set in each iteration. The availability of cheap, fast computing power allows for this advantage in efficiency. In the *FHFA* and *Massachusetts Mutual* cases cited previously, a variation of the Greenfield AVM was used to provide retrospective values of homes used as collateral in mortgage-backed securities. For a given security, the collateral may comprise of thousands of homes scattered across the United States.[17] My AVM has reliably produced estimates of market value with statistical rigor, throughout the United States. Thus, the Greenfield AVM accounts for any heterogeneity in the proposed class within professional and industry limits/standards.

32.   Individual property valuation methods typically rely on small samples of comparable sales (e.g., three in the case of the widely used Uniform Residential Appraisal Report [URAR]).[18] Estimates from small samples are subject to random and significant statistical variation

---

Pre-Trial Mem. (Dkt. No. 584), and *Massachusetts Mutual v. DLJ Mortgage Capital*, No. 11-30047 (D. Mass.), Order Deny Mot. Exclude (Dkt. No. 514).

[16] *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc., 104 F. Supp. 3d 441, 501 (S.D.N.Y. 2015), aff'd 873 F.3d 85 (2d Cir. 2017)* ("The GAVM served as a reliable gating mechanism to identify a set of materially inflated appraisals"; *Mass. Mut. Life Ins. Co. v. DB Structured Prod., Inc., No. 11-cv-30039-MGM, 2015 WL 2130060, at *9 (D. Mass. May 7, 2015)* ("As for Dr. Kilpatrick's testimony regarding GAVM, the court finds his opinion is relevant and rests upon sufficiently reliable grounds for admissibility purposes"

[17] It is for this reason that I am a State Certified Appraiser in all 50 states plus the District of Columbia. We believe only one other person in the United States holds this distinction.

[18] A standard form for reporting the appraisal of a dwelling; required by the major secondary mortgage purchasers. Also known as Form 1004.

(Kilpatrick, 2010).[19] The artful appraiser senses which data are suitable for analysis using experience, local market knowledge, and conversations with persons familiar with the sale, thereby reducing random error within the sample but at the expense of introducing bias in the sample selection process. By contrast, a mass appraisal method that looks at the broader geographical pattern and incorporates spatial analysis techniques will result in more stable, scientifically valid estimates of value impacts. Mass appraisal is better suited than individual valuations to sorting out the "signal" from the "noise" with respect to value changes while accounting for the effects of other property characteristics. When faced with real estate prices which are not well distributed (as is usually the case), the mass appraisal can take the form of a maximum likelihood estimator, that is consistent, asymptotically normal, and efficient (Kilpatrick, 2011).[20]

33. Using a mass appraisal system, an appraiser can assemble the data and mapping needed to identify the properties and property owners within the affected area. This mass appraisal system allows the appraiser to value the properties and assess the impacts on property values through a coherent mapping of effects across the class area. In addition, mass treatment greatly reduces the administrative costs of valuing the properties individually and estimating the damages.

34. From a real estate appraisal standpoint, mass appraisal provides an unbiased and efficient means of valuation. The pattern of damages to affected properties is best analyzed by considering the affected area as a whole.

35. A major factor supporting the use of mass appraisal in this case is the need to assemble, analyze, and interpret a large body of data for credible and unbiased valuations. Individual-property appraisal methodology requires a small dataset of comparable sales to be selected for comparison purposes. By contrast, in mass appraisal it is common to use all property sales of like kind—in this case, single-family residential. By using the same set of residential sales transactions as comparable sales, any bias that might be introduced when choosing comparable sales for a single property is eliminated. Further, when not limited to small datasets, adjustment factors are extracted from the market using statistical techniques instead of traditional judgment-based methods. Later in this report, I outline sources of data regarding property characteristics that I believe are sufficient, in combination, to value the single-family residential affected properties in a fair, accurate, and consistent manner.

36. The process of comprehensively gathering, compiling, and geo-referencing data is complex but necessary when simultaneously valuing thousands of properties either individually or *en masse*. Extensive data cleaning and checking processes are employed to eliminate the errors and omissions that naturally occur in even the best datasets. This quality control process requires both time and expertise. If different analysts performed this work independently for numerous individual owners, there would be severe challenges to ensure the consistency of data, appraisal methods, and valuation conclusions across the many properties.

---

[19] Kilpatrick, John A. 2010. "Appraisal Error Terms and Confidence Intervals." Presented at the 2010 ARES annual meeting. Note: This paper won the 2010 award for Best Paper in Real Estate Appraisal from the Appraisal Institute.

[20] Kilpatrick, John A., 2011, "Expert Systems and Mass Appraisal." Journal of Property Investment and Finance 29-4/5, 529-550

37. Handling valuation efforts through a mass appraisal system will allow the achievement of significant economies of scale.[21] I have created a database for the entire proposed class area, which will be used for "unimpaired" valuation of the affected residences against which the diminution in value will be measured.

38. An article in *The Appraisal Journal* by Colwell et al. (2009) highlighted favorable comments made by Judge Frank Easterbrook regarding the use of multiple regression analysis in litigation cases. In *Guardian Pipeline, LLC v. 950.80 Acres of Land et al.*, Judge Easterbrook suggested that both parties could have produced value estimates using multiple regression analysis, a method that "has the potential to be faster, less expensive, and more accurate than a parade of witnesses offering estimates that cannot be verified." Judge Easterbrook continued by citing the Reference Manual on Scientific Evidence, specifically Rubinfeld's "Reference Guide on Multiple Regression." The guide, published by the Federal Judicial Center, thoroughly outlines the components of multiple regression analysis. Multiple regression analysis is characterized as a statistical tool for understanding the relationship between two or more variables. Colwell et al. noted that the admissibility was governed by Federal Rule of Evidence 702 and that a significant implication from the decision was that there is a preference for systematic and defensible analysis.

39. The overwhelming weight of prevailing valuation methodology and USPAP make it difficult, if not impossible, to consider the valuation issues associated with this case without resorting, at least de facto, to an AVM. Prevailing thought among academic researchers is that large-scale valuation issues can be best described using large-scale statistical models, and those models meet the criteria outlined in *Daubert*.

## Relevant Literature – Mass Appraisal and Automated Valuation

40. Multiple regression analysis is a statistical method used to explore the relationships between several independent variables and a dependent variable. Examples of independent variables include, but are not limited to, the size of the house, the number of bathrooms, land acreage or lot size, location, and dwelling age. Once this information has been assembled for various houses, multiple regression analysis can be used to see whether and how these measures relate to the sales prices for houses in a control area (the dependent variable).

41. In the case of complex goods such as houses or other real estate assets, appraisers and valuation researchers have shown that the prices buyers pay is the sum of the values of the various property characteristics (Lancaster, 1966; Rosen, 1974).[22] These property attributes are "hedonic characteristics" or variables, from a Greek word meaning, "pertaining to pleasure" or "relating to like or dislike." Real estate prices can, as an example, be represented and explained through hedonic models (a type of multiple regression analysis) such as:

---

[21] Throughout this document, I will refer to mass appraisal, hedonic regression models, multiple regression models, and statistical analysis. For clarity, mass appraisal is a method approved by the *Uniform Standards of Professional Appraisal Practice* to systematically value a large number of properties simultaneously. Hedonic regression and multiple regression models are the most common techniques for conducting a mass appraisal.

[22] Lancaster, Kelvin J. 1966. "A New Approach to Consumer Theory," *Journal of Political Economy* 74-2, 132-157; Rosen, Sherwin. 1974. "Hedonic Prices and Implicit Markets: Product Differentiation in Pure Competition," *Journal of Political Economy* 82-1, 34-55.

*Equation 1*

Price = sum of values of individual property characteristics

42.     A multiple regression analysis applied to housing data may also use correlative variable, such as economic factors or local tax assessed values (TAV)[23]. Such a model uses data on actual sales prices and finds how these are correlated with other local economic factors. The following equation is often used to convey the general form of a multiple regression model:

*Equation 2*

$$P_i = \beta_0 + \beta_1 X_1 + \beta_2 X_2 + \ldots + \beta_N X_N + \varepsilon i$$

43.     In this equation, $P_i$ is the price the buyer pays for a property *i*. If the variables are hedonic characteristics, then $\beta_1$ is the marginal willingness to pay (expressed in dollars) for home characteristic $X_1$ or the correlation between $X_1$ and the selling price. It follows then that $\beta_N$ reflects the marginal willingness to pay (expressed in dollars) for any other characteristic $(X_N)$ that influences the sales price of a home (such as the presence of a garage) or the correlations between those variables and the selling price, and $\varepsilon_i$ is the error term associated with the equation.[24]

44.     Greenfield's AVM can be adapted to utilize either hedonic "causality" variables or "correlative" variables, depending on the data availability.

45.     Greenfield also uses a set of robust statistical tools to examine for the effects of outliers, to minimize the nonlinearity in real estate data, and to determine a confidence interval for each of the properties valued. The complete model itself and testing is set out later in this report.

## USPAP Requirements for Mass Appraisal Methods

46.     USPAP is the governing paradigm for real estate valuation in Texas and other states.[25] Kilpatrick et al. (2005) summarized mass appraisal methods as they are used in the appraisal of contaminated property and as they are applicable under USPAP.[26] Kilpatrick (2004 and 2005) applied the use of these techniques in class actions.[27] AVMs are addressed in USPAP through the Competency Rule, which applies to all appraisals under USPAP generally, as well as Advisory Opinions 18 and 37 and Standards 5 and 6, which apply more specifically.

47.     USPAP Standards 5 and 6 address mass appraisals, which include AVMs. Conceptually, an AVM is a more statistically rigorous extension of the sales comparison method, and it has a long history of use in the appraisal profession. USPAP defines a mass appraisal as "the process

---

[23] Applications of the GAVM in recent nationwide mortgage-backed securities cases have successfully used TAV as a correlative variable. This application has been consistently accepted by the Courts.

[24] For a comprehensive background on multiple regression analysis in the appraisal context, see Wolverton, <u>An Introduction to Statistics for Appraisers</u> (2009), chapters 9 and 10.

[25] https://www.talcb.texas.gov

[26] Kilpatrick, John A. 2005. "Appraising Real Estate in Complex Environmental Class Actions: An Expert's View," *Toxic Law Reporter* 20(2): 37-40.

[27] Kilpatrick, John A. 2004. "Real Estate Issues in Class Certification," *Class Action Litigation* 5(19): 712-715; Kilpatrick 2005, op cit.

of valuing a universe of properties as of a given date using standard methodology, employing common data, and allowing for statistical testing."[28] In addition, USPAP Standards Rule 5-1 comments: "Mass appraisal provides for a systematic approach and uniform application of appraisal methods and techniques to obtain estimates of value that allow for statistical review and analysis of results."[29] An automated valuation approach provides a means for ensuring consistency of treatment across a large group of properties. This uniformity of approach in ascertaining damages to multiple properties is consistent with the objectives of fairness in the allocation of damages in litigation. Obviously, this mass appraisal approach is far more efficiently applied to a class and is highly consistent with the objectives of class treatment.

48.    USPAP Mass Appraisal Standards Rule 5-1 requires that "in developing a mass appraisal, an appraiser must be aware of, understand, and correctly employ those recognized methods and techniques necessary to produce a credible mass appraisal." Standard 5 recognizes that available information may vary in local circumstances and allows for variation in methods due to variations in available data. The comment accompanying Standards Rule 5-5 includes the phrase "where applicable and feasible" regarding systems for collecting and maintaining "ownership, geographic [i.e., location], sales, income and expense, cost, and property characteristics data."[30] The comment to Standards Rule 5-5 also suggests that data collection programs incorporate "a quality control program, including checks and audits of the data to ensure current and consistent records."[31] These requirements clearly support the use of mass appraisal treatment to ensure consistency and quality control with respect to both data and valuation models across the proposed class.

49.    Consistent with other parts of USPAP, Advisory Opinion 18 outlines recommendations for appraisers who utilize AVMs. Advisory Opinion 18 cautions that while an appraiser can use an AVM as a tool in the development of an appraisal, appraisal review, or appraisal consulting assignment, the appropriate use of an AVM is, like any tool, dependent upon the skill of the user and the tool's suitability to the task at hand. However, when properly deployed by an appraiser, an AVM can be used as a tool to assist to reliably and credibly estimate market value of real property.[32] USPAP Advisory Opinion 37 continues on this theme, and notes that:

> Appraisers have access to technology that enables them to automate some aspects of the appraisal process. Regression analysis is a common example, but there are others as well. These tools generate information that once had to be calculated by hand. The information generated by this technology can enable appraisers to produce appraisals and appraisal reviews with greater credibility…[33]

---

[28] USPAP 2018-2019, p. 5.

[29] *Ibid.*, p. 34.

[30] *Ibid.*, p. 38.

[31] *Ibid.*

[32] *Ibid.*, p. 39.

[33] *Ibid,* p. 172.

50. USPAP Standards Rule 5-7 mandates "testing procedures and techniques to ensure that standards of accuracy are maintained." The comment appended to Standards Rule 5-7 states that:

> Appraisers engaged in mass appraisal have a professional responsibility to ensure that, on an overall basis, models produce value conclusions that meet attainable standards of accuracy. This responsibility requires appraisers to evaluate the performance of models, using techniques that may include but are not limited to, goodness-of-fit statistics, and model performance statistics such as appraisal-to-sale ratio studies, evaluation of hold-out samples, or analysis of residuals.[34]

51. This monitoring and evaluation of results implicitly recognizes the importance of consistency across a study area. Implementation of such quality control measures is well documented in the mass appraisal literature.

52. Regarding mass appraisal quality control and appraisal error analysis, I have performed evaluation studies on mass appraisal AVMs using the ratio statistics referred to in USPAP Standards Rule 5-7 and by the International Association of Assessing Officers (IAAO) Technical Standards Committee. Implicit in ratio statistics analysis is that a large number of appraisals are performed utilizing a single model and results are available for comparison to sales prices.

53. In addition to the formal tests of mass appraisal performance, I can further ensure quality of the mass appraisal effort by several methods, such as the following:

- Using well-established, peer-reviewed statistical methods, such as log-linear model specification of ordinary least squares (OLS) regression models, as part of the GAVM process.

- Using the GAVM testing process allows for the generation of an additional set of error statistics, furthering the diagnostic abilities that are appropriate for the trier-of-fact to determine the appropriate damages across the affected area.

54. The methods I have employed and will continue to employ as this case progresses for determining values have resulted and will continue to result in superior accuracy, reliability, and consistency across the proposed class. The process that I have used in this case currently includes the following steps:

- Using location coordinate property data allows the AVM to incorporate location factors and prices of neighboring or locationally similar properties into price estimates. Research (e.g., Pace and Zou, 2000; Fotheringham et al. 2002; Lipscomb and Farmer, 2005; Lipscomb, 2006; Farmer and Lipscomb, 2010; Ross et al., 2011; Belasco et al. 2012) has shown that spatial models outperform models that do not incorporate location.[35]

---

[34] *Ibid.,* p. 39.

[35] Pace, R. Kelley, and Dongya Zou. 2000. "Closed-Form Maximum Likelihood Estimates of Nearest Neighbor Spatial Dependence," *Geographical Analysis* 32(2): 154-172.

- Conducting limited data sampling and verification under careful supervision to ensure accuracy, consistency, and completeness. USPAP requires that mass appraisal reports must "summarize the sources of data and the data collection and validation processes."[36]

- Describing the sources of data and the data collection and validation processes as required by USPAP in a mass appraisal (Standard 5).

- Classifying the affected properties into appropriate strata (or subsets of the population) by areas and property characteristics, and then testing candidate price-affecting variables by the criteria suggested in Standards Rule 5-7.

- Locating and analyzing sources of data on the available property characteristics and values for properties within the proposed class area. The data checking and verification has achieved the level of quality control required by USPAP and will meet or exceed the IAAO performance standards for accuracy and dispersion.

**Data Sources**

55.    The proposed class is for owners and residents of residential real property seven miles of the Arkema facility in Crosby, Texas. Development of a database for an AVM involves gathering property characteristic data, transaction data, and geographic information systems (GIS) locational data. By combining data from these sources, credible, consistent, and accurate unimpaired values on the real estate within the proposed class can be accurately calculated. For this matter, data was obtained from the following sources:

- Transaction data from the local multiple listing service, and specifically all transactions for MLS areas 1, 2, 32, 52, and 53, which encompass all of the properties in the 7-mile ring plus additional "control areas" outside of the 7-mile area.

- Property ownership, location, and characteristic data from the Chambers County Certified Appraisal Roll for 2018

---

Fotheringham, A. Stewart, Chris Brunsdon, Martin Charlton. 2002. *Geographically Weighted Regression: The Analysis of Spatially Varying Relationships* (West Sussex: John Wiley & Sons Ltd).

Lipscomb, Clifford A., and Michael C. Farmer. 2005. "Household Diversity and Market Segmentation within a Single Neighborhood," *Annals of Regional Science* 39(1): 185-201.

Lipscomb, Clifford A. 2006. "An Alternative Spatial Hedonic Estimation Approach," *Journal of Housing Research* 15(2): 143-160.

Farmer, Michael C., and Clifford A. Lipscomb, (2010), "Using Quantile Regression in Hedonic Analysis to Reveal Submarket Competition," *Journal of Real Estate Research* 32(4): 435-460.

Ross, Justin M., Michael C. Farmer, and Clifford A. Lipscomb, (2011), "Inconsistency in Welfare Inferences from Distance Variables in Hedonic Regressions," *Journal of Real Estate Finance & Economics* 43: 385-400.

Belasco, Eric, Michael C. Farmer, and Clifford A. Lipscomb, (2012), "Using a Finite Mixture Model of Heterogeneous Households to Delineate Housing Submarkets," *Journal of Real Estate Research* 34(4): 577-594.

[36] USPAP 2018-2019, p. 41.

- Chambers County Tax Parcels as of 2020

- Harris County Certified Appraisal Rolls for 2018, 2019, and 2020

- Liberty County Certified Appraisal Rolls for 2019 and 2020.

- Aerial Photography and mapping from Google Earth

56. Transaction data was gathered from the period September 1, 2016 (one year prior to Hurricane Harvey) to August 31, 2018 (approximately one year after Hurricane Harvey). In total, I began with a data set of 10,274 transactions, broken down as shown in Table 3, following:

*Table 3 -- Total Transaction Data Set*

| MLS Area | # of Transactions |
|---|---|
| 1 | 5,318 |
| 2 | 4,270 |
| 32 | 681 |
| 52 | 1 |
| 53 | 4 |

57. To populate the GAVM, we gathered data as shown in Table 4, following:

*Table 4 -- Independent Variables and Summary Data*

| Characteristic | Mean | Median | Min | Max |
|---|---|---|---|---|
| Sales Price (N=10,274) | $189,532 | $174,000 | $1,400 | $2,000,000 |
| Living Area (SF) | 2,149 | 2,000 | 400 | 12,657 |
| Land Area (SF) | 11,693 | 7,626 | 1,000 | 903,304 |
| Bedrooms | 3.45 | 3.00 | 0.00 | 8.00 |
| Full Baths | 2.10 | 2.00 | 0.00 | 8.00 |
| Half Baths | 0.43 | 0.00 | 0.00 | 4.00 |
| Year Built | 1990 | 1998 | 1900 | 2018 |
| Sale Date | 9/10/2017 | 9/5/2017 | 9/1/2016 | 8/31/2018 |
| Tax Assessed Value (TAV) (N=10,029) | $173,919 | $160,972 | $69 | $1,980,874 |
| MLS Area | N/A | | | |

58. We also examined the data for Tax Assessed Value ("TAV"). In prior uses of the GAVM, we have found that the TAV is highly correlated with market value and provides an extremely high "hit" rate to value properties without sales prices (e.g. – the subject properties in this

case)[37]. Of the 10,274 sales examined, we were able to successfully ascertain the TAV for 10,029 properties, or 97.6% of all properties in the regression model.

59. As this case moves forward, I will supplement this data as appropriate.

### AVM Design

60. To best value each individual property, the GAVM has been calibrated using sales of properties in the 7-mile affected area during the one-year period prior to Harvey's landfall. The AVM contains variables for the number of days between the comparable property sale date and the date of valuation, allowing the GAVM to account for changes in the market over the one year of transactions.[38]

61. We utilized this data in three interlocked analyses. First, the transactions from within the 7-mile ring before Harvey's landfall were used to "train" the GAVM. Using the transactions shown in Tables 2 and 3 above, I find that there were 333 residential sales, all of which were included in MLS Areas 1 and 2. Further, using the common and accepted methodology known as "bootstrapping" the model revealed that an exceptionally high explanatory power came from use of the TAV, Sales Date, and Area 2, and Location (in/out) variables. The results of the training regression are shown in Table 5, following.

*Table 5 – Results from GAVM Training*

| Characteristic | Coefficient | t-Stat | P-Value |
|---|---|---|---|
| Intercept | 3.969581 | 63.70969 | 0 |
| LN(TAV) | 0.679234 | 132.978 | 0 |
| Days Since Sale | -0.0003 | -23.4535 | 1.8E-118 |
| Area 2 | -0.09535 | -15.3656 | 1.11E-52 |
| In/Out | 0.027946 | 2.763343 | 0.005732 |
| Adjusted $R^2$ | 0.709448 | | |
| Observations | 10,029 | | |

### Model Validation

62. Although USPAP set no specific targets for model fitting ability, there are several guidelines from the AVM industry and the academic literature for a quality AVM. The IAAO provides standards for tax assessment ratio studies, which are often applied to AVM validation. The IAAO standards suggest that models for newer single-family residential properties in homogenous subdivisions have a coefficient of dispersion (COD) (a measure of deviance from the median used to analyze the variability of a model) of less than 10. For older more diverse homes, the COD requirement is relaxed to 15. The mean or median here identifies model bias, or whether an AVM is systematically too high or too low. Additionally, a model with a mean

---

[37] TAV has consistently been found acceptable for use as a correlative variable in the GAVM by many courts. For the academic underpinnings, see Goolsby, William C., (1997), "Assessment Error in the Valuation of Owner-Occupied Housing", Journal of Real Estate Research 13-1, 33-45.

[38] I reserve the right to calculate, at some appropriate time closer to trial, the amount, if any, by which the values would have changed from the date of valuation for the affected area homes.

or median absolute error (MAE)[39] of less than 10 to 15% is generally regarded as a strong AVM.[40] No single validation metric can fully describe an AVM's statistical accuracy, so these metrics should be considered in context with each other.

63.    The full set of data was used to <u>validate</u> the data.  The coefficients from the training set were applied to each of the 10,029 observations in the sample.  Median Deviation (a measure of unbiasedness) and Median Absolute Deviation (a measure of consistency, analogous to standard deviation and a variant of the MAE) were used as goodness of fit measures[41].  A Median Deviation near zero indicates that the model is unbiased.  A Median Absolute Deviation of between 5% and 10% is consistent with International Association of Assessing Officers standards for goodness of fit in homogenous neighborhoods, and indeed suggests a reasonable degree of homogeneity in the subject area.  The goodness of fit statistics reported in Table 6, following, demonstrate that the GAVM as applied in this case is both unbiased and reasonably consistent.

*Table 6 -- Goodness of Fit Statistics*

| | |
|---|---|
| Median Deviation | -0.72% |
| Median Absolute Deviation | 9.28% |

## Impaired Values

64.    After unimpaired values are established, we next look to determine impaired value. Various sources of data will allow for the determination of before and after (or unimpaired and impaired) values on the properties in the proposed class area. This specialized study is beyond the scope of conventional appraisal. Particularly in determining the impaired values, specialized expertise is required. Greenfield Advisors has significant experience in similar cases and has contributed substantially to the published literature, valuation theory, precedent cases, and valuation techniques required for the determination of impaired values. Our firm has a unique and longstanding record as analysts of real estate values. These mass appraisal methods are well accepted in the appraisal field, including specifically in USPAP.

### Relevant Literature

65.    The effects of contamination on property value have been documented in the academic literature for decades. A sizable body of work supports the finding that environmental disamenities diminish property value. Risk is a common thread in environmental disamenities and has been demonstrated to influence values in a variety of areas. These effects can be lasting and, owing to the stigma attached to contamination, can be greater than the cost-to-cure the contamination.

---

[39] Median Absolute Error (MAE) is defined as the average of the absolute percent difference between the model value and the known sale price. Mathematically, this is expressed as $MAE = median(\left|\frac{SalePrice - ModelValue}{SalePrice}\right|)$

[40] Kirchmeyer, James, and Peter Staas. 2008. *AVMs 201: A Practical Guide to the Implementation of Automated Valuation Models*, 91.

[41] Consistent with prior uses of the Greenfield AVM accepted in numerous litigations, as previously cited.

66.    About thirty years ago, two seminal articles, Patchin (1988)[42] and Mundy (1992a),[43] brought contaminated property valuation issues to the attention of the appraisal profession. Since that time, hundreds, if not thousands, of additional studies have been conducted on the impacts of contamination and other negative factors on property values.[44] These studies provide a range of economic effects including property value diminution and reduced marketability of one's home. Empirical studies quantify (or express the quantity of) the loss in property value that results from toxic exposure in a variety of contamination contexts.

**Property Rights and Homeowner's Perceptions of Impairment**

67.    From a valuation perspective, property itself is not owned, but rather the rights to that property are owned. These include the right of *use*, right of *transfer*, and the right of *exclusion*. These three rights are at the core of property value. *Use* can be, and often is, limited by public and private restrictions. Within these restrictions, the owner may determine how a property is used. *Exclusion* provides that those who have no claim on the property should not benefit from the use of it. Exclusion provides that both the current benefits of ownership and future benefits accrue only to the rightful owner and his or her successors and assigns. In the absence of exclusion, the right of use is under constant threat of nullification without just compensation. The right of *transfer* provides the owner with the ability to exchange one resource for another. The simplest example is the outright sale of property, such as a vehicle or land, for an agreed upon sum of currency. The anticipation of future benefits associated with these rights creates value. Value is not necessarily based on the cost of creation or historical prices, but on market participants' perceptions of benefits.[45]

68.    Contamination affects all of these rights. Environmental impairment of a property restricts the right of use without providing economic compensation. Governing bodies may place restrictions on the use of real estate due to the contamination, which then limit the use or development of that property to something less than its highest and best use. Any violation of the right of exclusive use typically results in either payment of compensation to the rightful owner or assessment of a penalty. For example, if "A" trespasses on land owned by "B," then "A" is guilty of a tort and a possible penalty may be in order, such as civil damages. Contamination restricts the right of transfer; in fact, contamination may destroy the right of transfer to the extent that impairment may preclude marketability of the property.

69.    Edelstein (1986) specifically stressed the investment diminution aspect of his "inversion of home principle," when a home changes from a place of security and identity to one of danger and defilement.[46] Citing case studies from the Legler section of Jackson Township, New Jersey, where there was toxic chemical contamination of groundwater, he showed that residents could not separate the psychological pride in home ownership from the question of economic value.

---

[42] Patchin, Peter J. 1988. *"*Valuation of Contaminated Properties.*"* The Appraisal Journal 54(1):7–16.

[43] Mundy, Bill 1992a, "Stigma and Value." *The Appraisal Journal*, (January, 1992), 7-13.

[44] For a list of studies, see Simons, R., and J. Saginor. 2006. "A Meta-Analysis of the Effect of Environmental Contamination and Positive Amenities on Residential Real Estate Values." *Journal of Real Estate Research* 28:71–104.

[45] Appraisal Institute. 2013. *The Appraisal of Real Estate*, 14th Edition (Chicago: Appraisal Institute), 27.

[46] Edelstein, Michael R. 1986. "Toxic Exposure and the Inversion of the Home." *Journal of Architectural Planning and Research* 3: 237–251.

Surveys of the population revealed a generally uniform opinion that property values had diminished because of the problem.

70. Lunz (1989) noted that owners with contaminated groundwater underlying their properties have had their bundle of rights diminished.[47] As a result, the properties lose both their preservation and value creation potential. For owners of properties with groundwater contamination, the bundle of rights is reduced to the single right of owner occupancy.

71. Page and Rabinowitz (1993) found three disconnects in value perceptions by homeowners:

- Residential property owners often are not informed and buyers are not aware of the contamination. Real estate agents and brokers avoid discussing environmental issues with prospective buyers, and residential appraisers often fail to address the issue of hazardous materials or contamination, even though a fair market presumes a knowledgeable, prudent buyer.

- Residential property owners fail to perceive the risks associated with the ownership of property near toxic contamination.

- Due to the high value society places on home ownership, homebuyers feel that they will be protected from contamination problems, again failing the "knowledgeable, prudent buyer" test.[48]

## How Markets React to Contamination

72. Before exploring the consequences of toxic chemical exposure on property value, we must first examine the major factors that influence how the market reacts to the environmental contamination or impairment. Several empirical studies have examined this relationship; they indicate that proximity (physical closeness) to environmental contamination or within a polluted area and the spread of information about the contamination play key roles in determining the nature and degree of the effect on the market.

73. Real estate economics, appraisal, and assessment practice recognize that a physical impairment (contamination) has a negative effect on property values. USPAP requires appraisers to consider the effects of such contamination in the value estimation process.[49] The International Association of Assessing Officers (IAAO) publishes guidelines for assessors to use when determining assessments of environmentally impaired property. In short, both standards

---

[47] Lunz, Robert. 1989. "Groundwater Contamination and Real Estate Value: How what is below Affects what is above," *U.S. Water News*, October 1989, 13.

[48] Page, G. William, and Harvey Rabinowitz. 1993. "Groundwater Contamination: Its Effects on Property Values and Cities," *APA Journal*, Autumn 1993, 473–481.

[49] This is specifically covered under USPAP Standards Rule 1-2(e), one of the rules from which departure is not permitted. In other words, an appraiser may not fail to take physical disutility into account, even if disclosing such departure from the rules. A thorough discussion of the appraiser's responsibility is also contained in Eaton, J.D., *Real Estate Valuation in Litigation* (Chicago: The Appraisal Institute, 1995). For specific references, see pages 128, 129, 149–54, and 235–37. It is clear that an appraisal of a residence that fails to account for a physical deficiency, such as contamination, would violate USPAP. As of this writing, all 50 states have adopted these standards as a matter of law. In addition, adherence to these standards is mandatory for all federally insured mortgage transactions.

require that the valuation expert recognize factors that may influence value. These include cost to cure, loss of marketability, loss of use, and other factors.

74. The market for real estate transactions has numerous participants who influence transactions, including brokers and lenders. All potentially influence values. Lenders are generally reluctant to loan on contaminated properties. Liability risk is one of the reasons for this. Most real estate purchases require financing of some sort. Contaminated properties are not conventional and are usually subject to more onerous lending requirements and regulations, thus increasing transaction and financing costs. Brokers expect to face marketability challenges with contaminated property. Contaminated properties generally have a smaller number of potential buyers. For these reasons, contaminated real estate brings unique challenges that exert downward pressure on prices.

75. Negative market reaction partially explains the impaired effects on marketability resulting from environmental impairment. Negative market reaction can result from an undesirable event that disrupts the balance of an environmental system. Blame is associated with this disruption. When environmental features are perceived as repellent, upsetting, or disruptive, they can negatively affect the marketability of the real estate. Because value is determined by perceived future benefits, the market reaction can be and often is profound.

76. The most common appraisal definition of market value contains a central assumption that market value reflects the most probable price when *each buyer and seller is acting prudently and knowledgeably.*[50] However, real estate markets generally are not efficient. That is, information can be fractured and diffused unevenly. As a result, prices do not always reflect all available information; the vagaries of real estate market dynamics lead to a disconnect between market prices and market values. In particular, risks associated with contamination are not always known and recognized by the market. Many studies point to the lack of efficient information diffusion about environmentally impaired properties, which leads to a market operating in disequilibrium.[51] A variety of empirical studies confirms that a contamination event can lead to diminution in value, reduced sales price, reduced liquidity, and lower sales volume.

77. USPAP AO-9 presents a framework for analyzing a variety of detrimental conditions, including environmental contamination[52]. The framework requires the analyst to value the property as if there were no contamination (referred to as a benchmark), then compare this result to the "as is" value of the property in its actual contaminated state. AO-9 distinguishes between value effects due to remediation costs and the effects of additional risk attributable to contamination. Simons (2002) captured several longitudinal trends that characterize the real estate market after a contamination announcement:[53] It often takes years for information about contamination to fully diffuse or spread in a marketplace. As a result, many transactions occur that otherwise might not have been completed, or they occur at prices or within time frames

---

[50] 55 Fed Reg 33888, Aug 20, 1990; also incorporated in FDIC Rules and Regulations 323.2(h).

[51] *See* Farber, Stephen. 1998. "Undesirable Facilities and Property Values: A Summary of Empirical Studies," Ecological Economics 24: 3-4; Wisinger, Perry. 2014. "Chemical Hazardous Sites and Residential Prices: Determinants of Impact," Journal of Sustainable Real Estate 6(2): 3-21.

[52] See USPAP 2020-21, Advisory Opinion 9

[53] Simons, Robert. 2002. "Estimating Proximate Property Damage from PCB Contamination in a Rural Market: A Multiple Technique Approach," The Appraisal Journal 70(4): 388–400.

that are not indicative of a market at equilibrium—one where sales occur regularly and prices are determined by an equal number of knowledgeable sellers and buyers. Notably, the definition of market value that appraisers most commonly use, and that federally insured mortgage appraisals require, includes a requirement that comparable transactions used for appraisals represent *"… buyer and seller each acting prudently, knowledgeably…."*

78.   In the short run, buyers often have few alternatives, and this truncated supply of properties results in a disequilibrium. My research bears this out, and as such, transactions in the market are constrained by supply.

79.   In the short run, sellers have reservation prices below which they cannot transact a sale; these set prices are often due to outstanding liens, mortgage loans, and selling costs. Kinnard (1992) suggested that there is more information in sales that do not occur than in sales that did.[54]

80.   In the long run, buyers find alternatives, and sellers reduce their reservation prices (at least in real terms). This affects long-term price trends: these trends can be reduced compared to trends for otherwise unaffected properties, or they can be negative in real terms for a time until a new market equilibrium emerges at a lower range of values.

81.   The release of public information about contamination typically triggers a decrease in nearby property prices. However, the effect can vary widely over time and from community to community, from among what Fessenden-Raden et al. (1987) termed "various publics within the community."[55] The authors showed that the public perception of the value effects can vary, depending on independent factors. For example, a family with small children may pay more attention to the threat and react more quickly than an elderly retiree. Further, the authors cited a specific case of water supply pollution caused by a manufacturing plant to demonstrate that an entire population may be slow to react to a threat.

82.   By contrast, Kiel (1995) illustrated a market wary of contamination and slow to react positively, even after remediation.[56] She examined housing values in Woburn, Massachusetts, a community with two Superfund sites, one of which was a source of TCE groundwater contamination. Kiel reviewed the values of more than 2,000 houses from 1975 to 1992, using regression techniques with specified time periods: pre-announcement phase, discovery phase, announcement phase, and cleanup-identified phase. She also analyzed the effects of distance from the sites and discounted values of future rents that would be earned on the residences. Her study indicated that information made public on the toxicity of sites affects housing prices, and that the public does not necessarily believe official announcements that contaminated sites will be cleaned up.

---

[54] Kinnard, William. 1992. "Measuring the Effects of Contamination on Property Values," <u>Environmental Watch</u> (Appraisal Institute), Winter, 4(4): 1–4.

[55] Fessenden-Raden, June, Janet M. Fitchen, and Jenifer S. Heath. 1987. "Providing Risk Information in Communities: Factors Influencing What is Heard and Accepted," <u>Science, Technology, and Human Values</u>, Summer/Fall, 12(3/4): 94–101.

[56] Kiel, Katherine A. 1995. "Measuring the Impact of the Discovery and Cleaning of Identified Hazardous Waste Sites on Housing Values," <u>Land Economics</u> 71(4): 428–435.

83.   Jackson (2005) surveyed market participants, including lenders and equity investors, about their perceptions of the risks associated with groundwater contamination.[57] Specifically, he sought to assess how risk perception changes during different parts of the remediation cycle. 93.2% of lenders and 59.2% of investors would not lend on or acquire contaminated property that otherwise met their lending or investment criteria before cleanup and without an approved remediation plan. The large majority of respondents would only acquire property during cleanup at a discounted price and/or modified financing terms. A sizable number of respondents indicated that they would require a price discount post-remediation, to account for increased perceived risks. Zabel (2007) examined the effect of imperfect information on the transaction of contaminated property and demonstrated how imperfect information can deter socially optimal transactions.[58] The author noted that the deterrence effect of liability appears to contradict the economic theory that a properly functioning market should include the costs associated with environmental liabilities into the selling price and thus not deter transactions. Assuming the seller and buyer have full information about the environmental impairment, transactions involving impaired properties should proceed similarly to those of unimpaired properties. Zabel noted that several factors could influence transactions, including uncertainty regarding liability, differences in seller and buyer risk aversion, differences in buyer and seller default rate, externalities, property characteristics, and incomplete information about the level of contamination. Factors also include different types of asymmetric information, such as when one party has more information than the other, or when both buyer and seller have the same information but the actual level of contamination is greater (this is referred to as "partial information"). Lastly, there are circumstances where sellers refuse to sell properties because they believe conventional environmental inspections could reveal additional contamination, and the additional costs they would then incur would be greater than the benefits from a sale. Thus, these properties are not sold, which the author referred to as "mothballing."

84.   From this brief review of contamination in housing markets, it is apparent that market reactions may vary, but usually react based on available information, or even misinformation. As such, when a market area becomes contaminated or has an impairment event occur, there is usually a negative market reaction towards the properties involved. Moreover, the market dynamics of increased marketing time, problems with financing, spatial lock-in, and concerns over stigma can contribute to a disruption between market price and market value.

## Stigma

85.   A common term in appraisal and real estate economics literature, *stigma* refers to a very specific quantitative mechanism by which value is affected by either nearby or previous negative externalities. Many states have defined stigma with respect to the valuation of contaminated property as, "a perception that property value is negatively affected despite contamination clean-up."[59]

---

[57] Jackson, Thomas, O. 2005. "Groundwater Contamination and Real Estate Investment Risk," Journal of Real Estate Practice and Education 8(1):115–131.

[58] Zabel, Jeffrey. 2007. "The Impact of Imperfect Information on the Transactions of Contaminated Properties," *National Center for Environmental Economics*, Working Paper Series, January.

[59] Mundy, Bill. 1992a. *op cit.*

86.   The concept of stigma partially explains the negative market effects related to environmental impairment. A large portion of the prominent literature on the valuation of environmentally impaired property defines, explores, and quantifies stigma. The consequences of an environmental stigma can include decreased occupancy, a lower market price, reduced sales volume, less favorable terms of lending or sale, and increased marketing time.

87.   The process of stigmatizing something (originally, a person, but now also applied to real estate) applies a label to mark its deviant status. This marking typically has devastating consequences on emotions, thoughts, and behaviors. Many characteristics are applied to the perceived deviant person or thing: they are flawed, blemished, discredited, spoiled, or stigmatized. The mark may or may not be physical; it may be embedded in behavior, biography, ancestry, or group membership.[60]

88.   Environmental stigma results from an undesirable event that disrupts the balance of an environmental system.[61] Blame is associated with this disruption. When environmental features are perceived as repellent, upsetting, or disruptive, they are stigmatized as undesirable. Environmental stigma can result from a number of causes. Technologies, such as heavy metal processing, nuclear power plants, and waste processing, may be a source of environmental stigma. Activities, such as the development of hazardous storage sites, or the underground storage of petroleum products, may be another source. A third source may be the character of products themselves, such as heavy metals, chemicals, solvents, and agricultural products associated with health risks.

89.   The consequences of an environmental stigma can be direct or indirect. Direct consequences of various stigmas include decreased occupancy, a lower market price, reduced sales volume, less favorable terms of lending or sale, and increased marketing time for single-family residences. Indirect consequences include the general exodus of residents from an area affected by contamination, regardless of whether their homes are directly affected by the contamination (e.g., Love Canal, New York, and Times Beach, Missouri).

90.   Stigma contributes to the fact that real property market behavior is often influenced as much by perceptions as it is by reality. Richard Roddewig, an instructor of the Appraisal Institute who created its environmental seminar, has stated, "perceptions in the marketplace may be as important as the reality of whether the contamination or substance is actually physically affecting surrounding property."[62] Stigma underscores the disconnection between *actual* contamination or risk and *perceived* contamination or risk. Toxicologists have identified cause and effect relationships between various biological substances and diseases; however, human

---

[60] Jones, Edward E., A. Farina, A.H. Hastorf, Hazel Markus, Dale T. Miller, and Robert A. Scott. 1984. Social Stigma: The Psychology of Marked Relationships. New York: W.H. Freeman and Co. pp. 4–7.

[61] Edelstein, Michael R. 1988. Contaminated Communities: The Social and Psychological Impacts of Residential Toxic Exposure. Boulder, Colorado: Westview Press. p. 6.

[62] Roddewig, Richard. 1996. "Stigma, Environmental Risk and Property Value: Ten Critical Inquiries." The Appraisal Journal 64(4):375–387.

behavior often is not based on these causal relationships. As Roddewig noted, perceptions can have a substantial effect on real estate market behavior, and therefore, on price and value.[63]

91. The mechanism for environmental stigma is embedded in culture. For example, Mauss (1950) described a belief, widespread in many cultures, that things in contact with each other influence each other through the transfer of some of their properties via an "essence."[64] Thus, "once in contact, always in contact," even if that contact (exposure) is brief. Nemeroff and Rozin (1994) referred to this belief as a "law of contagion" and showed that it is common in our culture.[65] The implication is that even a minute amount of a toxic substance in one's food is perceived as making the food toxic; any amount of poison makes a substance poisonous; any amount of a carcinogen imparts carcinogenicity, and so on. The "essence of harm" that is contagious is typically referred to as a contamination. Erickson (1990, p. 122) explained:

> Being contaminated has an all-or-none quality to it, similar to being alive, or pregnant. When a young child drops a sucker on the floor, the brief contact with "dirt" may be seen as contaminating the candy, causing the parent to throw it away rather than washing it off and returning it to the child's mouth.[66]

This all-or-none quality, irrespective of the degree of exposure, is evident in Erickson's observation that "to be exposed to radiation or other toxins…is to be contaminated in some deep and lasting way, to feel dirtied, tainted, corrupted." As Kraus et al. (1992) explained, "A contagion or contamination model is obviously very different from the scientist's model of how contact with a chemical induces carcinogenesis or other adverse effects."[67]

92. Stigma effects can be wide-ranging. For instance, when a buyer is well versed in the present and future effect of the contamination, the price of a home will capture both the value of foregone rents and expected capital gains (financial), as well as the satisfaction and comfort of ownership (nonfinancial). At the extreme, stigma affects the nonfinancial benefits of home ownership (recall Edelstein's "inversion of home" principle in which a home goes from a place of security and identity to one of danger and defilement). Stigma can so overwhelm the financial benefits of home ownership that the property rights can be rendered worthless.

93. Perhaps the earliest references to stigma as a quantitative concept in real estate economics appear in studies by Patchin (1991) and Mundy (1992a).[68] Mundy's study differentiated between the cost to cure real risks (i.e., full remediation) and the costs associated with

---

[63] Roddewig, Richard J. 1999. "Environment and the Appraiser – Classifying the Level of Risk and Stigma Affecting Contaminated Property." The Appraisal Journal 67(1):98–102.

[64] Mauss, Marcel. The Gift, first published in 1950.

[65] Nemeroff and Rozin overview Fraser's and Mauss's theories as a basis to develop their theory on the "law of contagion." Nemeroff, Carol, and Paul Rozin. 1994. "The Contagion Concept in Adult Thinking in the United States: Transmission of Germs and of Interpersonal Influence." Ethos 22(2):158–186.

[66] Erickson, Kai. 1990. "Toxic Reckoning, Business Faces a New Kind of Fear." Harvard Business Review, January-February, pp. 118–126.

[67] Kraus, Nancy, Torbjorn Malmfors, and Paul Slovic. 1992. "Intuitive Toxicology: Expert and Lay Judgments of Chemical Risks." Risk Analysis 12(2):215–232.

[68] Patchin, Peter, J. 1991. "Contaminated Properties – Stigma Revisited." The Appraisal Journal (April 1991) 59(2):167–172; Mundy, Bill. 1992a, op cit.

perceived risks (i.e., stigma). The "cost-to-cure" is an out-of-pocket expense paid by the property owner or other responsible party to restore a property to its pre-contamination condition; stigma manifests in property value loss independent of the cost-to-cure. For example, a property that is restored to its pre-contamination condition may continue to suffer diminution in value due to risk perception (stigma).

94.   Patchin (1988) noted that the decline in market value of a contaminated property may exceed the cost-to-cure, even when that cost-to-cure is well defined.[69] Building on this theme, Mundy (1992a) was one of the first to outline the value paradigm for contaminated property damages: he argued that the value "before" or "clean" minus the value "after" or "dirty" is the appropriate measure.[70] From a mathematical perspective, this difference should represent the cost-to-cure. However, as he pointed out, in practice properties frequently sell for less than this cost-to-cure difference; he ascribed this disparity to the effect of stigma. In Mundy's framework, stigma is directly related to the level of uncertainty or risk associated with the contamination.

95.   Mundy (1992b) followed this theme by outlining two effects of stigma: an income effect and a marketability effect.[71] The income effect measures the lost value (or income, in the case of nonresidential properties) resulting from the contamination. The marketability effect accounts for the losses stemming from additional time-on-the-market, either to rent or to sell. Kilpatrick et al. (1999) built on this marketability theme and showed that opportunity costs resulting from increased time on the market may in fact exceed cost-to-cure and income-effect stigma.[72]

96.   Muldowney and Harrison (1995) demonstrated that perception of value diminution (loss) can result in an actual value diminution.[73] They showed that perceptions of value diminution result from stigma, which is generated by uncertainty, and that a simple contamination problem may have an easily quantifiable cost and a short time to cure. However, they noted that, "As the complexity of the contamination increases, the level of uncertainty and perceived risk rises." This can be seen in the uncertainty of costs and duration of the remediation processes. Similar conclusions were reached by Payne et al. (1987)[74] in their analysis of a former industrial site in the Chicago area. They concluded that it is the perception or fear associated with a hazardous site that is ultimately reflected in property values.

97.   Gluck et al. (2000) pointed out that stigma is not a mechanical exercise of subtracting impaired value from unimpaired value and assigning a value above and beyond costs.[75] Rather, it

---

[69] Patchin, Peter J. 1988. "Valuation of Contaminated Properties." The Appraisal Journal 54(1):7–16.

[70] Mundy, Bill. 1992a. *op cit.*

[71] Mundy, Bill. 1992b. "The Impact of Hazardous Materials on Property Values." The Appraisal Journal 60(2):155–162.

[72] Kilpatrick, John A., Douglas C. Brown, and Ronald C. Rogers, 1999. "The Performance of Exterior Insulation Finish Systems and Property Value." The Appraisal Journal 67(1):83–88.

[73] Muldowney, Timothy J., and Kendall W. Harrison. 1995. "Stigma Damages: Property Damage and the Fear of Risk." Defense Counsel Journal 62(4):525–538.

[74] Payne, B.A., S. Jay Olshansky, and T.E. Segel. 1987. "The Effects on Property Value of Proximity to a Site Contaminated with Radioactive Waste." Natural Resources Journal 27:579–590.

[75] Gluck, Allan, Donald Nanney, and Wayne Lusvardi. 2000. "Mitigation Factors in Appraisal and Valuation of Contaminated Real Property." Real Estate Issues, Vol. 25, No. 2, Summer 2000.

involves consideration of legal and environmental factors in arriving at a well-reasoned and supportable opinion of stigma.

98. McCluskey and Rausser (2003) argued that both temporary and long-term stigmas are possible equilibrium outcomes after the discovery and cleanup of contamination.[76] Their study focused on the RSR smelter in Dallas, Texas, and they concluded that a long-term stigma remained around the subject area. Buyers of homes in the area continued to demand discounts for property, even though the area had been remediated. As a result, the neighborhood was becoming less attractive to higher-income buyers and more affordable to lower-income families. The authors characterized this change in neighborhood as long-term stigma.

99. Messer et al. (2006) investigated the psychology behind stigma and Superfund sites.[77] They found that actions by authorities, even those leading to clean up, tended to exacerbate risks and stigma. The authors also found that owners and residents of contaminated areas tended to "medicalize" the risk of the pollution. Their literature review revealed another interesting phenomenon, originally noted by Kunreuther and Slovic (2001), of the "social amplification of original risks" due to the informal spread of information, both factual and otherwise, throughout the community.[78]

100. Messer et al (2006) additionally showed that, when cleanup of Superfund sites is delayed for a significant period of time, "the discounted present value of the cleanup is lost" with property values remaining depressed even after the site is finally remediated.[79]

101. In addition to the risks and costs associated with remediation, contaminated sites are often disadvantaged in their post-remediation, fully developed state as well. Simons et al. (1999) note that both source and non-source properties (those properties contaminated by an off-site contamination source) can suffer negative impacts long after remediation has been completed. For example, unreimbursed environmental monitoring costs must be deducted from future operating income, and restrictions on future use due to post-remediation conditions "may affect both property owners and lenders worried about the value of the real estate as collateral."[80]

102. Kilpatrick, et al. (1999) outlined a quantitative model for measuring the loss in value of income-producing property due to stigma effects; increases in market-driven capitalization

---

[76] McCluskey, Jill J., and Gordon C. Rausser. 2003a. "Stigmatized Asset Value: Is it Temporary or Long-Term?" The Review of Economics and Statistics 85(2):276–285.

[77] Messer, Kent D., William D. Schulze, Katherine F. Hackett, Trudy A. Cameron, and Gary H. McClelland. 2006. "Can Stigma Explain Large Property Value Losses? The Psychology and Economics of Superfund." Environmental and Resource Economics 33:299–324.

[78] Kunreuther, Howard, and Paul Slovic. 2001. "Coping with Stigma: Challenges and Opportunities." pp. 269–280 in Risk, Media and Stigma – Understanding Public Challenges to Modern Science and Technology, edited by J. Flynn, P. Slovic, and H. Kunreuther. London: Earthscan.

[79] Messer, Kent D., William D. Schulze, Katherine F. Hackett, Trudy A. Cameron, and Gary H. McClelland. 2006. "Can Stigma Explain Large Property Value Losses? The Psychology and Economics of Superfund," Environmental and Resources Economics 33: 299.

[80] Simons, R.A., William M. Bowen, and Arthur J. Sementelli. 1999. "The Price and Liquidity Effects of UST Leaks from Gas Stations on Adjacent Contaminated Property," The Appraisal Journal (April 1999) 67(2):186–194.

(cap) rates reveal these stigma effects.[81] We discussed four factors that affect the value of income-producing property due to contamination: (1) reduction in net operating income, (2) actual cost-to-cure, (3) ongoing increases in maintenance, and (4) stigma (increases in cap rates). In our model, slight increases in cap rates actually overwhelm the other three factors as a component of value diminution or loss. We concluded that under many circumstances, stigma effects are actually the greater portion of value losses to property owners.

103.    The literature regarding stigma, cited above, is relevant because it is likely that buyers of property in the proposed class area will be, or have been, aware of contamination in the neighborhoods stemming from the Arkema operation. The continuing media reporting of events concerning the contamination will continue to stigmatize the affected area.

### Empirical Evidence of Value Diminution

104.    The effects of contamination on property value have been documented in the academic literature for decades. Empirical studies quantify the loss in property value that results from toxic exposure in a variety of contamination contexts. Though nearly all of these studies find evidence of value diminution in the context of contamination, there is wide variation in the amount of property value diminution.

105.    In a comprehensive review of empirical studies published from 1982 to 1999, Jackson (2001) examined residential sales price effects from contamination.[82] Of the 19 studies, 15 found adverse effects on price from contamination. Noting that the effect of contamination appears to be greater for certain market segments, he specifically cited the following: 1) greater negative effect in higher-priced residential areas; 2) proximity to employment centers mitigates potential effects from environmental disamenities; and 3) urban areas and areas with greater market demand may be affected to a larger extent than rural areas and areas with weak market demand.

106.    Decker et al. (2005)[83] examined Douglas County, Nebraska, the most populated of the five counties in the Omaha metropolitan statistical reporting area. The authors used Toxics Release Inventory (TRI) data as a proxy for environmental hazard and found a significant link between release information and housing values. Of note is their finding that properties located within 3 miles of a former ASARCO smelter (which is now on the National Priorities List) were reduced in value 24% to 25%.

107.    In their meta-analysis of the effect of contamination on residential property values, Simons and Saginor (2006) reviewed 24 groundwater contamination studies and discovered a statistically significant average loss in value in groundwater contamination cases.[84] In the studies Simons and Saginor (2006) modeled, groundwater contamination was found to be associated with a $13,506 to $16,610 (in 2003 dollars) or 8.5% diminution in property values.

---

[81] Kilpatrick, John A., *et al.*1999. *op cit.*

[82] Jackson, Thomas O. 2001. "The Effects of Environmental Contamination on Real Estate: A Literature Review." Journal of Real Estate Literature 9(2):93–116.

[83] Decker, Christopher S., Donald A. Nielsen, and Roger P. Sindt. 2005. "Residential Property Values and Community Right-to-Know Laws: Has Toxics Release Inventory Had an Impact?" Growth and Change (Winter 2005) 36(1):113–133.

[84] Simons, Robert A., and Jesse D. Saginor. 2006. *Op cit.*

This observed effect is in addition to the average loss of 9.5% for all forms of environmental contamination across the study, leading to an overall diminution of 18%.

108. Several economists have used Contingent Valuation ("CV") survey techniques to study the stated preferences of market participants. For example, Jenkins-Smith et al. (2002), investigated a case of lead, cadmium, and zinc contamination in the soil of a neighborhood in Corpus Christi, Texas, that was adjacent to a former ASARCO smelter.[85] The authors explored whether knowledge of contamination reduced home values and whether a recent Texas statute requiring disclosure of contamination affected home values.[86] Results indicated that when sellers are required to disclose information on contamination and cleanup, home values diminish by approximately 30.5%. Additionally, sellers were willing to transact at discounts; nearly half of the respondents accepted a loss to be rid of their homes. Moreover, some sellers (5.5%) refused to sell their homes for fear of passing the risks on to future owners.

109. In another study, Berrens et al. (2003) examined a large concrete products and quarrying site in El Paso, Texas.[87] Because the area had a large Hispanic population, the surveys were conducted in either Spanish or English. Results indicated that the median amount prospective home buyers were willing to pay for a home decreased by 20%. Of interest from this study is that the negative effect of the environmental disclosure was significantly exacerbated when the survey was conducted in Spanish.

110. Another CV survey study, this one by Simons (2002),[88] found that PCB contamination in soil caused significant property losses. The survey results indicated that 95% of prospective homebuyers stated that they would not even want to live at a property with PCB soil contamination. In other words, only 5% of potential homebuyers would even bid on a property with soil contamination, and those that did bid required an average discount of 53%.

### Summary of Scholarly Research

111. Homeownership comes with a bundle of rights that may be usurped or impaired due to environmental contamination. The prominent literature indicates that markets usually react negatively to contamination or impairment events. Environmental impairment itself consists of cost-to-cure (remediation costs) and stigma. The consensus among the academic literature is that stigma has both an income component and a marketability component. The impact of stigma is real. However, the basis of stigma has more to do with the marketplace's perception of the contamination than with the actual contamination itself. Experts note that the effects of stigma can vary through time as well. The degree of property value diminution caused by stigma can range from a minimal amount to a total loss of value.

---

[85] Jenkins-Smith, Hank C., Carol L. Silva, Robert P. Berrens, and Alok Bohara. 2002. "Information Disclosure Requirements and the Effect of Soil Contamination on Property Values," Journal of Environmental Planning and Management 45(3): 323–339.

[86] A State of Texas statute requires that seller disclose to buyers any condition of which they are aware that "materially affects the physical health or safety of an individual" and any condition concerning "hazardous or toxic waste." See Texas statutes, Property codes, Section 5.008, "Seller's disclosure of property condition."

[87] Berrens, Robert P., Alok K. Bohara, Hank C. Jenkins-Smith, and Carol L. Silva. 2003. "The Effect of Environmental Disclosure Requirements on Willingness to Pay for Residential Properties in Borderlands Community," Social Science Quarterly 84(2): 359–378.

[88] Simons, R.A. 2002. *Op cit.*

112. A variety of empirical studies confirm that contamination can lead to diminution in value, reduced liquidity, and lower sales volume. The literature reviewed here indicates property value diminution from environmental contamination ranging between 18% and 53%. The bulk of this literature consists of hedonic studies; a shortcoming of using hedonic studies to analyze property value diminution from contamination is that they rely on sales as observations. Relying on sales transactions to measure property value diminution from environmental contamination may understate these losses. Delayed transactions and failed sales lead to a loss in property value, yet this data would not enter into a hedonic regression analysis. Statistically modeling property value impacts requires a large set of observations; there are quite simply relatively few sales observations in situations comparable to the affected properties.

### Residential Transaction Analysis

113. To examine this, I conducted an analysis of residential transactions within the 7-mile radius during the one-year period following the Arkema explosion and compared those to transactions both after the explosion as well as transactions before/after the explosion but outside of the 7-mile radius.

114. If the explosion had no impact on values, then pricing trends inside the affected area before/after the explosion should show no changes beyond those which might be discerned in unaffected control areas.  Since the entire area was impacted by the Harvey landfall, one might expect some systematic impact on real estate prices across the region.  However, any pricing impacts within the 7-mile affected area over and above those experienced outside the region would logically be ascribed to the effects of the explosion.  This sort of location adjustment is common in appraisal analyses[89].

115. For purposes of this analysis, I utilized the entirety of sales from the 5 MLS zones, categorized as follows:

*Table 7 -- Sales Analyzed Before/After*

| Category | Transactions |
|---|---|
| In/Before | 333 |
| In/After | 389 |
| Out/Before | 4,778 |
| Out/After | 4,774 |
| **Total Analyzed** | **10,274** |

116. Further, to smooth out idiosyncratic noise in the transactions, I examined per-square-foot prices on a monthly-average basis[90].  As expected, real estate prices both inside the 7-mile

---

[89] See, for example, The Appraisal of Real Estate 15th, at 390-392.

[90] For an exploration of this monthly smoothing technique in a mass appraisal model, see, for example, Mundy, Bill, and John Kilpatrick, "Factors Affecting CBD Land Prices", Real Estate Issues, Fall, 2000.  This technique was successfully utilized by Greenfield in the matter of *The State of Washington ,ex rel.; The Washington State Convention & Trade Center vs. Robert J. Allerdice, et al.; Diller Associates, et al.; Dina Corporation, et al.; Julia M. Evans, et al.; McLean Family Limited Partnership. et al.; Sansei American, Inc., et al.; Mary V. Sparks, et al.,*

affected zone and outsize evidenced materially significant upward trends during the twelve-month period prior to the event, as shown in the following graphics.

*Figure 4 -- Price Trend "Inside" Before the Arkema Event*



*Figure 5 -- Price Trend "Outside" Before the Arkema Event*



117.    As illustrated in Figures 4 and 5, prior to the Harvey landfall and the Arkema explosion, prices in both the affected area and surrounding areas trended upward.  In general, prices inside the 7-mile affected area were slightly higher and trended upward slightly faster, as shown in Table 8, following.

*Table 8 -- Monthly Per Square Foot Average Prices*

| Monthly Averages | In | Out |
|---|---|---|
| Sept, 2016 | 86.38 | 84.37 |
| Oct, 2016 | 92.15 | 82.67 |
| Nov, 2016 | 84.11 | 86.05 |
| Dec, 2016 | 99.94 | 84.55 |
| Jan, 2017 | 80.04 | 81.93 |
| Feb, 2017 | 86.65 | 82.10 |
| March, 2017 | 92.87 | 87.72 |
| April, 2017 | 91.19 | 86.96 |
| May, 2017 | 100.29 | 88.47 |
| June, 2017 | 97.84 | 89.84 |
| July, 2017 | 97.91 | 87.83 |
| Aug, 2017 | 104.73 | 88.39 |

118. Utilizing a trend line allows us to smooth out idiosyncratic movements from month to month. As such, utilizing the calculated trend line and the full year of data, we can determine the per-square-foot mean prices of homes inside and outside the 7-mile zone as demonstrated in Equations 3 and 4, following:

*Equation 3 -- August 2017 "Inside" Average Price PSF*

$$Inside\ PSF\ Price = \$83.949 + \$1.368\ X\ 12\ months = \$100.37/SF$$

*Equation 4 -- August 2017 "Outside" Average Price PSF*

$$Outside\ PSF\ Price = \$82.328 + \$0.5507\ X\ 12\ months = \$88.94/SF$$

119. Note that this works out to an annual price increase of about 19.5% "inside" and 8% "outside" the affected area. Notably, according to Redfin.com, as of May, 2021, home prices in Harris County had increased 21.2% year-over-year. Hence, these price increases are not unexpected.

120. From this, we can calculate the expected prices as of August, 2018, both inside the 7-mile area and outside, by utilizing the same trend lines, as shown in Equations 5 and 6, following:

*Equation 5 -- August 2018 "Inside" Forecasted Price PSF*

$$Inside\ PSF\ Price = \$83.949 + \$1.368\ X\ 24\ months = \$116.78/SF$$

*Equation 6 -- August 2018 "Outside" Forecasted Prices PSF*

$$Outside\ PSF\ Price = \$82.328 + \$0.5507\ X\ 24\ months = \$95.54/SF$$

121. However, these forecasted prices did not come to fruition for two reasons. First, the entire area was struck by Hurricane Harvey. Second, the area inside the 7-mile zone was impacted by the Arkema explosion and resultant contamination. As such, we can use mass appraisal techniques to examine actual prices and compare those to forecasted prices. The differences would be attributed to these two August 2017 events. Further, by examining prices both

"outside" and "inside" the affected area, we can allocate losses, if any, to Harvey versus to the Arkema event.

122.  Actual sales, measured on a monthly per-square-foot basis, used for this mass appraisal analysis, are as shown in Table 9, following:

*Table 9 -- Post Event Monthly Prices PSF*

| Monthly Averages | In | Out |
|---|---|---|
| Sept, 2017 | 90.44 | 90.53 |
| Oct, 2017 | 96.05 | 88.38 |
| Nov, 2017 | 99.82 | 87.09 |
| Dec, 2017 | 91.49 | 87.99 |
| Jan, 2018 | 95.29 | 86.35 |
| Feb, 2018 | 101.42 | 85.97 |
| March, 2018 | 93.75 | 89.76 |
| April, 2018 | 95.12 | 90.22 |
| May, 2018 | 96.27 | 92.28 |
| June, 2018 | 101.52 | 93.25 |
| July, 2018 | 96.98 | 92.86 |
| Aug, 2018 | 107.80 | 93.43 |

123.  Again, we can smooth out these monthly averages to arrive at monthly and annual pricing trends, as shown in Figures 6 and 7, following. For these analyses, we anchor the beginning of the trend line to the per-square-foot prices determined prior to Harvey and the Arkema Explosion. Thus, the beginning per-square-foot price for inside the 7-mile affected area is $100.37 (from Equation 3) and the beginning per-square-foot price for outside this area is $88.94 (from Equation 4):

*Figure 6 -- Price Trend "Inside" After the Arkema Event*



*Figure 7 -- Price Trend "Outside" After the Arkema Event*



124.    Not surprisingly, prices decline in both the affected area and the control area after Harvey and the Arkema explosion. In the control area (sales outside the 7-mile zone) prices drop immediately, but then rebound after about a half-year and return to a positive trend. In the affected area, prices fall even faster and do not return to a sustained positive trend even after a year.

125. Using the same mass appraisal analysis as shown in the previous four equations, we can now examine the actual price movements during the 12-month period following August 2017, as illustrated in Equations 7 and 8, following:

*Equation 7 -- August 2018 Actual Average "Inside" Prices PSF*

$$Inside\ PSF\ Price = \$100.37 - \$0.0296\ X\ 12\ months = \$97.85/SF$$

*Equation 8 -- August 2018 Actual Average "Outside" Prices PSF*

$$Outside\ PSF\ Price = \$88.936 + \$0.2256\ X\ 12\ months = \$91.64/SF$$

126. Thus, while prices outside the 7-mile zone do not decline following Havey, they also do not rise as much as the forecasted trend prior to Harvey. Conversely, prices inside the 7-mile zone are observed to actually decline from levels prior to the Arkema Explosion. These findings are summarized in Table 10, following:

*Table 10 -- Summary of Pricing Impacts After Arkema Explosion*

|  | Inside | Outside |
|---|---|---|
| Aug 2017 Prices | 100.365 | 88.9364 |
| Aug 2018 Forecasted | 116.781 | 95.5448 |
| Aug 2018 Actual Prices | 97.8548 | 91.6432 |
| % Change 2017/2018 | -16.21% | -4.08% |
| **Damages** | **-12.12%** | |

127. Thus, within one year of the Arkema Explosion, actual home prices in the 7-mile zone had decreased 12.12% more than they would have decreased without that explosion. Note that this is a <u>floor</u> for damages, since research shows us that homes in an affected area are less likely to transact, are less likely to fully and immediately inculcate new knowledge, and thus are not likely to be "at equilibrium". In prior cases similar to this one, we have seen several years for full equilibrium pricing to result.

128. As an additional analysis, we examined the sales prices within the 7-mile affected area as a function of distance to/from the Arkema facility. We first began by examining the correlation between sales price and distance <u>before</u> the Arkema explosion and found that there was nearly zero correlation between the two. This suggests that mere proximity to the facility is not a factor in sales prices. Second, we examined prices <u>after</u> the explosion, and found that while distance is a slight correlative factor, it does not pass the threshold of statistical significance, as shown in Table 11, following.

*Table 11 -- Correlations Between Distance and House Price*

|  | *Correlation* |
|---|---|
| *Before Explosion* | -0.006230049 |
| *After Explosion* | -0.029686217 |

## Case Studies

129.   Case studies also have long been an analytical technique used in business and real estate valuation. Case studies are a derivative of the sales comparison approach to valuation. They differ from simple sales transactions in that they are more in-depth and they focus on a contamination event and how it has affected market behavior, price, and value. Case studies rely on empirical information drawn from a variety of sources, and they provide a range of conclusions. Because there is seldom a perfectly comparable case study, the analyst must consider the characteristics of each study and its relevance to the subject. When each case study is considered individually, its merits and conclusions must be judged relative to other studies and its similarity to the subject. Valuation guidelines recommend that the analyst consider cost, use, and risk effects of contamination on value. While case studies are considered a derivative of the sales comparison approach to value, they more broadly address these three issues.

130.   I thus utilize case studies, including legal cases, as additional evidence to support conclusions I derived from other methods. Legal cases provide appraisers with a wealth of information on a variety of appraisal issues, including takings, assessment disputes, and property values, among others. In this dynamic industry of complex valuation assignments, appraisers must constantly seek to update their knowledge and skills:

> To keep abreast of these changes and developments, the appraisal profession is constantly reviewing and revising appraisal methods and techniques and devising new methods and techniques to meet new circumstances. For this reason it is not sufficient for appraisers to simply maintain the skills and the knowledge they possess when they become appraisers. Each appraiser must continuously improve his or her skill to remain proficient in real property appraisal.[91]

131.   In markets unsettled by real property contamination, appraisers normally rely on market information and transactions to assist them in determining market value. Legal cases are an additional type of information, readily available to the public and the appraiser. Informed judgments where disinterested parties with full knowledge make determinations about valuation disagreements should be considered. In short, similar issues should reach similar conclusions. Where other market information is in short supply, legal cases can be especially helpful. In an appraisal report for litigation, consideration of legal cases can help inform the intended users (clients, reviewing appraisers, and the jury) of "apples to apples" situations, providing facts about property value loss and displaying additional avenues for appraisers to explore in making their market value determinations. While legal cases need not be included in every appraisal report, they are useful to demonstrate precedent and to provide information in complex matters. Rulings and settlements are, in effect, normative evidence and data for the appraiser to consider in what is generally a challenging valuation assignment.

132.   The use of litigation outcomes has also been discussed in the appraisal literature. One such example of the use of legal case studies is from Simons and Throupe (2005).[92] They examined

---

[91] USPAP, Comment to USPAP Standards Rule 1-1(a), 94. The same is true for mass appraisal—see USPAP, Comment to USPAP Standards Rule 5-1(a).

[92] Simons, Robert A., and Ron Throupe. 2005. "An Exploratory Review of the Effect of Toxic Mold on Real Estate Values." The Appraisal Journal 73(2): 156–166.

the effects of toxic mold on housing values, presenting empirical results from litigation outcomes, CV surveys, and a public health study. With little data available, Simons and Throupe expanded their market research to provide the appraisal community with an exhaustive list of empirical results, including legal cases. Aalberts and Hoyt (2006)[93] also discussed mold cases, the appraiser's role, and appropriate guidelines, expanding on the Simons and Throupe (2005) article. In Boykin (1996),[94] various court rulings[95] demonstrated parameters that are useful in choosing comparable sales for land parcels. Robinson and Lucas (2005)[96] used court decisions to define the general concepts of buyer's knowledge in arm's-length transactions.[97] Likewise, I can use legal case studies to demonstrate additional market information.

133.   Using case studies in the valuation analysis of properties provides important insight into how the market has behaved in situations similar to the environmental contamination conditions prevailing in the affected neighborhoods. I will consider a broad range of case studies before narrowing my focus to those that shared the most commonality with the facts of this case.

134.   As a preliminary exercise, I have examined five recent case studies comparable to the Arkema situation.  All of these cases included air and soil-related contamination including industrial products.  Diminution in value for residential properties ranged for a low of 5% to as high as 42%, as shown in the accompanying Table 12.

---

[93] Aalberts, Robert J., and Richard W. Hoyt. 2006. "Toxic Mold Liability Update: Implications of *Kilian v. Equity Residential Trust*." The Appraisal Journal 74(2): 134–139.

[94] Boykin, James H. 1996. "Impropriety of Using Dissimilar Size Comparable Land Sales." The Appraisal Journal 64(3): 310–318.

[95] From Boykin (1996), see Duke Power Company v. Smith, 282 SE. 2d564 (NC. 1981); Pearl River Valley Water Supply Districts v. Wright, 203 So. 2d 296 (Miss. 1967); Yoder v. Iowa Power and Light Company, 215 N. W. 2d 328 (IA 1974); Hoeft v. State, 221 Iowa 694,697-698,266 NW. 571. 573,104 A.L.R. 1008; Welton v. State Highway Commission, 211 Iowa 625, Loc. Cit. 632,233 NW. 876,881; State v. Johnson, 191 SE. 2d641 (NC. 1972); Teele v. City of Boston, 165 N.E. 506 (Mass. 1896); McCarthy v. City of Amarillo, 307 S.W 2d 595 (Texas 1957); Morgan v. State of Texas, 343 SW. 2d 738 (Texas 1961). Note: In Boykin, *Redevelopment Commission of Winston-Salem v. Weaihennan, 208 S.E. 2d 412 (S.C. 1974)* was the only case where the appellate court did not uphold the impropriety of using different-sized comparable sales properties.

[96] Robinson, Rudy R., III, and Scott R. Lucas. 2005. "Seller Disclosure and Buyer Knowledge: How They Affect Market Value." The Appraisal Journal 73(2):156–166.

[97] From Robinson and Lucas (2005), see Reservation Eleven Associates v. District of Columbia, 420 F2d 153, 155 (CADC 1969); Sacramento, etc., R.R. Co. v. Heilbron, 156 Cal. 408, 409, 104 P 979,980 (1909).

*Table 12 -- Comparable Case Studies*

| Case Title | Location/Site | Case Type | Contaminant(s) | Media | Damages/Costs | Affected Area | Diminution |
|---|---|---|---|---|---|---|---|
| RSR Corp Lead Smelter | Dallas, TX | Appraisal Literature | Arsenic, Lead | Air, Soil | - | 1.2-Mile Radius | 20% |
| El Paso Cement Plant & Quarry | El Paso, TX | Contingent Valuation | Mercury, Metals | Air, Soil | - | - | 20% - 32% |
| Rocky Flats | Rocky Flats, CO | Appraisal Literature | Plutonium, Uranium | Air, Groundwater, Soil, Surface Water | $190M | 13,000 Properties | 5% - 30% |
| Industrial Excess Landfill | Uniontown, OH | Stigma | Arsenic, Benzene, Metals, Methane, Vocs | Air, Groundwater, Soil | $6.7M | 1,713 Property Owners | 5%–15% |
| ASARCO El Paso Smelter | El Paso, TX | Cost to Cure and Diminution | Arsenic, Carcinogens, Metals (Lead) | Air, Soil | - | 3-Mile Radius | 16% Cost to Cure & up to 42% Diminution |

135. *RSR Corp Lead Smelter* – Diminution in value based on a series of studies by McClusky and Rausser (2002, 2003a, 2003b) in which they examined 205,397 transactions both within 1.2 miles of the RSR site and beyond that distance. They found that, unremediated, the properties sold on average for 20% less than properties at a distance at equilibrium[98].

136. *El Paso Cement Plant & Quarry* – The impact of contamination emanating from this facility was the subject of a study published by Berrens, et al, (2003) in *Social Science Quarterly*. The study found that at equilibrium, with full disclosure of the contamination, home buyers would pay about 32% less for impacted properties[99].

137. *Rocky Flats* – Approximately 13,000 property owners in a 30 square mile area east of the facility were found to be contaminated by material emanating from the plant. An appraiser who analyzed the situation found that vacant land showed a diminution in value of about 30% while residences were diminished from 5% to 10%. Mass appraisal methods used to determine this include, case studies, market sales analysis coupled with a regression analysis and public opinion surveys.

138. *Uniontown, Ohio* – In 1971, the landfill caught fire when liquid wastes were combined with soil in the onsite lagoon. After a series of fires, the local Board of Health ordered the facility to

---

[98] McCluskey, Jill J., and Gordon C. Rausser. 2001. "Estimation of Perceived Risk and Its Effect on Property Values." Land Economics 77(1):42–55.; McCluskey, Jill J., and Gordon C. Rausser. 2003a. *op cit*; McCluskey, Jill J., and Gordon C. Rausser. 2003b. "Hazardous Waste Sites and Housing Appreciation Rates." Journal of Environmental Economics and Management 45(2003):166–176.

[99] Berrens, Robert P., Alok K. Bohara, Hank C. Jenkins-Smith, and Carol L. Silva. 2003. "The Effect of Environmental Disclosure Requirements on Willingness to Pay for Residential Properties in Borderlands Community." Social Science Quarterly 84(2):359–378.

stop dumping of liquid wastes.  Five economists and an appraiser testified in the resultant litigation that nearby properties decreased in value by 14%[100].

139.   *Asarco* – As of 2007, 2,100 out of 7,000 properties surrounding the smelter had been tested for arsenic and lead.  The per-property cost to cure averaged 16% of otherwise unimpaired value, and the local tax assessor determined that unremedied properties had declined in value by 42%[101].

140.   In summary, the case studies selected would support a diminution in value of at least 14%, the baseline finding in the Rocky Flats matter, and perhaps as high as 42%, the assessor finding in the Asarco matter.

## SUMMARY AND CONCLUSIONS

141.   A sales trend analysis, using actual sales and mass appraisal methodology, indicates that within one year of the explosion, prices in the affected area had stagnated by as much as 12%.  Experience, professional studies, and academic research would indicate that this decline in value is not yet at equilibrium and would probably continue.  Comparable case studies would indicate a somewhat higher equilibrium loss in value, and as such a conservative estimate of the actual decline in value would be in the range of 20%.

142.   To demonstrate the applicability of the model, we have valued the improved properties in Liberty County.  As noted in a previous section, there are 1,257 improved residential properties in the 7-mile affected area according to the Liberty County records.  Of these, I was able to value all 1,257, or 100% of the properties.  For each improved property, my mass appraisal model has determined the unimpaired value, the impaired value, and the diminution in value.  The individual values are retained in my workfile, but the aggregate valuations for Liberty County are as shown in the following Table 13:

*Table 13 -- Aggregate Values for Liberty County*

| Aggregate Unimpaired Values | $119,164,327.50 |
| Aggregate Impaired Values | $95,331,462.00 |
| Aggregate Diminution in Value | $23,832,865.50 |

143.   For Harris County, using tax assessor data, we have identified 10,478 improved residential properties in the 7-mile affected area sing Harris County records.  Of these, I was able to value all 10,478, or 100% of the properties.  For each improved property, my mass appraisal model has determined the unimpaired value, the impaired value, and the diminution in value.  The individual values are retained in my workfile, but the aggregate valuations for Harris County are shown in the following Table 14:

---

[100] DeSario v. Industrial Excess Landfill 68 Ohio App.3d 117 (1991)

[101] Snell, Marilyn Berlin.  "Arsenic in the Attic.",  www.sierraclub.org/sierra/200605/goingforbroke/page1.asp. Accessed: December 13, 2006.

*Table 14 -- Aggregate Values for Harris County*

| Aggregate Unimpaired Values | $1,714,660,093.90 |
|---|---|
| Aggregate Impaired Values | $1,371,728,075.12 |
| Aggregate Diminution in Value | $342,932,018.78 |

144. As previously noted, based on our analysis of public records and my inspection of the area, we do not find any improved residential properties in Chambers County.

145. With that, the total aggregate values of the residential properties in the 7-mile affected area (unimpaired and impaired) and the resultant diminution in value are shown in Table 15, following:

*Table 15 -- Aggregate Values for Affected 7-mile Area*

| Aggregate Unimpaired Values | $1,833,824,421.40 |
|---|---|
| Aggregate Impaired Values | $1,467,059,537.12 |
| Aggregate Diminution in Value | $366,764,884.28 |

146. I have also been asked by my clients to determine the aggregate unimpaired values of residences in each half-mile ring, the aggregate impaired values, and the diminution in each of those ring segments.  This is presented in Table 16, following:

*Table 16 -- Aggregate Values by Ring Segment*

| Ring Geometry – Distance from Arkema Site | Number of Residences | Aggregate Unimpaired Value | Aggregate Impaired value | Diminution in value |
|---|---|---|---|---|
| Within 1.5 miles | 397 | 58,969,379.53 | 47,175,503.63 | 11,793,875.91 |
| From 1.5 to 2 miles | 201 | 33,766,663.76 | 27,013,331.01 | 6,753,332.75 |
| From 2 to 2.5 miles | 276 | 36,590,224.12 | 29,272,179.30 | 7,318,044.82 |
| From 2.5 to 3 miles | 349 | 63,243,744.16 | 50,594,995.33 | 12,648,748.83 |
| From 3 to 3.5 miles | 599 | 97,303,153.52 | 77,842,522.81 | 19,460,630.70 |
| From 3.5 to 4 miles | 2,025 | 329,227,697.16 | 263,382,157.72 | 65,845,539.43 |
| From 4 to 4.5 miles | 1,606 | 267,563,983.72 | 214,051,186.97 | 53,512,796.74 |
| From 4.5 to 5 miles | 1,253 | 208,331,833.10 | 166,665,466.48 | 41,666,366.62 |
| From 5 to 5.5 miles | 1,168 | 191,451,396.99 | 153,161,117.59 | 38,290,279.40 |
| From 5.5 to 6 miles | 1,388 | 184,279,066.34 | 147,423,253.07 | 36,855,813.27 |
| From 6 to 6.5 miles | 1,442 | 212,282,418.17 | 169,825,934.53 | 42,456,483.63 |
| From 6.5 to 7 miles | 1,031 | 150,814,860.83 | 120,651,888.66 | 30,162,972.17 |
| Total Residences | 11,735 | $1,833,824,421.39 | $1,467,059,537.11 | $366,764,884.28 |

147. I reserve the right to alter or amend these findings if and as additional information is presented.

## VARIOUS USPAP-RELATED ITEMS

### Extraordinary Assumptions and Hypothetical Conditions:

My inspection of the affected area and surrounding MLS zones was in June, 2021, but the effective date of value is August, 2017. I assume that there were no material changes in the properties which would affect the value, but for the Hurricane and the Arkema Explosion, during the intervening period. If found to be false, this could have a material impact on the valuation conclusions.

The unimpaired value was determined under the hypothetical condition that the properties had not yet been impacted by neither the Hurricane nor the Arkema Explosion.

The impaired value was determined under the "as is" condition that the properties had been affected by the Arkema matter after having accounted for any value impact of Hurricane Harvey.

### Interests Valued

We are valuing the fee simple interests in these properties, which is the most complete bundle of rights associated with property ownership.

### Type and Definition of Value

The most common definition of Market Value is generally referred to as the Federal Definition, which is required to be used in most Federally regulated lending:

> *Market value means the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:*

> - *Buyer and seller are typically motivated;*
> - *Both parties are well informed or well advised, and acting in what they consider their own best interests;*
> - *A reasonable time is allowed for exposure in the open market;*
> - *Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and*
> - *The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated*

*with the sale.*[102]

## Highest and Best Use

As this matter is in litigation, no separate analyses of highest and best use have been performed. Use as determined by the local tax assessor is assumed to be the highest and best use for each property valued.

## General Assumptions

No responsibility is assumed for matters of a legal nature affecting title to the properties, nor is an opinion of title rendered. Information and data furnished by others are usually assumed to be true, correct, and reliable. When such information or data appears to be dubious and when it is critical to the analysis, a reasonable effort has been made to verify all such information; however, no responsibility for its accuracy is assumed by the appraiser.

We assume that there are no hidden or unapparent conditions of the properties, subsoil, or structures that would render them more or less valuable. No responsibility is assumed for such conditions or for engineering work that may be required to discover them.

We assume that all required licenses, consents, or other legislative or administrative authority from any local, state, or national government or private entity or organization have been or can be obtained or renewed for any use on which the value estimate contained in this report is based.

We assume that the utilization of the land and any improvements is within boundaries or property lines of the properties described and that there is no encroachment or trespass unless noted within this report.

## General Limiting Conditions

Possession of this report, or a copy thereof, does not carry with it the right of publication. It may not be used for any purpose by any person other than the party to whom it is addressed.

No environmental impact studies were either requested or made in conjunction with this analysis, other than as may be referenced in the report. Greenfield Advisors hereby reserves the right to alter, amend, revise, or rescind any value opinions based on any subsequent environmental impact studies, research, and/or investigation.

No part of this report may be used as a part of or referred to in a public or private stock offering.

---

[102] The Federal Definition is from regulations published by federal regulatory agencies pursuant to Title XI of FIRREA, between July 5, 1990, and August 24, 1990. 55 Fed. Reg. 27762, 27771-72 (July 25, 1990) (Federal Reserve System); 55 Fed. Reg. 30199-01, 30208 (July 25, 1990) (National Credit Union Administration); 55 Fed. Reg. 33879-01, 33888 (Aug. 20, 1990) (Federal Deposit Insurance Corporation); 55 Fed. Reg. 34219-01, 34228-29 (Aug. 22, 1990) (Resolution Trust Corporation); 55 Fed. Reg. 34532-01, 34547-48 (Aug. 25, 1990) (Department of the Treasury); 55 Fed. Reg. 34684-01, 34696 (Aug. 24, 1990) (Office of the Comptroller of Currency). This definition is also referenced in regulations jointly published by the OCC, OTS, FRS, and FDIC on June 7, 1994, and in the Interagency Appraisal and Evaluation Guidelines, dated December 10, 2010. Office of Thrift Supervision Integration Pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act, 76 Fed. Reg. 48950, 49063 (Aug. 9, 2011).

Acceptance of and/or use of this report constitutes acceptance of the foregoing General Assumptions and General Limiting Conditions.

The compensation for research services is dependent only on delivery of this report and is not contingent on the estimates provided.

## CERTIFICATION

I certify that, to the best of my knowledge and belief:

- The statements of fact contained in this affidavit are true and correct.

- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

- Neither Greenfield Advisors nor I have any present or prospective interest in the properties that are the subject of this affidavit and no personal interest with respect to the parties involved.

- Neither Greenfield Advisors nor I have performed any services, as an appraiser or in any other capacity, regarding the properties that are the subject of this affidavit within the 3-year period immediately preceding acceptance of this assignment.

- We have no bias with respect to the properties that are the subject of this affidavit or to the parties involved with this assignment.

- My engagement in this assignment was not contingent upon developing or reporting predetermined results.

- My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

- My analyses, opinions, and conclusions were developed, and this affidavit has been prepared, in conformity with the *Uniform Standards of Professional Appraisal Practice.*

- I made a personal inspection of the affected areas on June 7, 2021, but have not made an interior/exterior inspection of any of the named Plaintiffs' properties.

- Abigail Mooney of Greenfield Advisors provided me with significant professional assistance in the conduct of this assignment, specifically with assistance regarding case studies. Jonathan Kilpatrick of En-Syte Consulting, a subcontractor of Greenfield, provided significant professional assistance in geographic information systems and data management. Jerry Gilbert, a consultant engaged by my clients, provided preliminary assistance in the measurement and location of data.

- The reported analysis, opinions, and conclusions were developed and this affidavit has been prepared in conformity with the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute, of which I am an MAI Designated Member.

- The use of this affidavit is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

- As of the date of this affidavit, I have completed the continuing education program for Designated Members of the Appraisal Institute.

- As of the date of this affidavit, I have completed the Standards and Ethics Education Requirements for Designated Members of the Appraisal Institute.

I hereby declare that the above statement is true to the best of my knowledge and belief, and that I understand it is made for use as evidence in court and is subject to penalty for perjury.

**GREENFIELD ADVISORS INC.**

John A. Kilpatrick, PhD, MAI

Texas State Certified General Appraiser No. 1329613

July 16, 2021



**Greenfield Advisors**

*Economic, Market and Valuation Analysts*

| MAILING ADDRESS: | FOR PACKAGES/DELIVERIES: |
|---|---|
| #677, 400 NW GILMAN BLVD | 5561 248TH PLACE SE |
| ISSAQUAH, WA 98027 | ISSAQUAH, WA 98029 |
| PHONE 206-623-2935 | |
| FAX 206-623-2985 | |

## JOHN A. KILPATRICK, PhD, MAI

## PROFESSIONAL QUALIFICATIONS

John Kilpatrick is the Managing Director of Greenfield Advisors, formerly Mundy Associates. He has over 40 years of experience in finance and financial analysis, real estate, business development, statistical analysis, consulting, and teaching, including the following:

- Greenfield Advisors (1998–present)
- Kilpatrick Research Group (1994–1998), Principal conducting economic, financial, and market analyses for governments and private firms in the Southeast
- University of South Carolina: Lecturer in Real Estate (1992–1998), Researcher in the Center for Applied Real Estate (1997–1998), Administrator of the South Carolina Supercomputer Network (1994–1996), Project Coordinator of the Washington, DC, based Academic Coalition for Intelligent Manufacturing Systems (1994–1995), Assistant to the Senior Vice President for Research (1990–1994)
- Kilpatrick and Associates Realty (1987–1990), Broker-in-Charge, and Vice President of Sand Creek Development Company
- The Shumaker Company (1978–1981 and 1984–1987), CFO of a large-scale residential subdivision development, homebuilding, and brokerage company
- Dean Witter Reynolds (now Morgan Stanley, 1981–1984), Account Executive and S.C. Municipal Bond Coordinator

He has published extensively, most recently ***Real Estate Valuation and Strategy (***McGraw-Hill, 2020). His invited presentations have included members of the U.S. Senate (on advanced manufacturing R&D), *Institutional Investor's* Integrated Wealth Management Forum, the American Real Estate Society, the annual Applied Geography Conference of the American Association of Geographers, the Southeastern Builders Conference, the American Real Estate and Urban Economics Association, the National Trust for Historic Preservation, and the National Association of Homebuilders annual Executive Officers Conference. Dr. Kilpatrick is a regular participant and speaker at the famed *Renaissance Weekend* in Charleston, S.C. He is a frequent contributor and reviewer for numerous scholarly and practitioner journals, having served on the editorial boards of *The Appraisal Journal* and the *Journal of Sustainable Real Estate*, and on the review board for the *Journal of Real Estate Research* among others. In 2003, his industry peers in Western Washington honored him by naming him Editor of the semi-annual *Central Puget Sound Real Estate Research Report*.

His consulting and academic research activities include work for the National Science Foundation; the U.S. Departments of Energy, Interior, Defense, and Commerce; Oak Ridge National Lab; Southeastern Universities Research Association; Oak Ridge Associated Universities; SC Budget and Control Board; SC Department of Archives and History; SC Downtown Development Association; SC Housing Finance and Development Authority; and many city and county governments and private corporations. He has been featured in *The Wall Street Journal*, the *Boston Globe*, *The New York Times*, and other national publications. Dr. Kilpatrick served on the Working Group of the Data Consortium, which set the agenda for real estate information in 21st century technology. In 2000, the State of South Carolina and the U.S. Department of the Interior published a monograph honoring his research. In 2002, following the terrorist attacks on the World Trade Center, Dr. Kilpatrick was a consulting expert on real estate for Bloomberg Network News. In 2003, he became a Fellow of the American Real Estate Society. In 2004, Dr. Kilpatrick was elected to be a *Member* of the Faculty on Valuation of the Royal Institution of Chartered Surveyors, and he was named a *Fellow* of that organization in 2011. Also in 2004, the Appraisal Qualifications Board in Washington, DC, designated Dr. Kilpatrick a Nationally Certified Instructor for the *Uniform Standards of Professional Appraisal Practice*. In 2006, Dr. Kilpatrick was named a *Visiting Scholar in Real Estate Finance* at the Zicklin School of Business, Baruch College, City University of New York. In 2017, Governor Jay Inslee appointed Dr. Kilpatrick to be a *Director* of the Washington State Economic Development Finance Authority, and was named to the Audit Committee in 2018. In 2020, Dr. Kilpatrick was named to the *Advisory Committee* for the U.S. Global Leadership Coalition. He serves on the National Board of Advisors for the Carson College of Business, Washington State University. Dr. Kilpatrick is featured in the 2006 and later editions of *Who's Who in America.* He is an *MAI-Designated Member* of the Appraisal Institute, and is a state-certified appraiser in all 50 states.

John Kilpatrick has been qualified as an expert witness on finance, real estate, economics, construction matters, and statistical research in various state and federal courts throughout the United States.

## EDUCATION

Doctor of Philosophy, Finance, University of South Carolina
Dissertation: *Agency Costs and the Determinants of the Capital Structure of REITs*

Master of Business Administration, University of South Carolina

Bachelor of Science in Business Administration (Accounting), University of South Carolina

U.S. Naval Academy, 1972-1974, Ocean System Engineering

## HONORS AND AWARDS

Member, Advisory Committee, U.S. Global Leadership Coalition (2020-)

Board of Directors, Old Island Restoration Foundation, Key West, FL (2020-)

Director, Washington State Economic Development Finance Authority (2017-)
    Audit Committee (2018-)

University of South Carolina, *The Dr. John A. and Lynnda P. Kilpatrick Doctoral Fellowship* (2017-)

Review Panel, *The Appraisal Journal*, (2015–)

Visiting Scholar in Real Estate, Zicklin School of Business, Baruch College, New York (2006-2015)

International Association of Assessing Officers' Bernard L. Barnard Outstanding Technical Essay Award, 2014

Keynote address, Darla Moore School of Business Graduate Hooding Ceremony, Spring 2014

*Pinkham and Steel Society Honoree*, Seattle Rotary Club

*MAI-Designated Member*, Appraisal Institute

*Invited Participant*, Renaissance Weekend

*Fellow*, Royal Institution of Chartered Surveyors, Faculty of Valuation (2011-2020)

Editorial Board, *The Appraisal Journal* (2013–2014)

Editorial Board, *Journal of Sustainable Real Estate* (2010-2015)

Reviewer, *Journal of Real Estate Research*

Editorial Board (U.S.), *Modus* (2011–2013)

National Board of Advisors, Washington State University, Carson College of Business Administration

*Who's Who in American Business and Finance*

*Who's Who in America*

*Journal of Property Investment and Finance* Highly Commended Paper award (2013)

American Real Estate Society annual meetings, Best Paper on Valuation award sponsored by the Appraisal Institute (2010)

Editorial Board, *Brownfield News* (2005–2006)

*Principal Member*, Real Estate Counseling Group of America

*Paul Harris Fellow*, Rotary International

Nationally Certified Instructor, Uniform Standards of Professional Appraisal Practice, designated by the Appraisal Qualifications Board, Washington, DC

*Fellow*, American Real Estate Society
    Strategic Planning Committee Vice Chair (2013–)
    Education Committee (2008–09)
    Technology Committee Vice Chair (2010–11)

Professional Member, International Code Council

Board of Visitors, Episcopal Church Conference Center at Kanuga (1997-99)

American Real Estate and Urban Economics Association 1994 Doctoral Seminar Honoree (1993)

## HONORS AND AWARDS, Continued

Omicron Delta Epsilon Economics Honor Society (elected, 1993)

*National Graduate Scholar*, The Appraisal Institute (1992–1993)

*Arthur Warner Scholar,* The S.C. Association of Realtors (1991–1992)

*National University Scholar*, Commercial Investment Real Estate Council of the National Association of Realtors (1990–1991)

*Who's Who in the South and Southwest* (1984–1991 editions)

*Who's Who among Students in American Universities and Colleges* (1976 edition)

Omicron Delta Kappa Leadership Honor Society (elected, 1975)

## PUBLICATIONS AND WORKING PAPERS

*Real Estate Valuation and Strategy*, (New York:  McGraw Hill, 2020)

"Valuation of Telecommunications Corridors", Chapter 8 in in *Corridor Valuation*, (Chicago, IL:  Appraisal Institute, Appraisal Institute of Canada, and the International Right of Way Society, 2019)

"Rails-to-Trails Corridors", with David Matthews, Chapter 4 in *Corridor Valuation*, (Appraisal Institute, Appraisal Institute of Canada, and the International Right of Way Society, 2019)

"Toward an Equilibrium Model of Residential Real Estate Transactions", Working Paper presented at the 2018 annual meetings of the American Real Estate Society

"Stigma Revisited Again", with Clifford A. Lipscomb, working paper presented at the 2018 annual meetings of the American Real Estate Society

Krause, Andy, Lipscomb, Clifford A., and John A. Kilpatrick.  2013.  *Automated-valuation-model training-data optimization systems and methods*.  U.S. Patent 9,582,819, filed September 26, 2013, and issued February 28, 2017.

"Valuation of Brownfield Properties," with Clifford A. Lipscomb, Chapter 29 in *Brownfields Law and Practice: The Cleanup and Redevelopment of Contaminated Land* (LexisNexis Matthew Bender Publications, 2015).

"Using a Random Forest Process in an Automated Valuation Model," with Clifford A. Lipscomb, Jessica Kenyon, and Daniel Tetrick, presented at the 2015 annual meetings of the American Real Estate Society, April 2015.

"The Impact of the NAREIT Light Awards on REIT Performance," with Clifford A. Lipscomb, presented at the 2015 annual meetings of the American Real Estate Society, April 2015.

"Can We Forecast the Next Bubble?," with Clifford A. Lipscomb, presented at the 2015 annual meetings of the American Real Estate Society, April 2015.

"Animal Operations and Residential Appraisal," *Appraisal Journal,* Winter 2015.

"Appraisal and Valuation," Chapter 12 in *Private Real Estate Markets and Investments*, Peter Chinloy and Kent Baker, eds. (New York: Oxford U. Press, 2014).

"Do Survey Results Systematically Differ from Hedonic Regression Results? Evidence from a Residential Property Meta-Analysis," with Clifford Lipscomb and Abigail Mooney, *Journal of Real Estate Literature* 21-1, Fall 2013, 233–254. **International Association of Assessing Officers' Bernard L. Barnard Outstanding Technical Essay Award, 2014.**

"The Impact of Institutional Controls on Property Values," with Clifford Lipscomb and Abigail Mooney, accepted for presentation at the 2013 American Real Estate Society annual meetings.

"The U.S. Valuation Reconciliation is Still Ongoing," *Modus (Americas Edition)*, May 2012, p. 8.

"USPAP vs. International Valuation Standards – Compare and Contrast," *Greenfield Advisors working paper* presented at the 2012 American Real Estate Society annual meetings.

**PUBLICATIONS AND WORKING PAPERS (continued)**

"Integration of Sector Analysis into a Hedonic Pricing Model," with Clifford A. Lipscomb and Andy Krause, *Greenfield Advisors working paper* presented at the 2012 American Real Estate Society annual meetings.

"Deconstructing the Housing Price Bubble," accepted for presentation at the 2012 American Real Estate Society annual meetings.

"Willingness to Pay Convergence Between Contingent Valuation and Hedonic Methods," with Clifford A. Lipscomb, Andy Krause, and Michael C. Farmer, *Greenfield Advisors working paper* presented at the 2012 American Real Estate Society annual meetings. Under review at *Real Estate Economics.*

"Contaminated Properties, Trespass, and Underground Rent," with Andy Krause, Ron Throupe, and Will Spiess, *Journal of Property Investment and Finance* 30-3, 2012, pp. 304–320. ***Designated as a "Highly Commended Award Winner" at the Emerald Publishing Literati Network Awards for Excellence, 2013.***

"Expert Systems and Mass Appraisal," a Greenfield Advisors Working Paper, presented at the 2010 Valuation Colloquium; *Journal of Property Investment and Finance*, 2011.

"Contingent Valuation and Real Estate Damage Estimation," with Cliff Lipscomb, Max Kummerow, Will Spiess, and Sarah Kilpatrick, *Journal of Real Estate Literature* 19-2, 2011, pp. 235–282.

"Valuing Brownfields" with Bill Mundy, Chapter 10 in *Brownfields: A Comprehensive Guide to Redeveloping Contaminated Property, Third Edition.* Todd S. Davis and Scott A. Sherman, editors. (American Bar Association, 2010).

"What Is the Error Rate of a Commercial Appraisal?" a Greenfield Advisors Working Paper, winner of the ***Appraisal Institute's Best Appraisal Paper*** award at the 2010 meetings of the American Real Estate Society.

"The Gulf Oil Spill Updated," a Greenfield Advisors White Paper*,* with Cliff Lipscomb and Chris Miner, October 2010.

"The Gulf Oil Spill," a Greenfield Advisors White Paper, with Cliff Lipscomb, June 2010.

"Chinese Drywall," with Chris Miner, a Greenfield Advisors Working Paper*,* presented at the 2010 meetings of the American Real Estate Society.

"Can We Trust Market Values?" with Max Kummerow, a *Greenfield Advisors Working Paper,* presented at the 2009 meetings of the American Real Estate Society.

"Residential Real Estate Pricing Disequilibrium," presented at the 2008 annual meetings of the American Real Estate Society*.*

"Valuing Historic Preservation Easements in Regulated Historic Districts – An Empirical Study," presented at the 2008 annual meetings of the American Real Estate Society.

"Liquidation Value: The Valuation of Real Estate in Distress," presented at the 2008 annual meetings of the American Real Estate Society.

"From Brownfields to Greenfields – Case Studies in Environmentally Sensitive Development," *Greenfield Advisors Working Paper,* presented at the 2008 annual meetings of the Asian Real Estate Society, July 2008.

"Preservation Easements," with Vicki Adams, *Journal of Wealth Management*, Summer 2008.

*Central Puget Sound Real Estate Research Report* (Editor), published semi-annually by the Central Puget Sound Real Estate Research Committee, Inc., 2003–2007.

"Certifying the Real Estate Damages Class – An Appraisal Perspective," a Greenfield Advisors Working Paper*.*

"Real Estate in the High Net Worth Portfolio," presented to the Integrated Wealth Management Forum, sponsored by *Institutional Investor*, New York, September 2007.

"Foreign Direct Real Estate Investment in the U.S. – Opportunities and Cautions," presented at the annual meetings of the Asian Real Estate Society, Macao, China, July 2007.

## PUBLICATIONS AND WORKING PAPERS (continued)

"Economic Feasibility – the Challenge for Eminent Domain Appraisers under *Lucas,*" a Greenfield Advisors Working Paper

"Real Estate Investments of the Rich and Famous," *Journal of Wealth Management,* Spring 2007.

"When is a Taking 'Fair'?, a Repeat Sales Analysis," presented at the American Real Estate Society annual meetings, April 2007; presented at the Eminent Domain Institute annual meeting, April 2007.

"Valuing Multiple Contemporaneous Events: The Case of the Murphy Oil Spill," presented to the American Real Estate Society annual meetings, April 2007.

"The Impact of Transit Corridors on Residential Property Values," with Ron Throupe, John Carruthers, and Andy Krause, *Journal of Real Estate Research*, Spring 2007.

"The Aftermath of Katrina – Recommendations for Real Estate Research," with Sofia Dermisi, *Journal of Real Estate Literature*, 15-2, Spring 2007.

"Valuation of Impaired Land: Greenfield Advisors Experience with Contaminated Sites", with Vicki Adams, Max Kummerow, Bill Mundy, and Ron Throupe, *Proceedings of the 13th Pacific-Rim Real Estate Society Conference,* January 2007.

"Highlights from 'Valuation of Brownfield Properties,'" American Bar Association's *Section on Environmental Transactions and Brownfields Newsletter*, November 2006.

"Non-Parametric Methods and the Appraisal Process," a working paper in progress.

"Stigma Revisited Again," with Max Kummerow, a working paper in progress presented at the American Real Estate Society annual meetings, Key West, FL, April 2006.

"Application of Repeat Sales Analysis to Determine the Impact of a Contamination Event," *Journal of Housing Research,* Fall 2006.

"Redevelopment Brings Developers, Conservationists Together," with Nina Marshtein, *Charleston (SC) Business Journal*, March 2, 2006.

"Valuation of Impaired Property" with Ron Throupe, Bill Mundy, and Will Spiess, Chapter 6 in *When Bad Things Happen to Good Property*, Robert A. Simons, ed., (Washington, DC: National Environmental Law Center, 2005).

"5 mega-trends for Puget Sound Real Estate," *Daily Journal of Commerce* (Seattle, WA), October 6, 2005.

"Brownfields Let Texans Do Well While Doing Good," with David I. Mayes, *Dallas Business Journal*, October 28, 2005.

"Recycling Land Around D.C. Offers Field of Dreams," with John E. Tabella, *The Washington Construction News*, September 2005.

"Brownfields Offer Chance for Urban Redevelopment," with Steven Lamb, *Charlotte Business Journal*, July 29, 2005.

"Find Creative New Ways to Develop Land in Tampa Bay," with Mark Tumlin, *Tampa Bay Business Journal,* July 25, 2005.

"Contamination Needn't Be Barrier to Developing Site," with Helen Swenson, *Greater Cincinnati Area Business Courier*, July 15, 2005.

"Creative Redevelopment Can Turn Brownfields to Gold," with David Brewer, *Kansas City Business Journal*, June 10, 2005.

"Provide More Housing, While Cleaning Up Our Environment," with Brad Anderer, *Arizona Journal of Business and Real Estate*, May 2005.

"Multiple Regression Models and Diminishing Marginal Returns in Land Values," with John I. Carruthers, working paper in progress. Presented at the American Real Estate Society annual meetings, April 2005.

## PUBLICATIONS AND WORKING PAPERS (continued)

"Geotechnical Problems and Property Values: Market Evidence from the Pacific Northwest," a working paper in progress.

"Appraising Real Estate in Complex Environmental Class Actions: An Expert's View," *Toxic Law Reporter*, January 13, 2005.

"Agency Costs and REIT Debt Announcements," with Ronald C. Rogers, a working paper in progress (presented at the American Real Estate Society meetings in 2004).

"Brownfields Offer Optimism as Options Dissipate," with Joseph Kesling, *Puget Sound Business Journal*, December 10, 2004, pg. 41.

"Real Estate Issues in Class Certification," *Class Action Litigation Report,* October 8, 2004.

"Terrorism Impacts on the Value of Major Downtown Office Buildings," Mundy Associates LLC working paper series.

"Agency Costs and REIT IPO's," with Ronald C. Rogers, a working paper in progress, presented at the American Real Estate and Urban Economics Association meetings in January 2004.

"Windfall Lien Guidance," *Newsletter of the Environmental Transactions and Brownfields Committee*, American Bar Association Section on Energy, Natural Resources, and the Environment, January 2004.

"Looking Backward and Forward: Economic Restructuring and United States Real Estate Markets," with John Carruthers, Bill Mundy, and Ron Throupe, *Real Estate Issues*, Fall 2003.

"Appraisal of Contaminated Real Estate in the United States," with Bill Mundy, prepared by invitation of and for publication in the *Journal of the Japan Real Estate Institute*, October 2003.

"Construction Defects and Stigma," *Mealey's Construction Defects*, July 2003.

"*Daubert* Raises Its Ugly Head Again," *In-House Counsel Committee Newsletter*, American Bar Association, February 2003.

"Concentrated Animal Feeding Operations and Proximate Property Values," *Appraisal Journal,* July 2001.

"The Future of Real Estate Information," *Real Estate Issues,* Spring 2001.

"Valuation Implications of EIFS," *Mealey's Construction Defects,* January 2001.

"Factors Influencing CBD Land Prices," with Bill Mundy, *Real Estate Issues*, Fall 2000.

"Lead Contamination Impact on Property Values Significant," *Real Estate Environmental Liability News*, March 2000.

*The Economic Impact of Historic Designation* (monograph reviewing research done over several years, published by the S.C. Department of Archives and History, January 2000).

"Summation of Evidentiary Rules for Real Estate Experts Mandated by Daubert v. Merrell Dow Pharmaceuticals, Inc." with Bill Mundy and Dave McLean, *Real Estate Issues*, Fall 1999.

"Valuing Brownfields," *Valuation Insights and Perspectives*, February 1999, with Bill Mundy and Dave McLean.

"Performance of Exterior Insulation Finish Systems," with Douglas C. Brown and Ronald C. Rogers, *Appraisal Journal,* January 1999.

*The Economic Impact of Local Preservation Ordinances on Small Towns in South Carolina* (1998), research monograph funded by the South Carolina Downtown Development Association and the U.S. Department of the Interior – National Park Service.

*House Price Impacts of School District Choice* (1998), with Frank J. Hefner, research monograph funded by the South Carolina Center for Applied Real Estate Education and Research.

*CAREER News* (semi-annual publication of the USC Center for Applied Real Estate Education and Research), editor, 1997–1998.

#677, 400 NW GILMAN BLVD
ISSAQUAH, WA 98027
Phone 206-623-2935
Fax 206-623-2985

**PUBLICATIONS AND WORKING PAPERS (continued)**

 "Appraisal of Contaminated Properties," *CAREER News*, August 1998.

"Real Estate Law Means Major Changes," *Business and Economic Review*, April–June 1998.

"Economic Value Added for Real Estate," *CAREER News*, February 1998.

*Complete Real Estate Finance Desk Reference (Armouk, NY:  M.E. Sharpe Publishing, 1998)*

*Subdivision Development* (Chicago: Realtors Land Institute of the National Association of Realtors, 1998), John A. Kilpatrick, editor.

"Historic Designation and House Prices," *CAREER News*, August 1997.

The Five Critical C's of Credit," *Florida Home Builder Monthly*, May 1997.

"Managing the Shrinking Margins," *Florida Homebuilder*, April 1997.

*The Impact of Historic District Designation in Beaufort, South Carolina* (1997), research monograph funded by the Historic Beaufort Foundation, the S.C. Dept. of Archives and History, and the U.S. Department of the Interior – National Park Service.

*The Economic Impact of Local Preservation Ordinances in Greenville, South Carolina* (1997), research monograph funded by the Historic Greenville Foundation, the City of Greenville, South Carolina, the S.C. Department of Archives and History, and the U.S. Department of the Interior – National Park Service.

*Analysis of the Columbia Owens Downtown Airport Commercial Corridor* (1996), research monograph funded by the South Columbia Development Corp. and the City of Columbia.

"Impact of Historic District Designation on House Prices in Columbia, South Carolina," (1995), research monograph prepared for the S.C. Department of Archives & History.

*Understanding Home Construction*, (Washington, DC: Homebuilder Press, 1993). **Honorable Mention**, 1993 Washington, DC, EdPress Association Awards and **Top Honors**, 1994, Society for Technical Communication Awards.

"A Study into the Risk of Sales Variability and its Effect on the Success of Strip Shopping Centers," (1992). *Papers and Proceedings of Applied Geography Conferences* Volume 15, J. Frazier, B. Epstein, and F. Schoolmaster, editors.

"Development and Construction Financing: Where Do We Go From Here?" *Maryland Builder*, Baltimore, MD, February 1992.

*Sample Letters and Memos* (Washington, DC: Homebuilder Press, 1992).

*Financing Development and Construction in the Nineties* (Washington, DC: Homebuilder Press, 1991).

**INVITED TALKS**

*In addition to the invited talks listed below, John Kilpatrick is a frequent guest speaker at civic clubs and events throughout the United States.*

"Post Disaster Property Valuation", presented to the 38th annual National Conference of State Tax Judges, sponsored by the Lincoln Institute of Land Policy, Chicago, Ill, October 12, 2018

"The Effective and Strategic Use of Appraisals in Transactional Matters", presented to the Ohio State Bar Association, October 9, 2018

"The Effective and Strategic Use of Appraisals in Litigation", presented to the Ohio State Bar Association, October 9, 2018.

"Toward an Equilibrium Model of Residential Real Estate Transactions", presented at the 2018 annual meetings of the American Real Estate Society, Ft. Myers, Fl, April, 2018

#677, 400 NW GILMAN BLVD
ISSAQUAH, WA  98027
Phone 206-623-2935
Fax 206-623-2985

"**INVITED TALKS (continued)**

"Stigma Revisited Again", with Clifford A. Lipscomb, presented at the 2018 annual meetings of the American Real Estate Society, Ft. Myers, FL, April, 2018

"What Appraisers and Attorneys Need to Know about Automated Valuation Models", presented to the 11th Annual Fall Real Estate Conference, Washington State Convention Center, Seattle, October, 2017.

"Real Estate", Renaissance Weekend at the Aspen Institute, Aspen, Colorado, September, 2016

"The Economy of Cuba – a 2016 update", presented at the Real Estate Counseling Group of America, West Palm Beach, Florida, April, 2016

"Appraisal Litigation," presented at the University of Southern California in conjunction with the annual meeting of the Southern California Appraisal Institute chapter, November 2015.

"Practical Statistics for Practicing Appraisers," presented at the invitation of the Appraisal Institute at the 2015 annual meetings, Dallas, TX, July 2015.

"The Impact of the NAREIT Light Awards on REIT Performance," with Clifford A. Lipscomb, presented at the 2015 annual meetings of the American Real Estate Society, April 2015.

"Can We Forecast the Next Bubble?," with Clifford A. Lipscomb, presented at the 2015 annual meetings of the American Real Estate Society, April 2015.

"Mentoring," Keynote Address, Graduate Hooding Ceremony, Darla Moore School of Business, University of South Carolina, May 2014.

"Computational Modeling in Real Estate," Panel Chair, American Real Estate Society annual meetings, San Diego, CA, April 2014.

"Professional Real Estate Education," invited panelist on "The Importance of Teaching: Engaging Different Learning Styles," presented at the American Real Estate Society annual meetings, Kona, HI, April 2013.

"Appraisal Implications of Proximity to Feedlots," presented at the American Real Estate Society annual meetings, Kona, HI, April 2013.

"Advanced Statistical Methods in Real Estate Appraisal," presented at the Appraisal Institute annual meetings, San Diego, CA, August 2012.

"Real Estate Failure – BRAKING the Cycle," panel discussion presented at the American Real Estate Society annual meetings, St. Petersburg, FL, April 2012.

"Integration of Sector Analysis into a Hedonic Pricing Model," presented at the American Real Estate Society Annual Meetings, St. Petersburg, FL, April 2012.

"Deconstructing the Housing Price Bubble," presented at the American Real Estate Society Annual Meetings, St. Petersburg, FL, April 2012.

"USPAP versus the International Valuation Standards," presented at the American Real Estate Society Annual Meetings, St. Petersburg, FL, April 2012.

"Property Valuation Issues in Fracking Cases," Fracking Litigation Conference, Philadelphia, PA, September 2011.

Valuation of Construction Defects," presented at the Construction Defects and Insurance Coverage Conference, March 2011.

"Expert Systems and Mass Appraisal," Valuation Colloquium sponsored by Clemson University, November 2010.

"Valuation Impacts of the Gulf Oil Spill," the BP Oil Spill Litigation Conference, Miami Beach, FL, November 2010.

"The Gulf Oil Spill," presented to the Real Estate Counseling Group of America, Washington, DC, September 2010.

"Impact of the Gulf Oil Spill on Bank Collateral Portfolios," presented to the Collateral Risk Network, Washington, DC, July 2010.

#677, 400 NW GILMAN BLVD
ISSAQUAH, WA 98027
Phone 206-623-2935
Fax 206-623-2985

**INVITED TALKS (continued)**

"Valuation Impacts of the BP Oil Spill," presented at the BP Oil Spill Litigation Conference, Atlanta, GA, June 2010.

"The Grove Farm Project," presented to the Real Estate Counseling Group of America, Las Vegas, NV, April 2010.

"Real Estate Education," panel presentation at the 2010 annual meetings of the American Real Estate Society, Naples, FL, April 2010.

"Valuation Impact of Chinese Drywall," presented at two Chinese Drywall Litigation Conferences in New Orleans, LA, June 2009 and November 2009.

"Appraisal Error Terms," presented to faculty and students at Valdosta State University, October 2009.

"Real Estate Investment," panel chair for the Seattle Hedge Fund Society, May 2009.

"Environmental Valuation in the United States," panel chair for the 2008 annual meetings of the Asian Real Estate Society.

"Liquidation Valuation," presented to the 2008 annual meetings of the American Real Estate Society.

"Residential Real Estate Market Disequilibrium," presented to the 2008 annual meetings of the American Real Estate Society.

"Market Demand Factors for Master's Degree Students in Real Estate," panel discussion presentation at the 2008 annual meetings of the American Real Estate Society.

"Market Factors Affecting Redevelopment of Residential and Mixed-Use Contaminated Property," presented to the Brownfield CLE meetings, Seattle, WA, March 2008.

"Complex Valuation," presented to graduate students in the Zicklin School of Business, Baruch College, New York, September 2007.

"Real Estate in the High Net Worth Portfolio," Integrated Wealth Management Conference, sponsored by *Institutional Investor* magazine, September 12, 2007.

"Dollars and Sense of Real Estate Investments," Chair of Continuing Education Program, Seattle, Washington, June 2007. Presentations: "What's Working and What's Not" and "The Future of Real Estate Financing."

"Land Valuation," session chair, Asian Real Estate Society Annual Meetings, Macao, China, July 2007.

"Foreign Real Estate Investment in the U.S.: Pitfalls and Opportunities," Asian Real Estate Society annual meetings, Macao, China, July 2007.

"When is a Taking Fair?" Eminent Domain Institute, Las Vegas, NV, April 2007.

"Real Estate Investments of the Rich and Famous," American Real Estate Society annual meetings, San Francisco, CA, April 2007.

"Consistency and Bias in Eminent Domain Appraisals," American Real Estate Society annual meetings, San Francisco, CA, April 2007.

"Real Estate Investments of the Rich and Famous," American Real Estate Society annual meetings, San Francisco, CA, April 2007.

"Scope of Work Updates to the 2006 Uniform Standards of Professional Appraisal Practice, presented to the Real Estate Counseling Group of America, Philadelphia, PA, October 2006.

"Valuation of Contaminated Property in the United States," seminar presented to the faculty and students of the University of Endhoven, the Netherlands, June 2006.

"Stigma Revisited Again," working paper in progress with Max Kummerow, presented at the American Real Estate Society annual meetings, Key West, FL, April 2006.

"Application of a Repeat Sales Methodology to Evaluate Property Value Damages from Contamination," presented at the American Real Estate Society annual meetings, Key West, FL, April 2006, subsequently published in the *Journal of Housing Research.*

**INVITED TALKS (continued)**

"The Impact of Transit Corridors on Residential Property Values," with Ron Throupe, John Carruthers, and Andy Krause, presented at the American Real Estate Society annual meetings, Key West, FL, April 2006, accepted for publication in the *Journal of Real Estate Research.*

"Real Estate Investing," Seattle Society of Chartered Financial Analysts, December 14, 2005.

"Valuation," Session Chair for the American Real Estate Society meetings, Santa Fe, NM, April 2005.

"History of Valuation" Panelist for the American Real Estate Society meetings, Santa Fe, NM, April 2005.

"Regression Analysis and Diminishing Marginal Returns – An Appraisal Case Study" with John Carruthers, accepted for presentation at the 2005 Annual Meeting of the American Real Estate Society, Santa Fe, NM, April 2005.

"The USPAP Scope of Work Proposal," presented to the Real Estate Counseling Group of America, Savannah, GA, March 2005.

"Valuation of Brownfields," presentation to officials of the City of Greensboro, NC, January 2005.

"Trophy Property," presentation at the annual meetings of the American Society of Auctioneers, Madison, WI, July 2004.

"Environmental Valuation Issues," Session Chair for the American Real Estate Society meetings, Captiva Island, FL, April 2004.

"Agency Costs and REIT Debt Announcements," presented at the American Real Estate Society meetings, Captiva Island, FL, April 2004.

"The Future of Real Estate," presented at the invitation of the Real Estate Counseling Group of America, Half Moon Bay, CA, March 2004.

"Property Tax Appraisal," presented at a seminar in Tacoma, WA, February 2004.

"Agency Costs and REIT IPOs," presented at the invitation of the American Real Estate and Urban Economics Association, San Diego, CA, January 2004.

"Updates on the EPA's New Windfall Lien Provisions," presented at the invitation of the U.S. EPA at the Brownfields Conference, Portland, OR, October 29, 2003.

"Updates on the EPA's New Windfall Lien Provisions," presented in a nationwide teleconference sponsored by the American Bar Association's Section on Energy, Environment, and Natural Resources, August 20, 2003.

"Can a Tribal Utility Pay for Itself," presented at the Tribal Utilities Conference, Seattle, WA, June 9 & 10, 2003.

"Financing Residential Development," Master Builders Association of Olympia, WA, April 2003.

"Agency Costs and REIT Mergers," American Real Estate Society annual meetings, Monterrey, CA, April 2003.

"Economics of Brownfield Redevelopment," presented at the Advanced Brownfields Redevelopment Workshop, Anchorage, AK, January 27, 2003.

"Appraisal of Contaminated Property," International Association of Assessing Officials, West Puget Sound Chapter, Olympia, WA, April 26, 2002.

"Market Value(s)," presented to the Seattle Chapter of the Appraisal Institute, Seattle, WA, November 2001.

"Loss Profits and Damages from an Economist's Point of View," presented at the Washington State CPA's Association Litigation Services Seminar, May 4, 2001.

"Appraisal of EIFS Residences," presented at a Symposium on emerging litigation areas sponsored by Mealy Publications, Marina del Mar, CA, November 2000.

"The Puget Sound Economy," guest speaker for KIRO-TV (Seattle CBS affiliate) at client breakfast, September 21, 2000.

**INVITED TALKS (continued)**

"Public Interest Value," presented at the conference Valuation 2000, jointly sponsored by the Appraisal Institute, the American Society of Appraisers, and the American Farm Managers and Rural Appraisers, Las Vegas, NV, July 6–7, 2000.

"An Economic Model of Downtown Seattle Land Prices," presented to the Pacific Northwest Regional Economic Conference, Western Washington U., April 2000.

"Deposing the Real Estate Expert Witness," presented to participants in the Trial Advocacy classes, U. of Washington School of Law, March 2000.

"Economic Impact of Real Estate Development," presented to the Seattle Economists Club, December 1999.

"Appraisal of Contaminated Property," presented to the International Association of Assessing Officials, Evergreen Chapter, Woodinville, WA, November 1999.

"Appraisal of EIFS Residences," presented at a Symposium on EIFS sponsored by U.S. Inspect, Washington, DC, June 1999.

"House Price Implications of School District Choice," presented at the American Real Estate and Urban Economics Association, New York City, January 1999.

"Economic Impact Studies for Homebuilding," presented to the National Assn. of Homebuilders annual Governmental Affairs, St. Louis, MO, November 7, 1998.

"Economic Assessment of Historic Properties," presented to the 52nd annual Preservation Conference, National Trust for Historic Preservation, Savannah, GA, October 23, 1998.

"Current Topics in Financial Management for Homebuilders and Developers," presented to the South Eastern Builders Conference, Orlando, FL, August 17, 1998.

"Valuation of Contaminated Property," presented to the Quarterly Meeting of the South Carolina Appraisal Institute, Columbia, SC, July 23, 1998.

Panel discussion on Land Use, Regulation, and House Prices, presented at the American Real Estate and Urban Economics Association Mid-Year Meeting, held at the National Association of Homebuilders, Washington, DC, May 26, 1998.

"Accounting and Financial Management for Homebuilders," presented to the Southeastern Builders Conference, Orlando, FL, July 1997.

"Impact of Historic District Designation in Beaufort, South Carolina," presented to the American Real Estate Society, Sarasota, FL, April 1997.

"The Value of History to Real Estate," presented to the Lovable Communities Conference sponsored by the South Carolina Downtown Development Association, Charleston, SC, October 1996.

"Valuation of Historic Residences," presented to Appraisal Institute members, Savannah, GA, May 1996.

"House Price Implications of Historic District Designation," presented to the American Real Estate Society, Lake Tahoe, CA, March 29, 1996.

"Economics of Historic Districts," presented to the Georgia Trust for Historic Preservation, Atlanta, GA, February 16, 1996.

"Accounting and Financial Management for Homebuilders," presented to the South Eastern Builders Conference, Orlando, FL, July 1995.

Panel chair, "Appraisal of Historic Properties," presented at "Historic Preservation for Realtors," sponsored by the S.C. Department of Archives and History, Columbia, SC, January 13, 1995.

Presentation on Advanced Manufacturing Capabilities made to members of the U.S. Senate, Washington, DC, July 1993.

"A Study into the Risk of Sales Variability and its Effect on the Success of Strip Shopping Centers," presented at the Applied Geography Conference, Denton, TX, October 20, 1992.

## TEACHING

From 1992 through 1998, John Kilpatrick taught corporate finance and real estate in the Moore School of Business at the University of South Carolina. Courses developed and taught included Principles of Real Estate (FINA 366 – certified as a pre-licensing course by the S.C. Real Estate Commission); Real Estate Market Analysis (FINA 367 – certified as a pre-licensing course by the S.C. Real Estate Commission); Principles of Finance (FINA 363 – required of all undergraduate business majors); and Commercial and Central Banking (ECON 301).

John Kilpatrick's students won many of USC's top undergraduate Business scholarships, and his courses were consistently oversubscribed months in advance. Additionally, John Kilpatrick was a featured speaker for the Daniel Management Center of the University of South Carolina, teaching Executive Education courses on Real Estate (1995–96) and Corporate Budgeting (1997–98). He was the first person in South Carolina certified by the Real Estate Commission to teach continuing education courses via statewide closed circuit broadcast. As a Lecturer in Finance, Kilpatrick has taught Appraisal or Real Estate Continuing Education in South Carolina (1995–1998), Georgia (1996), Florida (1995–1998), and Washington (1999–present), and he has taught appraisal continuing education for the Seattle chapter of the Appraisal Institute, Bellevue College, and various chapters of the International Association of Assessing Officials.

Dr. Kilpatrick is a frequent lecturer on Real Estate Appraisal Standards and Methods, and in 2004 he was appointed by the Appraisal Standards Board (Washington, DC) as a Nationally Certified instructor of the *Uniform Standards of Professional Appraisal Practice*. He has taught the pre-licensing course USPAP course for Bellevue College, Bellevue, Washington. Also in 2004, he was nominated for a seat on the Appraisal Qualifications Board. From 2006-2015, Dr. Kilpatrick was a Visiting Scholar in Real Estate Finance at the Zicklin School of Business, Baruch College, New York City, New York. Dr. Kilpatrick currently serves on the National Board of Advisors for the Washington State University, Carson College of Business, and in Spring, 2020, he served as a visiting lecturer in Real Estate Investments.  In July, 2020, the Carson College of Business nominated him for the Financial Management Association's Innovations in Teaching Award.

## PROFESSIONAL ASSOCIATIONS

John Kilpatrick is an active member of various academic and professional organizations, including the Appraisal Institute (MAI-Designated Member), the American Real Estate Society (Fellow), and the National Association of Realtors, among others.

# Trial and Deposition Testimony, John A. Kilpatrick, Ph.D., MAI
# Greenfield Advisors Inc

| Greenfield Case No. | CASE NAME | PROJECT | COURT NAME | PLAINTIFF ATTORNEY | DEFENSE ATTORNEY | RETAINED BY | TRIAL | DEP | CASE NO. |
|---|---|---|---|---|---|---|---|---|---|
| 18-0601 | AMBAC Assurance Corporation and the Segregated Account of AMBAC Assurance Corporation v. First Franklin Financial Corporation, Bank of America, N.A., Merrill Lynch, Pierce, Fenner, & Smith, inc., Merrill Lynch Mortgage Lending, Inc., and Merrill Lynch Mortgage Investors, Inc. | Securities action, AVM, mass appraisal, appraisal review, underwriting | Supreme Court of the State of New York, County of New York | Patterson Belknap Webb & Tyler, LLP, New York | Munger, Tolles, & Olson, LLP, New York | Patterson Belknap | | X | 651217/2012 |
| 19-1202 | Oregon Mutual Insurance Company, as subrogeee of Iron Horse Industries LLC, v. Armstrong's Stove & Spa | Insurance matter | Superior Court for the State of Washington, Kittitas County | Soha & Lang, PS, Seattle, WA | Forsberg & Umlauf, PS, Seatle, WA | Forsberg & Umlauf | | X | 19-2-00150-19 |
| 17-0805 | Nomura Home Equity Loan, Inc., Series 2007-3, by HSBC Bank USA, NA, in its capacity as Trustee, v. Nomura Credit & Cpaital, Inc. | Securities action, AVM, mass appraisal, appraisal review, underwriting | Supreme Court of the State of New York, County of New York | McKool Smith, New York | Shearman & Sterling, New York | McKool Smith | | X | 651124/2013 |
| 17-0804 | Nomura Home Equity Loan, Inc., Series 2006-FM2, by HSBC Bank USA, NA, in its capacity as Trustee, v. Nomura Credit & Cpaital, Inc. | Securities action, AVM, mass appraisal, appraisal review, underwriting | Supreme Court of the State of New York, County of New York | McKool Smith, New York | Shearman & Sterling, New York | McKool Smith | | X | 653783/2012 |
| 17-0803 | Nomura Asset Acceptance Corporation, Alternative Loan Trust, Series 2006-S4, by HSBC Bank USA, NA, in its capacity as Trustee, v. Nomura Credit & Cpaital, Inc. | Securities action, AVM, mass appraisal, appraisal review, underwriting | Supreme Court of the State of New York, County of New York | McKool Smith, New York | Shearman & Sterling, New York | McKool Smith | | X | 653390/2012 |

as of March, 2021
page 1 of 6



Greenfield Advisors

Economic, Market and Valuation Analysts

# Trial and Deposition Testimony, John A. Kilpatrick, Ph.D., MAI
## Greenfield Advisors Inc

| Greenfield Case No. | CASE NAME | PROJECT | COURT NAME | PLAINTIFF ATTORNEY | DEFENSE ATTORNEY | RETAINED BY | TRIAL | DEP | CASE NO. |
|---|---|---|---|---|---|---|---|---|---|
| 17-0802 | Nomura Asset Acceptance Corporation, Alternative Loan Trust, Series 2006-S3, by HSBC Bank USA, NA, in its capacity as Trustee, v. Nomura Credit & Cpaital, Inc. | Securities action, AVM, mass appraisal, appraisal review, underwriting | Supreme Court of the State of New York, County of New York | McKool Smith, New York | Shearman & Sterling, New York | McKool Smith | | X | 652619/2012 |
| 16-0502 | Natixis Real Estate Capital Trust 2007-HE2, by Compushare Trust Company NA v Natixis Real Estate Holdings, LLC, as successor-by-merger to Natixis Real Estate Capital, Inc., f/k/a Ixis Real Estate Capital, Inc. | Securities action, AVM, mass appraisal, appraisal review, underwriting | Supreme Court of the State of New York, County of New York | Quinn Emanuel Urquhart & Sullivan, LLP, New York | Kaplan, Hecker, & Fink, LLP, New York | Quinn Emanuel | | X | 153945/2013 |
| 19-0901 | Bruzek, et al., v. Husky Energy, Inc., and Superior Refining Company LLC | Class Action, Loss of Use and Enjoyment | USDC, Western Dist of Wisconsin | Zimmerman Reed, Minneapolis, MN | Michael Best & Friedrich, Minneapolis, MN | Zimmerman Reed | | X | 18-cv-697-wmc |
| 19-0601 | Schoenborn, et al, v. Allstate Fire and Casualty Co. | Class Action, Insurance Matter | USDC, Middle Dist Georgia, Macon Div. | Richardson, Patrick, Westbrook, and Brickman, Charleston, SC | Dentons US, Atlanta, GA | Richardson Patrick | | X | 5:18-cv-00368-MTT |
| 18-0806 | Hahnenkamm, LLC, v. The United States | Breach of Contract | U.S. Court of Federal Claims | Marzulla Law Firm, Washington, DC | U.S. Dept. of Justice, Civil Division, Washington, DC | Marzulla | | X | 17-855C |

as of March, 2021
page 2 of 6

Case 4:17-cv-02960   Document 294-1   Filed 02/07/22 in TXSD   Page 82 of 179



Greenfield
Advisors

Economic, Market
and Valuation Analysts

# TRIAL AND DEPOSITION TESTIMONY,  JOHN A. KILPATRICK, PH.D., MAI
# GREENFIELD ADVISORS INC

| Greenfield Case No. | CASE NAME | PROJECT | COURT NAME | PLAINTIFF ATTORNEY | DEFENSE ATTORNEY | RETAINED BY | TRIAL | DEP | CASE NO. |
|---|---|---|---|---|---|---|---|---|---|
| 19-0102 | Bess v. Ocwen | Class certification, tresspass | USDC, Western Dist of Washington | Jeffers, Danielson, Sonn, Wylward, PS, Wenachee, WA; Michael Daudt, Seattle, WA | K&L Gates, Seattle, WA | Daudt | | X | 3:15-CV-05020-BHS |
| 19-0103 | Britton v. ServiceLink Field Services, LLC | Class certification, tresspass | USDC, Eastern Dist of Washington | Jeffers, Danielson, Sonn, Wylward, PS, Wenachee, WA; Michael Daudt, Seattle, WA | Hann Loeser, Cleveland, OH; Frey and Buck, Seattle, WA | Daudt | | X | 2:18-cv-00041-TOR |
| 18-0701 | HILT Investments, et al, v. J. Dudley, LLC, et al. | Contract disputes | Superior Court for the State of Washington, County of Franklin | Ted Buck, Frey and Buck, Seattle, WA | Lukins and Annis, Spokane, WA | Frey and Buck | X | X | 16-2-50812-11 |
| 15-0604 | FHLB Boston v. Nomura Asset Acceptance Corp., et al. | securities action, AVM, mass appraisal, appraisal review | Commonwealth of Mass, Superior Court of Suffock County | Keller Rohrback, Seattle | Goodwin Proctor, New York & Boston | Keller Rohrback | | X | 11-1533-BLS1 |
| 15-0604 | FHLB Boston v. Ally Financial, et al. | securities action, AVM, mass appraisal, appraisal review | Commonwealth of Mass, Superior Court of Suffock County | Keller Rohrback, Seattle | Orrick, Herreington, and Sutcliffe, New York | Keller Rohrback | | X | 11-1533-BLS1 |



Greenfield Advisors

Economic, Market and Valuation Analysts

## TRIAL AND DEPOSITION TESTIMONY,  JOHN A. KILPATRICK, PH.D., MAI
## GREENFIELD ADVISORS INC

| Greenfield Case No. | CASE NAME | PROJECT | COURT NAME | PLAINTIFF ATTORNEY | DEFENSE ATTORNEY | RETAINED BY | TRIAL | DEP | CASE NO. |
|---|---|---|---|---|---|---|---|---|---|
| 18-0304 | Tenniswood, et al., v. Ford Motor Company | Class action; contaminated property | State of Michigan, Circuit Court for the County of Wayne | The Collins Law Firm, Naperville, IL | Schiff Hardin, Washington, DC | Collins | | X | 2017-011941-NZ |
| 18-0501 | Barbara Morrow, et al, v. Allstate Indemnity Company | Insurance dispute | USDC, Middle District of Georga | Richardson, Patrick, Westbrook, and Brickman, Charleston, SC | Dentons US, Atlanta, GA | Richardson Patrick | | X | 5:15-cv-00137-HL |
| 18-0401 | Mizner Court Holdings LLC and San Marco Holdings LLC v. Country Club Maintenance Association, Inc., d/b/a Broken Sound Master Association | Contract disputes | Circuit Court for the Fifteenth Judicial Circuit in and for Palm Beach County, FL | Smolker Bartlett Loeb Hinds & Thompson, PA, Tampa, FL | Saul Ewing Arnstein & Lehr, Ft. Lauderdale, Fl; Moskowitz Mandell Salim & Simowitz, PA, Ft. Lauderdale, FL; Bloom & Freeling, Boca Raton, FL | Saul Ewing | | X | 15-CA-864-AB |
| 15-0301 | Alexander, et al, v. Flextronics International USA, Inc., et al. | Contaminated property | Superior Court of Wake County, NC | Girardi Keese, Los Angeles, CA | Womble Bond Dickinson, Charlotte, NC | Girardi Keese | | X | 13 CVS 15712 |
| 17-0201 | Federal Home Loan Bank of Chicago v. Banc of America Funding Corporation, et al. | Securities action, AVM, mass appraisal, appraisal review | Circuit Court of County, Il. | Keller Rohrback, Seattle; Miner, Barnhill, & Galland, Chicago | Davis Polk & Wardwell, New York | Keller Rohrback | | X | 10 CH 45033 |


Greenfield Advisors
Economic, Market and Valuation Analysts

# Trial and Deposition Testimony,  John A. Kilpatrick, Ph.D., MAI
## Greenfield Advisors Inc

| Greenfield Case No. | CASE NAME | PROJECT | COURT NAME | PLAINTIFF ATTORNEY | DEFENSE ATTORNEY | RETAINED BY | TRIAL | DEP | CASE NO. |
|---|---|---|---|---|---|---|---|---|---|
| 16-0802 | Kathy Little, et al., v. Louisville Gas and Electric Company | Class certificaiton, contaminated residences | Circuit Court, Jefferson County, KY | Hagens Berman, Seattle, WA | Frost Brown Todd, Louisville, KY | Hagens Berman | | X | 17- CI-3023 |
| 17-0604 | Laura Zamora Jordan v. Nationstar Mortgage LLC | Trespass | USDC, Eastern Dist of WA | Daudt Law Firm, Seattle, WA; Jeffers, Danielson, Sonn, & Aylward, PS, Wenatchee, WA; Terrell Marshall Law Group, Seattle, WA | Williams, Kastner, & Gibbs, PLLC, Seattle; Severson & Werson, PC, San Francisco; | Daudt | | X | 2:14-cv-00175 TOR |
| 17-0404 | William C. Hardy & Bertie Ann Hardy, et al, v. The United States of America | Catigorical taking | U.S. Court of Federal Claims | Stewart, Wald, McCulley, Kansas City, MO | US DOJ, Environmental & Natural Resources Div., Washington, DC | Stewart | | X | 14-0388L |
| 16-0302 | Deutsche Bank National Trust Company, solely in its capacity as Trustee for the Morgan Stanley Structured Trust I 20070-1, versus Morgan Stanley Mortgage Capital Holdings LLC, as Successor-by-Merger to Morgan Stanley Mortgage Capital, Inc. | securities action, AVM, mass appraisal, appraisal review | USDC, Southern Dist of NY | Molo Lamken LLP, NYC | Davis Polk & Wardwell LLP, NYC | Molo Lamken | | X | 14 Civ 3020 (LTS) |
| 16-0104 | Massachusetts Mutual Life Insurance Company v. Goldman Sachs Mortgage Company, et al., and Massachusetts Mutual Life Insurance Company v. Merrill Lynch Pierce Fenner & Smith, Inc., et al. | securities action, AVM, mass appraisal, appraisal review | USDC, Dist of Massachusetts | Bartlit Beck, Denver, CO | Sullivan & Cromwell, NYC, | Bartlit Beck | | X | 3:11-cv-30126 MGM; 3:11-cv-3025 MGM |
| 15-0703 | U.S. Bank National Association, solely in its capacity as Trustee for Citigroup Mortgage Loan Trust 2007-AR7, v. Citigroup Global Market Realty Corp. and Citimortgage, Inc. | securities action, AVM, mass appraisal, appraisal review | USDC, Southern Dist of NY | McKool Smith, New York | Paul Weiss, Rifkind, Wharton & Garrison, New York | McKool Smith | | X | 13 Civ. 6989 (GBD) |
| 15-0802 | Johnson v. Time Warner Entertainment | class action; easement (corridor) valuation | USDC, Dist. Of South Carolina, Columbia Div. | Harpootlean Law Firm, Columbia, SC | Sowell Gray Robinson Stepp & Laffitte LLC, Columbia, SC | Harpootlean | | X | 3:15-cv-01727-CMC |

as of March, 2021
page 5 of 6

Greenfield
Advisors

Economic, Market
and Valuation Analysts

## TRIAL AND DEPOSITION TESTIMONY,  JOHN A. KILPATRICK, PH.D., MAI
## GREENFIELD ADVISORS INC

| Greenfield Case No. | CASE NAME | PROJECT | COURT NAME | PLAINTIFF ATTORNEY | DEFENSE ATTORNEY | RETAINED BY | TRIAL | DEP | CASE NO. |
|---|---|---|---|---|---|---|---|---|---|
| 15-1001 | Home Equity Mortgage Trust Series 2006-1, et al, v. DLJ Mortgage Capital, et al. | securities action, AVM, mass appraisal, appraisal review | Supreme Court, State of New York | Quinn Emanuel, New York, NY | Orrick, Herrington, & Sutcliffe, New York, NY | Quinn Emanuel | | X | 156016/2012; 653787/2012 |



Greenfield Advisors

*Economic, Market and Valuation Analysts*

# Exhibit 3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

SHANNAN WHEELER, *et al.*,

      Plaintiffs,

v.

ARKEMA INC.,

      Defendant.

Civil Action No. 4:17-cv-2960

# SUPPLEMENTAL EXPERT REPORT OF SHENG LI, PH.D.

**September 17, 2021**

# I.  Introduction

## A.  Assignment

1.  My name is Sheng Li.  I am an economist and Associate Director at NERA Economic Consulting ("NERA").  I previously prepared a report in this matter submitted on October 8, 2018 ("Li 2018 Report")[1], responding to certain opinions presented in the Declaration of Randall Bell ("Bell Declaration").[2]  My qualifications are included in that report and are incorporated by reference.[3]

2.  I have been asked by counsel for Defendant Arkema Inc. ("Arkema") to review and respond to certain opinions presented in Dr. John A. Kilpatrick's report, "A Study Regarding the Diminution in Value of Properties Impacted by the Arkema Explosion in August, 2017," ("Kilpatrick Report") in connection with *Shannan Wheeler*, *et al*., *v*. *Arkema Inc*.[4]  Specifically, I have been asked to opine on whether Dr. Kilpatrick's opinions regarding the assessment of class-wide damages related to property value diminution are the product of reliable economic principles and methods, and have been reliably applied to the facts of this case.  I offer no opinion relating to the question of Arkema's liability in this matter and whether the alleged misconduct caused injury to the purported class members.  NERA is being compensated for my time at a rate of $625 per hour.  Neither NERA's nor my compensation depends on the outcome of this litigation.

## B.  Materials Relied Upon

3.  In addition to the materials considered in my 2018 report, I, and research staff working under my direction, have reviewed the Kilpatrick Report, supplemental reports from Dr. William M. Auberle,[5] Mr. Marc Glass,[6] and Dr. Marco Kaltofen,[7] and other

---

[1]  Expert Report of Sheng Li, Ph.D., on behalf of Defendant in connection with *Shannan Wheeler*, *et al., Plaintiffs, v. Arkema Inc., Defendant*, No. 4:17-cv-2960, United States District Court for the Southern District of Texas Houston Division, October 8, 2018.

[2]  Declaration of Randall Bell, Ph.D., MAI, on behalf of Plaintiff in connection with *Shannan Wheeler*, *et al., Plaintiffs, v. Arkema Inc., Defendant*, No. 4:17-cv-2960, United States District Court for the Southern District of Texas Houston Division, August 6, 2018.

[3]  An updated version of my curriculum vitae, which includes a list of my prior testimony, is appended to this report as **Supplemental Exhibit 1**.

[4]  Expert Report of John A. Kilpatrick, Ph.D., MAI, on behalf of Plaintiff in connection with *Shannan Wheeler*, *et al., Plaintiffs, v. Arkema Inc., Defendant*, No. 4:17-cv-2960, United States District Court for the Southern District of Texas Houston Division, July 16, 2021.

[5]  Expert Report of William M. Auberle, L.H.D, P.E., BCEE, on behalf of Plaintiff in connection with *Shannan Wheeler*, *et al., Plaintiffs, v. Arkema Inc., Defendant*, No. 4:17-cv-2960, United States District Court for the Southern District of Texas Houston Division, July 14, 2021 ("Auberle Report").

[6]  Supplemental Expert Report of Marc Glass, on behalf of Plaintiff in connection with *Shannan Wheeler*, *et al., Plaintiffs, v. Arkema Inc., Defendant*, No. 4:17-cv-2960, United States District Court for the Southern District of Texas Houston Division, July 15, 2021 ("Supplemental Glass Report").

[7]  Supplemental Expert Report of Marco Kaltofen, Ph.D., P.E., on behalf of Plaintiff in connection with *Shannan Wheeler*, *et al., Plaintiffs, v. Arkema Inc., Defendant*, No. 4:17-cv-2960, United States District Court for the Southern District of Texas Houston Division,  July 15, 2021 ("Supplemental Kaltofen Report").

1

documents and data produced in the course of this litigation, as well as additional publicly available data and information. The opinions that I express in this report are based on my review of these materials, in addition to my training and experience as an economist. A list of materials that I relied upon to form my opinions is presented in **Updated Exhibit 2**.

4. In preparing this report, I was requested by Arkema to accept as accurate and, to the extent necessary, rely on the information set out in Exhibit 3 to my 2018 report ("Timeline of Arkema Crosby Events"). The events described in Timeline of Arkema Crosby Events are hereafter referred to as the "2017 Crosby Incident."

## II. Summary of Opinions

5. Based on my analysis to date, I have reached the following opinions to a reasonable degree of economic certainty:

a. In my 2018 report, I identified a number of shortcomings in Dr. Bell's proposed method for assessing class-wide damages in this case, making it inappropriate and unreliable for proving class-wide economic damages in this case. Dr. Kilpatrick's proposed method for assessing class-wide damages does not address the shortcomings of Dr. Bell's proposed method and suffers from additional deficiencies. Specifically, Dr. Kilpatrick's ultimate opinion regarding economic damages is not supported by any regression or any other empirical analysis. Rather, Dr. Kilpatrick's quantitative analyses relating to alleged diminution are limited to a regression to determine an "unimpaired value" and a false trendline analysis that are both economically and statistically unreliable and unsupportable.

b. Dr. Kilpatrick presents two estimates of the alleged property value diminution in the purported class area due to the 2017 Crosby Incident: an estimate of 20 percent diminution based on case studies and an estimate of 12.12 percent diminution based on his purported trendline analysis of one year of data following the 2017 Crosby Incident. Neither of these estimates are based on regression analysis, and only the 12.12 percent estimate is linked to empirical assessment of a limited set of transaction prices.

c. Dr. Kilpatrick limited his empirical analysis to one year after the 2017 Crosby Incident. This presents an incomplete and misleading view of property prices in the purported class area. Sales data are available as recent as 2021, but Dr. Kilpatrick does not analyze or perform any regression or empirical assessment of any transaction that occurred after August 2018. In other words, market data is readily available for September through December 2018, all of 2019 and 2020, and 2021 through present, but Dr. Kilpatrick does not analyze any transaction that is more recent than August 2018, and he offers no justification for ignoring the readily available data for later years.

d. When Dr. Kilpatrick's false trendline is corrected, comparison of property value trends in the purported class area and Dr. Kilpatrick's control area, both during

2

Dr. Kilpatrick's assessed timeframe and extending through 2021 year to date, shows no indication that purported class members suffered any property value diminution.

e. Dr. Kilpatrick's opinion that property values in the purported class area suffered diminution of 12.12 percent to 20 percent due to the 2017 Crosby Incident is not based on any regression analyses, or any empirical analyses that account for the individualized effects of Hurricane Harvey on properties and variation in contamination, if any, in the purported class area.

i. Dr. Kilpatrick's opinion that property values in the purported class area declined by 20 percent due to the 2017 Crosby Incident is not grounded in any empirical analysis of market transactions in the purported class area. This opinion is also contradicted by market outcomes.

ii. Dr. Kilpatrick's opinion that property values within the purported class area decreased by 12.12 percent due to the 2017 Crosby Incident is based on erroneous analysis using a false trendline that does not correspond to the underlying data. In presenting his trendline analysis, Dr. Kilpatrick displayed a false trendline *and* misleadingly displayed the wrong R-squared value for the depicted false trendline. In doing so, Dr. Kilpatrick reports statistical values that suggest his false trendline fits the underlying data when reality is the opposite. Based on true trendlines that are fitted to the underlying data, during the 12 months following the 2017 Crosby Incident, property prices grew 49 percent faster in the purported class area compared to Dr. Kilpatrick's control area, which directly contradicts Dr. Kilpatrick's claim that "prices inside the 7-mile zone are observed to actually decline from levels prior to" the 2017 Crosby Incident.

iii. Dr. Kilpatrick provides no empirical analysis to establish that the effect of the 2017 Crosby Incident on property values, if any, is uniform across class members' properties, and instead assumes his conclusion that diminution is uniform. This assumption is inconsistent with analyses presented by Plaintiffs' other experts.

f. Dr. Kilpatrick only uses regression analysis to compute purported "unimpaired" property values as inputs to his damages calculation. The results of Dr. Kilpatrick's regression estimates from this application are not suitable measures of unimpaired property values because this "GAVM" regression analysis, based on a built-in Microsoft Excel function, does not distinguish between the effects of Hurricane Harvey and the 2017 Crosby Incident.

i. Dr. Kilpatrick's regression estimates of purported "unimpaired" values for class member properties is also economically unreliable and inappropriate for assessing damages, if any, in this case because the margin of error for his "unimpaired" value estimates are comparable to the magnitude of his claimed diminution effects.

g.  Using Dr. Kilpatrick's method to calculate class-wide damages would result in windfall awards to class members who suffered no property value diminution due to the 2017 Crosby Incident (which, as demonstrated in **Figure 2.B**, below, could be all purported class members according to Dr. Kilpatrick's methodology).

h.  Dr. Kilpatrick's proposed damages calculations is inappropriate and unreliable for proving class-wide economic damages, if any, in this case.

6.  These opinions are based on my analyses and review of information made available to me to date.  I reserve the right to update my opinions if additional information becomes available.

## III.  Economics of Class Certification and Damages

7.  I understand that, to obtain class certification, Plaintiffs must demonstrate that they can establish the central elements of their claim (including liability, injury, and damages) using evidence and methods common to the proposed class.

8.  I understand that, to establish class-wide damages, Plaintiffs must demonstrate that impact to individual class members can be established using evidence common to the class and that the amount of damages awarded to each purported class member can be reliably calculated using a formulaic approach that can be applied to the entire proposed class.

9.  Isolating the economic impact, if any, of the alleged harmful act is essential to any economic damages analysis.  Economic damages reflect how Plaintiffs' economic positions absent the conduct at issue would differ, if at all, from their present positions.  To establish economic damages, the expert must be able to demonstrate that the damages calculated are accurate to a reasonable degree of economic certainty and are causally linked, in an economic sense, to the conduct at issue.  That is, the damages expert must be able to reliably distinguish the alleged harm caused by the conduct at issue from the influence of other market factors unrelated to the conduct at issue.[8]

10.  In the case at hand, class-wide economic damages relating to property values, if any, must be measured by assessing how each individual Plaintiff's property value would have differed but for the alleged contamination arising from the 2017 Crosby Incident.  The damages expert must be able to reliably distinguish the alleged injury caused by the 2017 Crosby Incident from other market factors that influenced property values in the purported class area.  And, the expert must be able to do so using information and methodologies that are common to all properties in the purported class area.

11.  As previewed above and further described in the following sections, Dr. Kilpatrick's proposed damages calculations cannot be used to accurately and reliably measure class-

---

[8]  *See e.g.*, Mark A. Allen, Robert E. Hall, and Victoria A. Lazear, "Reference Guide on Estimation of Economic Damages," in *Reference Manual on Scientific Evidence* (3rd Edition) (Washington, DC: National Academies Press, 2011), p. 432.

wide damages, if any, arising from the 2017 Crosby Incident for the following reasons and others:

a. Market data is readily available for September through December 2018, all of 2019 and 2020, and 2021 through present, but Dr. Kilpatrick does not analyze any transaction that occurred after August 2018. He offers no justification for ignoring the readily available data for later years despite purporting to estimate diminution that continues after August 2018.

b. Dr. Kilpatrick's opinion that property values within the purported class area decreased by 12.12 percent due to the 2017 Crosby Incident is based on erroneous analysis using a false trendline that does not correspond to the underlying data. Based on true trendlines that are fitted to the underlying data, after the 2017 Crosby Incident, property prices grew 49 percent faster in the purported class area compared to Dr. Kilpatrick's control area, which directly contradicts Dr. Kilpatrick's claim that "prices inside the 7-mile zone are observed to actually decline from levels prior to" 2017 Crosby Incident.[9]

c. Dr. Kilpatrick's opinion that property values in the purported class area declined by 20 percent due to the 2017 Crosby Incident is not grounded in any empirical analysis of market transactions in the purported class area. This opinion is also contradicted by market outcomes.

d. In short, Dr. Kilpatrick's ultimate opinion regarding economic damages is not supported by any regression or any other empirical analysis. Rather, Dr. Kilpatrick's quantitative analyses relating to alleged diminution are limited to a regression to determine an "unimpaired value" and a false trendline analysis that are both economically and statistically unreliable and unsupportable.

## IV. Dr. Kilpatrick's Opinion That Property Values Within the Purported Class Area Decreased Due to the 2017 Crosby Incident is Based on Erroneous Analysis and False Trendlines

12. Dr. Kilpatrick presents two estimates of the alleged property value diminution in the purported class area due to the 2017 Crosby Incident: an estimate of 20 percent diminution based on case studies and an estimate of 12.12 percent diminution based on his purported trendline analysis of one year of data following the 2017 Crosby Incident.[10] Neither of these estimates is based on regression analysis, and only the 12.12 percent estimate is linked to an empirical assessment of transaction prices. Dr. Kilpatrick appears to concede that there are insufficient sales observations to properly use regressions to assess class-wide property value diminution in this case. He states that the "bulk of [the literature on contamination and diminution of value] consists of hedonic studies" but "a shortcoming of using hedonic studies to analyze property value diminution from

---

[9]   Kilpatrick Report, ¶ 126.

[10]   Kilpatrick Report, ¶¶ 127, 141.

contamination is that they rely on sales as observations."[11]  Dr. Kilpatrick does not present a hedonic regression analysis to assess property value diminution in this case and he concedes that "there are quite simply relatively few sales observations in situations comparable to the affected properties."[12]

13.    Dr. Kilpatrick ultimately opines that "the actual decline in value [due to the 2017 Crosby Incident] would be in the range of 20%," but he provides no empirical analysis of transaction prices to support this claim.[13]  Based on what he purports to be trendline analysis, Dr. Kilpatrick also opines that "actual home prices in the 7-mile zone had decreased 12.12% more than they would have decreased without" the 2017 Crosby Incident.[14]  As I explain below, Dr. Kilpatrick's 12.12 percent diminution estimate is based on erroneous statistical analysis which hinges on only a few hundred observations in the purported class area during the first year following the 2017 Crosby Incident.[15]  Correcting Dr. Kilpatrick's errors and extending the analysis to incorporate data from the remainder of 2018, 2019, 2020, and 2021 illustrates that property values within the purported class area grew at similar or faster rates compared to property values in Dr. Kilpatrick's control area, indicating that purported class members likely did not suffer any property value diminution due to the 2017 Crosby Incident.

## A.    Dr. Kilpatrick's Erroneous Trendline Analysis Obscures and Misrepresents Actual Trends in the Data

14.    Dr. Kilpatrick relies on his purported trendline analysis of per-square-foot sales prices to arrive at his 12.12 percent diminution estimate.  To conduct this analysis, Dr. Kilpatrick collects residential property transaction data from five MLS zones that cover the purported class area as well as what he claims to be "unaffected control areas."[16]  Dr. Kilpatrick restricts his analysis to property transactions that occurred within one year before or after the 2017 Crosby Incident (*i.e.*, September 2016 to August 2018).[17]  Dr. Kilpatrick provides no explanation for why he limited his analysis to those data, even though more recent market data were readily available[18] when he purported to estimate diminution that continues after August 2018.[19]  Dr. Kilpatrick then calculates per-square-

---

[11]    Kilpatrick Report, ¶ 112.

[12]    Kilpatrick Report, ¶ 112.

[13]    Kilpatrick Report, ¶ 141.  Dr. Kilpatrick refers to case studies as support for this opinion.  I understand that Arkema's other experts will establish that those case studies are not appropriate for assessing property value diminution in this case.

[14]    Kilpatrick Report, ¶¶ 126-127, Table 10.

[15]    Kilpatrick Report, Table 7.

[16]    Kilpatrick Report, ¶¶ 113-115.  For the purposes of this report, I replicated Dr. Kilpatrick's own methods using his own control areas.  This is not to be understood as endorsing his methods or his control areas.  I understand that the appropriateness of Dr. Kilpatrick's control areas will be addressed by others.

[17]    Kilpatrick Report, Tables 8-9, Figures 4-7.

[18]    Mr. Papke has provided real estate transaction data that extends to August 2021 for the same MLS zones identified in the Kilpatrick report.  *See*, Extended MLS data provided by Mr. Papke, "Sales to 2021.xlsx."

[19]    Kilpatrick Report, ¶¶ 127, 141.

foot prices on a monthly-median[20] basis for transactions of properties inside the purported class area as well as for transactions outside of the purported class area.[21]

15. Dr. Kilpatrick presents comparisons of predictions from his purported trendline of per-square-foot prices from the "inside" and "outside" areas to support his opinion that property prices had decreased 12.12 percent more than they would have decreased without the 2017 Crosby Incident.[22] However, Dr. Kilpatrick's findings are based on erroneous analyses and false trendlines. Dr. Kilpatrick claims that "prices inside the 7-mile zone are observed to actually decline from levels prior to" the 2017 Crosby Incident and he reports a negatively sloped trendline for the inside purported class area and after Hurricane Harvey sample,[23] but this is a false trendline that does not correspond to the underlying data.[24] When this error is corrected, the true trendline does not support Dr. Kilpatrick's claim.

16. It is clear from visual inspection that in Figure 6 of Dr. Kilpatrick's report, the underlying data trend upwards, but Dr. Kilpatrick reports a "trendline" that slopes downwards. Simply put, Dr. Kilpatrick's purported trendline does not fit the data. This lack of fit is quantitatively reflected in the poor R-squared value of his purported trendline. R-squared is a statistical measure of how well a trendline fits the underlying data, and R-squared typically takes on values between one and zero. A trendline that perfectly fits the data would have an R-squared value of one and a trendline that provides predictions with no correlation with the underlying data would have an R-squared value of zero.[25] Dr. Kilpatrick's purported trendline in Figure 6 of his report has a R-squared value of $-0.369$.[26] In layman's terms, the fit of Dr. Kilpatrick's purported trendline to the underlying data is so poor that the direction of the trendline's predictions is opposite to the direction of the underlying data, which generated a negative R-squared value.[27]

---

[20] Dr. Kilpatrick states in his report that his tables and figures present monthly averages of per-square-foot prices, but his reliance materials show that the numbers that he presents are monthly medians rather than averages. *See*, Kilpatrick Report, ¶ 116, Tables 8-9; Kilpatrick Reliance Materials, "Sales for In-Out Analysis.xlsx," tab "working copy."

[21] Kilpatrick Report, Tables 8-9.

[22] Kilpatrick Report, ¶¶ 126-127, Table 10. What Dr. Kilpatrick misleadingly labels as "Aug 2018 Actual Prices" in his Table 10 are not averages or medians of actual transaction prices in August 2018. The values that Dr. Kilpatrick presents under that label are forecasts from his erroneous trendline analysis from Equation 7 and Equation 8 of his report. Similarly, the values that Dr. Kilpatrick labels as "Aug 2017 Prices" are also not actual prices, but instead correspond to projections from Dr. Kilpatrick's Equation 3 and Equation 4.

[23] Kilpatrick Report, ¶ 126, Figure 6, Equation 7. Note that there is a typo in Dr. Kilpatrick's Equation 7, as it reports a slope of -0.0296 instead of the -0.2096 that he shows in Figure 6, which also matches the slope that is reported in his reliance materials. *See,* Kilpatrick Reliance Materials, "Sales for In-Out Analysis.xlsx," tab "working copy."

[24] Dr. Kilpatrick states that in constructing the purported trendlines in Figure 6 and Figure 7, he "anchor[ed] the beginning of the trend line to the per-square-foot prices determined prior to Harvey and the Arkema Explosion" using forecasts from Equation 3 and Equation 4 of his report. He provides no explanation for why it is appropriate to make such adjustments and no citations to any literature to support this methodology. *See,* Kilpatrick Report, ¶ 123. As discussed below, manually changing the starting point results in "trendlines" that do not represent the underlying data.

[25] *See*, William H. Greene, *Econometric Analysis*, 6th Edition, 2008, p. 34.

[26] Kilpatrick Reliance Materials, "Sales for In-Out Analysis.xlsx," tab "working copy."

[27] In technical terms, a negative R-squared value means the sum of squared prediction errors from the trendline (also known as the sum of squared residuals) is larger than the variance in the underlying data.

**Figure 1: Reproduction of Figure 6 of Kilpatrick Report[28]**
**Median Sale Price per Square-Foot Inside 7-Mile Radius After 2017 Crosby Incident**
**September 2017 – August 2018**



17.     **Figure 1** above illustrates that the actual trendline fitted to the sample of transactions that occurred inside the class area and after the 2017 Crosby Incident (the red dotted line above) has a positive slope, which indicates a positive $0.7932 per month growth rate for per-square-foot prices, rather than the negative $0.2096 per month per-square-foot price decline claimed by Dr. Kilpatrick (the blue dotted line above).[29]

18.     As discussed above and as displayed in **Figure 1**, the R-squared value of Dr. Kilpatrick's false trendline in his Figure 6 is −0.369. However, in his report at Figure 6, Dr. Kilpatrick shows the R-squared value of his false trendline as 0.3515. In simple terms, Dr. Kilpatrick's Figure 6 shows the blue dotted line above but displays the R-squared value of the red dotted line above. The work file that Dr. Kilpatrick provided for his Figure 6 *does show* the −0.369 R-squared of his false trendline (corresponding to the

---

[28]     Based on the underlying data used by Dr. Kilpatrick in his reliance materials to create Figure 6 of his report. *See,* Kilpatrick Reliance Materials, "Sales for In-Out Analysis.xlsx," tab "working copy."

[29]     Kilpatrick Report, Equation 7. Figure 7 of Dr. Kilpatrick's report also misleadingly presents a false trendline that does not match the underlying data as well as an R-squared value that does not correspond to his false trendline. See **Exhibit 3** for a correction of Dr. Kilpatrick's Figure 7 with the true trendline for the underlying data in that graph as well as the R-squared values for the true trendline and Dr. Kilpatrick's false trendline.

8

blue dotted line),[30] but the R-squared value shown in Figure 6 of Dr. Kilpatrick's report was manually changed to the 0.3515 R-squared value from the true trendline for that data series (which corresponds to the red dotted line).[31] This suggests that Dr. Kilpatrick generated the true trendline, yet he opted instead to display his false trendline *with the R-squared value of the true trendline*. In other words, Dr. Kilpatrick displayed a false trendline *and* misleadingly displayed the wrong R-squared value for the depicted false trendline. In doing so, Dr. Kilpatrick reports statistical values that suggest his false trendline fits the underlying data when reality is the opposite.

19. As shown in **Table 1**, the $0.7932 per month growth rate for per-square-foot prices in Dr. Kilpatrick's "Inside/After" category is higher than the $0.2256 per month per-square-foot growth rate for prices that Dr. Kilpatrick reports for his "Outside/After" category.[32] Based on true trendlines that are fitted to the underlying data, after the 2017 Crosby Incident, property prices grew 49 percent faster in the purported class area compared to Dr. Kilpatrick's control area, which directly contradicts Dr. Kilpatrick's claim that "prices inside the 7-mile zone are observed to actually decline from levels prior to" the 2017 Crosby Incident.[33]

---

[30]   **Exhibit 4** shows the worksheet from Dr. Kilpatrick's reliance materials that reports the −0.369 R-squared value of his false trendline.

[31]   *See,* Kilpatrick Reliance Materials, "Sales for In-Out Analysis.xlsx", tab "working copy."

[32]   Kilpatrick Report, Equation 8.

[33]   Kilpatrick Report, ¶ 126.

**Table 1: Average Monthly Change in Median Price per Square-Foot After Crosby Incident from Trendlines[34]**
**September 2017 – August 2018**

|  | True Trendline | Dr. Kilpatrick's Purported Trendline |
|---|---|---|
|  | ---(Dollars / Month)--- | ---------------(Dollars / Month)--------------- |
|  | (a) | (b) |
| Inside | $ 0.7932 | $ -0.2096 |
| Outside | 0.5317 | 0.2256 |

## B.   Dr. Kilpatrick's Price Index Shows No Diminution of Property Value Inside the Class Area After the 2017 Crosby Incident

20.   Comparison of per-square-foot prices between transactions in the purported class area and Dr. Kilpatrick's control area further illustrates that Dr. Kilpatrick's property diminution claims are at odds with market outcomes.  **Figure 2.A** below compares the growth of per-square-foot prices, as calculated by Dr. Kilpatrick, between the purported class area and Dr. Kilpatrick's control area,[35] during the time period that was examined by Dr. Kilpatrick.  To compare price growth across the purported class area and Dr. Kilpatrick's control area, I present the percent increase in price relative to the first month of the data period, so that a direct comparison of percentage price changes can be made across the two areas.[36]  As shown in **Figure 2.A**, per-square-foot prices grew faster in the purported class area compared to those in Dr. Kilpatrick's control area.  Over the time period examined by Dr. Kilpatrick, from one year prior to the 2017 Crosby Incident to one year after the incident, per-square-foot prices inside the purported class area achieved a compound annual growth rate ("CAGR") of 12 percent, while prices in Dr. Kilpatrick's control area only achieved a CAGR of five percent.  There is no indication that purported class members suffered property value diminution due to the 2017 Crosby Incident.  In fact, Dr. Kilpatrick's price index shows that property values inside the purported class area grew at equal of faster rates than those in Dr. Kilpatrick's control area.

---

[34]   **Exhibit 3**; **Figure 2.A**; Kilpatrick Report, Equations 7 and 8.

[35]   I offer no opinion on the appropriateness of Dr. Kilpatrick's control area for assessing property value diminution in the purported class area. I understand that Arkema's other experts will opine on this subject.

[36]   This method is often referred to as price normalization and is commonly employed in economic analysis to study price changes.  *See, e.g.,* home price indices for New York, NY and Dallas, TX reported by the Federal Reserve Bank of St. Louis.  These indices are normalized using January 2000 home prices.  "S&P Dow Jones Indices LLC, S&P/Case-Shiller NY-New York Home Price Index [NYXRSA]," *St. Louis Federal Reserve*; "S&P Dow Jones Indices LLC, S&P/Case-Shiller TX-Dallas Home Price Index [DAXRNSA]," *St. Louis Federal Reserve*.

**Figure 2.A: Growth in Median Price per Square-Foot[37]**
**September 2016 – August 2018**



## C. Dr. Kilpatrick Inappropriately Limits His Analysis to 2018 and an Analysis of Data Extending to 2021 Shows No Diminution of Property Value

21. Dr. Kilpatrick's decision to limit this analysis to one year after the 2017 Crosby Incident presents an incomplete and misleading view of property prices in the purported class area. Sales data are available as recent as 2021,[38] but Dr. Kilpatrick does not analyze any transaction that occurred after August 2018.[39] In other words, market data are readily available for September through December 2018, all of 2019 and 2020, and 2021 through present, but Dr. Kilpatrick does not analyze any transaction that is more recent than August 2018, and he offers no justification for ignoring the readily available data for later years.

---

[37] Median price per square-foot values are taken from the underlying data used by Dr. Kilpatrick in his reliance materials to create Figure 6 of his report. Percentage change in prices are calculated relative to September 2016. CAGR is from September 2016 to August 2018. *See*, Kilpatrick Reliance Materials, "Sales for In-Out Analysis.xlsx," tab "working copy."

[38] *See*, Extended MLS data provided by Mr. Papke, "Sales to 2021.xlsx."

[39] Kilpatrick Report, Tables 8-9, Figures 4-7.

11

**Figure 2.B: Growth in Median Price per Square-Foot[40]**
**September 2016 – July 2021**



22. As shown in **Figure 2.B** above, analysis of more recent data shows that the trends identified in **Section IV.B** continue through 2021 as property prices inside the purported class area outperform those in the control area. From one year prior to the 2017 Crosby Incident to July 2021, per-square-foot property prices inside the purported class area achieved a CAGR of 11 percent, while prices in Dr. Kilpatrick's control area achieved a CAGR of eight percent. This comparison of property value trends in the purported class area and Dr. Kilpatrick's control area, both during Dr. Kilpatrick's assessed timeframe and extending through 2021, shows no indication that purported class members suffered any property value diminution.

## D. Dr. Kilpatrick's Correlation Analysis is Inconsistent With Plaintiffs' Theory of Harm

23. Dr. Kilpatrick's findings relating to the correlation between sales prices and distance to the Arkema facility contradict Plaintiffs' and Dr. Kilpatrick's theory of harm relating to property value diminution due to contamination from the 2017 Crosby Incident. Table 11 of Dr. Kilpatrick's report shows that the correlation between property sales prices and

---

[40] Values are relative to September 2016. CAGR is from September 2016 to July 2021 in the extended MLS data. The monthly median price per square-foot values from the Extended MLS data and Dr. Kilpatrick's reliance materials do not match exactly, but the qualitative trends in those data are similar, as illustrated by how closely the solid and dashed lines track each other in the figure above. *See*, Kilpatrick Reliance Materials, "Sales for In-Out Analysis.xlsx," tab "working copy"; Extended MLS data provided by Mr. Papke, "Sales to 2021.xlsx."

distances to the Arkema facility was negative, both before and after the 2017 Crosby Incident, although neither of these correlations were statistically significant.[41] At face value, negative correlations between sales prices and distances to the Arkema facility mean that properties closer to the Arkema facility had higher sales prices. Dr. Kilpatrick's negative correlation estimates suggest that this relationship between proximity to the Arkema facility and higher sales prices was stronger after the 2017 Crosby Incident.[42] This result directly contradicts Plaintiffs' and Dr. Kilpatrick's theory of harm.

24.    Plaintiffs' experts opine that contamination was more severe in areas closer to the Arkema facility. Dr. Kaltofen opines that "the environmental concentration of compounds of interest increase as one gets closer to Arkema."[43] Expert reports of Dr. Auberle and Dr. Glass also present analysis with similar findings.[44] If, as Plaintiffs' experts claim, the contamination was more severe in areas closer to the Arkema facility and there was property value diminution due to contamination from the 2017 Crosby Incident, then there would likely exist a more positive correlation between sales prices and distance to the Arkema facility after the 2017 Crosby Incident. The fact that Dr. Kilpatrick found the opposite result (*i.e.*, a larger negative correlation between sales prices and distance to the Arkema facility during the period after the 2017 Crosby Incident) is inconsistent with his claim that that there was property value diminution based on contamination from the 2017 Crosby Incident.

# V.    Dr. Kilpatrick's Regression Property Value Estimates Are Fundamentally Unsuited as Benchmarks for Assessing Damages in This Case

25.    Dr. Kilpatrick's only use of regression analysis in his report is to compute purported "unimpaired" property values as inputs to his damages calculation. The results of Dr. Kilpatrick's regression estimates from this application are not suitable measures of unimpaired property values because Dr. Kilpatrick's regression model does not distinguish between the effects of Hurricane Harvey and the 2017 Crosby Incident.

---

[41]    Kilpatrick Report, Table 11, ¶ 128.

[42]    Dr. Kilpatrick finds that the correlation between sales prices and distance to the Arkema facility was -0.006230049 before the 2017 Crosby Incident and -0.029686217 after the 2017 Crosby Incident. *See,* Kilpatrick Report, Table 11. Dr. Kilpatrick's reliance materials do not include the worksheets for the correlation results shown in Table 11 of his Report. I was not able to replicate his correlation estimates.

[43]    Supplemental Kaltofen Report, p. 3, p. 12 ("The data show that highest Arkema release-related contaminant concentrations are at the Arkema site. For offsite samples, concentrations are highest closer to Arkema and are not related to distance from KMCO.")

[44]    Auberle Report, Figure 8; Supplemental Glass Report, Figure 9.

13

## A.   Dr. Kilpatrick's Regression Analysis is Not Appropriate for Establishing "Unimpaired" Property Values

26.   Dr. Kilpatrick's regression estimates of purported "unimpaired" values for class member properties are based on property transactions inside and outside of the purported class area from both before and after Hurricane Harvey.[45]  Neither transactions before nor transactions after Hurricane Harvey are appropriate benchmarks for measuring damages in this case.

27.   It is inappropriate for Dr. Kilpatrick to calculate "unimpaired" property values based on transactions in the purported class area that occurred before Hurricane Harvey because those transaction prices do not reflect the effects of Hurricane Harvey.  By calibrating his regression model using transaction prices that occurred before Hurricane Harvey, Dr. Kilpatrick calibrated his model, in part, to predict property prices based on transactions that were not affected by Hurricane Harvey.  It is not appropriate to use pre-Hurricane Harvey property prices as a basis for measuring economic damages in this case, as doing so would award damages based on the hurricane damage that is unrelated to Arkema's conduct at issue.

28.   It is also inappropriate for Dr. Kilpatrick to calculate "unimpaired" property values based on transactions in the purported class area that occurred after Hurricane Harvey because, under Plaintiffs' and Dr. Kilpatrick's theory of harm, those are the allegedly impaired transactions.  If a regression model is calibrated using allegedly impaired transactions, then any differences between the predictions of that regression model and the actual values of class members' properties would correspond to prediction errors from the regression model and statistical noise, rather than actual impairment.

29.   Given Dr. Kilpatrick's use of inappropriate inputs for calibrating his regression model, even if his regression is properly specified, the predictions from that model would still be inappropriate for estimating economic damages in this case.  However, as discussed below, Dr. Kilpatrick's regression specification also suffers from shortcomings that make it inappropriate for assessing damages in this case.

## B.   Dr. Kilpatrick's Regression Does Not Differentiate the Alleged Effects of the 2017 Crosby Incident from Unrelated Effects

30.   Another fundamental flaw in Dr. Kilpatrick's regression model is that it does not take into account any variables that measure the effect of Hurricane Harvey or factors that, as I understand, significantly affect property pricing.[46]  The only input variables used by Dr. Kilpatrick in his model are tax assessed value, days since sale, an indicator for whether

---

[45]   Dr. Kilpatrick's regression coefficients are derived from regression analysis using his full sample of 10,029 transactions, which includes transactions from both before and after the 2017 Crosby Incident.  *See,* Kilpatrick Report, Table 4 (showing a minimum sale date of 9/1/2016 and a maximum sale date of 8/31/2018), Table 5 (showing 10,029 observations used in the regression, which is the same number of observations shown to have tax assessed value in Table 4).

[46]   Kilpatrick Report, Table 5.  *See also*, Papke 2018 Report, pp. 13-14, 74-75; Yocke 2018 Report, p. 32; Stout, *et al*. 2018 Report, p. 13; Millner 2018 Report, p. 34; Thomann 2018 Report, pp. 6-8; Li 2018 Report, ¶¶ 28-30.

14

the property is in MLS area 2, and another indicator for whether the property is located within the purported class area. None of these variables measure the extent of damage from Hurricane Harvey.

31. More generally, Dr. Kilpatrick's regression does not account for property-specific factors such as each property's proximity to sources of chemical emissions that are unrelated to the 2017 Crosby Incident, location and topography, construction characteristics, locations of water breach, and preventative measures taken by owners. I understand that such factors are significant for assessing property value diminution, if any, due to the 2017 Crosby Incident.[47] The fact that Dr. Kilpatrick's regression model does not account for any such property factors means that it cannot separate the effects of the 2017 Crosby Incident from the effects of other unrelated sources of chemical emissions or the effects of Hurricane Harvey, making this model fundamentally unsuited for calculating class-wide economic damages in this case.

## C. Dr. Kilpatrick's "Unimpaired" Value Estimates are Inappropriate for Assessing Damages in This Case Because the Margin of Error for His Estimates Are Comparable to the Magnitude of His Claimed Diminution

32. In addition to the reliability issues discussed above, Dr. Kilpatrick's "unimpaired" property value estimates from his regression suffer from poor statistical precision, to the extent that the margins of error on those estimates are similar in magnitude to his claimed property value diminution effects. Dr. Kilpatrick reports that the median absolute deviation between the predictions of his regression model and the actual property sales prices is 9.28 percent,[48] which means half of Dr. Kilpatrick's "appraisal values" have prediction errors that are equal to or larger than 9.28 percent of the property's actual sales price. The average absolute deviation between the predictions of Dr. Kilpatrick's regression model and the actual property sales prices is even higher at 17.03 percent because for a large portion of properties, Dr. Kilpatrick's regression model generates large prediction errors.

33. Using Dr. Kilpatrick's property value diminution estimates as reference points, 39.81 percent of his regression property value predictions differ from the actual sales price by at least 12.12 percent, and 22.40 percent of his regression property value predictions differ from the actual sales price by at least 20 percent. As shown in **Table 2** below, for one in ten properties, the prediction error from Dr. Kilpatrick's regression model for property prices is greater than 36 percent of the actual transaction price, and for one in twenty properties, the prediction error is greater than 50 percent. Even if Dr. Kilpatrick's regression estimates did not suffer from the reliability issues discussed above, the poor statistical precision of these estimates would make them inappropriate benchmarks for assessing property value diminution in this case.

---

[47] Papke 2018 Report, pp. 13-14, 74-75; Thomann Report, pp. 6-8. *See also*, Li 2018 Report, ¶¶ 28-30.

[48] Kilpatrick Report, Table 6.

15

**Table 2: Absolute Deviation of Dr. Kilpatrick's Regression Estimates[49]**

| Percentile | Absolute Deviation |
|---|---|
| 5 th | 0.85 % |
| 10 | 1.64 |
| 25 | 4.19 |
| 50 | 9.28 |
| 75 | 18.38 |
| 90 | 36.03 |
| 95 | 53.75 |

34. The prediction error in Dr. Kilpatrick's regression model means that, even if he has accurate and appropriate measures of individual property value diminution due to the 2017 Crosby Incident, damages awards based on his regression estimates would be over- or under-compensating class members by at least 9.28 percent in half of the instances, and that a quarter of class members would be over- or under- compensated by at least 18.38 percent.

35. Furthermore, comparing actual transaction prices to Dr. Kilpatrick's regression's predicted values would likely result in large portions of false positives (*i.e.*, false estimates of impairment due to statistical noise, when no actual impairment exists). For example, if a property sold for 20 percent less than Dr. Kilpatrick's regression prediction, there is a 22.40 percent chance that this difference was due to the unreliability of his regression model, and not the result of the conduct at issue. Dr. Kilpatrick's proposed damages calculations rely fundamentally on these unreliable and noisy regression predictions. Because of this critical flaw and the other reliability issues discussed in previous sections, Dr. Kilpatrick's proposed damages calculations are inappropriate and unreliable for proving class-wide economic damages, if any, in this case.

\*\*\*

Signed this 17th day of September 2021:

Sheng Li

---

[49] Absolute deviation is calculated by taking the absolute value of the difference between the predicted sales price from Dr. Kilpatrick's regression and actual transaction price and then dividing that result by actual transaction price. Although Dr. Kilpatrick does not provide reliance materials for this calculation, this methodology exactly replicates the results shown in Table 6 of Dr. Kilpatrick's report. *See,* Kilpatrick Reliance Materials, "Copy 6 of Residential Sales.xlsx," tab "All Areas (NA removed) (3)."

**Exhibit 1**



**Sheng Li, PhD**
Associate Director

NERA Economic Consulting
360 Hamilton Avenue, 10th Floor
White Plains, New York 10601
Tel: 914-448-4104  Fax: 1 (914) 448-4040
sheng.li@nera.com
www.nera.com

# SHENG LI, Ph.D.
## Associate Director

Dr. Li is an Associate Director in NERA's Antitrust and Intellectual Property practices.  He applies his expertise in economics and data analytics to assist clients in high-stakes commercial damages, antitrust, intellectual properties, and class action litigations.  Dr. Li has provided expert report and deposition testimony in U.S. district court.

In the area of antitrust, Dr. Li has evaluated liability and damages theories in cases involving price-fixing, alleged monopolization, anticompetitive foreclosure, and exclusive dealing.  In the area of intellectual property, Dr. Li has assessed economic damages and liability claims arising from alleged patent and trademark infringement, as well as antitrust patent misuse.  He has analyzed economic damages and competitive issues in a variety of industries, including prescription eyewear, pharmaceuticals, medical devices, real estate, digital game platforms, financial services, dental supplies, communications hardware, auto parts, and insurance.

Dr. Li received his Ph.D. in economics from the University of California, Berkeley and his B.Sc. in financial economics from the University of Toronto.  He taught microeconomics, behavioral economics, game theory, and international trade at the University of California, Berkeley.  He has served as a peer-review referee for economic studies submitted to the *Antitrust Law Journal*, the *American Law and Economics Review,* the *Journal of European Economics Association,* and *The Review of Economic Studies.*

**Exhibit 1**

**Sheng Li, Ph.D.**

## Education

**University of California, Berkeley**
Ph.D., Economics, 2015

**University of Toronto**
B.Sc., *with High Distinction*, Financial Economics, 2009

## Professional Experience

**NERA Economic Consulting**
2020-Present  Associate Director
2017-2020     Senior Consultant
2015-2017     Consultant

**Microsoft Research New England**
2014  Research Analyst in Economics Group

**University of California, Berkeley**
2012-2013  Research Assistant, Department of Economics
2010-2011  Teaching Assistant for Microeconomics, Behavioral Economics, Game Theory, and International Trade

**University of Toronto**
2008-2009  Head Peer Mentor, Economics Study Center
2008  Research Assistant, Rotman School of Management

2014-2019  **Ad-hoc reviewer** for the *Antitrust Law Journal*, the *American Law and Economics Review,* the *Journal of European Economics Association,* and *The Review of Economic Studies*

## Expert Testimony and Report Experience

***Teradata Corp. et al., v. SAP SE et al.***

Submitted declaration in support of defendant SAP's motion to exclude certain portions of plaintiff's expert testimony in connection with *Teradata Corp. et al., v. SAP SE et al.*, August 2021.

***Nick's Garage, Inc. v. Allstate Insurance Co. et al.***

Retained as economic expert on behalf of defendant Allstate Insurance Co. in connection with *Nick's Garage, Inc. v. Allstate Insurance Co. et al.*, January 2019.

***Shannon Wheeler et al. v. Arkema Inc.***

**Exhibit 1**

**Sheng Li, Ph.D.**

Provided economic expert report and deposition testimony regarding assessment of classwide damages, contributing to the exclusion of the opposing class damages expert.

Deposition testimony, on behalf of defendant Arkema Inc. in connection with *Shannon Wheeler et al. v. Arkema Inc.*, January 17, 2019.

Expert Report, on behalf of defendant Arkema Inc. in connection with *Shannon Wheeler et al. v. Arkema Inc.*, October 8, 2018.

## Presentations

NYIAC Virtual Talks – SEPs to Arbitration: "Can we be FRANDS?", July 2021.

GCR Interactive: Pharmaceuticals, March 2021.

ACI 11th Summit on Biosimilars & Innovator Biologics, September 2020.

Berkeley-Tsinghua Conference on Transnational IP Litigation, October 2019.

The Legal Talk Network, ABA Section of Antitrust Law Big Data Task Force Podcast, April 2019.

The Knowledge Group, Antitrust Damages: Economic and Legal Considerations in 2018, January 2018.

The 7th Annual Chicago Forum on International Antitrust Issues at Northwestern University, June 2016.

Household and Behavioral Finance Symposium at Cornell University, April 2015.

Rady School of Management at University of California, San Diego, February 2015.

Financial Markets Group at London School of Economics and Political Science, January 2015.

School of Economics and Finance at University of Hong Kong, January 2015.

US Federal Reserve Board, January 2015.

Whitman School of Management at Syracuse University, January 2015.

Department of Economics at University of California, Berkeley, December 2014.

## Fellowships and Awards

Dean's Normative Time Fellowship, University of California, Berkeley, 2014

NERA Economic Consulting                                                        09/07/2021

**Exhibit 1**

**Sheng Li, Ph.D.**

Yale Summer School in Behavioral Finance, 2013

Russell Sage Foundation Summer Institute for Behavioral Economics, 2012

University of Toronto Excellence Awards Research Grant, University of Toronto, 2008

Peter F. Bronfman Leadership Award, University of Toronto, 2007

Dean's List, University of Toronto, 2005-2009

## Articles/White Papers

Contributor, "Artificial Intelligence & Machine Learning: Emerging Legal and Self-Regulatory Considerations – Part 2," American Bar Association Section of Antitrust Law, 2021.

Contributor, "Artificial Intelligence & Machine Learning: Emerging Legal and Self-Regulatory Considerations – Part 1," American Bar Association Section of Antitrust Law, 2019.

Contributor, Chapter 6: "Relevant Market" in *2018 Annual Review of Antitrust Law Developments*, American Bar Association Section of Antitrust Law, 2019.

"Automated Pricing Algorithms and Collusion: A Brave New World or Old Wine in New Bottles?", with Claire (Chunying) Xie, *Antitrust Source*, 2018

"Unpacking the Economic Toolbox: How to Make Sense of Your Economic Expert's Analysis," with Christine Meyer and Gabriella Monahova, *Antitrust Magazine*, 2018

"Rise of the Machines: Emerging Antitrust Issues Relating to Algorithm Bias and Automation," with Claire (Chunying) Xie, *ABA Perspectives in Antitrust,* 2017

"The Influence of Financial Advisers on Return Chasing," University of California, Berkeley, 2015

"Video Games and Youth Crime," University of California, Berkeley, 2015

## Languages

Native in English and Chinese (Mandarin)

**Updated Exhibit 2**

## Materials Relied Upon by Sheng Li, Ph.D.

### Expert Reports

Declaration of Randall Bell, Ph.D., MAI, August 6, 2018

Expert Report of Dr. Wayne R. Thomann, October 5, 2018

Expert Report of Gary R. Papke, MAI, October 8, 2018

Expert Report of Glenn Millner, Ph.D., October 8, 2018

Expert Report of John A. Kilpatrick, Ph.D., MAI, July 16, 2021

Expert Report of Mark Yocke, Ph.D., October 5, 2018

Expert Report of Scott Stout, Ph.D., P.G., Allen D. Uhler, Ph.D., and Katherine L. Flanders, Ph.D., October 5, 2018

Expert Report of Sheng Li, Ph.D., October 8, 2018

Expert Report of William Auberle, L.H.D, P.E., BCEE, July 14, 2021

Supplemental Expert Report of Marc Glass, July 15, 2021

Supplemental Expert Report of Marco Kaltofen, Ph.D., P.E., July 15, 2021

### Data

Extended MLS data provided by Mr. Papke

### Publicly Available Information

 "S&P Dow Jones Indices LLC, S&P/Case-Shiller NY-New York Home Price Index [NYXRSA]," *St. Louis Federal Reserve,* available at https://fred.stlouisfed.org/series/NYXRSA, accessed September 5, 2021

"S&P Dow Jones Indices LLC, S&P/Case-Shiller TX-Dallas Home Price Index [DAXRNSA]," *St. Louis Federal Reserve,* available at https://fred.stlouisfed.org/series/DAXRNSA, accessed September 5, 2021

Mark A. Allen, Robert E. Hall, and Victoria A. Lazear, "Reference Guide on Estimation of Economic Damages," in *Reference Manual on Scientific Evidence* (3rd Edition) (Washington, DC: National Academies Press, 2011)

William H. Greene, *Econometric Analysis*, 6th Edition, 2008

**Exhibit 3**

## Reproduction of Figure 7 of Kilpatrick Report
## Median Sales Price per Square Foot Outside 7-Mile Radius After 2017 Crosby Event
## September 2017 - August 2018



Notes:  Based on the underlying data used by Dr. Kilpatrick in his reliance materials to create Figure 7 of his report.
Dr. Kilpatrick misleadingly displays the R-squared of the actual trendline in his Figure 7 rather than the actual R-squared of his purported "trendline."

Source:  Kilpatrick Reliance Materials, "Sales for In-Out Analysis.xlsx," tab "working copy."

NERA Economic Consulting

**Exhibit 4**

**Reproduction of Figure 6 of the Kilpatrick Report as Shown in Reliance Materials**



Note:  Red circular callout added.

Source:  Kilpatrick Reliance Materials, "Sales for In-Out Analysis.xlsx," tab "working copy."

NERA Economic Consulting

# **<u>Tab 4</u>**

2013 WL 5514284

2013 WL 5514284
Only the Westlaw citation is currently available.
United States District Court,
S.D. Texas,
Galveston Division.

KYLE CANNON, et al, Plaintiffs,
v.
BP PRODUCTS NORTH
AMERICA, INC., Defendant.

Civil Action No. 3:10–CV–00622.
|
Sept. 30, 2013.

**Attorneys and Law Firms**

Anthony G. Buzbee, Peter Kelley Taaffe, Christopher K. Johns, The Buzbee Law Firm, James Hoke Peacock, III, Johnny W. Carter, Susman Godfrey, Houston, TX, for Plaintiffs.

Kenneth Lee Tekell, Sr., Michael Patrick Morris, Tekell Book et al, Lynne Liberato, Haynes Boone, LLP, HOUSTON, TX, David Philip Herrick, Herrick Assoc. PC, Richard Thaddeus Behrens, Haynes and Boone LLP, Dallas, TX, for Defendant.

### *MEMORANDUM AND ORDER*

GREGG COSTA, District Judge.

 **\*1** This proposed class action arises from allegations that numerous chemical releases and emissions events that occurred at Defendant BP Products North America's Texas City Refinery [1] after December 22, 2008, caused thousands of surrounding residential properties to decrease in value. Plaintiffs—five homeowners in the Texas City area—bring common law claims of negligence, trespass to property, and nuisance. They now seek certification of a class of:

[1]     BP completed a sale of the Texas City Refinery to Marathon Petroleum Corporation on February 1, 2013. The Court nonetheless will refer to the refinery as BP's given its ownership during the applicable period.

All persons who own or have owned any piece of real property classified as residential property, in the area

("Class Area") identified as affected by the air pollution plume of impact ("Plume") modeled by Dr. Paul Rosenfeld in his report of Jan. 9, 2012, and shown on Figure ES. 1 to Dr. Rosenfeld's report (and attached as Exhibit B), since December 22, 2008.

Docket Entry No. 26 at 20. The proposed class area includes roughly 14,300 residential parcels in Texas City and La Marque.

Plaintiffs' motion requires the Court to determine whether the proposed class meets the requirements of Federal Rule of Civil Procedure 23. But Plaintiffs' motion also requires the Court to evaluate the reliability and sufficiency of their two experts, Dr. Paul Rosenfeld and Dr. Robert Simons, upon whom they rely to create their class model. Dr. Rosenfeld, an environmental chemist, conducted a preliminary evaluation of air pollution emissions from the Refinery for 2009 and 2010. He modeled BP's sulfur dioxide (SO2) emissions during that timeframe and generated a plume of impact where the SO2 emissions reached a certain threshold. The plume defines Plaintiffs' proposed class area. Dr. Simons's opinions form the basis of Plaintiffs' causation and damages theories. Dr. Simons, a real estate economist, conducted a hedonic regression analysis, a real estate trends analysis, a contingent valuation analysis, and property owner surveys, and concluded that BP's airborne chemical releases resulted in permanent economic losses to all residential class properties, ranging between 5% and 20% of the property value.

As explained in more detail below, the Court finds that Dr. Simons's opinions are unreliable, and, accordingly **GRANTS** BP's motion to exclude his testimony. Left without a formulaic causation and damages model, Plaintiffs are unable to show that questions of law or fact common to the class predominate over individual ones, as is required by Rule 23(b)(3) under the present circumstances. Accordingly, the Court **DENIES** Plaintiffs' motion to certify.

### I. BACKGROUND

The Texas City Refinery, with more than twenty processing units and a refining capacity of more than 460,000 barrels per day, is the third largest refinery in the country. Docket Entry Nos. 34 at 5; 49 at 2. The Refinery has been in operation since 1934. BP acquired it in 1998 as part of its merger with Amoco. Though BP owned and operated the Refinery when Plaintiffs filed their complaint, BP subsequently sold the Refinery to Marathon Petroleum Corporation on February 1, 2013. *See* Press Release, BP, BP Completes Sale of Texas City Refinery and Related Assets to Marathon Petroleum

Cannon v. BP Products North America, Inc., Not Reported in F.Supp.2d (2013)

2013 WL 5514284

(Feb. 1, 2013), *available at* h ttp://www.bp.com/en/global/ co rporate/press/press-releases/bp-completes-sale-of-texas-city-refinery-andrelated-assets-to-marathon-petroleum.html (last visited Aug. 29, 2013).

**\*2** Plaintiffs paint a picture of a plant that, at least in 2009 and 2010, was poorly run and polluting at dangerous levels. According to Plaintiffs, the Refinery reported more total toxic air emissions in those years than any other refinery in the United States. Docket Entry No. 49 at 3. The Galveston County Health District purportedly received numerous odor, air quality, and property impact complaints from residents who noted that fumes were burning the eyes, making them nauseated, and depositing white, oily substances on their vehicles. *Id.*

While Plaintiffs' claims cover all chemical releases from the Refinery, including normal ones, Plaintiffs focus much of their complaint on the existence of "emissions events," which the Texas Administrative Code defines as "[a]ny upset event or unscheduled maintenance, startup, or shutdown activity, from a common cause that results in unauthorized emissions of air contaminants from one or more emissions points at a regulated entity." 30 Tex. Admin. Code § 101.1(28). Plaintiffs allege that data from the Texas Commission on Environmental Quality shows that in 2009–10, the Refinery had over 70 "reportable emissions events," *i.e.,* emissions events that in any 24–hour period result in emissions exceeding thresholds defined by the statute. *Id.* § 101.1(87) (defining "reportable emissions event"); *see also id.* § 101.1(88) (defining thresholds for reporting). During those emissions events, the Refinery purportedly released approximately 1,204,000 pounds of pollution over roughly 2800 hours. Docket Entry No. 49 at 4.

As BP points out, the reported emissions events "varied widely as to the source within the facility, the type and quantity of substance emitted, the duration of the emission, the cause, and the weather and wind conditions at the time of the emission." Docket Entry No. 34 at 18 (citing emission event reporting database). But Plaintiffs highlight one event that it refers to as the "most notorious release," which lasted between April and May 2010 and started when a fire broke out on the 100–J compressor at the Ultracracker—a unit used for production of light fuels such as gasoline. Docket Entry No. 49 at 4. According to Plaintiffs, BP shut down the Ultracracker when it discovered the fire, but decided to restart the unit before the compressor could resume operation. *Id.* Thus, with compressor down, the Refinery could not

safely process noxious chemicals and had to send them to a flare, which Plaintiffs contend was technologically antiquated and vastly inefficient. Consequently, the Refinery released 514,000 pounds of pollutants into the air during the 40–day event. *Id.* Plaintiffs allege that BP was not only at fault for restarting the unit prematurely, but also for failing to follow a number of industry best practices that would have prevented the event.

In August 2010, before filing this suit, Plaintiffs' counsel and other attorneys filed a series of individual lawsuits in state court that were later consolidated as a multidistrict litigation in Galveston County State District Court, *In re MDL Litigation Regarding Texas City Refinery Ultracracker Emission Event Litigation,* No. 10–uc–0001. As the case name suggests, the claims in that case cover BP's acts and omissions relating to the April/May 2010 emissions event. The state petitions assert not only claims for property damage, but also for personal injury based on benzene exposure. Roughly 50,000 plaintiffs, including the named Plaintiffs here, have joined that action, though the named Plaintiffs nonsuited their property claims in the MDL prior to the class certification hearing before this Court. [2]

[2]     BP argues that the pendency of these tens of thousands of individual cases seeking both personal injury and property damage relating to a BP emission event demonstrate that a class action is not a "superior" method for adjudicating the claims in this case. The Court need not decide that issue given its ruling on other grounds.

**\*3** On December 22, 2010, Plaintiffs filed this suit, alleging that chemical releases and emissions events occurring after December 22, 2008 caused a diminution in value for residential properties surrounding the Refinery. The suit does not include personal injury claims and is not restricted to the April/May 2010 event. Plaintiffs assert three common law causes of action: negligence, trespass, and nuisance. Plaintiffs amended their complaint on October 23, 2012.

The amended complaint differs from the original one in two central ways. First, while the original complaint focuses on the Refinery's problems with benzene releases and resultant benzene exposure to the population, the amended complaint barely mentions benzene. *Compare* Docket Entry No. 1 (mentioning benzene 27 times), *with* Docket Entry No. 49 (mentioning benzene twice). Second, the amended complaint proposes a new class definition: whereas the

WESTLAW    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

original complaint proposed a class of individuals who owned real property in the 77590, 77591, or 77568 zip codes, the amended complaint proposes a class based on exposure to sulfur dioxide emissions. *Compare* Docket Entry No. 1 at 14, *with* Docket Entry No. 49 at 10. Specifically, the new class includes all individuals who own or have owned residential property in the area "identified as affected by the air pollution plume of impact [ ] modeled by Dr. Paul Rosenfeld ..., since December 22, 2008." Docket Entry No. 49 at 10.

An understanding of Plaintiffs' proposed class requires a familiarity with Dr. Rosenfeld's expert report. Rosenfeld used AERMOD dispersion modeling software to model the effects of the Refinery's sulfur dioxide emissions on the residents of the three zip codes listed in the original complaint. Docket Entry No. 26–1. The model was constructed using BP's reported normal operating emissions of SO2, which do not include emissions from emissions events. *Id.* at 2. Rosenfeld's model generated an air pollution plume of impact showing where residents were subjected to at least five incidents between 2009–10 during which BP's emissions caused a one hour 50 μg/m [3] increase in ambient SO2 concentrations —the level at which two epidemiological studies relied on by Dr. Rosenfeld identified a statistically significant risk of exposed populations exhibiting asthmatic complications. *Id.* at 2–3. The report also noted BP's history of pollution and the existence of other air pollutants released from the Refinery, including volatile organic compounds, nitrogen oxides, and particulate matter in the plume area, but did not rely on those emissions or other alleged bad acts in creating the plume.

Though Plaintiffs' class boundary is based on exposure to SO2 emissions, their causation and damages theory is not. *See* Plaintiffs' Post–Hearing Brief, Docket Entry No. 86 at 6 ("BP wants this case to be about health effects of a *single type* of emission of *one chemical.* This case is about much more than that." (emphasis in original)). Plaintiffs' amended complaint broadly identifies "BP's contamination" as the cause of property value diminution without explaining why or how. They rely on their economic expert, Dr. Simons, for that explanation. *See* Docket Entry No. 52 at 11 (noting that, at trial, Simons would "testify about causation and damages" and "quantify[ ] the damages caused by BP's pollution"). Simons more specifically attributes the decline in property value to "general public knowledge of BP's extraordinary emissions." Docket Entry No. 50–1 at 9. Simons performed the following three analyses to estimate property value diminution:

**\*4** • a real estate trends analysis in which he compared the change in median sales price per square foot between 2008 and 2011 for the class area with the corresponding change for a control area comprised of portions of Pasadena, Deer Park, and Baytown, which Simons determined had similar houses with similar proximity to refineries and industrial developments;

• a hedonic regression analysis in which he compared real estate sales in the class area after January 1, 2009 with sales prices in the class area before 2009 and sales prices in the control area [3] before and after 2009. The model attempts to isolate the effects of a particular disamenity, in this case hypothesized to be BP's contamination, by holding all other factors —such as, lot size, year built, bedrooms, bathrooms, swimming pool, foreclosure status, and neighborhood characteristics—constant; and

[3]   The control area for the regression analysis was slightly larger than the one for the real estate trends analysis, and included portions of Texas City and La Marque outside the plume area, as well as the Harborwalk, Tiki Island, and Bayou Vista waterfront developments in Galveston County. Docket Entry No. 52 at 6.

• a contingent valuation analysis and property owner survey in which he surveyed non-class and class members, respectively, about how the existence of emissions similar to the Refinery's would affect the likelihood of bidding and price of bids on property.

*See generally* Docket Entry No. 50–1. The goal of Simons' first two analyses was to compare "housing price effects of living within an influence zone of reasonably well-managed and appropriately maintained cluster of petroleum industry (the control areas along the Houston Ship Channel) versus living near a poorly-maintained refiner (BP)," *id.* at 6, while the third analysis can more simply be referred to as a survey. Based on the various analyses, Simons concluded that BP's emissions drove down property values in the class area by an average of 5–20 percent.

The Court must now decide whether class certification is appropriate under Rule 23 and, to the extent it informs that decision, whether Plaintiffs' expert testimony should be excluded. As explained both in the parties' voluminous briefing and at the two-day class certification hearing held

on April 4–5, 2013, Plaintiffs rely heavily on their experts in arguing for class certification. Without Rosenfeld's plume model, the class boundary would not exist. And, without Simons's analyses, Plaintiffs would have to show causation and damages on an individual property-by-property basis. For the reasons discussed below, the Court excludes Simons's testimony and, accordingly, denies class certification.

## II. STANDARD FOR CLASS CERTIFICATION

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.' " *Comcast Corp. v. Behrend,* ––– U.S. ––––, ––––, 133 S.Ct. 1426, 1432, 185 L.Ed.2d 515 (2013) (quoting *Califano v. Yamasaki,* 442 U.S. 682, 700–01, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979)). "[T]he party seeking certification [ ] bears the burden of establishing that the requirements of Rule 23 have been met." *Bell Atl. Corp. v. AT & T Corp.,* 339 F.3d 294, 301 (5th Cir.2003) (citing *O'Sullivan v. Countrywide Home Loans, Inc.,* 319 F.3d 732, 737–38 (5th Cir.2003)). Rule 23(a) imposes four prerequisites to certify a class action: (1) a class "so numerous that joinder of all members is impracticable"; (2) "questions of law or fact common to the class"; (3) "claims or defenses of the representative parties [that] are typical ... of the class"; and (4) representatives that "will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a). These prerequisites are known as numerosity, commonality, typicality, and adequacy. *See Amchem Prods. v. Windsor,* 521 U.S. 591, 613, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

**\*5** In addition to meeting all four prerequisites of Rule 23(a), a party seeking class certification must also demonstrate at least one of the three conditions of Rule 23(b):

(1) litigating separate actions would create the risk of (a) inconsistent rulings toward individual class members that would create incompatible standards of conduct for the defendant or (b) rulings with respect to individual class members that would impair the ability of other individuals to protect their interests;

(2) the defendant's conduct applies generally to the class such that final injunctive or declaratory relief is appropriate as to the class as a whole; or

(3) common questions of law or fact predominate over individual questions and a class action is superior to other available methods for fairly and efficiently adjudicating the matter.

Fed.R.Civ.P. 23(b).

A district court must conduct a rigorous analysis of the Rule 23 requirements before certifying a class. *Gen. Tel. Co. v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982); *see also Amchem,* 521 U.S. at 615 (requiring district courts to take a "close look at the case" in making a Rule 23(b)(3) determination). The "class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Id.* at 160. Thus, "[a]lthough class certification hearings 'should not be mini-trials on the merits of the class of individual claims ... going beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues.' " *Madison v. Chalmette Refinings, L.L.C.,* 637 F.3d 551, 555 (5th Cir.2011) (alteration in original) (quoting *Unger v. Amedisys Inc.,* 401 F.3d 316, 321 (5th Cir.2005)); *see also In re Rail Freight Fuel Antitrust Litig.—MDL,* ––– F.3d ––––, 2013 WL 4038561, at \*6 (D.C.Cir. Aug.9, 2013) ("It is now indisputably the role of the district court to scrutinize the evidence before granting certification, even when doing so 'requires inquiry into the merits of the claim.' " (quoting *Comcast,* 133 S.Ct. at 1433)).

In that same vein, a district court's "rigorous analysis" may necessitate the evaluation of expert testimony. "Although courts are not to insist upon a battle of the experts at the certification stage ..., [i]n many cases, it makes sense to consider the admissibility of the testimony of an expert proffered to establish one of the Rule 23 elements in the context of a motion to strike prior to considering class certification." *Unger,* 401 F.3d at 323 n. 6 (citations and internal quotation marks omitted); *see also Am. Honda Motor Co. v. Allen,* 600 F.3d 813, 815–16 (7th Cir.2010) ("The [district] court must also resolve any challenge to the reliability of information provided by an expert if that

information is relevant to establishing any of the Rule 23 requirements for class certification."); *Sher v. Raytheon Co.,* 419 F. App'x 887, 891 (11th Cir.2011) (holding that "the district court erred as a matter of law by not sufficiently evaluating and weighing conflicting expert testimony on class certification" regarding the use of regression modeling to determine property value diminution). For instance, in a securities fraud action in which a showing of market efficiency was necessary to establish a classwide theory of causation, the Fifth Circuit affirmed denial of class certification in part because the expert testimony on market efficiency was unreliable. *Bell v. Ascendant Solutions, Inc.,* 422 F.3d 307, 314 n. 13 (5th Cir.2005). And the Supreme Court recently found class certification to be inappropriate when plaintiffs' expert calculated damages based off of four theories of liability of which three had already been dismissed by the trial court. *Comcast,* 133 S.Ct. at 1434–35. The Court rejected the view of the Court of Appeals that an "attac[k] on the merits of the methodology [had] no place in the class certification inquiry," as well as the appellate court's ruling that plaintiffs' "assurances" that they could fix the model at the merits stage would be sufficient for certification. *Id.* at 1431, 1434 (alterations in original) (quoting *Behrend v. Comcast Corp.,* 655 F.3d 182, 207 (3d Cir.2011)); *see also In re Rail Freight,* 725 F.3d 244, 2013 WL 4038561, at *8 ("It is now clear [after *Comcast* ] that Rule 23 not only authorizes a hard look at the soundness of statistical models that purport to show predominance— the rule commands it."). And in one sense scrutiny of expert testimony being used to show that a case is susceptible to class treatment seems less controversial than the normal application of *Daubert,* because it does not intrude on the jury's role given that class certification is an issue for the court.

**\*6** The Court thus turns to evaluating the expert testimony of Dr. Simons.

## III. ADMISSIBILITY OF DR. SIMONS'S TESTIMONY

### A. Legal Standard

When considering expert opinions at the class certification stage, "court[s] should rely on the admissibility standards for expert evidence as construed by the Supreme Court in *Daubert v. Merrell Dow Pharmaceutical, Inc.,* 509 U.S.

579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and *Kumho Tire Co. v. Carmichael,* 529 U.S. 137 (1999)." Hon. David Hittner et al., *Practice Guide: Federal Civil Procedure Before Trial, 5th Circuit Edition* ¶ 10:577.1 (2011); *see also Am. Honda Motor Co. .,* 600 F.3d at 816 ("[T]he district court must perform a full *Daubert* analysis before certifying the class if the situation warrants."). Plaintiffs have the burden of establishing admissibility of their experts by a preponderance of the evidence. *Daubert,* 509 U.S. at 592 n. 10 (citations omitted).

*Daubert* identifies a nonexhaustive list of factors a district court should consult in assessing the reliability of expert testimony: (1) whether the theory can or has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards and controls; and (5) whether the theory has been generally accepted in the relevant scientific, technical, or professional community. *Daubert,* 509 U.S. at 593–94. Other guideposts have been articulated subsequent to *Daubert.* Relevant to the Court's analysis here, the Supreme Court in *General Electric Co. v. Joiner* established the test of "fit" between the methodology and the conclusions drawn, stating that a "court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) (citation omitted); *see also* Fed.R.Evid. 702 Advisory Committee Notes (2000 Amends.) (listing factors relevant to the *Daubert* inquiry, including "[w]hether the expert has adequately accounted for obvious alternative explanations" and "[w]hether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion").

### B. Analysis

Dr. Simons's opinions fail to meet the standards set forth in *Daubert* and its progeny. As explained below, not only are specific aspects of Simons's methodologies flawed, but his overarching theory of damages is disconnected from Plaintiffs' causes of action of negligence, trespass, and nuisance which are limited to a particular time period beginning in late 2008.

### 1. Emissions Levels in the Control Area

Simons's real estate trends analysis and hedonic regression analysis are both premised on a comparison between the class

area and the control area.[4] The control area is comprised primarily of portions of Pasadena, Deer Park, and Baytown —areas that, like the class area, are in the greater Houston metropolitan area, are along the Houston ship channel, and contain industrial facilities. Docket Entry No. 75 at 38–39.

[4] As Simons noted at the class certification hearing, the regression analysis is essentially a "more refined" version of the real estate trends analysis. Docket Entry No. 75 at 20. Along those lines, he acknowledges that the regression analysis should "carry more weight" than the other methodologies he used. *Id.* at 25, 37.

**\*7** As Simons acknowledged at the class certification hearing, "the purpose of a control area in a regression model is to give you some basis to isolate and value the characteristic that you're trying to value." *Id.* at 39. Simons admits that "the characteristic that distinguishes the class area from other properties outside the boundary is that Dr. Rosenfeld has modeled a certain level of sulfur dioxide emissions within the class area." *Id.* But he qualifies his response by noting that his regression model did not isolate the effects of sulfur dioxide emissions, but more generally isolated the effects of "the activity of releases from BP, including exceedances and other things that Dr. Rosenfeld will discuss," because "sulfur dioxide is just a proxy for all the air pollutants from the plant." *Id.* at 39–40; *see also* Simons Rebuttal Declaration, Docket Entry No. 50–1 at 6 ("While residents or potential buyers of property would not necessarily be expected to have knowledge of specific sulfur dioxide concentrations, they would likely have knowledge of these general factors.").

In actuality, Simons does not, and cannot, know exactly what characteristic he isolated with his regression model—it could have been sulfur dioxide emissions, exceedances, events, bad press about the Refinery, or any other difference between the class area and control area that was not accounted for in his model, including non-BP related variables like neighborhood crime rates or the effects of Hurricane Ike. *See infra* Part III(B)(3).

But even assuming that Simons was able to isolate BP's conduct from all other relevant variables, his model is still flawed because Plaintiffs fail to show that SO2 emissions have been worse in the class area than the control area since December 2008. Simons admits that he did not assess SO2 levels in the control areas and that he "hop[ed] they're less, but [had] no knowledge of what they are." Docket Entry

Nos. 38–6 at 26–27; 75–1 at 8.[5] After a critique from one of BP's experts, Dr. Rosenfeld analyzed SO2 emissions in the control area in his rebuttal report and concluded that "concentrations of SO2 in Texas City/La Marque are elevated above levels typically measured in the Pasadena region with statistical significance." Docket Entry No. 51–1 at 5. But Rosenfeld's control area analysis is flawed and unreliable because he measured emissions levels for the control area using air monitors ranging from 5.7 to 20.7 miles away from the center of the control areas, while he measured emissions levels for the class area using air monitors not only within the class boundary, but within the boundary of the Refinery itself. Docket Entry No. 59–1 at 6, 11–12. As BP's toxicologist expert, Dr. Phillip Goad, points out, "chemicals disperse (that is, the concentration decreases) with distance when released into the air and receptors or monitors located at difference distances can have vastly different results, reflecting unique emissions sources within the local area." *Id.* at 6. Goad conducted a more apples-to-apples analysis by calculating SO2 emissions from the top SO2 emissions sources within a certain radius[6] of the class and control areas. Goad's study revealed that the SO2 emissions from within these control area boundaries were roughly six times higher in 2009 and more than eight times higher in 2010 than the SO2 emissions from within the respective class area boundaries. *Id.* at 7, 16. This is not surprising given that one of the control areas, Baytown, is home to the "largest petroleum & petrochemical complex in the United States." ExxonMobil, Baytown Area, About Us, http://www.exxonmobil.com/NA-English/about_ where_ref_bt_aboutus.aspx (last visited Sept. 12, 2013); *see also* Docket Entry 26–1 at 6 (showing that the Baytown Refinery had 2,344,831 pounds of Toxics Release Inventory air emissions for 2009–10 versus 2,515,337 pounds for the Texas City Refinery).

[5] Simons testified that he "certainly [did] not know" what the level of PAHs in the control area were. Docket Entry No. 38–6 at 27.

[6] Goad used a radius of 7.4 miles-the distance from the Park Place monitor to the center point of the closest control area. Docket Entry No. 59–1 at 7.

**\*8** The Court is persuaded by Goad's analysis and finds that Plaintiffs have not shown that SO2 emissions levels were worse in the class area than in Simons's control area. Despite Plaintiffs' admonition that this case is not about the release of one type of chemical, a distinction in SO2 emissions between the class area and control area is key to Simons's regression

Case 4:17-cv-02960 Document 294-1 Filed 02/07/22 in TXSD Page 119 of 179
Cannon v. BP Products North America, Inc., Not Reported in F.Supp.2d (2013)
2013 WL 5514284

and real estate trends analyses. *See* Docket Entry No. 51–1 at 5 (statement from Rosenfeld in his rebuttal report that his analysis of SO2 levels in the control areas "serves to support the opinions of Dr. Roby Simons"). The Court agrees with BP's expert Dr. Thomas Jackson: "If [Simons] found a delta, or price difference, you have to be able to say it's due to this characteristic that differs between the two areas." Docket Entry No. 76–3 at 14.

As the proposed class definition demonstrates, Plaintiffs use SO2 emission levels to define the boundaries of BP's liability and show the reaches of BP's bad acts. Though Plaintiffs may not be arguing that SO2 emissions caused the diminution in property value, they are still using SO2 emissions as a proxy for other pollutants and to show the reach of wrongful conduct. Simons testified that he looks at SO2 "as a proxy for the whole soup of chemicals that were released from the plants, and [ ] a good way to measure a certain area," Docket Entry No. 75 at 14, and Rosenfeld testified that "the SO2 plume [ ] serves as a proxy for all the other contaminates released by BP," Docket Entry No. 75–4 at 188. Assuming that to be true, if the class area and control area have similar levels of SO2 emissions, or if the control area has higher levels of such emissions, then the difference between property-value change in the two areas is very likely the result of something other than BP's wrongful conduct.[7] Accordingly, with respect to Simons's regression and real estate trends analyses, the Court concludes that "there is simply too great an analytical gap between the data and the opinion proffered." *Joiner,* 522 U.S. at 146 (citation omitted).

[7] At the class certification hearing, Plaintiffs backtracked on the use of SO2 emissions as a proxy, calling it "underinclusive" of other releases. Docket Entry No. 76–2 at 33. But if that were the case, Plaintiffs have not provided an alternative comparison (such as odors, bad press, or other pollutants) between the class area and control area. Thus, the same causation hole would remain: in order to draw any conclusions from his model, Simons would have to know that his control area did not share the same characteristic as his class area. *See* Docket Entry No. 76–3 at 14 (testimony from Dr. Jackson at the class certification hearing agreeing that "if [Simons] were to pick another characteristic of the class area [besides SO2] he would have to know, in order

to draw any conclusions from a regression model, that his control area didn't share that other different characteristic").

*2. Flawed Comparison in Regression Analysis*

In addition to its unsupported assumption regarding SO2 emissions in the control area, Simons's regression model is also structurally flawed by failing to compare the change in class area property values that occurred after December 22, 2008 with the change in control area property values after that date. As Dr. Jackson explains, regression models are designed to compare a subject group before and after a relevant date with a control group before and after the same date in order to measure the effect of some event or circumstance in the subject group. *See* Docket Entry No. 38–4 at 30–31 (citing W. Rogers, *Errors in Hedonic Modeling Regressions: Compound Indicator Variables and Omitted Variables,* The Appraisal Journal 208–13 (April 2000)). Rather than perform such a comparison, Simons compared the class area in the after period with the subject area in the before period and the control area in the before and after periods.



**\*9** While the scientific literature critiques such an approach as "biased due to omitted variables," *see id.,* common sense explains why it is unreliable. Under Plaintiffs' theory of the case, BP's conduct became worse after December 2008, causing property values to decline.[8] Their theory therefore requires some change in BP's conduct starting in December 2008, because the ordinary operation of the refinery—which has been in operation for more than 75 years—would have already been factored into Plaintiffs' initial purchase price of their homes. For instance, Plaintiff Genaro Ramirez bought his home in Texas City in 2006. *See* Docket Entry No. 26 at 35. If the stigma associated with the Refinery already existed in 2006, he would have purchased his house at a discount

Cannon v. BP Products North America, Inc., Not Reported in F.Supp.2d (2013)
2013 WL 5514284

then and would not have been injured by the discount in his property value that still existed during the class period.

*Cf.* 🔖 *LaBauve v. Olin Corp.,* 231 F.R.D. 632, 677 n. 96 (S.D.Ala.2005) ("[I]f plaintiffs were proceeding on a 'stigma' theory, surely any stigma and associated property devaluation would have attached no later than 1983, when the Olin plant was declared (amidst much fanfare and publicity) to be a Superfund site.").

8        The two-year statute of limitations explains Plaintiffs' theory; Plaintiffs filed their suit on December 22, 2010.

Comparing the class's "before and after" property values with the control group's "before and after" property values is thus key to determining the effect of BP's purported change in conduct after December 2008. Simons's regression model is unable to properly account for that change because it fails to reflect price differences between the class and control areas during the before period. Under Simons's model, which indicates a 4.7% diminution in value, property values could have been increasing in the class area in 2009–10 relative to the control group and the 4.7% diminution could be attributed to higher "before" property values in the control group. A tweak of the model to account for the proper comparison indicates this is exactly what happened. BP's expert respecified the model to include all four categories (subject and control, before and after) without making any other changes. Docket Entry Nos. 38–4 at 31; 76–3 at 36. He found that, in contrast with Simons's conclusion of a 4.7% loss, the tweaked model "indicate[d] that sales prices for single-family residential properties in Simons' subject area were 4.02% less than his control areas in the period prior to January 1, 2009 and they were .34% less in the period after January 1, 2009 ... for a net gain or improvement of 3.68%." Docket Entry No. 38–4 at 31.

Accordingly, the Court finds that Simons's regression model was improperly constructed and that his conclusion regarding a 4.7% diminution in property value is unreliable.

### 3. Inability to Isolate BP's Wrongful Conduct

Simons's regression model fails in one other way even if it is able to show a 4.7% diminution in property value during the relevant time period. Though the model holds a number of variables constant between the class and control areas,[9] the Court finds that he still fails to isolate BP's wrongful conduct as the cause of the identified diminution.

9        The full list of variables is included in Exhibits 6–1–6–4 of his expert report and includes lot size, square footage, bedrooms, bathrooms, pool, garage, cooling system, heating system, foreclosure status, SAT scores, and distance to airports, highways, and railroads.

**\*10** First, related to the *Daubert*-related factor concerning "[w]hether the expert has adequately accounted for obvious alternative explanations," Fed.R.Evid. 702 Advisory Committee Notes (2000 Amends.), the Court notes that seemingly important variables are missing from Simons's analysis. This is problematic because "failure to include a major explanatory variable that is correlated with the variable of interest in a regression model may cause an included variable to be credited with an effect that actually is caused by the excluded variable." Federal Judicial Center, *Reference Manual on Scientific Evidence* 314 (3d ed.2011). Such missing variables here include neighborhood crime rates and location in or outside of the floodplain, but the Court will only focus on one by way of example—the effects of Hurricane Ike. Hurricane Ike hit the Texas Gulf Coast in September 2008, just a few months before the relevant, and "will likely go down in history as the most costly and destructive storm ever to hit Texas." Jack Colley, *Foreword to the Federal Emergency Management Agency's Hurricane Ike Impact Report,* at ii (December 2008). The effects of the storm lasted well into Plaintiffs' class period, with an estimated $3.4 billion in damage to housing. *Id.* at 17.

But Simons did not include Hurricane Ike impact as a variable in his regression model; thus, the 4.7% unexplained loss that his model generated could have easily been generated from variances in Hurricane Ike effects, such as increases in insurance rates for hurricane—vulnerable properties, as from proximity to a poorly-managed refinery. And such variances in Hurricane Ike effects between the control areas and class area are not just hypothetical. Whereas the bulk of Pasadena is located inland, Texas City and La Marque are much closer to the Gulf and Galveston Bay, though parts are protected by a levee. *Id.* at 36–37. It logically follows that property values would be affected in different ways in the different areas. Moreover, the likelihood that events other than BP's emissions would have caused any property value diminution is significant given that, even as Dr. Rosenfeld admits, the air quality in Texas City has been improving over the last ten years including during the class period. Docket Entry No. 75–4 at 24–25. The failure to account for such factors deems Simons's methodology unreliable.

*See Bazemore v. Friday,* 487 U.S. 385, 400 & n. 10 (1986) (Brennan, J., joined by all other Members of the Court, concurring in part) ("Normally, failure to include variables will affect the analysis' probativeness, not its admissibility.... There may, of course, be some regressions so incomplete as to be inadmissible as irrelevant ...."); *see also Phillips v. Am. Honda Motor Co.,* 238 F. App'x 537, 542 (11th Cir.2007) (affirming exclusion of expert testimony due to model's failure to control for significant alternative sources of temperature variation). [10]

10    While the regression analysis is missing some key controls, it has far more controls than the real estate trends analysis. As Simons testified at his deposition, "there's a lot of factors in real estate trends that are not controlled for, explicitly, say, numbers of bedrooms and all the other things that go with it that regression does control for." Docket Entry No. 38–6 at 26; *see also* Docket Entry No. 75–2 at 31 (noting at class certification hearing that trends analysis is not as good as regression at holding things constant).

**\*11** Second, even if Simons's model could accurately attribute the alleged property value diminution to the Refinery or to BP or to extraordinary emissions, it could not specifically attribute the diminution to the conduct for which BP would potentially be liable. For instance, Simons ties the diminution to general public knowledge of BP's extraordinary emissions, where knowledge is derived from press reports, direct observations by people in the class area, and word of mouth." Docket Entry No. 50–1 at 9. But the regression model has no way of separating the stigma from the nuisance, trespass, and negligence that Plaintiffs claim in this case from any other BP-related stigma, especially considering that during the time period in question BP was responsible for the largest accidental oil spill in history. [11] *See Ponca Tribe of Indians of Okla. v. Cont'l Carbon Co.,* 2009 WL 5842042, at \*8–9 (W.D.Okla. Jan.23, 2009) (finding diminution calculations from hedonic regression analysis to be "unhelpful and not relevant to [ ] nuisance claims" in part because they were "not directly tied to the emission events that support Plaintiffs' claims in [the] lawsuit"); *cf.* Robert Simons, *When Bad Things Happen to Good Property,* Environmental Law Institute (May 2006) ("Many courts have denied recovery for stigma damages finding that there is no interference with plaintiffs' rights when there is no causal connection between the injury of plaintiffs and the unreasonable conduct of the defendant." (citations omitted)).

This fact was highlighted during the class certification hearing when one of the named Plaintiffs was asked which particular things relating to the refinery caused people to want to move out of his neighborhood and he responded: "[T]he oil spill, which is different from this, but a lot of things—a lot of people, whether it's based on fact or not, assume that—a lot of negativity towards the plants still from BP." Docket Entry No. 75–5 at 29.

11    An intentional oil spill caused by Iraqi forces in Kuwait during the Persian Gulf War is the only larger spill.

Similarly, even if there is a property value decline directly correlated with extraordinary emissions, as opposed to other BP stigma, there are too many sources of adverse environmental impacts within the class area to isolate and evaluate property value impacts from any one source. As BP's expert explained in his report, there are several other refineries and heavy industrial facilities near the Refinery, including Marathon Petroleum Company, Valero, and Sterling Chemicals, and 43 companies within the proposed class area that emit EPA criteria pollutants and are listed in EPA's AIRS database. Docket Entry No. 38–4 at 14. Consequently, "[i]t would be virtually impossible to isolate and analyze the source of any such emission, let alone to segregate the property value impacts, if any, from a single facility or emission event." *Id.* at 14–15. Simons even acknowledged at his deposition that "there could be, and probably is, another plant in this but it seems logical there's some other sources of pollution and they should possibly have some, also, responsibility." Docket Entry No. 38–6 at 26.

**\*12** Based on all of these problems, Simons is unable to reliably or formulaically calculate Plaintiffs' damages in this case.

*4. Real Estate Trends Analysis Not Tied to Class Area*
As discussed above, Simons's real estate trends analysis is intended to compare real estate sales patterns in the class area and the control areas from a period prior to the events investigated to a period when knowledge of the event became widespread in the community. Specifically, Simons attempted to compare the median sales price per square foot for transactions in the control area and the class area for 2008 and 2011 and concluded that property values decreased at a higher percentage in the class area than in the control area.

But Simons analyzes the wrong class area. The purported class area used in his analysis is the old, zip-code based area proposed in Plaintiffs' original complaint, rather than the plume-based area proposed in the current complaint. As Simons admits, the three zip codes contain properties not included in the plume-based boundary. Docket Entry No. 38–6 at 11. BP's expert Jackson calculates, and Plaintiffs do not dispute, that 24.15% of the parcels in the original class area are not included in the current one. Docket Entry No. 38–4 at 28 n. 61.

As such, Simons's real estate trends analysis is not a reliable indicator of property value diminution in the current class area. *Cf.* *Comcast,* 133 S.Ct. at 1433 ("[A] model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory."). Plaintiffs assure the Court that they can fix the model at the merits stage if needed. "But such assurance is not provided by a methodology that identifies damages that are not the result of the wrong." *Id.* at 1434; *see also* *In re Rail Freight,* 725 F.3d 244, 2013 WL 4038561, at *8 (rejecting plaintiffs' attempts at saving their damages model when plaintiffs failed to rerun the model). Given that Plaintiffs' bear the burden of establishing the reliability of their expert and that a properly-run model could change Simons's results (as happened with changing the temporal comparison in the regression model), the Court determines that the real estate trends analysis fails as a mechanism for showing causation or damages on a classwide basis.

### 5. Contingent Valuation Analysis

As Plaintiffs explain, a "contingent valuation analysis is a survey-technique that attempts to value things that do not typically have a market price, such as the presence or absence of environmental contamination." Docket Entry No. 50 at 7. For Simons's contingent valuation analysis, he retained a professional survey firm to call 400 homeowners in the zip codes surrounding Baytown, Deer Park, and Pasadena, which Simons describe as demographically similar to the class area. The interviewer presented scenarios of a house "very similar" to their current one but located in four different areas—one by a business park, one by a closed gas stations that had leaking underground storage tanks, one by a landfill or hydraulic fracturing site, and one by a petroleum refinery intended to mirror BP's Refinery—and asked the homeowners the likelihood that they would make an offer on the homes on a scale of –3 to +3 and the highest bid they would make on

the home. Docket Entry No. 38–5 at 88–105. Simons's results showed a 64% drop in demand and a 20% average discount for the top half of potential bidders. [12] From those results, Simons predicted that the refinery caused property values to decline in the rough range of 5% to 20%. *Id.* at 33.

[12]    Simons used two slightly different versions of the survey, which described the refinery scenario slightly differently. In the first there were detectable levels of PAHs in the air conditioning filter system; in the second, there was a nearby public school that had air quality in the worst 5% of the U.S. For simplicity, only the first set of results are shown above.

**\*13** As an initial matter, the Court notes its uncertainty that even Plaintiffs would argue that contingent valuation on its own—without the reinforcement of a regression or real estate trends analysis—would serve as a reliable calculation of damages. Simons admits that it does not carry as much weight as his regression analysis, Docket Entry No. 75 at 25, and Plaintiffs contend that none of the analyses should be viewed in a vacuum, Docket Entry No. 50 at 2. *See also* Docket Entry No. 50–1 at 12 (noting that "researchers have advocated the use of buyer surveys in conjunction with analysis of actual sales").

A debate exists in the scientific community about the validity of contingent valuation as a methodology for assessing market discounts associated with real estate disamenities. While BP's expert Dr. Jackson states that it is "not a generally accepted valuation method within the appraisal field," Simons notes that at least nineteen authors have published contingent valuation studies in the peer-reviewed real estate literature. *Compare* Docket Entry No. 38–4 at 22, *with* Docket Entry No. 50–1 at 11–12. Jackson presents a number of problems with contingent valuation: it is not as reliable as the existing transactional data; hypothetical bias may exist because the respondents do not have to bear the consequences of their decisions; it does not incorporate many factors that go into a home purchase; and respondents may be biased or not understand the scenarios. Docket Entry No. 38–4 at 23–25.

But regardless whether contingent valuation is a reliable methodology in general, Simons's contingent valuation analysis, standing alone, is unable to serve as a reliable or formulaic causation and damages model in this case. First, the analysis suffers from many of the same control problems described above. For instance, in the survey's refinery

scenario, a public school within five blocks of the house was ranked as being in the worst five percent for air quality in the U.S. Docket Entry No. 38–5 at 31–32. But the survey did not inform the respondents in Deer Park and Pasadena that they already lived near schools ranking in the worst one percent for air quality in the nation. *See* Docket Entry No. 38–4 at 21–22; USA Today, *The Smokestack Effect: Toxic Air and America's Schools,* http:// content.usatoday.com/news/nation/ environment/smokestack/index (last visited Sept. 12, 2013) (listing nine schools in Deer Park and Pasadena being in the top percentile of pollution, including a school ranked sixth worst in the nation). Likewise, the refinery in the survey is described as having had a malfunction that led to the release of over 500,000 pounds of pollutants, but the survey does not inform its Baytown respondents that they live near a plant that emitted over 1.25 million pounds of pollutants in 2009. *See* Docket Entry Nos. 38–4 at 21–22; 26–1 at 6. [13]

[13]    The survey also suffers from the opposite problem. After Simons began his survey, he added three new Houston zip codes within the Sam Houston Tollway/Belt 8 Loop, which do not share the same demographics or proximity to a refinery as the class area. See Docket Entry No. 75–1 at 5 (testimony from Simons that "it's important for the control group to have the attitudes of the people that live there that are accepting the petroleum"). Unlike the residents of Texas City, the residents of those zip codes did not already have proximity to a refinery factored into the purchase price of their home.

Second, and relatedly, a problem exists with respect to the survey's refinery scenario in which "PAHs were found in the air conditioning filter system." Docket Entry No. 38–5 at 31. Neither Simons nor Rosenfeld performed any testing of air conditioning systems in the control area to search for PAHs, thereby calling into question the study's results. Additionally, as BP's expert Dr. Goad explains, "PAHs are ubiquitous compounds that would be expected in 'detectable' levels in the community soils and in living space surface dust of homes," Docket Entry No. 39–1 at 22 (citing academic literature), meaning both that the respondents likely had PAHs in their air conditioners and that the existence of PAHs is not the disamenity that the survey makes it out to be. [14] Finally, the significance of the PAHs in air conditioning filters is questionable given that Dr. Rosenfeld did not identify BP as their source; indeed, vehicle exhaust, solvents, cleaning products, and cigarette smoke are common sources of PAHs. *Id.* at 21.

[14]    Along those same lines, it is doubtful that the refinery problems discussed in the survey scenario would have the same impact on actual property values as they do in the contingent valuation analysis because property purchaser do not have perfect information. Simons cites Item 6 of the Texas Seller's Disclosure of Property Condition, which requires a seller to disclose any "condition on the property which materially affects the physical health or safety of an individual." Docket Entry No. 38–5 at 82. But a review conducted by BP's expert Dr. Jackson shows that of the 49 publicly-available seller's disclosure forms for properties currently listed in the class area, none identified any reportable condition on their disclosure. Docket Entry No. 38–4 at 34.

**\*14**    Third, it is unclear how the contingent valuation analysis, standing alone, could calculate damages on a classwide basis. While the survey contained scenarios in which the refinery was half a mile from the hypothetical house and 1.75 miles away from the hypothetical house, the analysis does not explain how to calculate damages for houses that are other distances away from the refinery, including the houses of three of the five named Plaintiffs' and much of the putative class, which are located more than 1.75 miles away from the Refinery. Along those same lines, the survey fails to account for the fact the certain houses are more exposed to contamination based on their location in relation to the Refinery. Thus, if wind patterns point primarily to the north/northwest, a house a mile northwest of the plant may suffer different damages from a house a mile southeast of it. *See* Docket Entry No. 39–1 at 11 (discussing effects of meteorological conditions).

For these reasons, Simons's contingent valuation analysis is not a reliable or formulaic model to establish causation or calculate damages for the class. [15]

[15]    Simons also conducted a separate survey of putative class members. Regardless of that survey's reliability, it provides no support to Plaintiffs in terms of class certification and raises more questions than it answers. For instance, in response to the question, "Do you think emissions/ contamination from the BP Refinery has caused a change in your property values?" only 68% answered "yes." Docket Entry No. 38–5 at 34.

And only 62% indicated that contamination issues affected the use and enjoyment of their property. *Id.* at 34–35. Thus, the survey not only fails to provide a formulaic way to determine causation or damages for the class, but it also shows that such an endeavor may not be possible.

*6. Conclusion*

Based on the above, the Court concludes that Dr. Simons's testimony and reports fail to meet the standards propounded by *Daubert* and its progeny and are therefore inadmissible.

## IV. EFFECTS OF SIMONS'S EXCLUSION ON CLASS CERTIFICATION

As discussed in Part II, *supra,* a plaintiff seeking to certify a class must satisfy all four prerequisites of Rule 23(a)—numerosity, commonality, typicality, and adequacy—as well as one of the three conditions set forth in Rule 23(b). The Court need not address Plaintiffs' ability to meet the prerequisites of Rule 23(a), because, for the reasons set forth below, the Court finds that Plaintiffs are unable to satisfy Rule 23(b) without the testimony of Dr. Simons.

### A. Rule 23(b)(3): Predominance

A party seeking certification under Rule 23(b)(3) must show "both (1) that questions common to the class members predominate over questions affecting only individual members, and (2) that class resolution is superior to alternative methods for adjudication of the controversy." *Bell Atl. Corp. v. AT & T Corp.,* 339 F.3d 294, 301 (5th Cir.2003). The Court here will only focus on the predominance inquiry, which "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation" and is "far more demanding" that Rule 23(a)'s commonality requirement. *Unger v. Amedisys Inc.,* 401 F.3d 316, 320 (citation omitted).

The predominance hurdle "requires district courts to consider how a trial on the merits would be conducted if a class were certified." *Madison v. Chalmette Refining, L.L.C.,* 637 F.3d 551, 555 (5th Cir.2011) (citations and internal quotation marks omitted). "This, in turn, entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class, a process that ultimately prevents the class from degenerating into a series of individual trials." *Id.* (citations and internal quotation marks omitted). As a general rule, a "mass accident" is "not appropriate for a class action because of the likelihood that significant questions, not only of damages but of liability and defenses to liability, would be present, affecting the individuals in different ways," thus necessitating multiple, separately-tried lawsuits." Fed.R.Civ.P. 23(b)(3) advisory committee's note; *see also Steering Comm. v. Exxon Mobil Corp.,* 461 F.3d 598, 604 (5th Cir.2006) (finding that case involving an oil leak and a three-day fire did not have "any exceptional features that warrant departing from the general rule").

**\*15** Plaintiffs argue that they fall within the exception to the general rule because numerous common issues exist including the standard of care, BP's exercise of care, the quantity of the Refinery's emissions, the effects of BP's emissions on air quality in the class area, the effect of air pollution on property values, and whether liability for exemplary damages. Docket Entry No. 26 at 42–44. They illustrate their point by proposing a trial plan composed of the following four phases in which the jury or Court would consider: (1) common issues as to liability and individual issues, if any, as to causation and damages for the representative plaintiffs; (2) exemplary damages; (3) causation and damages issues for the absent class members, with the possibility of the Court creating subclasses; and (4) the calculation of punitive damages for the class as a whole based on the ration established in phase two. *Id.* at 27–29.

But Plaintiffs' trial plan—and their class theory as a whole—are highly dependent on Dr. Simons. They rely on Dr. Simons to (a) prove on a classwide basis that BP's wrongful conduct (through theories of negligence, nuisance, or trespass) caused a diminution in property value; and (b) calculate damages formulaically. *See id.* (proposing that at phase three plaintiffs would "present damages on a classwide basis, following the methodology of Dr. Simons"); Docket Entry No. 52 at 11, 13 ("The damages analysis will be done formulaically, by Dr. Simons's analysis."); Docket Entry No. 86 at 12 ("Dr. Simons has demonstrated that a common method of proof can be used to evaluate the diminution of property value caused by the proximity of a refinery which is poorly run." (emphasis omitted)); Docket Entry No. 87 at 3 (arguing that a regression model can provide evidence of causation).

Cannon v. BP Products North America, Inc., Not Reported in F.Supp.2d (2013)

2013 WL 5514284

Plaintiffs provide no alternatives to Simons's methodologies to prove causation or damages, and the Court cannot envision how a class action trial would operate without his testimony. Presumably, each of the roughly 14,300 putative Plaintiffs would have to prove damages by presenting appraisal figures before and after December 22, 2008 and would have to prove causation by presenting evidence the BP's wrongful conduct, and not some other source, caused the diminution in their property value. *See Steering Comm.,* 461 F.3d at 602 (noting that separate types of individualized proof would be necessary to prove property damage and devaluation stemming from an oil leak). As explained in *Steering Committee,* which involved only a single accident rather than years' worth of operations, chemical exposure is not straightforward or uniform. *Id.* at 603. If Plaintiffs' proved causation and damages for one plaintiff, they would still have to make the same proof for all the others.

Though individualized damages issues will not always preclude class certification, "where individual damages cannot be determined by reference to a mathematical or formulaic calculation, the damages issue may predominate over any common issues shared by the class." *Id.* at 602 (citations omitted); *see also Bell,* 339 F.3d at 306 (holding that "class certification is not appropriate" because plaintiffs "failed to demonstrate that the calculation of individualized actual economic damages, if any, suffered by the class members can be performed in accordance with the predominance requirement"); *O'Sullivan v. Countrywide Home Loans, Inc.,* 319 F.3d 732, 745 (5th Cir.2003) ("In light of the individual calculation of damages that is required, the district court abused its discretion in certifying [plaintiffs'] claims."); *Robertson v. Monsanto,* 287 F. App'x 354 (5th Cir.2008) (holding that individualized issues of causation and damages precluded certification and noting that "[a]lthough the alleged cause of the plaintiffs' injuries is a single incident ... each plaintiff still must show that [defendant's] negligence in causing the gas leak was proximately connected to the specific injuries complained of").

 **\*16** Accordingly, without the aid of Simons's testimony, Plaintiffs are unable to show that "the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed.R.Civ.P. 23(b)

(3). Thus, class certification under Rule 23(b)(3) is denied. [16]

[16] BP makes numerous arguments why Plaintiffs' fail the predominance inquiry independent of whether Simons's testimony is excluded. For instance, they argue that their affirmative defenses of preemption and limitations require individualized inquiries; that each of the 70+ emissions events presents individual liability issues because each event affected each property differently; that the nuisance claim requires individualized proof of substantial interference with the use of property; and that a certified class would be overwhelmed by subgroups based on such things as proximity to the plant and property type. Given the Court's broader finding that Simons's analysis is unreliable, it need not decide the specific issues.

**B. Rule 23(b)(1) and (b)(2)**

Plaintiffs also argue that they meet the conditions for certification articulated in Rule 23(b)(1) and (b)(2). Indeed, a plaintiff need only satisfy one of the three conditions of Rule 23(b) in order to obtain certification. Nonetheless, for the reasons below, the Court does not find certification to be appropriate under (b)(1) or (b)(2).

Rule 23(b)(1) applies when separate actions by individual class members would create a risk of "establish[ing] incompatible standards of conduct for the party opposing the class," or where individual adjudication "as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests." Fed.R.Civ.P. 23(b)(1). Rule 23(b)(2) applies when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed.R.Civ.P. 23(b)(2). "Classes certified under (b)(1) and (b)(2) share the most traditional justifications for class treatment—that individual adjudications would be impossible or unworkable as in a(b)(1) class, or that relief sought must perforce affect the entire class at once, as in a(b)(2) class." *Wal–Mart Stores, Inc. v. Dukes,* —— U.S. ——, ——, 131 S.Ct. 2541,

Cannon v. BP Products North America, Inc., Not Reported in F.Supp.2d (2013)
2013 WL 5514284

2558, 180 L.Ed.2d 374 (2011). Rule 23(b)(1) and (b)(2) are framed for situations in which class treatment is more clearly called for than in (b)(3) situations, and, accordingly, do not provide the same protections as a(b)(3), such as the opportunity to opt out or notice of the action. *Id.* (citations omitted).

Plaintiffs' justification for certification under (b)(1) and (b)(2) are both based on the fact that they are seeking an injunction that would require BP to change the operation of its Ultracracker Flare. *See* Docket Entry No. 26 at 37–40. [17]

[17] Specifically, Plaintiffs' amended complaint seeks an injunction: (1) requiring BP to calibrate all flowmeters and to conduct a relative accuracy test audit on the gas chromometer associated with the ULC Flare; (2) requiring BP to implement and enforce a policy on proper steam to gas ratios for operation of the ULC Flare; (3) requiring BP to test the ULC Flare after those steps have been completed to ensure that BP is actually operating the ULC Flare in such a manner as to actually achieve 98% destruction efficiency; and (4) prohibiting BP from using the ULC Flare unless and until the previous three steps have been completed, and thus that BP can demonstrate that the ULC Flare can be operated at a 98% destruction efficiency. Docket Entry No. 49 at 16.

Plaintiffs' arguments fail for two reasons. First, the injunctive relief upon which Plaintiffs base their arguments no longer appears to be part of this case. BP sold the Texas City Refinery to Marathon Petroleum Corporation on February 1, 2013. Since BP no longer owns the Refinery, it clearly would not be able to implement changes to the Ultracracker Flare there. Thus, as Plaintiffs' counsel recognized at the class certification hearing, "at least on the current state of the pleadings, that moots [Plaintiffs' request for] injunctive relief." Docket Entry No. 75 at 7.

Second, even if the injunction were still part of the relief Plaintiffs seek, certification would still be inappropriate under (b)(1) and (b)(2) because the individualized monetary relief that Plaintiffs seek is not merely "incidental to the injunctive or declaratory relief," as required by the case law interpreting Rule 23(b). *Wal–Mart,* 131 S.Ct. at 2557 ("[A]t a minimum, claims for individualized relief ... do not satisfy [ Rule 23(b)(2) ]." (emphasis omitted)); *see*

*also Allison v. Citgo Petroleum Corp.,* 151 F.3d 402, 415 (5th Cir.1998) ("[M]onetary relief predominates in (b)(2) class actions unless it is incidental to requested injunctive or declaratory relief." (citation omitted)); *Altier v. Worley Catastrophe Response, LLC,* 2011 WL 3205229, at *14–15 (applying *Wal–Mart* and *Allison* in the context of Rule 23(b)(1) and collecting cases). [18]

[18] Though *Wal–Mart* and *Allison* are specific to Rule 23(b)(2), their reasoning applies with equal force to Rule 23(b)(1) because both Rules contain the same due process concerns for a mandatory class. *See Wal–Mart,* 131 S.Ct. at 2558–59 (explaining that "individualized monetary claims belong in Rule 23(b)(3)" due to the procedural protections attending the (b)(3) class including predominance, superiority, mandatory notice, and the right to opt out).

**\*17** The Fifth Circuit has defined incidental damages as those "that flow directly from liability to the class as a whole on the claims forming the basis of the injunctive or declaratory relief." *Allison,* 151 F.3d at 415 (citing statutorily mandated awards as an example of incidental damages). The damages should "not [be] dependent in any significant way on the intangible, subjective differences of each class member's circumstances." *Id.*

Because each of the putative Plaintiffs seeks individualized damages for property value diminution—which vary significantly from plaintiff to plaintiff and do not flow directly from their request for injunctive relief—the Court determines that Plaintiffs fail to meet the requirements of certification under Rule 23(b)(1) and (b)(2) as propounded in *Wal–Mart* and *Allison.*

**V. Conclusion**

For the reasons discussed above, the Court rules that:

- BP's Motion to Exclude Proposed Expert Testimony of Dr. Robert A. Simons (Docket Entry No. 36) is **GRANTED;**

- Plaintiffs' Motion for Class Certification (Docket Entry No. 26) is **DENIED;** and

2013 WL 5514284

- BP's Motion to Exclude Proposed Expert Testimony of Dr. Paul Rosenfeld (Docket Entry No. 35) is **DENIED** as moot.

The Court will set a conference to discuss how the case shall proceed.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 5514284

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

# **Tab 5**

Cotromano v. United Technologies Corporation, Not Reported in Fed. Supp. (2018)

2018 WL 2047468

2018 WL 2047468
Only the Westlaw citation is currently available.
United States District Court, S.D. Florida.

Richard COTROMANO et al., Plaintiffs,
v.
UNITED TECHNOLOGIES CORPORATION
and Palm Beach Aggregates, LLC, Defendants.
Joseph Adinolfe etc., et al., Plaintiffs,
v.
United Technologies Corporation, Defendant.

Case No. 13-80928-Civ-Marra,
Case No. 10-80840-Civ-Marra
|
Signed 05/02/2018

**Attorneys and Law Firms**

Darren Robert Latham, John Scarola, Mara Ritchie Poncy Hatfield, Searcy Denney Scarola Barnhart & Shipley, P.A., West Palm Beach, FL, Bryan Scott Gowdy, Creed & Gowdy, P.A., Jacksonville, FL, Jeffrey Louis Haberman, Schlesinger Law Offices, Steven Jeffrey Hammer, Fort Lauderdale, FL, for Plaintiffs.

Andrew C. MacNally, Daniel R. McElroy, Alex Groden, Sean Gallagher, Bartlit Beck Herman Palenchar & Scott, LLP, Chicago, IL, Fabienne Elizabeth Fahnestock, Heather Carney Costanzo, Gunster Yoakley & Stewart PA, Fort Lauderdale, FL, Gerard Joseph Curley, Jr., Gregor J. Schwinghammer, Jr., Gunster Yoakley & Stewart, West Palm Beach, FL, Stephen James Rapp, Weinberg Wheeler Hudgins Gunn & Dial, Atlanta, GA, for Defendants.

**OPINION MEMORANDUM AND ORDER DENYING PLAINTIFFS' MOTION TO CERTIFY LITIGATION CLASS AS AGAINST DEFENDANT UNITED TECHNOLOGIES CORPORATION [DE 265]**

**and**

**DENYING PLAINTIFFS AND DEFENDANT PALM BEACH AGGREGATES, LLC'S JOINT MOTION TO CERTIFY SETTLEMENT CLASS AS AGAINST DEFENDANT PALM BEACH AGGREGATES, LLC [DE 253]**

KENNETH A. MARRA, United States District Judge

**\*1** **THIS CAUSE** is before the Court on the Plaintiffs' Joint Motion for Class Certification as against Defendant United Technologies Corporation [DE 265]. [1] Defendant United Technologies Corporation ("UTC") filed a Response in Opposition to the Motion [DE 320] and Plaintiffs filed a Reply [DE 330]. Each side has moved to exclude the others' experts pursuant to Rule 702 of the Federal Rules of Evidence and Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L.Ed.2d 469 (1993) and those motions are also pending [DE 236-248, 251, 277, 279]. The Court held a five-day evidentiary hearing on all relevant motions from January 8-12, 2018. The parties have since submitted written summations and proposed findings of fact and conclusions of law [DE 425, 426-1, 427-1, 428]. Having reviewed the Plaintiffs' Consolidated Class Action Complaint [DE 318] ("Compl."), the parties' class certification briefs, voluminous evidentiary submissions [DE 255-264; 284-285; 319; 363-367; 368-374, 394, 405, 419-424] expert reports, and the relevant law, the Court rules as follows.

[1]     Also before the Court is the Plaintiffs and Defendant Palm Beach Aggregates, LLC [PBA]'s joint motion to certify a settlement class as to Defendant Palm Beach Aggregates [DE 253], Defendant United Technologies Response in Opposition to the Motion [DE 321] and Plaintiffs' and PBA's Replies [DE 327, 331]. The Court previously directed that the class certification issues presented by both motions would be determined simultaneously, following a single evidentiary proceeding [DE 349], and now proceeds to determine both motions.

### I. Preface

Plaintiffs are five married couples and two individuals who own property in a semi-rural residential community in western Palm Beach County known as "the Acreage." They filed this putative class action against United Technologies Corporation ("UTC"), Pratt & Whitney Group ("Pratt & Whitney"), the owner of a rocket and aerospace testing and manufacturing plant located between five to fifteen miles north of the Plaintiffs' properties. Plaintiffs allege Pratt &

Case 4:17-cv-02960    Document 294-1    Filed 02/07/22 in TXSD    Page 130 of 179

Cotromano v. United Technologies Corporation, Not Reported in Fed. Supp. (2018)

2018 WL 2047468

Whitney released toxic contaminants into the air, water and soil at the Pratt & Whitney plant and in the communities surrounding the plant, and that some of the contaminants migrated to the Acreage via groundwater or soil transport. They claim their properties are either contaminated, at risk of future contamination, or in proximity to contaminated property as a result of Pratt & Whitney's environmental abuses, and that they have suffered a loss of use and enjoyment of their property, as well as a diminution in property values, as a result. [2]

[2]    Ten of the putative class representatives in this case are also individual plaintiffs in separate personal injury lawsuits alleging that certain family members residing in their homes developed brain tumors or other cancers as a result of exposure to contaminants allegedly released to the Acreage by Pratt & Whitney. *Pinares v. United Technology Corporation,* Case No. 10-80883-CIV-MARRA (consolidated action). In their capacity as putative class representatives in the above-styled proceeding, Plaintiffs do not allege that any putative class members have suffered health problems or personal injury from the alleged contamination.

**\*2**  In earlier proceedings before the Honorable Judge Kenneth L. Ryskamp, to whom this action was originally assigned, Plaintiffs' claims were dismissed due to insufficient evidence of class-wide actual contamination and causation. The Eleventh Circuit reversed and reinstated the claims, *Adinolfe v. United Technologies Corp. d/b/a Pratt & Whitney,* 768 F.3d 1161 (11th Cir. 2014). Following remand and reassignment to the undersigned, the putative class representatives filed a joint consolidated class action complaint [DE 318] and moved for class certification [DE 265]. For reasons set forth below, the Plaintiffs' motion for class certification is denied.

## II. Fact Background [3]

[3]    Except as otherwise noted (by reference to allegations, or disputed expert fact findings or interpretation of those findings), the facts recited in this history are undisputed and are drawn from the complaint, expert affidavits, hearing testimony and other evidence submitted by the parties in

connection with the pending class certification and *Daubert* motions. The facts recited here are provided as explanatory background to the issues framed by the current motion for class certification and relevant *Daubert* determinations, and are not conclusive or binding in any other context.

Since 1957, Pratt & Whitney has continuously operated rocket and aerospace testing and manufacturing facilities on a 30-square-mile property in rural western Palm Beach County. It has done business at this location as the Pratt & Whitney Government Engine Business Division, the Pratt & Whitney Aircraft Florida Research and Development Center, and Pratt & Whitney Rocketdyne. To support these operations, UTC constructed a system of canals, ponds, above and below ground tanks, pipelines, cooling towers and test stands. The southern edge of Pratt & Whitney's property is contiguous to a 25-square-mile parcel known as the J.W. Corbett Wildlife Management Area ("Corbett Wildlife Area"). The Corbett Wildlife Area, in turn, abuts the northernmost edge of the residential community known as "the Acreage."

According to Plaintiffs, Pratt & Whitney's manufacturing activities caused the release of vast quantities of toxins, contaminants, carcinogens and other hazardous wastes—collectively referred to as Chemical Contaminants of Concern ("CCOCs")—into the air, groundwater and soil at and near its Palm Beach County Campus. This allegedly resulted in migration of CCOCs to the Acreage by way of a shared permeable aquifer, and by way of ground transport of contaminated soil allegedly dumped at the Acreage for landfill. [4]

[4]    In the early 1990s, UTC began shipping tons of soil from its Pratt & Whitney campus to soil recycling companies. This process continued for roughly ten years and involved the removal of over 50,000 tons of soil. The bulk of the soil was shipped by rail to a treatment facility in Michigan, while the remainder was slated for shipment by truck to thermal treatment centers in West Palm Beach and Pompano Beach, Florida. Plaintiffs allege that many of the Florida soil transports were either not properly treated, or were diverted from the soil treatment recycling facilities and instead delivered directly to landfills. In this fashion, Plaintiffs allege there is a "possibility" that some soil removed from Pratt & Whitney's campus ended up, untreated, as residential landfill at the Acreage.

Case 4:17-cv-02960 Document 294-1 Filed 02/07/22 in TXSD Page 131 of 179
Cotromano v. United Technologies Corporation, Not Reported in Fed. Supp. (2018)
2018 WL 2047468

Due to concerns about on-site contamination with radionuclides and other contaminants, the United States Environmental Agency ("EPA") designated the Pratt & Whitney property as a potential Superfund site in the 1980s and placed it on the EPA National Priorities List.[5] Ultimately, UTC, through its consultant, Dames & Moore, negotiated a remediation plan with the Florida Department of Environmental Regulation, allowing it to conduct remediation at its Pratt & Whitney Campus with limited EPA oversight and without formal designation as an EPA "Superfund" site. Plaintiffs contend these remediation efforts came too late, after the shared aquifer had already been heavily contaminated, and that Pratt & Whitney's remediation work did not stop contaminated groundwater from escaping and traveling to the Acreage (Compl. ¶¶ 46, 49).

[5] The EPA determined that the Pratt & Whitney Camus met the criteria for Superfund designation in accordance with the provisions of the Comprehensive Environmental Response, Compensation. Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601-9657, as amended by the Superfund Amendments and Reauthorization Act of 1986. The Superfund "national priorities list" is a national list of facilities throughout the United States known to have released hazardous substances. Using established criteria, the EPA sets priorities for taking remedial response actions at Superfund sites, including investigation and clean-up of hazardous materials.

**\*3** In June 2009, the Florida Department of Health (FDOH) began investigating the incidence of pediatric cancer cases in the Acreage at request of a concerned parent whose six-year-old son had recently been diagnosed with a brain tumor. On February 1, 2010, at the completion of its investigation, the FDOH reported pediatric brain tumors diagnosed in the Acreage to be significantly escalated for years 2005-2007, leading the Palm Beach County Health Department to designate a section of the Acreage as a "cancer cluster" [Compl. ¶ 75]. Shortly after, the Center for Disease Control (CDC) confirmed the escalation and added 2008 pediatric diagnoses to the cluster [Compl. ¶¶ 25-26].

The FDOH investigation triggered a multi-agency inquiry into environmental contamination in the area. The Federal Housing Administration imposed a warning advising appraisers that the state-declared cancer cluster may be harming home values in the central Palm Beach County

residential community known as the Acreage. The Florida Department of Environmental Protection also stepped in, but, after several years of extensive on-site testing, concluded there was no reason for concern about environmental conditions in the Acreage: It announced, in its August 2010 public report, that "[t]he water qualify in the Acreage is generally good and residential property in The Acreage is safe for families to enjoy outside activities in their yards...." It noted "no risk factors were found associated to pediatric brain cancer," leading the FDOH to cease its investigation with no finding on causation of the cancer cluster. Plaintiffs contend this lapse is attributable to FDOH's use of incomplete data, failure to assess local polluters, agency bias and improper influence of a county engineer [Compl. ¶ 36].

It is undisputed that the soil and groundwater at the Pratt & Whitney Campus were contaminated when CCOCs seeped into the soil and groundwater over the course of Defendant's operations at the site. It is also undisputed that some of these contaminants migrated to the adjacent Corbett Wildlife Area, as evidenced by an underground plume of I, 4-dioxane originating at the Pratt & Whitney site and extending 1000 feet into the Corbett Wildlife Area. At issue in this case is whether contaminants released by Pratt & Whitney also migrated to or near the Acreage, by way of groundwater or soil transport, creating health risks for Acreage inhabitants and environmental stigma which has damaged their property values.

### Groundwater Transport

Pratt & Whitney's Palm Beach County Campus, the Corbett Wildlife Area, and the Acreage are underlain by and share a common underground aquifer. A groundwater "ridge" bisects the Pratt & Whitney campus and the Corbett Wildlife Area to the south. Groundwater from the eastern portion of the Pratt & Whitney site flows east and southeast, and groundwater from the western half of the site flows west and southwest. The experts' groundwater models, including the one prepared by Plaintiffs' expert, Daniel Stephens, show a narrow band in the center of the Pratt & Whitney property, described as a "preferred pathway," where groundwater could potentially flow from Pratt & Whitney toward the proposed class area.

The parties disagree as to whether groundwater velocity in this area is capable of carrying groundwater from Pratt & Whitney's site to the northern edge of the proposed class area in the relevant time period. Plaintiffs' hydrogeologists,

Cotromano v. United Technologies Corporation, Not Reported in Fed. Supp. (2018)
2018 WL 2047468

Philip Bedient and Daniel Stephens, opined this is feasible, via the "preferential pathway," and that contaminants from the aquifer underlying Pratt & Whitney could have, within a reasonable degree of probability, migrated to the Acreage via this pathway. The Defendant's hydrogeologist expert, Thomas Missimer, came to the opposite conclusion, opining that any contaminants found in groundwater at the Pratt and &Whitney facility would have attenuated by natural processes to the point of being undetectable before reaching the proposed class area.

### Off-Site Contamination

 *4  It is undisputed, as noted above, that an I, 4-dioxane underground plume migrated offsite from the Pratt & Whitney site, approximately 1,000 feet into the Corbett Wildlife Area. It is also undisputed that high concentrations of I, 4-dioxane have been detected in groundwater at the Pratt & Whitney site. In the Acreage, however, the FDEP detected I, 4-dioxane at only four of over 100 locations tested in the northern part of the proposed class area, and these detections were classified as "I" results below the "practical quantification limit" for the lab, meaning the amounts were too small to measure accurately. The Defendant disputes whether these detections are attributable to Pratt & Whitney operations.

Plaintiffs' experts also detected, based on independent test well drilling in the Acreage, the presence of methylene chloride, chloroform, bromodichloromethane, 1-4-dioxane, dioxins and furans. Plaintiffs' expert geologist, Brian Moore, attributes the presence of these chemicals in the Acreage to Pratt & Whitney operations. Moore explains that UTC's operations are known to involve carbon tetrachloride, which undergoes anaerobic microbial degradation to become chloroform, which in turn undergoes anaerobic microbial degradation to become methylene chloride. His opinion tethering these chemicals to Pratt & Whitney also derives from UTC's self-report of significant levels of chloroform, methylene chloride and bromodichloromethane in its monitoring wells, as well as high concentrations of I, 4-dioxane in its groundwater. UTC contests the admissibility of Moore's expert testimony connecting the detection of these materials to Pratt & Whitney activities.

Brian Moore also testified to detections of dioxin and furans in the groundwater at seven locations in the proposed class area, again attributing the presence of these materials to Pratt

& Whitney operations. Defendant challenges the reliability of Moore's physical findings and migration opinions—questioning lab accreditation and lab contamination issues attending the testing and criticizing Moore's failure to consider alternative sources for the Acreage detections.

### Soil Transport

The defense hydrogeologist, Thomas Missimer, testified that surface or groundwater transport of radioactive materials to the proposed class area is not possible. Plaintiffs do not identify any competing expert testimony on this issue.

Plaintiffs do focus on soil transport as the likely migration path of radioactive contaminants. Plaintiffs contend that untreated, contaminated soil removed from the Pratt & Whitney site was diverted from delivery to designated soil recycling plants in South Florida and instead trucked directly into the Acreage where it was used, untreated, as residential landfill; [6] in this manner, Plaintiffs contend that radioactive materials originating with Pratt & Whitney were introduced into the Acreage environment, where residuals relating to Acreage drinking water systems later showed "shockingly high levels of radioactive isotopes" at some homes.

[6]     Plaintiffs adduce a chain of circumstantial evidence suggesting this sequence. They point to records from the Magnum treatment facility, showing it was not receiving and treating the same amount of soil that UTC purported to have shipped there, and showing it did not treat all soil delivered to it. Combined with evidence of liens for soil deliveries by relevant trucking companies, and Tru-Trucking bookkeeper testimony that soil removed from Pratt & Whitney was not always delivered to Magnum, together with soil contamination test results within the Acreage, Plaintiffs adduce that contaminated soil from UTC found its way directly to the Acreage for use as residential landfill.

 *5  Plaintiffs' environmental radioactivity expert, civil engineer Marco Kaltofen, found elevated levels of several radioactive materials (comparable to those found at the UTC site) in several of the Acreage test home yards and in soils where the water systems backflush at those properties. Some of these homes were identified as potential recipients of fill products from Tru Trucking, one of the ground transport companies used by Pratt & Whitney to remove soil from

Cotromano v. United Technologies Corporation, Not Reported in Fed. Supp. (2018)
2018 WL 2047468

its Palm Beach County Campus during the 1990s. Sporadic testing by Kaltofen in the proposed class area revealed detections of naturally-occurring radioactive materials such as Uranium and Thorium-230, and man-made materials such as Cesium-137 and Strontium-90.

Kaltofen found detections of Thorium isotopes in some locations at above-background levels (without identifying the range of expected levels or reporting a mean for thorium detections above expected background concentrations),[7] in addition to detections of Radium-226 and Lead-210 found at above background levels. He correlated these detections to materials used at the UTC site, and by comparing characteristics of offsite and onsite samples using a microscopic analysis procedure called "SEM."[8]

[7]    As to Thorium-232, UTC acknowledges this material was also used in Pratt & Whitney's manufacturing operations, but disputes there is competent evidence linking Pratt & Whitney to the detections of this material found in the Acreage. It acknowledges this material was used in the form of thoriated nickel to manufacture a small quantity of engine parts (bound in a metal alloy resistant to corrosion) at its plant, but states that it disposed of thoriated nickel scrap and various remnants in or near its scrapyard, which was later remediated with the removal and shipment of toxic materials to a facility licensed to accept radioactive waste. Plaintiffs contend that thorium-inclusive alloys such as TD Nickel and TD Cobalt were used in its nuclear jet program, and question the efficacy of the alleged remediation efforts.

[8]    UTC challenges the reliability of these conclusions, noting other explanations for Kaltofen's high findings, and also challenges Kaltofen's expert opinion identifying Pratt & Whitney as the likely source of radionuclides detected at the Acreage. It contends there are several known alternative sources of man-made and naturally occurring radioactive materials detected in the proposed class area which were not considered by Kaltofen. For example, it notes man-made radionuclides are present around the world, at background levels, as a result of fallout from nuclear weapons testing and other large scale nuclear events. It also notes that natural radioactive materials are present throughout the environment, observing their presence can

be enhanced through mining operations such as those conducted by co-defendant Palm Beach Aggregates. Palm Beach Aggregates is located directly adjacent to the western edge of the proposed class area and was also a major source "fill" at Pratt & Whitney and in the construction of homes in the proposed class area.

Kaltofen tested for Strontium-90 in fifty soil samples, tabulated in his direct testimony affidavit [DE 363-1 pp. 10-11]. He explained that the sampling areas primarily encompassed case homes (homes included in the FDOH cancer cluster investigation), Pratt & Whitney site locations, in addition to six samples taken at Acreage homes identified as recipients of Tru Truck landfill deliveries. He found elevated Strontium-90 detections highest at the UTC campus, at Acreage homes closest to the UTC campus, and in Acreage homes that received Tru Trucking landfill, and noted that several of these detections were found in samples taken at different times and run by separate lab reports.

 *6  Kaltofen acknowledged that radioactive contamination could not be shown in a representative distribution across the proposed class area, and his Acreage samples were simply a presentation of a "particular mode of contamination spread." Drawing from the results of his limited sampling areas, he ultimately correlated the presence of radioactive materials (other than Strontium-90 and Cesium-137) detected in the Acreage to materials found in UTC operations, by comparing characteristics of onsite and offsite samples and by comparing metals present in samples through microscopic analysis.

Defendant acknowledges some documented uses of Cesium-137 and Strontium-90 at Pratt & Whitney, but contends there is only evidence of use of small quantities maintained in "closed sources," with no evidence that these materials were used at the site in an "uncontrolled fashion" that would allow them to be released into the environment. Kaltofen agrees that closed sources could not be a source of radioactive contaminants, assuming closed sources were used; he also acknowledges that the presence of Cesium-137 and Strontium-90 from something other than sealed sources would require nuclear fission, through means such as the operation of a nuclear reactor or detonation of a nuclear bomb, and that these materials could only be present in the amounts he detected if such fission-producing work occurred at the Pratt & Whitney site.[9] With no specific evidence of either event ever occurring at the Pratt & Whitney site, Kaltofen offered no opinion as to source of Cesium-137 or Strontium-90 detections specifically.

Case 4:17-cv-02960    Document 294-1    Filed 02/07/22 in TXSD    Page 134 of 179

Cotromano v. United Technologies Corporation, Not Reported in Fed. Supp. (2018)

2018 WL 2047468

9 Plaintiffs allude to the possibility that Pratt & Whitney developed nuclear aircraft propulsion at its Palm Beach County Campus. They refer to a Pratt & Whitney memorandum recently made available to them by the U.S. Energy Department, which mandates that any documentation regarding use or performance of nuclear material at its site remain classified. If the import of this reference is to intimate fission-producing activity may have occurred at the Pratt & Whitney site, but is unknown due to security interests, the intimation is speculative and assigned no weight in the Court's current analysis.

### III. Procedural Posture

#### A. The Consolidated Class Action Complaint

In its present incarnation, the Plaintiffs' Joint Consolidated Class Action Complaint [DE 318] alleges state-law causes of action against UTC for strict liability (Counts 1–3), [10] negligence (Counts 4-5), [11] and nuisance (Count 6), [12] as well as a federal claim for nuclear incident liability under the Price-Anderson Act (Count 7). [13]

10 The common law strict liability claim is based on the ultra-hazardous activity of test-firing rocket engines and jet engines on test stands using chemicals which create ultra-hazardous CCOCs (Count 1). The statutory strict liability claim is asserted under Sec. 376.313 (3), Fla. Stat., which authorizes "any person" to recover "all damages resulting from a discharge or other condition of pollution." On the statutory strict liability claims, Plaintiffs seek compensatory damages for injury due to "stigma" caused by the "groundwater plume" detected under the Corbett property (Count 2) and the "stigma" caused by contamination found by state investigatory agencies at Acreage case study homes included in the cancer cluster study, including benzopyrene and various heavy metals (lead, cadmium and barium) (Count 3).

11 The common law negligence claim is based on the failure to use reasonable care in the use, storage, discharge and disposal of CCOCs at the UTC campus, and violation of statutory duties of care imposed by Florida Air and Water Pollution Control Act and Water Quality Assurance Act. Plaintiffs allege injury due to "stigma" caused by the groundwater plume (Count 4) and stigma caused by contamination of Acreage homes included in the cancer cluster investigation (Count 5).

12 The common law nuisance claim is based on Pratt & Whitney's alleged improper storage use and disposal of CCOCs at the Pratt & Whitney Palm Beach County campus, resulting in the release and migration of contaminants by air and groundwater into Acreage neighborhoods. These acts allegedly caused a disturbance in Plaintiffs' free use, possession and enjoyment of their property (e.g. inability to fully use wells; fear and anxiety over exposure to and ingestion of well water drawn from contaminated aquifer; reliance on bottled water and water purification systems) (Count 6).

13 The Price-Anderson Act claim is based on Pratt & Whitney's alleged failure to follow applicable regulations promulgated under the statute, including 10 C.F.R.¶ 20.1301, and its unpermitted uses, burial, burning and dumping of nuclear source and by-product materials (Count 7). Plaintiffs claim these acts caused radionuclides to be leached or emitted into ground and surface waters which eventually migrated to Acreage. On this claim, Plaintiffs seek compensatory damages for injury due to contamination of certain Acreage homes with radioactive materials released by UTC as a result of unauthorized use and disposal of licensed nuclear by-product or source materials, and damages flowing from the "stigma" of living in a community where radioactive materials, migrating from a nearby industrial neighborhood, have been detected at above-background levels.

**\*7** Plaintiffs allege that UTC'S mishandling and improper disposal of CCOCs directly and proximately caused (1) contamination of a shared aquifer relied on by well-water reliant Acreage residents for activities of daily living; (2) widespread public concerns that it is unsafe to reside in the Acreage due to contamination of the shared aquifer; (3) localized areas of contamination at select locations

Cotromano v. United Technologies Corporation, Not Reported in Fed. Supp. (2018)

2018 WL 2047468

within the Acreage, and (4) diminution of property values across the Acreage as a result of environmental stigma and contamination at the UTC site and surrounding areas attributable to UTC [Compl. ¶ 50].

### B. The Proposed Class, Class Area, Class Representatives

The Plaintiffs propose a 60-square-mile class area which they describe as a "well-defined, homogenous, semi-rural predominantly residential neighborhood in Palm Beach County, Florida" commonly known as the "Acreage." This area contains 17,409 residential parcels, 14,509 of which are improved and 2,900 of which are vacant [DE 24-4 p. 10-11] [DE 258-6].

The proposed class they seek to certify consists of:

> All persons who, on August 24, 2009 (or alternatively on February 1, 2010) owned residential property within the neighborhood in Palm Beach County, Florida, known as The Acreage, as defined on the map attached directly to this motion as Exhibit A (or alternatively on the map attached directly to this motion as Exhibit B). [14]

[14] Plaintiffs' alternative proposed class, shown on the Ex. B map, is a slightly smaller area consisting of 15,663 parcels in the Acreage. This area corresponds with the cancer cluster identified by the Florida Department of Health and the definition originally proposed by the *Cotromano* plaintiffs in their Second Amended Complaint [DE 79 p. 5, DOH Report 10, p. 23-24)].

Plaintiffs contend that either alternative definition of the proposed class meets the requirements of Rule 23(a) and Rule 23(b)(3). With this proposed definition, Plaintiffs presumably seek to show that persons owning property found within either of these metes and bounds map descriptions have suffered a common injury by virtue of "being in the vicinity of, or being under the future threat of [environmental] contamination" caused by Pratt & Whitney [DE 265, p. 12].

The putative class representatives in *Cotromano* are five married couples who own or owned residential properties in the Acreage, all of whom have a child that was declared to be a member of the pediatric brain tumor cluster designated by the Florida Department of Health. [15] In *Adinolfe*, the proposed class representatives are two individual property owners, Joseph Adinolfe and Kay Samson, who claim a diminution in value of their property as a result of environmental stigma caused by UTC which clouds their property.

[15] The named plaintiffs in this group include: Richard and Bethany Cotromano (76th Road); Frank and Paulette DeCarlo (80th Lane North); Joyce and Bill Featherson (80th Lane North); Gregory and Jennifer Dunsford (85th St. North); Robert and Tracy Newfield (Banyan Blvd). The Dunsfords and Cotromanos sold their homes at a short sale after the FDOH included their homes in the pediatric brain tumor cluster declared in February 2010; the Feathersons lost their property in a foreclosure action after losing their child, Michael Beratta, to cancer.

Pratt & Whitney argues that class certification is inappropriate because the putative class representatives' claims are not typical of all injuries of the proposed absent class members (who are not claiming personal injury). They also object that the proposed class area is overbroad and insufficiently defined, without reference to a common injury from a common cause, and is therefore not "ascertainable." Defendant's primary objection, however, goes to the predominance and superiority requirements of Rule 23(b)(3). It asserts that individual issues touching on the measure of damages, the causation of each class member's damage, and defenses to be raised against such claims (e.g. statute of limitations) predominate over any common issues that exist. It also contends that Plaintiffs' mass appraisal technique for assessing property damage is not a valid formulaic or mathematical method that would be appropriate for a class action under the facts of this case. Finally, Defendant asserts that a class action is not a superior vehicle for adjudication of Plaintiffs' claims because absent class members have a strong interest in controlling their own claims, which are significant.

**\*8** As noted, the Court held a lengthy evidentiary hearing on the Plaintiffs' Motion for Class Certification from January 8, 2018 through January 12, 2018. In the wake of that hearing,

Case 4:17-cv-02960 Document 294-1 Filed 02/07/22 in TXSD Page 136 of 179

Cotromano v. United Technologies Corporation, Not Reported in Fed. Supp. (2018)
2018 WL 2047468

the Court directed both sides to submit written summations, in addition to proposed findings of fact and conclusions of law. The purpose of this post-hearing supplementary briefing was to provide an opportunity for the parties to streamline their arguments, and to designate specific exhibits and specific portions of the relevant depositions or live testimony they wish to be considered in support of or in opposition to the class certification motion. The parties have since submitted supplemental briefing, which to a limited degree, furthers this objective, and Plaintiffs' motion for class certification is now properly before the Court for disposition.

When an expert's report or testimony is "critical" to class certification, the court is bound to make a conclusive ruling on any *Daubert* challenge to that expert's qualifications or submissions before it may rule on a motion for class certification. *Sher v. Raytheon Co.*, 419 Fed. Appx. 887 (11th Cir. 2011) citing *American Honda Motor Co. v. Allen*, 600 F.3d 813 (7th Cir. 2010). This obligation applies whether the Court grants or denies certification, requiring a *Daubert* ruling on any expert opinion which touches upon or issues critical to the Court's class certification decision. *Messner v. Northshore University HealthSystem*, 669 F.3d 802, 812-13 (7th Cir. 2012).

In this case, the Court focuses its analysis on Plaintiffs' proffered expert witness on class-wide damages, Dr. John Kilpatrick. Dr. Kilpatrick holds a Ph.D in Real Estate Finance and is a licensed certified real estate appraiser in all fifty states. Plaintiffs tender Kilpatrick in effort to demonstrate that damages in this putative class action, encompassing approximately 18,000 property owners, are susceptible to calculation on a class-wide, uniform basis throughout the proposed class area by application of "mass appraisal" methodology. Because Kilpatrick's testimony is critical to the elements of commonality and predominance under Rule 23(b)(3), the Court must examine his opinion testimony to determine whether the underlying methodology shows some hallmarks of reliability for purpose of ruling on the threshold *Daubert* challenge to it. *See generally In re Polypropylene Carpet Antitrust Litigation,* 996 F. Supp. 18, 26 (N.D. Ga. 1997).

Having done so, relying in part on the critique of Kilpatrick's methodology proffered by defense rebuttal expert, John Hauser, Sc.D., the Court finds Dr. Kilpatrick's opinions on class-wide diminution in value calculations does not satisfy *Daubert* and is appropriately excluded under application of

Rule 702. Without Kilpatrick's testimony, [16] Plaintiffs cannot satisfy the predominance and superiority requirements of Rule 23(b)(3), as discussed in more detail below, and cannot carry their burden of proof under Rule 23, compelling defeat of their motion for class certification.

[16] Because elimination of Kilpatrick defeats the class certification motion, it is unnecessary for Court to address the numerous *Daubert* motions directed to the liability and causation experts on both sides at this juncture.

## IV. ANALYSIS—RULE 23 CLASS CERTIFICATION ISSUES

### A. Rule 23(a) Standard

Class actions are an exception to the rule that litigation is ordinarily conducted on behalf of individually named parties. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011). To obtain class certification, parties must satisfy Rule 23(a)'s four threshold requirements, as well as the requirements of Rule 23 (b) (1), (2) or (3). *Maldonado v. Ochsner Clinic Foundation*, 493 F.3d 521, 523 (5th Cir. 2007).

Rule 23(a) sets forth the following prerequisites for class certification:

(1) the class is so numerous that joinder of all members is impracticable;

**\*9** (2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the proposed class members and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23 (a). *See Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*, 350 F.3d 1181, 1188 n. 15 (11th Cir. 2003); *Brown v. Electrolux Home Products, Inc.,* 817 F.3d 1225, 1233 (11th Cir. 2016).

Cotromano v. United Technologies Corporation, Not Reported in Fed. Supp. (2018)
2018 WL 2047468

A district court is obligated to undertake a "rigorous analysis" to ensure that all requirements of Rule 23(a) are met, *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 131 S. Ct. 2451, 2551, 180 L Ed.2d 374 (2011), and to resolve all conflicts in the evidence necessary to make the requisite findings on the elements set forth in Rule 23. *Comcast Corp. v. Behrend,* 569 U.S. 27, 133 S. Ct. 1426, 1432, 185 L.Ed. 2d 515 (2013).

In addition to the Rule 23(a) requirements, parties seeking class certification must show the proposed class is "adequately defined and clearly ascertainable" in order to demonstrate standing, *Prado-Steiman v. Bush,* 221 F.3d 1266, 1279 (11th Cir. 2000); *Carriuolo v. General Motors Co.,* 823 F.3d 977, 984 (quoting *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012) ), *and* they must satisfy one or more prongs of Rule 23(b).

Here, Plaintiffs invoke Rule 23(b)(3), which allows a class to be certified if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In evaluating Rule 23(b)(3)'s predominance and superiority requirements, the Rule prescribes "[t]he matters pertinent to these findings" to include:

(A) the class members' interest in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

In assessing a motion for class certification, the court is mindful that "it is the party seeking certification that bears the burden of establishing that the requirements of Rule 23 have been met," *Gene & Gene LLC v. BioPay LLC,* 541 F.3d 318, 325 (5th Cir. 2008), and it within the district court's discretion to certify a class, a decision that it reviewed only for an abuse of that discretion. *Anderson v. U.S. Dept. of Housing & Urban Development,* 554 F.3d 525 (5th Cir. 2008).

Further, in conducting its "rigorous analysis" of the Rule 23 pre-requisites, the court may look past the pleadings to see if the requirements are met—indeed, going beyond the pleadings is necessary, because the court must understand the claims, defenses, relevant facts and applicable substantive law in order to make a meaningful determination of the certification issues. *O'Sullivan v. Countrywide Home Loans,* 319 F.3d 732 (5th Cir. 2003).

**1. Ascertainability of the Proposed Class**

**\*10** A party seeking class certification "must establish that the proposed class is adequately defined and clearly ascertainable." *Little v. T-Mobile USA, Inc.* 691 F.3d 1302, 1304 (11th Cir. 2012). This means the class must be defined "by reference to objective criteria," *Bussey v. Macon Cty. Greyhound Park, Inc.,* 562 Fed. Appx. 782, 787 (11th Cir. 2014) (quoting *Fogarazzo v. Lehman Bros., Inc.,* 263 F.R.D. 90, 97 (S.D.N.Y. 2000) ), and, as defined, must include a common claim for injury attributable to a common cause (the defendant's conduct). *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 349-50. *See also* Federal Judicial Center Manual for Complex Litigation § 21.222 (4th ed. 2004) (class definition must be "precise, objective, and presently ascertainable..... An identifiable class exists if its members can be ascertained by reference to objective criteria. The order defining the class should avoid subjective standards ... or terms that depend on resolution of the merits ..."). The district court has discretion to redefine the class to cure a deficiency in the proposed class, *see Benefield v. Int'l Paper Co.,* 270 F.R.D. 640, 645(M.D. Ala. 2010), but Plaintiffs "must propose an administratively feasible method by which class members can be identified." *Karhu v. Vital Pharms., Inc.* 621 Fed. Appx. 945, 947 (11th Cir. 2015) (unpub).

The proposed class definition here is stated as:

> All persons who, on August 24, 2009 (or alternatively on February 1, 2010) owned residential property within the

Case 4:17-cv-02960    Document 294-1    Filed 02/07/22 in TXSD    Page 138 of 179

Cotromano v. United Technologies Corporation, Not Reported in Fed. Supp. (2018)
2018 WL 2047468

neighborhood in Palm Beach County, Florida, known as The Acreage, as defined on the map attached directly to this motion as Exhibit A (or alternatively on the map attached directly to this motion as Exhibit B).

The first proposal matches the exact boundaries used by Palm Beach County and FDOH in conducting the cancer cluster investigation (advanced by the *Cotromano* plaintiffs), while the alternative proposal expands those boundaries to include "two disjointed sections of the official Acreage" and to "add[ ] some neighborhood blocks" found adjacent to "the official Acreage" (advanced by the *Adinolfe* plaintiffs). That is, Plaintiffs seek to certify a class consisting of all persons who owned property on certain dates (tethered to the timing of Palm Beach County's cancer cluster investigation and announcements) within certain metes and bounds related to FDOH-defined cancer cluster boundaries. Properties within these metes and bounds (for the smaller proposed class), or in the general vicinity of these bounds (for the larger proposed class), [17] are, according to Plaintiffs, "area[s] affected by the stigma of environmental contamination" [DE 428 p. 11].

[17]    Plaintiffs rely on their expert hydrogeologists, Daniel Stephens and Philip Bedient, and property appraiser, John Kilpatrick, to support their alternative definitions of the two proposed class areas.

The Court finds both definitions to be over-inclusive, and even assuming the admissibility of expert liability evidence on groundwater and soil migration, and considering Plaintiffs' evidence of sporadic contamination spots in Acreage locations, the Court is disinclined to refine the definition because it finds no means of doing so, using objective criteria, on this record.

Plaintiffs' groundwater expert, Daniel Stephens, expressed doubt that the whole area delineated by Plaintiffs as "the Acreage" has contamination. He testified it was theoretically possible that trace amounts of chemicals could travel via the aquifer, along the "preferred pathway" to discrete locations miles south of Pratt & Whitney's facility, but did not define any areas of actual, or threatened contamination, that correspond to the proposed class area. For example, he identified only four "estimated" detections of I, 4-dioxane in the proposed class area, and acknowledged that the "vast

majority" of results from the testing in the 60-square mile were "non-detects." Plaintiffs' other groundwater transport expert, Philip Bedient, did not define the contours of the proposed area by reference to actual contamination, or proximity to it, but instead relied on a handful of sporadic detections of chemicals across the 60-square mile area, conceding these sporadic detections do not indicate the presence of contamination at other properties within the Acreage.

 **\*11**  Plaintiffs' real estate appraisal expert, John Kilpatrick, opined about the metes and bounds of what he believed to be the "Acreage community," derived from his survey research, based on informal interviews with local realtors and inhabitants of similar semi-rural communities such as Jupiter Farms and Palm Beach Country Estates. He admitted, however, that his metes and bounds description of the proposed class area, including the entirety of the area colloquially known as "the Acreage," had nothing to do with areas actually affected by contamination, and that he took no steps to assess what market participants perceived to be the extent of contamination at locations within the Acreage. He was also unable to identify any survey methodology by which an appraiser could define a geographic area affected by the "stigma" of environmental contamination.

None of Plaintiffs' experts, then, connect the metes and bounds of the proposed class area to danger posed by soil or water contamination attributable to conduct of the Defendant, and in this sense, offer nothing meaningful on the threshold ascertainability issue. Plaintiffs simply argue, without evidentiary support, that each named putative class representative is similarly affected by CCOCs that migrated off-site from the Pratt & Whitney Campus because they own property which shares a common aquifer with that underlying the Pratt & Whitney site, and is situate in some amorphous zone of "vicinity" to contamination detections (of different types and levels) at different sporadic locations throughout the Acreage.

However, a definition based on general physical proximity to the Pratt & Whitney site (within a five to fifteen mile southern trajectory) or indeterminate distances from properties in the Acreage revealing detections of any variety of CCOCs alleged to have migrated there from the Pratt & Whitney site—untethered to evidence of exposure or dose reconstruction data for each individual in the proposed class and medical evidence establishing a health risk posed by that exposure—does not supply the requisite "objective criteria" needed to

Cotromano v. United Technologies Corporation, Not Reported in Fed. Supp. (2018)
2018 WL 2047468

define a class by reference to a common injury attributable to a common cause.

Plaintiffs contend that the general public and relevant real estate market harbor *a perception* that there is an elevated risk to human health posed by residing near industrial operations known to have released harmful contaminants into the groundwater (shared aquifer) and soil—a fear allegedly created by Pratt & Whitney through its mishandling of contaminants at its site—and that the class of property owners negatively affected by this "perception" may be captured here by drawing a line around nearby residential neighborhoods and communities loosely defined as "the Acreage." [DE 293, pp. 4-5]. The problem with this premise is that a public fear or perception of risk of environmental contamination is not an objective criteria by which to define an ascertainable class holding actionable tort claims against the alleged polluter —this follows because the claims are not actionable unless the polluter's alleged created dangerous dose exposures, measured in terms of risk to human life, to persons residing within specified geographical zones.

Under the view advanced by Plaintiffs, "environmental stigma" could attach due to an entirely unfounded and unreasonable perception of fear of environmental harm posed by negligent, accidental or even intentional contaminant spills or releases at nearby properties. However, engaging in conduct which causes a subjective, unreasonable fear of environmental danger is not actionable (e.g. a spill occurs, is completely remediated and poses no exposure risk under any heightened scientific standard, but the public still harbor concerns and the environmental stigma continues to cloud neighboring property as a result). Exposing people in neighboring communities to dangerous doses of contaminants through mishandling of CCOCs is an actionable harm.

 **\*12** In this case, there is no class-wide evidence of the dangerous exposure levels.

On the issue of risk, Plaintiffs' proffered Dr. Arie Perry, M.D., a neuropathologist with expertise in pediatric cancer, to give an opinion on the medically recognized causes for "increased incidence" of pediatric brain tumors of the type found in the Acreage. Dr. Perry testified, based on extensive review of epidemiological data, that radiation is recognized as the most well-established external carcinogen relative to pediatric brain tumors, and he confirmed the well-known association between brain tumors and high-dose ionizing radiation.

Dr. Perry stated he was not asked to give opinion on causation of any individual case. However, he explained he was not given any information regarding specific doses of radiation for any individual in the proposed class area. Therefore, he had no basis to compare the exposure Plaintiffs' allegedly suffered to the relevant medical literature [DE 363-7, ¶ 5c]. Also, Dr. Perry did not opine that exposure to radiation in water or soil (in any level) could result in a dose to the brain.

Without class-wide dose reconstruction data, there is no objective manner by which Defendant's alleged misconduct could be logically tethered to *all* property owners in the 60-square-mile expanse of the proposed class area covering 18,000 homes. If Plaintiffs could identify discrete locations in or near Acreage properties which were contaminated by CCOCs at dose levels posing a risk to human health for persons residing within prescribed geographic distances of those contaminants, they might supply this missing evidentiary link, and possibly propose an ascertainable class (based on an objectively-measured geographic zone of danger). [18] However, as this cannot be accomplished without an entire restructuring of the evidence, the Court finds it impossible to re-draw the geographical boundaries of the proposed class on this record and shall deny the motion to certify the class due to failure to demonstrate ascertainability.

[18]     Plaintiffs correctly assert, under *Adinolfe*, *supra*, that they are not required to prove class-wide contamination of the properties in order to state actionable claims against Pratt & Whitney. However, they are obligated to proffer a class definition, based on objectively reasonable criteria, that identifies a class of persons suffering a common injury from a common cause attributable to Defendant. Vaguely owning property "in the vicinity of" contamination released by Defendant is not an objectively reasonable yardstick, as it offers no objectively reasonable criteria by which to identify property likely damaged by environmental "stigma" created by Defendant (as opposed to stigma attaching due to public perceptions not logically related to harmful conduct attributable to Defendant).

Put another way, while a definable class may, as a general proposition, be established by geographic boundaries, [19] it is not possible to do so here because the geographic boundaries of the proposed class are not tied to exposure contours demonstrated to be dangerous to human life.

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:17-cv-02960 Document 294-1 Filed 02/07/22 in TXSD Page 140 of 179

Cotromano v. United Technologies Corporation, Not Reported in Fed. Supp. (2018)
2018 WL 2047468

*Compare* Yslava v. Hughes Aircraft Co., 845 F. Supp. 705, 712 (D. Ariz. 1993) (plaintiffs seeking damages for contamination of groundwater rationally defined proposed class with sufficient precision, where they delineated twenty-four separate subgroups representing precise geographic areas where plaintiffs lived, worked or went to school, and alleged that persons within specified areas were exposed to contaminated water) *with* Daigle v. Shell Oil Co., 133 F.R.D. 600, 602-03 (D. Col. 1990) (rejecting class against oil company defined by geographic boundaries where plaintiffs "failed to identify any logical reason relating to the defendant's activities" at toxic waste disposal pond).

19    In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Lit, 2007 WL 541954 at *1 (S.D.N.Y. 2007) (class defined as those living in vicinity of those owners whose property was actually contaminated); Boggs v. Divested Atomic Corp., 141 F.R.D. 58 (S.D. Ohio 1991) (class defined as persons living within six miles of radioactive materials plant, where class representatives alleged personal well-being was affected by exposure to radioactive materials and that property interests were damaged by contamination); Cook v. Rockwell Int'l Corp., 151 F.R.D. 378, 382 (D. Col. 1993) (certifying class defined by geographic boundaries based on dose or exposure contours of radioactive and non-radioactive materials)

**\*13** Assuming, arguendo, that Plaintiffs' proposed class definition is adequate, or could somehow be redefined to satisfy ascertainabilty, the Court shall proceed to examine the adequacy of Plaintiffs' showing on Rule 23(b)(3)'s predominance element.

## B. Rule 23(b)(3) Inquiry: Predominance

The predominance inquiry is more demanding that the commonality requirement of Rule 23(a) and requires courts to consider how a trial on the merits would be conducted if a class were certified. This, in turn, entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class, a process that ultimately prevents the class from degenerating into a series of individual trials. Madison v. Chalmette Refining, LLC, 637 F.3d 551 (5th Cir. 2011).

Whether common issues predominate and whether the class action is a superior method to resolve the controversy requires an understanding of the relevant claims, defenses, facts and substantial law presented in the case. This requirement, though reminiscent of the commonality requirement of Rule 23(a), is "far more demanding" because it "tests whether proposed class is sufficiently cohesive to warrant adjudication by representation." Unger v. Amedisys, Inc., 401 F.3d 316, 320 (5th Cir. 2005). Under this standard, the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, must predominate over those issues that are subject only individualized proof. Common issues can predominate only if they have a direct impact on every class member's effort to establish liability that is more substantial than the impact of individual issues in resolving the claims of each class member.

Plaintiffs rely primarily on the expert report and opinion of Dr. John Kilpatrick, Ph.D., MAI, FRICS, to establish predominance regarding property damages. Dr. Kilpatrick is an expert in real estate appraisal, and his expert report describes the method by which he proposes to calculate class-wide stigma damages for the estimated 18,000 properties located in the proposed class area. He recommends a mass appraisal technique because this method would achieve economies of scale in calculating property values before and after news of environmental contamination allegedly generated from Pratt & Whitney became public.[20]

20    Dr. Kilpatrick used six different methodologies to provide what he calls a "mass appraisal" of property value diminution in the proposed class area. He purports to have drawn his opinions from hedonic regression modeling, survey research, sales trend or transactional evidence, meta-analysis, literature review and case studies. He uses each of these six methodologies to conclude that the value of the 18,000 parcels in the proposed class area has uniformly diminished between 25% and 40% as a result of "stigma" caused by the properties' proximity to environmental contamination caused by Pratt & Whitney.

In his direct testimony affidavit, Kilpatrick opines: "My opinion remains that the Acreage neighborhood, was and

Case 4:17-cv-02960 Document 294-1 Filed 02/07/22 in TXSD Page 141 of 179
Cotromano v. United Technologies Corporation, Not Reported in Fed. Supp. (2018)
2018 WL 2047468

remained diminished because the brain cancer cluster increased awareness of the historical contamination at the UTC campus and its connectivity to the Acreage potable water supply, a surficial aquifer, such that the area suffers a stigma that has reduced property value." [DE 363-15].

 **\*14** The Defendant has moved to exclude the testimony of Dr. Kilpatrick under *Daubert*, and has proffered the testimony of John Hauser, Sc.D, in rebuttal. Plaintiffs have likewise moved to exclude testimony of Hauser. These *Daubert* challenges are assessed in the discussion which follows.

### 1. Standard of Review

Federal Rule of Evidence 702 provides that courts may admit expert testimony if it is both relevant and reliable:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods and (3) the witness has applied the principles and methods reliably to the facts of the case.

*See also* Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 592 n. 10, 113 S. Ct. 2786, 125 L.Ed.2d 469 (1993) (proponent of expert testimony must prove admissibility by a preponderance of the evidence). The Third Circuit has described Rule 702 as the embodiment of "a trilogy of restrictions" that expert testimony must meet for admissibility: qualification, reliability and fit. Schneider ex rel. Estate of Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003).

In considering reliability, a court may consider an expert's failure to account for obvious alternative explanations." Munoz v Orr, 200 F.3d 291 (5th Cir. 2000); Blomkest Fertilizer, Inc. v Potash Corp. of Saskatchewan, 203 F.3d

1028 (8th Cir. 2000). The issue on "fit," in turn, goes to "whether expert testimony proffered ... is sufficiently tied to the facts of the case [so] that it will aid the jury in resolving a factual dispute." Daubert, 509 U.S at 592 (quoting United States v Downing, 753 F.2d 1224, 1242 (3d Cir. 1985) ). Fit requires a "connection between the scientific research or test result to be presented and particular disputed factual issues in the case." In re Paioli R.R. Yard PCB Litigation, 35 F.3d 717, 743 (3d Cir. 1994). The standard for fit is "not that high," although it is "higher than bare relevance." Id. at 745.

To determine whether an expert's proposed testimony is reliable, a trial judge may consider (1) whether it can be tested or whether it is purely subjective; (2) whether it has been subject to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of controls, and (5) whether the method it has been generally accepted in the scientific community. *See* Kumho Tire Co., Ltd. v. Carmichael, 526 U.S 137, 149-50, 119 S. Ct. 1167, 143 L.Ed.2d 238 (1999). Under these factors, experts are not allowed to engage in haphazard, intuitive inquiry, and they must explain the research and methodology they employed in sufficient detail in order to allow the other party's expert to test that hypothesis. Oddi v. Ford Motor Co., 234 F.3d 136 (3d Cir. 2000).

With these precepts in mind, the analysis turns to the admissibility of testimony from John Kilpatrick, Ph.D., Plaintiffs' damage expert in the calculation of class-wide damages.

### 2. Dr. John Kilpatrick

Dr. Kilpatrick attempted to calculate the effect that "increased awareness of the historical contamination at the UTC campus" has had on the present market value of the putative class members' homes. He opined that it is feasible to perform a class-wide "mass appraisal" approach to determine the diminished value of the properties due to this environmental stigma. As defined by Kilpatrick, a mass appraisal model is a method of simultaneously and systematically valuing a large number of properties. He states that the majority of properties in the Acreage community are either single family detached residences, or vacant residential land, and contends that "[t]his extraordinary degree of homogeneity is further

Cotromano v. United Technologies Corporation, Not Reported in Fed. Supp. (2018)
2018 WL 2047468

evidence of the applicability of a mass appraisal model" in this case [DE 363-15].

**\*15** Kilpatrick's damage calculation is based on a simple formula: (1) unimpaired value of the property, minus (2) impaired value of the property, equals diminution in value.

Kilpatrick derives his unimpaired value from sales trend data which existed as of February 10, 2010, a date which coincides with the Palm Beach County Health Department's announcement of a cancer cluster in designated neighborhoods within the loose association of communities known as "The Acreage."

Kilpatrick's method for determining impaired value is more involved, deriving from six methodologies: sales trend data analysis; contingent valuation analysis; academic literature review; case study review; informal survey research of market participants (local residents, real estate brokers and lending institutions) and a meta-analysis.

Beginning with the sales trend analysis, Kilpatrick explains that he compared sales trends in the Acreage with those in "similar, unaffected control" areas supposedly similar in buyer-appeal (Palm Beach Country Estates, Jupiter Farms) to see if home property values moved in the same direction in the same degrees, beginning with sales data from the end of 2008 and continuing up through 2016.

As to valuation dips occurring before the cluster was announced in February 2010, Kilpatrick explains away this occurrence as due to "information leakage," i.e. the market's reaction to word-of-mouth health care concerns circulating throughout the Acreage before the government announced the cluster. And, while his original report referenced a precipitous falling off in values as a reflection of public concern attending the "cancer cluster" designation; in his direct testimony affidavit and hearing testimony presented at the class certification hearing, he shifted away from this verbiage, now stating that the drop reflected the market's reaction to environmental stigma associated with Pratt & Whitney's nearby industrial operations. Attempting to explain this shift, Kilpatrick contends that his earlier reference to a "cancer cluster" was simply mnemonic or "shorthand" for "fear of contamination"—what he now claims drove the drop in real estate values after February 2010.

Kilpatrick conducted a single web-based (online) contingent valuation survey, administered through an independent firm

which purchased email addresses for residents of Palm Beach County living outside the three zip codes covered the area known as the Acreage. He invited recipients to respond through an email containing a link to the web-based survey. After receiving 600 responses, the survey was closed and the data delivered to another firm retained to collect and process the data (Wilkins Research Services LLC) in Chattanooga, Tennessee.

In a contingent valuation survey, market participants are asked what they would be willing to pay for something contingent on a certain factor. Kilpatrick describes it as "a way to determine the value of a condition by asking people questions about that condition" [DE 363-15 p. 7]. In this case, Kilpatrick asked survey participants how much they would be willing to pay for a house that was in a neighborhood declared a "cancer cluster" zone by the Florida Department of Health due to high rates of pediatric brain cancer in the area, a phenomenon that "some local residents" suspected was due to contamination from the nearby Pratt & Whitney facility.

**\*16** He provided survey participants with a "Fact Card" stating that Pratt Whitney has been the focal point of "cleanup activities" since early 1980s, including "clean up chemicals, hazardous wastes, including cancer causing agents, oil, sodium cyanide, asbestos and mercury." [DE 373-1, p. 10]. The Card recites that "spills and leaks at the site caused chemicals and wastes to seep into the soil and groundwater at the Pratt & Whitney property, and that the chemicals eventually migrated off-site, to the Corbett Wildlife Refuge and The Acreage neighborhood. The Card states that Florida Department of Environmental Protection initially suspected the presence of 24 contaminants in the area and did "some limited testing" in early 2010, but ultimately reported that they did not find carcinogen levels that would cause pediatric brain cancer. It added that the Center for Disease Control explained, in a letter to Acreage residents, that it is not easy to make an association between cancer and environmental exposures due to factors of origin and long induction periods for most cancers.

The respondents overwhelmingly reported a very low "willingness to pay" as tabulated in Dr. Kilpatrick's schedule. For example, of the respondents asked if they would purchase a residence in the Acreage for 15 percent of the value of their current residence, only 10 percent of respondents answered "yes," meaning 90% would presumably refuse an opportunity to buy a residence similar to their own in the Acreage at an 85 percent discount.

Case 4:17-cv-02960 Document 294-1 Filed 02/07/22 in TXSD Page 143 of 179

Cotromano v. United Technologies Corporation, Not Reported in Fed. Supp. (2018)
2018 WL 2047468

After weighing the results from the contingent value survey, informal interviews, sales trend analysis and other methodologies employed, Dr. Kilpatrick ultimately identified an "estimate[d]" diminution in value in the range of 25% to 40%" for all Acreage homes, a calculation he finds "within a reasonable degree of appraisal certainty "and correlates to the market's perception and fears of environmental contamination posed by living in proximity to industrial operations at the nearby Pratt & Whitney site. In his direct testimony affidavit, he expressed an intent to later produce these values on a "property by property basis" within the class area as the case moves forward [DE 363-15 pp. 2-3], and at the class certification hearing, he similarly testified he plans to perform additional survey research to validate his diminished value calculations, looking at specific pricing and transactional data for homes in the proposed class area. He further explained that he has not yet run this model because he is waiting for the Court's determination of the class boundaries and ownership cut-off date in order to focus his efforts on the actual absent class members.

Defendant challenges the reliability of all of Kilpatrick's methodologies. To rebut Kilpatrick's proffered damage calculations, Defendant tendered the testimony of John Hauser, Sc.D., a Professor of Marketing at the Massachusetts Institute of Technology of ("MIT") Sloan School of Management [DE 373-1], proficient in the evaluation of consumer decision–making processes across a wide range of industries, products and services. Hauser is a pioneer and recognized expert in the evolution of "conjoint analysis" ("CA"), a survey tool which asks consumers multiple choice questions in context, a presentation designed to minimize respondent bias. He explains that "contingent valuation" ("CV") surveys, such as that used by Dr. Kilpatrick in this case, instead ask a consumer a single choice question based on a "Fact Card," and that Kilpatrick's CV methodology is in essence a "much-simplified and outdated version of choice-based CA [conjoint analysis] methodology" [DE 373-1].

Dr. Hauser's direct testimony affidavit more specifically challenges the reliability of Kilpatrick's contingent value survey on grounds that: (1) the fact card is inaccurate (recites matters not fitting facts of the case); (2) the fact card is misleading, presenting respondents with only negative information about the community, without mentioning any of the positive attributes that draw buyers to semi-rural communities of this kind; (3) Kilpatrick sampled the wrong

population—i.e. he drew respondents from a wealthier, more educated and older population than the proposed class of Acreage residents who likely live in locations which differ from the Acreage in fundamental ways unrelated to the present allegations—and the sample is therefore not representative of potential home buyers in the proposed class area; (4) Kilpatrick used the incorrect formula to estimate average "willingness-to-pay" and he failed to follow established protocol established by the authority (Hanemann paper) on which he supposedly relied in making those calculations. Under application of the correct formula, following the Hanemann paper, Hauser contends the CV survey conducted by Kilpatrick would suggest a diminution estimate of roughly 203 percent of property value (meaning a buyer would need to be handed an Acreage house for free, plus a substantial cash lump sum payment, before agreeing to live in the Acreage), which, Hauser contends, is nonsensical; (5) the CV survey fails to consider demand and supply in a competitive market, resulting in an exaggerated diminution estimate; (6) Kilpatrick failed to conduct a "pre-test" of his Fact Card to eliminate or minimize introduction of bias or confusion in the survey design.

*17 Plaintiffs, in turn, challenge the admissibility of Hauser's opinions under *Daubert*, contending Hauser lacks the requisite qualifications to opine about real estate appraisal matters because, unlike Kilpatrick, Hauser is not a certified real estate appraiser and he has no background in conducting consumer research in real estate or environmental damage contexts.

The Court begins with the *Daubert* challenge addressed to Hauser. First, none of the opinions offered by Hauser relate to real estate financial transactions, and his lack of background in appraisal activity does not necessarily defeat his qualifications to comment on the validity of Kilpatrick's survey methodology. He is a well-recognized expert in marketing science and research, specializing in the study of human judgment and decision-making in the consumer context [DE 373-1, 373-2], and with this background is well-qualified to testify as an expert regarding the validity of the contingent valuation survey that is the lynchpin of Kilpatrick's diminution opinion.

Given Dr. Hauser's expertise and extensive experience in consumer decision-making and opinion research, including the design, implementation and performance of consumer surveys, the Court finds his lack of real estate appraisal credentials to go to the weight, not to the admissibility of

Case 4:17-cv-02960    Document 294-1    Filed 02/07/22 in TXSD    Page 144 of 179

Cotromano v. United Technologies Corporation, Not Reported in Fed. Supp. (2018)
2018 WL 2047468

his testimony, and finds him fully qualified to comment on the reliability and validity of the methodology employed by Plaintiff's damage expert in conducting the contingent valuation survey underpinning his calculations. The Court therefore concludes, by a preponderance of the evidence, that Hauser has the requisite knowledge and experience to opine about the consumer-choice survey methodology used by Kilpatrick in this case, and denies Plaintiffs' motion to exclude his testimony under *Daubert.*

The Court next proceeds to consider Hauser's specific critiques of Dr. Kilpatrick "CV" survey methodology, as detailed below, and finding his opinions persuasive, shall grant Defendant's motion to strike Kilpatrick's testimony.

Dr. Kilpatrick's Fact Card, designed to elicit and gauge consumer response to environmental issues attending Acreage properties, consisted of four paragraphs and included a statement purporting to describe "a situation that is affecting a community in Florida." The card featured an aerial photograph of Pratt & Whitney's plant, even though the facility is not visible from any vantage point within the Acreage. The card mentions cancer repeatedly, and asserts that Pratt & Whitney contaminated the Acreage with various "cancer-causing agents:" In the 19 sentences employed, the Card makes ten references to "cancer" or a "cancer cluster," and one reference to "carcinogens."[21] The card also supplied information not publicly available to actual buyers; it mentions the county government investigation into a cancer cluster in the area, stating that the investigation was based on a "limited" study and did not result in finding of a causal link. The card also did not include language from the FDOH final report describing the Acreage as a "safe place to live" with water quality that is "generally good."

[21]    Years after conducting the CV survey (2011), Kilpatrick testified, in his April 2016 deposition given in this case, that he could remove the "cancer cluster" reference in the FACT Card without affecting the respondents' answers, because this expression was essentially mnemonic, or synonymous, with environmental contamination. In direct testimony given in support of the class certification motion, he similarly shifted the slant, stating that cancer cluster effectively increased public awareness of the historical contamination at the UTC campus and the relation of that contamination to the Acreage water supply. The Court views Kilpatrick's assumptions about

import of "cancer cluster" phraseology as entirely speculative and assigns no merit to them here. His proposed "mnemonic" interchange of "cancer cluster" for "environmental contamination" is rejected as patently not equivalent.

**\*18** Further, Kilpatrick's Fact Card mentioned several chemicals and hazardous waste materials allegedly present in Acreage, which *are not* consistent with Plaintiffs' allegations or expert testimony, or the actual facts of the case, such as "oil, sodium cyanide, asbestos and mercury and petroleum." These are *not* CCOCs that Plaintiffs allege were generated by Pratt & Whitney and migrated to the Acreage.

Hauser opines that the cumulative effect of Dr. Kilpatrick's erroneous statements and negative representation of the Acreage in the Fact Card was likely to create "demand artifacts" that skewed responses by revealing or hinting at the objective of the survey to the respondents. That is, by misrepresenting the history of the FDEP investigation, underplaying the conclusions of the FDOH, and making repeated reference to cancer, cancer clusters, and carcinogens, the Fact Card implies that Pratt & Whitney caused the cancer cluster designation, a negative implication reinforced by reference to contaminants that Plaintiffs never alleged were present at the Acreage. And with the use of an aerial photograph of the Pratt & Whitney plant—these all provide "non-subtle hints" to the respondents that they were expected to have a negative view of the Acreage properties. Thus, these "demand artifacts" likely encouraged respondents to express extremely negative views of Acreage properties and skewed the results.

The Court agrees that these defects in the design and implementation of Kilpatrick's CV survey are fundamental flaws which render the survey incapable of generating a reliable estimate of any alleged diminution in Acreage property values,[22] and finds Kilpatrick's diminution in value opinion, heavily relying on this research, inadmissible under *Daubert* and Rule 702.

[22]    Kilpatrick's effort at validating the results with "informal surveys" of real estate agents, residents of the Acreage and local residents of Palm Beach County do not cure or avoid these fundamental flaws. In 2011, his team recorded local interviews revealing a stated concern about the impact of the cancer cluster designation in the Acreage. In later reports

Case 4:17-cv-02960   Document 294-1   Filed 02/07/22 in TXSD   Page 145 of 179

Cotromano v. United Technologies Corporation, Not Reported in Fed. Supp. (2018)
2018 WL 2047468

prepared in anticipation of the instant proceeding, Kilpatrick changed the characterization of what the interviewee reported, saying they expressed a more general concern about Pratt & Whitney contamination of groundwater north of the Acreage. He made these changes without speaking to the staff that conducted the interviews, and defended the changes on his earlier–expressed and rejected rationale: that the words "cancer cluster" are merely a "mnemonic" device and are effectively understood to mean "environmental contamination" caused by the Pratt & Whitney industrial neighbor to the community.

The Court also finds the secondary foundation of Kilpatrick's diminution opinion—the sales trend analysis—to be fundamentally flawed. Kilpatrick admits his methodology for calculating "impaired values" from sales trend data in this area is not statistically rigorous or reliable, and admits there are ways to validate such an analysis that he did not perform in this case. His methodology oversimplifies the complex factors that influence home pricing trends, as it makes no accommodation for consideration of important individual variables that typically influence home values, such as age, size, condition or property uses. Nor did Kilpatrick explain a logical basis for drawing a causal inference from any perceived price trends in the time frame examined. Kilpatrick admits a "widening gap" in average price per square foot started to occur in the Acreage as early as 2007 or 2008, when a sudden economic downturn in the real estate market had an undisputed effect on Florida real estate markets state-wide, and he recognized that this event preceded the proposed class cut-off dates employed in his analysis.

 **\*19** Thus, the Court agrees that Kilpatrick cannot reliably use sales trend analysis to determine a single percentage diminution for the entire proposed class area, containing almost 18,000 properties (15,000 under the secondary definition proposed), and that the mass appraisal methodology proposed by him simply does not fit under the facts of this case. The affected community is not remarkably homogeneous, as he originally claimed, but rather includes a wide variety and scale of homes (equestrian farms, up-scale villas, simple ranch houses) of various ages, sizes and conditions—diverse properties which are not logically impacted in the same way by the alleged environmental stigma which Plaintiffs contend attaches by virtue of their general proximity to contaminated properties at the UTC site or at localized areas within the Acreage.

Due to the scientific unreliability of Kilpatrick's sales trend analysis and CV survey results, the Court grants UTC's motion to exclude Kilpatrick's proffered testimony on class-wide diminution in property values. Without this testimony, Plaintiffs are unable to satisfy the predominance element of Rule 23(b), compelling defeat of their current motion for class certification.

### 3. Even assuming, *arguendo*, the admissibility of Kilpatrick's testimony, Plaintiffs cannot satisfy the predominance element.

Even if the Court has erred in any aspect of its *Daubert* analysis of Kilpatrick's testimony, and assuming the admissibility of Dr. Kilpatrick's testimony and opinion that a 25-40% diminution in property values is appropriately applied uniformly across the proposed class, his mass appraisal methods are riddled with individual inquiries that would in any event defeat the predominance element of Rule 23(b)(3). Dr. Kilpatrick's opinion is predicated on the implicit assumption that each home in the proposed class was similarly damaged by actual contamination, or proximity to contaminant detections at the Pratt & Whitney site or within the Acreage itself, which the record does not support: Even the Plaintiffs recognize that not every home is confronted with the same or similar health risks due to CCOC exposure or proximity to CCOC exposure within the Acreage.

Further, Dr. Kilpatrick's common method for mass appraisal will need to account for numerous individual characteristics of the homes and surrounding neighborhoods, which are not uniform throughout the proposed class, as discussed above. And, because he has not yet run his contemplated individual sales trend data, based on real-world market evidence, even for the class representatives, there is no evidence that any home in the proposed class area has suffered a diminution in property value in this case, much less a class-wide diminution in values.

Thus, even assuming that Plaintiffs can prove the common question that negligence or other actionable conduct occurred at the Pratt & Whitney campus and caused off-site migration of CCOCs which pose a health risk to Acreage residents, proof of any Plaintiff's claim will require distinctly case-by-case inquiries into whether the migration resulted in a contaminant detection causing a dangerous exposure at his or her individual property, as well as an individual assessment into the type and extent of damage caused by any such exposure. The degree of damage will depend on whether a

particular Plaintiff claims actual or threatened contamination, or proximity to such contamination in a degree likely to pose health risks to persons living on the property; the source and level of such contamination, the cause and timing of the contamination, and the resulting damage, measured in diminution of property value. These are all questions requiring plaintiff-by-plaintiff scrutiny. *LaBauve v. Olin Corp.,* 231 F.R.D. 632 (S.D. Ala. 2005). This will necessitate testing each home individually to determine exposure and dose levels at each location in order to assess the magnitude of any damages attributable to conduct of Pratt & Whitney.

**\*20** To be clear, Plaintiffs do not need to prove actual contamination of individual properties to sustain their claims —but this does not eliminate individual assessments on damages. It only transports them to individualized inquiries, with all the same variables contributing to a determination on the extent of actual damages. The geographic variations in this case are numerous and involved.

This case will involve measurements of intangible "environmental stigma" damage that can vary significantly parcel to parcel, block to block, depending on the presence of actual or threatened contamination, or proximity to dangerous does of contamination on nearby properties (UTC or other Acreage homes), relevant exposure and dose levels, the type and extent of contamination (radioactive/non-radioactive, above or below background levels), individual soil testing and individual water testing results. In addition to these variables, all impacting the magnitude of "stigma" attaching to any one property, the individual measurement of damages on any given property will depend on construction materials, architectural style, neighborhood location, size and condition of property, as well as any unique structures present which deserve individual evaluation.

Further, individual proximate cause issues will permeate a diminution in value analysis because of the many diverse communities encompassed within the proposed class area. One neighborhood may experience less of a drop in value because the unimpaired values are significantly higher than other neighborhoods, and one community may experience more pronounced drops due to closer proximity to dangerous exposure levels. In addition, some communities may experience a drop in real estate value due to factors unrelated to Pratt & Whitney's operations.

Plaintiffs have not demonstrated how common issues will predominate over these very individual inquiries. Therefore,

class certification will be denied for failure to fulfill Rule 23(b)'s predominance requirement. [23] *See generally Corley v. Orangefield Independent School Dist.,* 152 Fed. Appx. 350 (5th Cir. 2005) (unpub) (under rule permitting certification only if damages are capable of computation by means of objective standards, not dependent on intangible subjective differences of each class members' circumstances, district court did not err in declining to certify class, where geographic variations among property-owners would render some parcels more valuable than others, precluding any mechanical calculation of damages); *Fisher v. Ciba Specialty Chem. Corp,* 238 F.R.D. 273 (S.D. Ala. 2006).

[23] Rule 23(b)(3)'s predominance and superiority requirements are not met if, after adjudication of the class-wide issues, Plaintiffs must still introduce a great deal of individualized proofs or argue a number of individualized legal points to establish most or all of the elements of their individual claims. *Vega v. T-Mobile USA, Inc.,* 564 F.3d 1256, 1270 (11th Cir. 2009). Thus, a plaintiff cannot satisfy the predominance requirement if, as a practical matter, "the resolution of an overarching common issue breaks down into an unmanageable variety of individual legal and factual issues." *Babineau v. Federal Express Corp.,* 576 F.3d 1183 (11th Cir. 2009).

### C. Rule 23(b)(3) Inquiry: Superiority

Rule 23(b)(3) also requires that the Court make a finding that a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P 23(b)(3). For many of the same reasons this class fails the predominance requirement, it also fails the superiority requirement.

**\*21** In weighing this proposed class action as a whole, the Court concludes that the class action device is not the superior method to adjudicate the claims. A class action could be desirable because the legal theories at hand are not particularly novel, and proving liability could require complex proof regarding transport mechanisms. These issues are common to the proposed class, suggesting it should be beneficial to Plaintiffs to join as a class to

Case 4:17-cv-02960 Document 294-1 Filed 02/07/22 in TXSD Page 147 of 179

Cotromano v. United Technologies Corporation, Not Reported in Fed. Supp. (2018)
2018 WL 2047468

prosecute this action. Yet, Plaintiffs must individually prove causation and damages after establishing liability, and varying kinds and amounts of "stigma" will attach to any given property, depending on the presence of actual or threatened contamination, varying kinds and amounts of contamination and proximity to it, making a class action a particularly inappropriate vehicle for this litigation.

Because plaintiffs do not satisfy the predominance or superiority requirements of 🔖 Rule 23(b)(3), the Court finds it unnecessary to address Defendant's other grounds of opposition to the request for class certification.

### V. CONCLUSION

All of Plaintiffs' tort claims are anchored in the contention that contamination from the Pratt & Whitney facility has created an "environmental stigma" which clouds their properties and impairs their property values. These claims certainly rely on some measure of common proof for all Plaintiffs, including: (1) Pratt & Whitney's history of aerospace manufacturing at the Pratt & Whitney facility from the 1950's going forward, and use of licensed nuclear materials at that site in conjunction with various defense projects; (2) the chemical properties, hazards and toxicity of contaminants released into groundwater and air and soil at the Pratt & Whitney facility; (3) Pratt & Whitney's waste disposal practices relating to CCOCs, and (4) the potential that such disposal practices would cause off-site migration of CCOCs, resulting in contamination of surrounding properties five to fifteen miles away, many years after Pratt & Whitney remediated the property and ceased the alleged improper disposal practices. Most of these common matters may be classified as background facts—a shared fact background that necessarily exists whenever multiple individuals pursue similar claims against the same defendant.

Regardless of how these common questions are resolved, the existence and degree of Pratt & Whitney's liability to a particular Plaintiff will turn on the following individual-specific questions: (1) whether that Plaintiff's property is actually contaminated or threatened with contamination of radionuclides or other CCOCs—or whether it is in proximity to a contamination detection which poses an objectively-measured health risk to occupants of the property; (2) whether the source of those contaminants is Pratt & Whitney, or whether there is a property-specific alternative source that better explains the detected contamination; (3) whether the

contamination is sufficiently severe to reduce the property's value, and if so, the extent of that diminution in value; (4) whether the property is contaminated by toxins other than those released by Pratt & Whitney, and if so, the extent to which any diminution in property value may be attributed to such other toxins; (5) whether each Plaintiff acquired his or her property before or after the alleged diminution in value occurred, and (6) when each Plaintiff was first on notice of the contamination and whether the timing of that notice renders his or her claims time-barred.

So, while there will be some common methods of proof, such as Defendant's disposal practices, migration pathways, and properties of released contaminants, it is likely common liability issues will not predominate in this case because the existence and degree of liability (measured by magnitude of damages owed) to a particular Plaintiff will turn on all of the individual inquiries outlined above.

**\*22** Plaintiffs have not met their burden proving a class action is appropriate. Their proposed class definition is overbroad, and they do not show, by a preponderance of the evidence, satisfaction of 🔖 Rule 23(b)'s predominance and superiority requirements.

It is accordingly **ORDERED AND ADJUDGED**:

1. The Plaintiffs' Daubert motion to exclude testimony of John Hauser [DE 237] is **DENIED** and the Defendant's motion to exclude testimony of John Kilpatrick [DE 241] is **GRANTED**.

2. All other pending *Daubert* (motions *in limine* ) [DE 236, 238-239, 242-248, 251] are **DENIED AS MOOT**. This order is without prejudice for either side to renew any relevant *Daubert* challenge at a later stage of this proceeding.

3. The Plaintiffs' Motion to Certify a Litigation Class as against Defendant United Technologies Corporation [DE 265] is **DENIED.**

4. Plaintiffs' and Defendant Palm Beach Aggregates, LLC's Joint Motion to Certify a Settlement Class as against Defendant Palm Beach Aggregates LLC [DE 253] is **DENIED** for failure to establish ascertainability of the settlement class, [24] based on the essential defects attending the proposed definition of the litigation class as more specifically identified in this Order.

Case 4:17-cv-02960    Document 294-1    Filed 02/07/22 in TXSD    Page 148 of 179

Cotromano v. United Technologies Corporation, Not Reported in Fed. Supp. (2018)

2018 WL 2047468

5. This case will proceed on behalf of the individually named Plaintiffs.

6. The parties are directed to submit a joint scheduling report within **TWENTY (20) DAYS** advising as to their discovery and scheduling needs, including a proposed trial date, going forward without the class action allegations.

**7.** In light of the foregoing, Defendant's motion to strike untimely disclosures re: expert Lawrence Wylie [DE 337], Defendant's motion to strike Plaintiffs' direct testimony affidavit of Brian Moore [DE 379] and Plaintiff's motion to file a sur-reply to Defendant's motion to strike Moore direct testimony [DE 395] are **DENIED AS MOOT.** Plaintiffs' motion to expedite consideration of the motion to extend fact discovery [DE 333] is also **DENIED AS MOOT.**

24     Plaintiffs and PBA define the proposed settlement class as "[a]ll Persons who own or have owned

real property in the Acreage at any time since August 24, 2009 until August 16, 2013, the date of filing and who did not request exclusion from this lawsuit ..." [DE 253, p. 11]. The parties' proposed notice to the settlement class attached to the joint motion [DE 253-2] inexplicably broadens this definition, providing: "You are a PBA Settlement Class Member *if you currently own property* in the Acreage area of Western Palm Beach County, Florida *or* if you owned property in the Acreage at any time on or after August 24, 2009 and before August 13, 2013." (emphasis added)

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida this 2nd day of May, 2018.

### All Citations

Not Reported in Fed. Supp., 2018 WL 2047468

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

# **<u>Tab 6</u>**

2011 WL 3648104

2011 WL 3648104
Only the Westlaw citation is currently available.
United States District Court,
S.D. Texas,
Houston Division.

Alva Ralph HIXSON, III, Plaintiff,
v.
HOUSTON INDEPENDENT SCHOOL
DISTRICT, et al., Defendants.

Civil Action No. 4:09–cv–3949.
|
Aug. 17, 2011.

**Attorneys and Law Firms**

Alva Ralph Hixson, III, Houston, TX, pro se.

Victoria M. Phipps, Littler Mendelson, P.C., Houston, TX, for Defendants.

### *MEMORANDUM AND ORDER*

KEITH P. ELLISON, District Judge.

**\*1** Pending before the Court are Defendant's Motion to Strike Plaintiff's Statistical Expert (Doc. No. 59) and Defendant's Motion for Complete Summary Judgment (Doc. No. 61). Upon considering the motions, all responses thereto, and the applicable law, the Court finds that Defendant's Motion to Strike Plaintiff's Statistical Expert must be granted and Defendant's Motion for Complete Summary Judgment must be granted.

**I. BACKGROUND**

Plaintiff Alva Ralph Hixson, III ("Plaintiff" or "Hixson") has filed suit against Defendant Houston Independent School District ("Defendant" or "HISD") for HISD's alleged failure to hire him in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 629 *et seq.* The following undisputed facts are drawn from the record.

Hixson was born on August 19, 1952. (Hixson Dep. 16:10.) After many years of work in unrelated fields, Hixson decided to change careers and begin work in the education industry. (*Id.* 34:22–25 .) He moved to McAllen in 2003. (*Id.* 18:2–23.) While living in McAllen, Hixson was accepted into the A–STEP alternative certification program, which provides individuals with a path to becoming a certified teacher. (*Id.* 38:21–39:15.) Hixson worked as a substitute teacher in various area school districts, including PSJA ISD, Harlingen ISD, and La Joya ISD, from approximately 2003 to 2005. (*Id.* 18:3–23.) During this time, Hixson applied for permanent teaching positions but was not chosen for them. (*Id.* 38:11–12, 42:3–43:5.)

In January 2006, Hixson moved to Houston. (Hixson Dep. 48:11–13.) Prior to his move, Hixson submitted an application to join HISD's alternative certification program ("ACP"). (*Id.* 53:8–13.) Hixson was accepted to ACP on November 29, 2005. (*Id.* 59:5–8, Ex. 6.) ACP provides individuals (also known as "interns") with the opportunity to become certified teachers. (Warren–Ards Decl. ¶ 2.) ACP interns must complete a six-month training, pass the content portion of the Texas Examination of Education Standards ("State-required tests") and independently find employment within HISD. (*Id.;* Hixson Dep. 59:13–17, 60:8–16.) Once an ACP intern passes his or her first State-required test, the intern is eligible to apply for permanent teaching positions at various schools. (Hixson Dep. 61:6–8.) If chosen for a permanent teaching position, the ACP intern is given a one-year probationary teaching certificate. (*Id.* 59:18–23.) During this one-year probationary period, the ACP intern must complete all of the State-required testing. (*Id.* 68:24–69:4.) If the ACP intern does not pass the State-required testing by the end of their probationary term, their employment in the permanent teaching position will not be renewed. (*Id.* 69:5–11.) On the other hand, once the ACP intern meets all the ACP benchmarks and obtains recommendations from the school principal and the ACP director, the ACP intern is eligible to apply for their standard teaching certificate. (Warren–Ards Decl. ¶ 2; Hixson Dep. 69:13–19.)

**\*2** Hixson began the HISD ACP program in February 2006 and completed his classes within the six month period. (Hixson Dep. 85:21–86:6.) Hixson had passed two State-required tests prior to moving to Houston. In December 2003, Hixson took the "special [education] content examination" from early childhood through 12th grade. (*Id.* 74:13–22.) In February 2004, he took the special education "pedagogy and professional" text for early childhood through 12th grade. (*Id.* 72:18–73:8.) These tests allowed him to teach special education from early childhood through twelfth grade. (*Id.* 74:16–19.) He took his third State-required test, a generalist examination from early childhood to Grade 4, on February 18, 2006. (*Id.* 71:16–72:6.) This exam allowed him to teach early

childhood to fourth grade students. (*Id.* 72:10–13.) Hixson's score on this exam placed him in the top eight percent of his "class." [1] (*Id.* 72:8–9.)

[1]  It is unclear whether Hixson refers to the "class" of fellow HISD ACP interns who might have taken this test or to the "class" of individuals at large who took this test, or to some other group altogether.

Because Hixson had already passed two State-required tests prior to his move to Houston, Hixson began applying in December 2005 for permanent teaching positions at HISD. (*Id.* 61:9–15; 71:2–5.) He continued to apply for permanent teaching positions at HISD schools throughout 2006, 2007, 2008, 2009, and until the present time. (*Id.* 86:7–8, 115:25–116:4, 128:22–129:6.) He has applied for approximately five thousand permanent teaching positions over the course of this time, and exactly three hundred thirty-eight (338) jobs in 2008. [2] (*Id.* 95:4; Warren–Ards Decl. ¶ 3.) In order to apply for permanent teaching positions at HISD, Hixson submitted an on-line employment application and attached his resume to the application. (Hixson Dep. 77:19–78:8, 101:14.) Over the years, Hixson updated his on-line employment application several times. (*Id.* 106:24–107:23.) More than one iteration of Hixson's employment application contained errors. In an application dated August 29, 2006, Hixson stated that he had a "professional certificate" for special education and a "probationary certificate" for EC–4 generalist, but should have indicated that he had probationary certificates for both positions. (*Id.* 79:4–22.) He also inaccurately described the special education certificate's length as "lifetime," when it should have stated "one year." (*Id.* 81:11–16.) Hixson characterized these as "clerical errors" and ascribes them to pressing the wrong button the computer. (*Id.* 79:23–24, 80:2, 81:14.) In another application, Hixson answered affirmatively to the question of whether he held a valid Texas certification even though he did not. (*Id.* 103:16–21.) He believed that holding a special education and elementary education certificate was the same as a valid Texas certification. (*Id.* 103:23–104:8.)

[2]  In our Memorandum and Order dated May 2, 2011 (Doc. No. 46), we dismissed Hixson's claims of age discrimination that are based on HISD's discriminatory acts before May 26, 2008 or after December 22, 2008. We found that discriminatory acts that occurred outside of May 26, 2008— December 22, 2008 were either time-barred or administratively unexhausted. Thus, we focus only

on HISD's discriminatory acts between the dates of May 26, 2008 and December 22, 2008. Of the 338 positions Hixson applied to in 2008, it is unclear how many Hixson applied to between the dates of May 26, 2008 and December 22, 2008.

After failing to receive interest in his application, Hixson sought assistance from various HISD personnel. He spoke to Robin Williams ("Williams"), a recruiter for HISD's human resources department, who gave him advice regarding certain items on his on-line application that should be fixed. (*Id.* 101:13–25, 110:2–111:12.) Williams put Hixson in touch with Josephine Morgan ("Morgan"), an EEO officer at HISD. (*Id.* 120:20–121:6.) Hixson drafted a letter that outlined his qualifications, including his status as ACP intern and HISD Associate Teacher, his success on the State-required tests, and his two-years of experience as a substitute teacher. Hixson also included language stating that "[t]ypically, other ACP candidates have passed only one test and do not have the years of classroom teaching experience as substitute or associate teachers possessed by Hixson." (Doc. No. 64 Ex. 2.) Williams sent Morgan the letter drafted by Hixson and changed the sentence stating that Hixson was "head and shoulders" more qualified than other ACP candidates to instead state that Hixson was "highly recommended." (Hixson Dep. 121:6–9.) Morgan signed the letter in September 2006, though she had never met Hixson in person and only exchanged emails with him. (*Id.* 120:15–17, 145:22–24, 146:24–25.)

**\*3** In 2008, HISD followed a selection process for its elementary education positions (kindergarten through fourth grade) and its special education positions. (Best Decl. ¶ 3.) School principals first reviewed an applicant's application, resume, cover letter, and reference letters. (*Id.*) If the principal was impressed with the applicant's traits, the principal interviewed the applicant and sometimes asked the applicant to conduct a demonstrative teaching lesson. (*Id.*) At the end of this process, the principal made a job offer to the applicant chosen for the position. (*Id.*)

Since he began applying for permanent teaching positions at HISD, Hixson has been called for between five and ten in-person interviews with school principals or vice-principals. (Hixson Dep. 96:3–16.) At these interviews, Hixson spoke about his substitute teaching experience at HISD and in McAllen and about his test scores. (*Id.* 132:20–22.) Hixson also conducted a computer demonstration of a pedagogical website to demonstrate the need for and utility of computers in the classroom. (*Id.* 132:22–134:16.) Hixson told the principals that he intended to purchase a computer for each

student in his class and showed the principals $10,000 in cash to demonstrate his commitment. (*Id.* 134:17–135:21.)

Hixson heard numerous comments from other teachers and teacher aids at HISD schools that HISD did not hire older individuals for permanent teacher positions and looked for ways to get rid of older individuals. (*Id.* 91:13–93:21.) At a school board meeting in March 2009, Hixson heard school board member Harwin Moore congratulate Melissa Garrett, HISD's director of finance, for savings on healthcare costs for the school district. (*Id.* 87:16–89:3.) Based on comments of fellow teachers and Moore's remarks at the school board meeting, Hixson concluded that HISD's policy is to save on healthcare costs by hiring people under 40 years of age due to their lower healthcare costs as compared to people over 40 years old. (*Id.* 88:12–16; 99:5–6.) Hixson also concluded that the principals in charge of hiring decisions are given a bonus for keeping the school budget low, which fuels a financial incentive not to hire individuals with high healthcare costs, such as those over the age of 40. (*Id.* 140:22–142:18.) However, Hixson never heard a principal comment that he or she would not hire someone over 40 years of age or that Hixson was not hired due to his age. (*Id.* 94:8–12; 96:22–25, 98:14–17.)

In September or October 2006, Hixson was hired by HISD as a substitute teacher. (*Id.* 49:18–21, 84:8–12.) Hixson remains a substitute teacher at HISD today. (*Id.* 84:13–15.) As a substitute teacher, Hixson is paid $10 per hour, receives no health insurance, and receives no benefits. (*Id.* 85:5–6, 143:25–144:4.)

Hixson filed a Charge of Discrimination with the EEOC on January 27, 2009, alleging age discrimination by HISD due to its failure to hire him for special education permanent teaching positions and EC–4 generalist permanent teaching positions. (*Id.* 112:7–15, 114:18–22.) In the Charge, Hixson stated that the earliest date of discrimination occurred on May 26, 2008 and that the latest date of discrimination was on December 22, 2008. (*Id.* 112:18–113:15.) Hixson claims that he was told by an EEOC representative that he could only put down charges for two years even though he had been discriminated against since "day 1." (*Id.* 112:22–113:9.) Hixson has not filed amended or new Charges of Discrimination against HISD. (*Id.* 113:16–114:10.)

**\*4** Hixson subsequently filed suit against HISD and several individual defendants for age discrimination in violation of ADEA arising out HISD's refusals to hire him for

permanent teaching positions. The individual defendants were subsequently dismissed. (Doc. No. 46.) Defendant HISD has now filed a motion for summary judgment and a motion to strike Hixson's statistical expert. The motions are briefed and ripe for disposition.

## II. MOTION TO STRIKE PLAINTIFF'S STATISTICAL EXPERT

Hixson has proffered the expert report of Brian D. Marx ("Marx"), Ph.D., who is a professor in the Department of Experimental Statistics at Louisiana State University. Marx performed certain statistical analyses on a set of data supplied by Hixson. The results of Marx's analyses have been submitted by Hixson as evidence that HISD discriminates on the basis of age in its hiring decisions.

HISD moves to strike Marx as an expert and to exclude his expert opinion on numerous grounds. Primarily, HISD argues that Marx's expert report does not meet the standards of Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), because his opinions and methodologies are unreliable. In addition, HISD contends that Marx advances impermissible legal conclusions, his testimony will not assist the trier of fact, and that his testimony is unduly prejudicial.

### A. Legal Standard

Federal Rule of Evidence 702 provides for the admission of expert testimony that assists the trier of fact to understand the evidence or to determine a fact in issue. A court is charged with a "gatekeeping function" to ensure expert testimony is both reliable and relevant. *Daubert,* 509 U.S. at 597. Reliability is analyzed under Rule 702, which requires that: (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. Fed.R.Evid. 702. As to the second prong, the Supreme Court has provided five, nonexclusive factors to consider when assessing whether a methodology is scientifically reliable. These factors are (1) whether the expert's theory can be or has been tested, (2) whether the theory has been subject to peer review and publication, (3) the known or potential rate of error of a technique or theory when applied, (4) the existence and maintenance of standards and controls, and (5) the degree to which the technique or theory has been generally accepted in the scientific community. *Daubert,* 509 U.S. at 593–

94. The test for determining reliability is flexible and can adapt to the particular circumstances underlying the testimony at issue. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 150–51, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). The party seeking to have the district court admit expert testimony must demonstrate that the expert's findings and conclusions are reliable, but need not show that the expert's findings and conclusions are correct. *Moore v. Ashland Chem., Inc.,* 151 F.3d 269, 276 (5th Cir.1998).

**\*5** Further, the expert witness must be qualified "by knowledge, skill, experience, training, or education...." Fed.R.Evid. 702. A court must exclude an expert witness "if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Wilson v. Woods,* 163 F.3d 935, 937 (5th Cir.1999); However, "Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue. Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." *Huss v. Gayden,* 571 F.3d 442, 452 (5th Cir.2009) (citing *Daubert,* 509 U.S. at 596).

Under Rule 704(a), "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Fed.R.Evid. 704(a); *United States v. Izydore,* 167 F.3d 213, 218 (5th Cir.1999). "Rule 704, however, does not open the door to all opinions." *Owen v. Kerr–McGee Corp.,* 698 F.2d 236, 240 (5th Cir.1983). Expert witnesses may neither tell the jury what result to reach nor provide legal conclusions. *Id.*

The party seeking to rely on expert testimony bears the burden of establishing, by a preponderance of the evidence, that all requirements have been met. *Daubert,* 509 U.S. at 593, n. 10; *Moore,* 151 F.3d at 276.

### B. Marx's Professional Qualifications and Expert Opinions

Marx has been a Full Professor of Statistics in the Department of Experimental Statistics at Louisiana State University since 1999. (Expert Report of Brian D. Marx ("Marx Report") App. A at 2, Doc. No. 37.) He previously held academic positions at Leiden University in The Netherlands, at LMU University of Munich in Germany, and at Stanford University. (*Id.*) Marx received his Master's Degree in Statistics from Penn State University and his Ph.D. in Statistics from Virginia Tech (Virginia Polytechnic Institute and State University). (*Id.* at 1.) He has published a number of book chapters and articles regarding regression models in statistical modeling and has two books scheduled to be published in the forthcoming year. (*Id.* at 2–5.) He is editor of a journal, *Statistical Modelling: An International Journal,* and is the statistical editor of another journal, *Journal of Apicultural Research.* (*Id.* at 8.) Over the last seventeen years, he has provided professional statistical consulting services in a variety of cases and topics. (Marx Dep. 11:5–14:7.)

In one project from 1994 to 1996, Marx analyzed the possible employment discrimination in the mass firing of restaurant workers at a major hotel. (*Id.* 14:11–15:2.) Marx conducted several statistical analyses in order to determine whether there was a significant association between the race of an employee and the proportion in which a particular race was represented in a management level or level of employment. (*Id.* 15:11–18:2.) His analyses resulted in a determination that there was a disparity in the distribution across race at various levels of management and that these disparities were significant. (*Id.* 19:17–19.) Marx did not testify as an expert in that case, but did present several charts with statistical summaries to his client. (*Id.* 18:18–19:5 .) Other than this case and Hixson's case, Marx has not performed any consulting work with respect to employment discrimination litigation. (*Id.* 20:16.) Marx does not have any specialized training with respect to statistical analyses in employment discrimination, has never taught courses on employment discrimination or employer hiring, and has never conducted research or authored publications on the topic of employment discrimination or hiring practices, (*Id.* 21:6–21, 22:22–23:5, 28:15–23, 29:1–4, 30:2–23, 32:8–12, 32:25, 35:7–12, 43:2–17.)

**\*6** Marx has prepared and submitted an expert report at the request of Hixson. (Marx Report App. B.) In his report, Marx conducted one statistical analysis. Marx was given by Hixson a chart containing data purportedly supplied by the Texas Education Agency (the "TEA Chart" or "PIR 9794"). (Marx Report App. D; Marx Dep. 69:22–70:3, 78:8–10.) In addition, Marx was supplied a statistical analysis containing programming, a summary of the data, charts, and tables prepared by an individual named Yanli Chen ("Chen"). (Marx Dep. 70:6–9.) Chen's programming synopsis and charts are attached to Marx's Report as Appendix C. (Marx. Report App. C; Marx Dep. 70:8–9.) Marx spoke to Chen about her

statistical methodology and data structure and confirmed that Chen's statistical analysis was also based upon the data in the TEA Chart. (Marx Dep. 71:2–24.) Marx then performed his own statistical analysis using certain data in the TEA Chart. (*Id.* 72:2.)

The TEA Chart contains a list of HISD ACP candidates who applied for employment at HISD between 2006 and 2008. (Marx Dep. 83:9–12, 85:2–5.) The TEA Chart contained information regarding a number of characteristics about each individual (e.g., ethnic group, gender), only two of which are relevant here. First, each individual was assigned to an age or "birth" group. (*Id.* 72:16–19; Marx Report App. D.) Second, each individual was listed as "employed" or not employed (also referred to as "hired" or "not hired"). (Marx Report App. D; Marx Dep. 72:20–73:9.) Marx assumed that the list of HISD ACP candidates in the TEA Chart was representative of the entire applicant pool for teaching jobs at HISD because the TEA Chart was "an applicant pool provided by the Texas Education Agency ." (Marx Dep. 77:13–21.)

Marx began with the null hypothesis that there was no association between age group and hiring rate. (Marx Dep. 74:15–17.) In other words, Marx began with the hypothesis that the hiring rate was constant across age group, i.e., that the proportion of individuals with each age group would remain constant across the "hired" group of individuals and the "not hired" group of individuals. (*Id.* 74:20–23.)

Marx then used the Chi–Square Test for Independence. (*Id.* 69:7–8.) The Chi–Square Test is a statistical method that tests for association across two variables that are categorical in nature.[3] (*Id.* 69:11–12.) He used "age group" as the first variable and "hired or not hired" as the second variable within the Chi–Square Test in order to determine whether there was a significant association or dependency contingency between these two variables. (*Id.* 69:17–20.) In essence, Marx used the test to arrive at percentages of individuals who were hired within a particular age group. (*Id.* 73:6–9.) The results of his analysis were that "the profiles of the distributions of age groups significantly varied across those people who were hired when compared to those people who were not hired." (*Id.* 73:12–14.) In other words, Marx found that older age groups are hired at a lesser rate than persons in the younger age group. (*Id.* 75:15–18.) Specifically, Marx found that the odds of one being hired under the age of 40 is 4.75 times greater than the odds of being hired if one was over the age of 40. (*Id.* 76:3–5.)

[3] As succinctly described in *Local Union Nos. 605/985, IBEW v. Miss. Power & Light Co.,* Case No. 3:96–CV572WS, 2004 U.S. Dist. LEXIS 31182 (S.D.Miss. Sept. 30, 2004), the Chi–Square test is a statistical method that may be used to determine whether differences in selection rates are associated with a particular variable, such as age:

> The chi-square procedure establishes an expected selection rate and then determines whether the difference between the expected selection rate and the actual selection rate is statistically significant. Small deviations are expected to occur as a result of chance, but at some point the deviation becomes so large that chance alone can be ruled out. For example, if thirty-three (33) persons passed an exam that made them eligible for promotion, and, of this thirty-three (33), the racial breakdown was twenty-four (24) whites, six (6) African Americans, and three (3) Hispanics, then the percentage of whites is 72%; the percentage of African Americans is 18%; and the percentage of Hispanics is 10%. If 22 of these persons are promoted, then one might expect that 72% of the 22 would be white (16); 18% would be African American (4); and 10% would be Hispanic (2) if the promotions were made at random. The chi-square test measures deviation from expected behavior. Any deviation from this expectation may indicate some influence other than random chance. Although some deviation may be expected to occur by chance, too much deviation must be accounted for by something other than chance. A significant chi-square value would indicate favoritism.

*Id.* at *30–*31 (omitting internal citations).

**\*7** Marx believed that the rate of error of his findings was one in 1,000, but could be as low as one in 12,000. (*Id.* 76:7–12, 121:11–18.) Marx found the statistical discrepancy to be significant. (*Id.* 73:15–16.) Marx summarizes his statistical expert report as follows:

> I have been asked to review, summarize and verify the statistical methods performed on data related to the above case. I have read and

reviewed a preliminary report based on 2008 data. The data are analyzed using a Chi-square test for association, which is an appropriate method for the tabulated data: Age group and Hiring count. The hypothesis that was tested is that no association exists between age group and hiring rate. The test statistic follows a chi-square distribution (with appropriate degrees of freedom) under this assumption of no association. The data finds extremely compelling evidence of a significant association (i.e. older age groups are hired less), and thus there is significant evidence to reject this hypothesis of no association. The data were explored more thoroughly through statistical regression techniques by breaking down the data by various job types, which also demonstrated significant relationships. In summary, I found the statistical analysis to be valid and highly significant in finding associations.

(Marx Report App. B.)

Outside of his expert report, Marx conducted two additional statistical analyses. The first analysis involved data provided by HISD consisting of a list of the positions for which Hixson applied and were filled by ACP interns during the period of 2008–09 (the "HISD Chart"). (Marx Dep. 102:15–17, 124:12–22.) Not all the ACP interns on the HISD Chart were *HISD* ACP interns; some were interns enrolled in ACP programs offered by other school districts or organizations. (*Id.* 127:17–15.) The HISD Chart contained only information regarding ACP interns who were hired, and did not contain information regarding ACP interns who were not hired. (*Id* . 102:15–17, 124:25–125:1.) Similar to his analysis of the TEA Chart, Marx examined whether the age distribution of individuals hired was similar to the age distribution of applicants to the positions. (*Id.* 125:2–9.) Because the HISD Chart did not contain information about the individuals who applied, but were not hired for the positions, Marx estimated the age distribution of the entire pool of applicants using the data contained in the TEA Chart. (*Id.* 125:6–9.) Marx's

applied the Chi–Square Test to the data in the HISD Chart. (*Id.* 129:13–14.) The hypothesis Marx tested was whether the data in the HISD Chart fit well with or significantly departed from the age distribution of individuals in the TEA Chart. (*Id.* 130:1–4.) Marx could not conduct the same analysis as he had with the TEA Chart because he did not have data regarding the individuals who were "not hired" for the positions to which Hixson applied. (*Id.* 130:1–14.) His analysis of the HISD Chart showed that the hiring rate (or distribution of hired individuals over and under 40) was not representative of the applicant age pool, as supplied by the TEA Chart, and that there was a significant association between age and hiring rate. (*Id.* 125:9–19, 126:2–5.) Marx found that the odds of someone under 40 being hired was approximately 2.25 times greater than the odds of someone over 40 being hired. (*Id.* 125:9–19.) He believed that this finding was statistically significant, with the probability of making an error as one in 30.03. (*Id.* 125:16–19.)

**\*8** The second analysis involved data provided by Hixson. (*Id.* 115:10–116:3.) Hixson told Marx that he had applied for approximately 2000 jobs and that there were approximately 300 applicants per job. (*Id.* 115:10–14.) Hixson also told Marx that he had zero offers. (*Id.* 115:14–15.) Based on this data, Marx calculated the probability of Hixson receiving zero offers as one out of 750. (*Id.* 115:14–19.) Marx's calculations showed that Hixson should have received approximately seven offers assuming that Hixson was average-qualified applicant. (*Id.* 115:19–116:3.)

As a result of his analyses, Marx concluded that HISD engaged in age discrimination in hiring decisions relating to teachers. (Marx Dep. 105:19–22, 106:3–8.)

**C. Analysis**

As many courts have recognized, statistics can play a significant role in discrimination cases. *See, e.g.,* *Wilkins v. Univ. of Houston,* 654 F.2d 388, 395 (5th Cir.1981) (citing *Hazelwood Sch. Dist. v. United States,* 433 U.S. 299, 307–08, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977)); *Carter v. Ball,* 33 F.3d 450, 456 (4th Cir.1994) ("Statistics can provide important proof of employment discrimination."). Statistical evidence can be used either to establish an inference of discrimination as an element of plaintiff's *prima facie* case, or to rebut the employer's stated nondiscriminatory reason for its action as pretext. *See* *EEOC v. Texas Instruments Inc.,* 100 F.3d 1173, 1185 (5th Cir.1996) ("statistical evidence may be

probative of pre-text in limited circumstances"); *Anderson v. Douglas & Lomason Co.,* 26 F.3d 1277, 1285 (5th Cir.1994) ("The plaintiffs may establish a prima facie case of disparate treatment by the use of statistics ...") (internal citations omitted). However, "the Supreme Court has cautioned 'that statistics are not irrefutable; they come in infinite variety and, like any other kind of evidence, they may be rebutted. In short, their usefulness depends on all the surrounding facts and circumstances.' " *Wilkins,* 654 F.2d at 395 (citing *Int'l Brotherhood of Teamsters v. United States,* 431 U.S. 324, 340, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1997)).

"Where plaintiffs use statistical evidence to challenge an employer's hiring practices, that evidence, to be probative of discriminatory intent, must compare the relevant portion of the employer's work force with the qualified population in the relevant labor market." *Anderson,* 26 F.3d at 1286 (quoting *EEOC v. Olson's Dairy Queens, Inc.,* 989 F.2d 165, 168 (5th Cir.1993)); *Carter,* 33 F.3d at 456 (statistical analysis must compare presence or absence of minority employees to relevant labor pool). In determining the composition of the relevant labor market or labor pool, "[a]ctual applicant flow figures are the preferred method by which to measure an employer's hiring practices and performance." *Anderson,* 26 F.3d at 1287; *see also Scott v. Univ. of Miss.,* 148 F.3d 493, 510 (5th Cir.1998).

With these guidelines regarding the use of statistical evidence in employment discrimination cases in mind, we review the three statistical analyses conducted by Marx.[4]

[4] Although we have no doubt that Marx is an eminently qualified statistician, we view his almost-complete lack of academic and professional experience in the area of statistical analyses of employment discrimination and employer hiring practices as a serious challenge to his qualification to render an expert opinion in this case. *See* Fed.R.Evid. 702. Our findings regarding the deficiencies in Marx's data and analysis, including the failure to analyze the actual or potential applicant pool, suggest that familiarity with the use of statistics with the specialized area of employment discrimination law is essential. However, because we exclude Marx's expert opinion on other grounds, we need not resolve the issue of whether Marx is qualified to render an opinion in this case.

### 1. Analysis of TEA Chart

**\*9** In his first analysis, Marx used data contained in the TEA Chart that provided the age groups and hiring rate of members of HISD's ACP program who applied to teaching positions. He compared the age distribution among all of the individuals listed in the TEA Chart to the age distribution among the individuals who were hired for teaching positions. He concluded that there was a statistically significant discrepancy in the hiring rate of applicants over 40 years of age as compared to the hiring rate of applicants under 40 years of age. Marx found that older applicants were hired at a lesser rate than persons in the younger age group. HISD has challenged this opinion on a number of grounds, including the unreliability of his methodology and the inaccuracy and incompleteness of the facts upon which his opinions are based. After a careful review of the data underlying Marx's analysis and the methodology he used, we must exclude Marx's opinion. We confine ourselves to the most serious deficiencies in Marx's analysis.[5]

[5] There are many other deficiencies in Marx's analysis. For example, Marx's analysis did not limit itself to 2008, which is the relevant time period to this lawsuit. (Marx Dep. 97:9–11.) Neither Marx nor Hixson offer an explanation of why an analysis of the time period 2006 to 2008 should be appropriate when examining hiring decisions that occur within a much smaller segment of time within the larger time period. In addition, Marx's analysis appears to be based upon an analysis performed by an individual named Yanli Chen. Hixson has not identified who Chen is, what her role in this lawsuit has been, her statistical methods, why her charts and graphs should be included in Marx's report, or how her analysis meets the *Daubert* standard.

First, Marx's analysis is based upon data contained in a chart that was purportedly furnished by TEA to Hixson. However, the TEA Chart neither has been authenticated by an individual with personal knowledge that it contains accurate information and nor falls within a category of self-authenticating documents. *See* Fed.R.Evid. 901, 902. Other than Hixson's statement that the chart was provided by the TEA, we have no information about the chart's provenance. Without authentication of the TEA Chart, we cannot conclude

that data underlying Marx's analysis is based upon sufficient facts or data, as required by Rule 702.

Second, the TEA Chart does not identify the positions for which the "hired" individuals were hired. (Marx Dep. 78:21–79:9, 98:23–25.) The TEA Chart does not even identify whether the "hired" individuals were hired as teachers. (Marx Dep. 133:14–19.) Hixson cannot use the TEA Chart to challenge discriminatory *teacher* hiring practices when he cannot even confirm that the data corresponds to individuals hired as teachers. Hixson is not bringing a challenge to discriminatory hiring practices by HISD in general (including, administrative, executive, or other positions), but rather is challenging HISD's hiring practices with respect to permanent *teaching* positions. Thus, data that does not confine itself to the hiring rate applicable to teaching positions is an insufficient bases upon which to test discriminatory hiring specific to this position.

Third, Marx does not know whether any of the individuals on the chart were actually hired by HISD. (Marx Dep. 83:17–23.) On the TEA Chart, each individual has a "yes" or "no" under the column entitled "Employed?". (Marx Report App. D.) However, there is also a column called "Organization Name" on the TEA Chart. (Marx Report App. D.) Each individual who is listed as employed has an "Organization Name" also listed. Each individual who is listed as not employed does not have an associated "Organization Name." (Marx Report App. D.) Four individuals who are listed as employed are associated with "Aldine ISD" as the "Organization Name." (Marx Report App. D at 1.) Three individuals who are employed are associated with "Alief ISD." (Marx Report App. D at 1.) Two individuals who are employed are associated with "Pasadena ISD." (Marx Report App. D at 4.) One person who is employed is associated with "Northwest Preparatory" and one person is associated with "Yes College Preparatory School." (Marx Report App. D at 4.) This information suggests that the data, and the subsequent analysis, did not confine itself to the hiring rate of HISD and included the hiring rate of other schools. However, Hixson is challenging the discriminatory hiring practices of HISD, not the discriminatory hiring practices of HISD in conjunction with other schools. Neither is Hixson challenging the HISD ACP program's vulnerability to discriminatory hiring practices by employers in general. Rather, Hixson challenges HISD's discriminatory hiring practices with respect to permanent teaching positions. Thus, a data set that includes information about hiring by schools other than HISD is inappropriate to support an analysis of HISD's discriminatory hiring practices.

**\*10** Fourth, and perhaps most importantly, the TEA Chart does not comprise the entire pool of candidates for teaching positions at HISD. (Marx Dep. 85:2–13.) The applicant pool Marx analyzed consisted only of HISD ACP candidates, but did not include ACP candidates from other ACP programs, or even more significantly, *certified teachers* who applied for teaching positions at HISD. (Marx Dep. 85:2–13.) Marx simply assumed that the TEA Chart represented the age distribution of the actual, entire pool of applicants for teaching positions at HISD. (Marx Dep. 126:10–17.) However, when determining the composition of the relevant labor pool, the actual applicant flow figures are the "preferred method" by which to measure HISD's hiring practices and should be used if available. *See* McClain v. Lufkin Indus., 519 F.3d 264, 279 (5th Cir.2008), *cert. denied,* 555 U.S. 881; Anderson, 26 F.3d at 1287; Scott, 148 F.3d at 510. Here, Hixson has not demonstrated that actual applicant flow data is unavailable. What Marx analyzed and used as the "relevant labor pool" was not the entire actual pool (or even the entire potential pool) of applicants for HISD's permanent teaching positions, but only a subset of applicants (the subset being members of HISD's ACP program). In order for Marx's statistical analysis to meet the standards outlined by the Fifth Circuit, Marx should have analyzed data regarding the entire actual applicant pool, or if this was unavailable the entire potential applicant pool, for HISD's permanent teaching positions. Alternatively, Marx should have provided some basis for his assumption that the age distribution of individuals in the TEA Chart was representative of the age distribution of the actual applicant pool or the age distribution of the potential labor pool. We cannot credit Marx's assumption based only upon his *ipse dixit* statement. Indeed, we note that some of the applicants left out of the labor pool, i.e. certified teachers, are individuals whose age distribution might skew towards the older range of ages.

Fifth and finally, Marx's analysis did not take into account various factors that may have been used by principals in making hiring decisions, such as references for each candidate, substitute teaching experience, and other variables, because he did not believe that the distribution of these factors would vary across age groups in the TEA Chart. (Marx Dep. 107:12–20, 107:12–20.) In Bazemore v. Friday, 478 U.S. 385, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986), the Supreme Court held that the plaintiffs' regression analysis

Case 4:17-cv-02960  Document 294-1  Filed 02/07/22 in TXSD  Page 158 of 179
Hixson v. Houston Independent School Dist., Not Reported in F.Supp.2d (2011)
2011 WL 3648104

of a wage disparity between black and white employees with the same job title, education and tenure was admissible even though there were other variables, such as county-by-county wage variations, that might have accounted for the salary disparity. The Supreme Court found that, though "the omission of variables from a regression analysis may render the analysis less probative than it otherwise might be," it does not make the analysis unacceptable as evidence. *Id.* at 400. However, a regression analysis that fails to take into account *significant* non-discriminatory factors, such as education and prior work experience, may be rejected as flawed. *See Medley v. DOJ of La.,* No. 10–31107, 2011 U.S.App. LEXIS 9954, *8–*9, 2011 WL 1834817 (5th Cir. May 16, 2011) (statistical analysis failed to account for several major variables, including education, past work experience, and length of job tenure); *Sheehan v. Purolator, Inc.,* 839 F.2d 99, 103 (2d Cir.1988). Here, Marx failed to take into account two extremely important factors—education and prior work experience—that may account for the disparity he found between the hiring rate of individuals under 40 and the individuals over 40. As such, we find that this flaw is one that renders the statistical analysis inadmissible. *See Medley,* 2001 U.S.App. LEXIS 9954 at *8, 2011 WL 1834817 (citing *Bazemore,* 478 U.S. at 400 n. 10 (noting that there are "some regressions so incomplete as to be inadmissible as irrelevant")).

### 2. Analysis of HISD Chart

 **\*11**  In his second analysis, Marx relied upon the data contained in the HISD Chart. The HISD Chart listed all of the positions for which Hixson applied and were filled by ACP interns during the period of 2008–09. Marx's analysis of the HISD Chart showed that the hiring rate of ACP interns was not representative of the applicant age pool. However, the labor pool used in this analysis was drawn from the TEA Chart, which, as discussed above, was not representative of either the actual applicant pool or the potential applicant pool for permanent teaching positions at HISD. As such, we must reject this analysis as unsound because it did not analyze the actual or potential applicant pool and did not provide a basis for assuming that the age distribution among the individuals in the TEA Chart is representative of the age distribution among the actual or potential applicant pool.

### 3. Analysis of Job Offers Hixson Should Have Received

In his third and final analysis, Marx took information provided by Hixson regarding the number of permanent teaching positions at HISD to which Hixson applied, the number of applicants for each position, and the number of job offers Hixson received. Marx analyzed this data and concluded that Hixson should have received a certain number of job offers based on the number of applications he submitted. In addition, Marx concluded that the probability that Hixson received zero offers considering the number of job applications he submitted to be one out of 750.

We find Marx's analysis here to be based upon insufficient data. Marx relied only on the figures provided by Hixson, which Hixson, in turn, heard at a court hearing. Marx testified that he did not know in what time period Hixson applied for the approximately 2000 jobs. (Marx Dep. 120:11–13.) He does not know how many jobs Hixson applied for in 2008. (Marx Dep. 120:8–10.) He does not possess the exact number of jobs that Hixson applied to. (Marx Dep. 120:6–7.) Hixson himself obtained these numbers during an "evidentiary" hearing where HISD's counsel stated that Hixson applied for 2000 jobs and that 300 applicants applied for each job. (Marx Dep. 144:16–20.) However, Hixson has not verified that these figures are exact or even close approximations to the actual number of Hixson's job applications and the number of applicants for each position. Without appropriate evidence supporting these figures as accurate and complete, we cannot conclude that they comprise sufficient data for Marx's analysis.

In sum, we exclude the entirety of Marx's expert opinion due to the insufficient facts and data upon which it is based and the failure of Marx's statistical method to take into account significant variables distinguishing the applicant pool, such as education and prior work history.

### III. SUMMARY JUDGMENT LEGAL STANDARD
A motion for summary judgment requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented. FED. R. CIV. P. 56(c). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Kee v. City of Rowlett,* 247 F.3d 206, 210 (5th Cir.2001) (quotations omitted). A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving

**Hixson v. Houston Independent School Dist., Not Reported in F.Supp.2d (2011)**

2011 WL 3648104

party. *Crawford v. Formosa Plastics Corp.,* 234 F.3d 899, 902 (5th Cir.2000). The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact but need not negate the elements of the nonmovant's case. *Exxon Corp. v. Oxxford Clothes, Inc.,* 109 F.3d 1070, 1074 (5th Cir.1997). If the movant meets this burden, then the nonmovant is required to go beyond its pleadings and designate, by competent summary judgment evidence, the specific facts showing that there is a genuine issue for trial. *Id.* The Court views all evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Id.* Hearsay, conclusory allegations, unsubstantiated assertions, and unsupported speculation are not competent summary judgment evidence. F.R.C.P. 56(e)(1); *See, e.g., Eason v. Thaler,* 73 F.3d 1322, 1325 (5th Cir.1996), *McIntosh v. Partridge,* 540 F.3d 315, 322 (5th Cir.2008); *see also Little v. Liquid Air Corp.,* 37 F.3d 1069, 1975 (5th Cir.1994) (noting that a nonmovant's burden is "not satisfied with 'some metaphysical doubt as to the material facts.' " (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

### III. SUMMARY JUDGMENT ANALYSIS

**\*12** HISD has moved for summary judgment on Hixson's claim of age discrimination under the ADEA. It contends that Hixson cannot establish a *prima facie* case of discrimination, that it possesses legitimate, nondiscriminatory reasons for not hiring Hixson, and that Hixson cannot show that HISD's legitimate, nondiscriminatory reasons were pretextual. In Response, Hixson contends that he has established a *prima facie* case of discrimination, that HISD has failed to offer legitimate, nondiscriminatory reasons for its failure to hire him, and that HISD's reasons are mere pretext.

A plaintiff filing suit under the ADEA may allege age discrimination either under a theory of disparate treatment or disparate impact. *See Smith v. City of Jackson,* 544 U.S. 228, 240, 125 S.Ct. 1536, 161 L.Ed.2d 410 (2005) (disparate impact theory of liability is available under ADEA); *Reeves v. Sanderson Plumbing Prods.,* 530 U.S. 133, 141, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (disparate treatment theory of liability available under ADEA). Only a disparate treatment claim is at issue here.[6] To prove disparate treatment under the ADEA, a plaintiff must prove, by a preponderance of the evidence, that age was the "but-for" cause of the challenged adverse employment action. *Gross v. FBL Fin. Servs.,* 557 U.S. ——, 129 S.Ct. 2343, 2352, 174 L.Ed.2d 119 (2009). A plaintiff may prove intentional discrimination by presented either direct or indirect evidence. *Scott v. Univ. of Miss.,* 148 F.3d 493, 504 (5th Cir.1998).

[6] Although Hixson devotes a portion of his response brief to arguing a claim based on disparate impact, we will not consider this argument. In our Memorandum and Order dated June 13, 2011 (Doc. No. 58), we denied Hixson leave to amend his complaint and add a claim of age discrimination based on disparate impact. We found that granting leave was futile because Hixson had failed to exhaust his administrative remedies with respect to a disparate impact-based claim.

When a plaintiff does not possess direct evidence of discrimination, courts apply the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See, e.g., Reeves,* 530 U.S. at 142–43 (applying *McDonnell Douglas* to ADEA claim); *Scott,* 148 F.3d at 504 (same). Under this framework, a plaintiff must first establish a *prima facie* case of discrimination. *Reeves,* 530 U.S. at 142. If the plaintiff establishes a *prima facie* case, the burden shifts to the employer to "produce evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The burden imposed upon the employer at this stage is one of production, not persuasion; the evidence, if taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). If the employer proffers such a justification, the plaintiff must come forward with some evidence, direct or circumstantial, "to rebut each of the employer's proffered reasons and allow the jury to infer that the employer's explanation was a pretext for discrimination." *Scott,* 148 F.3d at 504. "[T]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine,* 450 U.S. at 253.

It is undisputed that Hixson does not possess direct evidence of discrimination. (Hixson Dep. 94:8–12; 96:22–25, 98:14–17.) Therefore, we will analyze Hixon's claims of age discrimination under the *McDonnell Douglas* burden-shifting framework.

### A. Hixson's *Prima Facie* Case of Discrimination

**\*13** To establish a prima facie case for discriminatory failure to hire under the ADEA, the plaintiff must show that (1) he was over the age of forty at the time he was not selected; (2) he was qualified for the position he sought; (3) he was not selected; and (4) the job remained open or was filled by someone younger. *See* Berquist v. Wash. Mut. Bank, 500 F.3d 344, 349 (5th Cir.2007) (citations omitted) (setting forth a prima facie case under the ADEA for discriminatory discharge); Lindsey v. Prive Corp., 987 F.2d 324, 327 (5th Cir.1993).

It is undisputed that the first and third elements of Hixson's *prima facie* case are met. Hixson was born on August 19, 1952 and over the age of 40 when he applied to all of the permanent teaching positions at HISD. (Hixson Dep. 16:10.) He was not selected for any of these positions. Therefore, we will focus on the second and fourth elements of Hixson's *prima facie* case.

### 1. Hixson Was Qualified for Positions Sought

HISD argues that Hixson was not qualified for the permanent teaching positions he sought because (1) his application and resume were poorly drafted and contained mistakes (or even misrepresentations), and (2) his resume was not tailored to the positions he sought because he failed to indicate that he wished to teach non-Special Education classes. HISD concedes that Hixson had completed and passed all State-required tests for the Special Education and Elementary Education (Kindergarten through Fourth Grade) teaching positions to which he applied in 2008. (Mot. Summ. J. at 4.) As a result of passing these tests, Hixson was eligible to teach Elementary Education up to the Fourth Grade or Special Education. (*Id.*)

The Fifth Circuit has recognized that this element of a *prima facie* case is met once a plaintiff demonstrates that he possesses the "objective" employment qualifications; whether the plaintiff possesses "subjective" qualifications are left to the pretext stage of the *McDonnell–Douglas*

analysis. *See* Lindsey v. Prive Corp., 987 F.2d 324, 326–27 (5th Cir.1993) (holding *prima facie* case should not involve assessment of whether plaintiff met defendant's subjective qualification that dancers be "beautiful, gorgeous, and sophisticated"). Here, Hixson certainly possessed some of HISD's objective qualifications for permanent teaching positions because he had passed all of the State-required tests. [7] As for the "objective" requirement that Hixson specify the teaching position he sought on his resume, Hixson's failure to list his interest in Elementary Education positions potentially renders him unqualified only for the Elementary Education positions he sought. He remains qualified for the Special Education positions he sought because he clearly indicated in his resume that he desired to work in special education. Finally, with respect to HISD's "objective" criterion that applications and resumes be error-free and accurate, it is not clear that HISD actually used this as an objective qualification by which to reject applicants. Of the twenty-six declarations HISD submitted from the principals charged with hiring decisions, only four principals indicated that errors in Hixson's application materials were a reason they had chosen not to hire him. (Mot. Summ. J Ex. D–14, D–17, D–22, D–23.) Hixon's inclusion of errors in his application materials likely would have put him out of the running for teaching positions, but we believe there are fact issues as to whether principals actually used such errors as an "objective" criterion by which to disqualify applicants. Based on the undisputed fact that Hixson passed the State-required tests, we find that Hixson has proffered sufficient evidence to establish that he was qualified for the permanent teaching positions he sought.

7    Hixson has also proffered evidence of his qualifications in the form of audio recordings and recommendation letters from HISD personnel. HISD has challenged the admissibility of audio recordings. We need not resolve this issue because we determine that Hixson was qualified for the positions he sought based on his undisputed deposition testimony that he passed the three State-required tests.

### 2. Someone Outside Hixson's Protected Class Was Hired or the Position Remained Open

**\*14** HISD argues that Hixson cannot establish this element of his *prima facie* case because, of the three hundred thirty-eight (338) positions to which he applied in 2008, thirty-two (32) individuals hired for those positions were over the age

of 40. Twenty-seven (27) positions were either closed or not filled between May 26, 2008 and December 22, 2008.

Hixson has submitted a chart prepared by HISD listing the positions to which Hixson applied that were filled by ACP interns and containing birthdate information for the ACP interns. (Response to Mot. Summ. J.App. 6.) This chart demonstrates that many of the positions to which Hixson applied were filled by ACP interns younger than the age of 40.

Hixson has also submitted a chart prepared by HISD listing the positions to which Hixson applied that were filled by certified teachers, although this chart does not contain any birthdate information for the certified teachers. (*Id.* App. 7.) The declaration of Sharron Warren–Ards, HISD Certification Officer, confirms the information contained in this chart— that, of the positions to which Hixson applied, two hundred twenty-three positions (223) were filled by certified teachers. (Warren–Ards Decl. ¶ 3.) Further, Warren–Ards states that thirty-two (32) individuals hired were over the age of 40. (Warren–Ards Decl. ¶ 4 .) Assuming that these thirty-two individuals over 40 were all certified teachers, we are still left with the fact that HISD hired 191 certified teachers under the age of 40 for positions to which Hixson applied. As such, we find that Hixson has proffered sufficient evidence that the positions to which he applied were filled by individuals under the age of 40.

As for the 32 individuals hired who were over the age of 40, they may have been younger, the same age as, or older than Hixson. Hixson can meet his *prima facie* case by showing that someone younger was hired for the teaching positions. *See* 🚩 *Berquist,* 500 F.3d at 349. To the extent that these 32 individuals were younger than Hixson, Hixson has demonstrated that someone younger was hired for the teaching positions.

With respect to HISD's contention that Hixson cannot meet this element of his *prima facie* case because 27 positions were either closed or not filled between May 26, 2008 and December 22, 2008, the positions that were not filled (remained open) can still serve as a basis for a *prima facie* case. *See* 🚩 *Lindsey,* 987 F.2d at 327. As for the positions that were closed, these cannot serve as the basis for Hixson's *prima facie* case because these are not positions that were either filled by someone outside the protected class, someone younger than Hixson, or remained open.

Therefore, we find that Hixson has demonstrated that, with the exception of the positions that were closed between May 26, 2008 and December 22, 2008, the positions were filled by individuals under 40, individuals younger than himself, or remained open. In sum, we find that Hixson has demonstrated the necessary elements of a *prima facie* case of age discrimination.

**B. HISD's Proffered Legitimate, Nondiscriminatory Reasons**

**\*15** HISD has proffered several legitimate, nondiscriminatory reasons for not hiring Hixson for the positions to which he applied. First, with respect to 223 positions, HISD hired certified teachers, who were more qualified than Hixson because they already possessed state certification. Second, with respect to 88 positions, HISD hired ACP interns instead of Hixson for several reasons: (a) Hixson's resume and application did not indicate the type of prior experience he had working with younger children; (b) Hixson's resume and application indicated that he was looking for a position other than the one posted at that particular school; (c) Hixson did not have prior experience teaching students with behavioral needs; (d) in his application materials, Hixson did not express a desire to be a part of a team; (e) Hixson did not possess a strong background in mathematics or some other particular field the principal was focused upon; (f) Hixson did not have as impressive of academic credentials as some other ACP interns; (g) Hixson's resume and application was poorly written and contained errors; (h) Hixson did not have prior experience working with the principal, unlike the person who was hired; (i) Hixson was not part of Teach for America, unlike other HISD ACP interns; (j) Hixson's act of offering $10,000 to principals at his interview left an unfavorable impression. (Mot. Summ J. at 12–15 & Ex. D; Best Decl. ¶¶ 4–8.)

All of the reasons proffered by HISD for not hiring Hixson are legitimate and nondiscriminatory. HISD's desire to hire individuals with greater experience or better qualifications, such as certified teachers, teachers with superior academic credentials or enrollment in Teach for America, or teachers with a particular type of work experience or subject matter background, have been recognized as legitimate, nondiscriminatory reasons. *See* 🚩 *Price v. Fed. Express Corp.,* 283 F.3d 715, 721 (5th Cir.2002) (promoted candidate's management experience, military training and ties to local law enforcement served as legitimate, nondiscriminatory reasons for failure to

promote plaintiff); *Scott,* 148 F.3d at 505–507 (plaintiff's lack of federal clerkship experience, inferior legal writing experience, and lack of classroom teaching experience as legitimate, nondiscriminatory reasons for failure to hire);

*Bennett v. Total Minatome Corp.,* 138 F.3d 1053, 1061 & n. 11 (5th Cir.1998) (plaintiff's inability to speak French, insufficient offshore experience, and lack of drilling experience recognized as legitimate, nondiscriminatory reasons); *Pond v. Braniff Airways,* 500 F.2d 161, 165 (5th Cir.1974) (no discrimination where employer weighed talents of respective applicants and chose one over other based on talent). As for Hixson's failure to profess a desire to work as part of a team, this too has been recognized as a legitimate, nondiscriminatory reason for an employer's adverse employment action. *See Bennett,* 138 F.3d at 1061 n. 11 (legitimate, nondiscriminatory reason found in plaintiff's lack of team-building skills). With respect to the omissions and deficiencies in Hixson's application, these are very clear and specific reasons, unrelated to age, why Hixson would not have been selected for teaching positions. Finally, Hixson's offer of $10,000 in cash to purchase computers serves as a legitimate, nondiscriminatory reason for why he was not hired for the positions, even though the principals' negative reaction to this gesture was subjective. *See Alvarado v. Texas Rangers,* 492 F.3d 605, 616 (5th Cir.2007) (subjective assessment of candidate's performance in interview may serve as legitimate, nondiscriminatory reason for candidate's non-selection); *Richter v. Hook–SupeRx,* 142 F.3d 1024, 1029 (7th Cir.1998) (accepting employee's weak performance and lack of involvement in important job functions as legitimate, nondiscriminatory reasons).

**\*16** Hixson challenges HISD's proffered legitimate, nondiscriminatory reasons on various grounds, none of which are meritorious. First, Hixson claims that HISD's preference for "prestigious schools, "highly regarded" programs, and applicants known to principals are not legitimate, nondiscriminatory reasons for hiring one candidate in favor of another because they have the tendency to result in discriminatory hiring practices. However, the case cited by Hixson, *Thomas v. Washington Cnty. Sch. Bd.,* 915 F.2d 922, 924–26 (4th Cir.1990), dealt with hiring practices based on nepotism and "word-of-mouth." Here, the desire of HISD to hire graduates from prestigious schools or Teach for America and individuals with experience with a particular principal are perfectly legitimate, merit-based factors through which HISD attempts to hire the

best qualified candidates. Second, Hixson contends that several of the proffered reasons are not credible [8] and that the declarations from principals are all self-interested. At this stage, however, HISD's burden is one of production, not persuasion. *See Bodenheimer v. PPG Indus.,* 5 F.3d 955, 958 (5th Cir.1993) (court should avoid making credibility determinations because "the burden-of-production determination necessarily precedes the credibility-assessment stage. The employer need only articulate a lawful reason, regardless of what its persuasiveness may or may not be." (omitting internal quotation)).

[8]     For example, Hixson challenges the inference that his presentation of $10,000 at interviews was a bribe. Hixson claims that a close reading of the email he sent to a principal, and his continued work at the school after his interview without incident, shows that he did not offer a bribe and the principal did not take offense to offer.

We find that HISD has come forward with legitimate, nondiscriminatory reasons for its failure to hire Hixson sufficient to meet its burden under the *McDonnell Douglas* framework.

**C. Hixson's Demonstration of Pretext**

To establish pretext in a failure to hire claim, a plaintiff must demonstrate that the employer's nondiscriminatory reason was false or that the plaintiff was "clearly better qualified" than the others chosen for the position. *See Price v. Fed. Express Corp.,* 283 F.3d 715, 721–23 (5th Cir.2002).

**1. Clearly Better Qualified**

As an initial matter, Hixson cannot establish that he was "clearly better qualified" than the 223 individuals who were already certified teachers when HISD hired them for the teaching positions. Although Hixson is correct in stating that he was equally *eligible* to be hired for teaching positions as a certified teacher, he was not better *qualified* than the certified teachers because he was not yet certified. And, although Hixson may have had more years of substitute teaching experience than some of the certified teachers, this characteristic does not demonstrate that Hixson was *clearly* better qualified than certified teachers.

With respect to the 88 ACP interns hired by HISD for teaching positions sought by Hixson, Hixson has not demonstrated that

he was clearly better qualified than these individuals either. Hixson claims that he had passed all three State-required tests at the time he applied to teaching positions, while some ACP interns had not passed any tests and some actually had failed tests. Hixson points to the TEA Chart as evidence for this assertion, but this evidence does not serve the purpose for which it is marshalled because we have no idea whether any of the individuals on this chart were hired for the positions sought by Hixson. Hixson also points to a chart entitled "Chart 1: Positions Hixson Applied For That Were Filled by ACP Interns." (Doc. No. 64 App. 6.) In reviewing this chart, we can only see four positions that were filled by ACP interns that had not passed a State-required test prior to their date of hire: Position Nos. 48232–2, 20169–3, 7141–1, and 62577–2. However, two of these positions (48232–2, 7141–1) were for Special Education teachers and the individuals who were hired for them had passed their Special Education test prior to their date of hire, even though they passed their Content test after the date of hire. Hixson cannot demonstrate that he was clearly better qualified than these individuals, because they had passed the test necessary for a Special Education teaching position. The other two positions (20169–3, 62577–2) were also for Special Education teachers and the individuals hired for those positions had passed only the Content test prior to the date of hire, but not the Special Education exam. Arguably, Hixson could have been more qualified than these individuals, but without evidence about who these individuals were and their qualifications relative to those of Hixson, we cannot conclude that Hixson was *clearly* better qualified than them for the positions.

### 2. Legitimate, Nondiscriminatory Reasons Were False

**\*17** Hixson offers several arguments to rebut HISD's proffered legitimate, nondiscriminatory reasons as false. None of these succeeds in demonstrating that there is a genuine issue of material fact regarding the falsity of HISD's legitimate, nondiscriminatory reasons.

First, Hixson has argued that HISD had a policy to control healthcare costs by not hiring older applicants for teaching positions. However, Hixson has submitted no summary judgment evidence supporting the existence of such a policy. Hixson's references in his deposition to statements made by an HISD school board member at a school board meeting are insufficient to support a reasonable inference of age discrimination. These statements about the successful reduction of HISD's health care costs cannot serve as evidence of age discrimination because they do not refer in any way to Hixson's age, let alone the age of any applicant or employee,

or the employment decisions of which he complains. *See* [🚩] *Bennett v. Total Minatome Corp.,* 138 F.3d 1053, 1061 (5th Cir.1998) (employer's statement that it intended to focus recruitment efforts on young people did not support inference of age discrimination because it did not refer to plaintiff's age or demotion); [🚩] *Turner v. North American Rubber, Inc.,* 979 F.2d 55, 59 (5th Cir.1992) (comment by plaintiff's supervisor that he was sending him "three young tigers" to assist with operations not sufficient evidence of age discrimination because it did not refer in any way to plaintiff's age and was not in any way related to plaintiff's discharge). The other comments Hixson heard about HISD's hostility towards older employees and desire to get rid of them have not been attributed to any HISD decisionmaker.

*See* [🚩] *Manning v. Chevron Chem. Co. LLC,* 332 F.3d 874, 882 (5th Cir.2003) (in order for workplace comments to serve as evidence of discrimination, they must be made by individual with authority over the employment decision at issue). Therefore, Hixson has not shown that HISD's legitimate, nondiscriminatory reasons are pretext because HISD was, in fact, motivated by a desire to lower healthcare costs through the lack of hiring of older applicants.

Next, Hixson contends that HISD's reliance on errors in his resume and application as a legitimate, nondiscriminatory reason is pretext because he had his resume reviewed by various people in HISD's personnel department. These HISD employees, specifically Josephine Morgan and Robin Williams, either did not catch the errors on Hixson's application or endorsed Hixson as a highly recommended applicant despite the errors. Unfortunately, neither of these individuals' actions can demonstrate that HISD's failure to hire Hixson was pretext. It is undisputed that neither individual was involved in hiring decisions with respect to the positions that Hixson applied. Therefore, Williams' and Morgans' review and endorsement of Hixson's materials says nothing about whether the principals' who reviewed Hixson's materials found the errors contained in them to be a reason to exclude Hixson. Hixson cannot use the endorsement by Williams and Morgan as evidence that the principals who made the hiring decisions were actually motivated by Hixson's age rather than by the errors. We also note that Morgan signed a recommendation letter drafted by Hixson and sent to Williams. There are no facts in the record to indicate whether Morgan actually reviewed Hixson's application materials. Therefore, Hixson's claim that Morgan reversed her endorsement of Hixson's application materials

post-lawsuit is undermined by ambiguous nature of Morgan's initial review of Hixson's materials.

 **\*18**  Next, Hixson argues that HISD's reliance on the Teach for America ("TFA") program as a source of highly qualified candidates is pretext. Hixson's argument is not very clear, but it appears that he believes that the real reason why HISD prefers TFA participants is because they are young and they have lower health care costs. In addition, Hixson believes that nepotism is at work in the hiring of TFA candidates because Ann Best, HISD's Chief Human Resources Officer, is an alumna of the TFA program. As the Fifth Circuit has stated, "we should not substitute our judgment of an employee's qualifications for the employer's in the absence of proof that the employer's nondiscriminatory reasons are not genuine."

*EEOC v. Louisiana Office of Community Servs.,* 47 F.3d 1438, 1448 (5th Cir.1995). Here, Hixson's arguments do not attack HISD's reliance on TFA as false in the sense that HISD did not hire TFA candidates or was not motivated by a preference for TFA candidates. Rather, Hixson is really arguing that HISD is unjustified in using TFA candidates because of the propensity for nepotism and doubts about the program's cost-effectiveness.[9] These types of arguments do nothing to meet Hixson's burden that age discrimination is actually what lay behind HISD's preference for TFA candidates over him. Finally, with respect to the purported lower health care costs of TFA candidates, we simply do not possess competent summary judgment evidence to consider this proposition.[10]

[9] Hixson also contends that HISD's reliance on TFA candidates leads to a disparate impact upon individuals over 40 who apply for teaching positions because TFA has only been in place for 12 years and, consequently, TFA candidates are unlikely to be over the age of 40. Again, we have dismissed Hixson's claims based upon a disparate impact theory of discrimination.

[10] Hixson attempts to rely upon newspaper articles and academic studies of the TFA program as evidence that TFA candidates are younger and have lower health care costs than individuals over 40. (Doc. No. 64 App. 8, 9.) HISD has challenged this evidence as hearsay. We agree with HISD that these documents are not competent summary judgment evidence.

Similarly, Hixson challenges as pretext HISD's reliance on "prestigious schools," the fact that individuals hired were previously known to the hiring principals, and the hired candidates' prior successful experience working at the schools where they were hired. However, Hixson has not submitted any summary judgment evidence that HISD did not, in fact, rely upon these reasons when making hiring decisions. *See* *Scott,* 148 F.3d at 504 (jury issue presented where there is fact issue as to whether each of employer's stated reasons was what actually motivated employer). Hixson relies heavily on the case of *Lindsey v. Prive Corp.,* 987 F.3d 324, 328 (5th Cir.1983), for the proposition that "an employer may not utilize wholly subjective standards by which to judge its employees' qualifications and then plead lack of qualification when its promotion process, for example, is challenged as discriminatory." This case is inapposite to the situation presented here. The reliance upon "prestigious" schools is not wholly subjective, as there are rankings and other metrics by which to decide which schools provide better academic training than others. Similarly, the reliance upon prior teaching experience at a school and the principal's familiarity with a candidate is not a subjective assessment, but an objective characteristic about an application. Even assuming that these characteristics were subjective, Hixson has not supplied any evidence to indicate that HISD was less than truthful when relying upon these characteristics. In *Lindsey,* in contrast, the plaintiff provided some evidence that a gentleman's club was not truthful when it claimed she was not "beautiful, gorgeous, and sophisticated." *Id.* at 328.

 **\*19**  Rather, Hixson contends that HISD *should not have* relied upon these characteristics when hiring teachers. However, none of the reasons why Hixson contends that reliance upon these characteristics is unadvisable is linked to age discrimination. Hixson believes that taking into consideration academic prestige, connections to hiring principals, and prior experience at a school results in the exclusion of qualified candidates. While this may be true, there is no indication that any exclusion is motivated by a desire to discrimination against applicants based on age.

Finally, Hixson believes that HISD's reliance upon the purported "bribe" Hixson made to principals is pretext. Hixson contends that he did not attempt to bribe the principals, but merely intended to demonstrate his financial ability to purchase computers for students. He attacks the credibility of the declaration of Clifford W. Buck ("Buck"), principal of Shearn Elementary who hired a Special Education Support Class Teacher (Position No. 26368–4).

2011 WL 3648104

(Mot. Summ. J Ex. D2.) In his declaration, Buck states that the individual hired was selected because she had prior experience working with children who had behavioral problems. (*Id.* ¶ 2.) Buck states that he did not hire Hixson due to Hixson's problems with classroom management while a substitute teacher at the school and Hixson's derogatory statements about students. (*Id.* ¶ 3.) Buck also states that Hixson emailed him with an offer of $10,000 dollars to buy computers for students, which Buck interpreted as inappropriate bribery to solicit a job. (*Id.*) Hixson contends that Buck's proffered reasons are not credible because Buck never brought the derogatory comments or his concerns about the "bribe" to Hixson's attention at any point during the last three years that Hixson has worked at Buck's school as a substitute teacher. (Doc. No. 64 at 16.) We believe that Hixson's assertions do raise a genuine issue of material fact with respect to pretext over HISD's failure to hire him for Position No. 26368–4. Hixson has shown that there are reasons to doubt the credibility of Buck's reasons for not hiring Hixson. However, Hixson's assertions are merely arguments contained in a motion and are not competent summary judgment evidence. Hixson cannot use these unsupported assertions as a basis to defeat summary judgment.

We conclude that Hixson's evidence fails to raise a genuine issue of material fact as to pretext or falsity. Hixson has failed to meet his burden in order to defeat summary judgment. Therefore, we grant summary judgment to HISD on all of Hixson's claims.

## IV. CONCLUSION

Defendant's Motion to Strike Plaintiff's Statistical Expert (Doc. No. 59) is **GRANTED.** Defendant's Motion for Complete Summary Judgment (Doc. No. 61) is **GRANTED.** Plaintiff's claims against Defendant HISD are **DISMISSED.**

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 3648104

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

# **Tab 7**

Case 4:17-cv-02960 Document 294-1 Filed 02/07/22 in TXSD Page 167 of 179

In re Katrina Canal Breaches Consol. Litigation, Not Reported in F.Supp.2d (2007)

2007 WL 3245438

2007 WL 3245438
Only the Westlaw citation is currently available.
United States District Court,
E.D. Louisiana.

In re KATRINA CANAL BREACHES
CONSOLIDATED LITIGATION.
Pertains To: Levee/Mrgo
Daubert Hearings: Kilpatrick
(Doc. 7992) Truax (Doc. 8116).

Civil Action No. 05-4182.
|
Nov. 1, 2007.

### *ORDER AND REASONS*

[STANWOOD R. DUVAL, JR.](#), United States District Court
Judge.

**\*1** Before the Court are "Defendants' Motion to Exclude
the Report and Testimony of Plaintiffs' Putative Expert John
A. Kilpatrick" (Doc. 7992), "Sewerage and Water Board of
New Orleans' Motion to Exclude the Report and Testimony
of Plaintiffs' Putative Expert John A. Kilpatrick" (Doc. 8167)
and "Plaintiffs' Motion in Limine to Exclude the Class
Certification-Related Testimony of Michael W. Truax." (Doc.
8116). These motions came for hearing on October 17,
2007 where the live testimony of of Kerry Dean Vandell
("Vandell"), James Richardson ("Richardson") and Michael
Truax ("Truax") was adduced. In essence, both defendants
and plaintiffs have sought to strike their respective opponents'
experts concerning damages for class certification purposes.
The Court has reviewed the pleadings, memoranda, the
deposition testimony of Dr. John A. Kilpatrick ("Kilpatrick"),
the exhibits and the relevant law. Based upon all of this
evidence, the Court finds that both motions will be denied
with a certain caveat with respect to Mr. Truax's opinion
for the reasons that follow. The Court will begin with the
defendants' motions to exclude Dr. Kilpatrick.

### I. Kilpatrick

#### A. Background-Are Damages an Issue which Predominates for Purposes of Class Certification?

Plaintiffs are seeking class certification pursuant to Fed. R.
Civ. 23 for two classes and seven sub-classes of plaintiffs who
suffered damages as a result of the inundation of Greater New
Orleans as a result of Katrina and the levee breaches. The
Levee Class encompasses all of Orleans Parish north of the
Mississippi River and west of the Industrial Canal as well as
parts of Jefferson Parish on its east bank. It is comprised of
five sub-classes that correspond to the topography of the class
geography, topography being a major factor in determining
the source of water and that water's ultimate location. (Doc.
9772, Memorandum in Support of Plaintiffs' Motion for
Class Cert. Ex. A, Area & Sub-Class maps). The MRGO
class encompasses the portion of Orleans Parish east of the
Industrial Canal, all of St. Bernard Parish and all of New
Orleans East. It is comprised of two subclasses: the Lower
Ninth Ward & St. Bernard Sub-Class and the New Orleans
East Sub-Class.

Plaintiffs seek classification under Rule 23(a) and Rule 23(b)
(3) as a common-question class action. Thus, the appropriate
rules provide:

> **(a) Prerequisites to a Class Action.** One or more members
> of a class may sue or be sued as representative parties on
> behalf of all only if (1) the class is so numerous that joinder
> of all members is impracticable, (2) there are questions of
> law or fact common to the class, (3) the claims or defenses
> of the representative parties are typical of the claims or
> defenses of the class, and (4) the representative parties will
> fairly and adequately protect the interests of the class.

> **(b) Class Actions Maintainable.** An action may be
> maintained as a class action if the prerequisites of
> subdivision (a) are satisfied, and in addition:

> **\*2** ...

(3) the court finds that the questions of law or fact common
to the members of the class predominate over any questions
affecting only individual members, and that a class action is
superior to other available methods for the fair and efficient
adjudication of the controversy. The matters pertinent to
the findings include: (A) the interest of members of the
class in individually controlling the prosecution or defense
of separate actions; (B) the extent and nature of any
litigation concerning the controversy already commenced
by or against members of the class; (C) the desirability or
undesirability of concentrating the litigation of the claims
in the particular forum; (D) the difficulties likely to be
encountered in the management of a class action.

[Fed. R. Civ. P 23](#).

In re Katrina Canal Breaches Consol. Litigation, Not Reported in F.Supp.2d (2007)

2007 WL 3245438

While plaintiffs provide a list of nine "common legal and factual issues" for both classes [1], the focus of these *Daubert* motions concern the proof each side seeks to adduce with respect to the ninth issue-whether class-wide damages were suffered. Plaintiffs contend that this issue is particularly suited for class certification purposes because using a mass appraisal model, there are questions of fact with respect to damages that are common to the members of the class and that predominate over any questions affecting only individual members. Thus, plaintiffs maintain that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

[1]     The list is as follows:

1. What legal duties did each Defendant owe to all class member?

2. What causes of action might class members bring(or, mor pointedly, might they all bring the causes of action stated in the governing complaints)?

3. What immunities, if any, does each Defendant enjoy as a matter of law, and based upon what universal set of facts?

4. What historical facts (from past acts to legislative mandates and the like) are material to the case?

5. Whose acts and omissions proximately caused the failures of the floodwalls of the 17th Street Canal, London Avenue Canal, the IHNC (wet and east), and along the MRGO?

6. How might fault be allocated among the defendants based upon the ultimate fact determinations concerning their conduct? What legal principles are implicated, such as solidary obligations, master and servant, shared immunity, etc.?

7. Where and at what times did water begin to enter the relevant class areas? How may sources contributed within a give area? in short, where did the water com from; where did ti go; how did it get where it went; how deep was it once there; and when?

8. How might the answer to the above questions have differed had Defendants acted differently?

9. What class-wide damages were suffered?

(Doc. 9772, Memorandum in Support of Motions for Class Certification at 11).

Plaintiffs opine:

Even certain damages-specifically, diminution of real property values-are suited for class treatment. The Class Representatives propose using the well-established mass appraisal methodology for valuing class members' real property damages. They plan to call Dr. John Kilpatrick to render expert testimony on the application of the mass appraisal valuation method in this case. Dr. Kilpatrick's testimony will clearly establish that the question of damaged property values can best be analyzed on a class-wide basis using mass appraisal methodology, as recently was done by Dr. Kilpatrick himself in the *Murphy Oil* case. Mass appraisal offers efficiencies that far outweigh, and thus are superior to, the chaos of individualized damage computations.

The mass appraisal valuation methodology measures property damages by coupling objective factors with common facts. The result is a practical, economical approach to addressing property damage claims that arise from a single event and on an unprecedented level. Real property losses must be computed in this action or in the thousands of alternate actions that failure to certify would engender.

(Doc. 9772, Memorandum in Support of at 16) ("Memo in Support").

Plaintiffs also contend that Judge Fallon acknowledged in *Turner v. Murphy Oil USA,* 2006 WL 91364 (E.D.La. Jan. 12, 2006), the availability of objective criteria-public records-and the scientific validity of Dr. Kilpatrick's mass appraisal methodology, including its acceptance in the community of his peers as a recognized standard under Rule 6 of the Uniform Standards of Professional Appraisal Practice ("USPAP") [2] in *Id.* at 5. Plaintiffs opine that consideration of damages on an aggregate scale permits a proper reliance on objective criteria together with the importation of common facts. This method is used by tax assessors and insurance companies for valuation of property. Furthermore, the cost of individual assessments could cost over $15,000,000.00.

[2]     USPAP are the governing rules of real estate appraisal in Louisiana. *Turner v. Murphy Oil USA,* 2006 WL 91364, at *5 (E.D.La.

Case 4:17-cv-02960   Document 294-1   Filed 02/07/22 in TXSD   Page 169 of 179

In re Katrina Canal Breaches Consol. Litigation, Not Reported in F.Supp.2d (2007)

2007 WL 3245438

Jan. 12, 2006); *Vela v. Plaquemine Parish Gov't.,* 729 So.2d 178 (La.App. 4th Cir.1999) (recognizing reasonableness of utilizing mass appraisal methodology in a class action hurricane levee protection appropriation suit).

**B. Defendants' Motion to Exclude the Report and Testimony of Plaintiffs' Putative Expert John A. Kilpatrick-Applicable Standard and Alleged Deficiencies**

 **\*3** Defendants seek to exclude Kilpatrick's report based on their contention that this Court is required to employ a full-blown 🚩*Daubert*[3] gate-keeping function at the class certification stage of these proceedings. Defendants maintain that where expert testimony is offered to support a motion for class certification, the Fifth Circuit Court of Appeals instructs that a court should consider the "admissibility of the testimony of an expert proffered to establish one of the 🚩Rule 23 elements in the context of a motion to strike *prior* to considering class certification." 🚩*Unger v. Amedisys, Inc.,* 401 F.3d 316, 323 n. 6 (5th Cir.2005) (emphasis added); 🚩*Bell v. Ascendant Solutions, Inc.,* 2004 WL 1490009 at \* 4 (N.D.Tex. July 1, 2004). They contend that Judge Fallon's decision in the *Murphy Oil* litigation using a "*Daubert-lite* " standard is incorrect, particularly in light of the Second Circuit's decision in 🚩*In re Initial Public Offering Securities Litigation,* 471 F.3d 24 (2d Cir.2006) ("*In re IPO* ") where that court clarified its decision in 🚩*In re Visa Check/MasterMoney Antitrust Litigation,* 280 F.3d 124 (2d Cir.1999).

3
🚩*Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993).

Rather, defendants contend that Fed.R.Evid. 702 provides the proper method of evaluating Kilpatrick's testimony at this point, regardless of the stage of litigation. As applied to Kilpatrick's testimony, they contend that *ipse dixit* nature of his report does not satisfy the intellectual rigor required by Rule 702. Defendants argue that Kilpatrick's opinion does not provide a model or methodology. They contend that Kilpatrick's promise to develop a model which calculates actual or stigma-based diminution in property value is not enough. Kilpatrick's failure to explain how this model will work, lack of detail about the model and the failure to identify or analyze any piece of data makes it inadmissible.

Defendants further opine that under Rule 702, a trial court cannot simply take the expert's word as the basis for reliability because the reliability prong would be subsumed by the qualification prong of the expert's test. Thus, they seek its exclusion for failing to "articulate the methodology he intends to apply and disclose the facts and data required by the Federal Rules."

Furthermore, defendants maintain that Kilpatrick has not studied any data as of this date, and Kilpatrick's ruminations are not the product of reliable principles and methods, and, as such, his report fails Rule 702(2). Because the model has not been created, it cannot be tested nor is subject to peer review. They also argue that while he references automated valuation, hedonic and regression models-all of which have at least some academic acceptance-Kilpatrick has not provided any detail as to how he will use them and thus, he again is disqualified under Rule 702. Defendants further rely on the fact that the Road Home Program and the insurance companies have abandoned mass valuation techniques in dealing with the Katrina losses. In addition, the defendants claim that Kilpatrick's survey techniques such as "contingent valuation" are inherently flawed and produce unreliable results.

 **\*4** Defendants argue that Kilpatrick to date has only provided his real estate appraisal qualifications, a general description of a "mass appraisal methodologies" and identified "common factors" purporting to favor a mass appraisal methodology in this case. They contend that Kilpatrick has unreasonably asserted that a model he will create will measure the actual effects of flooding-without differentiating among the many and disparate causes of those effects-and the prospective effects of an intangible stigma arising from the possibility of future flooding.

While Kilpatrick maintains that his description of a mass appraisal model should be sufficient to demonstrate *his ability* to analyze property values on a class-wide, this *Daubert* challenge arises from the fact that he has not provided any details about how he will create (or apply) a model that will (1) purportedly control a multitude of property characteristics; (2) address divergent impacts of Katrina [defendants maintaining it was not a singular occurrence, but a confluence of events] and (3) ultimately deliver figures relating to the alleged diminution of real property values. Thus, the defendants argue that the complexities of this case are too varied to be reduced to a model. Since the model

Case 4:17-cv-02960    Document 294-1    Filed 02/07/22 in TXSD    Page 170 of 179

In re Katrina Canal Breaches Consol. Litigation, Not Reported in F.Supp.2d (2007)

2007 WL 3245438

still has not been produced, the defendants move the Court to strike Kilpatrick from testifying as an expert witness.

### C. Plaintiffs' Response

Plaintiffs argue that there are two methods for assessing or quantifying flood damage-individual appraisals conducted on a property-by-property basis-or mass appraisal which is Kilpatrick's approach. Plaintiffs maintain that there being well over 100,000 properties which allegedly sustained flood damage demonstrates that the mass appraisal method is the preferable approach. This approach was used in *Murphy Oil, supra.* Another example is *Cook v. Rockwell Int'l Corp., 2006 WL 3533049 (D.Colo 2006)* where a plaintiff class sought damages from the operators of a nuclear weapons plant near Denver, Col. based on plutonium contamination.

In essence, plaintiffs maintain that the issue at hand is expert witness admissibility for a class certification proceeding, and not trial on the merits. As such, they rely on Judge Fallon's reasoning wherein he stated:

> a district court may not weigh conflicting expert evidence or engage in a statistical dueling of experts. The question for the district court at the class certification stage is whether the plaintiffs' expert evidence is sufficient to demonstrate common questions of fact warranting certification of the proposed class, not whether the evidence will ultimately be persuasive.

*Turner v. Murphy Oil USA, Inc.,* 2006 WL 91364 (E.D.La. Jan. 12, 2006) at *3 citing *In re Visa Check/Master Money Antitrust Litigation,* 280 F.3d 124, 135 (2nd Cir.2001), the case that the Second Circuit's decision in *In re IPO Litigation* called into question. Plaintiffs argue that defendants are incorrect in that the Fifth Circuit has **not** directly addressed whether a Daubert analysis should or should not be conducted by the district court in the context of class certification.

Plaintiffs note that in *Bell v. Ascendant Solutions, Inc.,* 422 F.3d 307(5th Cir.2005) (quoting *Unger* ) the Fifth Circuit simply affirmed the district court's denial of class certification finding that it had acted properly in "applying

'rigorous, though preliminary, standards of proof' " to the class certification question. *Id.* at 313.

**\*5** Plaintiffs' also take issue with defendants' characterization of *In re IPO.* They maintain that it did not address what *Daubert* standard, if any, applies in the class certification context. In fact, they maintain that neither Rule 702 nor *Daubert* is even discussed in the opinion. The major thrust of the opinion in the context of *Murphy Oil,* which was decided prior to *In re IPO* was that the circuit court disavowed the suggestion in *Visa Check* that an expert's testimony may establish a component of a Rule 23 requirement simply by being not "fatally flawed." Thus, plaintiffs maintain that Judge Fallon's decision took the correct approach in allowing Kilpatrick to testify.

Plaintiffs maintain that Dr. Kilpatrick has described the mass appraisal method and techniques and has referred to the type of data that he intends to gather for model input. To rebut defendant's contentions, plaintiffs argue:

> 1) He has presented the data he already possesses regarding St. Bernard which is the biggest sub-class in MRGO by virtue of the *Murphy* litigation which contains precise property and housing data. (Doc. 7992-6, Deposition of Kilpatrick at 16) ("Dep. of Kilpatrick").

> 2) He will have constructed a larger database to include all properties in the classes' area, enabling discernment of property damages on a sub-class (or even neighborhood) basis and by specific type of home (Dep. of Kilpatrick at 170).

> 3. He will have analyzed all post-Katrina transactional sales data for the class area (Dep. of Kilpatrick at 366-67).

> 4. His affidavit report declares that he has done "extensive examination" of the New Orleans market. (Doc. 7992-5 Exhibit 2, Affidavit of Kilpatrick at ¶ 4) ("Aff. of Kilpatrick"). (Also see an article he co-authored on the flood effects of Katrina on the real estate market on New Orleans which is attached to that affidavit.)

> 5. He identified the type of mass appraisal mode or Automated Valuation Model (AVM); he possess a number "stigma models" from the past and that he does not "create such models purely for litigation." The statistical model he intends to use has been peer reviewed (Dep. of Kilpatrick, at 29 & 32).

Case 4:17-cv-02960 Document 294-1 Filed 02/07/22 in TXSD Page 171 of 179

In re Katrina Canal Breaches Consol. Litigation, Not Reported in F.Supp.2d (2007)

2007 WL 3245438

6. He proposes a mass appraisal "loss in value model." (Dep. of Kilpatrick at 33, 171-72). It will focus on (a) loss attributable to the post-Katrina flood, (b) the amount of such loss being determined on a location basis and (c) expressed as a percentage diminution of pre-Katrina property value (Dep. of Kilpatrick at 160 & 172). The model's reference point will be value just prior to Katrina and value diminishment of the same immediately following Katrina.

7. This model will reveal two things:

a) Pre-Katrina values "sortable" in different characteristics-by house type, etc.

b) Impaired values after Katrina due to flooding (Dep. of Kilpatrick at 231-33). This will capture both repair costs and stigma as merged components of damage. (Dep. of Kilpatrick at 238-39)

**\*6** 8. "Common factors" which will be addressed as variable in the mass appraisal model include:

a. flood

b. stigma of risk perception

c. economic impact of flood in real estate market

d. post-Katrina higher insurance premium

(Aff. of Kilpatrick at ¶ 9).

9. Authority for mass appraisal/AVM exists both in industry standards and in published and peer-reviewed literature. (Aff. of Kilpatrick at ¶¶ 25, 33-48).

10. The mass appraisal model can provide a large, statistically valid and reliable model at 5 to 10 percent of the cost in a year to two less years of time.

11. The model will be "hedonic" meaning-one designed to determine the value diminution impact of a negative externality. These values would then be tested by referring to a control area unaffected by the flooding which serves to calibrate the model as specified by USPAP. (Dep. of Kilpatrick at 207-209).

12. "The purpose of the hedonic model is to isolate the post-Katrina flood experience in the class area as a stigma, or negative externality." (Dep. of Kilpatrick at 474-75). Stigma, by definition is recognized in the real estate

industry as a common factor affecting the market value of properties; and it has been documented as such in peer-reviewed literature. (Aff. of Kilpatrick at ¶ 17).

Kilpatrick says that his model will also rely upon survey research to investigate the impact of the flood as well as the effect of the promised repair of flood control structures. This would be done in a statistically valid manner so that each factor could be isolated.

### D. Analysis

#### 1. Legal Standard

Based on the foregoing, the initial issue before the Court is where an expert seeks to testify at a class certification hearing, whether he or she must meet the standard of a full *Daubert* challenge-that is one equal to a Daubert challenge brought on at the time of hearing on the merits. In espousing this standard as being mandated by the Fifth Circuit, defendants rely primarily on *Unger v. Amedisys, Inc.,* 401 F.3d 316, 323 n. 6 (5th Cir.2005) and *Bell v. Ascendant Solutions, Inc.,* 422 F.3d 307 (5th Cir.2005). In addition, as noted, they contend that Judge Fallon's acceptance of Dr. Kilpatrick as an expert in the *Murphy Oil* matter is undercut and incorrect in light of *In re IOP,* 471 F.3d 24 (2d Cir.2006). A close review of these cases belies this assertion.

Rule 702 was enacted in response to the United States Supreme Court's decisions in *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579 (1993), and *Kuhmo Tire v. Carmichael,* 526 U.S. 137(199), which held that before an expert is allowed to testify, the trial court must assess the reliability of the methodology of the proposed expert and the relevance of the testimony to the facts at issue. *Legier & Materne v. Great Plains Software, Inc.,* 2005 WL 2037346 at *1 (E.D.La. August 3, 2005). Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient

Case 4:17-cv-02960 Document 294-1 Filed 02/07/22 in TXSD Page 172 of 179

In re Katrina Canal Breaches Consol. Litigation, Not Reported in F.Supp.2d (2007)

2007 WL 3245438

facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

**\*7** Fed.R.Evid. 702. As this Court has stated before:

Under *Daubert,* the proponent of the evidence must first prove that the offered testimony is based on sufficient facts or data. *See* Fed.R.Evid. 702. Next, the party must "demonstrate that the expert's findings and conclusions are based on the scientific method, and, therefore, are reliable.... The expert's assurances that he has utilized generally accepted scientific methodology is insufficient."

*Moore v. Ashland Chemical, Inc.,* 151 F.3d 269, 276 (5th Cir.1998) (en banc). The proponent of the evidence must prove the testimony's reliability by a preponderance of the evidence. *Id.*

In *Daubert,* the Supreme Court identified a non-exclusive list of factors for a district court to consider in determining reliability: (1) whether the theory has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error; and (4) the general acceptance of the methodology in the scientific community. *Daubert,* 509 U.S. at 593-95. A district court must focus on methodology, not conclusions. In *Kumho Tire v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the Court cautioned that the district court must ensure "that an expert, whether basing testimony upon professional studies or personal experiences, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tires,* 526 U.S. at 152. After the proponent of the expert testimony has carried her burden of showing reliability, the party must also prove the expert opinions' relevance. That is, that the experts' opinions have "a valid ... connection to the pertinent inquiry." *Daubert,* 509 U.S. at 592.

*Legier,* at 1.

As to the applicability of *Daubert* in the context of a class certification hearing, the Fifth Circuit has addressed this issue in its appellate opinion *Bell v. Ascendant*

*Solutions, Inc.,* 422 F.3d 307 (5th Cir.2005). In *Bell,* purchasers of common stock of Ascendant Solutions brought five securities fraud class action complaints that were consolidated into an amended class action complaint alleging that Ascendant made false and misleading statements in connection with its initial public offering in violation of federal securities laws. Plaintiffs sought class certification pursuant to Fed.R.Civ.P. 23(b)(3) of a class consisting of all persons (except defendants and certain related persons and interests) who purchased Ascendant common stock on the open market between the date of the IPO and the day Ascendant announced its troubles, and who were damaged by defendants' allegedly false and misleading statements in violation of sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. *Bell,* 422 F.3d at 309.

Ascendant opposed certification and submitted an expert report demonstrating that Ascendant's common stock did not trade in an efficient market. As such, the "putative class could not invoke the fraud-on-the-market theory recognized in *Basic Inc. v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), and obtain the benefit of its class-wide presumption of reliance, leaving plaintiffs' fraud claims dependent on proving individual reliance and thus unsuited for aggregation." *Id.* at 310. In response plaintiffs offered their own expert who included an event study that allegedly proved that Ascendant common stock did, in fact, trade in an efficient market. The district court, however, excluded the expert report. In doing so, the district court stated:

**\*8** Initially, Plaintiffs argue that any consideration of the admissibility of Professor Pettit's testimony is premature, since class certification is not the appropriate stage to indulge in a "battle of the experts." While Plaintiffs are correct that the class certification stage is not the time to conduct an inquiry into the merits of the case, the Court must still determine whether Plaintiffs have met their burden of proving market efficiency-so as to satisfy the Rule 23 requirement of predominance-when considering class certification. *See Lehocky v. Tidel Technologies, Inc.,* 220 F.R.D. 491, 507-08 (S.D.Tex.2004) (examining Professor Pettit's analysis of market efficiency at class certification stage); *Krogman v. Sterritt,* 202 F.R.D. 467, 477 n. 14 (N.D.Tex.2001) (weighing conflicting expert testimony concerning market efficiency in order to conclude that plaintiff was not entitled

Case 4:17-cv-02960 Document 294-1 Filed 02/07/22 in TXSD Page 173 of 179

In re Katrina Canal Breaches Consol. Litigation, Not Reported in F.Supp.2d (2007)

2007 WL 3245438

to presumption of reliance for class certification purposes). Although many courts, such as the *Lehocky* court, weigh the admissibility of expert testimony in the context of a motion for class certification rather than a *Daubert* style motion to strike, the Fifth Circuit has made clear that:

> A district court certainly may look past the pleadings to determine whether the requirements of 📑 rule 23 have been met. Going beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues.

📑 *Castano v. Am. Tobacco Co.,* 84 F.3d 734, 744 (5th Cir.1996). In many cases, it makes sense to consider the admissibility of the testimony of an expert proffered to establish one of the 📑 rule 23 elements in the context of a motion to strike prior to considering class certification. *See McNamara v. Bre-XMinerals Ltd.,* No. 5:97-CV-159, 2002 WL 32076175, at *4 (E.D.Tex. Sept. 30, 2002) (considering defendants' rule 702 motion to strike expert's testimony of market efficiency prior to subsequent class certification analysis). In order to consider Plaintiffs' motion for class certification with the appropriate amount of scrutiny, the Court must first determine whether Plaintiffs' expert testimony supporting class certification is reliable. Accordingly, a *Daubert*-type review is not premature.

📑 *Bell v. Ascendant Solutions, Inc.,* 2004 WL 1490009, *2 (N.D.Tex. July 1, 2004).

Defendants sought to exclude plaintiffs' expert's testimony concerning the efficiency of the market for Ascendant stock based on their contention that his analysis of stock price movement in response to company specific new was severely flawed. In the context of this type of litigation, the use of cause-and-effect relationships between unexpected corporate events or financial releases and immediate responses in stock price are used; however, the district court basically found the expert's use of "information days" and "absolute value" made his report "unreliable" if not in essence "rigged" to obtain the results needed. *Id.* at 3-4. The court noted that many of the dates chosen "appeared to be consciously chosen in order artificially to support his hypothesis of efficiency." *Id.* Furthermore, many of the choices of dates did not meet generally-accepted finance methodology used to establish efficiency. He also employed "absolute value" to determine

market price reaction to company news, "a technique never previously used to test for market efficiency and disavowed by the author of an article presented by plaintiffs of support its use." *Id.* at 4. Thus, the court found "the techniques supporting the expert's finding of market efficiency have not been tested, have not been subject to peer review and publication, and do not enjoy general acceptance within a relevant scientific community." *Id.* The court then found that without proof of efficiency being established as a prerequisite for the use of "fraud on the market" theory of reliance, the Court denied the certification motion.

**\*9** Plaintiffs in *Bell* appealed contending that they were required only to plead market efficiency at the class certification stage and that the district court had erred by requiring a threshold showing, improperly deciding an issue going to the merits. The Fifth Circuit rejected this contention noting that since its decision in 📑 *Castano v. Am. Tobacco Co.,* 84 F.3d 734, 745 (5th Cir.1996) where it found that a fraud class action cannot be certified when individual reliance is an issue, it has made clear that a district court "may certainly look past the pleadings to determine whether the requirements of 📑 rule 23 have been met." 📑 *Bell,* 422 F.3d at 312 n. 7. Thus, the court noted that in the context of a reliance issue, it espoused the "rigorous, though preliminary, application of standards of proof to the market efficiency determination." This holding was in line with the court's previous decision in *Unger v. Amedisys Inc.,* 410 F.3d 316 (5th Cir.2005).

In *Unger,* the Fifth Circuit, again in the context of a securities fraud and a "fraud on the market" theory, stated unequivocally that "[w]hen a court considers class certification based on the fraud on the market theory, it must engage in a thorough analysis, weigh the relevant factors, require both parties to justify their allegations and base its ruling on admissible evidence." Unquestionably, then, these cases stand for the proposition, that a court in approaching class certification must be certain that the methods underlying the proof of any requirement for class certification are reliable.

With respect to *In re IPO,* the Second Circuit addressed the issue of the proper standard to use at the class certification stage and characterized the issues presented there as follows:

> This appeal primarily concerns the issue, surprisingly unsettled in this Circuit, as to what standards govern a

Case 4:17-cv-02960 Document 294-1 Filed 02/07/22 in TXSD Page 174 of 179

In re Katrina Canal Breaches Consol. Litigation, Not Reported in F.Supp.2d (2007)
2007 WL 3245438

district judge in adjudicating a motion for class certification under Rule 23 of the Federal Rules of Civil Procedure. Comprehended within this broad issue are subsidiary issues such as [1] whether a definitive ruling must be made that each Rule 23 requirement has been met or whether only some showing of a requirement suffices, *[2] whether all of the evidence at the class certification stage is to be assessed or whether a class plaintiff's evidence, if not fatally flawed, suffices,* and [3] whether the standards for determination of a Rule 23 requirement are lessened when a Rule 23 requirement overlaps with an aspect of the merits of the proposed class action. Finally, the appeal presents the question whether granting a motion for class certification in the pending litigation exceeded the District Court's discretion.

*In re IPO,* 471 F.3d at 26-27. (emphasis added). In resolving these issues the Second Circuit reviewed in great detail Supreme Court precedent concerning the proper standard of examination for a Rule 23 certification and the genesis of the *In re Visa/MasterMoney* standard (methodology that is not "fatally flawed" is sufficient to meet Rule 23 requirements). In essence, the Second Circuit found that its use of this standard was misguided and that it was incorrect to apply the "no merits inquiry" language found in *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177, 94 S.Ct. 2140 (1974) to prohibit a court from a full examination of the class certification requirements when they overlap with merits. *In re IPO,* 471 F.3d at 33. Thus, in *In re IPO,* the court sought to clarify its approach to class certification and held the following:

> **\*10** In light of the foregoing discussion, we reach the following conclusions: (1) a district judge may certify a class only after making determinations that each of

the Rule 23 requirements has been met; (2) such determinations can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established and is persuaded to rule, based on the relevant facts and the applicable legal standard, that the requirement is met; (3) the obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement; (4) in making such determinations, a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement; and (5) **a district judge has ample discretion to circumscribe both the extent of discovery concerning Rule 23 requirements and the extent of a hearing to determine whether such requirements are met in order to assure that a class certification motion does not become a pretext for a partial trial of the merits.**

In drawing these conclusions, we add three observations. First, our conclusions necessarily preclude the use of a "some showing" standard, and to whatever extent *Caridad* might have implied such a standard for a Rule 23 requirement, that implication is disavowed. **Second, we also disavow the suggestion in *Visa Check* that an expert's testimony may establish a component of a Rule 23 requirement simply by being not fatally flawed. A district judge is to assess all of the relevant evidence admitted at the class certification stage and determine whether each Rule 23 requirement has been met, just as the judge would resolve a dispute about any other threshold prerequisite for continuing a lawsuit. Finally, we decline to follow the dictum in *Heerwagen* suggesting that a district judge may not weigh conflicting evidence and determine the existence of a Rule 23 requirement just because that requirement is identical to an issue on the merits.**

*In re IPO,* 471 F.3D at 41-42 (emphasis added).

Thus, it is clear that while some of the language that is cited by Judge Fallon in the *Murphy Oil* opinion, in particular the statement that a court " 'cannot 'engage in a statistical dueling

Case 4:17-cv-02960 Document 294-1 Filed 02/07/22 in TXSD Page 175 of 179

In re Katrina Canal Breaches Consol. Litigation, Not Reported in F.Supp.2d (2007)
2007 WL 3245438

of experts' " Murphy Oil, 2006 WL 91364 at *4, might be called into question, in reality, In re IPO adopts the same standard of examination as mandated by the Fifth Circuit but underscores that a court should not make a final determination of the merits at the certification stage. Instead, a court should exercise its discretion to insure that class certification does not become a pretext for a partial trial of the merits. Thus, the Second Circuit reiterated that a vigorous examination of the factors is required and noted that it was joining the ranks of the other circuit courts including the Fifth Circuit in enunciating such a requirement. In re IPO, 471 F.3d at 38-39.

**\*11** However, nothing in this language stands squarely for the proposition that a full *Daubert* review is mandated by *In re IPO.* This position is supported by Hnot v. Willis Group Holdings, Ltd., 241 F.R.D. 204 (S.D.N.Y. March 8, 2007) ("*Hnot II* "). In this case, a district court was asked to reconsider its having granted plaintiffs' motion for class certification in light of *In re IPO.* That court characterized *In re IPO* stating, "Thus, the holdings of *In re IPO* are both significant and narrow-a district judge must consider all of the relevant evidence in determining whether Rule 23 has been satisfied, but a district judge may not go beyond the boundaries of Rule 23 when making such a determination." Id. at 209. That district court noted as well:

> Contrary to defendants' assertions, *In re IPO* does not stand for the proposition that the Court should, or is even authorized to, determine which of the parties' expert reports is more persuasive. **Defendants ignore the fact that *In re IPO specifically rejected* this interpretation of Rule 23. Instead, *In re IPO* reiterated that "experts' disagreement *on the merits*-whether a discriminatory impact [can] be shown-[is] *not a valid basis* for denying class certification."** *In re IPO,* **471 F.3d at 35** (emphasis supplied), citing *Krueger,* **163 F.R.D. at 440.** Thus, the Court may only examine the expert

reports as far as they bear on the Rule 23 determination.

*Id.* at 210 (emphasis added).

Subsequently, another Southern District of New York court took up the issue of class action certification standards in Velvez v. Novartis Pharmaceuticals Corp., 244 F.R.D. 243 (S.D.N.Y.2007). That court cited *In re IPO* noting its clarification of the standards for the adjudication of motions for class certification:

> [A] district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met; [and] such determinations can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established and is persuaded to rule, based on the relevant facts and the applicable legal standard, that the requirement is met. [*In re IPO* ] at 41.

*Id.* at 256. The court continued:

> *In re IPO* makes clear that courts may resolve contested factual issues where necessary to decide on class certification, and when a claim cannot succeed as a matter of law, the Court should not certify a class on that issue. *See* In re IPO, 471 F.3d at 42 (denying class certification as to the issue of reliance because the presumption on which plaintiffs' theory depended was inapplicable). However "[c]ommonality requires that plaintiffs present common *questions* of fact or law; plaintiffs' ultimate success at trial on the merits requires an *answer* to that question, specifically that defendants actually did discriminate against plaintiffs." Hnot II, 241 F.R.D. at 211 (emphasis in original). "For the Court to decide which expert report was more persuasive would be to decide

2007 WL 3245438

whether the class was actually discriminated against by defendants. This the Court was not required to do, either before or after, *In re IPO.*" *Hnot II,* 241 F.R.D. at 211.

**\*12** *Velvez,* 244 F.R.D. at 257.

In light of the foregoing, the Court finds that its Rule 702 review of the expert report of Dr. Kilpatrick will be vigorous but limited to the opinion's reliability and relevance to the requirements of class certification under Rule 23. That inquiry will be focused on whether there are questions of fact with respect to damages that are common to the members of the class and that predominate over any questions affecting only individual members or not. A full *Daubert* examination will not be taken at this stage, and a determination at this time whether Kilpatrick's opinion will be accepted at the time of trial on the issues will not be made. The purpose of this examination is:

> [to] ensure that [these expert opinions] contain no flaws that would render [either] inadmissible as a matter of law: the methodology must show some hallmarks of reliability whether through peer review or use of generally-accepted standards or methods; the expert must be qualified; and the opinion must have probative value for the issues of class certification.

*Murphy Oil,* 2006 WL 91364 at \*4 *citing In re Polypopylene Carpet Antitrust Litig.,* 996 F.Supp. 18, 26 (N.D.Ga.1997). Obviously, the foregoing legal analysis and standard are equally applicable to the Truax opinion and shall be the basis for the Court's decision in that regard.

Clearly, comprehensive expert reports as will be required on the merits are not feasible at the Rule 23 stage. If the class is certified a detailed report will be necessary and required at the trial on the merits. The court's inquiry here is to determine if the expert testimony has sufficient reliability to be presented at the class certification hearing. Is the approach used by the experts sufficiently trustworthy to assist the Court in determining the requirements of commonality with respect to

damages? In essence, the Court must determine if the expert's testimony **may** reliably establish that a class action should or not be certified.

**2. Application to Dr. Kilpatrick**

The Court finds that Dr. Kilpatrick's report is acceptable for purposes of class certification. To begin, his credentials are substantial. Dr. Kilpatrick holds a Ph.D degree in Real Estate Finance and is a state-certified (general) real estate appraiser in Louisiana and many other states. He is president of Greenfield Advisors, formerly Mundy Associates, LLC, a real estate appraisal and consulting firm headquartered in Seattle, Washington. This firm has specialized in the valuation of contaminated sites. He has authored or acted as editor of fours books on real estate. He is the lead author of "The Aftermath of Katrina: Recommendations for Real Estate Research" a peer-reviewed article written at the invitation of the *Journal of Real Estate Literature* (Kilpatrick and Dermisi, 2007) to provide authoritative guidance to academics and real estate practitioners conducting scholarly research into the real estate impacts in new Orleans following the 2005 hurricane. The article recognizes that holistic, market-wide analytical methods are necessary to understand the economic and property value issues in the affected areas. He has also made extensive examination of the New Orleans market. (Affidavit of Kilpatrick, ¶¶ 1-4). He has never been rejected as an expert of mass appraisals. (Dep. of Kilpatrick at 38).

**\*13** Furthermore, the Court is satisfied that the methodology is reliable. Clearly, mass appraisal is an accepted methodology. As previously noted, it is a recognized standard under Rule 6 of the Uniform Standards of Professional Appraisal Practice ("USPAP") and has been accepted in this district in another case arising out of Hurricane Katrina where damages were to be assessed concerning oil damage that occurred simultaneously with flooding in *Turner v. Murphy Oil US,* 2006 WL 91364 (E.D.La. Jan. 12, 2006). Indeed, a large swath of those seeking damages in the MRGO Class Action would involve the same properties as in the *Murphy Oil* case. This approach is used in appraiser's offices all over the country to determine value. (Dep. of Kilpatrick at 248); *see also Berne Corp. v. Government of Virgin Islands,* 262 F.Supp.2d 540 (V.I.2003).

In essence the defense argues that Kilpatrick's mass appraisal is unreliable when there are multiple factors for the cause of damages and heterogeneity of the neighborhoods. Because of the differences in property values from block to block, house

2007 WL 3245438

to house, as well as the differences in the type of structures block to block, house to house, the defense maintains that the mass appraisal construct would not provide reliable information and thus should be stricken at this time. However, the Court was not persuaded by his testimony. Kilpatrick maintains that these factors can be calibrated in a model that he will construct once he obtains all of the data involved. While the defense argues that Kilpatrick is asking the Court to "trust him" when he has no specific modeling data, it must be kept in mind that the court has not certified this class at this time and will listen carefully at the hearing. As noted above, at this stage, the Court must be satisfied that the methodology is reliable to demonstrate that commonality is present with respect to damages. Mass appraisal is used throughout the country and used in hundreds of communities which must involve heterogeneity by each tax assessor. While it may or may not be as precise as appraisal, it uses a consistent methodology.

As stated in *Statistical Evidence of Real Estate Valuation: Establishing Value without Appraisers,* 21 S.Ill.U.L.J. 113 (Fall 1996):

> From the references cited herein, it is plain that the hedonic methodology qualifies under the majority of the court's suggested factors. As demonstrated, hedonic [4] pricing has often has often been tested and subjected to extensive peer review in the field of financial economics. Spatial models have received equal acceptance in economic geography. Error rates are not only discernible in statistical studies, the errors (in the form of observed variances from estimated values) are actually one of the principal objects of study. Thus, at least the first part of the *Daubert* test can be met, leaving only the question of relevance to a particular set of facts.

[4] The term "hedonic" is used to describe events in a model-such as flooding-which would be factored into a mass appraisal to demonstrate the economic effect thereof to the value of the property.

*Id.* at 146-47.

 **\*14** Defendants argued to the Court that this report is a pig in a poke; however, the Court has not bought the pig yet. It will listen to the expert testimony at the time of the class certification hearing to determine whether the Rule 23 factors are present. While Kilpatrick has not yet reached the empirical investigation stage, certainly, his report demonstrates that the mass appraisal technique is accepted and can demonstrate commonality for purposes of computation of damages.

The Court must reiterate that it is accepting this expert for purposes of demonstrating Rule 23 criteria; when and if this matter goes to trial on the merits, the report which by then should encompass all the empirical data necessary to create a model to demonstrate damages must be present. Kilpatrick avers that his model can:

> delineate what loss in value might be attributable to flood as opposed to other factors. And indeed, we have got some very powerful tools, such as survey research, which have proven to be consistently useful and acceptable not only for determining the total amount of market value lost to a given property but also to be able to delineate, on a statistically valid and reliable basis, how much loss is attributable to another component.

(Dep. of Kilpatrick at 172). Indeed, he maintains that his model will be able to separate out the valuation component of one damage versus another, such as wind versus rain. (Dep. of Kilpatrick at 232). Kilpatrick opined that on a property by-property basis, within the confines of a statistically valid database, the model will demonstrate what a property was worth before the storm and immediately after the storm. This model will differentiate by variables-the number of bathrooms or the number of floors, for example-as well as by exigencies of fate, like wind damage. (Dep. at 232-233). [5]

[5] This report will not include information for rental property or for loss of profits for businesses.

Case 4:17-cv-02960 Document 294-1 Filed 02/07/22 in TXSD Page 178 of 179

In re Katrina Canal Breaches Consol. Litigation, Not Reported in F.Supp.2d (2007)
2007 WL 3245438

In addition, clearly, in order for individual appraisals of all of the affected properties to occur, hundreds of individual appraiser would be employed. By definition, the subjective differences of each of reports would result in some inherent inconsistencies. Additionally, the time to accomplish this task would be greater, as well as the cost would be exponentially more. Accordingly,

**IT IS ORDERED** that "Defendants' Motion to Exclude the Report and Testimony of Plaintiffs' Putative Expert John A. Kilpatrick" (Doc. 7992) and "Sewerage and Water Board of New Orleans' Motion to Exclude the Report and Testimony of Plaintiffs' Putative Expert John A. Kilpatrick" (Doc. 8167) are **DENIED.**

**II. Plaintiffs' Motion in Limine to Exclude the Class Certification-Related Testimony of Michael W. Truax." (Doc. 8116)**

Plaintiffs have moved the Court to strike the proposed testimony of Mr. Michael Truax primarily on the basis that he has neither ever performed a mass appraisal nor is he sufficiently familiar with the factors necessary to construct a mass appraisal and/or hedonic model.

In the executive summary of his consulting report, he gave the following four items as the scope of his assignment and the following summary of his conclusions.

**\*15 Scope of the Assignment:** I. Appropriate analysis methodology and relevant property issues/ factors to be considered to provide accurate/reliable value and damage estimates for proposed class properties.

II. Efficacy and reliability of mass appraisal techniques for use in determining value and damage estimates for proposed class properties.

III. Reliability of local tax assessment data and values for use in determining value and damage estimates for proposed class properties.

IV. Adequacy of inadequacy of properties of the named plaintiffs as proposed class representative.

**Summary of Conclusions:** I. Individual/detailed property analysis and evaluation are necessary to produce accurate/credible value and damage estimates for properties in the proposed class.

II. The use of mass appraisal techniques to assess value and damage estimates for properties in the proposed class will not produce accurate/credible results.

III. Local tax assessment data and values cannot reliably be utilized to project value and damage estimates for properties in the proposed class.

IV. The properties of named plaintiffs are not broadly representative of those in the proposed class.

Expert/Consulting Report of Michael W. Truax (Exh. 1 at hearing).

Clearly, Mr. Truax is an extremely well-qualified appraiser and is extremely knowledgeable in the realm of the Greater New Orleans real estate market. Plaintiffs' primary focus is his lack of knowledge of mass appraisal techniques. Mr. Truax has opined, *inter alia,* that the efficacy of mass appraisal techniques for properties in the proposed class will not produce accurate and/or credible results. The primary basis for this opinion is his experience in comparing his individual appraisals to mass appraisals performed by the Jefferson Parish and/or Orleans Parish tax assessors. Mr. Truax acknowledged that he did not know specifically what model was being used by the various assessors, but he acknowledged that they were "rudimentary".

Although Mr. Truax has not had the benefit (nor has the Court) of seeing a full report by Dr. Kilpatrick and what statistical variables and modeling techniques he will utilize, Mr. Truax would still not be in a position to give expert testimony on the reliability or the validity of the Kilpatrick model. Therefore, the Court is reluctant to allow Mr. Truax to opine on the reliability of mass appraisal techniques where his only basis for the opinion is the comparison of his appraisals to the local tax assessors' appraisal when it is unclear how analogous or lacking in sophistication these models are to those of Dr. Kilpatrick's.

Therefore, the Court will allow Mr. Truax to testify as to his Conclusion I, III and IV as set forth above as they relate to the issue of commonality and typicality with respect to Rule 23; he is well-qualified to so opine. The defense has other experts that will testify as to the inappropriate use of mass appraisal techniques in the Greater New Orleans area. These experts may of course rely on the information and opinions contained in Mr. Truax's report in Sections I, III and IV. Accordingly,

Case 4:17-cv-02960 Document 294-1 Filed 02/07/22 in TXSD Page 179 of 179

In re Katrina Canal Breaches Consol. Litigation, Not Reported in F.Supp.2d (2007)

2007 WL 3245438

**\*16** **IT IS ORDERED** that Plaintiffs' Motion in Limine to Exclude the Class Certification-Related Testimony of Michael W. Truax is **GRANTED** with respect to Conclusion II and **DENIED** with respect to Conclusions I, III, and IV.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 3245438

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.